**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

HANSEN BEVERAGE COMPANY, d/b/a
MONSTER BEVERAGE COMPANY,   Case No. 6:11-CV-329-ORL-22DAB

    Plaintiff,

vs.

CONSOLIDATED DISTRIBUTORS, INC., METTEMP, INC., JOE COOL, INC., JOE COOL BIKE WEEK INC., DAVID BAKSHT, MICHELLE AMAR, AND YOSEF AMAR,

    Defendants.

_____ /

**DECLARATION OF DR. GERALD L. FORD IN SUPPORT OF PLAINTIFF HANSEN'S MOTION FOR RECONSIDERATION OF ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION**

**DECLARATION OF DR. GERALD L. FORD**

I, Gerald L. Ford, declare as follows:

INTRODUCTION

1. I am a partner in the marketing research and consulting firm of Ford Bubala & Associates, located in Huntington Beach, California, where I have been engaged in commercial marketing research and consulting for the past thirty-six years. I am also an emeritus faculty member of the School of Business Administration, California State University, Long Beach, where I held a full-time teaching position for twenty-five years, prior to my retirement in 1994. My professional experience is further summarized below in paragraphs 27 through 37.

2. In the instant matter, at the request of Knobbe, Martens, Olson & Bear, LLP, counsel for Hansen Beverage Company d/b/a Monster Beverage Company ("Monster"), I designed and caused to be conducted a survey to address the issue of secondary meaning or acquired distinctiveness with respect to the "M" claw mark for Monster Beverage Company's Monster energy drink. Specifically, the survey reported herein was designed to measure the level or degree, if any, to which the "M" claw mark is associated with energy drinks emanating from the named source "Monster" or a sole, yet anonymous, source.

3. The secondary meaning survey conducted in this matter employed a standard shopping center intercept methodology. Respondents in the survey were interviewed at shopping centers in metropolitan markets in eight (8) states, two (2) shopping centers located in each of the four (4) U.S. Census Regions.

4.  The secondary meaning survey conducted in this matter employed a scientific experimental survey design consisting of two survey cells: (1) a test or experimental survey cell designed to measure secondary meaning, if any, with respect to the "M" claw mark; and, (2) a control survey cell designed to measure the extent of mismeasurement error in the test cell survey results.

5.  In the test cell, survey respondents were asked about their association of "M" claw symbol for energy drinks, and, in the control cell, survey respondents were asked about their association of a control symbol for energy drinks.[1]

6.  The results of the secondary meaning or acquired distinctiveness survey evidence, on a net basis after adjusting the survey data for mismeasurement error based upon the control cell, that approximately sixty-five percent (64.81%) of the relevant universe associate the "M" claw with the named source, Monster, or a sole, yet anonymous, source. In my opinion this is a significantly high level of secondary meaning. I am also aware that courts have opined that survey evidence indicating that fifty percent (50%) or more of the relevant consuming public that associates a mark with a sole, yet anonymous source, is sufficient or more than sufficient to demonstrate secondary

---

[1] The control symbol was a stylized letter "O" with 5 claws emanating from the bottom of the "O."

meaning.[2] As Professor McCarthy notes "[g]enerally, figures over 50% are regarded as clearly sufficient."[3]

7. It is my opinion that the results of the survey conducted in this matter clearly support a finding of secondary meaning or acquired distinctiveness for Monster's "M" claw mark for energy drinks. The results of the survey evidence that a substantial segment of the relevant universe associate the "M" claw mark with the named source, Monster, or a sole, yet anonymous, source.

## SURVEY BACKGROUND

8. Attached hereto, as Exhibit A, are the results of a survey which addressed the issue of secondary meaning or acquired distinctiveness with respect to the "M" claw mark for energy drinks. Exhibit A provides a synopsis of the survey methodology, the survey screeners and questionnaires, response frequencies, and a listing of respondents' verbatim responses to the survey. The Appendix to Exhibit A contains a sequential listing of all of the survey responses and copies of the Supervisor and Interviewer Instructions, which provide additional

---

[2] Bay State Savings Bank v. Bay State Financial Services, LLC, 484 F Supp. 2d 205, 217 (D. Mass. 2007) ("Courts typically view survey evidence indicating that 50% or more of the consuming public associate a mark with the company's products as sufficient to demonstrate secondary meaning."); In re Jockey Int'l, Inc., 192 U.S.P.Q. 579, 581 (T.T.A.B. 1976) (survey showing 51.6% recognition found sufficient to establish acquired distinctiveness for trade dress); McNeil-PPC, Inc. v. Merisant Co., 2004 U.S. Dist. LEXIS 27733, *32 (D.P.R. 2004) ("...the survey shows a 'net' level of recognition of the Splenda trade dress of 58.5 percent. This percentage is more than sufficient to establish secondary meaning.").

[3] J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition, Vol. 6 §32:190 @ 32-411-412, Rel. #53, 3/2010.

details of the survey protocols, and other survey-related background materials.

      9.    The sample selection, questions, questionnaire design, and interviewing procedures employed in this survey were designed in accordance with the generally accepted standards and procedures in the field of surveys and were designed to meet the criteria for survey trustworthiness detailed in the Federal Judicial Center's Manual for Complex Litigation, Fourth.[4]

      10.    I was responsible for the design of the survey, the survey's questionnaires, and the instructions given to the survey's supervisors and interviewers, as well as for the procedures to be followed in conducting the interviews. Interviewing, data gathering, and response recordation were carried out, under the direction of Ford Bubala & Associates, by professional interviewers employed by independent professional interviewing organizations. Supervisors working on this survey were personally trained by Ford Bubala & Associates with respect to the design, procedures, and related protocols for the survey; and daily shipments of completed interviews from each professional interviewing service were reviewed by Ford Bubala & Associates to confirm that the questionnaires were being properly

---

[4] For the proffered poll or survey, "...Relevant factors include whether: the population was properly chosen and defined; the sample chosen was representative of that population; the data gathered were accurately reported; and the data were analyzed in accordance with accepted statistical principles... In addition, in assessing the validity of a survey, the judge should take into account the following factors: whether the questions asked were clear and not leading; whether the survey was conducted by qualified persons following proper interview procedures; and whether the process was conducted so as to ensure objectivity..." See Federal Judicial Center, Manual for Complex Litigation, Fourth, Section 11.493, @ 102-104 (2004).

executed. In addition, approximately sixty-seven percent (66.90%) of the survey interviews were validated, in person, by the survey supervisors personally meeting the survey respondents and confirming their qualification and participation in the survey. Ford Bubala & Associates conducted validations of approximately twenty-one percent (21.30%) of the interviews by recontacting, by telephone, survey respondents to confirm their qualification and participation in the survey. Net nonduplicated validations totaled approximately seventy-four percent (73.84%) of all survey interviews.[5] None of the interviews failed to validate.

11. The survey conducted in this matter was administered under a double-blind protocol. Specifically, not only were the respondents not informed of the purpose or sponsor of the survey, but similarly, both the survey's supervisors and interviewers were not informed of the purpose or sponsor of the survey.

SURVEY STRUCTURE

12. As noted above, the secondary meaning survey conducted in this matter employed a scientific experimental survey design consisting of two survey cells: (1) a test or experimental survey cell designed to measure secondary meaning, if any, with respect to the "M" claw mark for energy drinks; and, (2) a control survey cell designed to measure the extent of potential mismeasurement error in the test cell survey results.

---

[5] This level of validation exceeds industry standards of 10% to 15%.

13. In the test cell, survey respondents were asked about their association of the "M" claw symbol for energy drinks, and, in the control cell, survey respondents were asked about their association of a control symbol for energy drinks.

 

       Test Cell Symbol              Control Cell Symbol

14. The test and control cells were separate cells in the survey. In particular, although the questions and procedures for the test cell and the control cell were identical with the exception of the symbol respondents were asked about, any single respondent participated in an interview in only one of the two survey cells.

15. The control cell provides a measure of the extent of mismeasurement error that may exist in the test cell survey results that is not reflective of secondary meaning for the "M" claw mark, but rather is reflective of some other reason. Specifically, the control survey cell functions as a baseline and provides a measure of the degree to which respondents are likely to report that they associate the "M" claw mark with energy drinks from the named source Monster or from a single anonymous

source, not as a result of the secondary meaning or acquired distinctiveness of the "M" claw mark for energy drinks but rather because of other factors such as the survey questions, survey procedures, the market share or brand popularity or some other potential influence on the respondents' answers.

16. In a fashion similar to the protocols employed in a pharmaceutical drug test, the test or experimental cell represents the drug or pill with the "active" ingredient and the control cell represents the "placebo" that does not contain the active ingredient being tested.[6]

17. In total, four hundred thirty-two interviews were conducted in the survey: two hundred sixteen (216) in the test cell and two hundred sixteen (216) in the control cell.

18. As noted earlier, the secondary meaning survey in this matter employed a standard shopping center intercept methodology. Respondents in the survey were interviewed by interviewers employed by professional interviewing services at

---

[6] This methodology is consistent with the methodology discussed by Professor Diamond in the Federal Judicial Center's Reference Manual on Scientific Evidence, Second; "It is possible to adjust many survey designs so that causal inferences about the effect of a [stimulus]...become clear and unambiguous. By adding an appropriate control group, the survey expert can test directly the influence of the stimulus.... Respondents in both the experimental and control groups answer the same set of questions. The effect of the [stimulus]...is evaluated by comparing the responses made by the experimental group members with those of the control group members.... Both preexisting beliefs and other background noise should have produced similar response levels in the experimental and control groups. In addition, if respondents who viewed the [test cell stimulus]...respond differently than respondents who viewed the control [cell stimulus]..., the difference cannot be the result of a leading question, because both groups answered the same question..."
Shari Seidman Diamond "Reference Guide on Survey Research," in the Federal Judicial Center's Reference Manual on Scientific Evidence, Second, pages 257-258.

shopping centers in metropolitan markets in eight (8) states (i.e., Arizona, California, Illinois, Massachusetts, Minnesota, New York, South Carolina, and Texas), with two (2) shopping centers located in each of the four (4) U.S. Census Regions. Interviewing occurred between February 23 and March 10, 2011.

19. The relevant universe, for both the test cell and the control cell, was the same and was defined as males and females, eighteen (18) years of age or older, who reported that within the past three months they had purchased one or more energy drinks, or within the next three months they are likely to purchase one or more energy drinks.[7]

20. The respondent selection procedure employed in the survey is referred to as a quota sampling method. This method provided a respondent base that is generally representative of the age and gender distribution of purchasers of energy drinks eighteen (18) years of age or older. The distribution of these age and gender characteristics was based upon an Opinion Research Corporation survey conducted February 11 through February 13, 2011, and February 18 through February 21, 2011, among a nationally representative telephone sample of approximately two

---

[7] Additionally, the survey universe was also restricted as follows: (1) to respondents who did not, nor does anyone else in their homes, work for an advertising agency or marketing research firm; or a retail store or company that makes, sells, or distributes any energy drinks; (2) to respondents who, during the past three months, had not participated in any marketing research surveys other than a political poll, including online surveys; (3) to respondents who, during the past month, had not heard anything about the subject of any of the interviews being conducted at the mall; and (4) to respondents who, if the respondent wore contact lenses or eyeglasses when reading would be willing to wear them during the interview.

thousand (2,000) respondents eighteen (18) years of age or older across the continental United States.

### SURVEY PROCEDURES AND QUESTIONS

21. Initially, a potential survey respondent was stopped by an interviewer in the public area of a shopping mall and screened (i.e., asked questions) to determine if the potential respondent met the criteria to be included in the survey universe (i.e., during the past three months had purchased or within the next three months were likely to purchase one or more energy drinks, etc.). See Exhibit A, pages 6-7 and 33-34.

22. If a potential respondent fulfilled the screening criteria, also known as the survey universe definition, he/she was then invited to return with the interviewer to the professional interviewing service facility located within the shopping mall to complete the interview. See Exhibit A, pages 8-9 and 35-36. The interviewer then escorted the survey respondent into a private interviewing area. In the private interviewing area, the respondent was told:

> In a moment, I am going to show you a survey exhibit; then I will ask you a couple of questions.
>
> Please understand that we are only interested in your opinions; and if you don't have an opinion or don't know the answer to a question, that is an acceptable answer.

The respondent was then handed a card that had, in black and white, either the test cell symbol (i.e., the "M" claw mark) or the control cell symbol (i.e., the "O" claw symbol). Respondents were then told:

Please look at the symbol on this card.

Please take as much time as you like and let me know when you are ready to continue.

When a respondent indicated that he/she was ready to continue, the respondent was then asked:

6.0 Now, thinking about energy drinks...
Do you associate the symbol on this card with energy drinks from any particular company or companies?[8]

Respondents who reported that they associated the symbol with energy drinks from any particular company or companies of were asked:

6.1 What company or companies?

Respondents who reported an association in question 6.0 but could not identify the company or companies by name were asked:

6.2 Again, thinking about energy drinks...
Do you associate the symbol on this card with energy drinks from one company or more than one company?[9]

See Exhibit A, Appendix B and C, for additional details of the survey protocols.

---

[8] Respondents who said "no/don't know" to question 6.0 were not asked questions 6.1 or 6.2.

[9] To guard against any order bias, the first two alternatives in this list were rotated (i.e., approximately one-half of the respondents were read the list with the first alternative being "one company" and approximately one-half of the respondents were read the list with the first alternative being "more than one company").

## SURVEY RESULTS

### Test Cell Survey Results

23. In the test cell, approximately seventy-eight percent (78.24%) of the survey respondents reported that they associated the "M" claw mark with an energy drink emanating from the named source Monster (73.61%) or a sole, yet anonymous, source (4.63%). See Exhibit A, Table 1, page 10.

TABLE 1[10]
TEST CELL
MONSTER ENERGY "M" CLAW

Q6.0 Do you associate the symbol on this card with energy drinks from any particular company or companies?
Q6.1 What company or companies?
Q6.2 Do you associate the symbol on this card with energy drinks from one company or more than one company?

| Response Categories | Response Distribution Number | Percent (n=216) |
|---|---|---|
| Association - Monster Energy/One company | | |
| 1. Monster Energy | 159 | 73.61 |
| 2. Don't know name - One company | 10 | 4.63 |
| Subtotal | 169 | 78.24 |
| Association - Other | | |
| 3. Monster Energy plus other | 3 | 1.39 |
| 4. Other | 7 | 3.24 |
| 5. Don't know name - More than one company | 2 | 0.93 |
| 6. Don't know name - Don't know/no opinion | 4 | 1.85 |
| No Association | | |
| 7. No association | 31 | 14.35 |
| Total | 216 | 100.00 |

---

[10] Table numbers in this declaration correspond to the table numbers in Exhibit A and therefore may not be sequential.

Control Cell Survey Results

24. In the control cell, approximately thirteen percent (13.43%) of the survey respondents reported that they associated the control symbol with an energy drink emanating from the named source Monster (10.65%) or a sole, yet anonymouse, source (2.78%). See Exhibit A, Table 5, page 37.

TABLE 5
CONTROL CELL

Q6.0 Do you associate the symbol on this card with energy drinks from any particular company or companies?
Q6.1 What company or companies?
Q6.2 Do you associate the symbol on this card with energy drinks from one company or more than one company?

| Response Categories | Number | Percent (n=216) |
|---|---|---|
| Association - Monster Energy/One company | | |
| 1. Monster Energy | 23 | 10.65 |
| 2. Don't know name - One company | 6 | 2.78 |
| Subtotal | 29 | 13.43 |
| Association - Other | | |
| 3. Monster Energy plus other | 1 | 0.46 |
| 4. Other | 6 | 2.78 |
| 5. Don't know name - More than one company | 1 | 0.46 |
| 6. Don't know name - Don't know/no opinion | 4 | 1.85 |
| No Association | | |
| 7. No association | 175 | 81.02 |
| Total | 216 | 100.00 |

SUMMARY OF SURVEY RESULTS

25. The results of the secondary meaning or acquired distinctiveness survey evidence, on a net basis after adjusting the survey data for mismeasurement error based upon the control

cell, that approximately sixty-five percent (64.81%)[11] of the relevant universe associates the "M" claw mark with energy drinks emanating from Monster or a sole, yet anonymous, source. See Exhibit A, Table 9, page 50. In my opinion this is a significantly high level of secondary meaning. I am also aware that courts have opined that survey evidence indicating that fifty percent (50%) or more of the relevant consuming public that associates a mark with a sole, yet anonymous source, is sufficient or more than sufficient to demonstrate secondary meaning.[12] As Professor McCarthy notes "[g]enerally, figures over 50% are regarded as clearly sufficient."[13]

TABLE 9
TEST CELL AND CONTROL CELL
Composite Response Analysis

| Response Categories | Response Distribution | |
| --- | --- | --- |
| | Test Cell Percent (n=216) | Control Cell Percent (n=216) |
| 1. Monster Energy | 73.61 | 10.65 |
| 2. Don't know name – one company | 4.63 | 2.78 |
| Total | 78.24 | 13.43 |

---

[11] The adjustment for mismeasurement error in the survey results is accomplished by reducing the percentage of Monster and one company responses in the test cell by the percentage of Monster and one company responses in the control cell. In this case, 78.24% of the survey respondents in the test cell reported that they associated the "M" claw symbol with Monster or energy drinks from one company; and, 13.43% of the survey respondents in the control cell reported that they associated the control symbol with Monster or energy drinks from one company. Thus, the net secondary meaning would be calculated as 78.24% - 13.43% = 64.81%.

[12] Supra note 2.

[13] Supra note 3.

CONCLUSION

26.  It is my considered opinion, based upon my education, background, and professional experience, and my review and analysis of the survey conducted with respect to the issue of secondary meaning or acquired distinctiveness, that the results of the survey conducted in this matter clearly support a finding of secondary meaning or acquired distinctiveness for Monster's "M" claw mark for energy drinks.  The results of the survey evidence that a substantial segment of the relevant universe associate the "M" claw mark with the named source, Monster, or a sole, yet anonymous, source.

QUALIFICATIONS

27.  I hold a Bachelor's Degree in Advertising (B.A.) from San Jose State University, a Master's Degree in Business Administration (M.B.A.) from the University of Southern California, and a Doctoral Degree in Business Administration (D.B.A.) from the University of Southern California.

28.  During my twenty-five year academic appointment, my teaching responsibilities included both graduate and undergraduate level courses in a variety of subject areas.  My teaching responsibilities included courses in marketing (e.g., marketing, marketing management, advertising, promotion, consumer behavior, and marketing research) and management (e.g., principles of management; business policy and strategy; business policies, operations, and organizations; and integrated analysis).

29.  I am a member of the American Marketing Association (AMA), the American Academy of Advertising (AAA), the

American Association of Public Opinion Research (AAPOR), the Council of American Survey Research Organizations (CASRO), and the International Trademark Association (INTA).

30. As a partner with Ford Bubala & Associates, I have been retained by a variety of firms engaged in the consumer product, industrial product, and service sectors of the economy to provide marketing consulting and research services. Approximately one-half of Ford Bubala & Associates' consultancies in which I have participated have involved the design and execution of marketing research surveys.

31. During the past thirty-six years, I have been retained in a number of litigation-related consultancies involving intellectual property matters, including matters before federal and state courts, the Trademark Trial and Appeal Board of the U.S. Patent and Trademark Office, and the International Trade Commission. I have designed and executed surveys relating to intellectual property matters, including false advertising, trademark, patent, and other related matters. I am familiar with the accepted principles of survey research, as well as the tests for trustworthiness of properly conducted surveys or polls.[14]

32. During the past thirty-one years, I have addressed a variety of groups on the subject of surveys or polls and their use in the measurement of the state of mind of consumers, with respect to Lanham Act matters. For example, I have spoken at meetings of the American Bar Association, the American Intellectual Property Law Association, the Intellectual Property Owner's Association, the American Marketing Association, the

---

[14] Supra note 4.

International Trademark Association, the Marketing Research Association, the Intellectual Property Law Institute of Canada, and the Practising Law Institute.

33. I have also written on the subject of the design and execution of litigation-related surveys in Lanham Act matters. Attached hereto as Exhibit B is a list of papers I have written in the past ten (10) years.

34. Since 1998 I have served as a member of the Editorial Board of <u>The Trademark Reporter</u>, the scholarly legal journal on the subject of trademarks, published by the International Trademark Association.

35. I have been qualified and accepted as an expert in marketing and marketing research in more than fifty (50) trials before federal and state courts and administrative government agencies, including the Trademark Trial and Appeal Board.

36. Attached hereto as Exhibit C is a list of cases in which I have provided trial and/or deposition testimony since 1992.

37. Attached hereto as Exhibit D is a copy of my professional history, describing my qualifications and professional background.

<u>MATERIALS CONSIDERED</u>

38. Complaint; KO Beverages LLC's Answer and Affirmative Defenses to Hansen Beverage Company's Complaint; and infogroup/ORC omnibus survey.

<u>COMPENSATION</u>

39. Ford Bubala & Associates' fees for this engagement consist of billable time and expenses. Standard time is billed

at the rate of $500.00 per hour for the services of a Partner and $250.00 per hour for the services of a Research Associate. Deposition and trial time are billed at the rate of $600.00 per hour plus expenses.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 17th day of March, 2011, in Huntington Beach, California.

                                              _____
                                              Dr. Gerald L. Ford