# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**HANSEN BEVERAGE COMPANY, d/b/a**
**MONSTER BEVERAGE COMPANY,**

        **Plaintiff,**

**-vs-**                                              **Case No. 6:11-cv-329-Orl-22DAB**

**CONSOLIDATED DISTRIBUTORS, INC.,**
**METTEMP, INC., JOE COOL, INC., JOE**
**COOL BIKE WEEK INC., DAVID**
**BAKSHT, MICHELLE AMAR, AND**
**YOSEF AMAR,**

        **Defendants.**
_____

## ORDER

This cause comes before the Court for consideration of Plaintiff Hansen Beverage Company's Motion for Reconsideration of the Denial of Preliminary Injunction (Doc. No. 41), filed on March 31, 2011.  Plaintiff has also filed a supplemental declaration in support of the motion.  (Doc. No. 49.)  Plaintiff contends that Defendants' response in opposition to Plaintiff's motion for preliminary injunction (Doc. No. 32) "set forth a clearly erroneous legal standard governing the issuance of a seizure order and preliminary injunction."  (Doc. No. 41 p. 3.)  Plaintiff asserts that its motion for seizure and preliminary injunction was based not only on counterfeiting but also on trademark infringement.  Plaintiff contends that seizure is warranted even when infringement does not rise to the level of counterfeiting and thus Plaintiff did not have to prove that the marks were identical.  Plaintiff also disputes Defendants' claim of senior use.

1

However, as the Court explained in its previous order, the hearing made it clear that the temporary restraining order and order of ex parte seizure should never have been entered; for the reasons set forth below, the motion for reconsideration will be denied.[1]

Even in the short course of this litigation a pattern has emerged. Plaintiff files documents with the Court, which the Court expects to represent the situation accurately. Upon closer examination, however, the Court realizes that the most revealing or important aspect of Plaintiff's documents was ignored or misrepresented by Plaintiff. This pattern especially disturbs the Court considering the nature of Plaintiff's requested relief: first, an order of ex parte seizure and a temporary restraining order, now a preliminary injunction. These are extraordinary remedies; none are warranted in this case.

An ex parte seizure order is an extraordinary remedy because the potential for a defendant's business to be severely interrupted or even completely shut-down is very high. Courts reserve such orders for very limited circumstances. What courts fear when issuing ex parte orders came to pass in this case – that to award such a remedy without notice to the other side has the potential to cause injustice. Here, once Defendants were given notice of Plaintiff's complaint and permitted to present their side of the story, it became clear that this was not one of those limited circumstances and that an ex parte seizure order should not have been entered. In the Court's view, Plaintiff now attempts to paint a different picture in its motion for reconsideration than what Plaintiff initially requested. Plaintiff also overlooks what actually took place as a result of its request. The Court, however, is well aware that based on Plaintiff's representations to this Court, the Court issued an order authorizing federal marshals to essentially raid Defendants' office and warehouse in Daytona Beach, which occurred on March 7, 2011.

---

[1] The Court enters this Order without requiring Plaintiff to comply with Local Rule 3.01(g), though motions for reconsideration are not exempt from this requirement.

The order permitted the federal marshals not only to search, seize, and impound the merchandise that Plaintiff had represented was counterfeit; it also authorized them to seize and impound Defendants' pertinent business records.  Based on what was later revealed, the Court realized that Plaintiff, through its misrepresentations, effectively abused this legal process.

The Court entered the ex parte seizure order and temporary restraining order based partly on the erroneous impression of the nature of Defendants' business establishment in Daytona Beach.  The purpose of ex parte seizure orders is to "thwart the bad faith efforts of fly by night defendants to evade the jurisdiction of the court."  McCarthy on Trademarks and Unfair Competition, § 30:37 (4th ed. 2011) (citing Senate-House Joint Explanatory Statement on Trademark Counterfeiting Legislation, 130 Cong. Rec. H12076, at 12081 (Oct. 10, 1984)).  "[T]he express Congressional purpose for the availability of these extraordinary remedies in trademark cases is to prevent disreputable defendants from being able to either flee with, or destroy, the goods in question or pertinent business records and thereby avoid prosecution." *Int'l Beauty Exch., Inc. v. Tony Dollar Kingdom, Inc.*, 199 F.R.D. 700, 702 (S.D. Fla. 2001) (citing 130 Cong. Rec. H12080 (daily ed. Oct. 10, 1984)).  The Court was under the impression that Defendants were these types of "disreputable defendants," likely to pass on their goods to a third party or otherwise destroy or hide the goods.  This was based on Defendants' alleged "lack of integrity," and the statement that Defendants or "persons acting in concert" with them would "destroy, move, hide, or otherwise make the infringing products inaccessible to the court" if given notice.  (*See* Doc. No. 3 p. 25.)  The Court realized at the hearing and from Defendants' response in opposition that this was not true.  Defendants are not the typical "fly by night" counterfeiters.  Although the initial motion emphasized Defendants' online and event-based sales and stated that Defendants planned "to set up a tent outside of their offices and warehouse within

3

the Daytona Beach city limits to offer and sell their counterfeit products" (Doc. No. 3. p. 13), the Court realized that this was not the whole picture; Defendants' presence in Daytona is more substantial.   In the hearing, Defendants represented themselves as a family business that has operated a retail store in Daytona Beach for seventeen years.   The revelation of the permanent and established nature of Defendants' business in the area was one reason the Court determined that the temporary restraining order and order of seizure should never have been entered.

The hearing also revealed, as the Court explained in its order denying Plaintiff's motion for preliminary injunction, that Plaintiff misrepresented Defendants as counterfeiters and their goods as counterfeit.   Plaintiff is now essentially trying to divert the Court's attention from the fact that Plaintiff convinced the Court that an ex parte seizure of Defendants' goods was necessary based on its characterization of Defendants as "flagrant counterfeiters" and their goods as bearing a "slavish replica" of Plaintiff's federally-registered trademark.   (*See* Doc. No. 3 pp. 12-13.)   What Plaintiff's motion for reconsideration reveals to the Court is that it must now expressly state what should have been obvious from its previous order: Plaintiff is not entitled to further equitable relief after having misrepresented its case.

Plaintiff's instant motion only compounds the misleading nature of its initial motion because Plaintiff attempts to change positions, ignoring the language it previously set forth relating to the identical nature of its goods and the "counterfeit goods."   In its initial motion, Plaintiff repeatedly and strongly characterized the Defendants as counterfeiters and the Defendants' goods as both counterfeit and identical to Plaintiff's.   For example, the table of contents in Plaintiff's initial motion contained the following headings: "Defendants' Counterfeit M Claw Products Will Cause Customer Confusion . . . ," "An Ex Parte Seizure Order is Warranted to Prevent Further Counterfeiting and Concealment," "[Plaintiff] is Likely to Succeed

in Showing that Defendants Used a Counterfeit Mark," and "The Parties' Marks Are Not Just Similar, But Identical."   (Doc. No. 3 p. 2.)   In its complaint and initial motion, Plaintiff repeatedly refers to the t-shirts as the "Counterfeit Products."   (*See, e.g.*, Doc. No. 2 p. 11.) Plaintiff also represented to the Court that "in advance of the Daytona Beach Bike Week 2011, which will be held March 4-13, 2011, Defendants have begun selling t-shirts bearing counterfeit copies of [Plaintiff's] M Claw Trademark."  (Doc. No. 3 p. 5.)  Plaintiff then inserted a picture as a "sample of Defendants' counterfeit products."  (*Id.*)  Plaintiff asserted that such t-shirts bore "slavish copies" of Plaintiff's "M Claw Trademark."  (*Id.* at 5-6.)  Further, Plaintiff contended that if Defendants were not immediately enjoined, their "flagrant counterfeiting" of Plaintiff's trademark would cause Plaintiff irreparable harm.  (*Id.* at 6.)  In support of its need for an ex parte seizure order, Plaintiff asserted a "patent identity of trademarks."  (*Id.* at 17-18.)  Plaintiff also stated, "The M Claw is a famous mark, and the Defendants' mark is identical to it."  (*Id.* at 20.)  When granting the order of seizure, the Court also relied on Plaintiff's accusation that "Defendants have engaged in flagrant counterfeiting of [Plaintiff's] trademarks . . . ."  (*Id.* at 25.) In Plaintiff's request for preliminary relief, it asserted that it would be "irreparably injured if Defendants are not enjoined from selling Counterfeit Products" and that "the public interest would not be harmed in any way from issuance of an injunction against the Defendants' flagrant infringement and illegal counterfeiting activities."  (*Id.* at 27.)  However, as the Court explained in its prior order, the Defendants' goods do not appear to qualify as counterfeits.

Despite Plaintiff's repeated assertions that the goods were counterfeit, Plaintiff now maintains that it did not mislead the Court because ex parte seizure orders may be issued even where trademark infringement does not rise to the level of counterfeiting.  (*See* Doc. No. 41 p. 5) (citing *Dell Inc. v. BelgiumDomains, LLC*, No. Civ. 07-22674, 2007 WL 6862341, at *5-6 (S.D.

Fla. Nov. 21, 2007)).  Plaintiff never mentioned this theory in its initial motion.  Thus, it is disingenuous to suggest that Plaintiff's initial motion presented this as an alternative ground for relief.  (*See id.* at 3) ("Although the record supports issuance of the seizure order for the reasons set forth below, Hansen is not seeking reconsideration of the portion of the order directing that it return all seized items.").  By stating that it does not dispute returning the seized goods, it appears to the Court that Plaintiff attempts to direct the Court's attention away from the main thrust of Plaintiff's assertions in the initial motion and hearing that the goods were counterfeit and should be seized pursuant to 15 U.S.C. § 1116(d).

In support of Plaintiff's new line of reasoning regarding the ex parte seizure, Plaintiff relies on *Pepe (U.K.) Ltd. v. Ocean View Factory Outlet Corp.*, 770 F. Supp. 754 (D.P.R. 1991), and cases *Pepe* cites and that cite *Pepe*, to assert that seizure was warranted and imply that its initial motion was not misleading.  The court in *Pepe* found that goods which were – for the most part – exact duplications of genuine goods that included a registered trademark were subject to ex parte seizure pursuant to § 1116(d).  *Id.* at 759.  Although the defendants' shirts were not identical to the registered trademark, the *Pepe* court found that seizure was appropriate because the shirts bore "exact reproductions of plaintiffs' mark as actually used in the marketplace" and because most of the t-shirts "exactly duplicated the entire pattern on the original Pepe T-shirts." *Id.* at 758-59.  In support of this holding, the court quoted Congress's joint report on trademark counterfeiting legislation, which stated that "obviously, a mark need not be absolutely identical to a genuine mark in order to be considered 'counterfeit.' " *Id.*  However, the court continued the quote, adding emphasis: "the sponsors do not intend to treat as counterfeiting what would formerly have been *arguable, but not clear cut*, cases of trademark infringement." *Id.* at 758. The *Pepe* court considered the defendants' goods as more than arguable trademark infringement

because the goods were a "duplication of the genuine goods including the mark PEPE." *Id.* at 759. The instant case is not so clear cut. Defendants' t-shirts were not even close to exactly duplicating – or even closely duplicating – the entire pattern of any of Plaintiff's t-shirts. *See id.* Defendants' t-shirts also did not bear exact reproductions of the mark as it is registered or as it is used in the marketplace. *See id.* at 758.

Further, Plaintiff cites a case – also cited by Congress's joint report and *Pepe* – where the court determined that goods displaying a trademark as it was used on genuine articles qualified as counterfeits though the mark on the counterfeit goods was slightly different than the mark as represented in the drawing that was part of the registered trademark. (Doc. No. 41 p. 14) (citing *Montres Rolex, S.A. v. Snyder*, 718 F.2d 524, 530-32 (2d Cir. 1983)). The Second Circuit reasoned that because it is hard to transfer an image to 3D exactly as it is represented in 2D, the Rolex crown was considered a counterfeit mark on the fake bracelets because it exactly copied the crown as it actually appeared on the genuine bracelets. *Rolex*, 718 F.2d at 532. In any event, the statute under which the *Rolex* court evaluated the counterfeit claim was not at issue here. The *Rolex* court was evaluating the goods pursuant to 19 U.S.C. § 1526(e), a section of the Tariff Act, which incorporates the definition of "counterfeit" from 15 U.S.C. § 1127 but does not address the scope of the term "counterfeit" under sections 1114 or 1116. Thus, it does not contain the requirement that the owner of the registered mark must produce the same goods, though the court seemed to put weight on its finding that the bracelets themselves were also identical. *Rolex*, 718 F.2d at 533 ("We examined the actual bracelets at oral argument and found the [defendant's] samples to be the spitting image of the Rolex merchandise. An average purchaser would surely find the real and fake bracelets to be substantially indistinguishable.").

To reiterate, Plaintiff did not make this line of argument in its initial motion.  Moreover, Plaintiff's recently-filed "notice" gives the Court additional cause for concern regarding the extent to which it can rely on Plaintiff's representations.   The United States Patent and Trademark Office's ("PTO") official letter – attached to Plaintiff's notice – contains a material fact that should have been revealed to the Court upon Plaintiff's initial motion for temporary restraining order and order of ex parte seizure.  This material fact is a pending application for a trademark registration by Plaintiff – the "M" without the words "Monster Energy."  (*See* Doc. No. 49-2 pp. 9-10.)  This mark is to be applied to clothing.  (*See id.*)  The application was filed July 28, 2010.  (*Id.*)  The Court almost certainly would not have issued an ex parte order of seizure if Plaintiff had informed the Court that it had a trademark registration pending for the "M" mark alone to be applied to clothing; such information would have also put the Court on notice regarding the existence of an issue as to whether Defendants were actually using a mark identical to one of Plaintiff's registered marks in connection with the same goods and services as those for which the mark was registered.   Though the PTO stated in its official letter that Defendants' applied-for mark was "nearly identical" to Plaintiff's registered mark (Doc. No. 49-2 p. 3), this statement does not undo what the Court considers Plaintiff's misrepresentation regarding whether Defendants were selling "counterfeit products."  Plaintiff did not have the benefit of such language when it filed the motion for an ex parte seizure order.  Moreover, the standard for what is considered "counterfeit" is higher than for "likelihood of confusion."  To establish counterfeit, plaintiffs have to show more than just a likelihood of confusion; to be "identical" or "substantially indistinguishable from," there must be a "closer degree of similarity" than what is required for traditional trademark infringement.   McCarthy on Trademarks and Unfair Competition, §25:10 (4th ed. 2011).  Though the PTO's statement might

be helpful for Plaintiff as it prepares its case for trial, Plaintiff cannot undo what it has already asserted regarding the temporary restraining order and order of ex parte seizure.

In conclusion, the Court declines to grant preliminary relief on the basis of the fundamental principle that one who seeks equity must do equity and that whoever comes into equity must come with clean hands. The Court reiterates that Plaintiff's initial motion for temporary relief contained misleading statements upon which the Court relied to enter an order of ex parte seizure. Now, Plaintiff attempts to reframe its initial assertions. Moreover, it appears to the Court that Plaintiff was withholding material information. Plaintiff's actions and assertions negate any argument Plaintiff has presented for such an extraordinary remedy as a preliminary injunction. In any event, the Court is not denying Plaintiff all relief; rather, the Court is simply denying Plaintiff injunctive relief at this stage, and Plaintiff's claims remain to be resolved at trial. Defendants are again cautioned that any further use of the previously enjoined trademark may increase their liability for any future damages should they be held liable for trademark infringement as a result of trial or further order.

Based on the foregoing, it is ORDERED as follows:

Plaintiff Hansen Beverage Company's Motion for Reconsideration (Doc. No. 41), filed on March 31, 2011, is DENIED.

DONE and ORDERED in Chambers in Orlando, Florida, on April 12 , 2011.

ANNE C. CONWAY
United States District Judge

Copies furnished to:
Counsel of Record