1

```
 1              UNITED STATES DISTRICT COURT
                 MIDDLE DISTRICT OF FLORIDA
 2                  ORLANDO DIVISION

 3
    MONSTER ENERGY COMPANY, f/k/a
 4  HANSEN BEVERAGE COMPANY, d/b/a
    MONSTER BEVERAGE COMPANY
 5  ("MBC"),

 6               Plaintiff,

 7
    vs                        Case No. 6:11-CV-329-ORL-22DAB
 8

 9
    CONSOLIDATED DISTRIBUTORS, INC.,
10  METTEMP, INC., JOE COOL, INC., JOE
    COOL BIKE WEEK INC., DAVID BAKSHT
11  MICHELLE AMAR, AND YOSEF AMAR,

12               Defendants.

13  _____/

14

15       VIDEOTAPED DEPOSITION OF RODNEY SACKS

16          Taken on Behalf of the Defendant

17

18

19   DATE TAKEN:      September 20, 2012

20   TIME:            10:03 a.m. - 2:15 p.m.

21   PLACE:           Sclafani Williams Court Reporters
                      20  North Orange Avenue, Suite 1108
22                    Orlando, FL 32801

23

24           Stenographically Reported by:
                      Julie A. Watkins
25                    Court Reporter
```

Monster Energy Company, fka Hansen Bever v.
Consolidated Distributors, Inc

Rodney   Sacks
September 20, 2012

---

Page 2

```
1   APPEARANCES:

2   Counsel for the Plaintiff:

3       JOHN B. SGANGA, ESQUIRE
        Knobbe Martens
4       2040 Main Street, 14th Floor
        Irvine, CA 92614
5
6   Counsel for the Defendant:

7       MOSHE MORTNER, ESQUIRE
        Mortner Law Offices
8       40 Wall Street, 28th Floor
        New York, NY 10005
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

---

Page 4

```
1   DEFENDANT'S EXHIBIT 8 ............................ 85
        (T-shirt Pictures)
2
3   DEFENDANT'S EXHIBIT 9 ............................ 90
        (Form 10-K)
4
5   DEFENDANT'S EXHIBIT 10 ........................... 103
        (Counterfeit ID Guide)
6
7   DEFENDANT'S EXHIBIT 11 ........................... 104
        (Southprint Complaint)
8
9   DEFENDANT'S EXHIBIT 12 ........................... 109
        (O'Neal Complaint)
10
11  DEFENDANT'S EXHIBIT 13 ........................... 113
        (J.M.J.E. Complaint)
12
13  DEFENDANT'S EXHIBIT 14 ........................... 116
        (Factory Effex Complaint)
14
15  DEFENDANT'S EXHIBIT 15 ........................... 119
        (One Industries Complaint)
16
17  DEFENDANT'S EXHIBIT 16 ........................... 121
        (Declaration Unsigned)
18
```
```
19

20

21

22

23

24

25
```

---

Page 3

```
1                    INDEX

2                                           PAGE

3   RODNEY SACKS

4   Called on behalf of the Defendant
```
```
5   DIRECT EXAMINATION BY MR. MORTNER ................. 6

6   STIPULATIONS ..................................... 129

7   CERTIFICATE OF REPORTER OATH ..................... 130

8   REPORTER'S DEPOSITION CERTIFICATE ................ 131
```
```
9

10

11                   EXHIBITS

12
```
```
13  DEFENDANT'S EXHIBIT 1 ............................ 23
        (Copy of Trademark/Icon)
14
15  DEFENDANT'S EXHIBIT 2 ............................ 28
        (Trademark Certificate)
16
17  DEFENDANT'S EXHIBIT 3 ............................ 30
        (Registration Statement)
18
19  DEFENDANT'S EXHIBIT 4 ............................ 49
        (Spreadsheet)
20
21  DEFENDANT'S EXHIBIT 5 ............................ 49
        (Hansen Report)
22
23  DEFENDANT'S EXHIBIT 6 ............................ 70
        (Maconachy Declaration)
24
25  DEFENDANT'S EXHIBIT 7 ............................ 76
```

---

Page 5

1   MR. HOLLINGSWORTH: Today's date is
2   September the 20th, 2012.  The time is
3   approximately 10:03 a.m.  My name is Jamie
4   Hollingsworth, I'm the videographer.  The court
5   reporter is Julie Watkins.  We are present at the
6   offices of Sclafani Williams in Orlando, Florida.
7   We're here for the purposes of taking the
8   deposition of Rodney Sacks.  The case is
9   instituted in the United States District Court,
10  Middle District of Florida, Orlando Division.
11  The short style of the case is Monster Energy
12  Company versus Consolidated Distributors, Inc.,
13  et al.
14      I'll now ask the attorneys to introduce
15  themselves, beginning with the plaintiff's
16  attorney.
17      MR. SGANGA: This is John Sganga of Knobbe
18  Martens representing the plaintiff, Monster
19  Energy Company, and Mr. Sacks.
20      MR. MORTNER: Moshe Mortner, representing
21  the defendants Consolidated Distributors,
22  Incorporated, and David Baksht.  And with me is
23  Menachem Schneorson, an officer of Consolidated
24  Distributors, Incorporated.
25      MR. HOLLINGSWORTH: Would the court reporter

---

Case 6:11-cv-00329-ACC-DAB    Document 171    Filed 09/30/12    Page 3 of 46 PageID 3759
Monster Energy Company, fka Hansen Bever v.                                    Rodney   Sacks
Consolidated Distributors, Inc                                          September 20, 2012

Page 6

1  kindly swear in the witness?
2  THEREUPON
3    RODNEY SACKS, acknowledged having been duly
4  sworn to tell the truth and testified upon his oath as
5  follows:
6    THE WITNESS: I do.
7    DIRECT EXAMINATION
8    BY MR. MORTNER:
9  Q  Mr. Sacks, I'm Moshe Mortner, I'm an
10  attorney representing the defendant. This is a
11  deposition in which I will ask you questions, and you
12  must answer them truthfully, unless your attorney
13  tells you clearly and directory not to answer.
14  Although no judge is present, this is a formal, legal
15  proceeding, just like testifying in court, and you're
16  under the same legal obligations to tell the whole
17  truth, the truth and nothing but the truth. If you do
18  not understand any questions of mine, feel free to say
19  so, and I will rephrase it.
20    Do you understand, sir?
21  A  Yes.
22    MR. SGANGNA: And before we begin, I just
23  want to put you on notice, Mr. Mortner, and the
24  defendants, that we have provided to you in
25  discovery a substantial amount of confidential

Page 7

1  information in the form of documents. And to the
2  extent that the deposition testimony today also
3  encompasses confidential information of the
4  plaintiff, Monster Energy Company, and third
5  parties with which it contracts, we want you to
6  be aware that because the plaintiff is a
7  publically traded company, there are federal and
8  state laws restricting the use and dissemination
9  of that information for purposes that are
10  restricted by those laws. And we want you to be
11  on notice of that. And we want the record to be
12  clear that in no way does Monster Energy waive
13  any of its rights in that regard.
14    MR. MORTNER: All right. I'm not sure that
15  I'm understanding everything, the import of your
16  statement.
17    MR. SGANGNA: You take the information that
18  you learn here in this case and you use it for
19  purposes outside the lawsuit, disclose it to
20  other parties in ways that are restricted by the
21  securities laws, you're at risk. And we want to
22  be very clear that you should be aware of that,
23  and that we in no way are authorizing you to
24  disseminate this information beyond what is
25  absolutely necessary for these court proceedings.

Page 8

1    MR. MORTNER: So you mentioned that there
2  were some documents produced. We had made a
3  document request, and there was a production
4  August 9th. And plaintiff withheld substantial
5  number of documents on the basis of a claim of
6  privilege, and the court entered an order denying
7  plaintiff's motion for a protective order.
8    And I -- that was on September 4th. I
9  requested that the documents be produced not
10  later than September 12, as it was 10 boxes were
11  delivered on Sunday. We had to deliver them to
12  my home.
13    And, of course, Monday and Tuesday of this
14  week was Rosh Hashanah. Yesterday we were
15  traveling. So unfortunately we have not had
16  adequate time to review those documents in
17  preparation for this deposition. Consequently, I
18  am stating that after we've had the opportunity
19  to review those documents, if we determine that
20  additional testimony is needed from this witness
21  in regards to those documents, we are reserving
22  the right to call this witness again, and we
23  would seek the court's intervention in that
24  regard. We'll have to see what, what turns up in
25  those documents.

Page 9

1    MR. SGANGA: Well, we'll object. You could
2  have gotten the documents earlier, had you agreed
3  to a confidentiality restriction, and you chose
4  not to. And you chose to make us fight that with
5  the court. So be that as it may, we reserve our
6  position on that as well.
7    MR. MORTNER: Your objection is noted.
8  Q  Okay. Mr. Sacks, your name, please?
9  A  Rodney Sacks.
10  Q  Would you state your address, please?
11  A  383 Palm Crest Drive, Laguna Beach,
12  California .
13  Q  And your age, sir?
14  A  62.
15  Q  Would you state the date and your place of
16  birth for the record?
17  A  December 24, 1949, Johannesburg, South
18  Africa.
19  Q  And what year did you come to this country?
20  A  1989.
21  Q  Was that -- that's when you moved here as a
22  resident?
23  A  Yes.
24  Q  And you have been a continuous resident of
25  this country since then?

**Monster Energy Company, fka Hansen Bever v.**
**Consolidated Distributors, Inc**

Rodney    Sacks
September 20, 2012

Page 10

1  A   Yes, I have.
2  Q   And have you lived in California that whole
3  time?
4  A   Yes, I have.
5  Q   Mr. Sacks, are you in good health?
6  A   Yes.
7  Q   Do you have any issues with drugs or alcohol
8  that would affect your testimony today?
9  A   No.
10  Q   Do you have any disabilities?  Is your
11  eyesight well?  And your hearing well?
12  A   Yes.
13  Q   And yes, you have no disabilities?
14  A   No.
15  Q   Thank you.
16      And have you ever been diagnosed with any
17  mental illness?
18  A   No.
19  Q   Have you been -- are you under the care of a
20  doctor or a therapist at this time?
21  A   No.
22  Q   Okay.  Have you ever been convicted of a
23  felony?
24  A   No.
25  Q   Okay.  What is your current job, sir?

Page 11

1  A   I'm the chairman and chief executive officer
2  of Monster Energy Company.
3  Q   And prior to that job, what -- can you tell
4  me the jobs you've held?  What was the job you held
5  prior to coming to this country in 1989?
6  A   I was a lawyer.  I was a partner at a law
7  firm calls Werksmans, a large corporate law firm in
8  South Africa.
9  Q   What area of law did you practice there?
10  A   Litigation, international tax and some
11  transactional work.
12  Q   What was the last word?
13  A   Transactional work.
14  Q   Did you have any involvement in trademark
15  work?
16  A   Very little.  Occasionally, but very little.
17  Q   And since coming to the United States
18  starting in 1989, what jobs have you held -- if you'd
19  like, you can just give us a chronology.
20  A   I was, I was employed as a vice president at
21  Confidential Assignments, which was a temporary
22  staffing company, for a short period of time.  And
23  then became the chairman and CEO Monster Beverage
24  Corporation.  It had -- it originally was known as
25  Unipec.  And then when we acquired the Hansen

Page 12

1  business, the, the company, it was the same company
2  but it changed its name, which was listed on NASDAQ to
3  Hansen National Corporation.  And then at the
4  beginning of this year, that company ultimately
5  changed its name to Monster Beverage Corporation to
6  more accurately reflect the major product of the
7  company.
8  Q   Prior to the acquisition of Hansen, what was
9  the business of Unipec?
10  A   It had cash, and did not have any assets.
11  It was acquired for the purposes of creating an
12  investment for an investment group, and then we went
13  out to look for acquisitions and we acquired the
14  Hansen business in 1991-1992.
15  Q   And was Hansen -- was Unipec or Hansen a
16  publicly-traded company?
17  A   Unipec was.  The Hansen business we acquired
18  was obviously just the business, which was acquired
19  into the public company.
20  Q   Thank you.
21      What is your educational background, sir?
22  A   I am a lawyer by training.
23  Q   And trained in South Africa?
24  A   Trained in South Africa.  Yeah, I have a
25  higher diploma in tax law in South Africa and a

Page 13

1  diploma in law.  And I am a member of the bar in
2  California.  I did the bar exam, but I've not -- I've
3  never practiced.
4  Q   Are you an active member now?
5  A   Yes.
6  Q   And you had all your education in South
7  Africa?
8  A   Yes.
9  Q   So what is the -- if you could, describe the
10  business of your company, Monster Energy.  You're
11  calling it -- the official title now is Monster Energy
12  Company?
13  A   The holding company.  The listed company is
14  Monster Beverage Corporation.  The trading company
15  that's wholly unsubsidiary through which all the
16  business is conducted is Monster Energy Company.
17  Q   Okay.  Are there any other trading companies
18  under MBC, Monster Beverage Company?
19  A   Yes, many.
20  Q   In addition to Monster Energy Company?
21  A   They are all traded under Monster Energy
22  Company.  A lot of them are foreign subsidiaries.
23  Q   So Monster Energy Company is the umbrella
24  commercial business, and, and the holding company
25  which is the company the stocks are traded, is Monster

Page 14

1 Beverage Company?
2 A   Beverage Corporation.
3 Q   Beverage Corporation?
4 A   Right.
5 Q   Where is the company located?
6 A   In Corona, California.
7 Q   Now, is that, is that -- how long has it
8 been in that location?
9 A   It would be in this location for some five
10 years.  And before that, it was at another location in
11 Corona.  Before that, another location in Corona.  And
12 then prior to that, Anaheim and Brea, all in
13 California.
14 Q   Did you say you were -- you said you were
15 the chairman.  So as a director and as a chairman,
16 what are your responsibilities in the company?
17 A   Just to manager the, the company on an
18 overall basis.  I'm involved in the overall
19 supervision of the entire company.  I deal with the
20 investor relations.
21 Q   And do you have separate responsibilities as
22 an officer?  You said you were CEO?
23 A   Yes.  I think it all encompasses the same.
24 Q   The same?
25 A   Same thing.

Page 15

1 Q   Okay.  So -- and you have been in that --
2 held that capacity since acquiring, since acquiring
3 Unipec?
4 A   Since 1990, yes.
5 Q   Okay.  What is your authority within the
6 company concerning legal matters?
7 A   I have authority.
8 Q   And to what extent do you find yourself
9 involved in legal matters?
10 A   Reasonably actively.  I -- we have developed
11 an international group of in-house counsel.  And we
12 have outside counsel who specialize in different
13 aspects of -- that which we deal.  And we have
14 specialist intellectual property counsel.  We have
15 specialist SEC counsel.  Then we have general
16 litigation counsel.
17 Q   Do all the various attorneys report to you?
18     MR. SGANGA: Object, vague.
19 A   They don't report to me.  They report to me
20 ultimately, but they report to the in-house counsel
21 from time-to-time who work with him.  And then on some
22 occasions we'll report into other members of senior
23 staff, the president on some occasions.
24 Q   And with regard to legal actions -- and my
25 original question was regarding legal matters which

Page 16

1 can encompass transactional matters and tax matters
2 and securities compliance, and a whole -- as you know,
3 a whole penalty of issues.  But now with respect to
4 just legal actions, lawsuits, what is, what is your
5 authority there?  And what is your involvement in
6 these matters as a general function?
7 A   I'm the senior person.  And -- but
8 ultimately, some actions are discussed with the Board,
9 or the executive committee before they are launched.
10 But invariably I am involved in those discussions.
11 Q   And how are decisions made with respect to,
12 with respect to the launching of a legal action?
13 A   Discussion with our lawyers.
14 Q   Are you involved -- and you're involved in
15 those discussions?
16 A   Generally, yes.
17 Q   How about trademark matters?  What is your
18 involvement in, in trademark matters with the company?
19 A   I would generally be involved in discussion
20 with our lawyers.  But we also have -- one of our
21 internal, in-house counsel is -- specializes in
22 intellectual property, and he is extensively involved
23 in the discussions with the lawyers.
24 Q   When there's a decision to, to register a
25 trademark for the company, is that a matter that would

Page 17

1 come before you?  Or is that a matter that you would
2 be aware of?
3 A   Usually be aware of.  But there are -- in
4 some instances it may be dealt with by the president.
5 Q   Okay.  And who is the president of the
6 company?
7 A   Mr. Schlosberg.
8 Q   How long have you known be Mr. Schlosberg?
9 A   Twenty-five, thirty years.
10 Q   Did you know him before you came to this
11 company?
12 A   Yes, I did.
13 Q   At some point Hansen began to sell a product
14 called Monster Energy Drinks?
15 A   Yes.
16 Q   When was that?
17 A   April 2002 -- actually, first sale was the
18 end of the March, the first selling.  And interstate
19 commerce was in April, but that was the period.  I
20 think the first transaction was actually in the end of
21 March.
22     MR. SGANGA: You noticed the 30(b)(6)
23 deposition of the plaintiff, Mr. Sacks, is
24 appearing in that capacity as well today.
25     MR. MORTNER: Okay.

Monster Energy Company, fka Hansen Bever v.
Consolidated Distributors, Inc

Rodney   Sacks
September 20, 2012

Page 18

1  Q   Do you know how many trademarks Monster
2  presently owns in the United States?
3  A   No idea, but there are many hundreds.
4  Q   Do you know how many it owns with regard to
5  the Monster brand?
6  A   The majority of it relates to the Monster
7  brand or the claw icon.
8  Q   I'd like to show you an exhibit, a document
9  here.  I refer to it as an exhibit because it was the
10  exhibit identified as Exhibit A1 of the second amended
11  complaint, which is the pleading of plaintiff, your
12  company, in this case.
13  A   Right.
14  Q   Can you identify this document?
15  A   Yes, the trademark of our M claw icon.
16  Q   And I see the registration on this document
17  is November 16th, 2004.
18  A   Yes.
19  Q   Do you know if this is first registration of
20  this icon, the M claw mark?
21  A   I'm not sure.  I think it is.
22  Q   Okay.  Is this the design that is the
23  subject of this lawsuit, as far as you're aware?
24  A   Yes.
25  Q   Do you know who developed this mark for

Page 19

1  Monster?
2  A   Yes.
3  Q   Who was that?
4  A   It was developed by Mark Hall, who is the
5  president of the Monster Beverage division, in
6  conjunction with Ian McClain, who is an outside
7  graphics designer.  And the two of them were the
8  principle developers.  I was present with the -- at
9  the development stage, at the design stage, and worked
10  closely with Mark and Ian on the whole project.
11  Q   When was the mark developed?
12  A   The end of 2001, January/February 2002.  And
13  it continued to evolve, it started off in the form of
14  an M, the dripping paint form.  And then at Mark's
15  instigation it started to develop into a more
16  aggressive M claw style design.
17  Q   Does this mark reflect the, the more
18  aggressive version that you're referring to?
19  A   Yes, it does.
20  Q   When this mark was developed, what was the
21  product that it was intended to be used on?
22  A   On Monster Energy drinks.
23  Q   And when was the -- to your knowledge, when
24  was the mark first used in interstate commerce?
25  A   In -- on the 18th of April 2002.

Page 20

1  Q   Okay.  And I see that's what it says.  And
2  what is, what is the reference to March 27 -- do you
3  see where it says first use, March 27th, 2002?
4  A   Yes.
5  Q   Do you know what that date refers to?
6  What's the event of that date?
7  A   I believe that is the first use and sale of
8  the product in California.
9  Q   Okay.  Thank you.
10  Do you know what -- what are the goods that,
11  that the mark is currently used for?
12  A   This mark is currently used for drinks, as
13  indicated in here, which it's carbonated soft drinks
14  enhanced with vitamins, minerals, nutrients, amino
15  acids, herbs, carbonated/noncarbonated energy sports
16  drinks and fruit juice drinks having a juice content
17  of 50 percent or less by volume.  It is also used for
18  items of clothing.  It's stickers, caps, backpacks,
19  sports equipment.  A number of -- and a number of
20  other items.
21  Q   Okay.  Can you describe, when, when did this
22  mark first become used on clothing?
23  A   It became used on clothing at about the same
24  time that we launched the brand, it was being
25  developed at the same time.  The intention was to have

Page 21

1  clothing, T-shirts and caps with this claw on it at
2  the time.  And I believe during about probably a month
3  or two within of launching the product, we went
4  through samples and it was launched in probably May.
5  It actually was used for the first time in clothing
6  and interstate commerce May or June.
7  Q   And was this clothing that was manufactured
8  by Monster?
9  A   Manufactured by third parties for Monster.
10  In some cases, we bought the actual articles of
11  clothing and applied -- in the early stages, applied a
12  sticker which had the claw on it to the clothing or to
13  the caps.  And then as soon as we were able to get
14  production, then we actually had the claw embroidered
15  on the clothing.  Then it was done by the
16  manufacturers.
17  Q   What did, what did -- when you say it was
18  used in interstate commerce, what did you do with this
19  clothing?
20  A   It was sold to distributors and to
21  customers, and also provided to athletes who we, who
22  we were sponsoring, who would be representing the
23  brand and get exposure for us for the brand.  It was
24  used on our sales -- by our sales personnel around the
25  country, to represent the brand, when they made calls

Page 22

1  on customers, or attended events around the country.
2  And then ultimately it was also used, and then
3  eventually started to be sold to third parties through
4  the Internet and through other -- on other specialty
5  stores.
6  Q   When you said it was sold to distributors,
7  were you referring to beverage distributors?
8  A   Our distributors, yes.
9  Q   And when you said it was sold to customers,
10  what customers were you referring to?
11  A   Customers or consumers, members of the
12  public, and customers -- or, again, our distributors,
13  retailers, staff of the retailers and distributors.
14  And, and sporting events.  It was also starting to be
15  sold to members of the public.
16  Q   So did you have a separate sales unit in
17  your company in 2002 for the sale of clothing to
18  retailers?
19       MR. SGANGNA: Object, vague.
20  Q   Did you have sales people in your company in
21  2002 whose job it was to sell clothing bearing the M
22  claw mark to clothing retailers?
23  A   No.  It was part and parcel of the duties as
24  salesmen of the drinks.  Sale of clothing was always
25  integral with our drinks.

Page 23

1  Q   So the clothing was sold, you mentioned to
2  your distributors.  Was it also sold to retailers, you
3  said?
4  A   Later started becoming sold to retailers.
5  Q   By whom?
6  A   By -- in some cases, by licensees.  In other
7  cases, by our distributors, and by us on the Internet.
8  Q   Okay.  I'd like -- let's mark this document.
9  I'd ask the reporter to mark this (tendering) document
10  as Defendant's Exhibit One.
11       (WHEREUPON Defendant's Exhibit was marked for
12  identification.)
13  Q   Let me ask you this, before you began using
14  the M claw design in exhibit -- Defendant's Exhibit
15  One, did you do any research regarding this design?
16  Any trademark searches?  Or anything like that?
17  A   I believe our lawyers would have done the
18  necessary researches.
19  Q   Did you ever consult with them about that?
20  A   No.  They did the -- they would do the
21  searches, and if there was any issues, they would have
22  raised it.  We didn't come up against any issue.
23  Q   You didn't find any similar designs in the
24  marketplace?
25  A   Not to our knowledge, no.

Page 24

1  Q   Was there anything in your search that
2  indicated the defendant's business, Consolidated, or
3  the business of Joe Cool, Incorporated?
4  A   No.
5       MR. SGANGNA: You're asking at the time that
6  the --
7       MR. MORTNER: 2002.
8       MR. SGANGA: -- M claw was originally
9  adopted in 2002?
10       MR. MORTNER: That's right.
11  A   No.
12  Q   Did you find any -- you didn't have any --
13  did you find anything in your search that indicated
14  that Joe Cool was attempting to use your proposed
15  design in 2002?
16  A   No.
17  Q   And do you know if you conducted a
18  request -- if your company did a formal trademark
19  search and obtained any opinion of counsel?
20  A   I'm sure we did, that was our policy.
21  Q   Do you remember when the search was
22  conducted?
23  A   It would have been before we used the
24  search.
25  Q   Okay.

Page 25

1  A   Before, when we applied.
2  Q   I'd like to just take a look -- if you'd
3  take a look at Exhibit A1 for a second.
4       MR. SGANGNA: What you have marked as
5  Defendants Exhibit One?
6       MR. MORTNER: Yeah, Defendant's Exhibit One.
7  Q   Is color -- do you know whether color is a
8  part of the, of the trademark for Monster's M claw?
9  A   No.
10  Q   You don't know it?  I'm sorry?
11  A   It's not a part of it.
12  Q   It's not a part.  So the trademark only
13  covers the shape or the form that we see?
14  A   It covers everything.  It's as broad as you
15  can get it.
16  Q   Well, I just see a two-dimensional design.
17  A   My understanding is the trademark covers
18  everything, every color in that -- with that shape and
19  design.
20  Q   Okay.  Was there -- did there come a time
21  that you did any type of search of the M claw design
22  before you began using it on clothing products?
23  A   This happened at the same time, started
24  using it on clothing products within a month or two of
25  launching the brand.  We did a full search at the

Monster Energy Company, fka Hansen Bever v.
Consolidated Distributors, Inc

Rodney   Sacks
September 20, 2012

Page 26

1  time.
2  Q   Do you know, do you know who conducted the
3  search for you?
4  A   Our lawyers at the time, who applied for the
5  registration.
6  Q   Who was that?
7  A   I'm not sure if it was Knobbe Martens at
8  that time, or it -- if it was a prior firm that we had
9  been using when we moved to Knobbe Martens.  So I'm
10 not sure, but the records be will show whoever it was.
11 Q   Now, do you know when you filed a trademark
12 application for the M claw design for use on clothing?
13 A   I think that is many years later.
14 Q   Do you know why it was later?
15 A   No, it was just eventually we got to the
16 point of registering it.  We had used it, and we felt
17 we had adequate protection, both under initial
18 trademark and under our common law rights to use it.
19 For that, we used it for many items of goods.  And
20 then ultimately started to -- decided to, you know,
21 expand the registrations, which would simply give us
22 better enforceability rights.
23 Q   What would be those better enforceability
24 rights?
25 A   I believe we could -- it was easier to take

Page 27

1  action against infringes.  We were seeing more and
2  more cases of copyright and trademark infringement,
3  and counterfeit product being sold, both in the U.S.,
4  and started becoming a world-wide thing.  It started
5  to become a major issue for us.
6  Q   Let me show you a document (tendering.)
7  This document that has the marking on it of Exhibit
8  A10.  It was Exhibit A10 of the second amended
9  complaint in this case.
10    MR. SGANGNA: Do you have a copy?
11    MR. MORTNER: Yes, I (tendering) do.
12 Q   All right.
13 A   Yes.
14 Q   Can you identify this document?
15 A   Yes.
16 Q   What is it, sir?
17 A   It's the trademark, our trademark
18 registration certificate.
19 Q   And do you see that this, this is the mark
20 for clothing?
21 A   Yes.
22 Q   And you see that it -- underneath the claw
23 mark, it has words Monster Energy?
24 A   Yes.
25 Q   Do you understand that that's part of the

Page 28

1  trademark?
2  A   I would say the ancillary part, or
3  subservant part.  The principle part of the trademark
4  is the claw, and then the mark is the Energy's part of
5  it.
6  Q   What is the basis of that opinion?
7  A   My opinion?
8  Q   Yes.
9  A   Yes, it is my opinion, that this mark and
10 the key for this mark is the claw.  That is the main,
11 identifying icon that we have for our brand that's
12 unique, and that's what we use on everything.
13 Q   So is it your opinion that, that this mark
14 would cover any use of the claw without the words
15 Monster Energy, and it would be enforceable against
16 those?
17 A   I believe it does.
18 Q   Do you know what occurred on May 20 -- it
19 says here, first use May 24, 2002, on this document.
20 Let me, let me ask -- before you answer that, would
21 the reporter mark this document, please, as
22 Defendant's Exhibit Two?
23    (WHEREUPON Defendant's Exhibit was marked for
24 identification.)
25 Q   Okay.  Looking at Defendant's Exhibit Two,

Page 29

1  do you see where it says first use May 24, 2002?
2  A   Yes.
3  Q   Do you know what occurred on that date that
4  gives rise to that?
5  A   I think we had product that was used for the
6  first time, it was in California.  And in commerce in
7  June, was when we actually shipped product out of
8  state.
9  Q   Do you remember what those products were?
10 A   They were T-shirts and caps.
11 Q   Do you recall whether they had the claw with
12 the words Monster Energy, or without the words Monster
13 Energy?
14 A   I believe that they had the word Monster
15 Energy on the article of clothing -- articles of
16 clothing.  In the case of the cap, it may have had the
17 word -- the claw might have been on the front, and the
18 word Monster Energy on the back of the cap.
19 Q   Is color made a part of this registration?
20 A   No, it's not.
21 Q   And what goods was this, was this
22 registration obtained for?
23 A   It was obtained for clothing, as it
24 indicated, T-shirts, hooded shirts and hooded
25 sweatshirts, sweatshirts, jackets, pants, bandannas,

Page 30

1  sweatpants, gloves, headgear, hats and beanies, in
2  clause 25.
3  Q   And this is -- is this registration still in
4  use?
5  A   Yes, it is.
6  Q   Has this mark been in continuous use since
7  the date of first use indicated in the date of
8  application?
9  A   Yes, it has.
10  Q   How many years has that been?  Do you know?
11  A   It's 10 years.
12  Q   All right.  Let me show you another
13  document.
14     Mark (tendering) that as Defendant's Exhibit
15  Three, please.
16     (WHEREUPON Defendant's Exhibit was marked for
17  identification.)
18  Q   And I'll tell you that it's marked -- it
19  says Exhibit A13 on it because this particular
20  document was Exhibit A13 of the second amended
21  complaint in this case.  Can you identify this
22  document, please?
23  A   Yes, it's the registration statement for our
24  claw import trademark.
25  Q   Do you know why this -- do you see the date

Page 31

1  of registration on that?
2  A   November 2011, yes.
3  Q   And then subsequent to the Defendant's
4  Exhibit Two, is it not?
5  A   Yes.
6  Q   Do you know why this registration was filed
7  -- well, before I ask you that, if you don't mind.
8  Let me ask you, do you see this registration, it
9  states it's for clothing?
10  A   Yes.
11  Q   So it appears -- would you agree that it
12  appears that these registrations cover the same class
13  of goods, for use on the same class of goods?
14  A   Yes.
15  Q   So now let me ask you, do you know why this
16  subsequent registration was filed?
17  A   Because we just continued to increase our
18  diligence on our trademarks.  We continued to look at
19  alternatives, insuring that our trademarks were better
20  protected.  So we continued to increase the numbers of
21  trademarks that we have.  We've increased, we've
22  increased -- we've trademarked the word Monster in
23  many different ways to just basically -- because it's
24  so valuable to us, to just continue to trademark and
25  show we have as many trademarks on, on -- from every

Page 32

1  different angle and every different side.
2  Q   Well, when you say "different angle," what
3  is different about this mark?
4  A   This one is the claw itself.
5  Q   So are you saying that this one was filed to
6  provide further protection?  Is that what you're
7  telling me?
8  A   I would say additional protection.  It just
9  continued, in many ways, the same as we filed the
10  original Monster mark.  If we have a derivative of the
11  Monster brand, it still has Monster, but you may have
12  a sub-brand Monster Chaos, or Monster Rehab, and you
13  would file -- the Rehab brand name, you would file
14  Monster.  You would file Monster and Monster Rehab,
15  you would file the stylized version.  Then that's
16  generally what we've continued to do.  And it
17  continued to upgrade our trademarks to continue to
18  just achieve the maximum protection.
19  Q   Well, what I'm trying to understand though,
20  I mean, you may introduce new drinks, but you said
21  that the mark had been used on clothing since 2002.
22  I'm trying to understand why in 2000 -- in November --
23  well, why in 2011, you're getting this one.  It was
24  filed July 2010.
25  A   Right.

Page 33

1  Q   I'm just -- was there a process that
2  resulted within your company that caused you now to go
3  out and seek this registration?
4  A   No, I just think ongoing reviews of our
5  trademarks and discussions between us and our lawyers
6  are ongoing all the time.  And we continue to file new
7  trademarks all the time.
8  Q   Well, you filed the -- it says on
9  Defendant's Exhibit Two, it was filed April 2, 2009.
10  A   Right.
11  Q   And then on Defendant's Exhibit Three, it
12  says it was filed July 28, 2010.
13  A   Correct.
14  Q   So what were, what were the discussions you
15  had in April 2, 2009, that led to the filing of
16  Defendant's Exhibit Two?
17  A   I think I've already explained them.  We
18  just wanted to have additional rights.  We were taking
19  additional enforcement steps.  It became easier to
20  have additional trademarks when working with customs
21  officials and ICE and local law enforcement officers,
22  because the counterfeiting was becoming a very big
23  problem for us.  And our claw and our trademarks were
24  being ripped off around the country and
25  internationally, and so we simply looked at our

Monster Energy Company, fka Hansen Bever v.
Consolidated Distributors, Inc

Rodney    Sacks
September 20, 2012

Page 34

1  trademarks and reviewed them from time-to-time, and
2  decided to apply for these different -- these
3  additional trademarks. These were only some of many
4  others that we were probably applying for at that
5  time, or from time-to-time.
6  Q   So then are you saying that in July of 2010,
7  around the time that the Defendant's Exhibit Three was
8  filed, there was a further discussion with counsel
9  regarding the need for additional protection that
10 resulted in this registration?
11 A   I presume there would have been some
12 discussion, I don't know what that would have been
13 today.
14 Q   So it would have been some recognition then
15 that there was incomplete protection arising out
16 Defendant's Exhibit Two that would require --
17     MR. SGANGNA: No, object to mischaracterizes
18 the testimony, lacks foundation.
19     MR. MORTNER: Well, I'm not stating what you
20 said, I'm asking him a question.
21 A   There's nothing incomplete. We had
22 protection. It's a question of adding to the
23 protection. It's a question of making it easier in
24 some cases for enforcement to take place.
25 Q   Did you received reports about ongoing

Page 35

1  enforcement efforts?
2  A   Generally, yes.
3  Q   Did there -- did you have any occasion in
4  the period of, let's say between 2009 and 2010, to be
5  dissatisfied with the level of enforcement that you
6  were achieving?
7  A   I think we always, always do better. But we
8  had, we had engaged independent companies who
9  specialize in enforcement to work for us. We engaged
10 lawyers, which was costly. We had been working with
11 regulatory officials and customs, and it was just a
12 question of continuing to improve that. And as our
13 brand continued to increase in popularity, both in the
14 U.S. and around the world, so the level the
15 counterfeiting just started to become higher.
16 Q   What is the function of customs in that
17 conversation, in that dialogue?
18 A   The function of customs is to stop imports
19 coming in of counterfeit goods at all the ports, which
20 is what they do. And then customs -- and I think it
21 falls under customs, it's ICE. It's to go in where
22 you have registrations, to go into people and to do
23 seizures, and to actually prosecute people who are
24 selling infringing goods -- which takes place all the
25 time.

Page 36

1  Q   And has, has Monster -- I know there was a
2  seizure in this case. Was there -- have there been
3  any other seizures that Monster has authorized its
4  attorneys to seek?
5  A   I believe so. And either attorneys, or the
6  authorities through ICE. And they work together, yes,
7  ICE and local enforcement agents, correct.
8  Q   You see where it says on Defendant's Exhibit
9  -- if you look at both exhibits --
10     MR. SGANGNA: Which two exhibits? You have
11 the same marks here.
12     MR. MORTNER: I was just, I was just going
13 to say that. Defendant's Exhibit Two and
14 Defendant's Exhibit Three.
15 Q   And the -- both documents have the first use
16 in commerce as June 30, 2002?
17 A   Yes.
18 Q   Do you know why that date was chosen for
19 Defendant's Exhibit Three?
20 A   Because that was the first use of that same
21 trademark.
22 Q   And what was the basis of your understanding
23 that that was the date?
24 A   Because I -- there was an invoice in which
25 we shipped goods and sold them out of state on that

Page 37

1  date, the T-shirts with that trademark on it, with the
2  claw mark on it.
3  Q   All right. And did you make that -- I see
4  you have June 30, 2002, on Defendant's Exhibit Two,
5  which is the earlier registration. It has the words
6  Monster Energy.
7  A   Yes.
8  Q   And, and is that then referring to the same
9  invoice?
10 A   Yes.
11 Q   And so you would have made that invoice
12 available to your attorney prior to the filing of this
13 registration, to your knowledge?
14 A   Either we would have made the invoice
15 available, or we would have communicated that to our
16 attorney after a search, and after verifying the
17 facts.
18 Q   Do you have any recollection of, of, of
19 that -- of those events, personally?
20 A   I have a recollection that I know it was
21 done with my approval at the time. I can't recollect
22 when it was done, but I know that that was done. It
23 was we -- you know, we took steps to find out to
24 verify it. And I would have been the person to
25 approve it and authorize the communication to the

Page 38

1  attorneys.
2  Q   And you're referring to now -- when you said
3  "at the time," I assume you're referring to the first
4  time when you filed this Defendant's Exhibit Two,
5  which was in April 2009.  Is that correct?
6  A   I don't -- I can't say whether it would have
7  been April of 2009, or when it became available for
8  registration.  And we actually worked through that
9  process with the lawyers.
10 Q   But you -- all right.  Thank you.
11     But I, I just wanted to clarify, that when
12 you said that you were involved in the process, you
13 have a recollection of -- and if I'm not correctly
14 restating your testimony, please tell me.  But I
15 believe you testified that you have a recollection of,
16 of approving that date, based upon internal records of
17 Monster, June 30, 2002.  And my question is that that
18 recollection pertains to this document, the first
19 registration on clothing, Defendant's Exhibit Two.
20 A   Right, and the second document.
21 Q   And the second?
22 A   Yes.
23 Q   So when it came time to file the second
24 registration, which was filed July, there was a
25 repetition of the process?  There was -- I'm just

Page 39

1  trying to understand.
2  A   I believe there was, or it may have been one
3  process done at around that time in 2010.  I'm saying
4  when that process took place, I don't say it was at
5  the '09 date when it was applied for.  It may have
6  been at a later date when we actually looked for and
7  found the particular invoice.  And it may have been at
8  that time that that -- that application had already
9  been filed, and we were in the process, or had maybe
10 filed the second application.  That, I cannot verify.
11 Q   So -- okay.  But it's safe to say that it
12 would have predated the date of registration of the
13 first application, which is January of 2011?
14 A   Yes, it would.
15 Q   Okay.  And you think that it might have
16 been -- it's possible that it would have been one
17 communication that covered both registrations because
18 there might have been some overlapping.  Is that what
19 you're saying?
20 A   It could have been.
21 Q   You don't have a specific recollection?
22 A   No.  But I do know it was done with my
23 approval.  It would not have been done without my
24 approval.
25 Q   Okay.  Thank you.  And who would you have

Page 40

1  given your approval to?
2  A   It would have been given to, to our in-house
3  counsel.
4  Q   Who is that?
5  A   That's Greg Hall.  If it was later -- and
6  I'm not sure what date he started, he started with us
7  around 2010 or 2011.  Or it would have been our
8  in-house counsel prior to that, would have been Paul
9  Dechary.  Alternatively, it could have been directly
10 with the lawyers.
11 Q   Okay.
12 A   Because in many cases I will deal with our
13 in-house counsel, but I also deal directly with the
14 Martens' firm, particularly on the registration side
15 with Diane Reed.
16 Q   Diane Reed.  That's who --
17 A   Yes.
18 Q   I was going to ask you if you know Diane
19 Reed.
20 A   Yes, I do.
21 Q   How long have you known her?
22 A   Many years.
23 Q   Can you give me some indication?
24 A   From when we started working with Knobbe
25 Martens, probably close to 10 years.  I'm not sure of

Page 41

1  the exact date.
2  Q   She's been the responsible party at Knobbe
3  Martens for registrations for you?
4  A   Largely.  There have been other people
5  involved.  And it started with Steven Nataupsky, and
6  then there have been other partners and other persons
7  employed.  But she's been the primary person on the
8  registration side.
9  Q   So I want to just come back to this
10 question, there's a seven-year gap between 2002 when
11 Monster Energy, when it began business, and the filing
12 of Defendant's Exhibit Two.  And you've testified that
13 there was a process that you were involved with, and
14 other people within your organization, as well as
15 outside counsel, that gave rise to these
16 registrations.  And I'd just like you to think again
17 whether there were any specific events that gave rise
18 to the commencement of that process.
19 A   No, the clothing just continued to become a
20 bigger part of our overall business, and important
21 part of our business, together with other items that
22 we were producing in connection with the primary
23 business, which is the selling of drinks.  We started
24 to expand internationally.  We started to have a lot
25 more enforcement issues, and a lot more counterfeiting

Case 6:11-cv-00329-ACC-DAB   Document 171   Filed 09/30/12   Page 12 of 46 PageID 3768
Monster Energy Company, fka Hansen Bever v.                                    Rodney   Sacks
Consolidated Distributors, Inc                                           September 20, 2012

Page 42

1 incidents, both locally and internationally. And for
2 all those reasons, we believed we had adequate rights,
3 common law, and under the umbrella of our main brand,
4 and the fact that our brand and icon had become
5 famous. But basically we continued to look at that
6 and then decided to -- continued to expand the
7 registrations and to go into all these other
8 registrations. You know, you just can't go ahead and
9 just register in every class at every minute. You try
10 and be a little more sensible and business like about
11 doing it.
12 Q  You said there was an expansion in your
13 clothing business. When would you -- could you pin a
14 date on when that, when that expansion began?
15 A  It just continued to increase. When it --
16 it was a -- it was related to in, in, the size and the
17 expansion we had in our main drink business. And so
18 if you look at the number of items that we made over
19 the years, they continued to increase as our sales
20 increased of our drink business. And as the brand
21 started to become more popular and more well-known,
22 there was greater demand.
23     And then we started to have a lot of demand,
24 and we started to do some licensing and selling
25 through the Internet in addition to the initial

Page 43

1 business, which was, you know, to -- more related to
2 our products and etcetera. And it just continued to
3 increase in size to a point where we obviously then
4 relooked at the matter again, and then decided to
5 proceed with a lot of additional registrations.
6 Q  You mentioned that you started doing
7 licensing. Was there a, was there a decision made
8 within the management of Monster to, to make a
9 strategic change in how clothing was handled within
10 the company, and to expand that business?
11 A  No, no, it was no specific decision. They
12 simply happened was it simply evolved. The demand for
13 the brand continued to increase. The claw became a
14 very, very well-known icon with our brand, it became a
15 very popular brand. We started to get people putting
16 tattoos on themselves with the claw icon and sending
17 them in to us on the Internet. We started to get
18 enormous demand from our athletes who wanted to have
19 clothing.
20     And then what happened was athletes started
21 to derive some income from their -- basically their
22 authentic kit, their authentic race kit, or helmets,
23 or T-shirts, or when they were participating in
24 sports. And they started getting a demand -- or, had
25 or a demand from third-party clothing companies, and

Page 44

1 certain, specific what I call action sports, specialty
2 retailers, for the these, for their products. And we
3 started to get a lot of calls from our athletes, to
4 give them permission and to license them to use our
5 mark on their products, or on jointly-branded
6 products. And, and that started to evolve.
7     And so eventually what we agreed was it was
8 basically an agreement for the brand, and important
9 for the brand to have very premium, key code branded
10 products out in the market, which gave credibility to
11 our brand through the credibility of these athletes.
12 And also gave credibility to the athletes, because
13 they had a product that showed this icon which was
14 very much in demand. So it was a positive thing for
15 both of us.
16     But again, it became a very selective
17 process. I didn't want to simply go into a -- have an
18 uncontrolled business in clothing, because I felt that
19 would have -- could have an adverse affect on the
20 uniqueness and the premium image of the drinks
21 business, of our energy drinks, and so we wanted to do
22 that on a controlled basis. That simply evolved over
23 a period of time.
24 Q  Well, you mentioned that there was a
25 decision to begin cobranding with premium, I think you

Page 45

1 said, premium clothing --
2 A  Athletes, who we license -- we would jointly
3 license a manufacturer to have limited quantity of
4 products which were sold in limited types of outlets.
5 Q  I see. Roughly, when did that occur?
6 A  I think that probably started around the
7 '05, '06, '07 era, probably about the '06 era more.
8 Q  What was the purpose of limiting the
9 quantity?
10 A  Because we did not want our brand to become
11 too available. When a brand has a collectibility and
12 has a uniqueness and is not readily available, it's
13 premier, it commands a lot of premium and demand from
14 the market. The moment you take a very unique brand
15 and you start flooding the market, it loses its
16 cachet. It loses its uniqueness in the pool. So we
17 would not want our brand -- I could today sell this
18 brand and have products in Kmart, in Walmart, in
19 Target. Within a week of sitting here today, I could
20 have products ready and sold in all of those places,
21 but that is not what we want to do.
22     So the issue is -- the primary issue in our
23 primary business is our energy drinks. The other
24 articles that we participate in, we produce, we sell
25 and we market, but we do it in a very controlled

Page 46

1  fashion so that there is sale and it does meet
2  consumer demand.  It is seen, which means that it
3  helps the image and the exposure of the brand, but it
4  doesn't become uncontrolled and become loose.  And so
5  we -- I'm very concerned about the quantities of what
6  we do, whether it's, whether it's clothing, whether
7  it's stickers, whether it's anything of that nature.
8  Q   Okay.  So do you have any knowledge of the
9  sales figures for clothing, say from 2002 to 2005, in
10 that period of time, what the annual sales figures
11 might have been?
12 A   The, the amount of clothing that we
13 manufactured went up quite substantially.  And it
14 was -- I don't know the exact dollar figures, but it
15 was probably about 5,000 articles in 2002, about
16 double that in 2003.  Probably double that or slightly
17 more in 2004.  And up to about 50 or 60,000 articles
18 in 2005.  It sort of went up at that sort of range.
19 And the average sale of the article, average value was
20 probably varied from 5 to $20.00, so it's probably a
21 $12.00 average.
22 Q   So that was -- that, that characterizes the
23 period before you began doing premium cobranding?
24 A   Probably.
25 Q   Would that be a correct --

Page 47

1  A   There may have been some cobranding done
2  before.  I think there may well have been something
3  already done in '04, I can't speak to the exact date.
4  But that's the sort of period I know that, that
5  cobranding started.
6  Q   Now, those were sales, right?  Those were
7  not licensing royalties you described?
8  A   Those would be sales.  Those would be sales
9  and/or the use of the products and, you know, premiums
10 and promotions with our distributors, but separate and
11 distinct from the sales.  Sales on the Internet and
12 sales through the Monsteromni.com website and through
13 licensing took place from about that mid-2000 period.
14 Q   Did you do giveaways in that early period,
15 let's say those first three or four years?
16 A   There were some giveaways.  Giveaways were
17 given as part and parcel of premiums and value, it was
18 a value we received in return for listings of
19 products.  If we would go out, for example, and go to
20 a store and get a store to open an account and sell
21 them three cases, we may be -- one of the incentives
22 was to provide the retailer with the value through a
23 t-shirt or through a cap, in addition.
24 Q   It would be a cap -- you're talking about
25 one or two items?  Or are you talking about a quantity

Page 48

1  of items that he could sell?
2  A   No, it would be one item to him, and that
3  would be a value.
4  Q   I see.
5  A   And that -- our distributors would use that
6  in order to open accounts.  In order to get exposure
7  for the product, they would then use that for their
8  own salesman to wear and to go out in the trade and to
9  represent the brand.
10 Q   I see.  But then there came a time when you
11 started doing licensings deals.  Is that right?  You
12 said roughly around 2006 --
13 A   Limited amount of licensings deals, right.
14 And also sales through our, our website.
15 Q   Now, has there been any change in the
16 licensing strategy that you just described in the
17 present time?
18 A   No, it just continued to build up demand.
19 And we continue to try and assess the best way of
20 containing the demand and yet satisfying and having an
21 exposure for our products in the right stores, in the
22 cool places with kids, with cobranding with cool
23 athletes.  So we continued to license our products.
24 Again -- but it's a question of a balance.
25     So it's the -- the value of the licensing

Page 49

1  has continued to increase.  As the exposure to our
2  brand has, our marketing spend has.  And it continues
3  to increase, but, again, on a controlled basis.
4  Q   Okay.  I would like to show you a
5  document -- just give me one second.  Okay.  Let's
6  mark this as Defendant's Exhibit Four.  Mr. Sacks, if
7  you'd just take a look at (tendering) that, that's
8  Defendant's Exhibit Four.
9     This -- let me show you another document
10 here.  We'll mark (tendering) this as Defendant's
11 Exhibit Five.  Take a look at those two documents.
12     (WHEREUPON Defendant's Exhibits were marked
13 for identification).
14 Q   If you would, Mr. Sacks, can you look at
15 Defendant's Exhibit Five?  It's entitled expert report
16 of David Hansen, CPA.
17 A   Right.
18 Q   Have you seen this document before?
19 A   No.
20 Q   Would you just take a minute to take a look
21 at it?
22     MR. SGANGNA:  Well, I'm going to note that
23 this is beyond the topics here.  You had an
24 opportunity to notice Mr. Hansen's deposition and
25 you didn't do that.

---

Page 50

1    MR. MORTNER: I haven't asked the question
2  yet, so I don't know what it is I'm beyond.
3    MR. SGANGNA: I'm just noting that --
4  Q  Actually, I'm not going to ask you about
5  this, Mr. Sacks.  As you're reading it, I'm not going
6  to ask you questions about the content of this
7  document.  I just want you to have a chance to look at
8  it so you'll understand the context of the questions
9  that I will ask you.
10    MR. SGANGNA: All right.  Take your time.
11    MR. MORTNER: By all means, take your time.
12  Whenever you're ready.
13  A  All right.
14  Q  Okay.  I just wanted you to see Defendant's
15  Exhibit Five, because Defendant's Exhibit Four was
16  a -- an -- is actually an attachment to Defendant's
17  Exhibit Five.  In other words, this is a spreadsheet
18  that Mr. Hansen had attached to his report, which was
19  submitted in this case as an expert report.
20  A  Right.
21  Q  So if you would, take a look at Defendant's
22  Exhibit Four, because that's actually what I want to
23  ask you questions about.
24  A  Right.
25  Q  I just didn't want to spring a document on

---

Page 52

1  what I would call a separate, expressed identified
2  license agreements.
3  Q  This is a, a spreadsheet which identifies
4  license agreements between Monster Energy and third
5  party -- third parties for the use of the Monster
6  Energy mark on non-drink products?
7  A  Right.
8  Q  Is that -- were you correct with --
9  A  Correct.
10  Q  Okay.
11  A  Correct.
12  Q  And do you see where it says -- there's a
13  column that says licensed products.
14  A  No, it doesn't have a heading on mine.  But
15  I think I --
16  Q  The eighth column?
17    MR. SGANGNA: Start on the first page.
18  A  Sorry.
19  Q  Oh, there's no heading on the other page.
20  Okay.
21  A  Okay.  Yes.
22  Q  Actually, I want to ask you a question,
23  something you just mentioned.  Are you saying early on
24  that you had athletes that were permitted to go and
25  form their own contractualations with manufacturers?

---

Page 51

1  you without you understanding its source.
2  A  All right.
3  Q  Okay.  Have you ever seen this Defendant's
4  Exhibit Four, which is called schedule one?
5  A  No.
6  Q  Actually has the title here, summary of
7  royalty data, rate data, summary of royalty rate data.
8  Does the, does the information reported in this
9  document conform with your own personal knowledge and
10  recollection to the extent that you have a recall of
11  these details with regard to the business of Monster?
12  A  Yes, there were some earlier royalty
13  agreements, but they weren't specifically licensed --
14  separate licensed agreements.  But there were
15  arrangements with athletes in terms in which they were
16  permitted to manufacture, or to have certain items of
17  clothing, jointly branded clothing manufactured, that
18  happened from time to time.
19    There were also additional clothing that was
20  manufactured by some companies without authority,
21  which were actually -- eventually, action was taken
22  against them, where we asked them to produce products
23  for us, and that produced extra products, and they've
24  gone and sold them.  And so we were able to shut that
25  down.  But I think this covers the -- where we had

---

Page 53

1  A  No, no, we dealt with them.  But it was
2  under their distribution, their sponsorship
3  agreements.  And they would come to us with a request,
4  and we would give them a specific, limited request.
5  I'm saying these are specific license agreements --
6  Q  So what would be an example of that, like a
7  motorcycle jacket?
8  A  It would be a replicate kit for a motorcycle
9  jacket.  Or a Kawasaki kit.  Or something where we
10  would have a sponsorship, and they would have their
11  own Kawasaki team product.  And then they would want
12  to produce the product that the athlete was racing and
13  would race a race suit, and it would have a Monster
14  emblem on it, and we would agree.  And they would ask
15  us for permission, and we would give them permission
16  to put the claw on it.  And so there were other --
17  that's all I'm saying.  There were other ones --
18  Q  Did they market those products to --
19    MR. SGANGNA: Please let the witness finish
20  here.
21  Q  Oh, did I interrupt?  I'm sorry.  Were you
22  not finished?
23  A  So, so what we did was we agreed that they
24  could put it on the replicate kit.  We agreed that the
25  amount of, of units they could utilize and where they

---

---

Page 54

1 could sell them, and then and there was a limited
2 amount.  In some cases there was no royalty, because
3 we believed that it was simply important for our brand
4 image.  But it was used on clothing and then sold
5 through -- again, then that case would be specialist
6 motorcycle outlets, it wouldn't be any retail outlets.
7 Retail motorcycle outlets, but it's not retail stores,
8 clothing stores.  But they were items of clothing that
9 they would then use.
10 Q  I see.  And you would, you would contract
11 with a thirty-party manufacturer for that?
12 A  We would be involved in that.  We would
13 either give permission, and we would know who that,
14 and we would keep control of that.
15 Q  I see.  Okay.
16      Now, if you look at page one of this
17 Defendant's Exhibit Four, it identifies in the eighth
18 column, licensed product.  So it describes the -- in
19 that column, the particular product that's being
20 licensed to the license -- the particular use where
21 the mark can be used by that licensee.
22 A  Right.
23 Q  Okay.  So not all of these are clothing.
24 Can you -- as you look at this --
25      MR. SGANGNA: I would object to your -- I

---

Page 55

1 don't know if that's a question, but --
2      MR. MORTNER: Okay.  Well, I --
3      (Both talking at once).
4      MR. SGANGNA: -- the record properly here,
5 but for lack of foundation.
6 Q  Okay.  Well, would you consider a motorcycle
7 sticker kit clothing?
8 A  Sticker kit, no.
9 Q  Okay.
10 A  Unless the sticker kits are sometimes used
11 on clothing.  There are sticker kits that are made of
12 a material base, and they are actually used for the
13 purposes of being put onto clothing.  So you have a
14 crossover then where you have one category blurring
15 over into another category.
16 Q  I see.
17 A  But general motorcycle kits on its own would
18 not be.  But sticker kit, maybe.
19 Q  That would be for a motorcycle?
20 A  Yeah.  But again, it was put on cars.  It
21 was put on sports equipment.  It was put on
22 surfboards.  On skateboards.  On many other things.
23 Q  Okay.  As I look at this document, it seems
24 to me -- and tell me if you disagree -- that the
25 earliest license granted for use of apparel, clothing

---

Page 56

1 T-shirts, would have been the second one identified
2 here to the licensee being Slednecks,
3 S-L-E-D-N-E-C-K-S.  It looks like the date of that
4 license was June 30, 2007.
5 A  On this, this list, yes.
6 Q  Are you aware of any other licenses that
7 were granted to third parties prior to that -- not
8 including the athletes situation that you described.
9 A  The athletes are -- I think that involved
10 Kawasaki.  I think that involved pro-circuit.  There
11 were a number of other athletes at the time as well,
12 and athlete teams.  Pro-circuit and Kawasaki is all
13 motorcycles and racing.  Kawasaki is a team, a
14 motorcycle super-cross team.  They were earlier.  We
15 did have arrangements with them.  And I think we also
16 had arrangements with -- roundabout that time it was
17 Kenny Bernstein for drag racing.  It was also -- there
18 was also an arrangement with Feld Motor Sports for the
19 super-cross events, where they were producing clothing
20 and selling clothing with our claw on it at the events
21 with our approvals, and that was earlier than that.
22 Q  You said they were selling with your
23 approval?  Or without your approval?
24 A  With our approval.
25 Q  With?

---

Page 57

1 A  Yes.
2 Q  Oh, I misunderstood you.
3 A  Yes.
4 Q  But if you look at this, this document, it
5 seems that the date of most of these license
6 agreements, the real serious licensing activity, is in
7 2010 and 2011, perhaps some in 2009.
8 A  I'm not sure I agree with the words "serious
9 licensing."  There are different --
10 Q  Okay.  Well, let me say --
11 A  No, no, they are different types of
12 licensing activities.  This is where you're getting
13 more of sort of our caller, sort of a commercial with
14 athletes and third parties.
15      The other type of licensing is where we were
16 licensing very important sports partners to make
17 clothing and apparel relating to those events, and
18 those racers with us, and in conjunction with us,
19 where were important.  And that is another form of
20 licensing, but that's part and parcel of our
21 sponsorship agreement that we entered into with those
22 parties, and it wasn't a separate licensing agreement
23 in the traditional sense.
24      But those were -- the result of that was
25 there was clothing that was sold at those events, and

---

Monster Energy Company, fka Hansen Bever v.
Consolidated Distributors, Inc

Rodney   Sacks
September 20, 2012

Page 58

1 was sold to members of the public at the those events
2 in which were very important, from our point of view,
3 as part of our image of our -- and development of our
4 brand.
5 Q  And do you have any idea what the
6 royalties -- the quantity of royalties.
7 A  They weren't royalties because that was part
8 of the sponsorship arrangement.
9 Q  Okay.  There were no royalties?
10 A  That is the point on those, yes.
11 Q  And so in terms of these license agreements
12 that we see on this document, these are -- I see here
13 it has a royalty rate column.
14 A  Right.
15 Q  So would, would this then represent the
16 royalty earning license agreements?  Then if we could
17 clarify what this document is.
18 A  Again, not exactly, because many of these
19 you'll see One Industry, Chris Cole, who's an athlete.
20 The -- had no, had no royalties.  And again because --
21 Q  Yeah.
22 A  -- there were other criteria to us, and not
23 just the royalty.  The royalty amount, the payment is
24 not the most important criteria.  The most important
25 criteria is to us is what was the article of clothing.

Page 59

1 What was it going to look like and where was it going
2 to be sold and to what consumer.  And so that was more
3 important to us.  In many cases it was important that
4 that, that the royalty wasn't -- was not the important
5 issue.  It was controlling it and making sure we knew
6 where the clothing was going, the quality and the
7 outlets.  And that was, that was more important.  So
8 that's what I want to say.  It's not a -- you know,
9 the royalty is not the determining factor.
10 Q  All right.  Thank you.  It's not the
11 determining factor in what?
12 A  In our decision as to whether to license, or
13 whether to permit clothing to be made and how much to
14 be made.
15 Q  Okay.
16 A  For example, Rob Drydek is one of -- on
17 page -- schedule one, page two, there is royalty free.
18 But Rob Drydek is an athlete who gives us exposure on
19 Rob and Big and a number of shows on MTV which are
20 international, which are shown nationally and
21 internationally.  We pay Rob Drydek many millions of
22 dollars a year in sponsorship fees.  And as part of
23 that evaluation of what it's costing us, it's part of
24 what we're giving him, is part of the value, is his
25 ability to go and have these shirts done, and then we

Page 60

1 control it.  And again, if we would charge a royalty,
2 he would charge a higher sponsorship fee.  So it's
3 value at the exchange as part of an overall deal.
4 Q  I see.  Do you have any involvement in the
5 pricing decisions that Mr. Drydek makes?
6 A  Not in his pricing decisions, but on the
7 quality, yes.  And the designs, etcetera.
8 Q  So what I hear you saying is that the
9 exposure of the M claw design to the public is of
10 critical importance to Monster?
11 A  Yes, It is.
12 Q  What is, what is -- how would you describe
13 the value of the M claw trademark to Monster?
14 A  It's very valuable.
15 Q  Can you describe it in terms that don't
16 involve a monetary figure, in terms of just the, the
17 overall business and the business strategy?
18 A  It's just really important.  It's become
19 what we have as -- used as becoming as our identifier
20 for our brand.  So it, it on its own identifies our
21 brand.  It identifies who we are, the products, what
22 consumers can expect from them.  And it's, it's
23 internationally well known, that this -- identify
24 this icon is our icon.  Just as the way -- just as the
25 Nike icon is Nike.  In fact, you know, the result of

Page 61

1 this has been, for example, at the current time on
2 Facebook, our brand with the icon has become the
3 eighth most popular consumer brand in the world.  We
4 have 90 million, you know, Facebook fans around world,
5 so it is a valuable icon.  And that's what's been
6 developed by us extensively for 10 years.
7 Q  Do you have any idea if you were to
8 determine what -- if you take the company's valuation,
9 what percentage of that value would, would constitute
10 the brand as an asset?
11 A  I can't do that.
12 Q  Is it safe to say that anything affects the
13 trademark is important to the company?
14 A  It would be important, yes.
15     MR. HOLLINGSWORTH: Mr. Mortner, we have
16 five minutes left on this video.
17     MR. MORTNER: Okay.  Let's take a short
18 break and he can change the tape.
19     MR. HOLLINGSWORTH: We're off the video
20 record at 11:19.
21     (THEREUPON there was a brief recess).
22     MR. HOLLINGSWORTH: We are back on the video
23 record at 11:29.
24     BY MR. MORTNER:
25 Q  When was the first time that you heard of

Monster Energy Company, fka Hansen Bever v.
Consolidated Distributors, Inc

Rodney   Sacks
September 20, 2012

Page 62

1 Joe Cool, Incorporated, which is one of the defendants
2 in this case?
3 A   Approximately, the beginning of January
4 2000 -- in January of 2011.
5 Q   How did, how did that company come to your
6 attention?
7 A   I'm not sure how that did.  But we, we -- it
8 came to our attention that, that they were selling
9 T-shirts with a claw that was a -- basically, an
10 imitation ripoff of our claw trademark.
11 Q   How do you know it was an imitation ripoff?
12 A   Because I saw what it looked like.  It's
13 clear that it's an imitation in the form of -- it's
14 clear.  Well, is it possible that, that they may
14 Q   Well, is it possible that, that they may
15 have had it before, and that, that they were using
16 something that belonged to them prior to Monster's,
17 that it would not be a ripoff?
18 A   No, it's not, because I was involved in the
19 design of that claw, which was an evolution.  We sat
20 down and designed and drew it piece-by-piece.  And the
21 concept of it, the image of it, and the whole -- how
22 it came to together in 2002, as I explained to you,
23 and Mr. Hall and the graphics Ian McClain.  And that
24 was pretty much, in my mind, was an original work -- I
25 don't call it a work of art, but it's equivalent to a

Page 63

1 work of art, in my mind, for what we do.  And that was
2 an original document that we drew and designed, and I
3 sat there with Mark, sitting and scratching it out and
4 deciding how to do it.
5      Then you look to the product that came up
6 and that was, was clearly a ripoff.  I mean, you just
7 look at it and you know that it's a ripoff.  It's not
8 something that could have got created independently of
9 us.  And then it came up with yellow and green colors,
10 that was basically our color scheme that we had
11 developed for 10 years.  So there was no question in
12 my mind that that was an imitation of our product.
13 And yet, you know, somebody had tried to make a little
14 bit of -- a couple of pretty feeble, amaturist
15 differences, but it was a ripoff of our product.
16 Q   Have you ever seen any, any of the fonts
17 that are public, available to public as clip art?
18 A   Yes.
19 Q   And have you seen some of them that have a
20 dripping quality, or a claw-mark quality?
21 A   There are some, but I don't believe there
22 are any that are exactly like this.
23 Q   Exactly like yours?
24 A   Correct.
25 Q   But, but would you agree that there are some

Page 64

1 out there, that, that make use of the idea of a
2 scratch or of a dripping-type art?
3 A   There are.  There are different -- there's
4 different art, sure.
5 Q   And so the M in those fonts may look similar
6 to the Monster M claw?
7      MR. SGANGNA: Object, vague, lack of
8 foundation.
9      MR. MORTNER: Well, I'm asking the witness
10 if --
11      MR. SGANGNA: No, don't -- you haven't
12 presented him with any of these hypothetical clip
13 art fonts, so the question if vague and it lacks
14 foundation.
15      MR. MORTNER: I don't know if it was vague.
16 Q   Have you ever seen any of those fonts that,
17 that are in the color green?
18 A   Not specifically.  I can't guess -- I've
19 seen hundreds of fonts over the many years.  But I
20 certainly didn't -- I've never seen anything that I
21 believed was closely resembling our artwork which we,
22 which we created.
23 Q   What are the unique features of your work
24 that, that identify it to you?
25 A   Firstly, it's the, it's the claw with the M

Page 65

1 in the way that it has a large, round head at the top
2 that goes off, veers off to the left into a little
3 point.  And the way it veers off.  How the actual claw
4 thins out as it goes down.  And then there are parts
5 that are thinner and broader, those were originally
6 designed to be scratches, to have the effect of -- in
7 fact, the original -- one of the concepts from this
8 came from the -- the inspirations came from the movie
9 Jurassic Park.  And in that movie there was a claw, a
10 guy -- an animal that clawed through a door.  And the
11 feel was we were trying to get the feel of a claw in
12 an M, but the claw bursting or crawling out of the
13 can.  So we could see the metal actually coming out of
14 the can, the torn metal on the sides.  And we tried to
15 illustrate that, and we had -- when we discussed that
16 with our printing companies and the can companies, the
17 printing technology at the time was such that it
18 didn't really make it clear, that when they printed
19 it, it wouldn't have that feel.  It would just start
20 becoming confusing.
21      And so we continued to evolve this whole
22 design that was very unique and original, and we sat
23 with pieces of paper going up and down between the
24 graphics artist, and Mark calling his office.  And I
25 sat with him while he sat on his desk, scratching it

Page 66

1  and faxing it and re-faxing it and re-faxing it, until
2  we got what we wanted.  And this was a very unique
3  piece that created an M, but it is was in -- and
4  that's why you call it the claw, but it's really an M.
5  But it evolved into a claw that was very, very unique
6  and became stronger and became very unique to our
7  brand.
8  Q   How do you mean that it became unique to
9  your brand?
10 A   Because we were the only person -- this was
11 an original piece of art, and we used it extensively.
12 We used it extensively from the very first day on our
13 drinks, on everything we did, everything, every piece
14 of -- everything we do has the claw on it.  And so
15 this became synonomous with our brand, from the very
16 early days when we had -- we sponsored the monorail in
17 Las Vegas and we got worldwide press.  It was in every
18 newspaper and every TV station worldwide.  This
19 monorail with our claw, dawned with this massive claw.
20 And that was -- became very popular with the consumer,
21 so everything we did became -- turned around that claw
22 and became focused on that claw, on that image.  And
23 that is why, in fact, for that reason, although we use
24 different color images when we have different
25 extensions of our drinks, in fact, we stick with the

Page 67

1  yellow and green image, which is our main image.  And
2  that's the image we use for all our advertising, for
3  all our marketing, for all our public exposure.  And
4  so when I saw a T-shirt with a yellow -- a green and
5  yellow image with the same claw with that design, that
6  was clearly a ripoff.
7      I have no problem with people using M's.  I
8  have no problem with people using scratch marks.  I
9  have no problem with people using claws.  They are all
10 very different.  The T-shirt I saw was none of those,
11 it was, in fact, a clearly designed replica and copy
12 of our claw.  That's what motivated, and was the
13 inspiration behind that particular claw.
14 Q   So the fact that it -- what were the, the
15 decisive factors in that particular mark?
16 A   Just look at the whole overall image.  Look
17 at the top.  You saw the actual -- that same image
18 where you had that round bulb at the top with the claw
19 coming off it, and it went both ways.  And then, you
20 know, some guy trying to be a little too smart by half
21 turning the claw on the end, one the other way around.
22 But again, it was the same thing.  And so for the
23 uninformed person they don't get the little finety
24 that the claw -- that little twist gets turned the
25 other way around.  But really, the whole image and the

Page 68

1  whole purpose of that particular claw was to basically
2  copy our claw.
3  Q   Now, you're saying that that's based upon
4  your -- what is your knowledge that's based upon?
5  A   My visual knowledge.  My experience with our
6  claw.
7  Q   You don't, you don't know for a fact that --
8  I mean, have you spoken to, to Yosef Amar, the owner
9  of Joe Cool?
10 A   No.  No, I don't believe it is remotely
11 possible that someone would have come up with that
12 without having copied our claw.
13 Q   Okay.  Have you seen the, the wolverine
14 character?
15 A   What do you mean by the --
16 Q   I'm sorry.  Let me explain.  There's a
17 movie, wolf character, a wolverine in a comic book
18 character.  Are you familiar with that?
19 A   No.
20 Q   Okay.  So you testified that in January of
21 2011, you became aware of Joe Cool, Incorporated?
22 A   Yes.
23 Q   And that -- what was it that you learned
24 about that company?
25 A   That they were basically trying to sell

Page 69

1  T-shirts on the Internet, and that they were trying
2  to -- planning to sell them at the Daytona Bike Week,
3  I think, that takes place in March 2011.  And they
4  were going to sell them there, and this was -- we had
5  been involved, again, in many cases of infringing
6  operators who were selling T-shirts, who were selling
7  the -- you know, making the T-shirts up from, from
8  what you call the hot -- what do you call -- the heat
9  transfers.
10 Q   Heat transfers?
11 A   Yeah, and that had been a big problem for
12 us.  And this was just another one of those -- what we
13 perceived to be another one of those operators.
14 Q   How did the information come to you?
15 A   I cannot, I cannot recall.
16 Q   Do you have any procedures in place for
17 discovering these types of situations?
18 A   We, we, we do.  We have -- we had
19 independent firms who tracked the Internet and who
20 track -- go around and do this, and then report to us.
21     And the early days, again, some of these
22 cases would -- they actually represented us and took
23 action against the smaller infringes around.  And then
24 when we felt it got to a certain level, we would
25 consult with the lawyers and then look at sort of more

---

Page 70

1   formal proceedings. And they would, again, invoke the
2   proceedings with -- in many cases with the regulatory
3   authority, and try and get -- and try and deal with
4   it. We actually got this information, I think we
5   actually consulted with our lawyers. We ended up
6   getting a -- an investigator to get a report, which I
7   saw at the time. And that, that obviously is how we
8   started to get involved, and took a decision to take
9   urgent action to try and prevent the infringement.
10  Q   Okay. You mentioned the report. Let me
11  show you a -- this is (tendering) a document that was
12  submitted in this case. We'll mark this -- ask the
13  reporter to mark this as Defendant's Exhibit Six.
14      (WHEREUPON Defendant's Exhibit was marked for
15  identification).
16  Q   The -- I'm sorry, the staple is on the right
17  side instead of the left. But this is the report you
18  were referring to previously in your testimony?
19  A   No, this is his declaration. There was an
20  actual report that I saw.
21  Q   Okay. And this -- but this is the
22  individual who prepared that report?
23  A   Yes, and this was reported a couple of days
24  after he was engaged in February, and then I saw a
25  report.

---

Page 71

1   Q   Can you take a look at this document and let
2   me know whether you recall any additional information
3   in the report that you saw?
4   A   I can't guess. I mean, if you can show me
5   the report.
6   Q   Okay. Do you see where the -- let me just
7   see here. Paragraph eight of the declaration, do you
8   see that where on page four the declarant,
9   Mr. Maconachy, refers to an address?
10  A   Yes.
11  Q   Do you have any knowledge of what, what is
12  at that address?
13  A   No.
14  Q   All right. Do you see in paragraph nine he
15  says Ms. Sadler confirmed that Joe Cool will have a
16  large tent set up during Daytona Bike Week outside of
17  the building that houses Joe Cool, Incorporated,
18  business offices and warehouse located at 1052 Beach
19  Street, Holly Hill, Florida, a location within the
20  city limits of Daytona Beach.
21  A   Right.
22  Q   Do you recall now anything about that
23  address, 1052 North Beach Street?
24  A   No.
25  Q   Did you -- do you have any recollection that

---

Page 72

1   Mr. Maconachy stated that there was a building that
2   houses Joe Cool's business offices and warehouse?
3   A   No.
4   Q   Would you consider that to be a factor in
5   any of your decisions with respect to this case?
6      MR. SGANGNA: Object, vague. Which is a
7   factor?
8      MR. MORTNER: The fact that there's a
9   building in Daytona Beach that houses Joe Cool's
10  offices and warehouse.
11  A   I don't know. Normally offices are in a
12  building, so I don't understand the question.
13  Q   Okay. Well, isn't it true that
14  many counterfeiters don't have an office or a
15  warehouse that's a formal office or building?
16  A   Some do, some don't. They also move around.
17  And they are going to have tents. And they are on the
18  Internet. And have inventory. And inventory is there
19  one day, and inventory is not there the next day. So
20  it -- that doesn't have any real significance.
21  Q   What doesn't have any real significance?
22  A   That they have a warehouse or an office.
23  They have many counterfeiter -- I mean, I have many
24  counterfeiters that have offices or warehouses.
25  Q   And you say they did move around, though?

---

Page 73

1   A   Yes, they often do.
2   Q   And because they move around, that's why --
3   the fact that they may have an address on one day is
4   not significant?
5   A   It's not of significance. They may, they
6   have an address, and they may have the products there
7   the first, and then the next day they don't have
8   products. It depends what they're selling. Many
9   products the person sells -- I don't know what it
10  means. It doesn't have meaning or significance for
11  me.
12  Q   Did you investigate whether Joe Cool had
13  been at this particular location for an extended
14  period of time?
15  A   No, I just knew they were selling -- getting
16  ready to try and sell what I call copyright and
17  trademark infringing T-shirts at -- from a tent at a
18  Bike Week that was to take place for a brief period of
19  time.
20  Q   Well, it says it's at a tent, but the tent
21  is outside the building. What is the significance of
22  the tent to you?
23  A   It's just going -- that's where the
24  inventory will be, and then it will be gone. It's
25  going to be temporary.

---

Page 74

1  Q   What's temporary?
2  A   The tent.
3  Q   The tent will be gone.  But the building
4  won't be gone, will it?
5  A   But the inventory, maybe.
6  Q   Why would the inventory be gone?
7  A   Because it was being done for that Bike
8  Week.
9  Q   How do you know that their inventory was
10  only for Bike Week?
11  A   Well, what we, what we had seen was the
12  infringing articles related to the Bike Week.
13  Q   Had you, had, had you any investigation as
14  to what was in that building?
15  A   I had, I had the investigative report.  Do
16  you have the report -- and read it as well as I did,
17  as well as I could.
18  Q   So do you believe that the defendant's
19  actions were deliberately intended to infringe?
20  A   Yes, I do.
21  Q   And, and, and if I'm correct, I think that
22  you said that the basis for that belief is the
23  similarity between the marks?
24  A   You can see the similarity.  You can see the
25  marks.  I've seen thousands and thousands of, of

Page 75

1  infringing articles and copies, and this is classic of
2  one of them.  And this is a copy, and it's a bad copy.
3  And the quality was bad, and the circumstances
4  surrounding it.  And its image on the T-shirt was bad,
5  and we thought was very concerning to us, and to the
6  image of our brand and the image of our product.
7  Different colors all over it.  It -- everything was
8  bad about it.
9  Q   When you say it was bad, you mean it lacked
10  quality of being an exact, exact replica?
11  A   No, just the quality of the product.  The
12  actual quality of the printing.  The quality of the
13  way it was designed.  The colors that were utilized,
14  were, we believed, were cheap.
15  Q   When you say the design, let's focus on
16  that.  What about the design was bad?
17  A   Well, it just -- it had writing all over it,
18  and had all the Daytona Bike Week information on it.
19  So it was just a bad design.  It was not an upmarket,
20  premium product.
21  Q   Okay.  I'm sorry.  I'm just trying to
22  understand.
23  A   That -- you can look at the pictures of it,
24  and the different skulls, and what somebody perceived
25  to be cool.  I think it's just terrible art work and

Page 76

1  terrible taste.  But it's all over it.  There were
2  eagles and skulls obscuring it and across it and
3  interfering with it.  You know, it just was a bad
4  design.  The product from the -- of these T-shirts was
5  very poor quality.  The product of the printing on the
6  T-shirts, that I saw, was very poor quality.
7  Q   Why don't we look at -- mark this
8  (tendering) document Defendant's Exhibit Seven and
9  this is a copy of the second amended complaint that
10  Monster filed in this action, which I think you were
11  indicating.
12      (WHEREUPON Defendant's Exhibit was marked for
13  identification.)
14  Q   All right.  Would you take a look at page
15  14?  Have you seen the images depicted there before?
16  A   Yes.
17  Q   Were these the images you were referring to
18  just previously in your testimony?
19  A   Yes, yes.
20  Q   Now, do you see the first image on the, on
21  the left top?
22  A   Yes.
23  Q   That doesn't have any skulls or eagles on
24  it.  It has some writing on it.
25  A   It's got writing on it.  Then it's got a

Page 77

1  little piece on the side of it.  It just looks very
2  cheap and very poor.
3  Q   And what part of that image do you contend
4  is a counterfeit of Monster's M claw?
5  A   Counterfeit and/or trademark copy, both, is
6  the, is the whole, main claw.
7  Q   Okay.  What -- how do you define the word
8  trademark copy?
9  A   A copyright is one thing, that's the
10  artistic words.  And then you have trademark rights,
11  common law trademark rights and registered trademark
12  rights.  I think that infringes all of them.  That's
13  my only point.
14  Q   Okay.  Okay.  But you do see that -- you
15  perceive that design as a counterfeit?
16  A   Yes.
17  Q   And the, and the shirt is a counterfeit,
18  then.  Would that be correct to say that the entire
19  shirt is a counterfeit article?
20  A   Well, that's the main focus of the shirt.
21  If the main thing is counterfeit, then I think the
22  rest of it falls into that category.
23  Q   Okay.  What about the other designs here?
24  We have an eagle over the mark.  Is that, is that also
25  a counterfeit?

Monster Energy Company, fka Hansen Bever v.
Consolidated Distributors, Inc

Rodney   Sacks
September 20, 2012

Page 78

1  A  They're all counterfeit.  They're all in
2  breach of our trademark rights of the claw, which
3  forms the base.  They're trying to make it cool by
4  having these other illustrations interfere with it and
5  all over it.  I just think it cheapens it and
6  interferes with it.  It doesn't detract from the fact
7  that it's still a -- the basis is still a counterfeit
8  claw.
9  Q  Okay.
10  A  And that's what the attraction of this is,
11  of this T-shirt.  The attraction is not just an eagle
12  or a skull, everybody has eagles and skulls on every
13  T-shirt at every boardwalk sale or, you know, Bike
14  Week.
15  Q  I think if you look at page 27 -- excuse me,
16  paragraph 27 on page 14, it says defendant's
17  infringing products prominently display a slavish
18  replica of MBC M trademark of green on a black
19  background, as used in the marketplace on MBC's
20  original Monster Energy drink can and various clothing
21  items.  So would you agree with the statement that
22  that is a slavish replica?
23  A  I think it -- I think it's a bad replica,
24  but it's a slavish one, yes.
25  Q  Well, you say "bad."  I'd like you to --

Page 79

1  what do you mean by a bad --
2  A  Because I think it's in bad taste.  And I
3  think it's just a copy that's trying to be tweaked in
4  little ways here and there in order to try and say,
5  well, maybe this is a little bit different.  But
6  this -- the, the guts of this starts off from our
7  trademark.
8  Q  Okay.
9  A  That's clear to me.  And that's my view.
10  Q  So what are the tweaks?
11  A  The tweaks are if you take the claw on the
12  left, instead of it going a little bit more down, it
13  goes a little bit more up.  On the claw on the right,
14  instead of it being pointing to the left, they've
15  taken that claw and they've turned it to the other
16  side.  And then they've made an attempt to fiddle with
17  it.  And if you take a couple of these claws, little
18  designs they've made, this little piece sticks out a
19  little more, a little less on each side.  In other
20  words, what I'm saying, it's the base design has been,
21  has been stolen.  And that's been taken and tried to
22  be redesigned on something that looks as close to the
23  uninformed, quick viewer as the original, but at the
24  same time has got little points of difference.  That's
25  what that is.  That is not something that just was

Page 80

1  come up with independently, honestly and independently
2  of our trademark.  That is my view.
3  Q  Okay.  So I notice looking at your mark, the
4  middle line is higher, right?  And then this mark, the
5  middle line is lower than the other two.  Would that
6  be one of those tweaks?
7  A  Maybe a little higher.  It's positioned up
8  or down.  They are tiny differences like that that
9  become analytical.  But when you look at the overall
10  impression, you still get the impression that that is
11  a copy of our mark, to any average reader.
12  Q  How do you know when a green claw mark or a
13  green drippy M -- we've discussed those kinds of
14  fonts -- or a scratchy M font.  How do you know when
15  it's, it's, it's a copy of your mark that's been
16  tweaked versus something entirely independent and
17  different?
18  A  You normally, you normally have a pretty
19  good idea.  You normally -- you can normally see it.
20  And sometimes you may not, if it's very slight.  But
21  in this case it's clear.  It's also clear because of
22  the colors.  This is green and yellow, those are
23  colors we've used and made famous for 10 years on
24  every point of sale, on every poster, on every
25  promotion we use.  We use one color combination, green

Page 81

1  and yellow shaded from left to right.  That's what one
2  of the first giveaways is, this is green and yellow
3  left to right.
4  Q  Okay.  So would you look at page 11 of the
5  complaint, Defendant's Exhibit Seven?  And over there
6  we have depicted six cans of Monster Energy drinks.
7  A  Yes.
8  Q  And I see that you have -- five of them are
9  colors other than green?
10  A  Correct.
11  Q  So is it, is it -- so when you say that that
12  green and yellow is your color, I mean, isn't it true
13  that you also use other colors?
14  A  I just -- you didn't listen to what I just
15  told you.  Every single time we promote our product in
16  stores, on stickers, on static clings, on glide racks,
17  on coolers, every time an athlete appears, if you go
18  to these other athletes, every time there's a
19  publication on, on TV and on -- in print, and on the
20  Internet, all the hundreds of millions of views we
21  have on the Internets, on exposures, are all of our
22  athletes, are all of events that we sponsor.  They
23  always use the green and yellow claw.  We do not use
24  the other colors in anything to promote our brand.
25  It's on the individual products, but not on any

Monster Energy Company, fka Hansen Bever v.
Consolidated Distributors, Inc

Rodney   Sacks
September 20, 2012

---

Page 82

1  promotion. So the vast, vast majority of all the
2  exposure of our brand is in a green and yellow claw.
3  That's what we get -- we are known for.
4      If you actually look at our product sales,
5  the -- green was the original product. And today,
6  green is by far the largest product in -- the green
7  claw on different sized cans comprises pretty close to
8  nearly 50 percent of all of our sales.
9  Q   Okay.
10 A   And so it dwarfs everything else. There are
11 other colors and other little variations, but green is
12 the main color of our brand on a black background.
13 Q   Okay. You said -- and I believe you say in
14 here that you sold billions of cans of Monster Energy
15 drink?
16 A   Yes.
17 Q   And so if, if half of those were not the
18 green can, you're talking about 500 million cans of
19 other colored drinks?
20 A   Very possible.
21 Q   Okay. Do you see --
22 A   A point I want to just make, they are all
23 the claw. They are all the shade of claw that has the
24 shading, and they are different colors. But that is
25 correct.

---

Page 83

1  Q   Okay. Now, if you look closely at page 14
2  on Defendant's Exhibit Seven --
3  A   Right.
4  Q   -- the complaint. Do you see on each
5  picture to the left an additional piece of art?
6  A   Yeah.
7  Q   Can you identify what that is? Are you able
8  to see that?
9  A   It's just some tweaked version again of that
10 claw image in some sort of -- some artist's own vision
11 of some kind. He's got some other way of putting
12 another little icon on the side. What it is or what
13 it means, I don't know.
14     Again, but that's another way of -- another
15 bad example of the M, but it's been lengthened and
16 stretched and put down the side. But it's more basic
17 and more, you know -- but it's there. But again, that
18 detracts from it, but it's sort of -- it's just a
19 little more removed and probably less blatant, but it
20 still probably emanates from that same M design. But
21 it's just, you know, on the t-shirt.
22 Q   Okay. Did you -- after you learned about
23 Joe Cool, you testified that you had an investigator,
24 Mr. Maconachy. Is that right?
25 A   Yes.

---

Page 84

1  Q   And what did you do after receiving
2  Mr. Maconachy's report?
3  A   I'm sure I discussed that with our in-house
4  counsel and with our outside lawyers.
5  Q   Did you investigate to determine whether the
6  defendant had been using these marks that we've looked
7  at, since the early '90s?
8  A   I don't believe it was using these marks
9  since the early '90s.
10 Q   What would be the basis of that belief?
11 A   We've never seen them. We've done trademark
12 searches and we've never seen any of these marks, or
13 even of these products in the market. We have been
14 looking and policing the market for many years.
15 Q   Do you know which segment of the retail
16 market Joe Cool focuses on?
17 A   I think, you know -- I don't know exactly.
18 But it's, you know, retail sales and T-shirts and Bike
19 Weeks and things of that nature. I don't have an
20 intimate knowledge.
21 Q   Do you have any knowledge of what channels
22 of distribution they specialize in, if any?
23 A   No. But our investigators who we have
24 engaged over the years obviously go to look at all
25 these different outlets, and types of outlets where

---

Page 85

1  T-shirts and heat transfer shirts are sold.
2  Q   Did you authorize anybody to contact the
3  business of Joe Cool about your view that they were
4  infringing and counterfeiting your mark?
5  A   I, I, I don't recall. I think the attorneys
6  would have simply worked with our internal legal
7  counsel on that.
8  Q   If the, if the mark didn't have a federal
9  trademark registration or application, would you have
10 known that it had been in use since the early '90s?
11     MR. SGANGNA: Object, vague. As to which
12 mark?
13 Q   I'm sorry. The mark that, that we have on
14 these shirts here in the -- depicting defendant's
15 shirts on the complaint. You mentioned to me that --
16 I asked you whether you knew whether these, whether
17 these marks had been in use since the '90s, and you
18 said we did a trademark search?
19 A   We had investigators. I have a thousand
20 staff in America walking around in, in every walk of
21 life. We've never come across any shirt of this
22 nature that's been sold in any outlets anywhere,
23 including all of our investigators and all of our
24 trademark people. Whether it's registered or not
25 doesn't change the fact we would have clearly

---

Page 86

1  continued to police our mark. We have common law
2  rights in this mark, in this design.
3  Q   Okay. I'd like to show you another document
4  one second.
5      (WHEREUPON Defendant's Exhibit was marked for
6  identification).
7  Q   Would you look at page two of Defendant's
8  Exhibit Eight?
9  A   Yes.
10 Q   On the left shoulder of the shirt that is
11 depicted there, there is a claw mark over the letters
12 FL.
13 A   Right.
14 Q   Do you see that?
15 A   Yes.
16 Q   Do you -- would you consider that to be a
17 counterfeit mark of the Monster M claw?
18 A   Yes.
19 Q   Okay.
20 A   A little harder to tell with this because
21 this is a poor copy, a black and white.
22 Q   I apologize. I wanted to have color for
23 you.
24 A   But I do believe it is a -- I do believe it
25 is an infringing mark. And what's interesting about

Page 87

1  this particular T-shirt is the slogan that has been
2  also used on this T-shirt, Let Out Your Beast. Now,
3  we have used and registered the slogan Unleash The
4  Beast, which we've used consistently on -- with our
5  brand extensively since April of 2002. So again, once
6  again comes up the phrase out of the -- out of left
7  field that happens to be a little bit of a twist of a
8  variation of our beast mark, in conjunction with the
9  claw. And again, that then becomes even more
10 problematic. It just shows a state of mind that is
11 clearer to me, that there is somebody that is doing
12 this, is actually sitting with our marks and saying
13 how close can we come to ripping it off without maybe
14 getting into trouble. And where do we cross the line
15 or don't cross the line. That's what's actually going
16 on here.
17 Q   Now, if you look --
18 A   And then you look at the tag on this one,
19 which purports to be also a licensed product, licensed
20 by what and by who. Again, continuing to suggest that
21 this has somehow got an association or some connection
22 with Monster, with Monster Energy and with our claw
23 and our brand and our famous icon.
24 Q   I'm not sure what tag you're referring to.
25 A   The tags on the inside of these shirts. All

Page 88

1  of them have this official -- they purport to say
2  official licensed product and sort of wording to that
3  effect. But licensed to what, it's very clear. But
4  again, it's just a question of how these things have
5  all been cleverly worded to try and be -- you know,
6  just get around the fact that they might or might not
7  have overstepped the line of copying us.
8  Q   Now, let's look at -- okay. Thank you.
9      Let's look at the picture, page two again.
10 On the right shoulder it, it has a claw mark somewhat
11 horizontal over the words Sunshine State Florida. I
12 can't tell what else -- oh, USA, it looks like. Do
13 you see that mark?
14 A   Yes.
15 Q   Would you consider that mark to be a
16 counterfeit mark?
17 A   Yes, I do. It's just longer, taller and
18 thinner. But again, it's just a twisted adapting on a
19 computer of our mark. It still has the elements and
20 the feel of our mark, especially it's on the same
21 T-shirt.
22 Q   Uh-huh. What does that represent to you, on
23 the same T-shirt?
24 A   Again, you -- you're looking at the same
25 T-shirt with the mark in that form. And then you're

Page 89

1  looking at a mark in a slightly different form, one
2  that the reader will say, well, that looks like some,
3  some artist license has gone and been, you know,
4  artistic and smart. He's made it thinner. He's made
5  it a little taller or fatter. But it's still -- the
6  basic claw goes back to this is the Monster claw.
7  Q   Have you had any opportunity to read the
8  deposition of Yosef Amar in this case?
9  A   No.
10 Q   Are you aware that he testified that he had
11 been producing and selling a claw mark he transferred
12 design for clothing since 1993?
13 A   No, that's not correct. My understanding,
14 he's not been selling -- from any of the evidence I've
15 seen at depositions, he's not selling this claw mark.
16 The claw mark that he's alluded to from time-to-time
17 in depositions, or other times, or in affidavits, or
18 declarations with information I've got from my
19 counsel, has been that the information -- they are
20 different marks. They are not this mark. This mark
21 has only been used by him since the end of 2010 or
22 2011. Earlier marks -- there's a whole variation.
23 And if you want me to comment on the earlier marks,
24 and his comments about his use, I'm happy to do so.
25 But those are very different to this.

Monster Energy Company, fka Hansen Bever v.
Consolidated Distributors, Inc

Rodney   Sacks
September 20, 2012

---

Page 90

1   Q   Okay. But would it surprise you then if I
2   were to tell you this elongated version on the right
3   shoulder is what he testified to having used since
4   1993?
5   A   Well, I would be surprised. And I don't
6   believe him.
7   Q   Okay. Have you seen this, the actual shirt
8   that this is a picture of?
9   A   Not this particular shirt. I've seen many,
10  and I -- could have been in the mix. I want to say
11  definitely not. But I think we've seen the shirt
12  somewhere, that we have a shirt with that claw, that
13  unleashed little -- that reference to let out your
14  beast on it, and I may have seen it somewhere. But I
15  can't remember if this was the exact shirt.
16  Q   Okay. Now, this -- let's just refer to it
17  as the, the skinnier mark, the one on the right
18  shoulder.
19  A   Right.
20  Q   Do you know whether Monster has included
21  this mark as part of its claim of infringement in this
22  case?
23  A   I don't know. I would think the whole
24  T-shirt is anything that is resembling the mark, or
25  any variant of it would fall under that, that claim.

---

Page 91

1   But I don't know, exactly.
2   Q   Do you want to take a look at the complaint
3   that -- that's okay. We don't have to do that. I
4   don't want to -- you've given your answer. Thank you.
5       All right. I would like to show you another
6   document, sir. This one is Defendant's Eight. Okay.
7   Here you go (tendering).
8       I'll ask the reporter to mark that one as
9   Defendant's Exhibit Nine.
10      (WHEREUPON Defendant's Exhibit was marked for
11  identification).
12  Q   If you look at page 63, I believe it's the
13  last page.
14  A   Yes.
15  Q   Do you know if that -- you authorized that
16  signature on this document?
17  A   Yes, I did.
18  Q   What is this document?
19  A   This is our latest 10-K.
20  Q   And do you know that when you signed that
21  document, you were testifying to the truth of the
22  statements contained in this document?
23  A   Yes.
24  Q   Can you look at page seven, please? And at
25  the bottom of page begins a section called other

---

Page 92

1   products.
2   A   Right.
3   Q   Does this section indicate that, that
4   Monster is in the clothing business, or in the
5   licensing business?
6   A   It doesn't have anything to do with it.
7   Q   I'm sorry?
8   A   It doesn't have anything to do with it.
9   Q   What doesn't?
10  A   The clothing business or the licensing
11  business.
12  Q   Doesn't have anything to do with what?
13  A   Do with this statement. This is other
14  products.
15  Q   Other products. Well, page six describes
16  products.
17  A   Right.
18  Q   And actually -- actually, no, it begins
19  products -- begins on page four with product
20  introductions. Is there any mention of clothing or
21  licensing?
22  A   Why, why would there be? It's not our
23  principal business. It's not -- doesn't derive rights
24  and materiality in our revenues, and doesn't qualify
25  as a segment. So why would it be. Our principle

---

Page 93

1   business is the sale of beverages, marketing the sale
2   of beverages. We do things that are incidental to the
3   sale of beverages that are maybe important and
4   relevant to us. But they -- the revenues and the
5   extent of the activities relating thereto are not
6   material to our business, and to the size of the
7   business, then they don't have -- they're are not
8   covered and separately dealt with. They wouldn't be.
9   Q   Well, what constitutes materiality, in your
10  view point?
11  A   It's an accounting term. It would probably
12  be a business with maybe five or more percent of our
13  sales. It would be probably -- you know, at this
14  stage, it would be many tens of millions of dollars
15  before it would qualify for that. So while we have
16  these other courses of revenue streams, they are
17  important, they're included in our, our financial
18  statements. The licensing revenues are including as
19  other revenues, but they don't have a separate line
20  item or a separate segment because they don't justify
21  it, based on accounting, on accounting criteria.
22  Therefore, they don't need to be dealt with,
23  specifically, in the 10-K.
24  Q   Okay. Thank you.
25      Now, looking at page 23, would you look at

---

Monster Energy Company, fka Hansen Bever v.
Consolidated Distributors, Inc

Rodney   Sacks
September 20, 2012

---

Page 94

1  that, please?  It says our intellectual property
2  rights are critical to our success, and the loss of
3  such rights could materially, adversely affect our
4  business.
5  A  Right.
6  Q  And then it says further on, if we lose some
7  or all of our intellectual property rights, our
8  business may be materially, adversely affected.
9  A  Right.
10  Q  Is that a true statement?
11  A  I believe it is.
12  Q  Are, are you aware that there's a
13  counterclaim in this case for reverse confusion?
14  A  I'm, I'm aware that there is, there is -- a
15  claim has been made.  I think it has no credibility.
16  Q  And you understand what I mean by reverse
17  confusion?
18  A  Not fully, but --
19  Q  There's a claim that -- are you aware that
20  there's a claim that the defendant's mark is senior,
21  that they had use of it in commerce prior to the M
22  claw mark coming into use in commerce?  Are you aware
23  of that?
24  A  There have been some, there have been
25  some -- I'm aware there's some allegations.  I think

---

Page 95

1  there's been no sustainuation of anything near that.
2  Q  But before today, you weren't aware that,
3  that Mr. Amar testified that the skinny mark on
4  Defendant's Exhibit Eight, page two, on the right
5  shoulder was a mark that he says he was using in
6  continuous use since 1993?
7  A  I, I didn't know.  I don't know anything
8  about his deposition.
9  Q  So are you, are you aware that a finding by
10  the court in this case, that defendant's mark is the
11  senior mark, could result in cancellation of
12  plaintiff's trademark on clothing?
13  A  I don't believe that's possible.  There's
14  not a single shred of evidence that this was ever used
15  by -- in 1993, that mark or any mark that actually
16  resembles our mark.  And I don't believe there is
17  any -- there's any chance, chance of that.
18  Q  Would you consider that occurring to be
19  materially an adverse affect on Monster's business?
20  A  If it did occur, it could be.  I just don't
21  think Mr. Amar -- I think it's so remote that it's
22  highly unlikely, particularly since I know that we
23  actually created the mark and drafted the mark, and
24  were the original authors of that mark, of our mark.
25  I don't believe there could be anything that could be

---

Page 96

1  done that would stop us from using our own mark that
2  we created, and have used extensively for the past 10
3  years.
4  Q  Well, I'm -- my question is referring to
5  clothing, because Mr. Amar testified that he was using
6  the mark on clothing since '93.  So --
7  A  We've used it on clothing for 10 years.  And
8  I don't -- again, extensively, I just don't believe
9  there is any prospect that that was being done.  We
10  designed the mark.  Whether we designed the mark for
11  drinks or for clothing, we designed the mark
12  ourselves, and it was something that we created and
13  drew.  And I just don't believe there could be
14  anything else that could combine something to say they
15  have something so similar to that, that would stop us
16  from using our mark on any item or product, on any
17  product.
18  Q  Are you aware that you claimed in this case
19  that defendant's mark used on clothing is confusingly
20  similar to Monster's M claw mark as used on drink
21  cans?
22  A  Yes.
23  Q  Can you explain how the use of the
24  defendant's mark on a T-shirt could be confused with
25  the drink?

---

Page 97

1  A  Because it still associates the product that
2  is the T-shirt with our drink, and with our brand, and
3  our product, and the reputation we've created around
4  our product.  It's a broader thing.  Our brand is not
5  just limited to a, to a drink.  We've created that
6  product, and a name recognition for a claw icon that's
7  become famous and that extends across many things.
8      I'm sitting here today with a, with a
9  suitcase which is one of the most popular brands in
10  America called Ogio, where we have a claw on it.  And
11  that's what, that's what this brand has done.  And
12  that's what our icon has done.  It's, it's, it's very
13  broad.
14  Q  Okay.  Can I look?
15  A  You can look, with pleasure.  There it is.
16  Q  Oh, I see.  It has your mark on it?
17  A  Yes.
18  Q  Is Ogio one of your licensed --
19  A  Yes, we work with them.  They, they -- I
20  don't know if they're licensed, or we have these made
21  up for ourselves, and our own staff, and our
22  distributors and people.
23  Q  Okay.  Thank you.
24  A  That can fall into different categories of
25  how we have the marks applied and used on clothing and

---

---

Page 98

1  other items.
2  Q   Okay.  So you, you realize then that there's
3  a claim here of confusion between the defendant's mark
4  on clothing and Monster's mark on the drink?
5  A   I understand there is.  But again, my
6  understanding is it's not this mark.  That this mark
7  that we are now debating today, was the mark that was
8  only started to be used by Amar, or Consolidated, or
9  Cool, or whatever, at the end of '10 or the beginning
10  of '11.  The earlier rendition of what he says he used
11  at some time in the past, it was a very different
12  thing and it was just three lines.  It was nothing
13  to -- it wasn't this.  And it wasn't the version that
14  you put onto this T-shirt.
15  Q   Well, let's --
16  A   Not that you put on -- that you referred to
17  me on the T-shirt.
18  Q   Yeah, yeah.  Let me ask you another
19  question.  Are you aware that if there's a
20  determination that, in fact, he was using this mark,
21  either of those marks, the skinny one or long one,
22  which you've said are confusingly similar, that if
23  you -- if there's a determination that he has a senior
24  mark, that he was using it prior to Monster's use of
25  it, of Monster's mark, that it could result in

---

Page 99

1  cancellation of Monster's mark --
2       MR. SGANGNA: I'm going to object to this.
3  You're calling for a legal conclusion as to
4  remedies.  And the question is an incomplete
5  hypothetical, and it's vague.
6       MR. MORTNER: It's not a vague question.
7  Let me ask the witness the question.  He's an
8  attorney and he's very knowledgeable of trademark
9  matters.
10       MR. SGANGNA: He's not here as a trademark
11  law expert.  He's here as a fact witness in this
12  case.
13       MR. MORTNER: I want to know what he knows.
14       MR. SGANGNA: And you can ask him what he
15  knows.  If you ask him questions about what
16  potential remedies might be available if certain
17  facts are proven, you're getting into an area
18  that I think is inappropriate, and I'm raising my
19  objection.
20       MR. MORTNER: Okay.  You have your
21  objection.
22  Q   Let me ask the question again.  If you will
23  answer it, please.  I want to know whether you're
24  aware that, that if the court were to find that this
25  mark was used by Joe Cool as a senior mark prior to

---

Page 100

1  Monster's use of the M claw, that it could result in
2  this case in a determination that would result in the
3  cancellation of Monster's use of the M claw mark on
4  beverage cans?
5       MR. SGANGNA: Same objection.
6  A   It's nonsense, respectfully.
7  Q   I appreciate that.
8  A   My lawyers are, my lawyers -- you know, will
9  deal with the legal issues.  I mean, there are a
10  number of factors that would have to be proven, and
11  it's just not, it's just not, it's just not
12  conceivable.  It's just unrealistic.
13  Q   Well, what about if -- would you imagine
14  that it's possible that a determination that Joe
15  Cool's mark is the senior mark could result in a
16  finding that Monster is required to pay royalties to
17  Joe Cool for the sale of its drinks?
18       MR. SGANGNA: Same objections.  And, you
19  know, we had a mediation last week in which your
20  client didn't show up.  If you wanted to make
21  threats about what kinds of recoveries you think
22  you're entitled to demand in this case, you had a
23  opportunity.  Your client didn't show up.  And
24  that was your time and place.  I think you're
25  harassing the witness at this point, threatening

---

Page 101

1  him regarding remedies that you would like to
2  obtain in this case.
3       MR. MORTNER: All right.  Your objection is
4  noted.  The defendant, Consolidated, did appear
5  at the mediation.
6  Q   And I apologize if I appear to be
7  threatening or harassing.  I certainly did not intend
8  it.  I just -- want to just get to some of the issues
9  out in the case and find out what your knowledge is,
10  because you've made very strong statements about your
11  belief that these marks are counterfeits.  So I don't
12  know if you heard the question.  Do you recall the
13  question that was asked?  If you could answer?
14  A   It's not for me to comment.  The reverse
15  doesn't always remain true.  There's a number of other
16  legal issues that would be involved in that
17  determination, and I just don't believe it's
18  conceivable.  And I don't believe your client has any
19  prior rights.
20  Q   Okay.  Do you know whether this case is
21  mentioned in any of Monster's 10-Ks or 10-Qs in the
22  legal proceeding section?
23  A   Probably not.
24  Q   Why is that?
25  A   Because I don't think it needs to be.  It's

---

Page 102

1  not material, and it's not likely to result in
2  material problems.  This case, it's just, you know,
3  just completely speculative and non-credible.
4  Q  Okay.  See what time it is.  It's 12:30.  I
5  think this would be a good time to take a lunch break.
6  A  I just want to say to you, I reserved the
7  whole day.  I've been available since 8:30 this
8  morning.  I'm available, and I'm available -- I need
9  to take a plane and leave here at 5:00.
10 Q  Okay.  You need to leave here at 5:00?
11 A  I need to leave at 5:00.  As long as you
12 finish with me by then, I'm fine.  If you're not, I'm
13 very happy to forgo lunch and to continue to make sure
14 you have enough time.  But I do want to -- I need to
15 leave at 5:00.
16 Q  I appreciate it.
17 A  I can do whatever you want.
18 Q  We're going to do our best to get you out by
19    5:00, and I'm confident we'll be able to do that.  And
20 I think we can still afford a lunch break.
21 A  Up to you.  Your call.
22    MR. HOLLINGSWORTH: We're off the video
23 record.  It's 12:27.
24    (WHEREUPON the proceedings were in a brief
25 recess).

Page 103

1    MR. HOLLINGSWORTH: We are back on the video
2  record at 1:35 p.m.
3    DIRECT EXAMINATION
4    (continued)
5  BY MR. MORTNER:
6  Q  Mr. Sacks, I remind you that you're still
7  under oath, and we're going begin -- recommence the
8  deposition now.
9  A  Yes.
10 Q  Okay.  Let me show you a document that your
11 counsel gave me today.  It says Monster Energy
12 counterfeit identification guide?
13 A  Counterfeit identification guide, 212.
14 Q  Okay.  Have you seen this document before?
15 A  No.
16 Q  Do you know who produced it?
17 A  I think my legal department.
18 Q  Do you know what its purpose is?
19 A  I think to have a sort of a ready guide for
20 the law enforcement people we work with around the
21 country and internationally, to help us with
22 enforcement activities.
23 Q  Law enforcement people.  Are you talking
24 about people that -- government officials?
25 A  Customs, ICE, local law enforcement in

Page 104

1  different places, yeah.
2  Q  Okay.  And do you -- it says 2012.  Do you
3  know if this is still in use, this document?
4  A  I presume so, it says 2012.
5  Q  Okay.  Thank you.
6    Can we mark that a Defendant's Exhibit 10?
7    (WHEREUPON Defendant's Exhibit was marked for
8  identification).
9  Q  Okay.  I assure you we'll get you out of
10 here by -- in plenty of time to catch your flight.
11 A  Okay.  I'm fine.
12 Q  We're going to go through a bunch of
13 documents rapidly.  Let me ask the reporter to mark
14 this document as Defendant's Exhibit 11.
15    (WHEREUPON Defendant's Exhibit was marked for
16 identification).
17    MR. MORTNER: Off the record.
18    (Thereupon there was a discussion off the
19 record).
20 BY MR. MORTNER:
21 Q  I've shown you a document that says it's a
22 complaint in an action, Hansen Beverage Company, a
23 Delaware Corporation, d/b/a Monster Beverage Company,
24 against Southprint, Incorporated, a Virginia
25 Corporation, d/b/a a Checkered Flag Sports.

Page 105

1  A  Right.
2  Q  Have you seen this document before?
3  A  I may have.  I can't recall.
4  Q  Do you recall this lawsuit, this action
5  being filed?
6  A  Not specifically.  I think it might have
7  arisen from their making some items that we had agreed
8  would be licensed with Ricky Carmichael, and them
9  having gone beyond our authority to, to, to Ricky
10 Carmichael, who's one of our athletes.  And I think --
11 but, again, I'm guessing, unless I read through it.
12 Q  Well, take a look at paragraph 15, if you
13 would.
14 A  Yes.
15 Q  It, it indicates that, that, that the
16 defendant was engaged in the business of selling
17 and/or distributing clothing.
18 A  Right.
19 Q  Is it your recollection or understanding
20 that this is a complaint against a defendant that,
21 that Monster accused of infringing the M claw mark by
22 using it on clothing without authority?
23 A  Yes, yes.
24 Q  Thank you.
25    I'd like, if you would, to just peruse

Case 6:11-cv-00329-ACC-DAB   Document 171   Filed 09/30/12   Page 28 of 46 PageID 3784
Monster Energy Company, fka Hansen Bever v.                                    Rodney   Sacks
Consolidated Distributors, Inc                                         September 20, 2012

Page 106

1  paragraphs 6 through 14, and I'll ask you a question.
2  A   Yes.
3  Q   I, I observed that the complaint does not
4  allege that Monster uses its M claw mark on clothing.
5  Would you agree with that statement?
6  A   I don't know.  I mean, you know, you can
7  read it as well as I can.  I mean, it's a complaint
8  drafted off by my lawyers.
9  Q   Yeah, well, I'll tell you that -- I'll
10  represent to you that it does.
11      MR. SGANGA: I'm going to note an objection,
12  and I think that mischaracterizes the document.
13  And if you want to --
14      MR. MORTNER: In what way does it
15  mischaracterize the document?
16      MR. SGANGNA: I'm not the witness here
17  today, I'm just making the objections.
18      MR. MORTNER: Well, what's the objection?
19      MR. SGANGNA: You have mischaracterized the
20  evidence, and lack of foundation, assumes facts
21  not in evidence.
22      BY MR. MORTNER:
23  Q   All right.  So then I'm -- Mr. Sacks, if you
24  don't mind, would you look at the document, because I
25  would like to ask you questions about that issue,

Page 107

1  about whether the document makes an allegation about
2  use of the mark on clothing by Monster.  And I, I
3  tried to do a shortcut here to save you some time, but
4  if you would now, we'll have to go through the
5  document and you'll have to read it, please.
6  A   You know, I still don't understand what
7  you're, what you're saying.
8  Q   Well, I haven't asked the question yet.  I
9  just -- I need to establish that you understand that
10  this complaint doesn't allege that Monster uses the M
11  claw mark on clothing.
12  A   It doesn't -- it's not alleging.  It just
13  deals with certain, deals with trademarks, and
14  whatever is listed is listed.  I mean, we both can
15  read that.
16  Q   Well, the infringement section on page --
17  refers to Monster's trade dress, paragraph 16?
18  A   Right.
19  Q   And the term trade dress in this complaint
20  refers to the trade dress prominently featured on the
21  energy drinks, if you look at paragraph 11.
22  A   Right.
23  Q   So my question is, do you know why there was
24  no allegation in this complaint as to infringement of
25  Monster's use of the mark on clothing, as rather it

Page 108

1  only deals with the question of the beverage drink
2  trade dress?
3      MR. SGANGGA: Lack of foundation.
4  A   Personally, I think that that's the --
5  that's a draft.  Whoever drafted this draft did this
6  and got off a complaint.
7      Secondly, paragraph 12 does deal with our
8  broader use of the mark on sponsorship of athletes,
9  sponsorship of live events, concerts, because of all
10  of that is done on -- all of the mains there are
11  featured on clothing and our other items.  So I just
12  think all that they've done is they've gone to the
13  main items that we do, which is beverages, and they've
14  said there's an infringement, and that the use on
15  clothing infringes the beverages as well.  And that's
16  their view.  They've filed the complaint.  You know,
17  you can read it as well as I can.  I can't opine
18  anymore than that.
19  Q   Okay.  Okay.  Do you know whether -- do you
20  know -- do, do, do you recall whether there was a
21  seizure authorized in this case against, against
22  Checkered Flag Sports?
23  A   I, I know that there was a resolution, and I
24  know that they stopped and they ceased it.  It was a
25  cease and desist.  I don't know anymore than that.

Page 109

1  Q   So you think there was a cease and desist
2  letter sent?
3  A   No, no, no, an order or an agreement.
4  Whether it was an agreement or it was made an order of
5  court, I don't know.  But there was, there was a
6  resolution and they stopped selling these items, and
7  they removed them or destroyed them, whatever it was.
8  But that was the --
9  Q   The matter was resolved.  But I'm asking
10  more about how it was commenced than it resolved.  I'm
11  just curious as to know whether you're aware of
12  whether there was a seisure authorized.
13  A   I don't know.
14  Q   Okay.  If there was going to be a motion to
15  ask the court to direct the U.S. Marshal to conduct a
16  seizure on Southprint, that's, that's a matter that
17  you would have functioned on?
18  A   Probably.
19  Q   Does that at all help fresh your
20  recollection as to --
21  A   No.
22  Q   -- whether or not --
23  A   No.  There were other issues in this case,
24  and I don't know all the facts.  But there were other
25  issues, because there were -- there was some clothing.

---

Page 110

1 There was some authorized clothing. But there was an
2 issue about their having exceeded their authority, and
3 it was a question of bringing their clothing and
4 stopping the sales back. And I think that was all
5 that happened, they did stop those sales and they were
6 reversed.
7 Q   Okay.
8 A   But there was a resolution that was
9 satisfactory to us.
10 Q   Okay. Thank you. Thank you for your
11 testimony.
12    I'd like to you show you another document,
13 we'll mark it as Exhibit 12, Defendant's Exhibit 12.
14    (WHEREUPON Defendant's Exhibit was marked for
15 identification).
16 Q   This is a complaint against Jim O'Neal
17 Distributing, Incoporated, by Hansen Beverage.
18    MR. SGANGNA: Do you want to take a moment
19 and let the witness look at the document?
20    MR. MORTNER: Absolutely. Thank you.
21 Q   Okay. Do you have a recollection of this
22 action?
23 A   Not, not specifically.
24 Q   The action was filed in March of 2009. Do
25 you have a recollection of the dispute between Monster

Page 111

1 and Jim O'Neal Distributing around that time?
2 A   Not specifically. There were a number of
3 disputes where we found a number of people were
4 exceeding their authority to have made products that
5 had our claw on it, or were make products without,
6 without authority.
7 Q   What is the business of Jim O'Neal
8 Distributing?
9 A   I'm not sure. I think it's helmets or -- I
10 don't know offhand.
11 Q   Okay.
12 A   But this was done in '09, the other one that
13 you showed me earlier was '08.
14 Q   Can you look at paragraph 15?
15 A   Right.
16 Q   Hansen has informed and believes, and on
17 that basis alleges that defendant is engaged in the
18 business of producing, selling and/or distributing
19 replica helmets, gloves, boots and clothing, including
20 T-shirts, jerseys and pants. Does that refresh --
21 A   Right.
22 Q   -- your recollection about the --
23 A   I think it's in the motorcycle area. Right.
24 Q   Okay. Do you have any recall now about this
25 action? Does this --

Page 112

1 A   No. We did take a number of actions at the
2 time, because there were a number of people producing,
3 as I said, either counterfeit, or where they had had
4 authority and had been given authority to work with us
5 to produce a certain amount of items, and a certain
6 quantity or certain types. What happened was there
7 was -- because of the demand that happened, we found a
8 number of these companies in California had started to
9 produce excessive amounts and started selling wherever
10 they could create business, and that was hard to track
11 down. When we realized that was happening, we took an
12 action against a number of them.
13 Q   Okay. So this is -- this would be in that
14 group along with Southprint?
15 A   I think Southprint was separate. I think
16 Southprint was separate at a separate time. But it
17 was, again, it was as a result of a sponsorship
18 between Ricky Carmichael, that I think what we did,
19 was we gave Ricky the right to use our trademark on
20 Ricky Carmichael authentic gear sold at the tracks.
21 And what happened was he had arranged with -- what we
22 found out with Southprint, had been engaged to produce
23 the product for him. But then unknown to us -- I'm
24 not sure with or without his Ricky's consent -- they
25 had gone and starting selling it and putting it into

Page 113

1 Walmart, and we saw them. We then immediately took
2 action to stop it. So that was a different situation
3 to this one, but at different points in time.
4 Q   Okay. Do you know if you authorized this
5 action to be brought?
6 A   I'm sure I authorized it.
7 Q   Okay. And do you have any recollection of
8 whether you authorized there to be a seizure in this
9 case?
10 A   Again, I don't know if there was a seizure.
11 I know there -- you know, was action taken. There was
12 relief taken. There was sort of certain, certain
13 payments and damages, and certain products were, in
14 fact, surrendered or returned. I don't know the exact
15 details.
16 Q   Okay. Let me show you another document,
17 this will be Defendant's Exhibit 13.
18    (WHEREUPON Defendant's Exhibit was marked for
19 identification).
20 Q   This is another complaint filed in
21 March 2009 by Monster against a company called
22 J.M.J.E, Incorporated, a California Corporation.
23 A   Right.
24 Q   It appears that the allegations in these
25 complaints are pretty much for the same form. Would

Page 114

1  you --
2  A  Right.
3  Q  Yeah.
4  A  Yeah, that is correct.  This was at that
5  time that we started realizing that there was a --
6  there was effectively an underground movement of
7  people trying to make money off our, off our brand,
8  off our clothing, and that they had found ways to
9  basically try and produce and sell clothing, without
10  bringing it to our notice, without noticing.  And
11  ultimately we -- it came to a head and we found out
12  about it.  And we took a number of actions in
13  California and elsewhere against, against people at
14  that time.  This is the '08/'09 time.  This is now the
15  same time as that other one.
16  Q  Yeah, same one.
17  A  Right.  And again, it was some form -- it
18  was a format that was used by the lawyers at that
19  time.  At that time I note that -- that time I think
20  we hadn't got registrations for our clothing mark.
21  But, you know, it was done, whatever it was done with
22  by our --
23  Q  Do you know what business J.M.J.E. is in?
24  A  They are in clothing.  They make clothing.
25  Q  Okay.  Do you have a specific recollection

Page 115

1  of this action?
2  A  I remember the action, not the details.  But
3  I do remember the action.
4  Q  Okay.  And was this one resolved?
5  A  It was also resolved in substantial, you
6  know, penalties being paid by them and fees and
7  amounts.  I think there was also -- there was a cease
8  and desist, and they handed over designs and T-shirts
9  and clothing to us.
10  Q  I'm sorry?  What did you mean by there was a
11  cease and desist?
12  A  Because they agreed under -- either under
13  the federal rules, under, under an agreement that was
14  made in order of court.  It was either made, or just a
15  settlement agreement that was in court.
16  Q  Oh, they agreed to cease and desist?
17  A  They agreed to cease and desist and to hand
18  over certain things.  And there were certain things
19  done, yeah.
20  Q  Okay.  And so you, you think you authorized
21  this action.  Is that correct?
22  A  Yes, I'm sure I did.
23  Q  And do you recall whether or not you
24  authorized a seisure in this case?
25  A  I'm not sure if there was a seisure in this

Page 116

1  case.  I don't think so.
2  Q  Were these -- were the items being produced
3  counterfeit products?
4  A  Some of them were counterfeit and some of
5  them -- many of them were not counterfeit.  They
6  were -- they had made products for us with our
7  permission, and we were using to give -- to promote
8  our product to provide to athletes.  What we found out
9  was they were also making additional quantities.  So
10  they were the product, but they were exceeding their
11  authority.  So there were different rules and
12  different facts in each of those cases.
13  Q  Okay.
14  A  There was uncertainty about who had
15  authorized them and what was the authority.  And then
16  we -- but we took quite a lot of enforcement action to
17  clamp down on what was basically going on because of
18  the demand for our products.
19  Q  Okay.  I'm showing you another one, this
20  we'll mark as Defendant's Exhibit 14.
21  (WHEREUPON Defendant's Exhibit was marked for
22  identification).
23  Q  This is a complaint also filed --
24  MR. SGANGA: Wait a minute.
25  MR. MORTNER: Oh, sorry.  Let me wait for

Page 117

1  you.
2  Q  This is also a complaint filed in March 2009
3  in the United States District Court Central District
4  of California.  Hansen, doing business as Monster,
5  against a company called Factory Effex, Incorporated,
6  a California Corporation.  And it seems to follow the
7  same form as the other complaints.
8  A  Yeah, they were taking -- they were making
9  sticker kits for motorcycles.  And again, we found
10  that they were making more than we had known.  And
11  they were being sold in both in the U.S. and overseas
12  in excess of the quantities that we had approved, and
13  we took action.  So there were a number of actions
14  that we took at that time.
15  Q  And if you look at paragraph 15, it says
16  Hansen informed and believes on that basis, alleges
17  that defendant is engaged in the business of
18  producing, selling and/or distributing graphic kits,
19  sticker kits and iron-on kits.  So iron-on kits, is
20  that -- do you know if that's referring to heat
21  transfers for clothing?
22  A  No, not to my knowledge.  Our issue --
23  that's what their business was.  Our problem with them
24  was they were making sticker kits.
25  Q  Oh, okay.  Thank you.

Monster Energy Company, fka Hansen Bever v.
Consolidated Distributors, Inc

Rodney   Sacks
September 20, 2012

Page 118

1   A   They may have had a separate business doing
2   things -- it wasn't something that we were concerned
3   with.
4   Q   Thank you for clearing that up.
5       And you authorized this lawsuit?
6   A   Yes.
7   Q   Again, do you have any recollection of
8   whether you authorized a seizure in this case?
9   A   I don't think there, there was a seizure in
10  this case.
11  Q   And let me, let me correct that question.  I
12  should say authorized your attorneys to request the
13  court to issue a seizure.
14  A   You know, I don't know what the relief is,
15  there may have been --
16  Q   Of course --
17  A   -- in the relief that was caused.  But that
18  was the -- whatever the advice was with the lawyers at
19  that point in time about what we could do or couldn't
20  do, was followed in the -- in this case.
21  Q   Okay.
22  A   You know, there were, there were other
23  people that were making what we believed to be
24  counterfeit items, where they weren't official parties
25  who we had done business with.  In those cases we did

Page 119

1   have seizures.  And those cases were done with --
2   often in conjunction with law enforcement agencies.
3   There were different classes of people as to what
4   relief we could get.  We have done many seizures, but
5   in this particular case, I don't think there was a
6   seizure.
7   Q   Can you, can you recall -- you said you've
8   done many seizures.  Those were actions, actions that
9   you filed, and then your attorneys went into court on
10  an ex-parte motion.  Is that what you're referring to?
11  A   The attorneys or our, our -- the agents we
12  had used worked to file the actions, or filed the
13  paperwork, or did it with the -- often in conjunction
14  with law enforcement, because we found that became a,
15  a, a more efficient and a more reliable way to do it.
16  Q   Okay.  All right.  Let me show you one more
17  of these.  We'll Mark this as Defendant's Exhibit 15.
18      (WHEREUPON Defendant's Exhibit was marked for
19  identification).
20  Q   Now, this is another complaint filed in the
21  United States District Court, the Central District of
22  California, Monster against One Industries
23  Corporation, a Delaware Corporation.
24  A   Right.
25  Q   And it seems to follow the same format.

Page 120

1   A   Right.
2   Q   Filed at the same time.
3   A   Right.
4   Q   Again, this -- if you look at page four --
5   A   Right.
6   Q   Defendant's infringement of Hansen, Monster
7   marks and Monster's trade dress.
8   A   Right.
9   Q   Do you, do you know what One Industries
10  does?
11  A   They do all these things.  They do, they do
12  a lot of racing, motorcycle racing uniforms, what they
13  call racing kits.  But they also do, you know,
14  helmets.  They do casual wear.  They do shirts.  They
15  do jackets, socks.  As I said, general accessories,
16  backpacks.  They do a number of things.  And again,
17  they were, to some extent, licensed, and they were
18  making products with our knowledge.  And then we found
19  out they were making more product, in some cases
20  selling product overseas, that we had not authorized.
21  And we filed a suit and ultimately entered into a
22  licensed agreement with One Industries, I think, where
23  it limited the amount of their products, and what they
24  could do and the manner in which we could do it.  And
25  there was a subsequent license arrangement with One

Page 121

1   Industries for a while.
2   Q   Okay.  Do you still have a license with
3   them?
4   A   I think we, we do, or it may have come to an
5   end now.  We may not have renewed it now.  But it did
6   go on for some years.
7   Q   And did you authorize this lawsuit?
8   A   Yes.
9   Q   Do you have a recollection of whether you
10  directed your attorneys to make an ex-parte motion
11  requesting the court to grant an order of seizure?
12  A   I don't think so.  Again, because this was a
13  person we were involved with and doing business with.
14  Q   Okay.  Thank you.  All right.  Let me show
15  you another document, we'll mark this as Defendant's
16  Exhibit 16.
17      (WHEREUPON Defendant's Exhibit was marked for
18  identification).
19  A   Okay.
20  Q   Have you seen this document before?
21  A   Yes.
22  Q   And what is it?
23  A   It's a declaration unsigned.
24  Q   In this action, correct?
25  A   Yes.

---

Page 122

1    MR. SGANGNA: And note for the record, this
2  is incomplete.  It does not include the exhibits
3  that were attached to the original declaration.
4    MR. MORTNER: Okay.  Thank you.
5  Q   This motion -- this declaration was
6  submitted in support of Monster's ex-parte motion for
7  temporary restraining order, and an order of seizure
8  in this case.  Is that your recollection?
9  A   Right.
10 Q   On page 23, is that your signature?
11 A   Yes.
12 Q   And on page 22, at the bottom it states --
13 or, actually you stated, I declare under penalty of
14 perjury under the laws of the United States of
15 American, that the forgoing is true and correct.
16 A   Yes.
17 Q   And you understand that perjury is a crime?
18 A   Yes.
19 Q   And you understand that the declaration had
20 to be accurate and truthful?
21 A   Yes.
22 Q   Okay.  Would you look at paragraph 48,
23 please?
24 A   Yes.
25 Q   It states in addition, MBC -- that's Monster

---

Page 123

1  Beverage Corporation, the holding company?
2  A   Yes.
3  Q   Monster Beverage Corporation has filed
4  numerous other cases, and sent many cease and desist
5  letters to protect its valuable marks, including its M
6  claw trademark from infringing uses.
7  A   Yes.
8  Q   Do you know whether a cease and desist
9  letter was sent to the defendants in this case prior
10 to filing the action?
11 A   I, I don't know.  But I do not believe so.
12 Q   Why don't you believe so?
13 A   I haven't seen one.
14 Q   Okay.  Do you know what the factors are that
15 go into the determination to send the cease and desist
16 letter to a party that you believe is infringing?
17 A   I think that every case is different.  Every
18 case is determined on its own merits in the
19 circumstances.  There are a number of factors.  In
20 this particular case there was a -- we had, we had
21 obtained information in an unusual way about the fact
22 they were having this Bike Week.  We, we had an
23 investigator's report.  The investigator's report
24 showed that there were a number of companies that were
25 associated with the defendants in this case, they had

---

Page 124

1  created and had established dozens of companies, all
2  with names that were very close to other registered
3  and well-known trademarks, like Porshe, like Lemon
4  Cola, like Prince Charles.  There was, there was,
5  there was a numerous amount of them, of these
6  trademarks, companies that had all been registered,
7  and then they had gone defunct and then delisted.
8    Then there were different -- there were
9  concerns about the names of the principles.  We
10 couldn't find them.  And then the names were spelled
11 differently and the addresses were wrong.  There were
12 a number of circumstances in this case, that when they
13 were ultimately evaluated together with the t-shirts,
14 and the fact that the T shirts were going to be sold
15 on a temporary basis at a Bike Week, which would --
16 that the advice we got from the lawyers and was -- and
17 I don't want to go into the advice and what went into
18 that advice, that we had reasonable grounds for
19 bringing a seizure order.  And that would be the most
20 effective to stop the infringement, and the damage to
21 our brand and our reputation.  And that is what we
22 did.
23 Q   You say there were dozens of other
24 companies.  How did Monster acquire this information?
25 A   From our -- the report of our investigator.

---

Page 125

1  There's a report -- if you show it to me, I'll point
2  out the names to you.
3  Q   Have you ever heard of an attorney named
4  Leslie Lott?
5  A   I've heard of the name.
6  Q   Do you know if she was involved in the early
7  investigative stages of this case?
8  A   I don't know when she was involved.
9  Q   Do you know who David Bass is?
10 A   He's a name that's appeared associated with,
11 at times, with the defendants in this case, involved
12 Consolidated, and involved somehow with Joe Cool.  And
13 there's an interchange between Joe Cool and
14 Consolidated.  And the name comes out in different
15 names and different spellings and different
16 pronunciations, and there were -- in different
17 addresses.  That's all I know about him.
18 Q   Okay.  Well, do you know how his name became
19 associated with this case at Monster?
20 A   Well, because --
21 Q   How did you learn about him?
22 A   Through the reports as to the fact that he
23 had been associated with the defendants in this case,
24 with a number of these other companies that had been
25 incorporated, and had been involved in trademark

---

Page 126

1  registrations and disputes and a whole lot of other
2  areas. So that's how he became involved.
3  Q  I see. Are you aware that he's a -- he's
4  been made a defendant in this case?
5  A  Yes.
6  Q  Do you know what the factual basis is for
7  naming him individually as a defendant?
8  A  I think his conduct and his actions in this
9  matter in the infringement case, and, you know, being
10  involved in this case. And, you know, there are a
11  number of details about what he's done and who's
12  involved in this whole, this whole case.
13  Q  Well, do you have any knowledge of what --
14  you refer to his conduct. Do you have any specific
15  conduct that you're referring to?
16  A  As far as I'm aware, he's the person who is
17  behind Consolidated and involved. And is the --
18  actively involved in the company, in the decisions and
19  management of the company.
20  Q  And how do you, how do you come to that
21  opinion?
22  A  From the expert report that the -- not
23  expert, the investigator's report that we got at the
24  time. And then following discussions with our lawyers
25  at the time.

Page 127

1  Q  Okay. All right. I'd like to take a short
2  five-minute break. I think we're just about done.
3  I'd like to check the notes and see.
4      MR. HOLLINGSWORTH: We're off the video
5  record, it's 2:09.
6      (WHEREUPON the proceedings were in a brief
7  recess).
8      MR. HOLLINGSWORTH: We're back on the video
9  record at 2:13.
10      BY MR. MORTNER:
11  Q  Mr. Mr. Sacks, I don't have any more
12  questions for you. Thank you for coming today.
13      A question, Mr. Sganga, the witness
14  testified about a report that was prepared by
15  Mr. Maconachy that was an international report, as
16  opposed to the declaration that was filed here. Have
17  you produced that in this case?
18      MR. SGANGNA: I believe we have, yes.
19      MR. MORTNER: Okay. If you don't mind, I'd
20  ask you to either indicate where in the
21  production of some 25,000 documents it was
22  produced, what the number is, or simply send
23  another copy to us directly.
24      MR. SGANGNA: I'll see what I can do on
25  that, yeah.

Page 128

1      MR. MORTNER: Okay. Thank you.
2      MR. SGANGA: And I just -- yeah, let's just
3  note for the record we did provide you also in
4  the production that counterfeiting guideline
5  document that I handed you an original here
6  today. But that also, I believe, is getting
7  produced to you separately, and that's the one
8  that you marked here as, as an exhibit.
9      And then we also had a discussion off the
10  record, you indicated that you had documents that
11  you were producing to us that had previously been
12  withheld on the privileged grounds.
13      MR. MORTNER: That's correct.
14      MR. SGANGNA: We were hoping to get those to
15  us this week.
16      MR. MORTNER: Yes.
17      MR. SGANGNA: And I was referring -- the
18  counterfeiting guideline, is what you've marked
19  as Exhibit 10 here today.
20      MR. MORTNER: Good.
21      MR. SGANGNA: So we can go off the record?
22      MR. MORTNER: Yes.
23      MR. HOLLINGSWORTH: We're off the video
24  record at 2:15.
25

Page 129

1      STIPULATIONS
2      IT WAS STIPULATED AMONG counsel for the
3  respective parties, with the consent of the witness,
4  that reading and signing of the foregoing deposition by
5  the witness be waived.
6      THEREUPON, the deposition of Rodney Sacks was
7  concluded at 2:15 a.m.
8      NOTE: The original and one copy of the
9  foregoing deposition will be held by John Sganga,
10  Esquire; copy to Moshe Mortner, Esquire.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Case 6:11-cv-00329-ACC-DAB   Document 171   Filed 09/30/12   Page 34 of 46 PageID 3790
Monster Energy Company, fka Hansen Bever v.
Consolidated Distributors, Inc
Rodney   Sacks
September 20, 2012



Page 130

1    CERTIFICATE OF REPORTER OATH
2
3  STATE OF FLORIDA
4  COUNTY OF VOLUSIA
5
6    I, the undersigned authority, hereby certify
7  that the witness named herein personally appeared
8  before me and was duly sworn.
9
10
11    WITNESS my hand and official seal this
12  September 20, 2012.
13
14
15
16
17
18  _____
19  Julie A. Watkins
20  Notary Public - State of Florida
21  Commission No. DD 965178
22  Expires:  March 24, 2014
23  SCLAFANI WILLIAMS COURT REPORTERS, INC.
24
25

Page 131

1            REPORTER'S DEPOSITION CERTIFICATE
2
3  STATE OF FLORIDA
4  COUNTY OF VOLUSIA
5
6        I, Julie A. Watkins, Court Reporter and Notary
7  Public in and for the State of Florida at large, hereby
8  certify that the witness appeared before me for the
9  taking of the foregoing deposition, and that I was
10  authorized to and did stenographically and
11  electronically report the deposition, and that the
12  transcript is a true and complete record of my
13  stenographic notes and recordings thereof.
14        I FURTHER CERTIFY that I am neither an
15  attorney, nor counsel for the parties to this cause,
16  nor a relative or employee of any attorney or party
17  connected with this litigation, nor am I financially
18  interested in the outcome of this action.
19        DATED THIS DAY September 27, 2012, at Daytona
20  Beach, Volusia County, Florida.
21
22
23        _____
24        Julie A. Watkins
          SCLAFANI WILLIAMS COURT REPORTERS, INC.
25

Monster Energy Company, fka Hansen Bever v.
Consolidated Distributors, Inc

Rodney   Sacks
September 20, 2012

**$**

**$12.00 (1)** 46:21
**$20.00 (1)** 46:20

**0**

**04 (1)** 47:3
**05 (1)** 45:7
**06 (2)** 45:7,7
**07 (1)** 45:7
**08 (1)** 111:13
**08/'09 (1)** 114:14
**09 (2)** 39:5;111:12

**1**

**1:35 (1)** 103:2
**10 (11)** 8:10;30:11;40:25;61:6;
  63:11;80:23;96:2,7;98:9;104:6;
  128:19
**10:03 (1)** 5:3
**1052 (2)** 71:18,23
**10-K (2)** 91:19;93:23
**10-Ks (1)** 101:21
**10-Qs (1)** 101:21
**11 (4)** 81:4;98:10;104:14;107:21
**11:19 (1)** 61:20
**11:29 (1)** 61:23
**12 (4)** 8:10;108:7;110:13,13
**12:27 (1)** 102:23
**12:30 (1)** 102:4
**13 (1)** 113:17
**14 (5)** 76:15;78:16;83:1;106:1;
  116:20
**15 (4)** 105:12;111:14;117:15;
  119:17
**16 (2)** 107:17;121:16
**16th (1)** 18:17
**18th (1)** 19:25
**1949 (1)** 9:17
**1989 (3)** 9:20;11:5,18
**1990 (1)** 15:4
**1991-1992 (1)** 12:14
**1993 (4)** 89:12;90:4;95:6,15

**2**

**2 (2)** 33:9,15
**2:09 (1)** 127:5
**2:13 (1)** 127:9
**2:15 (2)** 128:24;129:7
**20 (2)** 28:18;130:12
**2000 (2)** 32:22;62:4
**2001 (1)** 19:12
**2002 (20)** 17:17;19:12,25;20:3;
  22:17,21;24:7,9,15;28:19;29:1;
  32:21;36:16;37:4;38:17;41:10;
  46:9,15;62:22;87:5
**2003 (1)** 46:16
**2004 (2)** 18:17;46:17
**2005 (2)** 46:9,18

**2006 (1)** 48:12
**2007 (1)** 56:4
**2009 (9)** 33:9,15;35:4;38:5,7;57:7;
  110:24;113:21;117:2
**2010 (8)** 32:24;33:12;34:6;35:4;
  39:3;40:7;57:7;89:21
**2011 (9)** 31:2;32:23;39:13;40:7;
  57:7;62:4;68:21;69:3;89:22
**2012 (4)** 5:2;104:2,4;130:12
**2014 (1)** 130:22
**20th (1)** 5:2
**212 (1)** 103:13
**22 (1)** 122:12
**23 (2)** 93:25;122:10
**24 (4)** 9:17;28:19;29:1;130:22
**25 (1)** 30:2
**25,000 (1)** 127:21
**27 (3)** 20:2;78:15,16
**27th (1)** 20:3
**28 (1)** 33:12

**3**

**30 (4)** 36:16;37:4;38:17;56:4
**30b6 (1)** 17:22
**383 (1)** 9:11

**4**

**48 (1)** 122:22
**4th (1)** 8:8

**5**

**5 (1)** 46:20
**5,000 (1)** 46:15
**5:00 (5)** 102:9,10,11,15,19
**50 (3)** 20:17;46:17;82:8
**500 (1)** 82:18

**6**

**6 (1)** 106:1
**60,000 (1)** 46:17
**62 (1)** 9:14
**63 (1)** 91:12

**8**

**8:30 (1)** 102:7

**9**

**90 (1)** 61:4
**90s (4)** 84:7,9;85:10,17
**93 (1)** 96:6
**965178 (1)** 130:21
**9th (1)** 8:4

**A**

**A1 (2)** 18:10;25:3
**A10 (2)** 27:8,8

**A13 (2)** 30:19,20
**ability (1)** 59:25
**able (4)** 21:13;51:24;83:7;102:19
**absolutely (1)** 7:25;110:20
**accessories (1)** 120:15
**account (1)** 47:20
**accounting (3)** 93:11,21,21
**accounts (1)** 48:6
**accurate (1)** 122:20
**accurately (1)** 12:6
**accused (1)** 105:21
**achieve (1)** 32:18
**achieving (1)** 35:6
**acids (1)** 20:15
**acknowledged (1)** 6:3
**acquire (1)** 124:24
**acquired (5)** 11:25;12:11,13,17,18
**acquiring (2)** 15:2,2
**acquisition (1)** 12:8
**acquisitions (1)** 12:13
**across (3)** 76:2;85:21;97:7
**action (24)** 16:12;27:1;44:1;51:21;
  69:23;70:9;76:10;104:22;
  105:4;110:22,24;111:25;
  112:12;113:2,5,11;115:1,2,3,21;
  116:16;117:13;121:24;123:10
**actions (11)** 15:24;16:4,8;74:19;
  112:1;114:12;117:13;119:8,8,
  12;126:8
**active (1)** 13:4
**actively (2)** 15:10;126:18
**activities (3)** 57:12;93:5;103:22
**activity (1)** 57:6
**actual (3)** 21:10;65:8;67:17;70:20;
  75:12;90:7
**actually (27)** 17:17;20;21:5,14;29:7;
  35:23;38:8;39:6;50:4,16,22;
  51:6,21;52:22;55:12;65:13;
  69:22;70:4,5;82:4;87:12,15;
  92:18,18;95:15,23;122:13
**adapting (1)** 88:18
**adding (1)** 34:22
**addition (4)** 13:20;42:25;47:23;
  122:25
**additional (12)** 8:20;32:8;33:18,19,
  20;34:3,9;43:5;51:19;71:2;
  83:5;116:9
**address (6)** 9:10;71:9,12,23;73:3,6
**addresses (2)** 124:11;125:17
**adequate (3)** 8:16;26:17;42:2
**adopted (1)** 24:9
**adverse (2)** 44:19;95:19
**adversely (2)** 94:3,8
**advertising (1)** 67:2
**advice (4)** 118:18;124:16,17,18
**affect (4)** 10:8;44:19;94:3;95:19
**affected (1)** 94:8
**affects (1)** 61:12
**affidavits (1)** 89:17
**afford (1)** 102:20
**Africa (3)** 9:18;11:8;12:23,24,25;
  13:7
**again (39)** 8:22;22:12;41:16;43:4;

**44:16;48:24;49:3;54:5;55:20;
  58:18,20;60:1;67:22;69:5,21;
  70:1;83:9,14,17;87:5,6,9,20;
  88:4,9,18,24;96:8;98:5;99:22;
  105:11;112:17;113:10;114:17;
  117:9;118:7;120:4,16;121:12
**against (16)** 23:22;27:1;28:15;
  51:22;69:23;104:24;105:20;
  108:21,21;110:16;112:12;
  113:21;114:13,13;117:5;119:22
**age (1)** 9:13
**agencies (1)** 119:2
**agents (2)** 36:7;119:11
**aggressive (2)** 19:16,18
**agree (6)** 31:11;53:14;57:8;63:25;
  78:21;106:5
**agreed (8)** 9:2;44:7;53:23,24;
  105:7;115:12,16,17
**agreement (8)** 44:8;57:21,22;109:3,
  4;115:13,15;120:22
**agreements (9)** 51:13,14;52:2,4;
  53:3,5;57:6;58:11,16
**ahead (1)** 42:8
**al (1)** 5:13
**alcohol (1)** 10:7
**allegation (2)** 107:1,24
**allegations (2)** 94:25;113:24
**allege (1)** 106:4;107:10
**alleges (2)** 111:17;117:16
**alleging (1)** 107:12
**alluded (1)** 89:16
**along (1)** 112:14
**Alternatively (1)** 40:9
**alternatives (1)** 31:19
**Although (2)** 6:14;66:23
**always (5)** 22:24;35:7,7;81:23;
  101:15
**Amar (6)** 68:8;89:8;95:3,21;96:5;
  98:8
**amaturist (1)** 63:14
**amended (4)** 18:10;27:8;30:20;
  76:9
**America (2)** 85:20;97:10
**American (1)** 122:15
**amino (1)** 20:14
**AMONG (1)** 129:2
**amount (9)** 6:25;46:12;48:13;
  53:25;54:2;58:23;112:5;
  120:23;124:5
**amounts (2)** 112:9;115:7
**Anaheim (1)** 14:12
**analytical (1)** 80:9
**ancillary (1)** 28:2
**and/or (4)** 47:9;77:5;105:17;
  111:18;117:18
**angle (2)** 32:1,2
**animal (1)** 65:10
**annual (1)** 46:10
**anymore (2)** 108:18,25
**apologize (2)** 86:22;101:6
**apparel (2)** 55:25;57:17
**appear (2)** 101:4,6
**appeared (2)** 125:10;130:7

Case 6:11-cv-00329-ACC-DAB Document 171 Filed 09/30/12 Page 36 of 46 PageID 3792
Monster Energy Company, fka Hansen Bever v.
Consolidated Distributors, Inc
Rodney Sacks
September 20, 2012

**appearing (1)** 17:24
**appears (4)** 31:11,12;81:17;113:24
**application (6)** 26:12;30:8;39:8,10,13;85:9
**applied (6)** 21:11,11;25:1;26:4;39:5;97:25
**apply (1)** 34:2
**applying (1)** 34:4
**appreciate (2)** 100:7;102:16
**approval (7)** 37:21;39:23,24;40:1;56:23,23,24
**approvals (1)** 56:21
**approve (1)** 37:25
**approved (1)** 117:12
**approving (1)** 38:16
**approximately (2)** 5:3;62:3
**April (8)** 17:17,19;19:25;33:9,15;38:5,7;87:5
**area (3)** 11:9;99:17;111:23
**areas (1)** 126:2
**arisen (1)** 105:7
**arising (1)** 34:15
**around (23)** 21:24;22:1;33:24;34:7;35:14;39:3;40:7;45:6;48:12;61:4;66:21;67:21,25;69:20,23;72:16,25;73:2;85:20;88:6;97:3;103:20;111:1
**arranged (1)** 112:21
**arrangement (3)** 56:18;58:8;120:25
**arrangements (3)** 51:15;56:15,16
**art (9)** 62:25;63:1,17;64:2,4,13;66:11;75:25;83:5
**article (4)** 29:15;46:19;58:25;77:19
**articles (7)** 21:10;29:15;45:24;46:15,17;74:12;75:1
**artist (2)** 65:24;89:3
**artistic (2)** 77:10;89:4
**artist's (1)** 83:10
**artwork (1)** 64:21
**aspects (1)** 15:13
**assess (1)** 48:19
**asset (1)** 61:10
**assets (1)** 12:10
**Assignments (1)** 11:21
**associated (4)** 123:25;125:10,19,23
**associates (1)** 97:1
**association (1)** 87:21
**assume (1)** 38:3
**assumes (1)** 106:20
**assure (1)** 104:9
**athlete (5)** 53:12;56:12;58:19;59:18;81:17
**athletes (19)** 21:21;43:18,20;44:3,11,12;45:2;48:23;51:15;52:24;56:8,9,11;57:14;81:18,22;105:10;108:8;116:8
**attached (2)** 50:18;122:3
**attachment (1)** 50:16
**attempt (1)** 79:16
**attempting (1)** 24:14
**attended (1)** 22:1
**attention (2)** 62:6,8
**attorney (7)** 5:16;6:10,12;37:12,16;

99:8;125:3
**attorneys (10)** 5:14;15:17;36:4,5;38:1;85:5;118:12;119:9,11;121:10
**attraction (2)** 78:10,11
**August (1)** 8:4
**authentic (3)** 43:22,22;112:20
**authorities (1)** 36:6
**authority (15)** 15:5,7;16:5;51:20;70:3;105:9,22;110:2;111:4,6;112:4,4;116:11,15;130:6
**authorize (3)** 37:25;85:2;121:7
**authorized (15)** 36:3;91:15;108:21;109:12;110:1;113:4,6,8;115:20,24;116:15;118:5,8,12;120:20
**authorizing (1)** 7:23
**authors (1)** 95:24
**available (10)** 37:12,15;38:7;45:11,12;63:17;99:16;102:7,8,8
**average (4)** 46:19,19,21;80:11
**aware (21)** 7:6,22;17:2,3;18:23;56:6;68:21;89:10;94:12,14,19,22,25;95:2,9;96:18;98:19;99:24;109:11;126:3,16

## B

**back (7)** 29:18;41:9;61:22;89:6;103:1;110:4;127:8
**background (1)** 12:21;78:19;82:12
**backpacks (2)** 20:18;120:16
**bad (13)** 75:2,3,4,8,9,16,19;76:3;78:23,25;79:1,2;83:15
**Bakshi (1)** 5:22
**balance (1)** 48:24
**bandannas (1)** 29:25
**bar (2)** 13:1,2
**base (3)** 55:12;78:3;79:20
**based (4)** 38:16;68:3,4;93:21
**basic (2)** 83:16;89:6
**basically (10)** 31:23;42:5;43:21;44:8;62:9;63:10;68:1,25;114:9;116:17
**basis (13)** 8:5;14:18;28:6;36:22;44:22;49:3;74:22;78:7;84:10;111:17;117:16;124:15;126:6
**Bass (1)** 125:9
**Beach (5)** 9:11;71:18,20,23;72:9
**beanies (1)** 30:1
**bearing (1)** 22:21
**Beast (4)** 87:2,4,8;90:14
**became (18)** 11:23;20:23;33:19;38:7;43:13,14;44:16;66:6,6,8,15,20,21,22;68:21;119:14;125:18;126:2
**become (13)** 20:22;27:5;35:15;41:19;42:4,21;45:10;46:4,4;60:18;61:2;80:9;97:7
**becomes (1)** 87:9
**becoming (5)** 23:4;27:4;33:22;60:19;65:20
**began (6)** 17:13;23:13;25:22;41:11;42:14;46:23

**begin (3)** 6:22;44:25;103:7
**beginning (4)** 5:15;12:4;62:3;98:9
**begins (3)** 91:25;92:18,19
**behind (2)** 67:13;126:17
**belief (3)** 74:22;84:10;101:11
**believes (2)** 111:16;117:16
**belonged (1)** 62:16
**Bernstein (1)** 56:17
**best (2)** 48:19;102:18
**better (4)** 26:22,23;31:19;35:7
**Beverage (16)** 11:23;12:5;13:14,18;14:1,2,3;19:5;22:7;100:4;104:22,23;108:1;110:17;123:1,3
**beverages (5)** 93:1,2,3;108:13,15
**beyond (7)** 7:24;49:23;50:2;105:9
**big (3)** 33:22;59:19;69:11
**bigger (1)** 41:20
**Bike (11)** 69:2;71:16;73:18;74:7,10,12;75:18;78:13;84:18;123:22;124:15
**billions (1)** 82:14
**birth (1)** 9:16
**bit (5)** 63:14;79:5,12,13;87:7
**black (2)** 78:18;82:12;86:21
**blatant (1)** 83:19
**blurring (1)** 55:14
**Board (1)** 16:8
**boardwalk (1)** 78:13
**book (1)** 68:17
**boots (1)** 111:19
**both (13)** 16:17;27:3;35:13;36:9,15;39:17;42:1;44:15;55:3;67:19;77:5;107:14;117:11
**bottom (1)** 91:25;122:12
**bought (1)** 21:10
**boxes (1)** 8:10
**brand (49)** 18:5,7;20:24;21:23,23,25;25:25;28:11;32:11,3,15;42:3,4,20;43:13,14,15;44:8,9,11;45:10,11,14,17,18;46:3;48:9;49:2;54:3;58:4;60:20,21;61:2,3,10;66:7,9,15;75:6;81:24;82:2,12;87:5,23;97:2,4,11;114:7;124:21
**branded (2)** 44:9;51:17
**brands (1)** 97:9
**Brea (1)** 14:12
**breach (1)** 78:2
**break (4)** 61:18;102:5,20;127:2
**brief (4)** 61:21;73:18;102:24;127:6
**bringing (3)** 110:3;114:10;124:19
**broad (2)** 25:14;97:13
**broader (3)** 65:5;97:4;108:8
**brought (1)** 113:5
**build (1)** 48:18
**building (8)** 71:17;72:1,9,12,15;73:21;74:3,14
**bulb (1)** 67:18
**bunch (1)** 104:12
**bursting (1)** 51:5
**business (52)** 12:1,9,14,17,18;13:10,16,24;24:2,3;41:11,20,21,23;

**begin (3)** 6:22;44:25;103:7
42:10,13,17,20;43:1,10;44:18,21;45:23;51:11;60:17,17;71:18;72:2;85:3;92:4,5,10,11,23;93:1,6,7,12;94:4,8;95:19;105:16;111:7,18;112:10;114:23;117:4,17,23;118:1,25;121:13

## C

**cachet (1)** 45:16
**California (13)** 9:12;10:2;13:2;14:6,13;20:8;29:6;112:8;113:22;114:13;117:4,6;119:22
**call (10)** 8:22;44:1;52:1;62:25;66:4;69:8,8;73:16;102:21;120:13
**called (6)** 17:14;51:4;91:25;97:10;113:21;117:5
**caller (1)** 57:13
**calling (3)** 13:11;65:24;99:3
**calls (1)** 11:7;21:25;44:3
**came (10)** 17:10;38:23;48:10;62:8,22;63:5,9;65:8,8;114:11
**can (47)** 11:3,19;16:1;18:14;20:21;25:15;27:14;30:21;40:23;49:14;54:21,24;60:15,22;61:18;65:13,14,16;71:1,4;74:24,24;75:23;78:20;80:19;82:18;83:7;87:13;91:24;96:23;97:14,15,24;99:14;102:17,20;104:6;106:6,7;107:14;108:17,17;111:14;119:7,7;127:24;128:21
**cancellation (3)** 95:11;99:1;100:3
**cans (6)** 81:6;82:7,14,18;96:21;100:4
**cap (4)** 29:16,18;47:23,24
**capacity (2)** 15:2;17:24
**caps (4)** 20:18;21:1,13;29:10
**carbonated (1)** 20:13
**carbonated/noncarbonated (1)** 20:15
**care (1)** 10:19
**Carmichael (4)** 105:8,10;112:18,20
**cars (1)** 55:20
**case (51)** 5:8,11;7:18;18:12;27:9;29:16;30:21;36:2;50:19;54:5;62:2;70:12;72:5;80:21;89:8;90:22;94:13;95:10;96:18;99:12;100:2,22;101:2,9,20;102:2;108:21;109:23;113:9;115:24;116:1;118:8,10,20;119:5;122:8;123:9,17,18,25;124:2;125:7,11,19,23;126:4,9,10,12;127:17
**cases (7)** 21:10;23:6,7;27:2;34:24;40:12;47:21;54:2;59:3;69:5,22;70:2;116:12;118:25;119:1;120:19;123:4
**cash (1)** 12:10
**casual (1)** 120:14
**catch (1)** 104:10
**categories (1)** 97:24
**category (3)** 55:14,15;77:22
**caused (2)** 33:2;118:17

**cease (9)** 108:25;109:1;115:7,11,16,17;123:4,8,15
**ceased (1)** 108:24
**Central (2)** 117:3;119:21
**CEO (2)** 11:23;14:22
**certain (13)** 44:1;51:16;69:24;99:16;107:13;112:5,5,6;113:12,12,13;115:18,18
**certainly (2)** 64:20;101:7
**certificate (2)** 27:18;130:1
**certify (1)** 130:6
**chairman (4)** 11:1,23;14:15,15
**chance (3)** 50:7;95:17,17
**change (4)** 43:9;48:15;61:18;85:25
**changed (2)** 12:2,5
**channels (1)** 84:21
**Chaos (1)** 32:12
**character (3)** 68:14,17,18
**characterizes (1)** 46:22
**charge (2)** 60:1,2
**Charles (1)** 124:4
**cheap (2)** 75:14;77:2
**cheapens (1)** 78:5
**check (1)** 127:3
**Checkered (2)** 104:25;108:22
**chief (1)** 11:1
**chose (2)** 9:3,4
**chosen (1)** 36:18
**Chris (1)** 58:19
**chronology (1)** 11:19
**circumstances (3)** 75:3;123:19;124:12
**city (1)** 71:20
**claim (7)** 8:5;90:21,25;94:15,19,20;98:3
**claimed (1)** 96:18
**clamp (1)** 116:17
**clarify (2)** 38:11;58:17
**class (3)** 31:12,13;42:9
**classes (1)** 119:3
**classic (1)** 75:1
**clause (1)** 30:2
**claw (91)** 18:7,15,20;19:16;21:1,12,14;22:22;23:14;24:8;25:8,21;26:12;27:22;28:4,10,14;29:11,17;30:24;32:4;33:23;37:2;43:13,16;53:16;56:20;60:9,13;62:9,10,19;64:6,25;65:3,9,11,12;66:4,5,14,19,19,21,22;67:5,12,13,18,21,24;68:1,2,6,12;77:4,6;78:2,8;79:11,13,15;80:12;81:23;82:2,7,23,23;83:10;86:11,17;87:9,22;88:10;89:6,6,11,15,16;90:12;94:22;96:20;97:6,10,10;100:1,3;105:21;106:4;107:11;111:5;123:6
**clawed (1)** 65:10
**claw-mark (1)** 63:20
**claws (2)** 67:9;79:17
**clear (8)** 7:12,22;62:13;65:18;79:9;80:21,21;88:3
**clearer (1)** 87:11
**clearing (1)** 118:4

**clearly (5)** 6:13;63:6;67:6,11;85:25
**cleverly (1)** 88:5
**client (3)** 100:20,23;101:18
**clings (1)** 81:16
**clip (2)** 63:17;64:12
**close (5)** 40:25;79:22;82:7;87:13;124:2
**closely (3)** 19:10;64:21;83:1
**clothing (85)** 20:18,22,23;21:1,5,7,11,12,15,19;22:17,21,22,24;23:1;25:22,24;26:12;27:20;29:15,16,23;31:9;32:21;38:19;41:19;42:13;43:9,19,25;44:18;45:1;46:6,9,12;51:17,17,19;54:4,8,8,23;55:7,11,13,25;56:19,20;57:17,25;58:25;59:6,13;78:20;89:12;92:4,10,20;95:12;96:5,6,7,11,19;97:25;98:4;105:17,22;106:4;107:2,11,25;108:11,15;109:25;110:1,3;111:19;114:8,9,20,24,24;115:9;117:21
**cobranding (5)** 44:25;46:23;47:1,5;48:22
**code (1)** 44:9
**Cola (1)** 124:4
**Cole (1)** 58:19
**collectibility (1)** 45:11
**color (11)** 25:7,7,18;29:19;63:10;64:17;66:24;80:25;81:12;82:12;86:22
**colored (1)** 82:19
**colors (10)** 63:9;75:7,13;80:22,23;81:9,13,24;82:11,24
**column (5)** 52:13,16;54:18,19;58:13
**combination (1)** 80:25
**combine (1)** 96:14
**comic (1)** 68:17
**coming (7)** 11:5,17;35:19;65:13;67:19;94:22;127:12
**commands (1)** 45:13
**commenced (1)** 109:10
**commencement (1)** 41:18
**comment (2)** 89:23;101:14
**comments (1)** 89:24
**commerce (8)** 17:19;19:24;21:6,18;29:6;36:16;94:21,22
**commercial (2)** 13:24;57:13
**Commission (1)** 130:21
**committee (1)** 16:9
**common (4)** 26:18;42:3;77:11;86:1
**communicated (1)** 37:15
**communication (2)** 37:25;39:17
**companies (12)** 13:17;35:8;43:25;51:20;65:16,16;112:8;123:24;124:1,6,24;125:24
**Company (50)** 5:12,19;7:4,7;11:2,22;12:1,1,4,7,16,19;13:10,12,13,13,14,16,18,20,22,23,24,25;14:1,5,16,17;19:15;6,16;18:25;17:6,11;18:12;18:12;17:20;24:18;33:2;43:10;61:13;62:5;68:24;

104:22,23;113:21;117:5;123:1;126:18,19
**company's (1)** 61:8
**complaint (22)** 18:11;27:9;30:21;76:9;81:5;83:4;85:15;91:2;104:22;105:20;106:3,7;107:10,19,24;108:6,16;110:16;113:20;116:23;117:2;119:20
**complaints (2)** 113:25;117:7
**completely (1)** 102:3
**compliance (1)** 16:2
**comprises (1)** 82:7
**computer (1)** 88:19
**conceivable (2)** 100:12;101:18
**concept (1)** 62:21
**concepts (1)** 65:7
**concerned (2)** 46:5;118:2
**concerning (2)** 15:6;75:5
**concerns (1)** 124:9
**concerts (1)** 108:9
**concluded (1)** 129:7
**conclusion (1)** 99:3
**conduct (4)** 109:15;126:8,14,15
**conducted (4)** 13:16;24:17,22;26:2
**confident (1)** 102:19
**confidential (3)** 6:25;7:3;11:21
**confidentiality (1)** 9:3
**confirmed (1)** 71:15
**conform (1)** 51:9
**confused (1)** 96:24
**confusing (1)** 65:20
**confusingly (2)** 96:19;98:22
**confusion (3)** 94:13,17;98:3
**conjunction (3)** 19:6;57:18;87:8;119:2,13
**connection (2)** 41:22;87:21
**consent (2)** 112:24;129:3
**Consequently (1)** 8:17
**consider (5)** 55:6;72:4;86:16;88:15;95:18
**consistently (1)** 87:4
**Consolidated (9)** 5:12,21,23;24:2;98:8;101:4;125:12,14;126:17
**constitute (1)** 61:9
**constitutes (1)** 93:9
**consult (2)** 23:19;69:25
**consulted (1)** 70:5
**consumer (4)** 46:2;59:2;61:3;66:20
**consumers (2)** 22:11;60:22
**contact (1)** 85:2
**contained (1)** 91:22
**containing (1)** 48:20
**contend (1)** 77:3
**content (2)** 20:16;50:6
**context (1)** 50:8
**continue (5)** 31:24;32:17;33:6;48:19;102:13
**continued (21)** 19:13;31:17,18,20;32:9,16,17;35:13;41:19;42:5,6,15,19;43:2,13;48:18,23;49:1;65:21;86:1;103:4
**continues (1)** 49:2
**continuing (2)** 35:12;87:20

**continuous (3)** 9:24;30:6;95:6
**contract (1)** 54:10
**contracts (1)** 7:5
**contractualations (1)** 52:25
**control (2)** 54:14;60:1
**controlled (3)** 44:22;45:25;49:3
**controlling (1)** 59:5
**conversation (1)** 35:17
**convicted (1)** 10:22
**Cool (20)** 24:3,14;48:22,22;62:1;68:9,21;71:15,17;73:12;75:25;78:3;83:23;84:16;85:3;98:9;99:25;100:17;125:12,13
**coolers (1)** 81:17
**Cool's (3)** 72:2,9;100:15
**copied (1)** 68:12
**copies (1)** 75:1
**copy (15)** 27:10;67:11;68:2;75:2,2;76:9;77:5,8;79:3;80:11,15;86:21;127:23;129:8,10
**copying (1)** 88:7
**copyright (3)** 27:2;73:16;77:9
**Corona (3)** 14:6,11,11
**corporate (1)** 11:7
**Corporation (14)** 11:24;12:3,5;13:14;14:2,3;104:23,25;113:22;117:6;119:23,23;123:1,3
**correctly (1)** 38:13
**costing (1)** 59:23
**costly (1)** 35:10
**counsel (18)** 15:11,12,14,15,16,20;16:21;24:19;34:8;40:3,8,13;41:15;84:4;85:7;89:19;103:11;129:2
**counterclaim (1)** 94:13
**counterfeit (20)** 27:3;35:19;77:4,5,15,17,19,21,25;78:1,7;86:17;88:16;103:12,13;112:3;116:3,4,5;118:24
**counterfeiter (1)** 72:23
**counterfeiters (2)** 72:14,24
**counterfeiting (6)** 33:22;35:15;41:25;85:4;128:4,18
**counterfeits (1)** 101:11
**country (5)** 9:19,25;11:5;21:25;22:1;33:24;103:21
**COUNTY (1)** 130:4
**couple (3)** 63:14;70:23;79:17
**course (2)** 8:13;118:16
**courses (1)** 93:16
**court (19)** 5:4,9,25;6:15;7:25;8:6;9:5;95:10;99:24;109:5,15;115:14,15;117:3;118:13;119:9,21;121:11;130:23
**court's (1)** 8:23
**cover (2)** 28:14;31:12
**covered (2)** 39:17;93:8
**covers (4)** 25:13,14,17;51:25
**CPA (1)** 49:16
**crawling (1)** 65:12
**create (1)** 112:10
**created (9)** 63:8;64:22;66:3;95:23;96:2,12;97:3,5;124:1

Case 6:11-cv-00329-ACC-DAB   Document 171   Filed 09/30/12   Page 38 of 46 PageID 3794
Monster Energy Company, fka Hansen Bever v.
Consolidated Distributors, Inc
Rodney   Sacks
September 20, 2012

**creating (1)** 12:11
**credibility (4)** 44:10,11,12;94:15
**Crest (1)** 9:11
**crime (1)** 122:17
**criteria (4)** 58:22,24,25;93:21
**critical (2)** 60:10;94:2
**cross (2)** 87:14,15
**crossover (1)** 55:14
**curious (1)** 109:11
**current (2)** 10:25;61:1
**currently (2)** 20:11,12
**customers (6)** 21:21;22:1,9,10,11,12
**customs (7)** 33:20;35:11,16,18,20,21;103:25

**D**

**d/b/a (2)** 104:23,25
**damage (1)** 124:20
**damages (1)** 113:13
**data (3)** 51:7,7,7
**date (21)** 5:1;9:15;20:5,6;29:3;30:7,7,25;36:18,23;37:1;38:16;39:5,6,12;40:6;41:1;42:14;47:3;56:3;57:5
**David (3)** 5:22;49:16;125:9
**dawned (1)** 66:19
**day (6)** 66:12;72:19,19;73:3,7;102:7
**days (3)** 66:16;69:21;70:23
**Daytona (5)** 69:2;71:16,20;72:9;75:18
**DD (1)** 130:21
**deal (8)** 14:19;15:13;40:12,13;60:3;70:3;100:9;108:7
**deals (5)** 48:11,13;107:13,13;108:1
**dealt (4)** 17:4;53:1;93:8,22
**debating (1)** 98:7
**December (1)** 9:17
**Dechary (1)** 40:9
**decided (4)** 26:20;34:2;42:6;43:4
**deciding (1)** 63:4
**decision (6)** 16:24;43:7,11;44:25;59:12;70:8
**decisions (5)** 16:11;60:5,6;72:5;126:18
**decisive (1)** 67:15
**declarant (1)** 71:8
**declaration (7)** 70:19;71:7;121:23;122:3,5,19;127:16
**declarations (1)** 89:18
**declare (1)** 122:13
**defendant (9)** 6:10;84:6;101:4;105:16,20;111:17;117:17;126:4,7
**defendants (8)** 5:21;6:24;25:5;62:1;123:9,25;125:11,23
**Defendant's (70)** 23:10,11,14;24:2;25:6;28:22,23,25;30:14,16;31:3;33:9,11,16;34:7,16;36:8,13,14,19;37:4;38:4,19;41:12;49:6,8,10,12,15;50:14,15,16,21;

51:3;54:17;70:13,14;74:18;76:8,12;78:16;81:5;83:2;85:14;86:5,7;91:6,9,10;94:20;95:4,10;96:19,24;98:3;104:6,7,14,15;110:13,14;113:17,18;116:20,21;119:17,18;120:6;121:15,17
**define (1)** 77:7
**definitely (1)** 90:11
**defunct (1)** 124:7
**Delaware (2)** 104:23;119:23
**deliberately (1)** 74:19
**delisted (1)** 124:7
**deliver (1)** 8:11
**delivered (1)** 8:11
**demand (14)** 42:22,23;43:12,18,24,25;44:14;45:13;46:2;48:18,20;100:22;112:7;116:18
**denying (1)** 8:6
**department (1)** 103:17
**depends (1)** 73:8
**depicted (3)** 76:15;81:6;86:11
**depicting (1)** 85:14
**deposition (12)** 5:8;6:11;7:2;8:17;17:23;49:24;89:8;95:8;103:8;129:4,6,9
**depositions (2)** 89:15,17
**derivative (1)** 32:10
**derive (2)** 43:21;92:23
**describe (4)** 13:9;20:21;60:12,15
**described (3)** 47:7;48:16;56:8
**describes (2)** 54:18;92:15
**design (23)** 18:22;19:9,16;23:14,15;24:15;25:16,19,21;26:12;60:9;62:19;65:22;67:5;75:15,16,19;76:4;77:15;79:20;83:20;86:2;89:12
**designed (8)** 62:20;63:2;65:6;67:11;75:13;96:10,10,11
**designer (1)** 19:7
**designs (5)** 23:23;60:7;77:23;79:18;115:8
**desist (9)** 108:25;109:1;115:8,11,16,17;123:4,8,15
**desk (1)** 65:25
**destroyed (1)** 109:7
**details (4)** 51:11;113:15;115:2;126:11
**determination (6)** 98:20,23;100:2,14;101:17;123:15
**determine (3)** 8:19;61:8;84:5
**determined (1)** 123:18
**determining (2)** 59:9,11
**detract (1)** 78:6
**detracts (1)** 83:18
**develop (1)** 19:15
**developed (8)** 15:10;18:25;19:4,11,20;20:25;61:6;63:11
**developers (1)** 19:8
**development (2)** 19:9;58:3
**diagnosed (1)** 10:16
**dialogue (1)** 35:17
**Diane (3)** 40:15,16,18
**difference (1)** 79:24

**differences (2)** 63:15;80:8
**different (38)** 15:12;31:23;32:1,1,2,3;34:2;57:9,11;64:3,4;66:24,24;67:10;75:7,24;79:5;80:17;82:7,24;84:25;89:1,20,25;97:24;98:11;104:1;113:2,3;116:11,12;119:3;123:17;124:8;125:14,15,15,16
**differently (1)** 124:11
**diligence (1)** 31:18
**diploma (1)** 12:25;13:1
**DIRECT (3)** 6:7;103:3;109:15
**directed (1)** 121:10
**directly (3)** 40:9,13;127:23
**director (1)** 14:15
**directory (1)** 6:13
**disabilities (2)** 10:10,13
**disagree (1)** 55:24
**disclose (1)** 7:19
**discovering (1)** 69:17
**discovery (1)** 6:25
**discussed (4)** 16:8;65:15;80:13;84:3
**Discussion (6)** 16:13,19;34:8,12;104:18;128:9
**discussions (6)** 16:10,15,23;33:5,14;126:24
**display (1)** 78:17
**dispute (1)** 110:25
**disputes (2)** 111:3;126:1
**dissatisfied (1)** 35:5
**disseminate (1)** 7:24
**dissemination (1)** 7:8
**distinct (1)** 47:11
**distributing (6)** 105:17;110:17;111:1,8,18;117:18
**distribution (2)** 53:2;84:22
**Distributors (14)** 5:12,21,24;21:20;22:6,7,8,12,13;23:2,7;47:10;48:5;97:22
**District (6)** 5:9,10;117:3,3;119:21,21
**Division (2)** 5:10;19:5
**doctor (1)** 10:20
**document (53)** 8:3;18:8,14,16,23:8,9;27:6,7,14;28:19,21;30:13,20,22;38:18,20;49:5,9,18;50:7,25;51:9;55:23;57:4;58:12,17;63:2;70:11;71:1;76:8;86:3;91:6,16,18,21,22;103:10,14;104:3,14,21;105:2;106:12,15,24;107:1,5;110:12,19;113:16;121:15,20;128:5
**documents (14)** 7:1;8:2,5,9,16,19,21,25;9:2;36:15;49:11;104:13;127:21;128:10
**dollar (1)** 46:14
**dollars (2)** 59:22;93:14
**done (29)** 21:15;23:17;37:21,22,22;39:3,22,23;47:1,3;59:25;74:7;84:11;96:1,9;97:11,12;108:10,12;111:12;114:21,21;115:19;118:25;119:1,4,8;126:11;127:2

**door (1)** 65:10
**double (2)** 46:16,16
**down (9)** 51:25;62:20;65:4,23;79:12;80:8;83:16;112:11;116:17
**dozens (2)** 124:1,23
**draft (2)** 108:5,5
**drafted (5)** 95:23;106:8;108:5
**drag (1)** 56:17
**dress (5)** 107:17,19,20;108:2;120:7
**drew (3)** 62:20;63:2;96:13
**drink (10)** 42:17,20;70:20;82:15;96:20,25;97:2,5;98:4;108:1
**Drinks (20)** 17:14;19:22;20:12,13,16,16;22:24,25;32:20;41:23;44:20,21;45:23;66:13,25;81:6;82:19;96:11;100:17;107:21
**dripping (2)** 19:14;63:20
**dripping-type (1)** 64:2
**drippy (1)** 80:13
**Drive (1)** 9:11
**drugs (1)** 10:7
**Drydek (4)** 59:16,18,21;60:5
**duly (2)** 6:3;130:8
**during (2)** 21:2;71:16
**duties (1)** 22:23
**dwarfs (1)** 82:10

**E**

**eagle (2)** 77:24;78:11
**eagles (3)** 76:2,23;78:12
**earlier (9)** 9:2;37:5;51:12;56:14,21;89:22,23;98:10;111:13
**earliest (1)** 55:25
**early (9)** 21:11;47:14;52:23;66:16;69:21;84:7,9;85:10;125:6
**earning (1)** 58:16
**easier (3)** 26:25;33:19;34:23
**education (1)** 13:6
**educational (1)** 12:21
**effect (2)** 65:6;88:3
**effective (1)** 124:20
**effectively (1)** 114:6
**Effex (1)** 117:5
**efficient (1)** 119:15
**efforts (1)** 35:1
**eight (4)** 71:7;86:8;91:6;95:4
**eighth (3)** 52:16;54:17;61:3
**either (8)** 36:5;37:14;54:13;98:21;112:3;115:12,14;127:20
**elements (1)** 88:19
**elongated (1)** 90:2
**else (3)** 82:10;88:12;96:14
**elsewhere (1)** 114:13
**emanates (1)** 83:20
**emblem (1)** 53:14
**embroidered (1)** 21:14
**employed (1)** 11:20;41:7
**encompass (1)** 16:1
**encompasses (2)** 7:3;14:23
**end (7)** 17:18,20;19:12;67:21;89:21;98:9;121:5

Case 6:11-cv-00329-ACC-DAB   Document 171   Filed 09/30/12   Page 39 of 46 PageID 3795
Monster Energy Company, fka Hansen Bever v.                                                    Rodney   Sacks
Consolidated Distributors, Inc                                                          September 20, 2012

**ended (1)** 70:5
**Energy (32)** 5:11,19;7:4,12;11:2;
13:10,11,16,20,21,23;17:14;
19:22;20:15;27:23;28:15;29:12,
13,15,18;37:6;41:11;44:21;
45:23;52:4,6;78:20;81:6;82:14;
87:22;103:11;107:21
**Energy's (1)** 28:4
**enforceability (2)** 26:22,23
**enforceable (1)** 28:15
**enforcement (15)** 33:19,21;34:24;
35:1,5,9;36:7;41:25;103:20,22,
23,25;116:16;119:2,14
**engaged (8)** 35:8,9;70:24;84:24;
105:16;111:17;112:22;117:17
**enhanced (1)** 20:14
**enormous (1)** 43:18
**enough (1)** 102:14
**entered (3)** 8:6;57:21;120:21
**entire (2)** 14:19;77:18
**entirely (1)** 80:16
**entitled (2)** 49:15;100:22
**equipment (2)** 20:19;55:21
**equivalent (1)** 62:25
**era (2)** 45:7,7
**especially (1)** 88:20
**Esquire (2)** 129:10,10
**establish (1)** 107:9
**established (1)** 124:1
**et (1)** 5:13
**etcetera (2)** 43:2;60:7
**evaluated (1)** 124:13
**evaluation (1)** 59:23
**even (2)** 84:13;87:9
**event (1)** 20:6
**events (11)** 22:1,14;37:19;41:17;
56:19;20;57:17,25;58:1;81:22;
108:9
**eventually (4)** 22:3;26:15;44:7;
51:21
**everybody (1)** 78:12
**evidence (4)** 89:14;95:14;106:20,
21
**evolution (1)** 62:19
**evolve (3)** 19:13;44:6;65:21
**evolved (3)** 43:12;44:22;66:5
**exact (7)** 41:1;46:14;47:3;75:10,10;
90:15;113:14
**exactly (5)** 58:18;63:22,23;84:17;
91:1
**exam (1)** 13:2
**EXAMINATION (2)** 6:7;103:3
**example (5)** 47:19;53:6;59:16;
61:1;83:15
**exceeded (1)** 110:2
**exceeding (2)** 111:4;116:10
**excess (1)** 117:12
**excessive (1)** 112:9
**exchange (1)** 60:3
**excuse (1)** 78:15
**executive (2)** 11:1;16:9
**exhibit (72)** 18:8,9,10,10;23:10,11,
14,14;25:3,5,6;27:7,8;28:22,23,

25;30:14,16,19,20;31:4;33:9,11,
16;34:7,16;36:8,13,14,19;37:4;
38:4,19;41:12;49:6,8,11,15;
50:15,15,17,22;51:4;54:17;
70:13,14;76:8,12;81:5;83:2;
86:5,8;91:9,10;95:4;104:6,7,14,
15;110:13,13,14;113:17,18;
116:20,21;119:17,18;121:16,
17;128:8,19
**exhibits (4)** 36:9,10;49:12;122:2
**expand (4)** 26:21;41:24;42:6;43:10
**expansion (3)** 42:12,14,17
**ex-parte (3)** 119:10;121:10;122:6
**expect (1)** 60:22
**experience (1)** 68:5
**expert (5)** 49:15;50:19;99:11;
126:22,23
**Expires (1)** 130:22
**explain (2)** 68:16;96:23
**explained (2)** 33:17;62:22
**exposure (9)** 21:23;46:3;48:6,21;
49:1;59:18;60:9;67:3;82:2
**exposures (1)** 81:21
**expressed (1)** 52:1
**extended (1)** 73:13
**extends (1)** 97:7
**extensions (1)** 66:25
**extensively (1)** 16:22;61:6;66:11,
12;87:5;96:2,8
**extent (5)** 7:2;15:8;51:10;93:5;
120:17
**extra (1)** 51:23
**eyesight (1)** 10:11

## F

**Facebook (2)** 61:2,4
**fact (19)** 42:4;60:25;65:7;66:23,25;
67:11,14;68:7;72:8;73:3;78:6;
85:25;88:6;98:20;99:11;
113:14;123:21;124:14;125:22
**factor (2)** 59:9,11;72:4,7
**factors (4)** 67:15;100:10;123:14,19
**Factory (1)** 117:5
**facts (5)** 37:17;99:17;106:20;
109:24;116:12
**factual (1)** 126:6
**fall (2)** 90:25;97:24
**falls (2)** 35:21;77:22
**familiar (1)** 68:18
**famous (4)** 42:5;80:23;87:23;97:7
**fans (1)** 61:4
**far (3)** 18:23;82:6;126:16
**fashion (1)** 46:1
**fatter (1)** 89:5
**faxing (1)** 66:1
**featured (1)** 107:20;108:11
**features (1)** 64:23
**February (1)** 70:24
**federal (3)** 7:7;85:8;115:13
**fee (1)** 60:2
**feeble (1)** 63:14
**feel (5)** 6:18;65:11,11,19;88:20

**fees (2)** 59:22;115:6
**Feld (1)** 56:18
**felony (1)** 10:23
**felt (3)** 26:16;44:18;69:24
**fiddle (1)** 79:16
**field (1)** 87:7
**fight (1)** 9:4
**figure (1)** 60:16
**figures (4)** 46:9,10,14
**file (7)** 32:13,13,14,15;33:6;38:23;
119:12
**filed (28)** 26:11;31:6,16;32:5,9,24;
33:8,9,12;34:8;38:4,24;39:9,10;
76:10;105:5;108:16;110:24;
113:20;116:23;117:2;119:9,12,
20;120:2,21;123:3;127:16
**filing (4)** 33:15;37:12;41:11;123:10
**financial (1)** 93:17
**find (8)** 15:8;23:23;24:12,13;37:23;
99:24;101:9;124:10
**finding (2)** 95:9;100:16
**fine (2)** 102:12;104:11
**finety (1)** 67:23
**finish (2)** 53:19;102:12
**finished (1)** 53:22
**firm (4)** 11:7,7;26:8;40:14
**firms (1)** 69:19
**first (25)** 17:17,18,20;18:19;19:24;
20:3,7,22;21:5;28:19;29:1,6;
30:7;36:15,20;38:3,18;39:13;
47:15;52:17;61:25;66:12;73:7;
76:20;81:2
**Firstly (1)** 64:25
**five (8)** 14:9;49:11,15;50:15,17;
61:16;81:8;93:12
**five-minute (1)** 127:2
**FL (1)** 86:12
**Flag (2)** 104:25;108:22
**flight (1)** 104:10
**flooding (1)** 45:15
**Florida (3)** 5:6,10;71:19;88:11;
130:3,20
**focus (2)** 75:15;77:20
**focused (1)** 66:22
**focuses (1)** 84:16
**follow (2)** 117:6;119:25
**followed (1)** 118:20
**following (1)** 126:24
**follows (1)** 6:5
**font (1)** 80:14
**fonts (6)** 63:16;64:5,13,16,19;80:14
**foregoing (2)** 129:4,9
**foreign (1)** 13:22
**forgo (1)** 102:13
**forgoing (1)** 122:15
**form (11)** 7:1;19:13,14;25:13;52:25;
57:19;88:25;89:1;113:25;
114:17;117:7
**formal (4)** 6:14;24:18;70:1;72:15
**format (2)** 114:18;119:25
**forms (1)** 78:3
**found (10)** 39:7;111:3;112:7,22;
114:8,11;116:8;117:9;119:14;

120:18
**foundation (6)** 34:18;55:5;64:8,14;
106:20;108:3
**four (10)** 47:15;49:6,8;50:15,22;
51:4;54:17;71:8;92:19;120:4
**free (2)** 6:18;59:17
**fresh (1)** 109:19
**front (1)** 29:17
**fruit (1)** 20:16
**full (1)** 25:25
**fully (1)** 94:18
**function (3)** 16:6;35:16,18
**functioned (1)** 109:17
**further (4)** 32:6;34:8;94:6

## G

**gap (1)** 41:10
**gave (6)** 41:15,17;44:10,12;103:11;
112:19
**gear (1)** 112:20
**general (4)** 15:15;16:6;55:17;
120:15
**Generally (4)** 16:16,19;32:16;35:2
**gets (1)** 67:24
**giveaways (4)** 47:14,16,16;81:2
**given (5)** 40:1,2;47:17;91:4;112:4
**gives (2)** 29:4;59:18
**giving (1)** 59:24
**glide (1)** 81:16
**gloves (2)** 30:1;111:19
**goes (4)** 65:2,4;79:13;89:6
**good (4)** 10:5;80:19;102:5;128:20
**goods (8)** 20:10;26:19;29:21;
31:13,13,15;34:19;24;36:25
**government (1)** 103:24
**grant (1)** 121:11
**granted (2)** 55:25;56:7
**graphic (1)** 117:18
**graphics (3)** 19:7;62:23;65:24
**greater (1)** 42:22
**green (19)** 63:9;64:17;67:1,4;78:18;
80:12,13,22,25;81:2,9,12,23;
82:2,5,6,6,11,18
**Greg (1)** 40:5
**grounds (2)** 124:18;128:12
**group (3)** 12:12;15:11;112:14
**guess (1)** 64:18;71:4
**guessing (1)** 105:11
**guide (1)** 103:12,13,19
**guideline (2)** 128:4,18
**guts (1)** 79:6
**guy (2)** 65:10;67:20

## H

**half (2)** 67:20;82:17
**Hall (3)** 19:4;40:5;62:23
**hand (2)** 115:17;130:11
**handed (2)** 115:8;128:5
**handled (1)** 43:9
**Hansen (16)** 11:25;12:3,8,14,15,15,
17;17:13;49:16;50:18;104:22;

Monster Energy Company, fka Hansen Bever v.
Consolidated Distributors, Inc

Rodney   Sacks
September 20, 2012

110:17;111:16;117:4,16;120:6
**Hansen's (1)** 49:24
**happened (8)** 25:23;43:12,20;
  51:18;110:5;112:6,7,21
**happening (1)** 112:11
**happens (1)** 87:7
**happy (2)** 89:24;102:13
**harassing (2)** 100:25;101:7
**hard (1)** 112:10
**harder (1)** 86:20
**Hashanah (1)** 8:14
**hats (1)** 30:1
**head (2)** 65:1;114:11
**headgear (1)** 30:1
**heading (2)** 52:14,19
**health (1)** 10:5
**hear (1)** 60:8
**heard (4)** 61:25;101:12;125:3,5
**hearing (1)** 10:11
**heat (4)** 69:8,10;85:1;117:20
**held (5)** 11:4,4,18;15:2;129:9
**helmets (4)** 43:22;111:9,19;120:14
**help (2)** 103:21;109:19
**helps (1)** 46:3
**herbs (1)** 20:15
**hereby (1)** 130:6
**herein (1)** 130:7
**higher (5)** 12:25;35:15;60:2;80:4,7
**highly (1)** 95:22
**Hill (1)** 71:19
**holding (3)** 13:13,24;123:1
**HOLLINGSWORTH (11)** 5:1,4,25;
  61:15,19,22;102:22;103:1;
  127:4,8;128:23
**Holly (1)** 71:19
**home (1)** 8:12
**honestly (1)** 80:1
**hooded (2)** 29:24,24
**hoping (1)** 128:14
**horizontal (1)** 88:11
**hot (1)** 69:8
**houses (3)** 71:17;72:2,9
**hundreds (3)** 18:3;64:19;81:20
**hypothetical (2)** 64:12;99:5

## I

**Ian (3)** 19:6,10;62:23
**ICE (5)** 33:21;35:21;36:6,7;103:25
**icon (17)** 18:7,15,20;28:11;42:4;
  43:14,16;44:13;60:24,24,25;
  61:2,5;83:12;87:23;97:6,12
**idea (5)** 18:3;58:5;61:7;64:1;80:19
**identification (17)** 23:12;28:24;
  30:17;49:13;70:15;76:13;86:6;
  91:11;103:12,13;104:8,16;
  110:15;113:19;116:22;119:19;
  121:18
**identified (3)** 18:10;52:1;56:1
**identifier (1)** 60:19
**identifies (4)** 52:3;54:17;60:20,21
**identify (6)** 18:14;27:14;30:21;
  60:23;64:24;83:7

**identifying (1)** 28:11
**illness (1)** 10:17
**illustrate (1)** 65:15
**illustrations (1)** 78:4
**image (19)** 44:20;46:3;54:4;58:3;
  62:21;66:22;67:1,1,2,5,16,17,
  25;75:4,4,6;76:20;77:3;83:10
**images (3)** 66:24;76:15,17
**imagine (1)** 100:13
**imitation (4)** 62:10,11,13;63:12
**immediately (1)** 113:1
**import (2)** 7:15;30:24
**importance (1)** 60:10
**important (17)** 41:20;44:8;54:3;
  57:16,19;58:2,24,24;59:3,3,4,7;
  60:18;61:13,14;93:3,17
**imports (1)** 35:18
**impression (2)** 80:10,10
**improve (1)** 35:12
**inappropriate (1)** 99:18
**Inc (2)** 5:12;130:23
**incentives (1)** 47:21
**incidental (1)** 93:2
**incidents (1)** 42:1
**include (1)** 122:2
**included (2)** 90:20;93:17
**including (5)** 56:8;85:23;93:18;
  111:19;123:5
**income (1)** 43:21
**incomplete (4)** 34:15,21;99:4;122:2
**Incoporated (1)** 110:17
**Incorporated (10)** 5:22,24;24:3;62:1;
  68:21;71:17;104:24;113:22;
  117:5;125:25
**increase (9)** 31:17,20;35:13;42:15,
  19;43:3,13;49:1,3
**increased (3)** 31:21,22;42:20
**independent (3)** 35:8;69:19;80:16
**independently (3)** 63:8;80:1,1
**indicate (2)** 92:3;127:20
**indicated (6)** 20:13;24:2,13;29:24;
  30:7;128:10
**indicates (1)** 105:15
**indicating (1)** 76:11
**indication (1)** 40:23
**individual (2)** 70:22;81:25
**individually (1)** 126:7
**Industries (4)** 119:22;120:9,22;
  121:1
**Industry (1)** 58:19
**information (14)** 7:1,3,9,17,24;51:8;
  69:14;70:4;71:2;75:18;89:18,
  19;123:21;124:24
**informed (2)** 111:16;117:16
**infringe (1)** 74:19
**infringement (9)** 27:2;70:9;90:21;
  107:16,24;108:14;120:6;
  124:20;126:9
**infringes (4)** 27:1;69:23;77:12;
  108:15
**infringing (11)** 35:24;69:5;73:17;
  74:12;75:1;78:17;85:4;86:25;
  105:21;123:6,16

**in-house (7)** 15:11,20;16:21;40:2,8,
  13;84:3
**initial (2)** 26:17;42:25
**inside (1)** 87:25
**inspiration (1)** 67:13
**inspirations (1)** 65:8
**instances (1)** 17:4
**instead (3)** 70:17;79:12,14
**instigation (1)** 19:15
**instituted (1)** 5:9
**insuring (1)** 31:19
**integral (1)** 22:25
**intellectual (4)** 15:14;16:22;94:1,7
**intend (1)** 101:7
**intended (2)** 19:21;74:19
**intention (1)** 20:25
**interchange (1)** 125:13
**interesting (1)** 86:25
**interfere (1)** 78:4
**interferes (1)** 78:6
**interfering (1)** 76:3
**internal (3)** 16:21;38:16;85:6
**international (4)** 11:10;15:11;59:20;
  127:15
**internationally (6)** 33:25;41:24;
  42:1;59:21;60:23;103:21
**Internet (3)** 22:4;23:7;42:25;43:17;
  47:11;69:1,19;72:18;81:20
**Internets (1)** 81:21
**interrupt (1)** 53:21
**interstate (4)** 17:18;19:24;21:6,18
**intervention (1)** 8:23
**intimate (1)** 84:20
**into (21)** 12:19;15:22;19:15;35:22;
  42:7;44:17;55:15;57:21;65:2;
  66:5;77:22;87:14;94:22;97:24;
  99:17;112:25;119:9;120:21;
  123:15;124:17,17
**introduce (2)** 5:14;32:20
**introductions (1)** 92:20
**invariably (1)** 10:10
**inventory (7)** 72:18,18,19;73:24;
  74:5,6,9
**investigate (2)** 73:12;84:5
**investigation (1)** 74:13
**investigative (2)** 74:15;125:7
**investigator (3)** 70:6;83:23;124:25
**investigators (3)** 84:23;85:19,23
**investigator's (3)** 123:23;126:23
**investment (2)** 12:12,12
**investor (1)** 14:20
**invoice (5)** 36:24;37:9,11,14;39:7
**invoke (1)** 70:1
**involve (1)** 60:16
**involved (27)** 14:18;15:9;16:10,14,
  14,19,22;38:12;41:5,13;54:12;
  56:9,10;62:18;69:5;70:8;
  101:16;121:13;125:6,8,12,25;
  126:2,10,12,17,18
**involvement (4)** 11:14;16:5,18;60:4
**iron-on (2)** 117:19,19
**issue (9)** 23:22;27:5;45:22,22;59:5;
  106:25;110:2;117:22;118:13

**issues (9)** 10:7;16:3;23:21;41:25;
  100:9;101:8,16;109:23,25
**item (3)** 48:2;93:20;96:16
**items (18)** 20:18,20;26:19;41:21;
  42:18;47:25;48:1;51:16;54:8;
  78:21;98:1;105:7;108:11,13;
  109:6;112:5;116:2;118:24

## J

**jacket (2)** 53:7,9
**jackets (2)** 29:25;120:15
**Jamie (1)** 5:3
**January (4)** 39:13;62:3,4;68:20
**January/February (1)** 19:12
**jerseys (1)** 111:20
**Jim (3)** 110:16;111:1,7
**JMJE (2)** 113:22;114:23
**job (4)** 10:25;11:3,4;22:21
**jobs (2)** 11:4,18
**Joe (18)** 24:3,14;62:1;68:9,21;71:15,
  17;72:2,9;73:12;83:23;84:16;
  85:3;99:25;100:14,17;125:12,
  13
**Johannesburg (1)** 9:17
**John (2)** 5:17;129:9
**jointly (2)** 45:2;51:17
**jointly-branded (1)** 44:5
**judge (1)** 6:14
**juice (2)** 20:16,16
**Julie (2)** 5:5;130:19
**July (4)** 32:24;33:12;34:6;38:24
**June (6)** 21:6;29:7;36:16;37:4;
  38:17;56:4
**Jurassic (1)** 65:9
**justify (1)** 93:20

## K

**Kawasaki (5)** 53:9,11;56:10,12,13
**keep (1)** 54:14
**Kenny (1)** 56:17
**key (2)** 28:10;44:9
**kids (1)** 48:22
**kind (1)** 83:11
**kindly (1)** 6:1
**kinds (2)** 80:13;100:21
**kit (8)** 43:22,22;53:8,9,24;55:7,8,18
**kits (10)** 55:10,11,17;117:9,18,19,19,
  19,24;120:13
**Kmart (1)** 45:18
**knew (2)** 59:5;73:15;85:16
**Knobbe (5)** 5:17;26:7;9;40:24;41:2
**knowledge (14)** 19:23;23:25;37:13;
  46:8;51:9;68:4,5;71:11;84:20,
  21;101:9;117:22;120:18;126:13
**knowledgeable (1)** 99:8
**known (7)** 11:24;17:8;40:21;60:23;
  82:3;85:10;117:10
**knows (2)** 99:13,15

## L

Monster Energy Company, fka Hansen Bever v.
Consolidated Distributors, Inc

Rodney    Sacks
September 20, 2012

**lack (4)** 55:5;64:7;106:20;108:3
**lacked (1)** 75:9
**lacks (2)** 34:18;64:13
**Laguna (1)** 9:11
**large (3)** 11:7;65:1;71:16
**Largely (1)** 41:4
**largest (1)** 82:6
**Las (1)** 66:17
**last (3)** 11:12;91:13;100:19
**later (6)** 8:10;23:4;26:13,14;39:6;
   40:5
**latest (1)** 91:19
**launched (3)** 16:9;20:24;21:4
**launching (3)** 16:12;21:3;25:25
**law (16)** 11:6,7,9;12:25;13:1;26:18;
   33:21;42:3;77:11;86:1;99:11;
   103:20,23,25;119:2,14
**laws (4)** 7:8,10,21;122:14
**lawsuit (5)** 7:19;18:23;105:4;118:5;
   121:7
**lawsuits (1)** 16:4
**lawyer (2)** 11:6;12:22
**lawyers (19)** 16:13,20,23;23:17;
   26:4;33:5;35:10;38:9;40:10;
   69:25;70:5;84:4;100:8,8;106:8;
   114:18;118:18;124:16;126:24
**learn (2)** 7:18;125:21
**learned (2)** 68:23;83:22
**leave (4)** 102:9,10,11,15
**led (1)** 33:15
**left (11)** 61:16;65:2;70:17;76:21;
   79:12,14;81:1,3;83:5;86:10;
   87:6
**legal (14)** 6:14,16;15:6,9,24,25;16:4,
   12;85:6;99:3;100:9;101:16,22;
   103:17
**Lemon (1)** 124:3
**lengthened (1)** 83:15
**Leslie (1)** 125:4
**less (3)** 20:17;79:19;83:19
**letter (3)** 109:2;123:9,16
**letters (2)** 86:11;123:5
**level (3)** 35:5,14;69:24
**license (17)** 44:4;45:2,3;48:23;52:2,
   4;53:5;54:20;55:25;56:4;57:5;
   58:11,16;59:12;89:3;120:25;
   121:22
**licensed (14)** 51:13,14;52:13;54:18,
   20;87:19,19;88:2,3;97:18,20;
   105:8;120:17,22
**licensee (2)** 54:21;56:2
**licensees (1)** 23:6
**licenses (1)** 56:6
**licensing (17)** 42:24;43:7;47:7,13;
   48:16,25;57:6,9,12,15,16,20,22;
   92:5,10,21;93:18
**licensings (2)** 48:11,13
**life (1)** 85:21
**likely (1)** 102:1
**limited (7)** 45:3,4;48:13;53:4;54:1;
   97:5;120:23
**limiting (1)** 45:8
**limits (1)** 71:20

**line (6)** 80:4,5;87:14,15;88:7;93:19
**lines (1)** 98:12
**list (1)** 56:5
**listed (4)** 12:2;13:13;107:14,14
**listen (1)** 81:14
**listings (1)** 47:18
**Litigation (2)** 11:10;15:16
**little (26)** 11:16,16;42:10;63:13;65:2;
   67:20,23,24;77:1;79:4,4,5,12,13,
   17,18,19,19,24;80:7;82:11;
   83:12,19;86:20;87:7;89:5;90:13
**live (1)** 108:9
**lived (1)** 10:2
**local (3)** 33:21;36:7;103:25
**locally (1)** 42:1
**located (2)** 14:5;71:18
**location (6)** 14:8,9,10,11;71:19;
   73:13
**long (5)** 14:7;17:8;40:21;98:21;
   102:11
**longer (1)** 88:17
**look (53)** 12:13;25:2,3;31:18;36:9;
   42:5,18;49:7,11,14,20;50:7,21;
   54:16,24,25,23;57:4;59:1;63:5,
   7;64:5;67:16,16;69:25;71:1;
   75:23;76:7,14;78:15;80:9;81:4;
   82:4;83:1;84:24;86:7;87:17,18;
   88:8,9;91:2,12,24;93:25;97:14,
   15;105:12;106:24;107:21;
   110:19;111:14;117:15;120:4;
   122:22
**looked (4)** 33:25;39:6;62:12;84:6
**Looking (6)** 28:25;80:3;84:14;
   88:24;89:1;93:25
**looks (5)** 56:3;77:1;79:22;88:12;
   89:2
**loose (1)** 46:4
**lose (1)** 94:6
**loses (2)** 45:15,16
**loss (1)** 94:2
**lot (10)** 13:22;41:24,25;42:23;43:5;
   44:3;45:13;116:16;120:12;
   126:1
**Lott (1)** 125:4
**lower (1)** 80:5
**lunch (3)** 102:5,13,20

## M

**Maconachy (4)** 71:9;72:1;83:24;
   127:15
**Maconachy's (1)** 84:2
**main (9)** 28:10;42:3,17;67:1;77:6,
   20,21;82:12;108:13
**major (1)** 12:6;27:5
**majority (2)** 18:6;82:1
**makes (2)** 60:5;107:1
**making (12)** 34:23;59:5;69:7;105:7;
   106:17;116:9;117:8,10,24;
   118:23;120:18,19
**management (2)** 43:8;126:19
**manager (1)** 14:17
**manner (1)** 120:24

**manufacture (1)** 51:16
**manufactured (5)** 21:7,9;46:13;
   51:17,20
**manufacturer (2)** 45:3;54:11
**manufacturers (2)** 21:16;52:25
**many (32)** 13:19;18:1,3,4;26:13,19;
   30:10;31:23,25;32:9;34:3;
   40:12,22;55:22;58:19;59:3,21;
   64:19;69:5;70:2;72:14,23,23;
   73:8;84:14;90:9;93:14;97:7;
   116:5;119:4,8;123:4
**March (9)** 17:18,21;20:2,3;69:3;
   110:24;113:21;117:2;130:22
**mark (121)** 18:20,25;19:4,10,11,17,20,
   24;20:11,12,22;22:22;23:8,9;
   27:19,23;28:4,9,10,13,21;30:6,
   14;32:3,10,21;37:2;44:5;49:6,
   10;52:6;54:21;63:3;65:24;
   67:15;70:12,13;76:7;77:24;
   80:3,4,11,12,15;85:4,8,12,13;
   86:1,2,11,17,25;87:8;88:10,13,
   15,16,19,20,25;89:1,11,15,16,
   20,20;90:17,21,24;91:8;94:20,
   22;95:3,5,10,11,15,15,16,23,23,
   24,24;96:1,6,10,10,11,16,19,20,
   24;97:16;98:3,4,6,6,7,20,24,25;
   99:1,25,25;100:3,15,15;104:6,
   13;105:21;106:4;107:2,11,25;
   108:8;110:13;114:20;116:20;
   119:17;121:15
**marked (19)** 23:11;25:4;28:23;
   30:16,18;49:12;70:14;76:12;
   86:5;91:10;104:7,15;110:14;
   113:18;116:21;119:18;121:17;
   128:8,18
**market (8)** 44:10;45:14,15,25;
   53:18;84:13,14,16
**marketing (3)** 49:2;67:3;93:1
**marketplace (2)** 23:24;78:19
**marking (1)** 27:7
**marks (18)** 36:11;67:8;74:23,25;
   84:6,8,12;85:7;87:12;89:20,
   22,23;97:25;98:21;101:11;
   108:10;120:7;123:5
**Mark's (1)** 19:14
**Marshal (1)** 109:15
**Martens (5)** 5:18;26:7,9;40:25;41:3
**Martens' (1)** 40:14
**massive (1)** 66:19
**material (4)** 55:12;93:6;102:1,2
**materiality (2)** 92:24;93:9
**materially (1)** 94:3,8;95:19
**matter (6)** 16:25;17:1;43:4;109:9,
   16;126:9
**matters (9)** 15:6,9,25;16:1,1,6,17,
   18;99:9
**maximum (1)** 32:18
**may (29)** 9:5;17:4;21:4,6;28:18,19;
   29:1,16;32:11,20;39:2,5,7;47:1,
   2,21;62:14;64:5;73:3,5,6;80:20;
   90:14;94:8;105:3;118:1,15;
   121:4,5
**maybe (8)** 39:9;55:18;74:5;79:5;

**80:7;87:13;93:3,12
**MBC (3)** 13:18;78:18;122:25
**MBC's (1)** 78:19
**McClain (2)** 19:6;62:23
**mean (16)** 32:20;63:6;66:8;68:8,15;
   71:4;72:23;75:9;79:1;81:12;
   94:16;100:9;106:6,7;107:14;
   115:10
**meaning (1)** 73:10
**means (4)** 46:2;50:11;73:10;83:13
**mediation (2)** 100:19;101:5
**meet (1)** 46:1
**member (2)** 13:1,4
**members (4)** 15:22;22:11,15;58:1
**Menachem (1)** 5:23
**mental (1)** 10:17
**mention (1)** 92:20
**mentioned (8)** 8:1;23:1;43:6;44:24;
   52:23;70:10;85:15;101:21
**merits (1)** 123:18
**metal (2)** 65:13,14
**mid-2000 (1)** 47:13
**Middle (3)** 5:10;80:4,5
**might (8)** 29:7;39:15,18;46:11;
   88:6,6;99:16;105:6
**million (2)** 61:4;82:18
**millions (3)** 59:21;81:20;93:14
**mind (7)** 31:7;62:24;63:1,12;87:10;
   106:24;127:19
**mine (2)** 6:18;52:14
**minerals (1)** 20:14
**minute (3)** 42:9;49:20;116:24
**minutes (1)** 61:16
**mischaracterize (1)** 106:15
**mischaracterized (1)** 106:19
**mischaracterizes (2)** 34:17;106:12
**misunderstood (1)** 57:2
**mix (1)** 90:10
**moment (2)** 45:14;110:18
**Monday (1)** 8:13
**monetary (1)** 60:16
**money (1)** 114:7
**monorail (2)** 66:16,19
**Monster (79)** 5:11,18;7:4,12;11:2,23;
   12:5;13:10,11,14,16,18,20,21,
   23,25;17:14;18:1,5,6;19:1,5,22;
   21:8,9;27:23;28:15;29:12,12,
   14,18;31:22;32:10,11,11,12,12,
   14,14,14;36:1,3;37:6;38:17;
   41:11;43:8;51:11;52:4,5;53:13;
   60:10,13;64:6;76:10;78:20;
   81:6;82:14;86:17;87:22,22;
   89:6;90:20;92:4;100:16;
   103:11;104:23;105:21;106:4;
   107:2,10;110:25;113:21;117:4;
   119:22;120:6;122:25;123:3;
   124:24;125:19
**Monsteromnicom (1)** 47:12
**Monster's (16)** 25:8;62:16;77:4;
   95:19;96:20;98:4,24;25;99:1;
   100:1,3;101:21;107:17,25;
   120:7;122:6
**month (2)** 21:2;25:24

Case 6:11-cv-00329-ACC-DAB Document 171 Filed 09/30/12 Page 42 of 46 PageID 3798
Monster Energy Company, fka Hansen Bever v.
Consolidated Distributors, Inc
Rodney   Sacks
September 20, 2012

**more (32)** 12:6;19:15,17;27:1,2;
41:25,25;42:10,21,21;43:1;
45:7;46:17;57:13;59:2,7;69:25;
79:12,13,19;83:16,17,19;87:9;
93:12;109:10;117:10;119:15,
15,16;120:19;127:11
**morning (1)** 102:8
**Mortner (45)** 5:20,20;6:8,9,23;7:14;
8:1;9:7;17:25;24:7,10;25:6;
27:11;34:19;36:12;50:1,11;
55:2;61:15,17,24;64:9,15;72:8;
99:6,13,20;101:3;103:5;104:17,
20;106:14,18,22;110:20;
116:25;122:4;127:10,19;128:1,
13,16,20,22;129:10
**Moshe (3)** 5:20;6:9;129:10
**most (6)** 57:5;58:24,24;61:3;97:9;
124:19
**motion (6)** 8:7;109:14;119:10;
121:10;122:5,6
**motivated (1)** 67:12
**Motor (1)** 56:18
**motorcycle (10)** 53:7,8;54:6,7;55:6,
17,19;56:14;111:23;120:12
**motorcycles (2)** 56:13;117:9
**move (3)** 72:16,25;73:2
**moved (1)** 9:21;26:9
**movement (1)** 114:6
**movie (3)** 65:8,9;68:17
**M's (1)** 67:7
**MTV (1)** 59:19
**much (4)** 44:14;59:13;62:24;
113:25
**must (1)** 6:12

## N

**name (10)** 5:3;9:8;12:2,5;32:13;
97:6;125:5,10,14,18
**named (2)** 125:3;130:7
**names (5)** 124:2,9,10;125:2,15
**naming (1)** 126:7
**NASDAQ (1)** 12:2
**Nataupsky (1)** 41:5
**National (1)** 12:3
**nationally (1)** 59:20
**nature (3)** 46:7;84:19;85:22
**near (1)** 95:1
**nearly (1)** 82:8
**necessary (2)** 7:25;23:18
**need (7)** 34:9;93:22;102:8,10,11,
14;107:9
**needed (1)** 8:20
**needs (1)** 101:25
**new (2)** 32:20;33:6
**newspaper (1)** 66:18
**next (2)** 72:19;73:7
**Nike (2)** 60:25,25
**nine (2)** 71:14;91:9
**non-credible (1)** 102:3
**non-drink (1)** 52:6
**none (1)** 67:10
**nonsense (1)** 100:6

**Normally (5)** 72:11;80:18,18,19,19
**North (1)** 71:23
**Notary (1)** 130:20
**note (6)** 49:22;106:11;114:19;
122:1;128:3;129:8
**noted (2)** 9:7;101:4
**notes (1)** 127:3
**notice (5)** 6:23;7:11;49:24;80:3;
114:10
**noticed (1)** 17:22
**noticing (1)** 114:10
**noting (1)** 50:3
**November (3)** 18:17;31:2;32:22
**number (23)** 8:5;20:19,19;42:18;
56:11;59:19;100:10;101:15;
111:2,3;112:1,2,8,12;114:12;
117:13;120:16;123:19,24;
124:12;125:24;126:11;127:22
**numbers (1)** 31:20
**numerous (2)** 123:4;124:5
**nutrients (1)** 20:14

## O

**oath (3)** 6:4;103:7;130:1
**object (9)** 9:1;15:18;22:19;34:17;
54:25;64:7;72:6;85:11;99:2
**objection (7)** 9:7;99:19,21;100:5;
101:3;106:11,18
**objections (2)** 100:18;106:17
**obligations (1)** 6:16
**obscuring (1)** 76:2
**observed (1)** 106:3
**obtain (1)** 101:2
**obtained (4)** 24:19;29:22,23;123:21
**obviously (4)** 12:18;43:3;70:7;
84:24
**occasion (1)** 35:3
**Occasionally (1)** 11:16
**occasions (1)** 15:22,23
**occur (2)** 45:5;95:20
**occurred (2)** 28:18;29:3
**occurring (1)** 95:18
**off (21)** 19:13;33:24;61:19;65:2,2,3;
67:19;79:6;87:13;102:22;
104:17,18;106:8;108:6;114:7,7,
8;127:4;128:9,21,23
**offhand (1)** 111:10
**office (4)** 65:24;72:14,15,22
**officer (1)** 5:23;11:1;14:22
**officers (1)** 33:21
**offices (6)** 5:6;71:18;72:2,10,11,24
**official (5)** 13:11;88:1,2;118:24;
130:11
**officials (3)** 33:21;35:11;103:24
**often (3)** 73:1;119:2,13
**Ogio (2)** 97:10,18
**once (2)** 55:3;87:5
**one (59)** 16:20;23:10,15;25:5,6;
32:4,5,23;39:2,16;47:21,25;
48:2;49:5;51:4;54:16;55:14;
56:1;58:19;59:16,17;62:1;65:7;
67:21;69:12,13;72:19;73:3;

75:2;77:9;78:24;80:6,25;81:1;
86:4;87:18;89:1;90:17;91:6,8;
97:9,18;98:21,21;105:10;
111:12;113:3;114:15,16;115:4;
116:19;119:16,22;120:9,22,25;
123:13;128:7;129:8
**O'Neal (3)** 110:16;111:1,7
**ones (1)** 53:17
**ongoing (3)** 33:4,6;34:25
**only (8)** 25:12;34:3;66:10;74:10;
77:13;89:21;98:8;108:1
**onto (2)** 55:13;98:14
**open (2)** 47:20;48:6
**operators (2)** 69:6,13
**opine (1)** 108:17
**opinion (6)** 24:19;28:6,7,9,13;
126:21
**opportunity (4)** 8:18;49:24;89:7;
100:23
**opposed (1)** 127:16
**order (12)** 8:6,7;48:6,6;79:4;109:3,4;
115:14;121:11;122:7,7;124:19
**organization (1)** 41:14
**original (14)** 15:25;32:10;62:24;
63:2;65:7,22;66:11;78:20;
79:23;82:5;95:24;122:3;128:5;
129:8
**originally (3)** 11:24;24:8;65:5
**Orlando (2)** 5:6,10
**others (1)** 34:4
**ourselves (2)** 96:12;97:21
**out (29)** 12:13;29:7;33:3;34:15;
36:25;37:23;44:10;47:19;48:8;
63:3;64:1;65:4,12,13;79:18;
87:2,6,6;90:13;101:9,9;102:18;
104:9;112:22;114:11;116:8;
120:19;125:2,14
**outlets (8)** 45:4;54:6,6,7;59:7;
84:25,25;85:22
**outside (7)** 7:19;15:12;19:6;41:15;
71:16;73:21;84:4
**over (15)** 42:18;44:22;55:15;64:19;
75:7,17;76:1;77:24;78:5;81:5;
84:24;86:11;88:11;115:8,18
**overall (7)** 14:18,18;41:20;60:3,17;
67:16;80:9
**overlapping (1)** 39:18
**overseas (2)** 117:11;120:20
**overstepped (1)** 88:7
**own (10)** 48:8;51:9;52:25;53:11;
55:17;60:20;83:10;96:1;97:21;
123:18
**owner (1)** 68:8
**owns (2)** 18:2,4

## P

**page (25)** 52:17,19;54:16;59:17,17;
71:8;76:14;78:15,16;84:1;83:1;
86:7;88:9;91:12,13,24,25;
92:15,19;93:25;95:4;107:16;
120:4;122:10,12
**paid (1)** 115:6

**paint (1)** 19:14
**Palm (1)** 9:11
**pants (2)** 29:25;111:20
**paper (1)** 65:23
**paperwork (1)** 119:13
**Paragraph (10)** 71:7,14;78:16;
105:12;107:17,21;108:7;
111:14;117:15;122:22
**paragraphs (1)** 106:1
**parcel (3)** 22:23;47:17;57:20
**Park (1)** 65:9
**part (22)** 22:23;25:8,11,12;27:25;
28:2,3,3,4;29:19;41:20,21;
47:17;57:20;58:3,7;59:22,23,
24;60:3;77:3;90:21
**participate (1)** 45:24
**participating (1)** 43:23
**particular (12)** 30:19;39:7;54:19,20;
67:13,15;68:1;73:13;87:1;90:9;
119:5;123:20
**particularly (2)** 40:14;95:22
**parties (10)** 7:5,20;21:9;22:3;52:5;
56:7;57:14,22;118:24;129:3
**partner (1)** 11:6
**partners (2)** 41:6;57:16
**parts (1)** 65:4
**party (3)** 41:2;52:5;123:16
**past (2)** 96:2;98:11
**Paul (1)** 40:8
**pay (2)** 59:21;100:16
**payment (1)** 58:23
**payments (1)** 113:13
**penalties (1)** 115:6
**penalty (2)** 16:3;122:13
**people (20)** 22:20;35:22,23;41:4,14;
43:15;67:7,8,9;85:24;97:22;
103:20,23,24;111:3;112:2;
114:7,13;118:23;119:3
**perceive (1)** 77:15
**perceived (2)** 69:13;75:24
**percent (2)** 20:17;82:8;93:12
**percentage (1)** 61:9
**perhaps (1)** 57:7
**period (11)** 11:22;17:19;35:4;44:23;
46:10,23;47:4,13,14;73:14,18
**perjury (2)** 122:14,17
**permission (5)** 44:4;53:15,15;
54:13;116:7
**permit (1)** 59:13
**permitted (2)** 51:16;52:24
**person (8)** 16:7;37:24;41:7;66:10;
67:23;73:9;121:13;126:16
**personal (1)** 51:9
**personally (5)** 37:19;108:4;130:7
**personnel (1)** 21:24
**persons (1)** 41:6
**pertains (1)** 38:18
**peruse (1)** 105:25
**phrase (1)** 87:6
**picture (3)** 83:5;88:9;90:8
**pictures (1)** 75:23
**piece (6)** 66:3,11,13;77:1;79:18;
83:5

Case 6:11-cv-00329-ACC-DAB   Document 171   Filed 09/30/12   Page 43 of 46 PageID 3799
Monster Energy Company, fka Hansen Bever v.
Consolidated Distributors, Inc
Rodney   Sacks
September 20, 2012

**piece-by-piece (1)** 62:20
**pieces (1)** 65:23
**pin (1)** 42:13
**place (9)** 9:15;34:24;35:24;39:4;
47:13;69:3,16;73:18;100:24
**places (3)** 45:20;48:22;104:1
**plaintiff (6)** 5:18;7:4,6;8:4;17:23;
18:11
**plaintiff's (3)** 5:15;8:7;95:12
**plane (1)** 102:9
**planning (1)** 69:2
**pleading (1)** 18:11
**please (12)** 9:8;10;28:21;30:15,22;
38:14;53:19;91:24;94:1;99:23;
107:5;122:23
**pleasure (1)** 97:15
**plenty (1)** 104:10
**pm (1)** 103:2
**point (13)** 17:13;26:16;43:3;58:2,10;
65:3;77:13;80:24;82:22;93:10;
100:25;118:19;125:1
**pointing (1)** 79:14
**points (2)** 79:24;113:3
**police (1)** 86:1
**policing (1)** 84:14
**policy (1)** 24:20
**pool (1)** 45:16
**poor (4)** 76:5,6;77:2;86:21
**popular (5)** 42:21;43:15;61:3;
66:20;97:9
**popularity (1)** 35:13
**Porshe (1)** 124:3
**ports (1)** 35:19
**position (1)** 9:6
**positioned (1)** 80:7
**positive (1)** 44:14
**possible (6)** 39:16;62:14;68:11;
82:20;95:13;100:14
**poster (1)** 80:24
**potential (1)** 99:16
**practice (1)** 11:9
**practiced (1)** 13:3
**predated (1)** 39:12
**premier (1)** 45:13
**premium (7)** 44:9,20,25;45:1,13;
46:23;75:20
**premiums (2)** 47:9,17
**preparation (1)** 8:17
**prepared (2)** 70:22;127:14
**present (4)** 5:5;6:14;19:8;48:17
**presented (1)** 64:12
**presently (1)** 18:2
**president (5)** 11:20;15:23;17:4,5;
19:5
**press (1)** 66:17
**presume (2)** 34:11;104:4
**pretty (5)** 62:24;63:14;80:18;82:7;
113:25
**prevent (1)** 70:9
**previously (3)** 70:18;76:18;128:11
**pricing (2)** 60:5,6
**primary (4)** 41:7,22;45:22,23
**Prince (1)** 124:4

**principal (1)** 92:23
**principle (3)** 19:8;28:3;92:25
**principles (1)** 124:9
**print (1)** 81:19
**printed (1)** 65:18
**printing (4)** 65:16,17;75:12;76:5
**prior (14)** 11:3,5;12:8;14:12;26:8;
37:12;40:8;56:7;62:16;94:21;
98:24;99:25;101:19;123:9
**privilege (1)** 8:6
**privileged (1)** 128:12
**probably (17)** 21:2,4;34:4;40:25;
45:6,7;46:15,16,20,20,24;83:19,
20;93:11,13;101:23;109:18
**problem (6)** 33:23;67:7,8,9;69:11;
117:23
**problematic (1)** 87:10
**problems (1)** 102:2
**procedures (1)** 69:16
**proceed (1)** 43:5
**proceeding (2)** 6:15;101:22
**proceedings (5)** 7:25;70:1,2;
102:24;127:6
**process (10)** 33:1;38:9,12,25;39:3,4,
9;41:13,18;44:17
**pro-circuit (2)** 56:10,12
**produce (7)** 45:24;51:22;53:12;
112:5,9,22;114:9
**produced (8)** 8:2,9;51:23;103:16;
116:2;127:17,22;128:7
**producing (7)** 41:22;56:19;89:11;
111:18;112:2;117:18;128:11
**product (40)** 12:6;17:13;19:21;20:8;
21:3;27:3;29:5,7,44:13;48:7;
53:11,12;54:18,19;63:5,12,15;
75:6,11,20;76:4,5;81:15;82:4,5,
6;87:19;88:2;92:19;96:16,17;
97:1,3,4,6;112:23;116:8,10;
120:19,20
**production (4)** 8:3;21:14;127:21;
128:4
**products (40)** 25:22,24;29:9;43:2;
44:2,5,6,10;45:4,18,20;47:9,19;
48:21,23;51:22,23;52:6,13;
53:18;60:21;73:6,8,9;78:17;
81:25;84:13;92:1,14,15,16,19;
111:4,5;113:13;116:3,6,18;
120:18,23
**project (1)** 19:10
**prominently (2)** 78:17;107:20
**promote (3)** 81:15,24;116:7
**promotion (2)** 80:25;82:1
**promotions (1)** 47:10
**pronunciations (1)** 125:16
**properly (1)** 55:4
**property (4)** 15:14;16:22;94:1,7
**proposed (1)** 24:14
**prosecute (1)** 35:23
**prospect (1)** 96:9
**protect (1)** 123:5
**protected (1)** 31:20
**protection (8)** 26:17;32:6,8,18;34:9,
15,22,23

**protective (1)** 8:7
**proven (2)** 99:17;100:10
**provide (4)** 32:6;47:22;116:8;128:3
**provided (2)** 6:24;21:21
**public (9)** 12:19;22:12,15;58:1;
60:9;63:17,17;67:3;130:20
**publically (1)** 7:7
**publication (1)** 81:19
**publicly-traded (1)** 12:16
**purport (1)** 88:1
**purports (1)** 87:19
**purpose (3)** 45:8;68:1;103:18
**purposes (5)** 5:7;7:9,19;12:11;
55:13
**put (10)** 6:23;53:16,24;55:13,20,21,
21;83:16;98:14,16
**putting (3)** 43:15;83:11;112:25

## Q

**qualify (2)** 92:24;93:15
**quality (11)** 59:6;60:7;63:20,20;75:3,
10,11,12,12;76:5,6
**quantities (4)** 46:5;116:9;117:12
**quantity (5)** 45:3,9;47:25;58:6;
112:6
**quick (1)** 79:23
**quite (2)** 46:13;116:16

## R

**race (3)** 43:22;53:13,13
**racers (1)** 57:18
**racing (6)** 53:12;56:13,17;120:12,
12,13
**racks (1)** 81:16
**raised (1)** 23:22
**raising (1)** 99:18
**range (1)** 46:18
**rapidly (1)** 104:13
**rate (3)** 51:7,7;58:13
**rather (1)** 107:25
**read (7)** 74:16;89:7;105:11;106:7;
107:5,15;108:17
**reader (2)** 80:11;89:2
**readily (1)** 45:12
**reading (2)** 50:5;129:4
**ready (4)** 45:20;50:12;73:16;
103:19
**real (3)** 57:6;72:20,21
**realize (1)** 98:2
**realized (1)** 112:11
**realizing (1)** 114:5
**really (4)** 60:18;65:18;66:4;67:25
**reason (1)** 66:23
**reasonable (1)** 124:18
**Reasonably (1)** 15:10
**reasons (1)** 42:2
**recall (13)** 29:11;51:10;69:15;71:2,
22;85:5;101:12;105:3,4;108:20;
111:24;115:23;119:7
**received (2)** 34:25;47:18
**receiving (1)** 84:1

**recess (3)** 61:21;102:25;127:7
**recognition (2)** 34:14;97:6
**recollect (1)** 37:21
**recollection (18)** 37:18,20;38:13,15,
18;39:21;51:10;71:25;105:19;
109:20;110:21,25;111:22;
113:7;114:25;118:7;121:9;
122:8
**recommence (1)** 103:7
**record (16)** 7:11;9:16;55:4;61:20,23;
102:23;103:2;104:17,19;122:1;
127:5,9;128:3,10,21,24
**records (2)** 26:10;38:16
**recoveries (1)** 100:21
**redesigned (1)** 79:22
**Reed (3)** 40:15,16,19
**re-faxing (1)** 66:1,1
**refer (3)** 18:9;90:16;126:14
**reference (2)** 20:2;90:13
**referred (1)** 98:16
**referring (14)** 19:18;22:7,10;37:8;
38:2,3;70:18;76:17;87:24;96:4;
117:20;119:10;126:15;128:17
**refers (4)** 20:5;71:9;107:17,20
**reflect (2)** 12:6;19:17
**refresh (1)** 111:20
**regard (5)** 7:13;8:24;15:24;18:4;
51:11
**regarding (4)** 15:25;23:15;34:9;
101:1
**regards (1)** 8:21
**register (2)** 16:24;42:9
**registered (5)** 77:11;85:24;87:3;
124:2,6
**registering (1)** 26:16
**registration (23)** 18:16,19;26:5;
27:18;29:19,22;30:3,23;31:1,6,
8,16;33:3;34:10;37:5,13;38:8,
19,24;39:12;40:14;41:8;85:9
**registrations (11)** 26:21;31:12;35:22;
39:17;41:3,16;42:7,8;43:5;
114:20;126:1
**regulatory (2)** 35:11;70:2
**Rehab (3)** 32:12,13,14
**related (3)** 42:16;43:1;74:12
**relates (1)** 18:6
**relating (2)** 57:17;93:5
**relations (1)** 14:20
**relevant (1)** 93:4
**reliable (1)** 119:15
**relief (4)** 113:12;118:14;17;119:4
**relooked (1)** 43:4
**remain (1)** 101:15
**remedies (3)** 99:4,16;101:1
**remember (5)** 24:21;29:9;90:15;
115:2,3
**remind (1)** 103:6
**remote (1)** 95:21
**remotely (1)** 68:10
**removed (2)** 83:19;109:7
**rendition (1)** 98:10
**renewed (1)** 121:5
**repetition (1)** 38:25

rephrase (1) 6:19
replica (6) 67:11;75:10;78:18,22,
  23;111:19
replicate (2) 53:8,24
report (28) 15:17,19,19,20,22;49:15;
  50:18,19;69:20;70:6,10,17,20,
  22,25;71:3,5;74:15,16;84:2;
  123:23,23;124:25;125:1;
  126:22,23;127:14,15
reported (2) 51:8;70:23
reporter (8) 5:5,25;23:9;28:21;
  70:13;91:8;104:13;130:1
REPORTERS (1) 130:23
reports (2) 34:25;125:22
represent (5) 21:25;48:9;58:15;
  88:22;106:10
represented (1) 69:22
representing (4) 5:18,20;6:10;21:22
reputation (2) 97:3;124:21
request (5) 8:3;24:18;53:3,4;
  118:12
requested (1) 8:9
requesting (1) 121:11
require (1) 34:16
required (1) 100:16
research (1) 23:15
researches (1) 23:18
resembles (1) 95:16
resembling (2) 64:21;90:24
reserve (1) 9:5
reserved (1) 102:6
reserving (1) 8:21
resident (2) 9:22,24
resolution (3) 108:23;109:6;110:8
resolved (1) 109:9,10;115:4,5
respect (4) 16:3,11,12;72:5
respectfully (1) 100:6
respective (1) 129:3
responsibilities (2) 14:16,21
responsible (1) 41:2
rest (1) 77:22
restating (1) 38:14
restraining (1) 122:7
restricted (2) 7:10,20
restricting (1) 7:8
restriction (1) 9:3
result (9) 57:24;60:25;95:11;98:25;
  100:1,2,15;102:1;112:17
resulted (2) 33:2;34:10
retail (5) 54:6,7,7;84:15,18
retailer (1) 47:22
retailers (7) 22:13,13,18,22;23:2,4;
  44:2
return (1) 47:18
returned (1) 113:14
revenue (1) 93:16
revenues (4) 92:24;93:4,18,19
reverse (3) 94:13,16;101:14
reversed (1) 110:6
review (2) 8:16,19
reviewed (1) 34:1
reviews (1) 33:4
Ricky (5) 105:8,9;112:18,19,20

Ricky's (1) 112:24
right (69) 7:14;8:22;14:4;18:13;
  24:10;27:12;30:12;32:25;
  33:10;37:3;38:10,20;47:6;
  48:11,13,21;49:17;50:10,13,20,
  24;51:2;52:7;54:22;58:14;
  59:10;70:16;71:14,21;76:14;
  79:13;80:4;81:1,3;83:3,24;
  86:13;88:10;90:2,17,19;91:5;
  92:2,17;94:5,9;95:4;101:3;
  105:1,18;106:23;107:18,22;
  111:15,21,23;112:19;113:23;
  114:2,7;119:16,24;120:1,3,5,8;
  121:14;122:9;127:1
rights (16) 7:13;26:18,22,24;33:18;
  42:2;77:10,11,12;78:2;86:2;
  92:23;94:2,3,7;101:19
ripoff (8) 62:10,11,13,17;63:6,7,15;
  67:6
ripped (1) 33:24
ripping (1) 87:13
rise (3) 29:4;41:15,17
risk (1) 7:21
Rob (4) 59:16,18,19,21
Rodney (5) 5:8;6:3;9:9;129:6
Rosh (1) 8:14
Roughly (2) 45:5;48:12
round (2) 65:1;67:18
roundabout (1) 56:16
royalties (7) 47:7;58:6,6,7,9,20;
  100:16
royalty (12) 51:7,7,12;54:2;58:13,16,
  23,23;59:4,9,17;60:1
rules (2) 115:13;116:11

S

Sacks (15) 5:8,19;6:3;9:9;8,9;10:5;
  17:23;49:6,14;50:5;103:6;
  106:23;127:11;129:6
Sadler (1) 71:15
safe (2) 39:11;61:12
sale (12) 17:17;20:7;22:17,24;46:1,
  19;78:13;80:24;93:1,1,3;100:17
sales (20) 21:24,24;22:16,20;42:19;
  46:9,10;47:6,8,8,11,11,12;
  48:14;82:4,8;84:18;93:13;
  110:4,5
salesman (1) 48:8
salesmen (1) 22:24
same (30) 6:16;12:1;14:23,24,25;
  20:23,25;25:23;31:12,13;32:9;
  36:11,20;37:8;67:5,17,22;
  79:24;83:20;88:20,23,24;100:5,
  18;113:25;114:15,16;117:7;
  119:25;120:2
samples (1) 21:4
sat (5) 62:19;63:3;65:22,25,25
satisfactory (1) 110:9
satisfying (1) 48:20
save (1) 107:3
saw (10) 62:12;67:4,10,17;70:7,20,
  24;71:3;76:6;113:1

saying (12) 32:5;34:6;39:3,19;52:23;
  53:5,17;60:8;68:3;79:20;87:12;
  107:7
schedule (2) 51:4;59:17
scheme (1) 63:10
Schlosberg (2) 17:7,8
Schneorson (1) 5:23
Sclafani (2) 5:6;130:23
scratch (2) 64:2;67:8
scratches (1) 65:6
scratching (2) 63:3;65:25
scratchy (1) 80:14
seal (1) 130:11
search (10) 24:1,13,19,21,24;25:21,
  25;26:3;37:16;85:18
searches (3) 23:16,21;84:12
SEC (1) 15:15
second (12) 18:10;25:3;27:8;30:20;
  38:20,21,23;39:10;49:5;56:1;
  76:9;86:4
Secondly (1) 108:7
section (4) 91:25;92:3;101:22;
  107:16
securities (2) 7:21;16:2
seeing (1) 27:1
seek (3) 8:23;33:3;36:4
seems (4) 55:23;57:5;117:6;119:25
segment (3) 84:15;92:25;93:20
seisure (3) 109:12;115:24,25
seizure (12) 36:2;108:21;109:16;
  113:8,10;118:8,9,13;119:6;
  121:11;122:7;124:19
seizures (5) 35:23;36:3;119:1,4,8
selective (1) 44:16
sell (12) 17:13;22:21;45:17,24;
  47:20;48:1;54:1;68:25;69:2,4;
  73:16;114:9
selling (21) 17:18;35:24;41:23;
  42:24;56:20,22;62:8;69:6,6;
  73:8,15;89:11,14,15;105:16;
  109:6;111:18;112:9,25;117:18;
  120:20
sells (1) 73:9
send (2) 123:15;127:22
sending (1) 43:16
senior (9) 15:22;16:7;94:20;95:11;
  98:23;99:25;100:15
sense (1) 57:23
sensible (1) 42:10
sent (3) 109:2;123:4,9
separate (12) 14:21;22:16;47:10;
  51:14;52:1;57:22;93:19,20;
  112:15,16,16;118:1
separately (2) 93:8;128:7
September (4) 5:2;8:8,10;130:12
serious (2) 57:6,8
set (1) 71:16
settlement (1) 115:15
Seven (4) 76:8;81:5;83:2;91:24
seven-year (1) 41:10
Sganga (10) 5:17,17;9:1;17:22;24:8;
  106:11;116:24;127:13;128:2;
  129:9

SGANGNA (35) 6:22;7:17;15:18;
  22:19;24:5;25:4;27:10;34:17;
  36:10;49:22;50:3,10;52:17;
  53:19;54:25;55:4;64:7,11;72:6;
  85:11;99:2,10,14;100:5,18;
  106:16,19;108:3;110:18;122:1;
  127:18,24;128:14,17,21
shade (1) 82:23
shaded (1) 81:1
shading (1) 82:24
shape (2) 25:13,18
shipped (2) 29:7;36:25
shirt (10) 77:17,19,20;85:21;86:10;
  90:7,9,11,12,15
shirts (8) 29:24;59:25;85:1,14,15;
  87:25;120:14;124:14
short (4) 5:11;11:22;61:17;127:1
shortcut (1) 107:3
shoulder (5) 86:10;88:10;90:3,18;
  95:5
show (19) 18:8;26:10;27:6;30:12;
  31:25;49:4,9;70:11;71:4;86:3;
  91:5;100:20,23;103:10;110:12;
  113:16;119:16;121:14;125:1
showed (3) 44:13;111:13;123:24
showing (1) 116:19
shown (2) 59:20;104:21
shows (2) 59:19;87:10
shred (1) 95:14
shut (1) 51:24
side (9) 32:1;40:14;41:8;70:17;
  77:1;79:16,19;83:12,16
sides (1) 65:14
signature (2) 91:16;122:10
signed (1) 91:20
significance (5) 72:20,21;73:5,10,
  21
significant (1) 73:4
signing (1) 129:4
similar (5) 23:23;64:5;96:15,20;
  98:22
similarity (2) 74:23,24
simply (9) 26:21;33:25;43:12,12;
  44:17,22;54:3;85:6;127:22
single (2) 81:15;95:14
sitting (4) 45:19;63:3;87:12;97:8
situation (2) 56:8;113:2
situations (1) 69:17
Six (3) 70:13;81:6;92:15
size (3) 42:16;43:3;93:6
sized (1) 82:7
skateboards (1) 55:22
skinnier (1) 90:17
skinny (2) 95:3;98:21
skull (1) 78:12
skulls (4) 75:24;76:2,23;78:12
slavish (3) 78:17,22,24
Slednecks (1) 56:2
S-L-E-D-N-E-C-K-S (1) 56:3
slight (1) 80:20
slightly (2) 64:16;89:1
slogan (2) 87:1,3
smaller (1) 69:23

smart (2) 67:20;89:4

socks (1) 120:15

soft (1) 20:13

sold (23) 21:20;22:3,6,9,15;23:1,2,4;
27:3;36:25;45:4,20;51:24;54:4;
57:25;58:1;59:2;82:14;85:1,22;
112:20;117:11;124:14

somebody (3) 63:13;75:24;87:11

somehow (2) 87:21;125:12

someone (1) 68:11

sometimes (2) 55:10;80:20

somewhat (1) 88:10

somewhere (2) 90:12,14

soon (1) 21:13

sorry (10) 25:10;52:18;53:21;68:16;
70:16;75:21;85:13;92:7;
115:10;116:25

sort (11) 46:18,18;47:4;57:13,13;
69:25;83:10,18;88:2;103:19;
113:12

source (1) 51:1

South (6) 9:17;11:8;12:23,24,25;
13:6

Southprint (6) 104:24;109:16;
112:14,15,16,22

speak (1) 47:3

specialist (3) 15:14,15;54:5

specialize (3) 15:12;35:9;84:22

specializes (1) 16:21

specialty (2) 22:4;44:1

specific (8) 39:21;41:17;43:11;
44:1;53:4,5;114:25;126:14

specifically (6) 51:13;64:18;93:23;
105:6;110:23;111:2

speculative (1) 102:3

spelled (1) 124:10

spellings (1) 125:15

spend (1) 49:2

spoken (1) 68:8

sponsor (1) 81:22

sponsored (1) 66:16

sponsoring (1) 21:22

sponsorship (9) 53:2,10;57:21;
58:8;59:22;60:2;108:8,9;112:17

sporting (1) 22:14

sports (9) 20:15,19;43:24;44:1;
55:21;56:18;57:16;104:25;
108:22

spreadsheet (2) 50:17;52:3

spring (1) 50:25

staff (4) 15:23;22:13;85:20;97:21

staffing (1) 11:22

stage (3) 19:9,9;93:14

stages (2) 21:11;125:7

staple (1) 70:16

start (3) 45:15;52:17;65:19

started (33) 19:13,15;22:3;23:4;
25:23;26:20;27:4,4;35:15;40:6,
6,24;41:5,23,24;42:21,23,24;
43:6,15,17,20,24;44:3,6;45:6;
47:5;48:11;70:8;98:8;112:8,9;
114:5

starting (3) 11:18;22:14;112:25

starts (1) 79:6

state (9) 7:8;9:10,15;29:8;36:25;
87:10;88:11;130:3,20

stated (2) 72:1;122:13

statement (6) 7:16;30:23;78:21;
92:13;94:10;106:5

statements (3) 91:22;93:18;101:10

States (9) 5:9;11:17;18:2;31:9;
117:3;119:21;122:12,14,25

static (1) 81:16

stating (2) 8:18;34:19

station (1) 66:18

steps (2) 33:19;37:23

Steven (1) 41:5

stick (1) 66:25

sticker (9) 21:12;55:7,8,10,11,18;
117:9,19,24

stickers (3) 20:18;46:7;81:16

sticks (1) 79:18

still (14) 30:3;32:11;78:7,7;80:10;
83:20;88:19;89:5;97:1;102:20;
103:6;104:3;107:6;121:2

STIPULATED (1) 129:2

STIPULATIONS (1) 129:1

stocks (1) 13:25

stolen (1) 79:21

stop (6) 35:18;96:1,15;110:5;
113:2;124:20

stopped (2) 108:24;109:6

stopping (1) 110:4

store (2) 47:20,20

stores (5) 22:5;48:21;54:7,8;81:16

strategic (1) 43:9

strategy (2) 48:16;60:17

streams (1) 93:16

Street (2) 71:19,23

stretched (1) 83:16

strong (1) 101:10

stronger (1) 66:6

style (2) 5:11;19:16

stylized (1) 32:15

sub-brand (1) 32:12

subject (1) 18:23

submitted (3) 50:19;70:12;122:6

subsequent (3) 31:3,16;120:25

subservant (1) 28:3

subsidiaries (1) 13:22

substantial (3) 6:25;8:4;115:5

substantially (1) 46:13

success (1) 94:2

suggest (1) 87:20

suit (2) 53:13;120:21

suitcase (1) 97:9

summary (2) 51:6,7

Sunday (1) 8:11

Sunshine (1) 88:11

super-cross (2) 56:14,19

supervision (1) 14:19

support (1) 122:6

sure (19) 7:14;18:21;24:20;26:7,10;
40:6,25;57:8;59:5;62:7;64:4;
84:3;87:24;102:13;111:9;
112:24;113:6;115:22,25

surfboards (1) 55:22

surprise (1) 90:1

surprised (1) 90:5

surrendered (1) 113:14

surrounding (1) 75:4

sustainuation (1) 95:1

swear (1) 6:1

sweatpants (1) 30:1

sweatshirts (2) 29:25,25

sworn (2) 6:4;130:8

synonomous (1) 66:15

## T

tag (2) 87:18,24

tags (1) 87:25

talking (5) 47:24,25;55:3;82:18;
103:23

taller (2) 88:17;89:5

tape (1) 61:18

Target (1) 45:19

taste (2) 76:1;79:2

tattoos (1) 43:16

tax (3) 11:10;12:25;16:1

team (3) 53:11;56:13,14

teams (1) 56:12

technology (1) 65:17

telling (1) 32:7

tells (1) 6:13

temporary (5) 11:21;73:25;74:1;
122:7;124:15

tendering (9) 23:9;27:6,11;30:14;
49:7,10;70:11;76:8;91:7

tens (1) 93:14

tent (7) 71:16;73:17,20,20,22;74:2,
3

tents (1) 72:17

term (2) 93:11;107:19

terms (4) 51:15;58:11;60:15,16

terrible (2) 75:25;76:1

testified (10) 6:4;38:15;41:12;68:20;
83:23;89:10;90:3;95:3;96:5;
127:14

testifying (2) 6:15;91:21

testimony (8) 7:2;8:20;10:8;34:18;
38:14;70:18;76:18;110:11

therapist (1) 10:20

Therefore (1) 93:22

thereto (1) 93:5

THEREUPON (4) 6:2;61:21;
104:18;129:6

thinner (3) 65:5;88:18;89:4

thins (1) 65:4

third (7) 7:4;21:9;22:3;52:4,5;56:7;
57:14

third-party (1) 43:25

thirty (1) 17:9

thirty-party (1) 54:11

though (2) 32:19;72:25

thought (1) 75:5

thousand (1) 85:19

thousands (2) 74:25,25

threatening (2) 100:25;101:7

threats (1) 100:21

Three (8) 30:15;33:11;34:7;36:14,
19;47:15,21;98:12

times (2) 89:17;125:11

time-to-time (5) 15:21;34:1,5;51:18;
89:16

tiny (1) 80:8

title (2) 13:11;51:6

today (5) 7:2;10:8;17:24;34:13;
45:17,19;82:5;95:2;97:8;98:7;
103:11;106:17;127:12;128:6,19

Today's (1) 5:1

together (4) 36:6;41:21;62:22;
124:13

told (1) 81:15

took (5) 37:23;39:4;47:13;69:22;
70:8;112:11;113:1;114:12;
116:16;117:13,14

top (4) 65:1;67:17,18;76:21

topics (1) 49:23

torn (1) 65:14

track (2) 69:20;112:10

tracked (1) 69:19

tracks (1) 112:20

trade (6) 48:8;107:17,19,20;108:2;
120:7

traded (3) 7:7;13:21,25

trademark (44) 11:14;16:17,18,25;
18:15;23:16;24:18;25:8,12,17;
26:11,18;27:2,17,17;28:1,3;
30:24;31:24;36:21;37:1;60:13;
61:13;62:10;73:17;77:5,8,10,
11,11;78:2,18;79:7;80:2;84:11;
85:9,18,24;95:12;99:8,10;
112:19;123:6;125:25

trademarked (1) 31:22

trademarks (15) 11:8;31:18,19,21,
25;32:17;33:5,7,20,23;34:1,3;
107:13;124:3,6

trading (2) 13:14,17

traditional (1) 57:23

trained (2) 12:23,24

training (1) 12:22

transaction (1) 17:20

transactional (3) 11:11,13;16:1

transfer (1) 85:1

transferred (1) 89:11

transfers (3) 69:9,10;117:21

traveling (1) 8:15

tried (4) 63:13;65:14;79:21;107:3

trouble (1) 87:14

true (5) 72:13;81:12;94:10;101:15;
122:15

truth (5) 6:4,17,17,17;91:21

truthful (1) 122:20

truthfully (1) 6:12

try (9) 42:9;48:19;70:3,3,9;73:16;
79:4;88:5;114:9

trying (5) 32:19,22;39:1;65:11;
67:20;68:25;69:1;75:21;78:3;
79:3;114:7

t-shirt (17) 47:23;67:4,10;75:4;78:11,
13;83:21;87:1,2;88:21,23,25;

Monster Energy Company, fka Hansen Bever v.
Consolidated Distributors, Inc

Rodney   Sacks
September 20, 2012

90:24;96:24;97:2;98:14,17

**T-shirts (18)** 21:1;29:10,24;37:1;
43:23;56:1;62:9;69:1,6,7;73:17;
76:4,6;84:18;85:1;111:20;
115:8;124:13

**Tuesday (1)** 8:13

**turned (3)** 66:21;67:24;79:15

**turning (1)** 67:21

**turns (1)** 8:24

**TV (2)** 66:18;81:19

**tweaked (3)** 79:3;80:16;83:9

**tweaks (3)** 79:10,11;80:6

**Twenty-five (1)** 17:9

**twist (2)** 67:24;87:7

**twisted (1)** 88:18

**two (22)** 19:7;21:3;25:24;28:22,25;
31:4;33:9,16;34:16;36:10,13;
37:4;38:4,19;41:12;47:25;
49:11;59:17;80:5;86:7;88:9;
95:4

**two-dimensional (1)** 25:16

**type (2)** 25:21;57:15

**types (5)** 45:4;57:11;69:17;84:25;
112:6

## U

**ultimately (8)** 12:4;15:20;16:8;22:2;
26:20;114:11;120:21;124:13

**umbrella (2)** 13:23;42:3

**uncertainty (1)** 116:14

**uncontrolled (2)** 44:18;46:4

**under (17)** 6:16;10:19;13:18,21;
26:17,18;35:21;42:3;53:2;
90:25;103:7;115:12,12,13,13;
122:13,14

**underground (1)** 114:6

**underneath (1)** 27:22

**undersigned (1)** 130:6

**unfortunately (1)** 8:15

**uniforms (1)** 120:12

**uninformed (2)** 67:23;79:23

**Unipec (5)** 11:25;12:9,15,17;15:3

**unique (8)** 28:12;45:14;64:23;
65:22;66:2,5,6,8

**uniqueness (3)** 44:20;45:12,16

**unit (1)** 22:16

**United (6)** 5:9;11:17;18:2;117:3;
119:21;122:14

**units (1)** 53:25

**unknown (1)** 112:23

**Unleash (1)** 87:3

**unleashed (1)** 90:13

**unless (3)** 6:12;55:10;105:11

**unlikely (1)** 95:22

**unrealistic (1)** 100:12

**unsigned (1)** 121:23

**unsubsidiary (1)** 13:15

**unusual (1)** 123:21

**up (22)** 8:24;23:22;46:13,17,18;
48:18;63:5,9;65:23;68:11;69:7;
70:5;71:16;79:13;80:1,7;87:6;
97:21;100:20,23;102:21;118:4

**upgrade (1)** 32:17

**upmarket (1)** 75:19

**upon (4)** 6:4;38:16;68:3,4

**urgent (1)** 70:9

**USA (1)** 88:12

**use (49)** 7:8,18;20:3;7;24:14;26:12,
18;28:12,14,19;29:1;30:4,6,7;
31:13;36:15,20;44:4;47:9;48:5,
7;52:5;54:9,20;55:25;64:1;
66:23;67:2;80:25,25;81:13,23,
23;85:10,17;89:24;94:21,22;
95:6;96:23;98:24;100:1,3;
104:3;107:2,25;108:8,14;
112:19

**used (41)** 19:21,24;20:11,12,17,22,
23;21:5,18,24;22:2;24:23;
26:16,19;29:5;32:21;54:4,21;
55:10,12;60:19;61:6,11,12;78:19;
80:23;87:2,3,4;89:21;90:3;
95:14;96:2,7,19,20;97:25;98:8,
10;99:25;114:18;119:12

**uses (3)** 106:4;107:10;123:6

**using (18)** 23:13;25:22,24;26:9;
62:15;67:7,8,9;84:6,8;95:5;
96:1,5,16;98:20,24;105:22;
116:7

**Usually (1)** 17:3

**utilize (1)** 53:25

**utilized (1)** 75:13

## V

**vague (9)** 15:18;22:19;64:7,13,15;
72:6;85:11;99:5,6

**valuable (4)** 31:24;60:14;61:5;
123:5

**valuation (1)** 61:8

**value (10)** 46:19;47:17,18,22;48:3,
25;59:24;60:3,13;61:9

**variant (1)** 90:25

**variation (2)** 87:8;89:22

**variations (1)** 82:11

**varied (1)** 46:20

**various (2)** 15:17;78:20

**vast (2)** 82:1,1

**veers (2)** 65:2,3

**Vegas (1)** 66:17

**verify (2)** 37:24;39:10

**verifying (1)** 37:16

**version (5)** 19:18;32:15;83:9;90:2;
98:13

**versus (2)** 5:12;80:16

**vice (1)** 11:20

**video (8)** 61:16,19,22;102:22;
103:1;127:4,8;128:23

**videographer (1)** 5:4

**view (6)** 58:2;79:9;80:2;85:3;
93:10;108:16

**viewer (1)** 79:23

**views (1)** 81:20

**Virginia (1)** 104:24

**vision (1)** 83:10

**visual (1)** 68:5

**vitamins (1)** 20:14

**volume (1)** 20:17

**VOLUSIA (1)** 130:4

## W

**Wait (2)** 116:24,25

**waive (1)** 7:12

**waived (1)** 129:5

**walk (1)** 85:20

**walking (1)** 85:20

**Walmart (2)** 45:18;113:1

**warehouse (5)** 71:18;72:2,10,15,22

**warehouses (1)** 72:24

**Watkins (2)** 5:5;130:19

**way (7)** 7:12,23;48:19;60:24;65:1,
3;67:21,25;75:13;83:11,14;
106:14;119:15;123:21

**ways (6)** 7:20;31:23;32:9;67:19;
79:4;114:8

**wear (2)** 48:8;120:14

**website (2)** 47:12;48:14

**week (14)** 8:14;45:19;69:2;71:16;
73:18;74:8,10,12;75:18;78:14;
100:19;123:22;124:15;128:15

**Weeks (1)** 84:19

**well-known (3)** 42:21;43:14;124:3

**weren't (4)** 51:13;58:7;95:2;118:24

**Werksmans (1)** 11:7

**What's (6)** 20:6;61:5;74:1;86:25;
87:15;106:18

**Whenever (1)** 50:12

**WHEREUPON (17)** 23:11;28:23;
30:16;49:12;70:14;76:12;86:5;
91:10;102:24;104:7,15;110:14;
113:18;116:21;119:18;121:17;
127:6

**wherever (1)** 112:9

**white (1)** 86:21

**whole (17)** 6:16;10:2;16:2,3;19:10;
62:21;65:21;67:16,25;68:1;
77:6;89:22;90:23;102:7;126:1,
12,12

**wholly (1)** 13:15

**who's (3)** 58:19;105:10;126:11

**whose (1)** 22:21

**Williams (2)** 5:6;130:23

**withheld (2)** 8:4;128:12

**within (9)** 15:5;21:3;25:24;33:2;
41:14;43:8,9;45:19;71:19

**without (14)** 28:14;29:12;39:23;51:1,
20;56:23;68:12;87:13;105:22;
111:5,6;112:24;114:9,10

**witness (6)** 6:1,6;8:20,22;53:19;
64:9;99:7,11;100:25;106:16;
110:19;127:13;129:3,5;130:7,
11

**wolf (1)** 68:17

**wolverine (2)** 68:13,17

**word (6)** 11:12;29:14,17,18;31:22;
77:7

**worded (1)** 88:5

**wording (1)** 88:2

**words (10)** 27:23;28:14;29:12,12;
37:5;50:17;57:8;77:10;79:20;
88:11

**work (14)** 11:11,13,15;15:21;35:9;
36:6;62:24,25;63:1;64:23;
75:25;97:19;103:20;112:4

**worked (4)** 19:9;38:8;85:6;119:12

**working (3)** 33:20;35:10;40:24

**world (4)** 35:14;60:23;61:3,4

**worldwide (2)** 66:17,18

**world-wide (1)** 27:4

**writing (3)** 75:17;76:24,25

**wrong (1)** 124:11

## Y

**year (3)** 9:19;12:4;59:22

**years (18)** 14:10;17:9;26:13;30:10,
11;40:22,25;42:19;47:15;61:6;
63:11;64:19;80:23;84:14,24;
96:3,7;121:6

**yellow (10)** 63:9;67:1,4,5;80:22;
81:1,2,12,23;82:2

**Yesterday (1)** 8:14

**Yosef (2)** 68:8;89:8