1          UNITED STATES DISTRICT COURT

2          MIDDLE DISTRICT OF FLORIDA

3              ORLANDO DIVISION

4          CASE NO. 6:11-CV-329-ORL-22DAB

5   MONSTER ENERGY COMPANY, f/k/a        )
    HANSEN BEVERAGE COMPANY, d/b/a       )
6   MONSTER BEVERAGE COMPANY,            )
                                         )
7           Plaintiff,                   )
                                         )
8   -vs-                                 )
                                         )
9   CONSOLIDATED DISTRIBUTORS, INC.,     )
    METTEMP, INC., and DAVID BAKSHT      )
10  (a/k/a David Lipsker a/k/a David     )
    Bakshet a/k/a D Bakht a/k/a DM       )
11  Schneerson a/k/a Abraham Shneorson,  )
                                         )
12          Defendants.                  )
    _____)

13

14

15  VIDEOTAPED

16  DEPOSITION OF:      YOSEF AMAR

17  DATE TAKEN:         WEDNESDAY, AUGUST 29, 2012

18  TIME:               10:38 A.M.

19  PLACE:              165 BILL FRANCE BOULEVARD
                        HOMEWOOD SUITES BY HILTON
20                      DAYTONA BEACH, FLORIDA

21  REPORTED BY:        CARMEN THOMAS, REGISTERED
                        PROFESSIONAL REPORTER AND
22                      NOTARY PUBLIC

23

24

25

                        2

BARKLEY
Court Reporters

```
 1      APPEARANCES:

 2           Appearing on Behalf of the Plaintiff:
             PAUL A. STEWART, ESQUIRE
 3           Knobbe, Martens, Olson & Bear, LLP
             2040 Main Street, 14th Floor
 4           Irvine, California 92614
             (949)760-0404
 5           paul.stewart@kmob.com

 6           Appearing on Behalf of the Defendant:
             MOSHE MORTNER, ESQUIRE
 7           The Mortner Law Offices
             40 Wall Street, 28th Floor
 8           New York, New York 10005
             (646)820-8770
 9           mm@mortnerlaw.com

10           SHAWN LANE, VIDEOGRAPHER

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

YOSEF AMAR

BARKLEY
Court Reporters

```
1                        I N D E X

2      TESTIMONY OF YOSEF AMAR
            Direct Examination by Mr. Stewart          8
3           Cross Examination by Mr. Mortner         156
       CERTIFICATE OF REPORTER                       161
4      CERTIFICATE OF OATH                           162

5

6                      E X H I B I T S

7                   DESCRIPTION                     PAGE
                                                   MARKED
8      Exhibit 1     3DL design(marked in a previous   --
                     deposition)
9      Exhibit 22    Subpoena                          11
       Exhibit 23    Written Responses                 11
10     Exhibit 24    document                          25
       Exhibit 25    Declaration                       28
11     Exhibit 26    parrot design                     30
       Exhibit 27    purple dinosaur design            35
12     Exhibit 28    design examples of the letter M   38
                     used in words and sentences
13     Exhibit 29    designs showing usage of M        40
       Exhibit 30    artwork                           42
14     Exhibit 31    artwork                           43
       Exhibit 32    artwork                           44
15     Exhibit 33    artwork                           46
       Exhibit 34    artwork                           47
16     Exhibit 35    artwork                           47
       Exhibit 36    invoice                           52
17     Exhibit 37    artwork                           53
       Exhibit 38    artwork                           54
18     Exhibit 39    artwork                           54
       Exhibit 40    artwork                           56
19     Exhibit 41    artwork                           57
       Exhibit 42    artwork                           58
20     Exhibit 43    artwork                           58
       Exhibit 44    artwork                           59
21     Exhibit 45    artwork                           60
       Exhibit 46    artwork                           60
22  *  Exhibit 47    tee-shirt                         61
    *  Exhibit 48    tee-shirt                         61
23  *  Exhibit 49    tee-shirt                         61
    *  Exhibit 50    tee-shirt                         61
24

25

                            4
```

BARKLEY
Court Reporters

1                            E X H I B I T S

| | | | |
|---|---|---|---|
| * | Exhibit 51 | tee-shirt | 61 |
| * | Exhibit 52 | tee-shirt | 61 |
| * | Exhibit 53 | tee-shirt | 61 |
| | Exhibit 54 | 1996 catalog | 66 |
| | Exhibit 55 | e-mail | 71 |
| | Exhibit 56 | 1997 Product Catalog | 94 |
| | Exhibit 57 | 2000 Product Catalog | 94 |
| | Exhibit 58 | 2004 Product Catalog | 94 |
| | Exhibit 59 | 2005 Product Catalog | 94 |
| | Exhibit 60 | application for modified 3DL trademark | 109 |
| | Exhibit 61 | document from trademark file | 110 |
| | Exhibit 62 | document entitled preliminary amendment | 111 |
| | Exhibit 63 | Florida State Trademark Registration | 115 |
| | Exhibit 64 | Trademark Application for the three drooping lines design with the word Daytona Beach, Florida | 120 |
| | Exhibit 65 | New Jersey State Registration for the 3DL mark with the word Wildwood | 121 |
| | Exhibit 66 | 3DL invoices | 139 |
| | Exhibit 67 | 3DL invoices for the year 2011 | 142 |

*   (Exhibits 47 through 53 were retained by

    Mr. Paul Stewart Esquire.)

5

YOSEF AMAR

1      THE VIDEOGRAPHER:  We are now on the record

2   in the matter of Monster Energy Company versus

3   Consolidated Distributors, Inc. et al.  Today's

4   date is August 29, 2012, and the time is

5   approximately 10:38 a.m.

6      This is the video recorded deposition of

7   Yosef Amar being taken at 165 Bill France

8   Boulevard, Daytona Beach, Florida.

9      My name is Shawn Lane and I am the camera

10  operator and our court reporter today is Carmen

11  Thomas.  We both represent Barkley Reporting

12  located at 187 Century Park East, Los Angeles,

13  California.

14     Will counsel please introduce themselves for

15  the record.

16     MR. STEWART:  Paul Stewart of Knobbe Martens.

17  I'm here on behalf of the plaintiff, Monster

18  Energy.

19     MR. MORTNER:  Moshe Mortner, Mortner law

20  Office, here on behalf of Consolidated

21  Distributors, Incorporated and Dave Baksht.

22     THE VIDEOGRAPHER:  And will our court

23  reporter please swear in the witness.

24     THE COURT REPORTER:  Would you raise your

25  right hand, please.

6

YOSEF AMAR

BARKLEY
Court Reporters

1           THE WITNESS:  I'm sorry.  I cannot swear

2      because it's against my religion.  I can say -- I

3      can say the truth.

4           THE COURT REPORTER:  Would you raise your

5      right hand?

6           THE WITNESS:  Huh?

7           THE COURT REPORTER:  Would you raise your

8      right hand?

9           THE WITNESS:  I don't think I'm allowed to.

10     I can -- I say the truth.  I just -- you know,

11     we're not allowed to swear and --

12           MR. MORTNER:  Usually -- she's going to ask

13     you to affirm.  That's like -- that's just saying

14     what you just said, that I'm going to tell the

15     truth.

16           THE WITNESS:  I tell the truth.

17           MR. STEWART:  Can -- can you say the standard

18     thing with the word affirm instead of swear?

19           THE COURT REPORTER:  Yeah, I was going to.

20           MR. STEWART:  Okay.

21           THE COURT REPORTER:  Will you raise your

22     right hand?

23  Whereupon,

24                      YOSEF AMAR,

25  having been first duly sworn, was examined, and

7

YOSEF AMAR

1    testified as follows:

2              THE WITNESS:  I will tell the truth.

3                   DIRECT EXAMINATION

4    BY MR. STEWART:

5         Q    Thank you.

6              Can you state your name for the record,

7    please.

8         A    Yosef Avrham Amar.

9         Q    And who do you spell your first and last

10   names?

11        A    First Yosef, Y-o-s-e-f and Amar, A-m-a-r.

12        Q    Thank you.

13             Have you ever had your deposition taken

14   before?

15        A    Once.

16        Q    And when was that?

17        A    Probably 18 years ago, something.

18        Q    Okay.  What -- what -- what type of lawsuit

19   did that involve?

20        A    We had a partner that -- in Joe Cool that we

21   didn't end up and, you know, we had to buy him out.  So

22   we went through a, you know, deposition and then we

23   bought him out.

24        Q    Okay.  Well, let me just go over some of the

25   basic procedures for you since it's been 18 years since

8

BARKLEY
Court Reporters

1    your last deposition.

2         A    Okay.

3         Q    I'm going to be asking you a series of

4    questions about the -- the three drooping lines or 3DL

5    logo that you're familiar with I'm sure and your job is

6    just to provide me with your answers to the best of your

7    ability.

8         A    Okay.

9         Q    And the court reporter is creating a written

10   transcript of every word that both you and I say.  So

11   please wait till I finish my questions before you begin

12   your answers.  That way she can create a -- a clear

13   record of the questions and the answers.  Do you

14   understand that?

15        A    Yes.

16        Q    Okay.  Good.

17             And all of your answers should be in words.

18   You shouldn't just nod your head or shake your head,

19   because the court reporter can't really take that down.

20        A    Okay.

21        Q    Now, are you represented here today by

22   Mr. Mortner?

23        A    No.

24        Q    Okay.  So Mr. Mortner may object to some of

25   the questions that -- that I ask you, but his objections

9

YOSEF AMAR

1     are for the record for the judge to rule on at a later

2     time.  So if you can answer the questions that he

3     objects to it's -- it's still your job to go ahead and

4     answer the questions.  Do you understand that?

5          A     Yes.

6          Q     Okay.  Now, do understand the answers you're

7     giving are under oath -- sworn is not quite the right

8     word, but they're under oath just as if you were in a

9     courtroom in front of a judge and a jury.  Do you

10    understand that?

11         A     Yes.

12         Q     So you're -- you're obligated to tell the

13    truth.  Do you understand that?

14         A     Yes.

15         Q     Okay.  Is there any reason why you're not

16    able to give full and complete and truthful testimony

17    today?

18         A     There is a reason what?

19         Q     A reason why you wouldn't be able to give

20    your -- your best testimony today?

21         A     No.

22         Q     Are you -- are you under any medication that

23    would inhibit your ability to testify properly?

24         A     No.

25         Q     Okay.  Good.

                              10

BARKLEY
Court Reporters

```
1            Have you done anything to prepare for the

2    deposition today?

3        A    Just stuff that you asked me to prepare.

4        Q    And -- and that would be the -- the box of

5    documents that was delivered to the hotel yesterday?

6        A    Yeah, all the records that I have, you know,

7    that I could find and whatever you ask in your subpoena.

8        Q    Okay.  Well, let me just go ahead and

9    introduce the subpoena.

10           MR. STEWART:  I'll ask the reporter to mark

11       it as Exhibit 22.

12           (Exhibit 22 was marked for identification.)

13   BY MR. STEWART:

14       Q    Is this the subpoena that you were referring

15   to just a moment ago?

16       A    Yes.

17       Q    Okay.  And is the box of documents that you

18   provided to my hotel yesterday the documents that you

19   believe respond to the request in this subpoena?

20       A    Yes.

21       Q    Okay.  And in the box, you gave me a set of

22   written responses that I'll ask the reporter to mark as

23   Exhibit 23.

24           (Exhibit 23 was marked for identification.)

25   BY MR. STEWART:
```

11

BARKLEY
Court Reporters

1      Q      And I just wanted to ask you if these are in

2      fact the written responses to the -- the subpoena that

3      you provided to me?

4      A      Yes.

5      Q      Okay.  Good.  Not a trick question.

6             Now, in the subpoena, Exhibit Number 22,

7      there's 20 types of documents that we asked for and your

8      response, Exhibit 23, has 20 numbered paragraphs.  Do --

9      do those 20 paragraphs correspond to each other?

10     A      There was 23 you said?

11     Q      20.

12     A      Oh, yeah.  So that's -- we ask that 20.

13     Q      Yeah.  So these are -- Exhibit Number 23 --

14     A      Oh, okay, okay.

15     Q      -- is the 20 answers to the 20 --

16     A      Yes.

17     Q      -- document requests?

18     A      Yes.

19     Q      Thank you.

20            And did you prepare the 20 answers yourself?

21     A      Yes.

22     Q      Okay.  And all of the answers are -- are

23     truthful and accurate?

24     A      Yes, to the best of my ability.

25     Q      Okay.  Very good.  That's all we can ask.

12

BARKLEY
Court Reporters

```
 1              Have you spoken with anybody to help you
 2      prepare for today's deposition?
 3          A    No.
 4          Q    You didn't speak with anybody at Joe Cool?
 5          A    Well, my wife help me to gather all the
 6      stuff.
 7          Q    Okay.
 8          A    That's all.  My wife, yes --
 9          Q    Okay.  Fair enough.
10          A    -- but that's all.
11          Q    Did you -- did you speak with David Baksht?
12          A    No.
13          Q    Did you speak with an attorney?
14          A    No.
15          Q    Okay.
16          A    Well, I take it back because, you know, Bob
17      was -- I didn't want to come here, you know, so he was
18      talking -- I was talking to him about it before, but
19      after he, I guess, didn't want to represent anymore.  So
20      I -- that's the only one I spoke to before, but after
21      that we talk, me and you, about, you know, subpoena and
22      everything.  So I just went straight to you.
23          Q    And that was Bob Pershes you were referring
24      to?
25          A    Yeah, Bob Pershes.
```

13

BARKLEY
Court Reporters

```
 1        Q     Okay.  Did you -- did you review any

 2   documents other than the documents that you sent to me

 3   and brought here today?

 4        A     I have another few invoice.  I mean, I have

 5   -- I have other more invoices, but it's -- takes time to

 6   go through them but what I found is -- I just brought

 7   another -- I showed -- I showed you before the series of

 8   tee-shirt of the iguanas in 1996 --

 9        Q     Okay.

10        A     -- which we sold to customer Corasel

11   (phonetic).  So that's addition if you want to take a

12   copy or something, whatever.

13        Q     Okay.  I understand.

14              Now, you -- you are the owner of the store

15   called Joe Cool; is that correct?

16        A     Correct.

17        Q     Okay.  And are you also the president of Joe

18   Cool, Inc.?

19        A     Correct.

20        Q     Okay.  What type of business does Joe Cool,

21   Inc. do?

22        A     Joe Cool is a producer of heat transfers to

23   apply on tee-shirts.  It's artwork designs that we sell

24   on paper and people that have capability of machine --

25   heat press machine -- heat press machine that press the
```

YOSEF AMAR

BARKLEY
Court Reporters

1     designs into the tee-shirts.  They can do it as a custom

2     order, like the designs on the wall, and somebody can

3     sell one that design or they can preprint them and sell

4     them already ready to go with a design and a tee-shirt

5     and a price tag and sell it.

6             So we are the manufacturer of heat transfers.

7     And also we do bike shows, retail.  We do retail

8     business in flea markets.  That's how we started before

9     we started to produce.  I had owned tee-shirt shops.  So

10    I have the background of retail in the tee-shirt

11    business and buying transfers from other companies and

12    that's what we do --

13        Q     Okay.  And when you say --

14        A     -- retail and wholesale.

15        Q     And so the -- if I understand correctly, the

16    retail business is the sale of tee-shirts that have --

17        A     Correct.

18        Q     So you --

19        A     Tee-shirts with our designs on it --

20        Q     Okay.

21        A     -- printed.

22        Q     So you'll take your own design and apply it

23    to the tee-shirt?

24        A     Correct.

25        Q     But then you will also just take the design

15

BARKLEY
Court Reporters

1    on paper and sell that to wholesale customers?

2         A     Correct.

3         Q     Okay.  And where is the Joe Cool store

4    located?

5         A     It's 1052 North Beach Street, Holly Hill,

6    Florida.

7         Q     Okay.  And is that -- that's part of Daytona

8    Beach?

9         A     It's -- we are right -- right on the border

10   of Daytona and Holly Hill --

11        Q     Okay.

12        A     -- right -- so we -- we actually Holly Hill.

13        Q     Holly Hill.  Okay.

14              Let me ask you about a different subject

15   here.  When -- well, have you ever met David Baksht?

16        A     Yes, I did.

17        Q     And when did you first meet him?

18        A     I meet him -- I met him in New York about I

19   think four or five -- five -- four or five years ago.

20   But I knew him before from when he was living in

21   Florida.

22        Q     Okay.  Had -- had you met him when he was

23   living in Florida?

24        A     I know of him, but I never met -- met him.

25   He came to Joe Cool one time, but I never -- I -- I

16

YOSEF AMAR

BARKLEY
Court Reporters

1      don't think -- I don't remember meeting him before.

2           Q      Okay.  And what -- what do you think of

3      Mr. Baksht?

4           A      He's a nice guy, you know --

5           Q      Okay.

6           A      -- businessperson.  He does a lot of -- you

7      know, he have some background in trademarks and

8      copyright and stuff like that.  That's mostly what --

9      how I knew him from.

10          Q      Okay.  Do you have a belief as to whether

11     he's an honest man?

12          A      Yes.

13          Q      You believe he is?

14          A      Yes.

15          Q      Okay.  And have you heard of a company called

16     Consolidated Distributors, Inc.?

17          A      Yes, I did.

18          Q      Okay.  And is Mr. Baksht affiliated with that

19     company?

20          A      Yes.

21          Q      What's his role with Consolidated?

22          A      He's partner with Consolidated.

23          Q      He's a -- one of the partners?

24          A      One of the partners.

25          Q      And who -- who are the other partners?

17

BARKLEY
Court Reporters

1        A       Menachem Schneorson.

2        Q       Are there any other partners?

3        A       Not that I know of.

4        Q       Okay.

5        A       I mean, except, you know, they own that

6    corporation.

7        Q       Have you ever met Mr. Schneerson, Menachem

8    Schneerson?

9        A       Yes, I did.

10       Q       And when was that?

11       A       In -- probably when we started, you know, the

12   business together.

13       Q       And -- and approximately when was that?

14       A       About two and a half years ago or something

15   that.

16       Q       Okay.  And did you meet Mr. Baksht at the

17   same time?

18       A       Yeah, before.

19       Q       Did you deal -- when you were dealing with

20   Consolidated, did you deal primarily with Mr. Baksht or

21   with Mr. Schneerson?

22       A       Mostly Baksht.

23       Q       Mostly Baksht.  Okay.

24               What type of business does Consolidated do?

25       A       They -- you know, we have -- you know, they

18

YOSEF AMAR

BARKLEY
Court Reporters

1    do a lot of trademark marketing, you know, selling.  So

2    that's about that, you know, what I know about them.

3         Q    What do you mean by trademark marketing and

4    selling?

5         A    They do trademarks and they have their own,

6    you know, way of selling, you know, marketing this --

7    the trademarks -- the trademarks that they do.

8         Q    And -- and what's their way of marketing the

9    trademarks?

10        A    Like every other business.  Market it,

11   advertising, sell, you know, pushing it through the

12   channels.

13        Q    Okay.  Does Consolidated sell its own

14   tee-shirts or heat transfers?

15        A    He's -- he's selling for -- you know, when we

16   were -- when we work -- we -- when we join together, so

17   they're selling also their side.

18        Q    Okay.  So both Consolidated and Joe Cool --

19        A    Their job -- yeah, their job was also to

20   market and sell whatever they have the channels and Joe

21   Cool also will do his own part.

22        Q    Okay.  So would Joe Cool supply the heat

23   transfers to Consolidated so Consolidated could market

24   them?

25        A    No.  They just push the sales.  Joe Cool was,

19

BARKLEY
Court Reporters

1    you know, selling -- I mean shipping.  If you so call do

2    the shipping and the -- and the -- whatever they -- we

3    sell, we ship and then we get the orders, whatever if

4    they have any order from them, so.

5        Q    Oh, so Consolidated would refer orders to Joe

6    Cool?

7        A    That -- that was, yeah, the joint venture,

8    yeah.  That was part of was supposed to do.

9        Q    Okay.  And did Joe Cool -- excuse me.  Did

10   Consolidated ever actually refer any customers to Joe

11   Cool?

12       A    Yes.

13       Q    Okay.  Do you remember where those customers

14   were located?

15       A    They have all kind of connections, you know,

16   that people call.  I don't remember.  I don't control

17   every sale that comes in -

18       Q    Sure.

19       A    -- but in general, yeah.

20       Q    Were -- was Consolidated bringing in

21   customers from out of state?

22       A    They were referring, call Joe Cool, they have

23   design, you know.

24       Q    I'm sorry.  I didn't hear you.

25       A    They -- they're referring to us, so the

20

BARKLEY
Court Reporters

1    customers --

2         Q    Yes.

3         A    -- and we will get the sales, the customers.

4         Q    And -- and were they referring to you

5    customers who came from out of -- out of state, outside

6    of Florida?

7         A    Yeah, out of state.

8         Q    Okay.  And where -- where is Consolidated

9    located?

10        A    In New York.

11        Q    Do you know its address?

12        A    716 or 715 Eastern Parkway something.

13        Q    Okay.

14        A    Okay.

15        Q    That's in Brooklyn?

16        A    Brooklyn, yeah.

17        Q    Have you ever been an officer of

18   Consolidated?

19        A    Yes.

20        Q    And when was that?

21        A    When we started and I was the vice president

22   for Consolidated.

23        Q    When you were doing business with

24   Consolidated?

25        A    Yeah, yes.

YOSEF AMAR

BARKLEY
Court Reporters

```
 1        Q     Okay.  Did -- did you receive any

 2    compensation for being an officer of Consolidated?

 3        A     We didn't get to that yet, you know --

 4        Q     Okay.

 5        A     -- we just started the company and we didn't

 6    -- I mean, nobody got paid yet.  It's all was putting

 7    back into build up the joint venture.  So we didn't have

 8    any -- you know, we didn't get paid yet or -- or

 9    anything from the corporation because it was just moving

10    forward, you know.

11        Q     Okay.  Have you heard of a company called

12    Mettemp, Inc.?

13        A     Yes.

14        Q     Is Mr. Baksht affiliated with that company?

15        A     Yes.

16        Q     And what -- what's his role with that

17    company?

18        A     I'm not sure.

19        Q     Okay.  Have you ever met anybody else from

20    Mettemp, Inc.?

21        A     I'm not sure if there's any other --

22        Q     Okay.

23        A     -- officers.

24        Q     Do you know what type of business Mettemp

25    does?
```

22

BARKLEY
Court Reporters

```
 1        A     Mettemp?

 2        Q     Yes.

 3        A     Well, they're the same thing.  It started

 4   Mettemp I think and then they have also Consolidated, so

 5   same thing.

 6        Q     Same type --

 7        A     Trademark.

 8        Q     Same type of business as Consolidated?

 9        A     Yeah.

10        Q     Has Joe Cool ever done business with Mettemp?

11        A     Yeah.  We did some Bike Week trademarks

12   together.  I think it was Panama City Bike Week or

13   something if I'm not mistaken.

14        Q     Was that the Daytona Beach Bike Week --

15        A     Bike --

16        Q     -- trademark?

17        A     No.  I think it was Panama -- I think it was

18   Panama City and maybe also Daytona.  I'm not sure.

19   Yeah, I think it was both.  I'm not clear, but it was --

20   I know Panama City was there, but Daytona the first --

21   yeah, yeah, Daytona also was there now as I remember.

22        Q     And do you remember that there was a lawsuit

23   over the Daytona Beach Bike Week trademark?

24        A     Yes.

25        Q     Who -- whose idea was it to get a trademark
```

23

BARKLEY
Court Reporters

1    for Daytona Beach Bike Week?

2         A      Together, me and David.

3         Q      Okay.  And was the -- was the hope that you

4    would be able to be the only -- only company that could

5    market Daytona Beach Bike Week tee-shirts?

6         A      Yes.

7         Q      And -- and why did you believe that you had

8    the -- the right to be the only company that could do

9    that?

10        A      Because back in those days nobody really much

11   marketed that item like Joe Cool and over 20 something

12   years we push that item and brought it back to be a mark

13   that people asking for and -- and talking about it, you

14   know.

15              There was other people probably doing it but

16   they never pushed it like we pushed it.  So we felt like

17   we have the right to trademark it because the fact is

18   that other Bike Weeks were trademarked after the fact

19   that they -- 20, 30, 40, 50 years after the event was

20   happening and people sold tee-shirts there and the

21   trademark office gave them a trademark.  So on those --

22   those basis why not.  So we marketed our Bike Week,

23   pushed it for so many years.  We thought we have the --

24   the right for it.

25        Q      Okay.  Have you heard of a company called

                              24

BARKLEY
Court Reporters

```
 1     National Trademark Center?

 2          A     Yeah.

 3          Q     And is Mr. Baksht affiliated with that

 4     company as well?

 5          A     I think he have something.  I'm not familiar

 6     much with that, but, yeah, I think he have something

 7     with that.

 8          Q     Do you know what National Trademark Center

 9     does?

10          A     Not much.

11          Q     Okay.  Let me show you another document,

12     which I'll ask the reporter to mark as 24.

13               (Exhibit 24 was marked for identification.)

14     BY MR. STEWART:

15          Q     Have you seen this document before?

16          A     Yeah.

17          Q     What -- what is this document?

18          A     This document was made by I think the girl

19     that work with us, Carrie Sadler.

20          Q     Carrie Sadler?

21          A     Yeah.

22          Q     So you think Carrie Sadler made this

23     document?

24          A     Yeah.  She all -- she ordered because that

25     was -- the Bike Week, you know, was the first -- you
```

YOSEF AMAR

BARKLEY
Court Reporters

1    know, was the first trademark that we did was Mettemp

2    and I guess was represented by -- this is -- I think we

3    had one of those done for Bike Week.  So she -- because

4    we had the trademark for the 3DL, she just put the same

5    paper together I guess or request from David so we have

6    another copy for that.  So that's what it is.

7         Q    So let me -- let me see if I understand

8    correctly.  You -- a similar document was prepared

9    for --

10        A    For Bike Week.

11        Q    -- Daytona Beach Bike Week?

12        A    Yes.

13        Q    Okay.  And then it was modified for the three

14   drooping lines?

15        A    Yes.

16        Q    Okay.  And you think Carrie Sadler did the

17   modification?

18        A    I think so.  I think she maybe asked David to

19   give us because, you know, people wanted to know that

20   are -- are legit trademark so wrote for her or so copy

21   for that or she just added on the same -- I don't

22   exactly sure but -- but I think that was she maybe

23   modified from -- from the letter before for Bike Week.

24        Q    Okay.  So in the -- in the very first line it

25   says, please be advised that we represent Mettemp, Inc.,

26

BARKLEY
Court Reporters

1    a New York corporation.  Our client owns the trademark

2    three drooping lines.

3         A    See, that's why it's not because it was

4    Consolidated.

5         Q    Okay.

6         A    So she wrote -- she mixed up the -- the Bike

7    Week with that.

8         Q    Okay.  And it also says in the third

9    paragraph, our client has been using the trademark and

10   it says early as 1987.  Is that also because it got

11   mixed up with Bike Week?

12        A    Bike Week '87.

13        Q    Bike Week was 1987?

14        A    Yeah, '87.

15        Q    Okay.  You see at the bottom it's signed by

16   SS Stein, trademark counselor?

17        A    Yeah, I see it.

18        Q    Do you know who SS Stein is?

19        A    No.

20        Q    Okay.  Have you heard of a company called

21   Associated Business Consultants?

22        A    Associated Business Consultant?  No.

23        Q    Okay.  Have you heard of David Lipsker?

24        A    No.

25        Q    Have you ever heard of David Baksht refer to

27

YOSEF AMAR

BARKLEY
Court Reporters

1    himself as David Lipsker?

2         A     David Baksht, no.  David Baksht is David

3    Baksht.

4         Q     Okay.  Well, if you look back at Exhibit 24

5    the -- the letter from Mettemp and the National

6    Trademark Center, you see the e-mail address at the top

7    it DavidLipsker@gmail.com.

8               Have you ever communicated with that e-mail

9    address before?

10        A     I don't remember.  I don't think so.

11        Q     Okay.  Have you ever heard of an Abraham

12   Schneerson that's associated with Mr. Baksht or his

13   businesses?

14        A     Only through the lawsuit that you guys added

15   me to the lawsuit, but I don't know.  I don't know the

16   person.  I never heard about him.

17        Q     Okay.  And how about DM Schneerson?

18        A     DM Schneerson, also no.

19        Q     Okay.  I'm going to show you a document I'll

20   ask the reporter to mark as Exhibit 25.

21              (Exhibit 25 was marked for identification.)

22   BY MR. STEWART:

23        Q     And do you recognize this document?

24        A     Yeah.

25        Q     And is this the -- the declaration that you

28

BARKLEY
Court Reporters

1    submitted in connection with the lawsuit with Monster

2    Energy?

3         A    Yes.

4         Q    Okay.  And just to let you know what we did

5    because it was -- it had a lot of exhibits attached to

6    it and we only are concerned today about one of the

7    exhibits.  So it's your complete declaration plus

8    exhibit A6.  The other exhibits were just deleted for --

9    to save me weight carrying around.

10             If you look at the -- the last page before

11   the exhibit, it's the signature line.  This direction.

12   If you -- there we go.

13             Is that your signature there?

14        A    Yes.

15        Q    Okay.  Good.

16             And if you look at paragraph nine, in

17   paragraph nine, you'll see a reference to the 3DL design

18   and then there's a description of the differences

19   between the 3DL design and the Monster design.

20        A    Yeah, I'm --

21        Q    Okay.

22        A    This is describing the 3DL.

23        Q    Yes.  And what I wanted to do is to show you

24   a picture and just ask you to confirm that this is the

25   3DL design that you were referring to.

29

YOSEF AMAR

BARKLEY
Court Reporters

1          Is this, in fact, the 3DL design you were

2     referring to?

3          A     That's the 3DL.

4          Q     Okay.  For the record, this has previously

5     been marked as Exhibit 1 and I'll just ask the reporter

6     to -- to remark it as Exhibit 1 if she could.

7                Now, before the time when Joe Cool marketed

8     this specific 3DL design shown in Exhibit 1, did Joe

9     Cool also market other designs that included the general

10    concept of three lines?

11         A     I give you example of almost 200 --

12         Q     Yes.

13         A     -- 200 different ones.

14         Q     Okay.  So those are examples of -- of other

15    uses of three lines in -- in the artwork of Joe Cool; is

16    that correct?

17         A     Correct.

18         Q     Okay.  Now, I'm going to go through those as

19    quickly as I can, but I think -- I think I need to go

20    through most of them with you.

21         A     Okay.

22         Q     So I'll ask the reporter to mark this as

23    Exhibit 25 -- 26, Exhibit 26, and ask you if you

24    recognize this.

25                (Exhibit 26 was marked for identification.)


                           30

BARKLEY
Court Reporters

```
 1                    THE WITNESS:  Yes.
 2      BY MR. STEWART:
 3            Q      And what is this?
 4            A      This shows a picture of parrot and to come
 5      together where they have marks -- scratch marks and
 6      trees all around them, the top trees, the bottom scratch
 7      marks.
 8            Q      Okay.  So are the scratch marks the thing
 9      that the orange arrow is pointing to?
10            A      Right there.
11            Q      This -- this orange piece of tape with the
12      arrow?  Yes?
13            A      Yeah.
14            Q      Okay.  And is that your -- the first example
15      you could find of a -- of three lines together in your
16      artwork?
17            A      I explain -- explain how it works.
18            Q      Okay.  Sure.
19            A      Okay.  To put one design on a tee-shirt it's
20      kind of boring.  So what you do is, we take the design
21      and now we customize -- we custom -- we play with it.  I
22      take a scissor.  I cut pieces of the art.  I have press
23      machine.  I have a plain tee-shirt.  I want to take the
24      two columns and I want put them right here by them self.
25      I want to take up leaves and put here.  I want to take
```

31

YOSEF AMAR

BARKLEY
Court Reporters

1    and put the sleeve to match.  I want to take a piece and

2    put it in the back.

3          It's all about what you do with a design.  Or

4    you can take couple designs and work with them together.

5    That's how the ideas starts.

6          So in this particular design we used to take

7    pieces like you see here, put them here on a sweatshirt,

8    put two counts on here, put leaves.  Just wrap on the

9    hoody, put some -- some stuff here and then you make a

10   sweatshirt from 20 bucks you make it $50 because it's

11   all just that with the designs, with -- with the mark.

12         So when we do that, we get ideas.  We take

13   that and we say, oh, it looks good on the sweatshirt,

14   let's -- let's take it and put it on biker designs or

15   anything, you know.  And you make -- from this we

16   created the three -- the first 3DL in '91 -- in 2000 --

17   2000 -- '91 this one.  '93 we started to market the 3DL

18   from that.  So this is the beginning and through the

19   designs, I'll show you all the history.

20   Q    Okay.  Now, when you say you started

21   marketing the 3DL in 1993, do you mean you started

22   marketing the three lines shown in Exhibit 26, is -- is

23   that the version?

24   A    This -- this is how it's born.  That's how it

25   was born.

32

YOSEF AMAR

BARKLEY
Court Reporters

1      Q    Okay.  Well, did you market the design shown

2   in Exhibit 1 in 1993, the exact design shown in

3   Exhibit 1?

4      A    In Exhibit 1?

5      Q    Yes.

6      A    Very similar to it in '93.

7      Q    In '93.  Okay.

8           What -- what did that look like?

9      A    It look like -- it's couple designs, you

10  know, the exhibit that you showed me before.  If you

11  look at the 3DL on the trademark there is on the side

12  here a skinny scratch mark 3DL, but it was very similar

13  to that that we were putting on sleeves for sweatshirts.

14     Q    Okay.  Did you bring any examples of that

15  with you today?

16     A    As per the, you know, agreement we don't have

17  anymore samples of anything to do with the 3DL.  So

18  everything was, you know, destroyed and --

19          MR. MORTNER:  If I may, is it -- may I?

20          MR. STEWART:  Sure.

21          MR. MORTNER:  Is -- are you referring to

22  this?

23          THE WITNESS:  I'm referring to that.

24  Something similar to --

25          MR. MORTNER:  I'm just indicating the -- on

33

YOSEF AMAR

BARKLEY
Court Reporters

```
 1              the subpoena, there's some artwork on the subpoena

 2              he's referring to.  I just want to interject

 3              because I've got -- know that there's a post-it on

 4              Exhibit 26.

 5                   MR. STEWART:  Yes.  I was going to get to

 6              that in a minute.

 7                   MR. MORTNER:  Okay.  Fine.

 8      BY MR. STEWART:

 9         Q     Did -- did you prepare the post-it that's on

10      Exhibit 26?

11         A     Prepare what?

12         Q     Did you prepare this yellow note?

13         A     My wife wrote it.  I told her what to write,

14      she wrote.

15         Q     Okay.  And is that true of all the yellow

16      notes in the box that you delivered to me?

17         A     That's cape -- as clear -- we work a lot of

18      hours.  We put a lot of hours.  So if there is a couple

19      of, you know --

20                   MR. MORTNER:  I'm thinking it would be good

21              if the reporter could staple that on so it doesn't

22              get separated.  It seems like it's only held by the

23              post-it.

24                   MR. STEWART:  You're right.  Do you have a

25              stapler?
```

34

BARKLEY
Court Reporters

1          THE COURT REPORTER:  I can get one on a

2     break.

3          MR. STEWART:  Yeah.  Okay.

4     BY MR. STEWART:

5     Q    All right.  Well, let me introduce the next

6     exhibit which I believe is 27.

7          (Exhibit 27 was marked for identification.)

8     BY MR. STEWART:

9     Q    And what -- what is shown in this document?

10    A    We showing use of -- it's a -- first of all,

11    this is a copyright design from '9 -- '93 I think of Joe

12    Cool copyright.  We showing purple Jimmy, which is Joe

13    Cool character back then, with three green claws.

14    That's all we showing.

15    Q    Okay.  And so it's -- it's a purple dinosaur

16    with three green claws; is that correct?

17    A    That's it.

18    Q    Okay.  And why -- why did you include that in

19    the materials that you brought to me?

20    A    Just to show that we used claw -- green claws

21    from '93.  It's not new.  It's not like we created the

22    wheel.  It's -- it's there.

23    Q    I understand.  But it is -- would you agree

24    with me that that's not the same set of green lines that

25    you see in Exhibit 1?

35

BARKLEY
Court Reporters

```
 1        A      It's all the same family.

 2        Q      I -- I understand it's the same --

 3        A      It's all the same family.

 4        Q      I understand it's the same family.

 5        A      See, if you talking about the shape -- here

 6    we talking about the shape --

 7        Q      Yes.

 8        A      -- of -- the whole lawsuit started because

 9    your claw mark, they claim it that it's like the 3DL.

10    Okay.  So use of claw mark by us is part of the

11    business, if it's in bikers, if it's in characters.

12    It's not like something new.  It's -- I'm sure not --

13    not only me, if you take any decal company in the United

14    States or heat transfer company or screen printing

15    company, people that is production and do massive

16    artwork designs to the market, you going to find a lot

17    of similarity.

18            It's not like Monster came up with something

19    new.  I'm showing you a claw mark green.  So it's

20    shorter little bit, but it's a claw mark.  It's green.

21    We used it from '9 -- from '93, copyright design.

22    That's all.  It's all about the shape.  Doesn't matter,

23    longer, shorter.  If we used it, we used it.

24        Q      So is it your understanding that because you

25    marketed the purple Jimmy the dinosaur in 1993 you had
```

YOSEF AMAR

BARKLEY
Court Reporters

1    the right to modify it and market Exhibit 1; is that

2    your understanding?

3         A     It's -- it's not because -- I'm just giving

4    examples of stuff that we did --

5         Q     Okay.

6         A     -- it has nothing to do with each other.  I'm

7    just saying that, hey, claw mark green, we have it.

8    When?  1993.

9         Q     Okay.

10        A     Copyright, yes.  That's all I'm saying.

11        Q     Okay.  Now, you have an agreement now with --

12   with Monster Energy not to market Exhibit 1, correct?

13        A     Correct.

14        Q     Okay.  But you still market other claw

15   designs, correct?

16        A     Correct.

17        Q     With -- with no objection by Monster,

18   correct?

19        A     I don't see claw, if it's not the same.

20        Q     So how do you decide which claw mark you're

21   permitted to market under the settlement agreement and

22   which claw mark you're not permitted to market?

23        A     What we agreed is same shape.  So if it's not

24   the same, we're allowed to market it.

25        Q     Okay.  So in the box that you provided to me

37

BARKLEY
Court Reporters

1    today, were there any marks that were the same shape as

2    Exhibit 1?

3        A    Yes, a lot.

4        Q    A lot.  Well, we'll -- we'll go through those

5    then.

6             MR. MORTNER:  He's going to show you

7        documents.

8    BY MR. STEWART:

9        Q    Yeah, I was going to show you but --

10       A    Oh, I'm sorry.  I thought you said pull them

11   out.

12       Q    No.  That's okay.  I think I've got the same

13   set over here, so.

14       A    I don't think -- I don't know if I gave you

15   everything.

16       Q    Okay.  Well, we'll -- we'll go through and

17   we'll see what we have.

18            Let me show what I'm asking the reporter to

19   mark as Exhibit 28.

20            (Exhibit 28 was marked for identification.)

21   BY MR. STEWART:

22       Q    And what -- what is Exhibit 28?

23       A    Exhibit 28 is giving example of all different

24   Ms that we used from -- what year is it?  I don't

25   remember even.  It could be something probably eight,

38

1    ten, that each one have a different M that Joe Cool use

2    as a typestyle, because part of the market is also some

3    typestyles.  Here is one M that is a long M --

4         Q    Okay.

5         A    -- and if you paint it in green and you put

6    it on a tee-shirt, it's going to look closer to what you

7    have.

8         Q    And were you using that M by itself on a

9    tee-shirt in the 1990s?

10        A    Some of them, yes.  I'll show you example on

11   a tee-shirt.

12        Q    But -- but this particular M --

13        A    This particular M --

14        Q    -- in exhibit --

15        A    -- I'm just showing you variety of usage --

16        Q    I understand.

17        A    -- of -- of different M.  That's -- I didn't

18   -- I use -- I use some of them, yes, on -- as M by

19   itself.

20        Q    But in -- in this particular instance in

21   exhibit --

22        A    In this particular.

23        Q    -- in this particular --

24        A    This is examples of variety -- wide variety

25   of usage.  That's all I'm saying.  So some of them we

39

YOSEF AMAR

BARKLEY
Court Reporters

1    did use by itself.  Some of them we use with this

2    initial like MB.  I gave you some.  Like MB or -- or

3    Miami Beach, you know, Miami, M, you know, stuff like

4    that.  Mom.  All kind of stuff that we use and we don't

5    have all the copies, you know, left from all the years,

6    but here is another way of looking like drooping or

7    something or an M.

8               Here is a rounded M that we used.  Here is

9    another M here with the -- it's a typestyle.  It's not

10   like we created it.  It's in the computer.  You just

11   choose a typestyle and the look like an M.  Here is a

12   longer M here.  Here is another M.  That's all it is.

13   Q     Okay.  So these -- these then are examples of

14   the letter M that you used in words and sentences; is

15   that correct?

16   A     Correct.  Or sometimes by itself or with

17   another initial.

18   Q     But in -- in this particular stack --

19   A     In this particular stack is the way it is.

20   Q     They're in words and sentences?

21   A     Yeah, just -- and sentences.

22   Q     Okay.  I'll ask the reporter to mark as

23   Exhibit 29 the next document here.

24               (Exhibit 29 was marked for identification.)

25   BY MR. STEWART:

                              40

BARKLEY
Court Reporters

1       Q      And what is this document?

2       A      Same thing.  Different Ms and different

3    designs, you know, showing usage of Ms.

4       Q      Showing usage of Ms usually in words and

5    sentences again?

6       A      Yeah.

7       Q      Okay.  All right.  Are any of them the same

8    as the M in Exhibit 1?

9       A      Exhibit 1?  What's Exhibit 1?

10      Q      Exhibit 1.

11      A      Well, some of them are.

12      Q      Okay.  Which ones are the same?

13      A      Not the same, but similar (indicating).

14      Q      Okay.  But are --

15      A      Okay.  See the jagged.

16      Q      Not the same?

17      A      Not the same, but I -- I tell you something,

18   in art if I take this M and I enlarge it and I color it

19   this colors, you won't know the difference.  If somebody

20   sees this M and that M --

21      Q      Did you ever take that M and --

22      A      It's an M, it's a generic letter of the A, B,

23   C.  So it's --

24      Q      Did -- did you ever take the M in Exhibit 28

25   in your hand and enlarge it and color it green and put

41

BARKLEY
Court Reporters

1    it on a tee-shirt?

2         A     That M, no.

3         Q     Okay.  Okay.

4               MR. STEWART:  I'll ask the reporter to mark

5         this as Exhibit 30.

6               (Exhibit 30 was marked for identification.)

7    BY MR. STEWART:

8         Q     And what is Exhibit 30?

9         A     Okay.  Exhibit 30 shows you the Ms that we

10   use before.  We shows you the three drooping line here

11   in the hair.  Okay.

12        Q     So in the dreadlocks?

13        A     The dreadlocks.  The -- the gen -- I'm

14   showing generic shape of three lines that will resemble.

15   Again, if I take those three lines and I enlarge them, I

16   put them in green and yellow, you're going to see a

17   resembling.  Here is three -- looks like three -- 3DL.

18   That's all usage.

19        Q     And you're pointing again at the dreadlocks?

20        A     Oh, I'm sorry.  I'm pointing right here to

21   the shapes.  Those all shapes, palm tree lines, three

22   lines, lines, everything made out of three lines.  It's

23   nothing new.

24        Q     Okay.

25        A     It's basic shape of graphic that we use over

42

BARKLEY
Court Reporters

1     and over in different designs.  Again, and this I have

2     the original hand drawn copy if you want to see it.  I

3     brought it.

4          Q     I don't think that's necessary.

5          A     Okay.  Just to show that it's Joe Cool art.

6     Again, the three lines, again, all over the place.  The

7     M again used.  Again.  Again, same thing over and over.

8     This line was created -- I got some invoices that we

9     sold in -- what year was it?  10/16/96.

10         Q     Okay.  Thank you.

11               MR. STEWART:  I'll ask the reporter to mark

12          this as the next exhibit in order, 31.

13               (Exhibit 31 was marked for identification.)

14    BY MR. STEWART:

15         Q     And what is this document?

16         A     Same thing.  We show the three lines, you

17    see.  If you look at here you're going to see this like

18    an M, elongated three lines, you can see the --

19         Q     Okay.  That's on the first page with the

20    skull?

21         A     Yeah, yeah.  And it's in the skull which also

22    the 3DL is one of the designs was a skull with the three

23    lines together, 3DL.  So this also probably ten years or

24    so usage.  Here, again, a sleeve design that we see the

25    three lines right there.

                              43

BARKLEY
Court Reporters

1      Q      So that's what you've circled on the second

2      page?

3      A      Yeah, that's what I circled here to show you

4      what I'm -- you know, where it's -- it's a generic

5      shape.  It's a shape that if you take it and you paint

6      it in any color, it will be resembling to all the 3DL

7      designs that we did all through the years.

8              Here is another scratch mark built into the

9      design, right.

10      Q      And that's what you've circled?

11      A      That's what I circle.

12      Q      Okay.

13      A      There is another one here.  Here is another

14      style of, you know, pointy line, marks.

15      Q      All right.  Let me show you the next one

16      which the reporter will mark as Exhibit 32.

17              (Exhibit 32 was marked for identification.)

18              THE WITNESS:  Oh, we see here we start

19          selling this from '96.  You see here the -- those

20          -- those are peel on -- we call them peel on sample

21          for salesman book --

22      BY MR. STEWART:

23      Q      Okay.

24      A      -- I found them in our storage with other

25      stuff, the old stuff and that's how we market, you know.

44

BARKLEY
Court Reporters

1    We go to the store and we print them on this material

2    and we put it like holes or something or staple them

3    together.  We can see right here the holes that goes

4    into the big binder and that's how we -- we put style

5    number on it and then how -- that's how we sold it.

6             Again we see here from '96 MB, the M again,

7    Myrtle Beach used for city name.

8         Q    Yes.

9         A    Okay.

10        Q    And are any of those Ms the same as the M in

11   Exhibit 1?

12        A    The color.

13        Q    Okay.  How about the shape?

14        A    The shape is close.  It's an M.

15             Here again, '96 --

16        Q    Okay.

17        A    -- we see the M here.  We see the -- the

18   lines on the -- like here is -- here is -- here is a

19   shape -- it's a little, I don't know if you going to see

20   it, but right here, pointy --

21        Q    Okay.

22        A    -- I can find ten different shape if I can

23   look at it closer and each -- but here, the bottom line,

24   we have to understand that we talking about a generic

25   shape that we use over and over in on all our designs

45

1    through the years.

2              Here is Miami Beach design.  Okay.  Maybe

3    it's closer to your design with the shape.  See the

4    rounded shape there?

5         Q    I see the rounded shape.

6         A    The top, yeah.  And then the big M.  Again.

7    Same thing here, Miami, Myrtle Beach, wherever.  USA,

8    what we got here?  Okay.  Again, maybe closer to your --

9    top of your -- see how the -- this is a use from '95, an

10   M.

11        Q    The M in America?

12        A    America.

13        Q    All right.  See what else we've got here.

14             MR. STEWART:  Ask the reporter to mark as

15        Exhibit 33 the next document.

16             (Exhibit 33 was marked for identification.)

17             THE WITNESS:  Here we market the M closer to

18        your design on the top there.  It's circle.  That's

19        probably -- what year was this?  About ten years

20        ago.

21   BY MR. STEWART:

22        Q    Okay.

23        A    It's a Spanish line that we come up with.

24   Back then it was -- you know, it was demand for it.

25   Look at the M here.  Here is another one.  Look at the

46

YOSEF AMAR

1   typestyle (indicating).  Okay.  And again and again

2   different ways.

3         Q    Okay.  And the next Exhibit 34.

4              (Exhibit 34 was marked for identification.)

5   BY MR. STEWART:

6         Q    Is this more examples of your use of the

7   letter M?

8         A    Same thing and shapes, all the Ms here.  We

9   market all the Ms, different Ms.

10        Q    Okay.

11        A    Okay.  Again Ms.  Okay.  All Ms here.  Okay.

12  Look at the stencil over there, the shape of a scratch

13  mark right here in the tent that resemble the 3DL --

14        Q    Okay.

15        A    -- it's 1995, 1995.  And you can see all the

16  claw mark for the wolf and, you know, see a lot of claws

17  over there.

18        Q    Okay.  Let me hand you what the reporter will

19  mark as Exhibit 35.

20             (Exhibit 35 was marked for identification.)

21  BY MR. STEWART:

22        Q    And what is this document?

23        A    Okay.  This I would like to show the original

24  because it's going to show clear picture.  This is a

25  copy --

47

BARKLEY
Court Reporters

```
 1          Q      Sure.

 2          A      -- if you don't mind.  Okay.  This here and

 3     then I got an invoice here.  Okay.  You have this one?

 4     Oh, that's the page.

 5          Q      That wasn't the page I gave you I don't think

 6     but --

 7          A      Yeah, right here.

 8          Q      Oh, there it is.  Okay.

 9          A      This is where I send the copy.  This is

10     original art.  Artist name M Saddle.  I don't know -- I

11     don't remember him even, but as you see here, very

12     interesting, you can see a claw mark that looks like the

13     3DL in '96, very close shape.  If I enlarge it and put

14     it on a tee-shirt, I don't think anybody going to see

15     the different much.

16               Here is a nice M claw mark right here from

17     '96.  Here, again, 3DL goes this way and go that way and

18     three in the middle.  Where is that exhibit 3DL?  Right

19     here.  You can see the claw mark is very resemble to the

20     3DL.

21          Q      And when --

22          A      Again -- sorry.

23          Q      Go ahead.

24          A      We see again, look at that M right there.

25     Look at the claw mark, green.  Very close to what we
```

48

BARKLEY
Court Reporters

```
1      did.  It's '96 original artwork.

2           Q      And -- and for how long did you market this

3      artwork?

4           A      Till today.  I printed -- I have it in the

5      catalog.

6           Q      Okay.

7           A      Where is the gray catalog?  I gave you gray

8      catalog.

9           Q      You gave me several catalogs.

10          A      Okay.  Let me see where is the catalog here.

11     Here you go.  This one is not in the catalog, but I will

12     show you the other four with the tee-shirt.  Here is

13     this one right here.  We modified it.  You see, it

14     doesn't say what the original says, because the original

15     says some kind of island over there, St. Croix, US

16     Virgin Island.  But when we modified it because the fact

17     of we didn't want to market that only for St. Croix, US

18     Virgin Island, but we wanted to market it all over the

19     world.  So we took off the St. Croix and we just put a

20     generic shape -- if you can see on the tee-shirt it's

21     better.  Okay.  We just put a different shape here and

22     then with the name drop we can cover any place in the

23     world, Daytona Beach, Myrtle Beach, Ocean City, New

24     York, Bahamas and so forth, so on.

25                 So you can see this is -- this is -- this is
```

49

BARKLEY
Court Reporters

```
 1    made '96.  This is from '96.  We use claw marks green

 2    and yellow.  Look at the colors.  If that's not the

 3    same, then I don't know what I'm doing 25 years.

 4         Q    Did you ever market any tee-shirts that had

 5    just the claw by itself without the iguana and all the

 6    other design?

 7         A    Right there and I showed you the one from

 8    '9 -- right here.  The one that we made -- I don't have

 9    a copy for it, but right here and I show some examples

10    in -- you showed me something, the exhibit -- that MB,

11    the one that you showed me the beginning, that was taken

12    from this design also.  It's -- we use the clipart over

13    and over.  We don't go -- we have so much archive of

14    art, so we need -- if we have idea you go to the --

15              THE VIDEOGRAPHER:  Can I have him sit down.

16              THE WITNESS:  I'm sorry.  If we have -- I'm

17         sorry.

18              If we have an -- an idea we look for our clip

19         arts because we have over -- I would say in the

20         last 24 years of business and we marketing art,

21         probably in the thousands of artworks, thousands

22         literally, and not everything in the catalog,

23         because some stuff is scissor and some stuff we

24         didn't go, didn't come out good, we don't want

25         to -- but okay.  So that's one.
```

50

BARKLEY
Court Reporters

1           Okay.  Another design that's in the catalog,

2     I'm going to show right now, the lizard that you

3     going to see 3DL from 19 --

4           MR. MORTNER:  You want to wait for a

5     question, let him show you exhibits?  I think it's

6     better.

7  BY MR. STEWART:

8     Q     Yeah, that -- that probably would be better.

9     A     Okay.  I just wanted to -- you say you want

10  to go through those.

11    Q     Well, I'm -- yeah, let's find the exhibit

12  we're --

13    A     Let's continue.

14    Q     Yes.  Okay.  So we were in the middle of

15  Exhibit 35.  And I guess you've -- you've told me it's a

16  copy of artwork that you were just showing me --

17    A     The original, yes.

18    Q     So I -- I don't think I have any further

19  questions about Exhibit 35.

20    A     Okay.  Now, here we have some more.  We saw

21  this one?

22    Q     Yes.

23    A     This one you should see the original because

24  it's a lot clearer.  You see the little iguana coming

25  out of the egg?

51

BARKLEY
Court Reporters

```
 1        Q    Yes.
 2        A    Look at the claw mark there.  Okay.  What
 3   else we have here?  Here we go again.  This one I have
 4   original art right here.
 5        Q    Okay.
 6        A    Again, this guy, again another shape
 7   (indicating), three lines.
 8        Q    Okay.
 9        A    Original gator claw mark, original design,
10   same artist.  The signature right there, M Saddle.
11   Okay.  That's it.
12        Q    Okay.  Hand you Exhibit 36.
13             (Exhibit 36 was marked for identification.)
14             THE WITNESS:  That's the same.
15   BY MR. STEWART:
16        Q    Can you --
17        A    This is --
18        Q    What is this document?
19        A    This document shows an invoice that was sold
20   in '96 again.  Somebody in Daytona -- Holly Hill
21   actually.  And it shows those designs.  Quantity sold --
22   let me see.  Okay.  No.  This -- yeah, this one.  Here
23   we go.  25, 25, 25.  Those three designs and this I just
24   wanted to show how the transfers looks like.  This is
25   actually the design printed on -- on paper.  And from
```

52

BARKLEY
Court Reporters

1    the paper, if you see, it's -- the writing is backward

2    because when you look at it in the light, you can read

3    it because that's the way we transfer it, which is

4    backwards.  So this is actual transfers that we use to

5    create those tee-shirts --

6         Q    Okay.

7         A    -- that I showed.

8              And you have another invoice here for the

9    iguanas that was sold in -- what year was it?  Was sold

10   in -- the date?  10/4/96 to a customer in Corasel.

11        Q    Okay.

12        A    N-A in '96.  I guess that's it.

13             Here is another design on tee-shirt.  I give

14   you sample.

15        Q    Okay.

16             MR. STEWART:  Let me ask the reporter to mark

17        the next exhibit as 37.

18             (Exhibit 37 was marked for identification.)

19   BY MR. STEWART:

20        Q    And is this just another example of the use

21   of the letter M in your business?

22        A    Yes.

23        Q    Okay.

24        A    Green M.  Year '94.  Invoice, invoice '96.

25   10/16/96.

```
 1          Q      Okay.  Let me show you what I will have the

 2     reporter mark as Exhibit 38.

 3                 (Exhibit 38 was marked for identification.)

 4     BY MR. STEWART:

 5          Q      And is this another example of claws used

 6     on --

 7          A      Claw, yeah.  This is -- I give you a copy of

 8     the original graph -- drawing, hand drawing.

 9          Q      Okay.

10          A      You can see the claw.

11          Q      Yes.

12          A      And you can see the actual design, the

13     gator --

14          Q      Yes.

15          A      -- modified with Florida and whatever sayings

16     goes with it.  Invoices to show.  From what year is

17     that?  4/21/2005.  Another invoice from 2005.  Another

18     invoice from 2005.

19                 MR. STEWART:  All right.  Let me ask the

20            reporter to mark this next one as Exhibit 39.

21                 (Exhibit 39 was marked for identification.)

22     BY MR. STEWART:

23          Q      And this is a collection of items.  So why

24     don't you just tell me what these are.

25          A      Okay.  We see here in eagle from 1997.  I
```

54

BARKLEY
Court Reporters

1    circle -- look at that shape there how it resemble to

2    the M with the style eyes, you know, like 3DL kind of.

3    Same thing here.  And now look at this shape right here

4    of the claw.  And this one right here, very close shape

5    to what we did.

6              I'm just showing in this usage of -- all

7    through the years different shape of three things that

8    you put together --

9         Q    Yes.

10        A    -- that it's again -- it's a generic shape

11   that we use in every designs and everywhere you can look

12   you can see three things together.  It's part of

13   graphic.

14             Again, claws and different designs 1995, you

15   know.  Again, this is from -- what year is it?  This is

16   probably from early '90s.  I remember this design.  We

17   sell -- we sell a lot of them.  Look at those claws

18   there.

19             This is a company that we represent and sold

20   their designs and also early '90s.  Cheri Fashion in --

21   from Toronto, Canada.  See, again, claw marks.

22             This is call of the wing.  This is also early

23   '90s, claw marks.  Bike Week 56 -- or '97.  Look at

24   those big claws right there.

25             Here is another design for -- we distributed

55

1     for Cheri from Toronto, Canada.  We see bear claw marks.

2              Here is some more eagles, claw marks.  1997,

3     claw marks.  '97.  And, again, all different claw marks

4     through the years usage of claw marks.

5         Q    Okay.  So Exhibit 39 shows usage of claw

6     marks through the years?

7         A    Correct.

8         Q    Okay.  Almost done with the stack.

9         A    But that's not -- that's just part of it.  I

10    can get more stuff, but it's -- it's years of --

11        Q    I understand.

12        A    -- of production, you know.

13        Q    Well, let me ask you to look at what the

14    reporter will mark as Exhibit 40.

15             (Exhibit 40 was marked for identification.)

16    BY MR. STEWART:

17        Q    And if you could tell me what this is.

18        A    Again, three leaves shape that green we used

19    in -- what year was it?  Early '90s, but I don't -- I

20    don't see the year here on the -- on the thing what it

21    says here.  Let me see.  '95.  Okay.  We see again

22    green, green leaves over there.

23        Q    So that's the green leaves coming out of the

24    sandwich?

25        A    Exactly.  Spring break design.

56

BARKLEY
Court Reporters

1          Anyway, here we see those shapes again all

2     over the place.  Again, in the mermaids we can see some

3     lines.  And in the peace sign design, psychedelic peace

4     sign, also from -- what year is it -- 1993, 1993, we can

5     see a lot of leaf all over.  Look at those lines there.

6     Okay.

7          Same thing here all different shapes just to

8     give a generic -- you know, to show that there's a

9     generic shape.  It's not -- nobody created the wheel

10    here.  The wheel was created.  We just keep on using it.

11         Q     Okay.  Now I'll show you what the reporter

12    will mark as Exhibit 41.

13              (Exhibit 41 was marked for identification.)

14    BY MR. STEWART:

15         Q     And what is Exhibit 41?

16         A     Okay.  2002, those we took graphic, you know,

17    I had the disk for original art that we draw in Joe

18    Cool, one of the artist.  I don't know who, but we can

19    see again a dragon claw.  We can see a frog.  We can see

20    the style of freelance lettering.  Look at that M there.

21    We can see lizard.  Again, the shapes, you know, one,

22    two and three.

23              The more you look, the more you see.  Again,

24    dragons, those shapes again.  This is just to show

25    different -- again, they're the same shape again and

57

BARKLEY
Court Reporters

1    again in different designs and different usage.

2         Q    Okay.  All right.  I'm going to show you

3    Exhibit 42.

4              (Exhibit 42 was marked for identification.)

5    BY MR. STEWART:

6         Q    What is Exhibit 42?

7         A    Exhibit 42 we can see the M right there on

8    the whole typestyle of drooping lines.  If you can see

9    how the hands and then the M rounded before Monster was

10   born and that was 2000 -- no.  Three -- 2005.  I got

11   invoice, and 2006, okay, for that design.  And we had

12   it -- we have it in the catalog -- one of the catalogs

13   now.  Let me see which one is it.  Do you want to see

14   it?

15        Q    No, I don't need to see it in the catalog.

16        A    Okay.  And, again, invoices to show sales.

17   So that's the drooping line again, dripping typestyle.

18        Q    Okay.  Let me ask you to look at what I'll

19   ask the reporter mark as Exhibit 43.

20             (Exhibit 43 was marked for identification.)

21   BY MR. STEWART:

22        Q    What is Exhibit 43?

23        A    Year 2000 Joe Cool launch a line of --

24   because of Millennium, you know -- aliens.  We see

25   aliens sitting in the bar.  It says 2000 right there.

YOSEF AMAR

BARKLEY
Court Reporters

```
 1    Pub.  They're drinking some -- so the -- the main thing
 2    is look at those green fingers.  The color green is
 3    being used from Joe Cool from the '90s early, green and
 4    yellow, and, again, those three lines again.
 5         Q    Okay.  I guess these are separate.  So we've
 6    got to do them separately.
 7              MR. STEWART:  I'll ask the reporter to mark
 8         this as Exhibit 44.  Actually this is 2008.  So I
 9         don't think I'll be marking these as exhibits.
10              THE WITNESS:  Huh?
11              MR. STEWART:  I can certainly allow you to
12         mark them as exhibits if you have a use for them,
13         but I'm going to put these back in the magic box.
14              And that makes this the last one of this
15         stack.  Exhibit 44.
16              (Exhibit 44 was marked for identification.)
17    BY MR. STEWART:
18         Q    And what is Exhibit 44?
19         A    Exhibit 44 it's a line of -- we see in the
20    dragon green claws three lines.  Okay.  We can see here
21    -- let me move this so you can see better -- another way
22    of using the three lines (indicating) in green and
23    yellow.  Again, basic shapes that was used over and
24    over.  Here we see -- you see there?
25         Q    Uh-huh.
```

YOSEF AMAR

BARKLEY
Court Reporters

1        A     Okay.  Claw marks tiger.  Again, same shape

2   again.  Different shapes, different styles.  Look at

3   this bony hands over there.  And also claw mark over

4   line.  Claw marks, claw marks, claw marks.

5            MR. STEWART:  All right.  I think just for

6        completeness I will go ahead and mark these last

7        two as Exhibit 45 and 46.  You can mark it on the

8        back if you want.

9            (Exhibit 45 was marked for identification.)

10           (Exhibit 46 was marked for identification.)

11   BY MR. STEWART:

12       Q     And are Exhibits 45 and 46 designs from 2008?

13       A     From 2008.  You can see very close resembling

14   of M in Miami, Miami Beach.  Just, you know, we do a lot

15   of city names --

16       Q     Uh-huh.

17       A     -- so every city that you do and you have M

18   there through the years, you know.  I didn't show you

19   much of those, but that's, you know, again same type

20   just to show you that it's a typestyle you just pull

21   from the computer and use.  It's a free clipart.

22       Q     Okay.  Now I'm just going to show you the

23   tee-shirts that you included in the box.  I'm going to

24   show them to you all at once, but I'll ask the reporter

25   to mark them as Exhibits, let's see, 47, 48, 49, 50, 51,

60

BARKLEY
Court Reporters

1    52, and 53, so 47 to 53.

2                  (Exhibits 47, 48, 49, 50, 51, 52 and 53 were

3         marked for identification.)

4    BY MR. STEWART:

5         Q    Okay.  What is shown in these tee-shirts, 47

6    to 53?

7         A    We showing here --

8         Q    This is 47.

9         A    -- the claw mark.

10             We showing use of a claw mark --

11        Q    Okay.  And that's 48.

12        A    -- from '96.

13             We showing use from '96 also green claw marks

14   again.

15        Q    Okay.  That's Exhibit 49.

16        A    We showing initials on tee-shirts, just names

17   of people, you know.  It was time that it was in style

18   and everybody want that shirt --

19        Q    Okay.  That was exhibit --

20        A    -- use M.

21        Q    That was Exhibit 50.

22        A    Okay.  Again claw mark eagles.

23        Q    Okay.  That was Exhibit 51.

24        A    Wolf claw mark.

25        Q    Exhibit 52.

BARKLEY
Court Reporters

1       A     And the iguana from '96, again, green claw

2    marks, very resembling to the 3DL.

3       Q     Okay.  And that's Exhibit 53.

4       A     That's it.

5       Q     Now, we've looked through now a lot of heat

6    transfers and art designs and tee-shirts.

7             In -- in your view which of the designs that

8    we looked at so far most closely resembles Exhibit 1,

9    this version of the 3DL?

10      A     A lot of them.

11      Q     Okay.

12      A     You want to go back.

13      Q     Well, I --

14      A     That's why I showed before so, you know, in

15   -- you have to understand, if I take any M --

16      Q     Yes.

17      A     -- and I paint it with green and yellow it

18   will resemble.

19      Q     Well, I understand that but --

20      A     So --

21      Q     -- I'm -- I'm asking for which M design or

22   claw design in its original form, without modifying it

23   to be green and yellow, without expanding it, without

24   separating from other contexts, which one do you think

25   most closely resembles Exhibit 1?

                             62

BARKLEY
Court Reporters

1        A      I'll go over again.  I'll show you at least

2   50.  You want to go back?  I'll show you each one.

3        Q      I don't want you to show me 50 of them.

4        A      Okay.  Anyway, it's -- it's the iguanas.

5   It's the M.  It's this one.  It's all resemble.  It's

6   all resembles.  You see.  I just -- we went over

7   everything.

8              It's all to me as -- as -- as -- as a person

9   with experience in graphic this is -- we talking about

10  the shape here.  We're not talking about anything else

11  but the shape of three lines and it's --

12       Q      Yes.

13       A      -- everywhere.

14       Q      Well, then I'm going to have to go back to an

15  earlier question I had for you.

16              You -- you have a settlement agreement with

17  Monster Energy, correct?

18       A      Yes.

19       Q      And under that settlement agreement you are

20  not marketing the design shown in Exhibit 1, correct?

21       A      Correct.

22       Q      And you've obeyed that agreement and we've

23  never argued otherwise.  And -- but you are selling lots

24  of other designs with the iguana claws and alligator

25  claws and so forth; is that correct?

63

YOSEF AMAR

BARKLEY
Court Reporters

1       A       Correct.  All through the years.

2       Q       All through the years.

3               So how do you decide in your own mind whether

4       it's appropriate for you to sell an alligator claw

5       design or an iguana claw design and not violate your

6       agreement with Monster?

7       A       Well, that's what I have to go through now.

8       I'll show you all old stuff that we used before the

9       agreement.  If you asking me from now on, of course, I'm

10      going to watch everything that I'm doing that is not

11      going to be close to it.

12      Q       But you're still selling iguanas with claws,

13      correct, and eagles with claws?

14      A       Yes.

15      Q       Okay.  And that's because those are different

16      than Exhibit 1; is that correct?

17      A       It's -- I will say it's the -- it's the same

18      -- same -- same claws.

19      Q       So if they're the same, why are you still

20      selling them despite your settlement agreement?

21      A       We -- settlement agreement is just, you know,

22      the -- the 3DL.  We sell 3DL only or anything that look

23      like it, okay, but resembles, we have a lot.

24      Q       Okay.  So you've agreed not to sell the 3DL

25      or anything that looks like it, but you have a lot of

64

YOSEF AMAR

```
1    things that resemble the 3DL?
2         A     This is -- all I showed you is before the
3    fact, you know.
4         Q     When did you start using the exact design
5    shown in Exhibit 1, including the colors, the size and
6    the shape?
7         A     2002.
8         Q     2002?
9         A     2010.
10        Q     2010.  Okay.
11        A     I'm sorry.  I -- with dates here.
12        Q     No.  That's fine.
13        A     2010, yeah.
14        Q     Yeah.
15        A     About, you know, that -- that area.
16        Q     Okay.  And what were the circumstances that
17   led you to start using that design?
18        A     Well, I wanted some -- you know, we do a lot
19   of Myrtle Beach, Miami, all kind of city names and the M
20   is -- you know, we do like MB and stuff like that.  So I
21   showed the -- the design to my -- my artist and I told
22   him, you know, give me something that -- you know, from
23   the old stuff that we sold, you know, from the -- from
24   the -- resembling of the palm tree here -- where is that
25   design?
```

65

BARKLEY
Court Reporters

1              Okay.  In this page I showed him, you know,

2     give me something that look like, you know, a nice M.

3     Don't give me the basic type, and that's how we come up.

4     He showed it to me.  He put the city name on it.  Okay.

5     Let's give it a try, volia.

6              We are like the fisherman.  We throw the

7     hook, see what catches.  If it catches, we sell it.

8         Q    So which specific design was it based on?

9         A    Based on the iguanas and the scratch here and

10    there.

11        Q    Okay.  So the scratch below the birds?

12        A    Yeah.

13        Q    And the birds were exhibit --

14        A    And I'm not -- if I'm not mistaken, I had

15    maybe an old one from 2000 -- from '93 I think, yeah,

16    the modified one.  So, you know, I showed him those --

17    those designs and -- from there.

18        Q    Which catalog is this?

19        A    This is 2000 -- that's '9 -- '96 or '97.

20             MR. STEWART:  Why don't we make this into an

21             exhibit then, the 1996 catalog.  It will be

22             Exhibit 54.

23             (Exhibit 54 was marked for identification.)

24    BY MR. STEWART:

25        Q    Just so I understand, it's your testimony

                              66

BARKLEY
Court Reporters

1      that the Exhibit 1 design for three drooping lines was

2      based upon the OSO4 design and the IG125 design; is that

3      correct?

4           A     Yeah, yeah.  The iguana, the greens and the

5      design that we had from previous from -- modified from

6      '93, from this.

7           Q     The OSO4 design?

8           A     Yeah.

9           Q     Okay.  So the 1993 version of the OSO4 design

10     plus the iguana designs?

11          A     Yes.

12          Q     Okay.  Okay.  I'd like to go back all the way

13     to Exhibit 25, which was your declaration, which must be

14     buried under here somewhere.  I think maybe that's it.

15          A     Okay.

16          Q     Okay.  And if you could look at paragraph

17     six, the final sentence in paragraph six says -- says,

18     the designs at issue in this matter were licensed from

19     Consolidated Distributors, Inc.  Do you see that?

20          A     Six?  Number six you said?

21          Q     Yeah, number six, the very last sentence of

22     number six.

23          A     Yes.

24          Q     Okay.  Did Joe Cool, in fact, license the

25     Exhibit 1 design 3DL from Consolidated?

67

1          A     Correct.

2          Q     Correct.  It was licensed.

3                But was the 3DL design developed by Joe Cool

4     or by Consolidated?

5          A     Joe Cool.

6          Q     By Joe Cool.

7                So why did Joe Cool need to license its own

8     design from Consolidated?

9          A     Because we had an agreement that they will be

10    the trademark holding company because, you know, for me

11    trademark is not familiar.  So I had to go to a company

12    that knows, you know, about trademark and in order for

13    me to get, you know, protected and that will have a

14    variety of -- you know, a widespread of exposure with

15    their experience, we -- we decided that I will, you

16    know, give them the right on the -- the mark in return

17    and they going to give me the -- the licensing as a

18    partnership, you know.

19         Q     Okay.  So basically Joe Cool assigned the

20    trademark to Consolidated as a holding company and then

21    Consolidated licensed the trademark back to Joe Cool?

22         A     Yes.

23         Q     Okay.  Okay.  If you look at paragraph eight

24    of your declaration, Exhibit 25.

25         A     Okay.

BARKLEY
Court Reporters

1        Q     At the very beginning of the paragraph it

2    says, all designs were originally drawn.  Do you see

3    that?

4        A     Yes.

5        Q     Do you know who originally drew the Exhibit 1

6    design in 2010?

7        A     I -- I can just guess, but I'm not sure.  I

8    think it's -- it's freelance artist by the name of Mike

9    T, but I don't know where he is or what's going on with

10    him, but I think that's -- that's the same guy that also

11    created -- if I'm not mistaken, okay, if -- if I

12    remember correctly he modified it from --  anyway, okay.

13        Q     Okay.  But somebody named Mike T?

14        A     Mike T I think.

15        Q     Is that somebody that Joe Cool hired as an

16    artist?

17        A     It's -- previously I owned some stores,

18    retail stores in Main Street on the beach side --

19        Q     Okay.

20        A     -- he worked for me and I -- I knew him.

21    He's a good artist.  So when I open up Joe Cool he did

22    for me some freelance work.

23        Q     Okay.  Now, look -- do you have -- I don't

24    know if you have your copy of Exhibit 1 handy.

25        A     Here.

69

YOSEF AMAR

BARKLEY
Court Reporters

1      Q     If you look at the droop -- the third line on

2    the far right it says, Consolidated 2003, and it has the

3    copyright symbol.  Do you see that?

4      A     Yeah.

5      Q     Do you know what the 2003 represents?

6      A     2003.

7      Q     But, I mean, is it supposed to be the year it

8    was drawn or the year -- the year of what?

9      A     It looks like that was supposed to be '93.  I

10   don't know how it got 2003.  They probably made a

11   mistake.

12     Q     So you think it was supposed to say copyright

13   1993?

14     A     '93, because that's the date, yeah, that it

15   started.

16     Q     That was the date that it -- the first

17   version started?

18     A     The first version, yeah.

19     Q     But this version you testified started in

20   2010?

21     A     In 2000 -- exactly.

22     Q     Okay.  When did you first learn of the

23   Monster Energy claw logo?

24     A     When I got hit.

25     Q     You -- you had not heard of it before the

70

BARKLEY
Court Reporters

1    lawsuit?

2         A    No.

3         Q    Okay.  You don't drink a lot of energy

4    drinks?

5         A    It's -- it's not kosher.

6         Q    It's not kosher.  Okay.

7              I don't know if they are or they aren't.

8    I'll have to trust you on that one.

9              MR. STEWART:  Let me introduce what will be

10        Exhibit 55.

11             (Exhibit 55 was marked for identification.)

12   BY MR. STEWART:

13        Q    And I'd like you to focus on the e-mail that

14   starts on the very bottom of the first page.  You can

15   just read that to yourself quickly, that would be great.

16        A    The whole thing?

17        Q    Yeah, just to yourself.

18        A    This one?

19        Q    No.  Just the bottom one here.

20        A    Okay.  Yeah.

21        Q    Okay.  Is this an e-mail from you that you

22   wrote?

23        A    Yeah.

24        Q    Okay.  Who were you writing it to?

25        A    I think to was it Bob -- is it Bob -- David.

                          71

1     Q     David Baksht?

2     A     I say David.  I think from -- from the office

3     probably they send him.  What day was it?

4     Q     Looks to me like March 14, 2011, but --

5     A     Is it -- when was the seizure?

6     Q     That was March 7, 2011, I believe.

7     A     Maybe the office send a message to David to

8     show them also the typestyle that -- that is also in our

9     design.  I -- where is that?  What did you show me those

10    -- those letters?  You show me that exhibit, those

11    typestyle.

12    Q     The ones here?

13    A     Yeah, yeah.

14    Q     Yeah, they're on your page as well.

15    A     Probably the -- the office showed David also

16    the typestyle to show him that it's generic and to send

17    him just to show him that here is a very close typestyle

18    to what was used.  Maybe they didn't know what my

19    background on this -- on this art, you know, so.

20    Q     So you think -- you think --

21    A     The office.

22    Q     You think it was sent by somebody at the

23    office, not by you?

24    A     Could be, could be.  Could be somebody from

25    the office, yeah.

72

BARKLEY
Court Reporters

1      Q    Okay.  Do you know who at the office could

2    have done that?  At the very end it say Yosef.

3      A    It could be -- maybe could be Carrie or

4    somebody.

5      Q    If you --

6      A    Could be Carrie maybe.

7      Q    If you look on page two --

8      A    Yeah.

9      Q    -- at the end of the e-mail, it has the name

10   Yosef.  Do you see that?

11     A    Maybe they put my name sometimes, you know.

12     Q    Oh, okay.

13     A    But this is, you know, their interpretation

14   of what's going on --

15     Q    Okay.

16     A    -- with -- because this is the type resem --

17   resembling type to the 3DL and I showed this -- I

18   actually showed this type in the showcase the first time

19   we saw -- I saw -- I saw the -- I showed it to the --

20   you know, in the showcase.  Bob actually showed that as

21   part of it.  So that's what it is.  I think somebody

22   from the office misinterpreted how it was made or

23   something.

24     Q    Okay.  You said the showcase, what were you

25   referring to?

73

BARKLEY
Court Reporters

1          A     The first one -- the first time we went into

2     the -- in front of the judge, master.

3          Q     Oh, the hearing?

4          A     Yeah.

5                MR. STEWART:  Okay.  Let's go ahead and

6          change the tape.

7                THE VIDEOGRAPHER:  Okay.  This concludes disk

8          number one in the deposition of Yosef Amar.  The

9          time is approximately 12:30 p.m.  We are off the

10         record.

11               (A recess was taken.)

12               THE VIDEOGRAPHER:  Going back on the record.

13         The time is approximately 12:43 p.m.

14    BY MR. STEWART:

15         Q     Okay.  Welcome back.

16         A     Welcome back.

17         Q     I'd like you to continue looking at

18    Exhibit 55, which is the e-mail, and it's still the

19    e-mail at the bottom of the page.  The -- at the very

20    beginning of the e-mail are the three letters BSD.  Do

21    you see that?

22         A     Yeah.

23         Q     What -- what does that signify?

24         A     That's God willing.

25         Q     God willing.  Okay.

74

BARKLEY
Court Reporters

 1                  And is that something that people in your

 2       office would put on an e-mail other than you?

 3            A      It's -- probably.  It could be maybe -- could

 4       be, but I'm not sure.

 5            Q      Okay.  So do you -- do you still believe that

 6       this was an e-mail written by somebody other than you?

 7            A      See, I always have somebody sign my e-mails,

 8       so --

 9            Q      Okay.

10            A      -- I never type.  My English is not the best.

11            Q      Okay.  Well, let me just go over some of the

12       details of the e-mail with you.

13                  The very first sentence says, these are fonts

14       that are available in clipart on the internet for anyone

15       who wants to use them.  Do you see that?

16            A      Yeah.

17            Q      And are the -- the fonts that you're

18       referring to are the two fonts that are shown on the

19       next page; is that correct?

20            A      Whoever -- yeah.  Whoever -- yeah.  Whoever

21       wrote it, yeah, was referring to those I guess.

22            Q      Okay.

23            A      Could be the artist that sent it maybe.

24            Q      Okay.  And the next sentence says, these are

25       the typestyles that our art department created the

                                    75

BARKLEY
Court Reporters

1    letter M from for the 3DL design.  Do you see that

2    sentence?

3         A    Yes.

4         Q    And is it -- is it your understanding that

5    that's incorrect?

6         A    It could be that -- I mean, they have

7    resemblance, so it could be that the artist also used

8    part of it to create from that too.

9         Q    Okay.

10        A    So it's possible that that's what took from.

11   You know, because we showed that typestyle in -- but,

12   you know, my employees, they don't know my back -- what

13   I started, what I have and what designs, you know, we

14   sold before.

15             So the -- if you talking about, you know --

16   Carrie, she's worked maybe five, six months before, you

17   know, we got to the seizure.  The artist maybe a year

18   and a half or two.  So they could be just -- what I --

19   what I work and I see and I show stuff like that, you

20   know, and maybe they can see some types, it could be

21   that the artist himself used some of this to create it

22   also, so -- but I don't know because I left it -- you

23   know, I gave it to him.  I said, give me something like

24   that.  So it could be that he also used part of those

25   types in the creation.

76

1            So, you know, you can take from -- to create

2    he can take, you know, ideas or something that he have,

3    you know, to work with already available so he probably

4    looked at it or so.  I don't know.

5            I -- I wasn't there when he created it.  I

6    just saw.  I got it.  You know, I saw the design, okay,

7    let's try it.  Like everything else.  I don't follow

8    exactly sitting with him and seeing exactly what he

9    using to -- to use that, but in general, that's what I

10   told you.  That's where we started and from there the

11   artist did his own things, whatever he did to -- to get

12   it, you know.

13       Q    Okay.  The last sentence of the e-mail begins

14   on the first page and it says, the reason we -- we

15   created the M because every year we create new city name

16   drop designs and we started with M for Myrtle Beach

17   designs.

18       A    That's exactly what I said before.  If you

19   look at -- that's what I said.  That's -- that's what --

20   you know, we started do the M for Myrtle Beach because

21   we trying to give a look for every year.  We do a new --

22   new look or design so we -- we take from what we have

23   and we work with it.  So it's not like something new

24   that -- every year we do new stuff.  We update.  We

25   modify.  We -- we use our own stuff.  We use old stuff.

                            77

YOSEF AMAR

BARKLEY
Court Reporters

1    We use new stuff.

2         Q    Now, was the exact version that's shown in

3    Exhibit 1, was that meant to represent Myrtle Beach?

4         A    Is this one was?

5         Q    Yes.

6         A    Yeah, yeah, that's the same one.

7         Q    This one was meant to represent Myrtle Beach?

8         A    That's the one.

9         Q    Okay.  Do you have any tee-shirts that

10   include Exhibit 1 in the words Myrtle Beach on them?

11        A    Not -- I give everything back to Monster when

12   we settled.

13        Q    But you did make some tee-shirts like that?

14        A    Oh, yeah.  Oh, yeah.

15        Q    Okay.

16        A    That's how we started.

17        Q    It started with Myrtle Beach?

18        A    Because before we use -- you know, sometimes

19   we do Bike Week and stuff, but with Myrtle Beach it was

20   a certain typestyle that was written right on the bottom

21   here, like across the bottom, Myrtle Beach, South

22   Carolina.

23        Q    Okay.

24        A    So that's what they made, you know, Myrtle

25   Beach.

78

1        Q      Now, if you look at the top of the page, of

2    the first page, you'll see the same e-mail is repeated.

3    It starts, these are fonts that are available in

4    clipart.  Do you see that?

5        A      Same thing exactly it says?

6        Q      Well, it's -- that's what I'm going to go

7    over with you.  It's almost -- it's almost exactly the

8    same.

9        A      Okay.

10       Q      And I only found one difference which was in

11   the second sentence.  It says, these are the typestyle

12   that our art department created the letter M from, the

13   3DL design, in 1997.  The words in 1997 appear in the

14   top e-mail, but I don't see them in the bottom e-mail.

15   And my question for you is, if you -- if you know how

16   the words 19 -- in 1997 found their way into the top

17   e-mail?

18       A      It could be that, you know, correspond to the

19   old stuff.  So like I said, the guys that working there,

20   you know, we got -- we got landed with -- with marshals

21   and -- and it was a big confusion.  I was out of order,

22   tell you the truth.  I was -- that's the reason I

23   settled.  I was out of order.  They came, they bust into

24   my life and it was big confusion.  So people I guess in

25   the office are referring to the old stuff, 1997, the

                              79

BARKLEY
Court Reporters

1    Bike Week is '97, you know.  The e-mail they get from --

2    you know, from Bike Week '97 or it's a big I think --

3    see a lot of stuff that Carrie was writing she's

4    assuming that this is what it is, you know.  So I cannot

5    tell you really what, you know, 1997 means here, but --

6    but -- but referring to the old designs that we had, you

7    know.

8         Q    Okay.  So just to summarize, you -- you don't

9    know how the words in 1997 got into this copy of the

10   e-mail?

11        A    No.

12        Q    Was that a no?

13        A    It's a no.  I really don't know.

14        Q    Okay.  That's fine.

15             Did anything in 1997 significant happen with

16   respect to the 3DL design?

17        A    Just probably the -- the selling of the

18   old -- the old version, you know.  Could be that that's

19   what it is, you know.  They're referring to the

20   beginning of it, you know.  Some -- somehow it's an

21   older date, so I guess they're referring to the older

22   design that we had.

23             They probably heard me say, oh, we had that

24   before and after the seizure, you know, the office

25   everybody's there, we talking and I'm on the phone,

                              80

BARKLEY
Court Reporters

1    maybe they heard something.  So that's probably what

2    they get it, from the old stuff, from the old version.

3    That's what I take from it.

4         Q    Okay.  If you could look at paragraph 11 of

5    your declaration, this document here, the first sentence

6    reads, what we call the 3DL three drooping lines has

7    been utilized for numerous years by a multitude of

8    clothing and heat transfer users.  Do you see that?

9         A    Yes.

10        Q    Is that a true statement?

11        A    Of course.

12        Q    So who -- who, other than Joe Cool, was using

13   the 3DL design for many years?

14        A    For many years?

15        Q    Yeah.

16        A    I guess the people that we sold to.

17        Q    The people you sold to?

18        A    Yeah.

19        Q    Okay.

20        A    For many years, and we -- the stuff that we

21   sold, retail and wholesale.  I show you invoices for --

22   you know, from '96 and --

23        Q    Yes.

24        A    -- and '91 and '94.  I don't have '93 much,

25   but utilize in different variations, different shapes

81

BARKLEY
Court Reporters

1    and -- and designs, you know, resembling.  It's a shape

2    after all.

3        Q    Were any of Joe Cool's competitors using the

4    3DL design for years?

5        A    Not exactly the same, but I'm sure they have

6    resemble -- resemble designs.

7        Q    Okay.  Are you aware of any competitor of Joe

8    Cool that was using the exact design shown in Exhibit 1?

9        A    No.

10       Q    Okay.  Okay.  I'd like you to look at the

11   very last sentence of ex -- of paragraph 11.

12       A    11.

13       Q    It's the very last --

14       A    Just --

15       Q    Yeah.  We were in paragraph 11.  We just did

16   the first sentence and now I'd like to look at the very

17   last sentence which begins, I have been using such fonts

18   and marks back in the mid 1990s when I first opened my

19   store.  Do you see that?

20       A    11?

21       Q    Yes, paragraph 11, final sentence.

22       A    Final sentence.  I have been using such font

23   and marks in the mid 1990s when I first opened my store.

24   Yes.

25       Q    And I want to know what you were referring to

YOSEF AMAR

1    when you said such fonts and marks.  Is that the same

2    stuff we've been referring to today?

3         A    Yeah, yeah.  That's, you know, the '91 design

4    with the -- that the -- the -- with the parrot that we

5    refer to, the -- the -- modifying from it '93 and -- and

6    all the designs that we went through.

7         Q    All the different iguana claws and alligator

8    claws?

9         A    Yeah, all that stuff.

10        Q    Okay.  You -- in paragraph 11, you weren't

11   intending to say you had been using Exhibit 1 since the

12   early 1990s; is that correct?

13        A    The -- this paragraph?

14        Q    Yeah, in this paragraph.  You were not

15   referring to Exhibit 1 when you said, I have been using

16   these fonts and marks since 19 --

17        A    I was referring to the -- probably the older

18   version because this one was just modified in -- in

19   2010.

20        Q    Okay.

21        A    Okay.

22        Q    Okay.  I'd like you to turn to the last two

23   pages of your declaration, which are the exhibit.  See

24   there's a page that says exhibit A6 and then there's two

25   pages that follow.

83

BARKLEY
Court Reporters

1      A      A6?

2      Q      Yes.  Okay.  Have you had a chance to look at

3    those?

4      A      Yes.

5      Q      Okay.  Good.

6             First of all, I wanted to check, would you --

7    would you agree with me that the designs shown in

8    exhibit A6 differ from Exhibit Number 1?

9      A      Different?

10     Q      Different.

11     A      Yes.

12     Q      Okay.  They are different?

13     A      They're not -- they're not exactly --

14     Q      Okay.  That's -- that's all I'm asking.

15     A      -- that's different.

16     Q      Okay.  Now, I noticed that your declaration

17   that you signed under oath never says specifically that

18   you used these tee-shirt designs in 1993.  It only

19   appears on this page where it says designs from 1993.

20            And so my question for you is, did you use

21   the tee-shirt designs shown in exhibit A6 in 1993?

22     A      Yeah.

23     Q      You did?

24     A      Yeah.

25     Q      And how do you know that?

84

BARKLEY
Court Reporters

1      A     How I know it?

2      Q     Yes.

3      A     I remember designs that I did --

4      Q     Okay.

5      A     -- from old years.

6      Q     Do you have any documents showing the sales

7   of these specific shirts in 1993?

8      A     I have to look at it.  Yeah, probably.  I

9   have to, you know, pull out and look at if I have those

10  dates available and invoices.

11     Q     Okay.

12     A     It doesn't mean that we sold it exactly like

13  -- like with Myrtle Beach.  Could be just, you know, the

14  scratch with the -- could be flea market sell, Bike Week

15  sales.  It could be everywhere.

16     Q     Yeah, I guess.  And my -- my question to you

17  is, did you sell exactly what's shown in this?

18     A     The design, yes, but it could be -- like I

19  say, it could be with a typestyle.  It could be without

20  the typestyle, the design itself the three --

21     Q     The three lines?

22     A     Yeah, it could be, yeah.

23     Q     And --

24     A     It's -- it's -- it's of -- it's available

25  sometimes just the scratch marks sometimes.  You don't

85

BARKLEY
Court Reporters

1     put city names.  So we can -- we sold it the way it is,

2     you know --

3          Q     Okay.

4          A     -- the design.

5          Q     And did -- did you continue selling them

6     after 1993?

7          A     I'm sure there is sales after, yeah.  I mean,

8     yeah.  You know, when you make -- you make a run, so not

9     everything you sell right away, you know --

10         Q     Sure.

11         A     -- you sell them eventually in the end.  You

12    know, whatever left over you can -- I have -- I have a

13    lot of sales that I sold it, you know, closeouts, you

14    know, just stuff that you want to clean up, you know.

15         Q     Is this a design you're still selling today?

16         A     No.

17         Q     Okay.  Do you know about when you stopped

18    selling this design?

19         A     I can't give you exact date when I stopped,

20    you know.  Could be sold, you know, in closeouts three,

21    four years after, five or maybe some samples or some

22    designs that left we clean them up in Bike Week.

23         Q     Okay.

24         A     You know, we sell -- we sell flea market.  We

25    sell wholesale.  We sell retail.  So it's really -- to

86

BARKLEY
Court Reporters

1 identify how long, you know, they stayed, but I'm sure

2 there is leftovers and through the years we got rid of

3 them, you know.

4   Q Okay.  Do you think you sold most of them in

5 the 1990s?

6   A I won't say exactly the year.  Like I say, it

7 probably took years to sell them, you know.

8   Q Well, you started in about 1993, correct?

9   A Yeah, but it takes, you know -- like the

10 iguanas I showed you was stuff from 18, 19 years ago.  I

11 -- I -- I -- I -- in my stock.  You know, I have

12 16,000 square feet warehouse.

13   Q Okay.

14   A The two gringos (phonetic) when they came,

15 you know, the seizure, in the attorney, so they see I

16 got boxes of boxes of stuff, you know.  I don't even

17 know what's in some boxes.  I didn't go up in the shelf

18 up there.  So I -- I cannot tell you when -- if we sold

19 them all or we -- you know, how long it took to sell

20 them, but I know the design, it goes through the years,

21 you know.  Sometimes you have left over.  Sometimes you

22 clean them up in closeout.  Sometimes you throw them

23 away.

24   Q Okay.  So you know you started selling in

25 1993; you know you don't currently sell, but you're not

BARKLEY
Court Reporters

1    sure when you stopped selling?

2        A    No.  Definitely right now I don't sell

3    because, you know, I gave, you know, whatever left over

4    on those probably in the -- in the -- in the stuff that

5    we gave to Monster.  We cut them up and put them in

6    boxes and gave everything to Monster, anything that was,

7    you know, close -- close to the design.

8        Q    Okay.  How would you -- if you were looking

9    at your invoices, how would you determine that an

10   invoice reflects a sale of one of these shirts?  Is

11   there a product number, an item number?

12       A    Most -- most of the time if it's something

13   that continues, we will assign a number to it, but not

14   always.  You know, I have a lot of stuff that not

15   inventory item.  So in general we give style numbers.

16   Everything, no.

17       Q    So does -- does this shirt have an item

18   number?

19       A    I have to check it.

20       Q    Okay.  And how would you check it?

21       A    I have to go to see if I have any old, you

22   know, styles in Myrtle Beach on those years and see how

23   I can find that.  I cannot tell you right now.  You

24   know, it's nothing on the standard of caliber or

25   anything.

88

YOSEF AMAR

BARKLEY
Court Reporters

1    Q    Okay.  How was this document exhibit A6

2    physically created?  How did you create it?

3    A    This was -- if you look at the resembling --

4    again, referring to the original stuff.  Okay?

5    Q    Yes.

6    A    (Indicating.)

7    Q    I see your --

8    A    Look at that and look at that.

9    Q    No.  But my question is a little bit

10   different.  This -- these two pages called --

11   A    No.  We created it for -- to show that we had

12   previously, you know, sold those designs, so.

13   Q    Yes.  So did you -- did you photograph four

14   tee-shirts and put them on this page or --

15   A    No.  There was a copy of -- probably a design

16   that we have left over or something and we put it in

17   there, scan and pull it on there.  He colored it

18   differently just to show different color combinations.

19   Q    I'm not sure I'm following you.

20   A    If you have a -- like a catalog.

21   Q    Yeah.  We have a catalog here somewhere.

22   A    Okay.  For the design that we found, you

23   know, he take any design.  You scan it and then you line

24   it up --

25   Q    So where --

89

BARKLEY
Court Reporters

```
 1          A     -- and you color it.

 2          Q     So where was this design found?

 3          A     It was found in the -- you know, one part of

 4    the designs that we did previous, you know.

 5          Q     Was it in a catalog?

 6          A     It was probably a flier or something that we

 7    found back there.

 8          Q     Okay.  Was it dated, the flier?

 9          A     I cannot answer you right now.

10          Q     Okay.

11          A     I don't -- you know, again, you know, you

12    talking about, you know, we had to come up with all the

13    stuff that we sold before and before there was like a

14    pressure to answer in time and -- and gather stuff and

15    so that's, you know, what we had back then.

16                I didn't even -- if you pay attention, I

17    didn't even have the iguanas displayed to -- in the

18    showcase when we came to the -- in front of the judge.

19    I didn't have a lot of designs because I was completely

20    out from the seizure.  I was devastated.  So whatever I

21    remember, whatever I could get hold of, it just -- I

22    didn't even think.  Bob was telling me, give me samples,

23    give me stuff that you did.  You know, so whatever I

24    gathered, you know, I gathered.

25          Q     Okay.  So let me see if I understand
```

90

BARKLEY
Court Reporters

1      correctly.

2              You think that somebody at Joe Cool scanned

3      in a flier --

4          A      Right.

5          Q      -- for one of the Myrtle Beach tee-shirts?

6          A      Either flier or design that we have left

7      over --

8          Q      Okay.

9          A      -- I really can't point -- you know, pinpoint

10     it but it could be a design that was left over or it

11     could be a flier --

12         Q      Okay.

13         A      -- that we -- we gathered that information.

14         Q      And then the -- the employee who scanned it

15     in then changed the colors of the three drooping lines?

16         A      Yeah.  To show -- to show different colors

17     how we do thing, how we -- from one design we always

18     sold a variety of -- in order to increase sales or to

19     match your designs to the tee-shirts we always do four,

20     five, six colors combination from the same design.  Like

21     the 3DL design with the green, with purple, with red.

22     We had the yellow.  We have the orange --

23         Q      Okay.

24         A      -- so we just, you know, showing the

25     different color combination.

91

BARKLEY
Court Reporters

1        Q      And do you know what color was the original

2    that was scanned in to create exhibit A6?

3        A      I wouldn't be able to tell you right now --

4        Q      Okay.

5        A      -- exactly what happened.

6        Q      Okay.  And then if you turn to the second

7    page of exhibit A6, you'll see similar tee-shirts but

8    with MB instead of M on them, correct?

9        A      Yeah.

10       Q      And, again, somebody found a brochure or --

11       A      It could be on the same, you know, page,

12   could be was -- was both designs, yeah --

13       Q      Okay.

14       A      -- both designs.

15       Q      And how did you determine that this design

16   was from 1993?

17       A      Like, you know, how did I determine all this

18   stuff that I gave you here?  I had to go and search and

19   look and see what we -- what we did or approximately and

20   I have to remember what year you did certain designs.

21       Q      Well, if you look at the -- the bird drawing

22   which I think is Exhibit 26 --

23       A      Yeah.

24       Q      -- it has a copyright date on it.  It says

25   1991?

                          92

BARKLEY
Court Reporters

1        A     But not all of them again.

2        Q     Yes.

3        A     Not all of them.  Lot of city -- lot of -- I

4    showed you some of them had.  Some artist forget to put

5    it, you know --

6        Q     Sure.

7        A     -- you tell them to put the date, they don't

8    put the date.  So you print it without the date.  Where

9    is those other -- a lot of designs there's no date on

10   them.

11       Q     But my -- my question --

12       A     Like here --

13       Q     I understand that.

14       A     -- so.

15       Q     My question for you is how you determined the

16   date of exhibit A6?

17       A     We had to -- to see probably back then how --

18   how was -- you know, when we sold that or remembering

19   what that's -- that's about the time we come up with.

20       Q     In exhibit A6 I take it the -- the letter M

21   stands for Myrtle Beach?

22       A     Yeah.

23       Q     I'm going to ask the reporter to mark as

24   exhibits some additional product catalogs of Joe Cool

25   that you provided to me, and I have four of them.  And

93

BARKLEY
Court Reporters

1    they have tags on them that say 2000, 1997, 2004, and

2    2005.  So maybe I'll put them in chronological order

3    here.

4              MR. STEWART:  If the reporter could mark

5         these as the next four exhibits in order.

6              (Exhibits 56, 57, 58, and 59 were marked for

7         identification.)

8              (Off the record discussion.)

9    BY MR. STEWART:

10        Q    Okay.  Mr. Amar, if you could look at

11   Exhibits 56 to 59 and just confirm that they are, in

12   fact, Joe Cool's product catalogs from the years

13   indicated.

14        A    Yes.

15        Q    So the first one is from 1997?

16        A    Yeah.

17        Q    And the second one is from 2000?

18        A    It says 2000?  Yeah, yeah.  Okay.

19        Q    And the third one is from 2004?

20        A    Yes.

21        Q    And the fourth one is from 2005?

22        A    Yeah.

23        Q    Okay.  And since these are all before 2010,

24   is it correct to say that I would not be able to find

25   the exact same logo shown in Exhibit 1 anywhere in those

94

BARKLEY
Court Reporters

1    catalogs?

2         A     Because -- yeah, because before, yeah.  On --

3    on the exact -- exact design, yeah, you're not going to

4    see it there.

5         Q     Okay.  Good.

6              MR. STEWART:  All right.  Let's take a lunch

7         break.

8              THE VIDEOGRAPHER:  Going off the record.  The

9         time is approximately 1:12 p.m.

10             (A recess was taken.)

11             THE VIDEOGRAPHER:  Going back on the record.

12        The time is approximately 2:20 p.m.

13   BY MR. STEWART:

14        Q     Welcome back.

15        A     Welcome back.

16        Q     I'd like you to take a quick look back at

17   Exhibit 23, which was the document you provided me with

18   the responses to the subpoena.  That looks like it.

19        A     I see.

20             MR. MORTNER:  My client Menachem Schneorson

21        just showed up.  You mind if he sits in?

22             THE VIDEOGRAPHER:  You want to go off the

23        record?

24             MR. STEWART:  Yeah, let's go off the record

25        for a second.

                              95

BARKLEY
Court Reporters

1      THE VIDEOGRAPHER:  Going off the record.  The

2      is approximately 2:20 p.m.

3           (A recess was taken.)

4      THE VIDEOGRAPHER:  Going back on the record.

5      The time is approximately 2:22 p.m.

6    BY MR. STEWART:

7      Q    Okay.  Hello again, Mr. Amar.

8      A    Hello.

9      Q    I'd like you to look at paragraph seven on

10   Exhibit 23.

11     A    Okay.

12     Q    It says, the 3DL mark has been used in

13   various shapes of three lines as early as the mid 1990s,

14   as early as 1993.  And then it continues, the design is

15   a variation of fonts, different type styles utilized

16   with dragons, skulls, scratch marks, different claws,

17   like eagle claws, iguana claws and lizard claws,

18   dinosaur claws, dragon claws and bear claws, etcetera.

19   Do you see that?

20     A    Uh-huh.

21     Q    Is that -- is that an accurate summary of the

22   history of the 3DL variations?

23     A    What we meant by that, that we had so many

24   different style that looks like from the original when

25   we started in '93 all through.  We had same look of the

96

BARKLEY
Court Reporters

1    stuff, you know, more or less is the claw, is the

2    scratch and through that, that's what we're saying.

3    It's -- it's not only one design but it's a lot of

4    designs.  That's what we -- that's what we trying to say

5    here.

6         Q    I understand that.  I'm just -- I'm just

7    asking you basically if -- if you -- if you would

8    confirm that paragraph seven is an accurate reflection

9    of what occurred?

10        A    It's the history.

11        Q    It's an accurate history?

12        A    It's an accurate history.

13        Q    Okay.  Very good.  That was -- that was my

14   question.  Let me move on to a different topic with you.

15             When did Joe Cool start working with

16   Consolidated to sell the 3DL tee-shirts?

17        A    When we started the -- all the trademarks

18   from Bike Weeks.  So many time we go -- I mean we --

19   they added another corporation.  I would say about all

20   together four -- from the beginning -- from the first

21   trademark that we did was Bike Week trademark.  So I

22   don't remember exactly the year but four or five years

23   ago, three, three and a half years ago.

24        Q    And that was for the Daytona Beach Bike

25   Week --

97

BARKLEY
Court Reporters

1        A       Yeah.

2        Q       -- trademark?

3        A       Yeah, we started then.

4        Q       Okay.  When did you first start working with

5    Consolidated to sell tee-shirts that have the logo shown

6    in Exhibit Number 1 that we've been discussing?

7        A       The -- we -- we started that, you know, when

8    -- when the design -- when we remade -- I mean, like

9    modified the design and then we trademarked it.  So

10   that's where everything began on the 3DL, prior to Bike

11   Week.

12       Q       Okay.  Well, did -- did Joe Cool ever sell

13   the version of the 3DL mark shown in Exhibit 1 before it

14   started its relationship with bike -- with Consolidated?

15       A       Did Joe Cool sold what?

16       Q       Did Joe Cool sell heat transfers or

17   tee-shirts with the Exhibit Number 1 logo before it

18   entered into its arrangement with Consolidated?

19       A       Joe Cool sold that design from the beginning,

20   from -- from '9 --

21       Q       All right.  But you --

22       A       -- '93, yes.

23       Q       Okay.  But you told me earlier that the

24   specific design shown in Exhibit 1 with the exact same

25   color --

YOSEF AMAR

BARKLEY
Court Reporters

1      A      The modified, the modified design, yeah.

2      Q      Yeah.   Okay.   The modified design?

3      A      Yes.

4      Q      That was started in 2010, correct?

5      A      Yeah.

6      Q      And is that something that Joe Cool started

7      on its own or is that something Joe Cool--

8      A      No, we --

9      Q      -- did in cooperation?

10     A      That's the joint venture.   Started when we

11     actually started trademarks from Bike Weeks and then the

12     3DLs and continue on, you know, to the last 3DL that we

13     did.

14     Q      Okay.   So sometime in 2010, Joe Cool and

15     Consolidated started working together to sell the

16     modified 3DL that's shown in Exhibit 1; is that correct?

17     A      Correct.

18     Q      Okay.   Good.

19            And what was Joe Cool's role in that

20     business?

21     A      Refer to here?

22     Q      Okay.

23     A      Well, we are manufacturer.

24     Q      Paragraph 15, is that what you're referring

25     to?

BARKLEY
Court Reporters

1          A      Yeah.

2          Q      Okay.

3          A      Should I read it.

4          Q      You don't have to you.  You can give me your

5     own words or you can read it if you think that's the

6     most accurate.

7          A      Manufacturing heat -- heat transfers and

8     preprinted tee-shirts.  We create a new design.  We

9     added more designs into it, you know, and future-wise

10    we'll -- the plan was to continue on with modifying and

11    improving, you know, our business, selling and

12    marketing, shipping and quality control --

13         Q      Okay.

14         A      -- and of course, you know, whatever money

15    needs to be -- you know, financing.

16         Q      So in -- in the -- in your business

17    relationship with Consolidated, which company actually

18    owned the heat transfers?

19         A      With Consolidated?

20         Q      Yes.  Did -- did Consolidated own the heat

21    transfers?  Did Joe Cool own the heat transfers?

22         A      Well, it was joint venture.

23         Q      And what do you mean by that?

24         A      So -- so it's a partnership.  Whatever we

25    sold it's both of us.

YOSEF AMAR

BARKLEY
Court Reporters

```
 1        Q     Okay.  Now, there came a time when you
 2   reached the settlement with Monster Energy that I'm sure
 3   you recall.
 4        A     Yes.
 5        Q     And at that time you destroyed all of the
 6   modified 3DL heat transfers; is that correct?
 7        A     Well, yeah, that was part of the agreement
 8   to, you know, damage them and send them -- and, you
 9   know, whatever, transfer them to -- to Monster --
10        Q     Okay.  And --
11        A     -- attorneys.
12        Q     If -- if the 3DL merchandise was jointly
13   owned with Consolidated, why did you feel comfortable
14   destroying it on your own?
15        A     Well, let's start from the beginning.
16        Q     Sure.
17        A     When the seizure happened, it shock me.  You
18   know, I was devastated.  I wasn't the same Joe Cool that
19   you know.  I -- I was confused.  It just -- I couldn't
20   bear doing business.  I mean, for a year, I lost a whole
21   year of, you know, looking forward to see, to do and to
22   stuff.  I just was floating because of, you know, the
23   seizure.  It's -- it's like somebody come and -- and
24   knock you without, you know, expect because we have
25   trademark.  We have -- everything is, you know,
```

YOSEF AMAR

BARKLEY
Court Reporters

1    according to the books, and so I took it very harsh,

2    very -- I mean, so for me in the beginning, you know,

3    the first -- you know, somebody punch you want to punch

4    back and that's what we did.  But after a while the

5    emotions could not control and I -- I wanted out of it.

6    I just didn't want to continue with fight.

7           I don't want to fight.  I'm a person of

8    peace.  I don't like to fight with nobody.  I like to,

9    you know, respect others with they respect me and I

10   couldn't bear to fight with anybody.  I mean, I don't

11   want -- you fight me your way I take to the right.  I'm

12   not going to bother you, you know.

13          So I had -- you know, we had, you know, back

14   and forth.  We didn't agreed on certain things and I

15   told him, listen, let's settle.  I don't want to -- and

16   they felt that, you know, they had their own thing that

17   they wanted -- initially they wanted to settle, but the

18   Monster become -- you know, they change something in the

19   paperwork at the end because they were like, you know --

20   there was supposed to be maybe joining -- voluntarily

21   joining of the settlement that we had, but something

22   happened.  Monster didn't wanted to take them in the

23   end.  And I don't know what's the reason.  And I told

24   him, I said, I can't, I can't.  I just cannot fight.  I

25   don't want to go through with this.  For what?  Money.

YOSEF AMAR

BARKLEY
Court Reporters

1    You don't take money with you nowhere.

2         So I -- I said, listen, guys, I'm -- I'm

3    shattered.  I have to -- you know, to get it over with.

4    That's what happened, so --

5         Q    Okay.

6         A    -- that's what I did.  I mean, I want -- the

7    part of the settlement that they wanted this merchandise

8    to -- you know, to be destroyed.  I didn't want to do it

9    because, you know, I have partners.  I have to -- you

10   know, I told Bob, it's not my merchandise also -- only.

11   It's ours.  He said, listen, if you want to settle

12   that's part of the settlement.  You got to destroy the

13   stuff and -- and that's what it is.

14        I mean, I couldn't take it.  I couldn't take

15   it.  And hopefully I mean you will understand me but

16   that's -- that's what I do.

17        Q    Okay.  What was Consolidated's role in the

18   modified 3DL business?

19        A    They supposed to be in charge of the -- you

20   know, like application trademarks, you know, all --

21   obtaining the trademarks.  Marketing, selling on their

22   side, you know, whatever they generate.  Financing.  And

23   I guess -- let me see if I forget anything.  Protecting

24   the trademark.  That's their job was.

25        Q    Okay.  Did Consolidated provide you with a

103

YOSEF AMAR

BARKLEY
Court Reporters

1       $10,000 loan to start the 3DL business?

2       A    Yes.

3       Q    Okay.  And did Consolidated arrange for any

4    additional financing for the business?

5       A    As -- as we -- they were supposed to continue

6    -- they were supposed to continue to support, and

7    whatever we generate just went back into it, you know.

8       Q    Okay.  And what -- what -- what kinds of

9    marketing responsibilities did -- did Consolidated have?

10      A    You know, advertising, approaching sales

11   markets, you know, different markets that maybe I didn't

12   have.  Advertising, whatever they -- whatever it takes.

13   You know, whatever it takes to -- to market the stuff,

14   you know.

15      Q    Did Consolidated do any advertising of the

16   3DL?

17      A    Yes, they did.

18      Q    Do you have copies of any of that

19   advertising?

20      A    I don't have copies.  Like I told you, I -- I

21   throw everything.

22      Q    Do you know what -- what type of advertising

23   they did, whether it was fliers, newspaper ads?

24      A    Phone calls, I guess e-mails if I remember,

25   contacting their people, you know, whatever they have,

104

YOSEF AMAR

1    so referring people to us.  That kind of stuff.

2         Q    Okay.  For the actual selling of the 3DL

3    merchandise, was that exclusively Joe Cool's

4    responsibility?

5         A    If they -- yeah, I mean, to sell, to actually

6    get it out of the premises, yeah, but --

7         Q    Okay.

8         A    -- could have come from them or from others,

9    you know, salespeople and stuff.

10        Q    I mean, is it fair to say that all of the

11   sales of the 3DL merchandise were through Joe Cool's

12   store or Joe Cool's website?

13        A    Actual -- yeah, came out from -- not -- not

14   all brought in, but all came out from there, yeah.

15        Q    Okay.  And did Joe Cool agree to give

16   50 percent of the profits from the 3DL merchandise to

17   Consolidated?

18        A    Correct, yes.

19        Q    Okay.  And did Joe Cool ever make any

20   payments to -- to pay for the 50 percent share?

21        A    We didn't get there yet, you know.  We were

22   taken by surprise.  I mean, we just were generating

23   whatever sales we had and just putting back and

24   production and continue to -- you know, to grow with it.

25   So everything went back into the business.

YOSEF AMAR

BARKLEY
Court Reporters

1    Q    Okay.  So all -- all of the profits went back

2    in to making more merchandise?

3    A    More merchandise, yes.

4    Q    Okay.  Now, sometimes businesses result in --

5    in losses instead of profits as I'm sure you know.

6         Did -- did you have an agreement with

7    Consolidated about who would be responsible for any

8    losses?

9    A    Of course, but 50/50 is 50/50 --

10   Q    Okay.

11   A    -- to the right and to the left.

12   Q    That was my question.

13        Did Joe Cool and Consolidated have any

14   written agreements relating to the 3DL business?

15   A    No, we didn't have a written agreement.  We

16   had a verbal -- verbal agreement.

17   Q    Okay.  And what were the general terms of the

18   verbal agreement?  Just everything you've already told

19   me or were there more terms?

20   A    Yeah, what we -- you know, the jobs that each

21   one had taken, you know, the 50/50 and -- and, you know,

22   the marketing part of it, the trademark part of it,

23   whatever we talked about before.

24   Q    Okay.  Did Consolidated have any role in the

25   formation of Joe Cool Bike Week, Inc.?

106

YOSEF AMAR

BARKLEY
Court Reporters

1    A    Like I said, Joe Cool Bike Week, Inc. was

2    supposed to be a company that all the sales eventually

3    were supposed to go there.  But since, you know, we

4    started, you know, the business, the season came in.  I

5    was busy with a lot of stuff, so we didn't get into

6    directing all the sales into there, but that was the

7    general plan that, you know, the sales from Daytona and

8    the area will be in there and whatever they generate

9    probably in the future is going to be probably another

10   account or -- or -- or, you know, people that we give

11   license to, you know, on the general -- you know, on the

12   -- on the bigger picture, but that was, you know, just,

13   you know, supposed to happen, but since the seizure

14   everything, you know, stopped.

15        Q    Okay.  Who -- who were the owners of Joe Cool

16   Bike Week?

17        A    We were -- you know, is supposed to be a

18   company -- I was the president --

19        Q    Okay.

20        A    -- but we supposed -- you know, all the

21   marketing, all the money that comes from the marketing

22   has to go through the company and then split up --

23        Q    Okay.

24        A    -- so it's just a company that -- that we

25   know accounting-wise what we sold together will go

107

BARKLEY
Court Reporters

1    through that for this area and -- and the bigger picture

2    it would be a different corporations and future.  You

3    know, we looked at bigger things and to do.  So it's not

4    like --

5         Q    Joe Cool Bike Week was a corporation, right?

6         A    It was a corporation, yes.

7         Q    So who -- who were the shareholders of the

8    corporation?

9         A    When I opened it I just opened it as I was

10   the president of it.

11        Q    Okay.  So you were the sole shareholder?

12        A    For -- not -- I mean not -- on paper, yeah,

13   but that was supposed to be the corporation that splits

14   up everything to -- to --

15        Q    Okay.  Did -- did anybody from Consolidated

16   ever formally become a shareholder of Joe Cool Bike

17   Week, Inc.?

18        A    We didn't get there.  I mean, that was the

19   plan future, but we didn't get there yet.  I mean, that

20   was the plan.

21        Q    And do you remember when Joe Cool Bike Week,

22   Inc. was formed?

23        A    I think it was formed maybe three or four

24   months before the seizure, two months before the

25   seizure, something like that.

YOSEF AMAR

BARKLEY
Court Reporters

1        Q      Okay.

2        A      Maybe three or four.  Yeah, three or four

3    months I think.

4        Q      Okay.  Whose -- whose idea was it to apply

5    for trademark registrations for the 3DL trademarks?

6        A      Both of us.

7        Q      Both?

8        A      We -- we -- I mean, Joe Cool and Consolidated

9    together.

10       Q      Okay.  Let me show you what I'm asking the

11   reporter to mark as the next exhibit, 60.

12              (Exhibit 60 was marked for identification.)

13   BY MR. STEWART:

14       Q      And do you recognize this as the -- the

15   application for the modified 3DL trademark at the

16   federal level?

17       A      That's federal?

18       Q      Yes, United States --

19       A      Okay.

20       Q      -- Patent and Trademark Office.

21       A      Okay.

22       Q      And you see on the front page it lists the

23   owner of the trademark as Consolidated Distributors.  Do

24   you see that?

25       A      On the front?

YOSEF AMAR

BARKLEY
Court Reporters

```
 1          Q      On the front page, yes, about halfway down.

 2          A      The first page?

 3          Q      Yes, on the first page.  Owner of mark,

 4     Consolidated.

 5          A      Okay.  Yeah, I'm looking -- yes.

 6          Q      And then it lists the address as 719 Eastern

 7     Parkway, Suite 3 --

 8          A      Yes.

 9          Q      -- Brooklyn and then North Carolina.  Do you

10     know why it says North Carolina?

11          A      No.

12          Q      Okay.  Let me show you another document from

13     the same trademark file.  I'll ask the reporter to mark

14     as 61.

15                 (Exhibit 61 was marked for identification.)

16     BY MR. STEWART:

17          Q      First of all, do you remember seeing this

18     document?

19          A      Yeah.

20          Q      Okay.  Good.

21                 And if you go about half way down it has the

22     signatory's name and it says Amar.

23          A      Halfway down Amar, yeah.

24          Q      Yeah, but it's -- it's misspelled, right?

25          A      Misspelled, yeah, I know.
```

110

YOSEF AMAR

BARKLEY
Court Reporters

```
1          Q      Do you know how that happened?

2          A      I don't know.  Somebody maybe typed twice.

3          Q      So you -- you didn't physically type this up?

4          A      No.

5          Q      Okay.  All right.  Let me introduce to you

6     another document from the federal file which I'll ask

7     the reporter to mark as 62.

8                 (Exhibit 62 was marked for identification.)

9     BY MR. STEWART:

10         Q      And for the record, this document is entitled

11    preliminary amendment, and if you look about halfway

12    down it says on the left column, first use anywhere

13    date, and it says at least as early as 12/3/1993.  Do

14    you see that?

15         A      Right here?

16         Q      Yes.

17         A      Yes.

18         Q      Now, what does that December 3, 1993 date

19    refer to?

20         A      It's -- it's the first of the original -- I

21    mean the mod -- the first one that we did, the -- the

22    scratch mark.

23         Q      Okay.  So it's the first use of the three

24    scratch marks?

25         A      Yeah.  It's on the -- I showed you before or
```

111

BARKLEY
Court Reporters

1    somebody show it, the designs.  It's sitting right here

2    on the trademark I think in Florida or something.

3    That's the original.  That's the beginning.

4         Q    But --

5         A    You have a copy?

6         Q    Of -- of the Florida one?

7         A    Yeah.

8         Q    Yeah, I'll get to that in -- in a minute.

9    But --

10        A    That's probably what it's referring if you

11   asking what's -- 1993.

12        Q    But is -- is it -- but based on what you told

13   me earlier today it's not referring to the first use of

14   the exact modified design in Exhibit 1; is that correct?

15        A    Can you say that again.

16        Q    Was the exact modified design shown in

17   Exhibit 1 first used on December 3, 1993, or was it

18   first used in 2010?

19        A    It was just skinnier.  That's what I'm

20   saying.  It's the same mark, skinnier.  I showed you

21   before.  We saw it before.  I saw it before, the copy.

22   You have a copy of the trademark I can show you better.

23        Q    All right.  Let's jump ahead a little bit

24   here.  Actually I may be even able to do a little bit

25   better.  Hold on.

112

YOSEF AMAR

BARKLEY
Court Reporters

1      A      Right there.

2      Q      These three lines here?

3      A      That's the one.

4      Q      Okay.  For the record, I'm pointing at

5  Exhibit 4, a tee-shirt which has three skinny lines next

6  to three fatter lines and I'm pointing at the three

7  skinny lines on the left.

8            So is it your testimony that these three

9  skinny lines were used in 1993?

10     A      Yes.

11     Q      Okay.  Do you have any documents that show

12  that?

13     A      Right there.

14     Q      Okay.  Well, this tee-shirt was purchased

15  much more recently, for the 70th anniversary of Daytona

16  Beach Bike Week.

17     A      No.  I'm just saying that's the same

18  design --

19     Q      Okay.

20     A      -- that's the document, I can't show you

21  because I return everything -- in the settlement I sent

22  everything to the -- to Monsters --

23     Q      Okay.

24     A      -- so everything went there with everything,

25  whatever was the old one and the new one.

YOSEF AMAR

1     Q     Okay.  I thought your testimony earlier today

2     was that in 1993 you were using the Jimmy the dinosaur

3     purple dinosaur design with the three claws and that you

4     were using --

5          A     And modified from this I said.

6          Q     And modified --

7          A     From this.  That's the one.  We never got

8     there so I didn't want to talk about something that we

9     didn't --

10         Q     Okay.  So you took what was shown in

11    Exhibit 26 --

12         A     Yeah.

13         Q     -- those fern leaves and you modified them to

14    create the three skinny lines --

15         A     That's where we got the idea from '91.  So I

16    told you, I explained before that we were using on

17    sweatshirts sleeves and on the hoodies cutting up the

18    designs and that's how we got the idea to say, okay,

19    let's do something for bikers for the sweatshirts for

20    Bike Week --

21         Q     Okay.

22         A     -- and that's what we come up with.

23         Q     Okay.  All right.  So the reference to

24    December 3, 1993 --

25         A     That's the one.

114

BARKLEY
Court Reporters

1          Q     -- is referring to when you first started

2     using those three elongated lines?

3          A     Exactly.

4          Q     Okay.  But, again, you started using the

5     design -- the exact design shown in Exhibit 1 sometime

6     in 2010; is that correct?

7          A     This is exactly -- I mean, was worked out,

8     modified from that to create that.  It's about enlarging

9     and working out couple details of the artist did --

10         Q     Okay.

11         A     -- so.

12         Q     And that occurred in 2010?

13         A     2010.

14         Q     As long as I have Exhibit 4 out, can you

15    verify that this is one of the -- one of the tee-shirts

16    that you were selling before the seizure occurred?

17         A     Yes.

18         Q     Okay.  Good.

19               Okay.  Now I'd like to hand you a copy of one

20    of the applications for the Florida registration.  Ask

21    the reporter to mark it as Exhibit 63.

22               (Exhibit 63 was marked for identification.)

23               THE WITNESS:  State of Florida.

24               MR. MORTNER:  I think it was previously

25          marked just for --

                              115

BARKLEY
Court Reporters

```
 1              MR. STEWART:  It was?

 2              MR. MORTNER:  Yeah, I think that your

 3         colleague Ken Nielsen marked all of these state.

 4         It's okay, you can mark them again.

 5              MR. STEWART:  Yeah, I think I'm just going to

 6         have to mark them again because I wasn't -- I

 7         didn't -- wasn't able to keep track of what his

 8         numbers were.

 9              MR. MORTNER:  We're going to call it 60?

10              MR. STEWART:  63.

11              MR. MORTNER:  Okay.

12    BY MR. STEWART:

13         Q    Okay.  Have you seen this document before?

14         A    Yes.

15         Q    And is this the Florida State Trademark

16    Registration for the -- the three drooping lines with

17    the words Florida Sunshine State below it?

18         A    Yes.

19         Q    Okay.  And that trademark is shown on the

20    very last page of the document; is that correct?

21         A    The design?

22         Q    Yeah, the design.

23         A    Yeah.

24         Q    Okay.  Good.

25              If you'd look at the fifth page.
```

116

BARKLEY
Court Reporters

1       A     From the bottom, fifth from the bottom?

2       Q     Fifth from the top actually.  Sorry about

3    that.

4       A     It's okay.  Okay.  Yes.

5       Q     Is that your signature on that page?

6       A     Yes.

7       Q     Okay.  Good.

8             And VP signifies that you were the vice

9    president of Consolidated at the time?

10      A     Yes.

11      Q     Are you still an officer of Consolidated?

12      A     I don't know.  Maybe ask -- I'm still?  I

13   don't think so.

14      Q     Okay.

15      A     I don't know where we standing though.  Like

16   I said, it's frozen right now --

17      Q     Okay.

18      A     -- so I don't know what to say.

19      Q     Now, if you turn to the second page of this

20   exhibit it -- it says that all correspondence should be

21   returned to Yosef Amar at Consolidated Distributors in

22   Brooklyn, New York.  Do you see that?

23      A     Yes.

24      Q     Did you ever maintain a residence or an

25   office in Brooklyn, New York?

117

BARKLEY
Court Reporters

1      A      No.

2      Q      Was that no?

3      A      No.

4      Q      Okay.  Do you know why this document lists

5      your address as being in Brooklyn, New York?

6      A      No.  It just -- my name is there.  There is

7      the office of my partners.  So they can send it to the

8      office there and my name is there.  So it's nothing to

9      -- it's not like I'm saying my address is there.  I'm

10     saying refer all correspondence to there.

11     Q      Why wouldn't you want to refer to -- the

12     correspondence to Mr. Baksht or Mr. Schneerson who --

13     who were in Brooklyn?

14     A      It says name of person that fill out the

15     application, so I guess I put the name.  I'm not the

16     best trademark expert, no.

17     Q      Okay.  I understand.

18            Okay.  If you could turn to the very last

19     page of the -- the document again which is the picture

20     of the logo.

21     A      Okay.

22     Q      Do you know when Joe Cool started using this

23     exact logo with the words Florida Sunshine State and

24     Florida and the three drooping lines plus the elongated

25     three drooping lines all together?

118

BARKLEY
Court Reporters

1      A      When we started selling it?

2      Q      Yes.

3      A      You know, we were just making -- the only

4    thing we do is like change names and do different cities

5    or events like what we do with all the designs.  We just

6    continue like if -- if I make a line for Myrtle Beach,

7    the same line goes to Fort Lauderdale, St. Croix,

8    Wildwood.  We just changing the name.  The same logo,

9    it's there --

10     Q      Okay.

11     A      -- so it's just -- I don't know exactly when

12   we started selling it or what point we started selling

13   it, but I guess when we have the design probably we

14   start selling it then.  So whatever the date was that we

15   applied, before that, but 2002 like we say we started

16   with everything.  So we started Myrtle Beach, we did

17   Daytona, Fort Lauderdale, everywhere.

18     Q      Okay.  But this -- this includes the modified

19   three drooping line design right in the middle.  Do you

20   see that it?

21     A      It's include original design and modified all

22   the same trademark.

23     Q      Yes, I see that.

24            So since it includes the modified design, it

25   must have been created in 2010 or later; is that

119

BARKLEY
Court Reporters

1      correct?

2           A      Yeah.

3           Q      Okay.  I'm going to ask the reporter to mark

4      the next document as Exhibit 64.

5                  (Exhibit 64 was marked for identification.)

6      BY MR. STEWART:

7           Q      And do you recognize this document?

8           A      Yes.

9           Q      And is this a trademark application for the

10     three drooping lines design with the word Florida --

11          A      The word Daytona Beach.

12          Q      -- and the word Daytona Beach as well?

13          A      Yeah.

14          Q      Okay.

15          A      No.  This -- this is Daytona Beach.

16          Q      Yeah.  Daytona Beach, Florida?

17          A      Oh, yeah, yeah.

18          Q      Sorry.  You're right.  It's a little subtle.

19                 If you turn to the second page of the

20     document, do you know who filled out this page?

21          A      The office probably or -- because -- yeah,

22     the office of Consolidated.

23          Q      Consolidated did.  Okay.  I was wondering

24     about the spelling of your name again.

25          A      Somebody --

                              120

BARKLEY
Court Reporters

1        Q       Somebody got it wrong.

2               Okay.  Is there a reason why you personally

3    signed some of the trademark applications but didn't

4    some of the other ones?

5        A       We were partners, so it doesn't matter.

6    Sometimes they did it from there.  Sometimes I did it

7    from here.

8        Q       Okay.  And if you look at the logo again on

9    the final page, do you agree with me that it includes

10   the original three drooping lines plus the modified

11   three drooping lines?

12       A       It's include, yes.

13       Q       And -- and so, again, the -- this complete

14   design with both the original and modified three

15   drooping lines must have come out in 2010 or later; is

16   that correct?

17       A       Yes.

18       Q       Okay.  I've got one more trademark

19   registration to show you.

20       A       Okay.

21              MR. STEWART:  Ask the reporter to mark it as

22          Exhibit 65.

23              (Exhibit 65 was marked for identification.)

24   BY MR. STEWART:

25       Q       Is this the New Jersey state registration for

121

```
1    the 3DL mark with the word Wildwood?

2        A     Yes.

3        Q     Okay.  Now, your other registrations were --

4    were federal and Florida.  Why did you apply for this

5    registration in New Jersey?

6        A     Why?

7        Q     Yes.

8        A     Because we sold it -- the original design was

9    sold everywhere, you know, also New Jersey.

10       Q     What -- what do you mean, the original design

11   was sold everywhere?

12       A     The small one the side right here

13   (indicating).

14       Q     Oh, I see.  The original elongated --

15       A     The original, yeah, elongated.

16       Q     Okay.  But, again, since -- since this

17   particular logo includes both the elongated and the

18   modified 3DL, this logo you started using in 2010 or

19   later; is that correct?

20       A     It -- yeah, yeah, 2010.

21       Q     Okay.  Do you -- if I asked you this before,

22   I apologize, but for the original elongated version of

23   the three drooping lines, do you have any of the

24   original heat transfers that you used to create that?

25       A     I don't have anything left because I -- I had
```

122

1    to package and -- and damage everything that we have and

2    send back according to the settlement agreement to

3    Monster.

4         Q    Okay.  So that would have included any of the

5    elongated ones?

6         A    Oh, yeah.

7         Q    And that would have included the elongated

8    ones?

9         A    Yeah.

10        Q    Okay.  Do you have any documents recording

11   sales of -- of elongated three drooping lines

12   merchandise?

13        A    I probably have.  I have to -- I have to keep

14   digging.

15        Q    Okay.

16        A    Yeah.

17        Q    But you weren't able to find any in response

18   to our subpoena?

19        A    I -- the design itself?

20        Q    For the -- for -- any documents relating to

21   the original three drooping lines design?

22        A    I -- I -- I couldn't find, no.  I don't

23   know -- I tell you why, because I don't think we ever

24   give it a style number or something.  It was just like a

25   sleeve design.  So it's like an add-on to -- it's not

123

BARKLEY
Court Reporters

1    like a design by itself, you know, the -- that represent

2    itself.  It was an add-on back then, you know, so I

3    don't think that I -- I was looking to see what I could

4    find, but I don't think that we ever style number it.

5         Q    Okay.  Did Joe Cool ever take any steps to

6    enforce its rights in its 3DL trademarks against

7    infringers before the whole seizure thing?

8         A    Did we take any steps?

9         Q    Yeah.  Did you send any cease and desist

10   letters or file any lawsuits?

11        A    I didn't know --

12        Q    Okay.

13             THE COURT REPORTER:  I'm sorry.  I didn't

14        hear you.

15             THE WITNESS:  I didn't know nobody that

16        copyright our design.

17   BY MR. STEWART:

18        Q    And so -- so is that true for all of the

19   versions of 3DL mark going back to 1991?  For -- for all

20   the versions going back to 1991 you -- you're not aware

21   of anybody having copied those designs; is that correct?

22        A    Oh, from 1991, no, I don't know.  I'm not

23   aware.

24        Q    From 1991 to the present?

25        A    Yeah, I'm not aware.

                              124

YOSEF AMAR

BARKLEY
Court Reporters

```
 1          Q     Okay.

 2          A     I mean, I'm in the market so, you know, I

 3     have search people, I go out, I go see customers, so

 4     nobody copied us.

 5          Q     Okay.

 6          A     It wasn't the biggest seller back then, you

 7     know.

 8          Q     Sure.  I wanted to turn, again, just to the

 9     modified 3DL design in Exhibit Number 1.

10          A     Okay.

11          Q     Before Joe Cool began doing business with

12     Consolidated, who was the owner of the modified 3DL

13     logo?

14          A     Before?

15          Q     Before.

16          A     Before?

17          Q     Yes, before you began doing business with Joe

18     Cool.

19          A     With Joe Cool or --

20          Q     Excuse me.  Before you began doing business

21     with Consolidated.

22          A     It was Joe Cool's.

23          Q     Okay.  That's what I thought.  I just wanted

24     to make sure.

25          A     Yeah.
```

125

YOSEF AMAR

BARKLEY
Court Reporters

1    Q    And so did Joe Cool eventually assign the 3DL

2    trademark to Consolidated?

3    A    Yes.

4    Q    Was that in 2010?

5    A    Yes, when we started trademarks, yeah, bike

6    weekend and on.

7    Q    Okay.  Is there a written contract that

8    assigns the 3DL trademarks from Joe Cool to

9    Consolidated?

10   A    The only, you know, is the applications.  You

11   can see that we had -- I mean, not reading -- not

12   reading like agreement -- agreement, but the filing of

13   the trademark shows you that we had the connection.

14   That's all.

15   Q    Okay.  But there's no actual contract?

16   A    No, we didn't do -- it was verbal, you know.

17   We didn't -- we didn't get to agreements till the -- you

18   don't buy -- you don't buy the crib before the baby till

19   the baby is out, you know.  That's what we believe, so.

20   Q    So you just had a verbal agreement --

21   A    We had a verbal agreement.

22   Q    Okay.  Did Joe Cool assign anything else to

23   Consolidated when it assigned the 3DL trademarks?

24   A    We assigned the Bike Week and the trademarks

25   for the 3DL.  And was just the beginning and we were

YOSEF AMAR

BARKLEY
Court Reporters

1    supposed to continue with all the designs that we want

2    to market together.

3         Q    Okay.  So you -- you assigned the Bike Week

4    trademark?

5         A    Yes.

6         Q    And the 3DL trademark?

7         A    Yes.

8         Q    Did you assign any portion of -- of the Joe

9    Cool business to Consolidated?

10         A    Joe Cool, no.

11         Q    Okay.  Did you assign any customer lists to

12    Consolidated?

13         A    Well, because of our partnership, whatever we

14    sold, they had to do with my customers too and their

15    customers.  So we didn't assign it, but we worked, you

16    know, together on the same customers or whatever they

17    both in or whatever.

18         Q    Okay.  Did Joe Cool assign any of its

19    physical assets to Consolidated?

20         A    Physical assets, what that means?  Like --

21         Q    Like machinery?

22         A    No.

23         Q    Okay.  Did Joe Cool assign the goodwill from

24    its business to Consolidated?

25         A    The goodwill from the trademarks or from the

127

BARKLEY
Court Reporters

1    business?

2        Q     The goodwill from the business.

3        A     From Joe Cool premises, no.

4        Q     Okay.  And what -- what did Joe Cool receive

5    in exchange for the verbal assignments?

6        A     Like we said before, we say that they going

7    to protect and obtain trademarks applications and so

8    forth and so on with the -- their part of -- you know,

9    of partnership.

10       Q     Okay.  And after the assignment I think you

11   said that Joe Cool obtained a license back from

12   Consolidated to use the 3DL marks; is that --

13       A     Correct.

14       Q     Okay.  And is that license in writing?

15       A     It's also verbal.

16       Q     Okay.  And what are the terms of that license

17   to the best you can remember?

18       A     Like we say before, 50/50, you know, sharing

19   the weight of the business, sales, marketing and, you

20   know, they going to protect the trademark.  That's that

21   kind of --

22       Q     What -- was it an exclusive license so that

23   only Joe Cool was allowed to use the 3DL marks?

24       A     Well, we were planning on the big picture,

25   you know, to -- to license to others also.  So it's just

YOSEF AMAR

BARKLEY
Court Reporters

1    was the beginning, and on the bigger picture it's not

2    only Joe Cool going to sell it, but we can license to

3    others.

4         Q    And -- and who would do the licensing, Joe

5    Cool or Consolidated?

6         A    Together.

7         Q    Together?

8         A    I mean Consolidated because we are partner

9    and, you know, whatever Joe Cool, Consolidated does.

10        Q    Were -- were any of other licenses ever

11   granted besides the license to Joe Cool?

12        A    Any licenses as far as what?

13        Q    For the 3DL trademark.

14        A    Were granted to -- to Joe Cool?  To Joe Cool?

15        Q    No.  I understand that Consolidated granted a

16   license to Joe Cool?

17        A    Yeah.

18        Q    Were there any other licenses granted by

19   Consolidated to third parties?

20        A    Not yet, no.

21        Q    Okay.

22        A    Before the seizure, no.

23        Q    So as far as you know then, Joe Cool was the

24   only company marketing 3DL merchandise under the

25   authority of Consolidated's license; is that correct?

129

BARKLEY
Court Reporters

1        A      Yes.

2        Q      Under the license, what -- what types of

3    merchandise was Joe Cool permitted to sell using the 3DL

4    mark?

5        A      Under the license?

6        Q      Yeah.  Could -- could you sell -- obviously

7    you could sell tee-shirts?

8        A      Oh, tee-shirts, I mean, items, sweatshirts,

9    sweatpants, tank tops, anything to do with clothing.

10       Q      Hats?

11       A      Hats.

12       Q      And did Consolidated -- excuse me.  Did Joe

13   Cool actually sell some hats with the 3DL logo?

14       A      Yes.

15       Q      And some sweatpants?

16       A      Sweatpants we sold -- you know, when we sell

17   the transfers to our customers so they sell on

18   sweatpants.  They sell on everything, so.

19       Q      Oh, I see.

20       A      So it's -- it's -- when we sell the transfers

21   we don't know where it goes.  I mean, if it goes on the

22   shirt, on the sweatshirt, tank top, on the pants.  We

23   had little ones that goes on the shorts on the front.

24   We have one for the back.

25       Q      And then were the hats heat transfers or were

130

BARKLEY
Court Reporters

```
 1    they embroidery?

 2         A     Everything was heat transfers --

 3         Q     Okay.

 4         A     -- applied to the garment.

 5         Q     Okay.  Did -- did Joe Cool itself make

 6    anything other than tee-shirts in its own shop?

 7         A     We sell a lot of other stuff, you know, as

 8    well to the gift shops, whatever we have sometime, you

 9    know, kind of other knickknacks and stuff, whatever.

10         Q     For the 3DL merchandise?

11         A     3DL.

12         Q     Did -- did you make up any 3DL sweatshirts or

13    sweatpants?

14         A     Sweatshirt, yeah, yeah, of course.

15         Q     Okay.

16         A     Oh, yeah.

17         Q     So sweatshirts, sweatpants?

18         A     Sweatshirt -- sweatshirts, sweatpants could

19    be little bit.  I don't remember --

20         Q     Okay.

21         A     -- all the sales but clothing in general,

22    yes --

23         Q     Okay.

24         A     -- clothing in general.

25         Q     Hats and shorts?
```

131

YOSEF AMAR

BARKLEY
Court Reporters

1       A       Shorts, tee-shirts, sweatshirts, you know,

2   even dresses.

3       Q       Okay.  So was -- was Joe Cool basically

4   permitted to apply the 3DL mark to any product that it

5   wanted to?

6       A       As long as it's in the clothing business,

7   yeah.

8       Q       Okay.  Did Consolidated have the right to

9   object to your decisions about which types of products

10  to -- to put the 3DL logo on?

11      A       Yeah.  The general rule is, you know, that,

12  you know, keep it on a good quality and all that stuff,

13  you know, whenever, you know, presentable.

14      Q       Okay.

15      A       The whole thing, you know, quality control.

16      Q       Did anyone from Consolidated ever come to Joe

17  Cool's place of business in Florida?

18      A       I don't remember.  No, I don't think so.

19      Q       Okay.  Did Joe Cool ever ship any 3DL

20  merchandise to Consolidated for its inspection?

21      A       Yes, we send them samples.

22      Q       You did?

23      A       Yes.

24      Q       Okay.  And --

25      A       Drop samples or something, yeah.

YOSEF AMAR

1          Q      And -- and what was the purpose of sending

2     samples to Consolidated?

3          A      Just, you know, to see the product and -- and

4     also samples to -- you know, for -- so they can sell to

5     apply the trademark, quality control, just to see what

6     we doing, you know, stuff like that.

7          Q      Did -- did you ever send any of the actual

8     3DL heat transfers to Consolidated?

9          A      Yeah.

10         Q      Okay.  I'm going to show you another

11    tee-shirt.  It's previously been marked as Exhibit 14.

12    And I'd like you to tell me if you've seen this style of

13    tee-shirt before.

14         A      Florida, Florida, Florida.  This is Joe Cool

15    designs and Joe Cool's tee-shirt.  What I can tell you

16    about this shirt, you know, when we -- when we run the

17    stuff, so we take a tee-shirt, you know, we run on large

18    sheets which is 28 wide by 40 inches long and we put

19    several designs on the sheets.  So maybe on this size we

20    can put like eight or -- or six different designs --

21         Q      Okay.

22         A      -- could be different names of cities, but

23    the same line.  So when we come -- after production it

24    looks to me that this shirt was a test shirt to see the

25    final product.  You know, like you test it to make sure

YOSEF AMAR

BARKLEY
Court Reporters

1    that the quality's okay, the paper peels okay.  So you

2    just put whenever you have room and all the -- we take a

3    tee-shirt and we print the designs on the tee-shirt in

4    order to quality control the -- the -- the merchandise

5    before it goes out.

6           Because sometimes the dryer will be

7    overheating and then the whole ink will dry on the paper

8    and it's not going to come off when a customer prints

9    it.  So we do a quality control and we test -- we test

10   several designs from the same run on a shirt to make

11   sure that it bleeds okay and that's what it looks to

12   me --

13        Q    Okay.

14        A    -- one of the shirts -- I don't know how you

15   got that, but that's probably what it is.

16        Q    Okay.  Well, it looks like a Joe Cool quality

17   control test tee-shirt?

18        A    Exactly.

19        Q    Okay.  Let me ask you to look at one of the

20   logos or slogans on the back here.  Do you see the

21   phrase there, Let Out Your Beast?

22        A    Yeah.

23        Q    Is that a phrase that Joe Cool has used on

24   tee-shirts before?

25        A    We use a lot of slogans, yeah, a lot of

134

BARKLEY
Court Reporters

1    slogan.  I showed you this morning a bunch of slogans.

2         Q    Oh, absolutely.  I understand you have quite

3    a few.

4         A    Yeah.

5         Q    Do -- do you know whose idea it was to use

6    the slogan Let Out Your Beast on this shirt?

7         A    No.

8         Q    Are you familiar with the Monster Energy

9    slogan Unleash the Beast?

10        A    No.

11        Q    Okay.

12             MR. MORTNER:  Is that what it is, Unleash the

13        Beast?

14             MR. STEWART:  Unleash the Beast is one of

15        Monster Energy's slogans, yeah.

16   BY MR. STEWART:

17        Q    Okay.  That's -- I think that's it for this

18   tee-shirt.  Nice stack.

19             Do you know about how many of the 3DL heat

20   transfers were made by Joe Cool during its relationship

21   with Consolidated?

22        A    Right off the bat I cannot tell you but --

23        Q    I mean was it tens of thousands?

24        A    Probably -- no.  More.

25        Q    More than tens of thousands?

135

YOSEF AMAR

BARKLEY
Court Reporters

```
 1        A      Probably -- just what we return back, you
 2   know, in the last settlement agreement it was about 70
 3   or 80,000, something like that.  I'm not sure exactly
 4   the number, but prior to that two -- 200 maybe could be,
 5   you know.  I'm not -- I'm not going to say exactly
 6   number but --
 7        Q      Sure.
 8        A      -- it's in the hundreds.
 9        Q      So -- but there was approximately 70 or
10   80,000 that were returned or shredded --
11        A      Yes.
12        Q      -- because of the settlement?
13        A      Yes.
14        Q      And before that you think there may have been
15   as many as 200,000?
16        A      No.  I mean, all together I'm saying.
17        Q      All together there may have been --
18        A      Probably something two or 250.  I will --
19        Q      Okay.
20        A      I wouldn't pinpoint the number because I
21   don't -- I don't have -- I don't know exactly, but
22   approximately.
23        Q      And however many it was, all of them, except
24   for the 80,000, were -- were sold by Joe Cool in the
25   ordinary course of business?
```

136

BARKLEY
Court Reporters

```
 1              A      Oh, yeah.

 2              Q      Okay.  And how much did each of the 3DL heat

 3      transfers sell for?

 4              A      How much do -- do -- we were selling for?

 5              Q      Yeah.

 6              A      We had -- we started with I think 60, 65

 7      something like that cents.  Shirts were selling for six

 8      I think.  Sweatshirt for over -- over $10.  And then we

 9      sold the transfer in the end a dollar a piece.

10              Q      Okay.  So the transfers started at 65 cents

11      but eventually progressed to about a dollar?

12              A      Yeah.

13              Q      And the shirts you said were about $6 each?

14              A      Well, I will say between four -- depend what

15      shirt, four to six, you know.  Sweatshirt's more.

16              Q      Okay.  Sweatshirts you said around $10,

17      right?

18              A      Ten, ten and a half.

19              Q      Okay.  And is -- are those prices about the

20      same as for your other heat transfers and tee-shirts?

21              A      More or less, you know.  Between 50 cents,

22      dollar 50, you know, depend, you know.

23              Q      Okay.

24              A      Depend how big and -- it goes by size and

25      colors, how many colors on the design, because every
```

YOSEF AMAR

BARKLEY
*Court Reporters*

1    color we have to run, you know, separately.  We do the

2    black let's say.  Then yellow.  Then green.  So depend

3    how many times we run it through.

4         Q    So it sounds like you sold over a hundred

5    thousand of the heat transfers roughly for --

6         A    Like I said before, I am not sure exactly.

7         Q    I understand but --

8         A    I give you, you know, invoices --

9         Q    Yes.

10        A    -- part of the stuff, so you can look at

11   them.

12        Q    So you think you gave me invoices for all of

13   the sales of the 3DLs?

14        A    I wouldn't -- I wouldn't say all the sales,

15   because it could be more than that, because we sell also

16   as assortment and the -- it's done by style number and

17   -- and sell we -- we have a wholesale market that we go

18   to every Monday --

19        Q    Okay.

20        A    -- here in Florida.  We sell it to people and

21   it could be assorted sales, you know.  So you can't

22   really pinpoint, you know, that's all of it, but I will

23   say most of it.

24        Q    Okay.  And all -- all of those revenues,

25   whether it was a hundred thousand sales or however much,

YOSEF AMAR

1       those revenues were all put back into the business?

2            A     Yes.

3            Q     So there was no time when you divided up the

4       profits 50/50 with Consolidated?

5            A     Like I said, we -- we just -- you know, we're

6       building it up.

7            Q     Okay.

8            A     We were building it up so we didn't have

9       extra to take yet.

10           Q     Okay.  Let me -- let's see.  Let me show you

11      a document that I'll ask the reporter to mark as the

12      next exhibit, 66.

13                 (Exhibit 66 was marked for identification.)

14                 MR. STEWART:  And for the record, this is a

15           stack of documents that was provided yesterday by

16           Mr. Amar.

17      BY MR. STEWART:

18           Q     Can -- can you tell me what this stack of

19      documents is?

20           A     Says invoices for 3DL.

21           Q     For 3DL.  And how can you tell they're for

22      3DL?

23           A     I cannot tell you.  That's my office.  I

24      mean, they know what numbers they use and stuff but the

25      A and --

                              139

YOSEF AMAR

1       Q    So your -- you -- you asked -- excuse me.

2   I'm losing my voice.

3            You asked your office to gather the --

4       A    The sales.

5       Q    -- 3DL invoices?

6       A    Yeah.

7       Q    Okay.  And these are the ones they gathered

8   for the year --

9       A    That's what they gathered.

10      Q    -- for the year 2010; is that correct?

11      A    Yeah, 2010.

12      Q    Okay.  Does it also include materials that

13  are not 3DL merchandise all mixed together?

14      A    Yeah.

15      Q    Okay.

16      A    Because some people buy that and buy another,

17  you know, stock designs.

18      Q    So I'm looking at just the first invoice.

19  There's four different item descriptions, adult generic

20  scratch, pocket scratch, junior and butt print.

21           So would it be fair to say that the adult

22  generic scratch and the pocket scratch are the 3DL mark?

23      A    The -- the -- describe them, you know, when

24  we do the description or names, we use -- because this

25  is different designs --

140

YOSEF AMAR

```
 1          Q      Yes.

 2          A      -- so different scripts for each design, so

 3     not all of them got the same because you have one with

 4     skull, one with Florida, one with Wildwood, one with

 5     Ocean City.  Every -- every one has to be described as

 6     -- as -- you know, for the -- whatever -- whoever in the

 7     office just give it, you know, description.  So that's

 8     what it is.

 9          Q      Okay.  So do you know whether -- just on this

10     first page whether any of those four items are -- are

11     the 3DL?

12          A      Yeah.

13          Q      Which ones are the 3DL?

14          A      All those four.

15          Q      Even butt print is a 3DL?

16          A      Uh-huh.

17          Q      How can you tell?

18          A      Because we had it also as a butt print, you

19     know, on the shorts it goes on the back.  Like on a

20     sweatpants on the back.

21               MR. MORTNER:  You don't have that.

22               MR. STEWART:  No, I don't have that.  I was

23          assuming it was a picture of somebody's butt.

24               THE WITNESS:  No.  That's the style of the --

25          of the design.
```

BARKLEY
Court Reporters

1   BY MR. STEWART:

2       Q    Okay.  So is it fair to say that Exhibit 66

3   is your office's best efforts to collect the 3DL

4   invoices from 2010?

5       A    That's -- yeah.

6            MR. STEWART:  Okay.  And I'll ask the

7       reporter to mark the next document as Exhibit 67.

8            (Exhibit 67 was marked for identification.)

9   BY MR. STEWART:

10      Q    And is Exhibit 67 your office's best effort

11  to collect all of the 3DL invoices for the year 2011?

12      A    Yeah.

13      Q    And, again, there may be some other items

14  mixed in on each particular invoice?

15      A    Yeah, could be.

16      Q    Okay.  What was it in Exhibit 66 that told

17  you all four of these items were 3DL?

18      A    ND, ND, ND.  They're all ND.

19      Q    ND?

20      A    Yeah, name drop.

21      Q    Oh, name drop stands for --

22      A    Name drop.  City -- in different cities, ND

23  name drop.  You know, we do Wildwood.  We do Ocean City,

24  Daytona, so forth and so on.

25      Q    Okay.  So anytime you see ND that indicates

142

BARKLEY
Court Reporters

1    it's the three drooping lines?

2         A    In this style, yeah.  In this style number,

3    yeah.

4         Q    Okay.

5         A    You have a lot of style, you know.

6         Q    Okay.  Did anyone from Consolidated ever

7    review the financial records that you were keeping for

8    the 3DL merchandise?

9         A    Just, you know, we talked over the phone

10   how's it going, what's -- what's -- where we standing.

11   I say we progressing.  We're selling.  You know, just

12   normal business conversations.

13        Q    Okay.  Were the 3DL shirts and heat transfers

14   good sellers in your business?

15        A    They were -- in the last couple years, I will

16   say fairly okay, fairly okay.

17        Q    They were good in 2010 and 2011?

18        A    Yeah.

19        Q    Okay.  Were they among your top sellers?

20        A    Among the top sellers.

21        Q    Okay.  And how about the earlier versions of

22   the 3DL logo in 2009 and before, were they good sellers?

23        A    Not -- not as good as this.

24        Q    Okay.  Do you know why that is?

25        A    I have a lot of designs doesn't sell good.

143

BARKLEY
Court Reporters

```
1          Q     Okay.
2          A     I told you, we're like the fisherman.  We --
3     we throw the hook and we see what we get.  You make a
4     sample.  You do the test run and whatever hits, you
5     print.  You know, we don't -- we don't fall in love with
6     our merchandise.
7          Q     Has Joe Cool done any advertising for any of
8     the 3DL merchandise?
9          A     Yes.
10         Q     What kinds of advertising have you done?
11         A     Brochures, like fliers, salespeople out
12    there, e-mails, website.  Go to shows, we show the --
13    you know, show the product.  Whatever needs to be done,
14    you know, to advertise.
15         Q     Okay.
16         A     Website we have.
17         Q     Has Joe Cool ever sponsored any athletes
18    using the 3DL trademark?
19         A     We didn't have the chance yet.
20         Q     Okay.  So the answer so far is no?
21         A     No, not with the design we don't.
22         Q     Okay.  Did Joe Cool ever sponsor any sporting
23    events using the 3DL logo?
24         A     We do a lot of events, but like to support it
25    like, I mean, we -- we -- we had our locations in Bike
```

144

YOSEF AMAR

BARKLEY
Court Reporters

1    Weeks and bike events and shows and stuff like that and,

2    you know.

3         Q     Did -- did you pay Bike Week for them to

4    display the 3DL logo?

5         A     Well, Bike Week it's -- it's not like it's in

6    a certain place under one roof.  It's all over.  So --

7         Q     Okay.

8         A     -- you are at the locations and you display

9    your stuff and you sell it.

10        Q     Okay.  But have -- have you ever been the

11   paid sponsor of a trade show or other event where the

12   3DL logo was displayed?

13        A     I wouldn't have a chance.  I mean, was so

14   quick before we got punched down.

15        Q     Has Joe Cool ever sponsored any music

16   festivals using the 3DL logo?

17        A     No.

18        Q     Has Joe Cool ever put the 3DL logo on any

19   vehicles?

20        A     No.

21        Q     Has Joe Cool ever arranged to have people

22   appear on TV shows wearing 3DL clothing?

23        A     No.

24        Q     Okay.  Has any of the 3DL merchandise been

25   sold in Mackinaw, Michigan?

145

YOSEF AMAR

1      A      Mackinaw, Michigan?  I have to look at the

2   invoices.

3      Q      Fair enough.

4      A      We have a lot of locations that we sold to,

5   so I don't remember all of them.

6      Q      Have you ever been present at the Joe Cool

7   store when customers were purchasing 3DL merchandise?

8      A      Well, I was, yeah --

9      Q      Okay.

10     A      -- passing by I see what's going on.

11     Q      Okay.  Do you remember how customers would

12  refer to the 3DL merchandise, what -- what they would

13  call it?

14     A      3DL.

15     Q      They did call it 3DL?

16     A      Yes.

17     Q      Do you remember ever hearing any of them

18  refer to it as -- as Monster shirts?

19     A      No.

20     Q      Have you ever had any customers ask if

21  there's a connection between your 3DL products and

22  Monster Energy?

23     A      No.

24     Q      I'd like to talk to you now about that day in

25  March of 2011 when the seizure occurred.  Obviously from

146

YOSEF AMAR

1   what you've told me, you remember that event pretty

2   well.

3        A     I remember it because I wasn't in the

4   premises when it happened.

5        Q     Okay.  I was going to ask you that.  You were

6   not on the premises?

7        A     Uh-uh.

8        Q     Do you know who was on the premises that day

9   for Joe Cool?

10       A     The employees there.

11       Q     Do -- do you remember which ones?

12       A     Carrie was there, the printers, Eric,

13   Derrick.  My brother Sam was there, Nisim.

14       Q     Nisim Amir?

15       A     Nisim.

16       Q     And -- I'm sorry.  Go ahead.

17       A     The employees, you know.

18       Q     Okay.  Who -- who is Nisim Amir?

19       A     My brother.

20       Q     Oh, he's your brother?

21       A     Yes.

22       Q     Oh, okay.  Spells his last name slightly

23   different than you.

24       A     Little bit.  He change it a little bit.

25       Q     Okay.  And he's an employee of the store?

147

YOSEF AMAR

BARKLEY
Court Reporters

1        A      No.

2        Q      He just happened to be there because he's

3   your brother?

4        A      No.  He have -- the front office is -- he

5   have sign company.

6        Q      Okay.

7        A      So he's, you know, renting the front from us.

8        Q      Do you remember what financial records were

9   taken by the marshals during the seizure?

10       A      All the cabinets, the invoices --

11       Q      Do you know for what years?

12       A      -- computer.  Huh?

13       Q      Do you know for what years the financial

14   records were taken?

15       A      All -- till I think -- I think we had maybe

16   till 2005 that -- it was mixed -- I don't remember

17   exactly, you know, the years but it was, you know, files

18   from -- customer files, you know, hard copies from

19   invoices and stuff like that.

20       Q      Okay.  So I guess since you weren't there,

21   you wouldn't know whether any customers were present at

22   the time; is that correct?

23       A      One of the customer told me that he was there

24   when it happened.

25       Q      Do you remember -- do you remember what

YOSEF AMAR

BARKLEY
Court Reporters

```
 1    customer that was?

 2         A     I think it was -- his name is Slome

 3    (phonetic) from the beach side, Daytona.

 4         Q     Okay.  And did he continue to do business

 5    with Joe Cool after the seizure?

 6         A     Yeah.  I'm sure he did little bit, yeah.

 7         Q     Okay.  Do you think your business with him

 8    declined after the seizure?

 9         A     I think in general, you know, not particular

10    person, but, yeah, I got big reduction of salespeople,

11    you know.  Doesn't take us serious anymore like before.

12    It was a big damage for the company.

13         Q     Did you ever tell your customers that

14    Consolidated or that Mr. David Baksht were involved in

15    the sale of the 3DL merchandise?

16         A     I always refer to them as my -- the partners

17    in New York.

18         Q     Okay.

19         A     That's all.  If they heard anything, you

20    know, somebody asked, the partners in New York, that's

21    -- that's what they will hear.

22         Q     Okay.  Did you ever discuss with customers

23    that the merchandise that was seized related

24    specifically to the partners in New York?

25         A     Yeah.  They know that we had trademark and we
```

149

BARKLEY
Court Reporters

1    gave copies of the trademark.  So they know that

2    Consolidated, you know, is part of it.  So they knew

3    there is partnership going on in real, you know -- no

4    details, because I don't tell them details.  It's not

5    their business but if they ask for a trademark, yeah,

6    the holding company's in New York.

7        Q    Okay.  Why -- why would customers be asking

8    about the trademarks?

9        A    We offer, you know, as a trademark --

10   trademark item.  That's all.  So they -- you know,

11   customer curious to know everything, so --

12       Q    Okay.

13       A    -- they buying it.

14       Q    Let me turn back to Exhibit 4, which is one

15   of the tee-shirts.  If you look at the tag it says Joe

16   Cool official licensed product.  Do you see that?

17       A    Joe Cool 3DL --

18       Q    Yes.

19       A    -- designs official licensed product, yeah.

20       Q    Yeah.

21       A    I see it.

22       Q    Is that the type of thing that would prompt

23   your customers to ask about the trademarks?

24       A    Could be.  No.  We had to give -- you know,

25   we have to give them the tags to tag on the shirt when

YOSEF AMAR

BARKLEY
Court Reporters

1   we sell the transfers, so they will ask why.  It's

2   trademark item.  We want you to use it.  When you sell

3   it, when you print it, put it back on it.  That's part

4   of the protection that we need to give the trademark.

5       Q    And then in that context would you sometimes

6   mention that you had a partner in New York?

7       A    Not always.  I mean, if somebody really ask

8   and --

9       Q    I'm just trying to understand how it would

10  come up that you had a partner in New York, how that

11  came up in business?

12      A    If somebody will ask I -- I referred, you

13  know, the trademark is not Joe Cool's, it's

14  Consolidated.  So they say who is Consolidated.  So I

15  refer --

16      Q    Okay.

17      A    -- that's all.

18          MR. STEWART:  All right.  Let's go ahead and

19      change the disk.

20          THE VIDEOGRAPHER:  Okay.  This is the end of

21      disk number two in the deposition of Yosef Amar.

22      The time is approximately 3:44 p.m.  We are off the

23      record.

24          (A recess was taken.)

25          THE VIDEOGRAPHER:  This is the beginning of

151

BARKLEY
Court Reporters

```
 1            disk number three in the deposition of Yosef Amar.
 2            The time is approximately 3:48 p.m.  We are on the
 3            record.
 4     BY MR. STEWART:
 5            Q     Okay.  Mr. Amar, I assume you're aware that
 6     the court instructed Monster Energy to return the 3DL
 7     merchandise shortly after the seizure, correct?
 8            A     Yes.
 9            Q     Did -- did Joe Cool take any steps to notify
10     its customers that the court determined that the seizure
11     was a mistake?
12            A     I think, you know, we mentioned that we got
13     our stuff back, you know --
14            Q     Okay.
15            A     -- that was the, you know -- yeah, we
16     mentioned, but not like advertise to everybody.  We
17     just -- you know, I was in shock by then, so I just
18     wanted to keep it in -- I mean, we got it back, but low
19     key, no big deal, you know, don't -- don't stir the -- I
20     didn't know what I'm going to do still, you know.  I got
21     it back and I -- in one hand, you know, I was
22     devastated.  So we just, you know -- yeah, we mention.
23            Q     Okay.
24            A     But not, you know, advertising to everybody,
25     but just --
```

YOSEF AMAR

BARKLEY
Court Reporters

```
1        Q     Well, the customers you mentioned it to, did

2   they continue to do business with you?

3        A     They -- they might, yeah, but not -- I don't

4   know in what level, you know, because my business drop

5   down a lot.  So my reorder designs that they have

6   already in stock and they wanted to reorder, but I don't

7   know what's going to happen next year --

8        Q     Okay.

9        A     -- you know, continue to trust me or my

10  merchandise, you know.

11       Q     Well, obviously the -- the 3DL merchandise

12  dropped off to -- to zero because you stopped selling

13  it?

14       A     Yeah.

15       Q     Did -- how about your other merchandise, how

16  did that do?

17       A     I believe we are like probably -- I will say

18  not -- 35 to 40 percent off.

19       Q     Okay.  And would your -- do you have records

20  that would show that you've lost about 35 to 40 percent

21  of your business?

22       A     The numbers.

23       Q     Okay.

24       A     The numbers, yeah.

25       Q     Do you know why those customers have slowed
```

153

BARKLEY
Court Reporters

1    down or stopped doing business with you?

2         A     Look, when you come and you tell them,

3    listen, I have trademark design, I have this and

4    suddenly you're in the media as a counterfeiter, as --

5    as a guy that got busted, company that got busted, it

6    affects, you know, the -- the trust, the relationship.

7    That's what I feel.  That's what I see, I mean --

8         Q     Okay.

9         A     -- it's not like the same like it was.

10        Q     I'm going to show you one more set of

11   documents that you gave to me.  I haven't had a chance

12   to copy them yet, but I just -- I want to know what

13   these documents are.

14        A     This is just sales of like the -- all the

15   stuff that resembles, you know -- not all the stuff,

16   some of the stuff, like those purple Jimmy with the --

17   you know, from '93.  All the stuff that have three lines

18   and was sold through the years and the bird -- I mean,

19   the mark there, what you see here, all the -- the rest

20   of designs and, so forth so for, you know, sales that

21   could have -- so the -- the same kind of line art that

22   we sold before.

23        Q     Okay.  And is there any way to determine

24   looking through these invoices which ones relate --

25        A     Some of them you can find in the catalog.

154

YOSEF AMAR

BARKLEY
Court Reporters

1    Some of them are not the catalog number.  So not

2    everything we put in the catalog.  So if you look at the

3    catalog and you can match some numbers, yeah.

4          Q    How is this stack of papers compiled?  How

5    did somebody know what papers to pull?

6          A    Oh.  I just --

7          Q    Take the runner band off if it's easier.

8          A    Yeah.  They marked whatever is --

9          Q    Oh, I see.

10         A    -- and I put the dot just for you to see

11   style number.  I went through looking for, you know,

12   stuff, so.

13         Q    I understand.

14         A    Okay.  Wherever you see a dot, you can match

15   it to something that was similar stuff that we did --

16         Q    Okay.

17         A    -- before.  But if you can return them to me,

18   please, I didn't -- I didn't have a chance to take a

19   copy.

20         Q    Yes.

21         A    I appreciate it.

22         Q    Okay.  Yeah, we will.

23         A    I leave it that.

24              MR. STEWART:  That's -- those are all the

25              questions that I have.


                              155

YOSEF AMAR                                    BARKLEY
                                              Court Reporters

1          MR. MORTNER:  Okay.  Why don't we take a

2      short break and I'll just ask a few questions.

3          MR. STEWART:  Okay.

4          THE VIDEOGRAPHER:  Going off the record.  The

5      time is approximately 3:55 p.m.

6          (A recess was taken.)

7          THE VIDEOGRAPHER:  Going back on the record.

8      The time is approximately 4:08 p.m.

9                    CROSS EXAMINATION

10  BY MR. MORTNER:

11      Q    Okay.  Mr. Amar, I'm just going to ask you a

12  few questions.  I'd like to go back to this garment

13  which was previously marked as Exhibit 14.  I think you

14  described this as a -- as a quality control test shirt?

15      A    Yeah, that's what -- what it is.

16      Q    Okay.  So you have over here a number of 3DL

17  designs.  Now, this one is --- like this, it looks --

18  looks about ten inches long.  This one is shorter.

19          Are these the elongated versus the -- the

20  originally elongated versus the subsequent modified

21  design?  Can you identify for me?

22      A    Yeah, this is elongated one.

23      Q    You're indicating the -- looks like to be the

24  left shoulder.  And this one here is which?

25      A    It's also elongated, but it's a little bit

                            156

YOSEF AMAR                                    BARKLEY
                                          Court Reporters

1    wider.  According to the design, you know, they can play

2    with the images.  So those are the elongated one --

3         Q    How about this --

4         A    -- first one.

5         Q    Okay.  That one -- what's the second one

6    which is on the -- would be on the right little bit

7    below the shoulder?  That's an all white mark.

8         A    What?

9         Q    This white one here --

10        A    Yeah.

11        Q    -- which one is that?

12        A    That's long -- it's a version of elongated

13   but it's --

14        Q    Okay.  This one --

15        A    -- that one was more --

16        Q    -- on the lower left hip?

17        A    This is the -- the newer -- the -- the

18   modified one.

19        Q    Okay.  And on the -- okay.  That's going to

20   be the right back shoulder, there's a -- there's a mark

21   there.

22        A    On the back shoulder, that's the -- the

23   initial one, the first one, '93.

24        Q    Okay.  Is this one -- also the one on the

25   left a '93?

YOSEF AMAR

BARKLEY
Court Reporters

```
 1        A      Yeah.

 2        Q      Okay.  Just to be clear.  Okay.  Thank you.

 3               You mentioned -- you used a number of

 4     different words, devastated, shattered, regarding your

 5     emotional state after the seizure.  Let me just ask you

 6     some questions about that.

 7               Those are -- those are descriptive words, but

 8     let me ask you:  Did you lose sleep as a result after

 9     the seizure, as you described your psychological state?

10        A      Emotionally I was devastated.  I couldn't

11     sleep.  I couldn't go to the bathroom correctly.

12        Q      Did you have crying fits?

13        A      I wasn't focused.  I wasn't focused.  I was

14     all shook up.

15        Q      Did you have crying fits?

16        A      I had crying, yeah.

17        Q      Did you -- were you afraid when you went

18     outside?

19        A      I was afraid when I -- when I was in Joe

20     Cool, anybody going to come through the door now,

21     something like that.

22        Q      Did you experience --

23        A      Anybody came in, delivery thought somebody's

24     coming to get you.

25        Q      What about when you were outside on the
```

YOSEF AMAR

BARKLEY
Court Reporters

1    street, did you have fears as well?

2         A    Not as much as Joe Cool.

3         Q    Did you make a visit to -- to New York to see

4    your partners after the seizure?

5         A    Yes.

6         Q    Were you crying there?

7         A    I was crying for them to -- let's finish and

8    settle it.

9         Q    Okay.  Did you seek any help to help resolve

10   the emotional stress you were under?

11        A    No.

12        Q    Did you talk to a rabbi or a psychologist?

13        A    I talked to the rabbi, yes.

14        Q    The rabbi.

15             Are you still suffering any of those

16   emotional scars?

17        A    After the settlement not as much, you know,

18   but you still look who's coming to Joe Cool, who's this

19   guy.

20             MR. MORTNER:  Okay.  I don't have anymore

21        questions.

22             MR. STEWART:  Okay.  I don't have anymore

23        questions either.

24             THE VIDEOGRAPHER:  Okay.  This concludes the

25        video recorded deposition of Yosef Amar.

YOSEF AMAR

BARKLEY
Court Reporters

1           The time is approximately 4:13 p.m.  We are

2      off the record.

3              (The deposition concluded at 4:13 p.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

YOSEF AMAR

BARKLEY
Court Reporters

1                    CERTIFICATE OF REPORTER

2   STATE OF FLORIDA)
    COUNTY OF ORANGE)
3
         I, Carmen J. Thomas, Registered Professional
4   Reporter, and Notary Public, do hereby certify that I
    was authorized to and did stenographically report the
5   foregoing deposition of YOSEF AMAR; that a review of the
    transcript was requested; and that the foregoing
6   transcript, pages 1 through 161 is a true record of my
    stenographic notes.
7
         I FURTHER CERTIFY that I am not a relative,
8   employee, or attorney, or counsel of any of the parties'
    attorneys or counsel connected with the action, nor am I
9   financially interested in the action.

10       DATED this 5th day of September, 2012 at Orlando,
    Orange County, Florida.
11

12

13

14                    Carmen J. Thomas
                      Registered Professional Reporter
15

16

17

18

19

20

21

22

23

24

25

                              161

BARKLEY
Court Reporters

CERTIFICATE OF OATH

STATE OF FLORIDA

COUNTY OF ORANGE

     I, Carmen J. Thomas, Registered Professional
Reporter, Notary Public, State of Florida, certify that
witness, YOSEF AMAR, personally appeared before me on
the 29th day of August, 2012 and was duly sworn.

     WITNESS my hand and official seal this 5th day of
September, 2012.

                         Carmen J. Thomas,
                         Registered Professional Reporter
                         Notary Public, State of Florida
                         MY COMMISSION #DD 924980
                         EXPIRES November 16, 2013

162

YOSEF AMAR

BARKLEY
Court Reporters

**$**

**$10 (2)**
137:8,16
**$10,000 (1)**
104:1
**$50 (1)**
32:10
**$6 (1)**
137:13

**A**

**A6 (10)**
29:8;83:24;84:1,8,
21;89:1;92:2,7;
93:16,20
**ability (3)**
9:7;10:23;12:24
**able (8)**
10:16,19;24:4;
92:3;94:24;112:24;
116:7;123:17
**Abraham (1)**
28:11
**absolutely (1)**
135:2
**according (3)**
102:1;123:2;157:1
**account (1)**
107:10
**accounting-wise (1)**
107:25
**accurate (6)**
12:23;96:21;97:8,
11,12;100:6
**across (1)**
78:21
**actual (6)**
53:4;54:12;105:2,
13;126:15;133:7
**actually (13)**
16:12;20:10;
52:21,25;59:8;73:18,
20;99:11;100:17;
105:5;112:24;117:2;
130:13
**added (4)**
26:21;28:14;
97:19;100:9
**addition (1)**
14:11
**additional (2)**
93:24;104:4
**add-on (2)**
123:25;124:2
**address (6)**
21:11;28:6,9;
110:6;118:5,9
**ads (1)**
104:23
**adult (2)**

140:19,21
**advertise (2)**
144:14;152:16
**advertising (9)**
19:11;104:10,12,
15,19,22;144:7,10;
152:24
**advised (1)**
26:25
**affects (1)**
154:6
**affiliated (3)**
17:18;22:14;25:3
**affirm (2)**
7:13,18
**afraid (2)**
158:17,19
**again (69)**
41:5;42:15,19;
43:1,6,6,7,7,7,24;
45:6,6,15;46:6,8;
47:1,1,11;48:17,22,
24;52:3,6,6,20;
55:10,14,15,21;56:3,
18,21;57:1,2,19,21,
23,24,25,25;58:1,16,
17;59:4,4,23;60:1,2,
19;61:14,22;62:1;
63:1;89:4;90:11;
92:10;93:1;96:7;
112:15;115:4;116:4,
6;118:19;120:24;
121:8,13;122:16;
125:8;142:13
**against (2)**
7:2;124:6
**ago (8)**
8:17;11:15;16:19;
18:14;46:20;87:10;
97:23,23
**agree (4)**
35:23;84:7;
105:15;121:9
**agreed (3)**
37:23;64:24;
102:14
**agreement (22)**
33:16;37:11,21;
63:16,19,22;64:6,9,
20,21;68:9;101:7;
106:6,15,16,18;
123:2;126:12,12,20,
21;136:2
**agreements (2)**
106:14;126:17
**ahead (8)**
10:3;11:8;48:23;
60:6;74:5;112:23;
147:16;151:18
**al (1)**
6:3
**aliens (2)**
58:24,25

**alligator (3)**
63:24;64:4;83:7
**allow (1)**
59:11
**allowed (4)**
7:9,11;37:24;
128:23
**almost (4)**
30:11;56:8;79:7,7
**always (6)**
75:7;88:14;91:17,
19;149:16;151:7
**Amar (16)**
6:7;7:24;8:8,11;
74:8;94:10;96:7;
110:22,23;117:21;
139:16;151:21;
152:1,5;156:11;
159:25
**A-m-a-r (1)**
8:11
**amendment (1)**
111:11
**America (2)**
46:11,12
**Amir (2)**
147:14,18
**among (1)**
143:19,20
**Angeles (1)**
6:12
**anniversary (1)**
113:15
**anymore (5)**
13:19;33:17;
149:11;159:20,22
**apologize (1)**
122:22
**appear (2)**
79:13;145:22
**appears (1)**
84:19
**application (4)**
103:20;109:15;
118:15;120:9
**applications (4)**
115:20;121:3;
126:10;128:7
**applied (2)**
119:15;131:4
**apply (6)**
14:23;15:22;
109:4;122:4;132:4;
133:5
**appreciate (1)**
155:21
**approaching (1)**
104:10
**appropriate (1)**
64:4
**approximately (16)**
6:5;18:13;74:9,13;
92:19;95:9,12;96:2,

5;136:9,22;151:22;
152:2;156:5,8;160:1
**archive (1)**
50:13
**area (3)**
65:15;107:8;108:1
**argued (1)**
63:23
**around (3)**
29:9;31:6;137:16
**arrange (1)**
104:3
**arranged (1)**
145:21
**arrangement (1)**
98:18
**arrow (2)**
31:9,12
**art (13)**
31:22;41:18;43:5;
48:10;50:14,20;
52:4;57:17;62:6;
72:19;75:25;79:12;
154:21
**Artist (14)**
48:10;52:10;
57:18;65:21;69:8,16,
21;75:23;76:7,17,21;
77:1;91:3;4;115:9
**arts (1)**
50:19
**artwork (8)**
14:23;30:15;
31:16;34:1;36:16;
49:1,3;51:16
**artworks (1)**
50:21
**assets (2)**
127:19,20
**assign (8)**
88:13;126:1,22;
127:8,11,15,18,23
**assigned (4)**
68:19;126:23,24;
127:3
**assignment (1)**
128:10
**assignments (1)**
128:5
**assigns (1)**
126:8
**Associated (3)**
27:21,22;28:12
**assorted (1)**
138:21
**assortment (1)**
138:16
**assume (1)**
152:5
**assuming (2)**
80:4;141:23
**athletes (1)**
144:17

**attached (1)**
29:5
**attention (1)**
90:16
**attorney (2)**
13:13;87:15
**attorneys (1)**
101:11
**August (1)**
6:4
**authority (1)**
129:25
**available (5)**
75:14;77:3;79:3;
85:10,24
**Avrham (1)**
8:8
**aware (5)**
82:7;124:20,23,
25;152:5
**away (2)**
86:9;87:23

**B**

**baby (2)**
126:18,19
**back (56)**
13:16;22:7;24:10,
12;28:4;32:2;35:13;
46:24;59:13;60:8;
62:12;63:2,14;
67:12;68:21;74:12,
15,16;76:12;78:11;
82:18;90:7,15;
93:17;95:11,14,15,
16;96:4;102:4,13;
104:7;105:23,25;
106:1;123:2;124:2,
19,20;125:6;128:11;
130:24;134:20;
136:1;139:1;141:19,
20;150:14;151:3;
152:13,18,21;156:7,
12;157:20,22
**background (3)**
15:10;17:7;72:19
**backward (1)**
53:1
**backwards (1)**
53:4
**Bahamas (1)**
49:24
**Baksht (19)**
6:21;13:11;16:15;
17:3,18;18:16,20,22,
23;22:14;25:3;
27:25;28:2,2,3,12;
72:1;118:12;149:14
**band (1)**
155:7
**bar (1)**
58:25

**Barkley (1)**
6:11
**based (4)**
66:8,9;67:2;
112:12
**basic (4)**
8:25;42:25;59:23;
66:3
**basically (3)**
68:19;97:7;132:3
**basis (1)**
24:22
**bat (1)**
135:22
**bathroom (1)**
158:11
**Beach (39)**
6:8;16:5,8;23:14,
23;24:1,5;26:11;
40:3;45:7;46:2,7;
49:23,23;60:14;
65:19;69:18;77:16,
20;78:3,7,10,17,19,
21,25;85:13;88:22;
91:5;93:21;97:24;
113:16;119:6,16;
120:11,12,15,16;
149:3
**bear (4)**
56:1;96:18;
101:20;102:10
**Beast (5)**
134:21;135:6,9,13,
14
**become (2)**
102:18;108:16
**began (4)**
98:10;125:11,17,
20
**begin (1)**
9:11
**beginning (13)**
32:18;50:11;69:1;
74:20;80:20;97:20;
98:19;101:15;102:2;
112:3;126:25;129:1;
151:25
**begins (2)**
77:13;82:17
**behalf (2)**
6:17,20
**belief (1)**
17:10
**below (3)**
66:11;116:17;
157:7
**besides (1)**
129:11
**best (8)**
9:6;10:20;12:24;
75:10;118:16;
128:17;142:3,10
**better (6)**

**big (11)**
45:4;46:6;55:24;
79:21,24;80:2;
128:24;137:24;
149:10,12;152:19
**bigger (4)**
107:12;108:1,3;
129:1
**biggest (1)**
125:6
**bike (46)**
15:7;23:11,12,14,
15,23;24:1,5,18,22;
25:25;26:3,10,11,23;
27:6,11,12,13;55:23;
78:19;80:1,2;85:14;
86:22;97:18,21,24;
98:10,14;99:11;
106:25;107:1,16;
108:5,16,21;113:16;
114:20;126:5,24;
127:3;144:25;145:1,
3,5
**biker (1)**
32:14
**bikers (2)**
36:11;114:19
**Bill (1)**
6:7
**binder (1)**
45:4
**bird (2)**
92:21;154:18
**birds (2)**
66:11,13
**bit (10)**
36:20;89:9;
112:23,24;131:19;
147:24,24;149:6;
156:25;157:6
**black (1)**
138:2
**bleeds (1)**
134:11
**Bob (8)**
13:16,23,25;71:25,
25;73:20;90:22;
103:10
**bony (1)**
60:3
**book (1)**
44:21
**books (1)**
102:1
**border (1)**
16:9
**boring (1)**
31:20
**born (3)**
32:24,25;58:10
**both (12)**

6:11;9:10;19:18;
23:19;92:12,14;
100:25;109:6,7;
121:14;122:17;
127:17
**bother (1)**
102:12
**bottom (11)**
27:15;31:6;45:23;
71:14,19;74:19;
78:20,21;79:14;
117:1,1
**bought (1)**
8:23
**Boulevard (1)**
6:8
**box (7)**
11:4,17,21;34:16;
37:25;59:13;60:23
**boxes (4)**
87:16,16,17;88:6
**break (4)**
35:2;56:25;95:7;
156:2
**bring (1)**
33:14
**bringing (1)**
20:20
**brochure (1)**
92:10
**Brochures (1)**
144:11
**Brooklyn (7)**
21:15,16;110:9;
117:22,25;118:5,13
**brother (4)**
147:13,19,20;
148:3
**brought (6)**
14:3,6;24:12;
35:19;43:3;105:14
**BSD (1)**
74:20
**bucks (1)**
32:10
**build (1)**
22:7
**building (2)**
139:6,8
**built (1)**
44:8
**bunch (1)**
135:1
**buried (1)**
67:14
**business (48)**
14:20;15:8,11,16;
18:12,24;19:10;
21:23;22:24;23:8,
10;27:21,22;36:11;
50:20;53:21;99:20;
100:11,16;101:20;
103:18;104:1,4;

105:25;106:14;
107:4;125:11,17,20;
127:9,24;128:1,2,19;
132:6,17;136:25;
139:1;143:12,14;
149:4,7;150:5;
151:11;153:2,4,21;
154:1
**businesses (2)**
28:13;106:4
**businessperson (1)**
17:6
**bust (1)**
79:23
**busted (2)**
154:5,5
**busy (1)**
107:5
**butt (4)**
140:20;141:15,18,
23
**buy (5)**
8:21;126:18,18;
140:16,16
**buying (2)**
15:11;150:13

**C**

**cabinets (1)**
148:10
**caliber (1)**
88:24
**California (1)**
6:13
**call (9)**
20:1,16,22;44:20;
55:22;81:6;116:9;
146:13,15
**called (6)**
14:15;17:15;
22:11;24:25;27:20;
89:10
**calls (1)**
104:24
**came (12)**
16:25;21:5;36:18;
79:23;87:14;90:18;
101:1;105:13,14;
107:4;151:11;
158:23
**camera (1)**
6:9
**can (78)**
7:2,3,10,17,17;8:6;
9:12;10:2;12:25;
15:1,2,3;30:19;32:4;
35:1;43:18;45:3,22,
22;47:15;48:12,19;
49:20,22,25;50:15;
52:16;53:2;54:10,
12;55:11,12;56:10;
57:2,4,18,19,19,21;

58:7,8;59:11,20,21;
60:7,13;69:7;71:14;
76:20;77:1,2;86:1,
12;88:23;100:4,5;
112:15,22;115:14;
116:4;118:7;126:11;
128:17;129:2;133:4,
15,20;138:10;
139:18,18,21;
141:17;154:25;
155:3,14,17;156:21;
157:1
**Canada (2)**
55:21;56:1
**capability (1)**
14:24
**cape (1)**
34:17
**Carmen (1)**
6:10
**Carolina (3)**
78:22;110:9,10
**Carrie (9)**
25:19,20,22;
26:16;73:3,6;76:16;
80:3;147:12
**carrying (1)**
29:9
**catalog (18)**
49:5,7,8,10,11;
50:22;51:1;58:12,
15;66:18,21;89:20,
21;90:5;154:25;
155:1,2,3
**catalogs (5)**
49:9;58:12;93:24;
94:12;95:1
**catches (2)**
66:7,7
**cease (1)**
124:9
**Center (3)**
25:1,8;28:6
**cents (3)**
137:7,10,21
**Century (1)**
6:12
**certain (4)**
78:20;92:20;
102:14;145:6
**certainly (1)**
59:11
**chance (5)**
84:2;144:19;
145:13;154:11;
155:18
**change (5)**
74:6;102:18;
119:4;147:24;
151:19
**changed (1)**
91:15
**changing (1)**

119:8
**channels (2)**
19:12,20
**character (1)**
35:13
**characters (1)**
36:11
**charge (1)**
103:19
**check (3)**
84:6;88:19,20
**Cheri (2)**
55:20;56:1
**choose (1)**
40:11
**chronological (1)**
94:2
**circle (3)**
44:11;46:18;55:1
**circled (3)**
44:1,3,10
**circumstances (1)**
65:16
**cities (3)**
119:4;133:22;
142:22
**City (15)**
23:12,18,20;45:7;
49:23;60:15,17;
65:19;66:4;77:15;
86:1;93:3;141:5;
142:22,23
**claim (1)**
36:9
**claw (47)**
35:20;36:9,10,19,
20;37:7,14,19,20,22;
47:16;48:12,16,19,
25;50:1,5;52:2,9;
54:7,10;55:4,21,23;
56:1,2,3,3,4,5;57:19;
60:1,3,4,4,4;61:9,10,
13,22,24;62:1,22;
64:4,5;70:23;97:1
**claws (24)**
35:13,16,20;
47:16;54:5;55:14,17,
24;59:20;63:24,25;
64:12,13,18;83:7,8;
96:16,17,17,17,18,
18,18;114:3
**clean (3)**
86:14,22;87:22
**clear (5)**
9:12;23:19;34:17;
47:24;158:2
**clearer (1)**
51:24
**client (3)**
27:1,9;95:20
**clip (1)**
50:18
**clipart (4)**

50:12;60:21;
75:14;79:4
**close (9)**
45:14;48:13,25;
55:4;60:13;64:11;
72:17;88:7,7
**closely (2)**
62:8,25
**closeout (1)**
87:22
**closeouts (2)**
86:13,20
**closer (5)**
39:6;45:23;46:3,8,
17
**clothing (6)**
81:8;130:9;
131:21,24;132:6;
145:22
**colleague (1)**
116:3
**collect (2)**
142:3,11
**collection (1)**
54:23
**color (11)**
41:18,25;44:6;
45:12;59:2;89:18;
90:1;91:25;92:1;
98:25;138:1
**colored (1)**
89:17
**colors (8)**
41:19;50:2;65:5;
91:15,16,20;137:25,
25
**column (1)**
111:12
**columns (1)**
31:24
**combination (2)**
91:20,25
**combinations (1)**
89:18
**comfortable (1)**
101:13
**coming (4)**
51:24;56:23;
158:24;159:18
**communicated (1)**
28:8
**companies (1)**
15:11
**Company (28)**
6:2;17:15,19;22:5,
11,14,17,24:4,8,25;
25:4;27:20;36:13,14,
15;55:19;68:10,11,
20;100:17;107:2,18,
22,24;129:24;148:5;
149:12;154:5
**company's (1)**
150:6

**compensation (1)**
22:2
**competitor (1)**
82:7
**competitors (1)**
82:3
**compiled (1)**
155:4
**complete (3)**
10:16;29:7;121:13
**completely (1)**
90:19
**completeness (1)**
60:6
**computer (3)**
40:10;60:21;
148:12
**concept (1)**
30:10
**concerned (1)**
29:6
**concluded (1)**
160:3
**concludes (2)**
74:7;159:24
**confirm (3)**
29:24;94:11;97:8
**confused (1)**
101:19
**confusion (2)**
79:21,24
**connection (3)**
29:1;126:13;
146:21
**connections (1)**
20:15
**Consolidated (83)**
6:3,20;17:16,21,
22;18:20,24;19:13,
18,23,23;20:5,10,20;
21:8,18,22,24;22:2;
23:4,8;27:4;67:19,
25;68:4,8,20,21;
70:2;97:16;98:5,14,
18;99:15;100:17,19,
20;101:13;103:25;
104:3,9,15;105:17;
106:7,13,24;108:15;
109:8,23;110:4;
117:9,11,21;120:22,
23;125:12,21;126:2,
9,23;127:9,12,19,24;
128:12;129:5,8,9,15,
19;130:12;132:8,16,
20;133:2,8;135:21;
139:4;143:6;149:14;
150:2;151:14,14
**Consolidated's (2)**
103:17;129:25
**Consultant (1)**
27:22
**Consultants (1)**
27:21

**contacting (1)**
104:25
**context (1)**
151:5
**contexts (1)**
62:24
**continue (14)**
51:13;74:17;86:5;
99:12;100:10;102:6;
104:5,6;105:24;
119:6;127:1;149:4;
153:2,9
**continues (2)**
88:13;96:14
**contract (2)**
126:7,15
**control (9)**
20:16;100:12;
102:5;132:15;133:5;
134:4,9,17;156:14
**conversations (1)**
143:12
**Cool (109)**
8:20;13:4;14:15,
18,20,22;16:3,25;
19:18,21,22,25;20:6,
9,11,22;23:10;24:11;
30:7,9,15;35:12,13;
39:1;43:5;57:18;
58:23;59:3;67:24;
68:3,5,6,7,19,21;
69:15,21;81:12;
82:8;91:2;93:24;
97:15;98:12,15,16,
19;99:6,14;100:21;
101:18;105:15,19;
106:13,25;107:1,15;
108:5,16,21;109:8;
118:22;124:5;
125:11,18,19;126:1,
8,22;127:9,10,18,23;
128:3,4,11,23;129:2,
5,9,11,14,14,16,23;
130:3,13;131:5;
132:3,19;133:14;
134:16,23;135:20;
136:24;144:7,17,22;
145:15,18,21;146:6;
147:9;149:5;150:16,
17;152:9;158:20;
159:2,18
**Cool- (1)**
99:7
**Cool's (10)**
82:3;94:12;99:19;
105:3,11,12;125:22;
132:17;133:15;
151:13
**cooperation (1)**
99:9
**copied (2)**
124:21;125:4
**copies (5)**

40:5;104:18,20;
148:18;150:1
**copy (18)**
14:12;26:6,20;
43:2;47:25;48:9;
50:9;51:16;54:7;
69:24;80:9;89:15;
112:5,21,22;115:19;
154:12;155:19
**copyright (9)**
17:8;35:11,12;
36:21;37:10;70:3,
12;92:24;124:16
**Corasel (2)**
14:10;53:10
**corporation (8)**
18:6;22:9;27:1;
97:19;108:5,6,8,13
**corporations (1)**
108:2
**correctly (5)**
15:15;26:8;69:12;
91:1;158:11
**correspond (2)**
12:9;79:18
**correspondence (3)**
117:20;118:10,12
**counsel (1)**
6:14
**counselor (1)**
27:16
**counterfeiter (1)**
154:4
**counts (1)**
32:8
**couple (5)**
32:4;33:9;34:18;
115:9;143:15
**course (6)**
64:9;81:11;
100:14;106:9;
131:14;136:25
**court (13)**
6:10,22,24;7:4,7,
19,21;9:9,19;35:1;
124:13;152:6,10
**courtroom (1)**
10:9
**cover (1)**
49:22
**create (12)**
9:12;53:5;76:8,21;
77:1,15;89:2;92:2;
100:8;114:14;115:8;
122:24
**created (14)**
32:16;35:21;
40:10;43:8;57:9,10;
69:11;75:25;77:5,
15;79:12;89:2,11;
119:25
**creating (1)**
9:9

**creation (1)**
76:25
**crib (1)**
126:18
**Croix (4)**
49:15,17,19;119:7
**CROSS (1)**
156:9
**crying (5)**
158:12,15,16;
159:6,7
**curious (1)**
150:11
**currently (1)**
87:25
**custom (2)**
15:1;31:21
**customer (8)**
14:10;53:10;
127:11;134:8;
148:18,23;149:1;
150:11
**customers (23)**
16:1;20:10,13,21;
21:1,3,5;125:3;
127:14,15,16;
130:17;146:7,11,20;
148:21;149:13,22;
150:7,23;152:10;
153:1,25
**customize (1)**
31:21
**cut (2)**
31:22;88:5
**cutting (1)**
114:17

**D**

**damage (3)**
101:8;123:1;
149:12
**date (15)**
6:4;53:10;70:14,
16;80:21;86:19;
92:24;93:7,8,8,9,16;
111:13,18;119:14
**dated (1)**
90:8
**dates (2)**
65:11;85:10
**Dave (1)**
6:21
**David (17)**
13:11;16:15;24:2;
26:5,18;27:23,25;
28:1,2,2,2;71:25;
72:1,2,7,15;149:14
**DavidLipsker@gmailcom (1)**
28:7
**day (3)**
72:3;146:24;147:8
**days (1)**

24:10
**Daytona (23)**
6:8;16:7,10;23:14,
18,20,21,23;24:1,5;
26:11;49:23;52:20;
97:24;107:7;113:15;
119:17;120:11,12,
15,16;142:24;149:3
**deal (3)**
18:19,20;152:19
**dealing (1)**
18:19
**decal (1)**
36:13
**December (3)**
111:18;112:17;
114:24
**decide (2)**
37:20;64:3
**decided (1)**
68:15
**decisions (1)**
132:9
**declaration (7)**
28:25;29:7;67:13;
68:24;81:5;83:23;
84:16
**declined (1)**
149:8
**Definitely (1)**
88:2
**deleted (1)**
29:8
**delivered (2)**
11:5;34:16
**delivery (1)**
158:23
**demand (1)**
46:24
**department (2)**
75:25;79:12
**depend (4)**
137:14,22,24;
138:2
**deposition (11)**
6:6;8:13,22;9:1;
11:2;13:2;74:8;
151:21;152:1;
159:25;160:3
**Derrick (1)**
147:13
**describe (1)**
140:23
**described (3)**
141:5;156:14;
158:9
**describing (1)**
29:22
**description (3)**
29:18;140:24;
141:7
**descriptions (1)**
140:19

**descriptive (1)**
158:7
**design (123)**
15:3,4,22,25;
20:23;29:17,19,19,
25;30:1,8;31:19,20;
32:3,6;33:1,2;35:11;
36:21;43:24;44:9;
46:2,3,18;50:6,12;
51:1;52:9,25;53:13;
54:12;55:16,25;
56:25;57:3;58:11;
62:21,22;63:20;64:5,
5;65:4,17,21,25;
66:8;67:1,2,2,5,7,9,
25;68:3,8;69:6;72:9;
76:1;77:6,22;79:13;
80:16,22;81:13;82:4,
8;83:3;85:18,20;
86:4,15,18;87:20;
88:7;89:15,22,23;
90:2;91:6,10,17,20,
21;92:15;95:3;
96:14;97:3;98:8,9,
19,24;99:1,2;100:8;
112:14,16;113:18;
114:3;115:5,5;
116:21,22;119:13,
19,21,24;120:10;
121:14;122:8,10;
123:19,21,25;124:1,
16;125:9;137:25;
141:2,25;144:21;
154:3;156:21;157:1
**designs (71)**
14:23;15:1,2,19;
30:9;32:4,11,14,19;
33:9;36:16;37:15;
41:3;43:1,22;44:7;
45:25;52:21,23;
55:11,14,20;58:1;
60:12;62:6,7;63:24;
66:17;67:10,18;
69:2;76:13;77:16,
17;80:6;82:1,6;83:6;
84:7,18,19,21;85:3;
86:22;89:12;90:4,
19;91:19;92:12,14,
20;93:9;97:4;100:9;
112:1;114:18;119:5;
124:21;127:1;
133:15,19,20;134:3,
10;140:17,25;
143:25;150:19;
153:5;154:20;
156:17
**desist (1)**
124:9
**despite (1)**
64:20
**destroy (1)**
103:12
**destroyed (3)**

33:18;101:5;103:8
**destroying (1)**
101:14
**details (4)**
75:12;115:9;
150:4,4
**determine (4)**
88:9;92:15,17;
154:23
**determined (2)**
93:15;152:10
**devastated (5)**
90:20;101:18;
152:22;158:4,10
**developed (1)**
68:3
**differ (1)**
84:8
**difference (2)**
41:19;79:10
**differences (1)**
29:18
**different (49)**
16:14;30:13;
38:23;39:1,17;41:2,
2;43:1;45:22;47:2,9;
48:15;49:21;55:7,
14;56:3;57:7,25;
58:1,1;60:2,2;64:15;
81:25,25;83:7;84:9,
10,12,15;89:10,18;
91:16,25;96:15,16,
24;97:14;104:11;
108:2;119:4;133:20,
22;140:19,25;141:2;
142:22;147:23;
158:4
**differently (1)**
89:18
**digging (1)**
123:14
**dinosaur (5)**
35:15;36:25;
96:18;114:2,3
**DIRECT (1)**
8:3
**directing (1)**
107:6
**direction (1)**
29:11
**discuss (1)**
149:22
**discussing (1)**
98:6
**discussion (1)**
94:8
**disk (5)**
57:17;74:7;
151:19,21;152:1
**display (2)**
145:4,8
**displayed (2)**
90:17;145:12

**distributed (1)**
55:25
**Distributors (6)**
6:3,21;17:16;
67:19;109:23;
117:21
**divided (1)**
139:3
**DM (2)**
28:17,18
**document (34)**
12:17;25:11,15,17,
18,23;26:8;28:19,23;
35:9;40:23;41:1;
43:15;46:15;47:22;
52:18,19;81:5;89:1;
95:17;110:12,18;
111:6,10;113:20;
116:13,20;118:4,19;
120:4,7,20;139:11;
142:7
**documents (15)**
11:5,17,18;12:7;
14:2,2;38:7;85:6;
113:11;123:10,20;
139:15,19;154:11,13
**dollar (3)**
137:9,11,22
**done (9)**
11:1;23:10;26:3;
56:8;73:2;138:16;
144:7,10,13
**door (1)**
158:20
**dot (2)**
155:10,14
**down (9)**
9:19;50:15;110:1,
21,23;111:12;
145:14;153:5;154:1
**dragon (3)**
57:19;59:20;96:18
**dragons (2)**
57:24;96:16
**draw (1)**
57:17
**drawing (3)**
54:8,8;92:21
**drawn (3)**
43:2;69:2;70:8
**dreadlocks (3)**
42:12,13,19
**dresses (1)**
132:2
**drew (1)**
69:5
**drink (1)**
71:3
**drinking (1)**
59:1
**drinks (1)**
71:4
**dripping (1)**

58:17
**droop (1)**
70:1
**drooping (22)**
9:4;26:14;27:2;
40:6;42:10;58:8,17;
67:1;81:6;91:15;
116:16;118:24,25;
119:19;120:10;
121:10,11,15;
122:23;123:11,21;
143:1
**drop (8)**
49:22;77:16;
132:25;142:20,21,
22,23;153:4
**dropped (1)**
153:12
**dry (1)**
134:7
**dryer (1)**
134:6
**duly (1)**
7:25
**during (2)**
135:20;148:9

**E**

**eagle (2)**
54:25;96:17
**eagles (3)**
56:2;61:22;64:13
**earlier (5)**
63:15;98:23;
112:13;114:1;
143:21
**early (10)**
27:10;55:16,20,
22;56:19;59:3;
83:12;96:13,14;
111:13
**easier (1)**
155:7
**East (1)**
6:12
**Eastern (2)**
21:12;110:6
**effort (1)**
142:10
**efforts (1)**
142:3
**egg (1)**
51:25
**eight (3)**
38:25;68:23;
133:20
**Either (2)**
91:6;159:23
**elongated (16)**
43:18;115:2;
118:24;122:14,15,
17,22;123:5,7,11;

156:19,20,22,25;
157:2,12
**else (6)**
22:19;46:13;52:3;
63:10;77:7;126:22
**e-mail (18)**
28:6,8;71:13,21;
73:9;74:18,19,20;
75:2,6,12;77:13;
79:2,14,14,17;80:1,
16
**e-mails (3)**
75:7;104:24;
144:12
**embroidery (1)**
131:1
**emotional (3)**
158:5;159:10,16
**Emotionally (1)**
158:10
**emotions (1)**
102:5
**employee (2)**
91:14;147:25
**employees (3)**
76:12;147:10,17
**end (8)**
8:21;73:2,9;86:11;
102:19,23;137:9;
151:20
**Energy (11)**
6:2,18;29:2;37:12;
63:17;70:23;71:3;
101:2;135:8;146:22;
152:6
**Energy's (1)**
135:15
**enforce (1)**
124:6
**English (1)**
75:10
**enlarge (4)**
41:18,25;42:15;
48:13
**enlarging (1)**
115:8
**enough (2)**
13:9;146:3
**entered (1)**
98:18
**entitled (1)**
111:10
**Eric (1)**
147:12
**et (1)**
6:3
**etcetera (1)**
96:18
**even (9)**
38:25;48:11;
87:16;90:16,17,22;
112:24;132:2;
141:15

**event (3)**
24:19;145:11;
147:1
**events (4)**
119:5;144:23,24;
145:1
**eventually (4)**
86:11;107:2;
126:1;137:11
**everybody (3)**
61:18;152:16,24
**everybody's (1)**
80:25
**everywhere (6)**
55:11;63:13;
85:15;119:17;122:9,
11
**ex (1)**
82:11
**exact (13)**
33:2;65:4;78:2;
82:8;86:19;94:25;
95:3,3;98:24;112:14,
16;115:5;118:23
**exactly (24)**
26:22;56:25;
70:21;77:8,8,18;
79:5,7;82:5;84:13;
85:12,17;87:6;92:5;
97:22;115:3,7;
119:11;134:18;
136:3,5,21;138:6;
148:17
**EXAMINATION (2)**
8:3;156:9
**examined (1)**
7:25
**example (6)**
30:11;31:14;
38:23;39:10;53:20;
54:5
**examples (7)**
30:14;33:14;37:4;
39:24;40:13;47:6;
50:9
**except (2)**
18:5;136:23
**exchange (1)**
128:5
**exclusive (1)**
128:22
**exclusively (1)**
105:3
**excuse (4)**
20:9;125:20;
130:12;140:1
**Exhibit (171)**
11:11,12,23,24;
12:6,8,13;25:13;
28:4,20,21;29:8,11;
30:5,6,8,23,23,25;
32:22;33:2,3,4,10;
34:4,10;35:6,7,25;

37:1,12;38:2,19,20,
22,23;39:14,21;
40:23,24;41:8,9,9,
10,24;42:5,6,8,9;
43:12,13;44:16,17;
45:11;46:15,16;47:3,
4,19,20;48:18;50:10;
51:11,15,19;52:12,
13;53:17,18;54:2,3,
20,21;56:5,14,15;
57:12,13,15;58:3,4,
6,7,19,20,22;59:8,15,
16,18,19;60:7,9,10;
61:15,19,21,23,25;
62:3,8,25;63:20;
64:16;65:5;66:13,21,
22,23;67:1,13,25;
68:24;69:5,24;71:10,
11;72:10;74:18;
78:3,10;82:8;83:11,
15,23,24;84:8,8,21;
89:1;92:2,7,22;
93:16,20;94:25;
95:17;96:10;98:6,13,
17,24;99:16;109:11,
12;110:15;111:8;
112:14,17;113:5;
114:11;115:5,14,21,
22;117:20;120:4,5;
121:22,23;125:9;
133:11;139:12,13;
142:2,7,8,10,16;
150:14;156:13
**exhibits (13)**
29:5,7,8;51:5;
59:9,12;60:12,25;
61:2;93:24;94:5,6,11
**expanding (1)**
62:23
**expect (1)**
101:24
**experience (3)**
63:9;68:15;158:22
**expert (1)**
118:16
**explain (2)**
31:17,17
**explained (1)**
114:16
**exposure (1)**
68:14
**extra (1)**
139:9
**eyes (1)**
55:2

**F**

**fact (8)**
12:2;24:17,18;
30:1;49:16;65:3;
67:24;94:12
**Fair (5)**

13:9;105:10;
140:21;142:2;146:3
**fairly (2)**
143:16,16
**fall (1)**
144:5
**familiar (4)**
9:5;25:5;68:11;
135:8
**family (3)**
36:1,3,4
**far (5)**
62:8;70:2;129:12,
23;144:20
**Fashion (1)**
55:20
**fatter (1)**
113:6
**fears (1)**
159:1
**federal (4)**
109:16,17;111:6;
122:4
**feel (2)**
101:13;154:7
**feet (1)**
87:12
**felt (2)**
24:16;102:16
**fern (1)**
114:13
**festivals (1)**
145:16
**few (4)**
14:4;135:3;156:2,
12
**fifth (3)**
116:25;117:1,2
**fight (6)**
102:6,7,8,10,11,24
**file (2)**
110:13;111:6;
124:10
**files (2)**
148:17,18
**filing (1)**
126:12
**fill (1)**
118:14
**filled (1)**
120:20
**final (5)**
67:17;82:21,22;
121:9;133:25
**financial (3)**
143:7;148:8,13
**financing (3)**
100:15;103:22;
104:4
**find (11)**
11:7;31:15;36:16;
45:22;51:11;88:23;
94:24;123:17,22;

124:4;154:25
**Fine (3)**
34:7;65:12;80:14
**fingers (1)**
59:2
**finish (2)**
9:11;159:7
**first (46)**
7:25;8:9,11;16:17;
23:20;25:25;26:1,
24;31:14;32:16;
35:10;43:19;70:16,
18,22;71:14;73:18;
74:1,1;75:13;77:14;
79:2;81:5;82:16,18,
23;84:6;94:15;
97:20;98:4;102:3;
110:2,3,17;111:12,
20,21,23;112:13,17,
18;115:1;140:18;
141:10;157:4,23
**fisherman (2)**
66:6;144:2
**fits (2)**
158:12,15
**five (7)**
16:19,19,19;
76:16;86:21;91:20;
97:22
**flea (3)**
15:8;85:14;86:24
**flier (5)**
90:6,8;91:3,6,11
**fliers (2)**
104:23;144:11
**floating (1)**
101:22
**Florida (23)**
6:8;16:6,21,23;
21:6;54:15;112:2,6;
115:20,23;116:15,
17;118:23,24;
120:10,16;122:4;
132:17;133:14,14,
14;138:20;141:4
**focus (1)**
71:13
**focused (2)**
158:13,13
**follow (2)**
77:7;83:25
**following (1)**
89:19
**follows (1)**
8:1
**font (1)**
82:22
**fonts (8)**
75:13,17,18;79:3;
82:17;83:1,16;96:15
**forget (2)**
93:4;103:23
**form (1)**

62:22
**formally (1)**
108:16
**formation (1)**
106:25
**formed (2)**
108:22,23
**Fort (2)**
119:7,17
**forth (6)**
49:24;63:25;
102:14;128:8;
142:24;154:20
**forward (2)**
22:10;101:21
**found (9)**
14:6;44:24;79:10,
16;89:22;90:2,3,7;
92:10
**four (19)**
16:19,19;49:12;
86:21;89:13;91:19;
93:25;94:5;97:20,
22;108:23;109:2,2;
137:14,15;140:19;
141:10,14;142:17
**fourth (1)**
94:21
**France (1)**
6:7
**free (1)**
60:21
**freelance (3)**
57:20;69:8,22
**frog (1)**
57:19
**front (9)**
10:9;74:2;90:18;
109:22,25;110:1;
130:23;148:4,7
**frozen (1)**
117:16
**full (1)**
10:16
**further (1)**
51:18
**future (3)**
107:9;108:2,19
**future-wise (1)**
100:9

## G

**garment (2)**
131:4;156:12
**gather (3)**
13:5;90:14;140:3
**gathered (5)**
90:24,24;91:13;
140:7,9
**gator (2)**
52:9;54:13
**gave (15)**

11:21;24:21;
38:14;40:2;48:5;
49:7,9;76:23;88:3,5,
6;92:18;138:12;
150:1;154:11
**gen (1)**
42:13
**general (11)**
20:19;30:9;77:9;
88:15;106:17;107:7,
11;131:21,24;
132:11;149:9
**generate (3)**
103:22;104:7;
107:8
**generating (1)**
105:22
**generic (11)**
41:22;42:14;44:4;
45:24;49:20;55:10;
57:8,9;72:16;140:19,
22
**gift (1)**
131:8
**girl (1)**
25:18
**giving (3)**
10:7;37:3;38:23
**God (2)**
74:24,25
**goes (11)**
45:3;48:17;54:16;
87:20;119:7;130:21,
21,23;134:5;137:24;
141:19
**Good (23)**
9:16;10:25;12:5,
25;29:15;32:13;
34:20;50:24;69:21;
84:5;95:5;97:13;
99:18;110:20;
115:18;116:24;
117:7;132:12;
143:14,17,22,23,25
**goodwill (3)**
127:23,25;128:2
**granted (4)**
129:11,14,15,18
**graph (1)**
54:8
**graphic (4)**
42:25;55:13;
57:16;63:9
**gray (2)**
49:7,7
**great (1)**
71:15
**green (28)**
35:13,16,20,24;
36:19,20;37:7;39:5;
41:25;42:16;48:25;
50:1;53:24;56:18,22,
22,23;59:2,2,3,20,

22;61:13;62:1,17,23;
91:21;138:2
**greens (1)**
67:4
**gringos (1)**
87:14
**grow (1)**
105:24
**guess (17)**
13:19;26:2,5;
51:15;53:12;59:5;
69:7;75:21;79:24;
80:21;81:16;85:16;
103:23;104:24;
118:15;119:13;
148:20
**guy (5)**
17:4;52:6;69:10;
154:5;159:19
**guys (3)**
28:14;79:19;103:2

## H

**hair (1)**
42:11
**half (5)**
18:14;76:18;
97:23;110:21;
137:18
**halfway (3)**
110:1,23;111:11
**hand (11)**
6:25;7:5,8,22;
41:25;43:2;47:18;
52:12;54:8;115:19;
152:21
**hands (2)**
58:9;60:3
**handy (1)**
69:24
**happen (3)**
80:15;107:13;
153:7
**happened (8)**
92:5;101:17;
102:22;103:4;111:1;
147:4;148:2,24
**happening (1)**
24:20
**hard (1)**
148:18
**harsh (1)**
102:1
**Hats (5)**
130:10,11,13,25;
131:25
**head (2)**
9:18,18
**hear (3)**
20:24;124:14;
149:21
**heard (12)**

17:15;22:11;
24:25;27:20,23,25;
28:11,16;70:25;
80:23;81:1;149:19
**hearing (2)**
74:3;146:17
**heat (25)**
14:22,25,25;15:6;
19:14,22;36:14;
62:5;81:8;98:16;
100:7,7,18,20,21;
101:6;122:24;
130:25;131:2;133:8;
135:19;137:2,20;
138:5;143:13
**held (1)**
34:22
**Hello (2)**
96:7,8
**help (4)**
13:1,5;159:9,9
**hey (1)**
37:7
**Hill (5)**
16:5,10,12,13;
52:20
**himself (2)**
28:1;76:21
**hip (1)**
157:16
**hired (1)**
69:15
**history (5)**
32:19;96:22;
97:10,11,12
**hit (1)**
70:24
**hits (1)**
144:4
**hold (2)**
90:21;112:25
**holding (3)**
68:10,20;150:6
**holes (2)**
45:2,3
**Holly (5)**
16:5,10,12,13;
52:20
**honest (1)**
17:11
**hoodies (1)**
114:17
**hoody (1)**
32:9
**hook (2)**
66:7;144:3
**hope (1)**
24:3
**hopefully (1)**
103:15
**hotel (2)**
11:5,18
**hours (2)**

34:18,18

**how's (1)**
143:10

**Huh (3)**
7:6;59:10;148:12

**hundred (2)**
138:4,25

**hundreds (1)**
136:8


# I

**idea (7)**
23:25;50:14,18;
109:4;114:15,18;
135:5

**ideas (3)**
32:5,12;77:2

**identification (37)**
11:12,24;25:13;
28:21;30:25;35:7;
38:20;40:24;42:6;
43:13;44:17;46:16;
47:4,20;52:13;
53:18;54:3,21;
56:15;57:13;58:4,
20;59:16;60:9,10;
61:3;66:23;71:11;
94:7;109:12;110:15;
111:8;115:22;120:5;
121:23;139:13;
142:8

**identify (2)**
87:1;156:21

**IG125 (1)**
67:2

**iguana (9)**
50:5;51:24;62:1;
63:24;64:5;67:4,10;
83:7;96:17

**iguanas (7)**
14:8;53:9;63:4;
64:12;66:9;87:10;
90:17

**images (1)**
157:2

**improving (1)**
100:11

**Inc (12)**
6:3;14:18,21;
17:16;22:12,20;
26:25;67:19;106:25;
107:1;108:17,22

**inches (2)**
133:18;156:18

**include (5)**
35:18;78:10;
119:21;121:12;
140:12

**included (4)**
30:9;60:23;123:4,
7

**includes (4)**

119:18,24;121:9;
122:17

**including (1)**
65:5

**Incorporated (1)**
6:21

**incorrect (1)**
76:5

**increase (1)**
91:18

**indicated (1)**
94:13

**indicates (1)**
142:25

**indicating (8)**
33:25;41:13;47:1;
52:7;59:22;89:6;
122:13;156:23

**information (1)**
91:13

**infringers (1)**
124:7

**inhibit (1)**
10:23

**initial (3)**
40:2,17;157:23

**initially (1)**
102:17

**initials (1)**
61:16

**ink (1)**
134:7

**inspection (1)**
132:20

**instance (1)**
39:20

**instead (3)**
7:18;92:8;106:5

**instructed (1)**
152:6

**intending (1)**
83:11

**interesting (1)**
48:12

**interject (1)**
34:2

**internet (1)**
75:14

**interpretation (1)**
73:13

**into (16)**
15:1;22:7;44:8;
45:4;66:20;74:1;
79:16,23;80:9;
98:18;100:9;104:7;
105:25;107:5,6;
139:1

**introduce (5)**
6:14;11:9;35:5;
71:9;111:5

**inventory (1)**
88:15

**invoice (12)**

14:4;48:3;52:19;
53:8,24,24;54:17,18;
58:11;88:10;140:18;
142:14

**invoices (17)**
14:5;43:8;54:16;
58:16;81:21;85:10;
88:9;138:8,12;
139:20;140:5;142:4,
11;146:2;148:10,19;
154:24

**involve (1)**
8:19

**involved (1)**
149:14

**island (3)**
49:15,16,18

**issue (1)**
67:18

**item (8)**
24:11,12;88:11,15,
17;140:19;150:10;
151:2

**items (5)**
54:23;130:8;
141:10;142:13,17


# J

**jagged (1)**
41:15

**Jersey (3)**
121:25;122:5,9

**Jimmy (4)**
35:12;36:25;
114:2;154:16

**job (5)**
9:5;10:3;19:19,19;
103:24

**jobs (1)**
106:20

**Joe (120)**
8:20;13:4;14:15,
17,20,22;16:3,25;
19:18,20,22,25;20:5,
9,10,22;23:10;24:11;
30:7,8,15;35:11,12;
39:1;43:5;57:17;
58:23;59:3;67:24;
68:3,5,6,7,19,21;
69:15,21;81:12;82:3,
7;91:2;93:24;94:12;
97:15;98:12,15,16,
19;99:6,7,14,19;
100:21;101:18;
105:3,11,12,15,19;
106:13,25;107:1,15;
108:5,16,21;109:8;
118:22;124:5;
125:11,17,19,22;
126:1,8,22;127:8,10,
18,23;128:3,4,11,23;
129:2,4,9,11,14,14,

16,23;130:3,12;
131:5;132:3,16,19;
133:14,15;134:16,
23;135:20;136:24;
144:7,17,22;145:15,
18,21;146:6;147:9;
149:5;150:15,17;
151:13;152:9;
158:19;159:2,18

**join (1)**
19:16

**joining (2)**
102:20,21

**joint (4)**
20:7;22:7;99:10;
100:22

**jointly (1)**
101:12

**judge (4)**
10:1,9;74:2;90:18

**jump (1)**
112:23

**junior (1)**
140:20

**jury (1)**
10:9


# K

**keep (5)**
57:10;116:7;
123:13;132:12;
152:18

**keeping (1)**
143:7

**Ken (1)**
116:3

**key (1)**
152:19

**kind (10)**
20:15;31:20;40:4;
49:15;55:2;65:19;
105:1;128:21;131:9;
154:21

**kinds (2)**
104:8;144:10

**knew (4)**
16:20;17:9;69:20;
150:2

**knickknacks (1)**
131:9

**Knobbe (1)**
6:16

**knock (1)**
101:24

**knows (1)**
68:12

**kosher (2)**
71:5,6


# L

**landed (1)**

79:20

**Lane (1)**
6:9

**large (1)**
133:17

**last (18)**
8:9;9:1;29:10;
50:20;59:14;60:6;
67:21;77:13;82:11,
13,17;83:22;99:12;
116:20;118:18;
136:2;143:15;
147:22

**later (4)**
10:1;119:25;
121:15;122:19

**Lauderdale (2)**
119:7,17

**launch (1)**
58:23

**law (1)**
6:19

**lawsuit (7)**
8:18;23:22;28:14,
15;29:1;36:8;71:1

**lawsuits (1)**
124:10

**leaf (1)**
57:5

**learn (1)**
70:22

**least (2)**
63:1;111:13

**leave (1)**
155:23

**leaves (6)**
31:25;32:8;56:18,
22,23;114:13

**led (1)**
65:17

**left (16)**
40:5;76:22;86:12,
22;87:21;88:3;
89:16;91:6,10;
106:11;111:12;
113:7;122:25;
156:24;157:16,25

**leftovers (1)**
87:2

**legit (1)**
26:20

**less (2)**
97:1;137:21

**letter (9)**
26:23;28:5;40:14;
41:22;47:7;53:21;
76:1;79:12;93:20

**lettering (1)**
57:20

**letters (3)**
72:10;74:20;
124:10

**level (2)**

109:16;153:4
**license (14)**
  67:24;68:7;
  107:11;128:11,14,
  16,22,25;129:2,11,
  16,25;130:2,5
**licensed (5)**
  67:18;68:2,21;
  150:16,19
**licenses (3)**
  129:10,12,18
**licensing (2)**
  68:17;129:4
**life (1)**
  79:24
**light (1)**
  53:2
**line (18)**
  26:24;29:11;
  42:10;43:8;44:14;
  45:23;46:23;58:17,
  23;59:19;60:4;70:1;
  89:23;119:6,7,19;
  133:23;154:21
**lines (52)**
  9:4;26:14;27:2;
  30:10,15;31:15;
  32:22;35:24;42:14,
  15,21,22,22,22;43:6,
  16,18,23,25;45:18;
  52:7;57:3,5;58:8;
  59:4,20,22;63:11;
  67:1;81:6;85:21;
  91:15;96:13;113:2,5,
  6,7,9;114:14;115:2;
  116:16;118:24,25;
  120:10;121:10,11,
  15;122:23;123:11,
  21;143:1;154:17
**Lipsker (2)**
  27:23;28:1
**listen (4)**
  102:15;103:2,11;
  154:3
**lists (4)**
  109:22;110:6;
  118:4;127:11
**literally (1)**
  50:22
**little (14)**
  36:20;45:19;
  51:24;89:9;112:23,
  24;120:18;130:23;
  131:19;147:24,24;
  149:6;156:25;157:6
**living (2)**
  16:20,23
**lizard (3)**
  51:2;57:21;96:17
**loan (1)**
  104:1
**located (4)**
  6:12;16:4;20:14;

21:9
**locations (3)**
  144:25;145:8;
  146:4
**logo (20)**
  9:5;70:23;94:25;
  98:5,17;118:20,23;
  119:8;121:8;122:17,
  18;125:13;130:13;
  132:10;143:22;
  144:23;145:4,12,16,
  18
**logos (1)**
  134:20
**long (9)**
  39:3;49:2;87:1,19;
  115:14;132:6;
  133:18;156:18;
  157:12
**longer (2)**
  36:23;40:12
**look (67)**
  28:4;29:10,16;
  33:8,9,11;39:6;
  40:11;43:17;45:23;
  46:25,25;47:12;
  48:24,25;50:2,18;
  52:2;53:2;55:1,3,11,
  17,23;56:13;57:5,20,
  23;58:18;59:2;60:2;
  64:22;66:2;67:16;
  68:23;69:23;70:1;
  73:7;77:19,21,22;
  79:1;81:4;82:10,16;
  84:2;85:8,9;89:3,8,8;
  92:19,21;94:10;
  95:16;96:9,25;
  111:11;116:25;
  121:8;134:19;
  138:10;146:1;
  150:15;154:2;155:2;
  159:18
**looked (4)**
  62:5,8;77:4;108:3
**looking (9)**
  40:6;74:17;88:8;
  101:21;110:5;124:3;
  140:18;154:24;
  155:11
**looks (15)**
  32:13;42:17;
  48:12;52:24;64:25;
  70:9;72:4;95:18;
  96:24;133:24;
  134:11,16;156:17,
  18,23
**Los (1)**
  6:12
**lose (1)**
  158:8
**losing (1)**
  140:2
**losses (2)**

106:5,8
**lost (2)**
  101:20;153:20
**lot (36)**
  17:6;19:1;29:5;
  34:17,18;36:16;38:3,
  4;47:16;51:24;
  55:17;57:5;60:14;
  62:5,10;64:23,25;
  65:18;71:3;80:3;
  86:13;88:14;90:19;
  93:3,3,9;97:3;107:5;
  131:7;134:25,25;
  143:5,25;144:24;
  146:4;153:5
**lots (1)**
  63:23
**love (1)**
  144:5
**low (1)**
  152:18
**lower (1)**
  157:16
**lunch (1)**
  95:6

## M

**machine (4)**
  14:24,25,25;31:23
**machinery (1)**
  127:21
**Mackinaw (2)**
  145:25;146:1
**magic (1)**
  59:13
**main (2)**
  59:1;69:18
**maintain (1)**
  117:24
**makes (1)**
  59:14
**making (2)**
  106:2;119:3
**man (1)**
  17:11
**manufacturer (2)**
  15:6;99:23
**Manufacturing (1)**
  100:7
**many (11)**
  24:23;81:13,14,
  20;96:23;97:18;
  135:19;136:15,23;
  137:25;138:3
**March (3)**
  72:4,6;146:25
**mark (73)**
  11:10,22;24:12;
  25:12;28:20;30:22;
  32:11;33:12;36:9,10,
  19,20;37:7,20,22;
  38:19;40:22;42:4;

43:11;44:8,16;
  46:14;47:13,16,19;
  48:12,16,19,25;52:2,
  9;53:16;54:2,20;
  56:14;57:12;58:19;
  59:7,12;60:3,6,7,25;
  61:9,10,22,24;68:16;
  93:23;94:4;96:12;
  98:13;109:11;110:3,
  13;111:7,22;112:20;
  115:21;116:4,6;
  120:3;121:21;122:1;
  124:19;130:4;132:4;
  139:11;140:22;
  142:7;154:19;157:7,
  20
**marked (43)**
  11:12,24;25:13;
  28:21;30:5,25;35:7;
  38:20;40:24;42:6;
  43:13;44:17;46:16;
  47:4,20;52:13;
  53:18;54:3,21;
  56:15;57:13;58:4,
  20;59:16;60:9,10;
  61:3;66:23;71:11;
  94:6;109:12;110:15;
  111:8;115:22,25;
  116:3;120:5;121:23;
  133:11;139:13;
  142:8;155:8;156:13
**Market (28)**
  19:10,20,23;24:5;
  30:9;32:17;33:1;
  36:16;37:1,12,14,21,
  22,24;39:2;44:25;
  46:17;47:9;49:2,17,
  18;50:4;85:14;
  86:24;104:13;125:2;
  127:2;138:17
**marketed (4)**
  24:11,22;30:7;
  36:25
**marketing (16)**
  19:1,3,6,8;32:21,
  22;50:20;63:20;
  100:12;103:21;
  104:9;106:22;
  107:21,21;128:19;
  129:24
**markets (3)**
  15:8;104:11,11
**marking (1)**
  59:9
**marks (30)**
  31:5,5,7,8;38:1;
  44:14;50:1;55:21,
  23;56:1,2,3,3,4,6;
  60:1,4,4,4;61:13;
  62:2;82:18,23;83:1,
  16;85:25;96:16;
  111:24;128:12,23
**marshals (2)**

79:20;148:9
**Martens (1)**
  6:16
**massive (1)**
  36:15
**master (1)**
  74:2
**match (1)**
  32:1;91:19;155:3,
  14
**material (1)**
  45:1
**materials (2)**
  35:19;140:12
**matter (4)**
  6:2;36:22;67:18;
  121:5
**may (7)**
  9:24;33:19,19;
  112:24;136:14,17;
  142:13
**maybe (29)**
  23:18;26:18,22;
  46:2,8;66:15;67:14;
  72:7,18;73:3,6,11;
  75:3,23;76:16,17,20;
  81:1;86:21;94:2;
  102:20;104:11;
  108:23;109:2;111:2;
  117:12;133:19;
  136:4;148:15
**MB (6)**
  40:2,2;45:6;50:10;
  65:20;92:8
**mean (43)**
  14:4;18:5;19:3;
  20:1;22:6;32:21;
  70:7;76:6;85:12;
  86:7;97:18;98:8;
  100:23;101:20;
  102:2,10;103:6,14,
  15;105:5,10,22;
  108:12,18,19;109:8;
  111:21;115:7;
  122:10;125:2;
  126:11;129:8;130:8,
  21;135:23;136:16;
  139:24;144:25;
  145:13;151:7;
  152:18;154:7,18
**means (2)**
  80:5;127:20
**meant (3)**
  78:3,7;96:23
**media (1)**
  154:4
**medication (1)**
  10:22
**meet (3)**
  16:17,18;18:16
**meeting (1)**
  17:1
**Menachem (3)**

18:1,7;95:20
**mention (2)**
151:6;152:22
**mentioned (4)**
152:12,16;153:1;
158:3
**merchandise (27)**
101:12;103:7,10;
105:3,11,16;106:2,3;
123:12;129:24;
130:3;131:10;
132:20;134:4;
140:13;143:8;144:6,
8;145:24;146:7,12;
149:15,23;152:7;
153:10,11,15
**mermaids (1)**
57:2
**message (1)**
72:7
**met (7)**
16:15,18,22,24,24;
18:7;22:19
**Mettemp (9)**
22:12,20,24;23:1,
4,10;26:1,25;28:5
**Miami (7)**
40:3,3;46:2,7;
60:14,14;65:19
**Michigan (2)**
145:25;146:1
**mid (3)**
82:18,23;96:13
**middle (3)**
48:18;51:14;
119:19
**might (1)**
153:3
**Mike (3)**
69:8,13,14
**Millennium (1)**
58:24
**mind (3)**
48:2;64:3;95:21
**minute (2)**
34:6;112:8
**misinterpreted (1)**
73:22
**misspelled (2)**
110:24,25
**mistake (2)**
70:11;152:11
**mistaken (3)**
23:13;66:14;69:11
**mixed (5)**
27:6,11;140:13;
142:14;148:16
**mod (1)**
111:21
**modification (1)**
26:17
**modified (33)**
26:13,23;49:13,

16;54:15;66:16;
67:5;69:12;83:18;
98:9;99:1,1,2,16;
101:6;103:18;
109:15;112:14,16;
114:5,6,13;115:8;
119:18,21,24;
121:10,14;122:18;
125:9,12;156:20;
157:18
**modify (2)**
37:1;77:25
**modifying (3)**
62:22;83:5;100:10
**Mom (1)**
40:4
**moment (1)**
11:15
**Monday (1)**
138:18
**money (4)**
100:14;102:25;
103:1;107:21
**Monster (24)**
6:2,17;29:1,19;
36:18;37:12,17;
58:9;63:17;64:6;
70:23;78:11;88:5,6;
101:2,9;102:18,22;
123:3;135:8,15;
146:18,22;152:6
**Monsters (1)**
113:22
**months (4)**
76:16;108:24,24;
109:3
**more (21)**
14:5;47:6;51:20;
56:2,10;57:23,23;
97:1;100:9;106:2,3,
19;113:15;121:18;
135:24,25;137:15,
21;138:15;154:10;
157:15
**morning (1)**
135:1
**MORTNER (23)**
6:19,19,19;7:12;
9:22,24;33:19,21,25;
34:7,20;38:6;51:4;
95:20;115:24;116:2,
9,11;135:12;141:21;
156:1,10;159:20
**Moshe (1)**
6:19
**most (8)**
30:20;62:8,25;
87:4;88:12,12;
100:6;138:23
**mostly (3)**
17:8;18:22,23
**move (2)**
59:21;97:14

**moving (1)**
22:9
**much (13)**
24:10;25:6,10;
48:15;50:13;60:19;
81:24;113:15;137:2,
4;138:25;159:2,17
**multitude (1)**
81:7
**music (1)**
145:15
**must (3)**
67:13;119:25;
121:15
**Myrtle (19)**
45:7;46:7;49:23;
65:19;77:16,20;78:3,
7,10,17,19,21,24;
85:13;88:22;91:5;
93:21;119:6,16

## N

**N-A (1)**
53:12
**name (23)**
6:9;8:6;45:7;
48:10;49:22;66:4;
69:8;73:9,11;77:15;
110:22;118:6,8,14,
15;119:8;120:24;
142:20,21,22,23;
147:22;149:2
**named (1)**
69:13
**names (8)**
8:10;60:15;61:16;
65:19;86:1;119:4;
133:22;140:24
**National (3)**
25:1,8;28:5
**ND (7)**
142:18,18,18,18,
19,22,25
**necessary (1)**
43:4
**need (5)**
30:19;50:14;
58:15;68:7;151:4
**needs (2)**
100:15;144:13
**New (29)**
16:18;21:10;27:1;
35:21;36:12,19;
42:23;49:23;77:15,
21,22,23,24;78:1;
100:8;113:25;
117:22,25;118:5;
121:25;122:5,9;
149:17,20,24;150:6;
151:6,10;159:3
**newer (1)**
157:17

**newspaper (1)**
104:23
**next (17)**
35:5;40:23;43:12;
44:15;46:15;47:3;
53:17;54:20;75:19,
24;94:5;109:11;
113:5;120:4;139:12;
142:7;153:7
**nice (4)**
17:4;48:16;66:2;
135:18
**Nielsen (1)**
116:3
**nine (2)**
29:16,17
**Nisim (1)**
147:13,14,15,18
**nobody (6)**
22:6;24:10;57:9;
102:8;124:15;125:4
**nod (1)**
9:18
**normal (1)**
143:12
**North (3)**
16:5;110:9,10
**note (1)**
34:12
**notes (1)**
34:16
**noticed (1)**
84:16
**notify (1)**
152:9
**nowhere (1)**
103:1
**Number (28)**
12:6,13;45:5;
67:20,21,22;74:8;
84:8;88:11,11,13,18;
98:6,17;123:24;
124:4;125:9;136:4,6,
20;138:16;143:2;
151:21;152:1;155:1,
11;156:16;158:3
**numbered (1)**
12:8
**numbers (6)**
88:15;116:8;
139:24;153:22,24;
155:3
**numerous (1)**
81:7

## O

**oath (3)**
10:7,8;84:17
**obeyed (1)**
63:22
**object (2)**
9:24;132:9

**objection (1)**
37:17
**objections (1)**
9:25
**objects (1)**
10:3
**obligated (1)**
10:12
**obtain (1)**
128:7
**obtained (1)**
128:11
**obtaining (1)**
103:21
**obviously (3)**
130:6;146:25;
153:11
**occurred (4)**
97:9;115:12,16;
146:25
**Ocean (3)**
49:23;141:5;
142:23
**off (15)**
49:19;74:9;94:8;
95:8,22,24;96:1;
134:8;135:22;
151:22;153:12,18;
155:7;156:4;160:2
**offer (1)**
150:9
**Office (23)**
6:20;24:21;72:2,7,
15,21,23,25;73:1,22;
75:2;79:25;80:24;
109:20;117:25;
118:7,8;120:21,22;
139:23;140:3;141:7;
148:4
**officer (3)**
21:17;22:2;117:11
**officers (1)**
22:23
**office's (2)**
142:3,10
**official (2)**
150:16,19
**old (15)**
44:25;64:8;65:23;
66:15;77:25;79:19,
25;80:6,18,18;81:2,
2;85:5;88:21;113:25
**older (3)**
80:21,21;83:17
**Once (2)**
8:15;60:24
**one (103)**
13:20;15:3;16:25;
17:23,24;26:3;29:6;
31:19;32:17;35:1;
39:1,3;43:22;44:13,
15;46:25;48:3;
49:11,13;50:7,8,11,

25;51:21,23;52:3,22;
54:20;55:4;57:18,
21;58:12,13;59:14;
62:24;63:2,5;66:15,
16;71:8,18,19;74:1,
8;78:4,6,7,8;79:10;
83:18;88:10;90:3;
91:5,17;94:15,17,19,
21;97:3;106:21;
111:21;112:6;113:3,
25,25;114:7,25;
115:15,15,19;
121:18;122:12;
130:24;134:14,19;
135:14;141:3,4,4,4,
5;145:6;148:23;
150:14;152:21;
154:10;156:17,18,
22,24;157:2,4,5,5,9,
11,14,15,18,23,23,
24,24

**ones (11)**
30:13;41:12;
72:12;121:4;123:5,
8;130:23;140:7;
141:13;147:11;
154:24

**only (19)**
13:20;24:4,4,8;
28:14;29:6;34:22;
36:13;49:17;64:22;
79:10;84:18;97:3;
103:10;119:3;
126:10;128:23;
129:2,24

**open (1)**
69:21

**opened (4)**
82:18,23;108:9,9

**operator (1)**
6:10

**orange (3)**
31:9,11;91:22

**order (10)**
15:2;20:4;43:12;
68:12;79:21,23;
91:18;94:2,5;134:4

**ordered (1)**
25:24

**orders (2)**
20:3,5

**ordinary (1)**
136:25

**original (29)**
43:2;47:23;48:10;
49:1,14,14;51:17,23;
52:4,9,9;54:8;57:17;
62:22;89:4;92:1;
96:24;111:20;112:3;
119:21;121:10,14;
122:8,10,14,15,22,
24;123:21

**originally (3)**

69:2,5;156:20

**OSO4 (3)**
67:2,7,9

**others (4)**
102:9;105:8;
128:25;129:3

**otherwise (1)**
63:23

**ours (1)**
103:11

**out (31)**
8:21,23;20:21;
21:5,5,7;38:11;
42:22;50:24;51:25;
56:23;79:21,23;
85:9;90:20;102:5;
105:6,13,14;115:7,9,
14;118:14;120:20;
121:15;125:3;
126:19;134:5,21;
135:6;144:11

**outside (3)**
21:5;158:18,25

**over (42)**
8:24;23:23;24:11;
38:13;42:25;43:1,6,
7,7;45:25,25;47:12,
17;49:15,18;50:12,
13,19;56:22;57:2,5;
59:23,24;60:3,3;
63:1,6;75:11;79:7;
86:12;87:21;88:3;
89:16;91:7,10;
103:3;137:8,8;
138:4;143:9;145:6;
156:16

**overheating (1)**
134:7

**own (16)**
15:22;18:5;19:5,
13,21;64:3;68:7;
77:11,25;99:7;100:5,
20,21;101:14;
102:16;131:6

**owned (4)**
15:9;69:17;
100:18;101:13

**owner (4)**
14:14;109:23;
110:3;125:12

**owners (1)**
107:15

**owns (1)**
27:1

---

**P**

**package (1)**
123:1

**page (32)**
29:10;43:19;44:2;
48:4,5;66:1;71:14;
72:14;73:7;74:19;

75:19;77:14;79:1,2;
83:24;84:19;89:14;
92:7,11;109:22;
110:1,2,3;116:20,25;
117:5,19;118:19;
120:19,20;121:9;
141:10

**pages (3)**
83:23,25;89:10

**paid (3)**
22:6,8;145:11

**paint (3)**
39:5;44:5;62:17

**palm (2)**
42:21;65:24

**Panama (1)**
23:12,17,18,20

**pants (1)**
130:22

**paper (8)**
14:24;16:1;26:5;
52:25;53:1;108:12;
134:1,7

**papers (2)**
155:4,5

**paperwork (1)**
102:19

**paragraph (17)**
27:9;29:16,17;
67:16,17;68:23;
69:1;81:4;82:11,15,
21;83:10,13,14;96:9;
97:8;99:24

**paragraphs (2)**
12:8,9

**Park (1)**
6:12

**Parkway (2)**
21:12;110:7

**parrot (2)**
31:4;83:4

**part (20)**
16:7;19:21;20:8;
36:10;39:2;55:12;
56:9;73:21;76:8,24;
90:3;101:7;103:7,
12;106:22,22;128:8;
138:10;150:2;151:3

**particular (11)**
32:6;39:12,13,20,
22,23;40:18,19;
122:17;142:14;
149:9

**parties (1)**
129:19

**partner (2)**
8:20;17:22;129:8;
151:6,10

**partners (11)**
17:23,24,25;18:2;
103:9;118:7;121:5;
149:16,20,24;159:4

**partnership (5)**

68:18;100:24;
127:13;128:9;150:3

**passing (1)**
146:10

**Patent (1)**
109:20

**Paul (1)**
6:16

**pay (3)**
90:16;105:20;
145:3

**payments (1)**
105:20

**peace (3)**
57:3,3;102:8

**peel (2)**
44:20,20

**peels (1)**
134:1

**people (19)**
14:24;20:16;
24:13,15,20;26:19;
36:15;61:17;75:1;
79:24;81:16,17;
104:25;105:1;
107:10;125:3;
138:20;140:16;
145:21

**per (1)**
33:16

**percent (4)**
105:16,20;153:18,
20

**permitted (4)**
37:21,22;130:3;
132:4

**Pershes (2)**
13:23,25

**person (5)**
28:16;63:8;102:7;
118:14;149:10

**personally (1)**
121:2

**phone (3)**
80:25;104:24;
143:9

**phonetic (3)**
14:11;87:14;149:3

**photograph (1)**
89:13

**phrase (2)**
134:21,23

**physical (2)**
127:19,20

**physically (2)**
89:2;111:3

**picture (9)**
29:24;31:4;47:24;
107:12;108:1;
118:19;128:24;
129:1;141:23

**piece (3)**
31:11;32:1;137:9

**pieces (2)**
31:22;32:7

**pinpoint (3)**
91:9;136:20;
138:22

**place (5)**
43:6;49:22;57:2;
132:17;145:6

**plain (1)**
31:23

**plaintiff (1)**
6:17

**plan (4)**
100:10;107:7;
108:19,20

**planning (1)**
128:24

**play (2)**
31:21;157:1

**please (7)**
6:14,23,25;8:7;
9:11;26:25;155:18

**plus (4)**
29:7;67:10;
118:24;121:10

**pm (12)**
74:9,13;95:9,12;
96:2,5;151:22;
152:2;156:5,8;160:1,
3

**pocket (2)**
140:20,22

**point (2)**
91:9;119:12

**pointing (5)**
31:9;42:19,20;
113:4,6

**pointy (2)**
44:14;45:20

**portion (1)**
127:8

**possible (1)**
76:10

**post-it (3)**
34:3,9,23

**preliminary (1)**
111:11

**premises (5)**
105:6;128:3;
147:4,6,8

**prepare (7)**
11:1,3;12:20;13:2;
34:9,11,12

**prepared (1)**
26:8

**preprint (1)**
15:3

**preprinted (1)**
100:8

**present (3)**
124:24;146:6;
148:21

**presentable (1)**

132:13
**president (5)**
14:17;21:21;
107:18;108:10;
117:9
**press (4)**
14:25,25,25;31:22
**pressure (1)**
90:14
**pretty (1)**
147:1
**previous (2)**
67:5;90:4
**previously (6)**
30:4;69:17;89:12;
115:24;133:11;
156:13
**price (1)**
15:5
**prices (1)**
137:19
**primarily (1)**
18:20
**print (8)**
45:1;93:8;134:3;
140:20;141:15,18;
144:5;151:3
**printed (3)**
15:21;49:4;52:25
**printers (1)**
147:12
**printing (1)**
36:14
**prints (1)**
134:8
**prior (2)**
98:10;136:4
**Probably (35)**
8:17;18:11;24:15;
38:25;43:23;46:19;
50:21;51:8;55:16;
70:10;72:3,15;75:3;
77:3;80:17,23;81:1;
83:17;85:8;87:7;
88:4;89:15;90:6;
93:17;107:9,9;
112:10;119:13;
120:21;123:13;
134:15;135:24;
136:1,18;153:17
**procedures (1)**
8:25
**produce (1)**
15:9
**producer (1)**
14:22
**product (9)**
88:11;93:24;
94:12;132:4;133:3,
25;144:13;150:16,19
**production (4)**
36:15;56:12;
105:24;133:23

**products (2)**
132:9;146:21
**profits (4)**
105:16;106:1,5;
139:4
**progressed (1)**
137:11
**progressing (1)**
143:11
**prompt (1)**
150:22
**properly (1)**
10:23
**protect (2)**
128:7,20
**protected (1)**
68:13
**Protecting (1)**
103:23
**protection (1)**
151:4
**provide (2)**
9:6;103:25
**provided (6)**
11:18;12:3;37:25;
93:25;95:17;139:15
**psychedelic (1)**
57:3
**psychological (1)**
158:9
**psychologist (1)**
159:12
**Pub (1)**
59:1
**pull (5)**
38:10;60:20;85:9;
89:17;155:5
**punch (2)**
102:3,3
**punched (1)**
145:14
**purchased (1)**
113:14
**purchasing (1)**
146:7
**purple (6)**
35:12,15;36:25;
91:21;114:3;154:16
**purpose (1)**
133:1
**push (2)**
19:25;24:12
**pushed (3)**
24:16,16,23
**pushing (1)**
19:11
**put (43)**
26:4;31:19,24,25;
32:1,2,7,8,8,9,14;
34:18;39:5;41:25;
42:16;45:2,4;48:13;
49:19,21;55:8;
59:13;66:4;73:11;

75:2;86:1;88:5;
89:14,16;93:4,7,8;
94:2;118:15;132:10;
133:18,20;134:2;
139:1;145:18;151:3;
155:2,10
**putting (3)**
22:6;33:13;105:23

**Q**

**quality (8)**
100:12;132:12,15;
133:5;134:4,9,16;
156:14
**quality's (1)**
134:1
**Quantity (1)**
52:21
**quick (2)**
95:16;145:14
**quickly (2)**
30:19;71:15
**quite (2)**
10:7;135:2

**R**

**rabbi (3)**
159:12,13,14
**raise (4)**
6:24;7:4,7,21
**reached (1)**
101:2
**read (4)**
53:2;71:15;100:3,
5
**reading (2)**
126:11,12
**reads (1)**
81:6
**ready (1)**
15:4
**real (1)**
150:3
**really (8)**
9:19;24:10;80:5,
13;86:25;91:9;
138:22;151:7
**reason (7)**
10:15,18,19;
77:14;79:22;102:23;
121:2
**recall (1)**
101:3
**receive (2)**
22:1;128:4
**recently (1)**
113:15
**recess (5)**
74:11;95:10;96:3;
151:24;156:6
**recognize (4)**

28:23;30:24;
109:14;120:7
**record (23)**
6:1,15;8:6;9:13;
10:1;30:4;74:10,12;
94:8;95:8,11,23,24;
96:1,4;111:10;
113:4;139:14;
151:23;152:3;156:4,
7;160:2
**recorded (2)**
6:6;159:25
**recording (1)**
123:10
**records (5)**
11:6;143:7;148:8,
14;153:19
**red (1)**
91:21
**reduction (1)**
149:10
**refer (12)**
20:5;10;27:25;
83:5;99:21;111:19;
118:10,11;146:12,
18;149:16;151:15
**reference (2)**
29:17;114:23
**referred (1)**
151:12
**referring (27)**
11:14;13:23;
20:22,25;21:4;
29:25;30:2;33:21,
23;34:2;73:25;
75:18,21;79:25;80:6,
19,21;82:25;83:2,15,
17;89:4;99:24;
105:1;112:10,13;
115:1
**reflection (1)**
97:8
**reflects (1)**
88:10
**regarding (1)**
158:4
**registration (5)**
115:20;116:16;
121:19,25;122:5
**registrations (2)**
109:5;122:3
**relate (1)**
154:24
**related (1)**
149:23
**relating (2)**
106:14;123:20
**relationship (4)**
98:14;100:17;
135:20;154:6
**religion (1)**
7:2
**remade (1)**

98:8
**remark (1)**
30:6
**remember (30)**
17:1;20:13,16;
23:21,22;28:10;
38:25;48:11;55:16;
69:12;85:3;90:21;
92:20;97:22;104:24;
108:21;110:17;
128:17;131:19;
132:18;146:5,11,17;
147:1,3,11;148:8,16,
25,25
**remembering (1)**
93:18
**renting (1)**
148:7
**reorder (2)**
153:5,6
**repeated (1)**
79:2
**reporter (43)**
6:10,23,24;7:4,7,
19,21;9:9,19;11:10,
22;25:12;28:20;
30:5,22;34:21;35:1;
38:18;40:22;42:4;
43:11;44:16;46:14;
47:18;53:16;54:2,
20;56:14;57:11;
58:19;59:7;60:24;
93:23;94:4;109:11;
110:13;111:7;
115:21;120:3;
121:21;124:13;
139:11;142:7
**Reporting (1)**
6:11
**represent (7)**
6:11;13:19;26:25;
55:19;78:3,7;124:1
**represented (2)**
9:21;26:2
**represents (1)**
70:5
**request (2)**
11:19;26:5
**requests (1)**
12:17
**resem (1)**
73:16
**resemblance (1)**
76:7
**resemble (9)**
42:14;47:13;
48:19;55:1;62:18;
63:5;65:1;82:6,6
**resembles (5)**
62:8,25;63:6;
64:23;154:15
**resembling (8)**
42:17;44:6;60:13;

62:2;65:24;73:17;
82:1;89:3
**residence (1)**
117:24
**resolve (1)**
159:9
**respect (3)**
80:16;102:9,9
**respond (1)**
11:19
**response (2)**
12:8;123:17
**responses (3)**
11:22;12:2;95:18
**responsibilities (1)**
104:9
**responsibility (1)**
105:4
**responsible (1)**
106:7
**rest (1)**
154:19
**result (2)**
106:4;158:8
**retail (8)**
15:7,7,10,14,16;
69:18;81:21;86:25
**return (5)**
68:16;113:21;
136:1;152:6;155:17
**returned (2)**
117:21;136:10
**revenues (2)**
138:24;139:1
**review (2)**
14:1;143:7
**rid (1)**
87:2
**right (76)**
6:25;7:5,8,22;
10:7;16:9,9,12;24:8,
17,24;31:10,24;
34:24;35:5;37:1;
41:7;42:20;43:25;
44:9,15;45:3,20;
46:13;47:13;48:7,16,
18,24;49:13;50:7,8,
9;51:2;52:4,10;
54:19;55:3,4,24;
58:2,7,25;60:5;
68:16;70:2;78:20;
86:9;88:2,23;90:9;
91:4;92:3;95:6;
98:21;102:11;
106:11;108:5;
110:24;111:5,15;
112:1,23;113:1,13;
114:23;117:16;
119:19;120:18;
122:12;132:8;
135:22;137:17;
151:18;157:6,20
**rights (1)**

124:6
**role (5)**
17:21;22:16;
99:19;103:17;
106:24
**roof (1)**
145:6
**room (1)**
134:2
**roughly (1)**
138:5
**rounded (4)**
40:8;46:4,5;58:9
**rule (2)**
10:1;132:11
**run (7)**
86:8;133:16,17;
134:10;138:1,3;
144:4
**runner (1)**
155:7

**S**

**Saddle (2)**
48:10;52:10
**Sadler (4)**
25:19,20,22;26:16
**sale (4)**
15:16;20:17;
88:10;149:15
**sales (24)**
19:25;21:3;58:16;
85:6,15;86:7,13;
91:18;104:10;
105:11,23;107:2,6,7;
123:11;128:19;
131:21;138:13,14,
21,25;140:4;154:14,
20
**salesman (1)**
44:21
**salespeople (3)**
105:9;144:11;
149:10
**Sam (1)**
147:13
**same (66)**
18:17;23:3,5,6,8;
26:4,21;35:24;36:1,
2,3,4;37:19,23,24;
38:1,12;41:2,7,12,
13,16,17;43:7,16;
45:10;46:7;47:8;
50:3;52:10,14;55:3;
57:7,25;60:1,19;
64:17,18,18,19;
69:10;78:6;79:2,5,8;
82:5;83:1;91:20;
92:11;94:25;96:25;
98:24;101:18;
110:13;112:20;
113:17;119:7,8,22;

127:16;133:23;
134:10;137:20;
141:3;154:9,21
**sample (3)**
44:20;53:14;144:4
**samples (7)**
33:17;86:21;
90:22;132:21,25;
133:2,4
**sandwich (1)**
56:24
**save (1)**
29:9
**saw (8)**
51:20;73:19,19,
19;77:6,6;112:21,21
**saying (10)**
7:13;37:7,10;
39:25;97:2;112:20;
113:17;118:9,10;
136:16
**sayings (1)**
54:15
**scan (2)**
89:17,23
**scanned (3)**
91:2,14;92:2
**scars (1)**
159:16
**Schneerson (7)**
18:7,8,21;28:12,
17,18;118:12
**Schneorson (2)**
18:1;95:20
**scissor (2)**
31:22;50:23
**scratch (18)**
31:5,6,8;33:12;
44:8;47:12;66:9,11;
85:14,25;96:16;
97:2;111:22,24;
140:20,20,22,22
**screen (1)**
36:14
**scripts (1)**
141:2
**search (2)**
92:18;125:3
**season (1)**
107:4
**second (8)**
44:1;79:11;92:6;
94:17;95:25;117:19;
120:19;157:5
**seeing (2)**
77:8;110:17
**seek (1)**
159:9
**seems (1)**
34:22
**sees (1)**
41:20
**seized (1)**

149:23
**seizure (22)**
72:5;76:17;80:24;
87:15;90:20;101:17,
23;107:13;108:24,
25;115:16;124:7;
129:22;146:25;
148:9;149:5,8;152:7,
10;158:5,9;159:4
**self (1)**
31:24
**sell (52)**
14:23;15:3,3,5;
16:1;19:11,13,20;
20:3;55:17,17;64:4,
22,24;66:7;85:14,17;
86:9,11,24,24,25,25;
87:7,19,25;88:2;
97:16;98:5,12,16;
99:15;105:5;129:2;
130:3,6,7,13,16,17,
18,20;131:7;133:4;
137:3;138:15,17,20;
143:25;145:9;151:1,
2
**seller (1)**
125:6
**sellers (4)**
143:14,19,20,22
**selling (28)**
19:1,4,6,15,17;
20:1;44:19;63:23;
64:12,20;80:17;86:5,
15,18;87:24;88:1;
100:11;103:21;
105:2;115:16;119:1,
12,12,14;137:4,7;
143:11;153:12
**send (10)**
48:9;72:3,7,16;
101:8;118:7;123:2;
124:9;132:21;133:7
**sending (1)**
133:1
**sent (4)**
14:2;72:22;75:23;
113:21
**sentence (13)**
67:17,21;75:13,
24;76:2;77:13;
79:11;81:5;82:11,16,
17,21,22
**sentences (4)**
40:14,20,21;41:5
**separate (1)**
59:5
**separated (1)**
34:22
**separately (2)**
59:6;138:1
**separating (1)**
62:24
**series (2)**

9:3;14:7
**serious (1)**
149:11
**set (4)**
11:21;35:24;
38:13;154:10
**settle (4)**
102:15,17;103:11;
159:8
**settled (2)**
78:12;79:23
**settlement (14)**
37:21;63:16,19;
64:20,21;101:2;
102:21;103:7,12;
113:21;123:2;136:2,
12;159:17
**seven (2)**
96:9;97:8
**several (3)**
49:9;133:19;
134:10
**shake (1)**
9:18
**shape (35)**
36:5,6,22;37:23;
38:1;42:14,25;44:5,
5;45:13,14,19,22,25;
46:3,4,5;47:12;
48:13;49:20,21;
52:6;55:1,3,4,7,10;
56:18;57:9,25;60:1;
63:10,11;65:6;82:1
**shapes (11)**
42:21,21;47:8;
57:1,7,21,24;59:23;
60:2;81:25;96:13
**share (1)**
105:20
**shareholder (2)**
108:11,16
**shareholders (1)**
108:7
**sharing (1)**
128:18
**shattered (2)**
103:3;158:4
**Shawn (1)**
6:9
**sheets (2)**
133:18,19
**shelf (1)**
87:17
**ship (2)**
20:3;132:19
**shipping (3)**
20:1;2;100:12
**shirt (11)**
61:18;88:17;
130:22;133:16,24,
24;134:10;135:6;
137:15;150:25;
156:14

**shirts (7)**
85:7;88:10;
134:14;137:7,13;
143:13;146:18
**shock (2)**
101:17;152:17
**shook (1)**
158:14
**shop (1)**
131:6
**shops (2)**
15:9;131:8
**short (1)**
156:2
**shorter (3)**
36:20,23;156:18
**shortly (1)**
152:7
**shorts (4)**
130:23;131:25;
132:1;141:19
**shoulder (4)**
156:24;157:7,20,
22
**show (60)**
25:11;28:19;
29:23;32:19;35:20;
38:6,9,18;39:10;
43:5,16;44:3,15;
47:23,24;49:12;
50:9;51:2,5;52:24;
54:1,16;57:8,11,24;
58:2,16;60:18,20,22,
24;63:1,2,3;64:8;
72:8,9,10,16,17;
76:19;81:21;89:11,
18;91:16,16;109:10;
110:12;112:1,22;
113:11,20;121:19;
133:10;139:10;
144:12,13;145:11;
153:20;154:10
**showcase (4)**
73:18,20,24;90:18
**showed (25)**
14:7,7;33:10;50:7,
10,11;53:7;62:14;
65:2,21;66:1,4,16;
72:15;73:17,18,19,
20;76:11;87:10;
93:4;95:21;111:25;
112:20;135:1
**showing (16)**
35:10,12,14;
36:19;39:15;41:3,4;
42:14;51:10;55:6;
61:7,10,13,16;85:6;
91:24
**shown (23)**
30:8;32:22;33:1,2;
35:9;61:5;63:20;
65:5;75:18;78:2;
82:8;84:7,21;85:17;

94:25;98:5,13,24;
99:16;112:16;
114:10;115:5;
116:19
**shows (11)**
15:7;31:4;42:9,10;
52:19,21;56:5;
126:13;144:12;
145:1,22
**shredded (1)**
136:10
**side (6)**
19:17;33:11;
69:18;103:22;
122:12;149:3
**sign (4)**
57:3,4;75:7;148:5
**signatory's (1)**
110:22
**signature (4)**
29:11,13;52:10;
117:5
**signed (3)**
27:15;84:17;121:3
**significant (1)**
80:15
**signifies (1)**
117:8
**signify (1)**
74:23
**similar (7)**
26:8;33:6,12,24;
41:13;92:7;155:15
**similarity (1)**
36:17
**sit (1)**
50:15
**sits (1)**
95:21
**sitting (3)**
58:25;77:8;112:1
**six (11)**
67:17,17,20,20,21,
22;76:16;91:20;
133:20;137:7,15
**size (3)**
65:5;133:19;
137:24
**skinnier (2)**
112:19,20
**skinny (5)**
33:12;113:5,7,9;
114:14
**skull (4)**
43:20,21,22;141:4
**skulls (1)**
96:16
**sleep (2)**
158:8,11
**sleeve (3)**
32:1;43:24;123:25
**sleeves (2)**
33:13;114:17

slightly (1)
147:22
**slogan (3)**
135:1,6,9
**slogans (4)**
134:20,25;135:1,
15
**Slome (1)**
149:2
**slowed (1)**
153:25
**small (1)**
122:12
**sold (40)**
14:10;24:20;43:9;
45:5;52:19,21;53:9,
9;55:19;65:23;
76:14;81:16,17,21;
85:12;86:1,13,20;
87:4,18;89:12;
90:13;91:18;93:18;
98:15,19;100:25;
107:25;122:8,9,11;
127:14;130:16;
136:24;137:9;138:4;
145:25;146:4;
154:18,22
**sole (1)**
108:11
**somebody (23)**
15:2;41:19;52:20;
69:13,15;72:22,24;
73:4,21;75:6,7;91:2;
92:10;101:23;102:3;
111:2;112:1;120:25;
121:1;149:20;151:7,
12;155:5
**somebody's (2)**
141:23;158:23
**somehow (1)**
80:20
**sometime (3)**
99:14;115:5;131:8
**sometimes (13)**
40:16;73:11;
78:18;85:25,25;
87:21,21,22;106:4;
121:6,6;134:6;151:5
**somewhere (2)**
67:14;89:21
**sorry (12)**
7:1;20:24;38:10;
42:20;48:22;50:16,
17;65:11;117:2;
120:18;124:13;
147:16
**sounds (1)**
138:4
**South (1)**
78:21
**Spanish (1)**
46:23
**speak (3)**

13:4,11,13
**specific (4)**
30:8;66:8;85:7;
98:24
**specifically (2)**
84:17;149:24
**spell (1)**
8:9
**spelling (1)**
120:24
**Spells (1)**
147:22
**split (1)**
107:22
**splits (1)**
108:13
**spoke (1)**
13:20
**spoken (1)**
13:1
**sponsor (2)**
144:22;145:11
**sponsored (2)**
144:17;145:15
**sporting (1)**
144:22
**Spring (1)**
56:25
**square (1)**
87:12
**SS (2)**
27:16,18
**St (4)**
49:15,17,19;119:7
**stack (8)**
40:18,19;56:8;
59:15;135:18;
139:15,18;155:4
**standard (2)**
7:17;88:24
**standing (2)**
117:15;143:10
**stands (2)**
93:21;142:21
**staple (2)**
34:21;45:2
**stapler (1)**
34:25
**start (8)**
44:18;65:4,17;
97:15;98:4;101:15;
104:1;119:14
**started (44)**
15:8,9;18:11;
21:21;22:5;23:3;
32:17,20,21;36:8;
70:15,17,19;76:13;
77:10,16,20;78:16,
17;87:8,24;96:25;
97:17;98:3,7,14;
99:4,6,10,11,15;
107:4;115:1,4;
118:22;119:1,12,12,

15,16;122:18;126:5;
137:6,10
**starts (3)**
32:5;71:14;79:3
**state (12)**
8:6;20:21;21:5,7;
115:23;116:3,15,17;
118:23;121:25;
158:5,9
**statement (1)**
81:10
**States (2)**
36:14;109:18
**stayed (1)**
87:1
**Stein (2)**
27:16,18
**stencil (1)**
47:12
**steps (3)**
124:5,8;152:9
**STEWART (83)**
6:16,16;7:17,20;
8:4;11:10,13,25;
25:14;28:22;31:2;
33:20;34:5,8,24;
35:3,4,8;38:8,21;
40:25;42:4,7;43:11,
14;44:22;46:14,21;
47:5,21;51:7;52:15;
53:16,19;54:4,19,22;
56:16;57:14;58:5,
21;59:7,11,17;60:5,
11;61:4;66:20,24;
71:9,12;74:5,14;
94:4,9;95:6,13,24;
96:6;109:13;110:16;
111:9;116:1,5,10,12;
120:6;121:21,24;
124:17;135:14,16;
139:14,17;141:22;
142:1,6,9;151:18;
152:4;155:24;156:3;
159:22
**still (12)**
10:3;37:14;64:12,
19;74:18;75:5;
86:15;117:11,12;
152:20;159:15,18
**stir (1)**
152:19
**stock (3)**
87:11;140:17;
153:6
**stopped (6)**
86:17,19;88:1;
107:14;153:12;
154:1
**storage (1)**
44:24
**store (8)**
14:14;16:3;45:1;
82:19,23;105:12;

146:7;147:25
**stores (2)**
69:17,18
**straight (1)**
13:22
**Street (3)**
16:5;69:18;159:1
**stress (1)**
159:10
**stuff (62)**
11:3;13:6;17:8;
32:9;37:4;40:3,4;
44:25,25;50:23,23;
56:10;64:8;65:20,
23;76:19;77:24,25,
25;78:1,19;79:19,25;
80:3;81:2,20;83:2,9;
86:14;87:10,16;88:4,
14;89:4;90:13,14,23;
92:18;97:1;101:22;
103:13;104:13;
105:1,9;107:5;131:7,
9;132:12;133:6,17;
138:10;139:24;
145:1,9;148:19;
152:13;154:15,15,
16,17;155:12,15
**style (16)**
44:14;45:4;55:2;
57:20;61:17;88:15;
96:24;123:24;124:4;
133:12;138:16;
141:24;143:2,2,5;
155:11
**styles (3)**
60:2;88:22;96:15
**subject (1)**
16:14
**submitted (1)**
29:1
**subpoena (11)**
11:7,9,14,19;12:2,
6;13:21;34:1,1;
95:18;123:18
**subsequent (1)**
156:20
**subtle (1)**
120:18
**suddenly (1)**
154:4
**suffering (1)**
159:15
**Suite (1)**
110:7
**summarize (1)**
80:8
**summary (1)**
96:21
**Sunshine (2)**
116:17;118:23
**supply (1)**
19:22
**support (2)**

104:6;144:24
**supposed (15)**
20:8;70:7,9,12;
102:20;103:19;
104:5,6;107:2,3,13,
17,20;108:13;127:1
**sure (30)**
9:5;20:18;22:18,
21;23:18;26:22;
31:18;33:20;36:12;
48:1;69:7;75:4;82:5;
86:7,10;87:1;88:1;
89:19;93:6;101:2,
16;106:5;125:8,24;
133:25;134:11;
136:3,7;138:6;149:6
**surprise (1)**
105:22
**swear (4)**
6:23;7:1,11,18
**sweatpants (8)**
130:9,15,16,18;
131:13,17,18;141:20
**sweatshirt (7)**
32:7,10,13;
130:22;131:14,18;
137:8
**sweatshirts (9)**
33:13;114:17,19;
130:8;131:12,17,18;
132:1;137:16
**Sweatshirt's (1)**
137:15
**sworn (2)**
7:25;10:7
**symbol (1)**
70:3

**T**

**tag (3)**
15:5;150:15,25
**tags (2)**
94:1;150:25
**talk (4)**
13:21;114:8;
146:24;159:12
**talked (3)**
106:23;143:9;
159:13
**talking (11)**
13:18,18;24:13;
36:5,6;45:24;63:9,
10;76:15;80:25;
90:12
**tank (2)**
130:9,22
**tape (2)**
31:11;74:6
**tee-shirt (27)**
14:8;15:4,9,10,23;
31:19,23;39:6,9,11;
42:1;48:14;49:12,

20;53:13;84:18,21;
113:5,14;133:11,13,
15,17;134:3,3,17;
135:18
**tee-shirts (31)**
14:23;15:1,16,19;
19:14;24:5,20;50:4;
53:5;60:23;61:5,16;
62:6;78:9,13;89:14;
91:5,19;92:7;97:16;
98:5,17;100:8;
115:15;130:7,8;
131:6;132:1;134:24;
137:20;150:15
**telling (1)**
90:22
**ten (7)**
39:1;43:23;45:22;
46:19;137:18,18;
156:18
**tens (2)**
135:23,25
**tent (1)**
47:13
**terms (3)**
106:17,19;128:16
**test (7)**
133:24,25;134:9,9,
17;144:4;156:14
**testified (2)**
8:1;70:19
**testify (1)**
10:23
**testimony (5)**
10:16,20;66:25;
113:8;114:1
**thinking (1)**
34:20
**third (4)**
27:8;70:1;94:19;
129:19
**Thomas (1)**
6:11
**though (1)**
117:15
**thought (5)**
24:23;38:10;
114:1;125:23;
158:23
**thousand (2)**
138:5,25
**thousands (4)**
50:21,21;135:23,
25
**three (70)**
9:4;26:13;27:2;
30:10,15;31:15;
32:16,22;35:13,16;
42:10,14,15,17,17,
21,22;43:6,16,18,22,
25;48:18;52:7,23;
55:7,12;56:18;
57:22;58:10;59:4,20,

22;63:11;67:1;
74:20;81:6;85:20,
21;86:20;91:15;
96:13;97:23,23;
108:23;109:2,2;
111:23;113:2,5,6,6,
8;114:3,14;115:2;
116:16;118:24,25;
119:19;120:10;
121:10,11,14;
122:23;123:11,21;
143:1;152:1;154:17
**throw (4)**
66:6;87:22;
104:21;144:3
**tiger (1)**
60:1
**till (6)**
9:11;49:4;126:17,
18;148:15,16
**times (1)**
138:3
**today (14)**
6:10;9:21;10:17,
20;11:2;14:3;29:6;
33:15;38:1;49:4;
83:2;86:15;112:13;
114:1
**Today's (2)**
6:3;13:2
**together (24)**
18:12;19:16;
23:12;24:2;26:5;
31:5,15;32:4;43:23;
45:3;55:8,12;97:20;
99:15;107:25;109:9;
118:25;127:2,16;
129:6,7;136:16,17;
140:13
**told (16)**
34:13;51:15;
65:21;77:10;98:23;
102:15,23;103:10;
104:20;106:18;
112:12;114:16;
142:16;144:2;147:1;
148:23
**took (7)**
49:19;57:16;
76:10;87:7,19;
102:1;114:10
**top (12)**
28:6;31:6;46:6,9,
18;79:1,14,16;117:2;
130:22;143:19,20
**topic (1)**
97:14
**tops (1)**
130:9
**Toronto (2)**
55:21;56:1
**track (1)**
116:7

**trade (1)**
145:11
**trademark (61)**
19:1,3;23:7,16,23,
25;24:17,21,21;25:1,
8;26:1,4,20;27:1,9,
16;28:6;33:11;
68:10,11,12,20,21;
97:21,21;98:2;
101:25;103:24;
106:22;109:5,15,20,
23;110:13;112:2,22;
116:15,19;118:16;
119:22;120:9;121:3,
18;126:2,13;127:4,6;
128:20;129:13;
133:5;144:18;
149:25;150:1,5,9,10;
151:2,4,13;154:3
**trademarked (2)**
24:18;98:9
**trademarks (20)**
17:7;19:5,7,7,9;
23:11;97:17;99:11;
103:20,21;109:5;
124:6;126:5,8,23,24;
127:25;128:7;150:8,
23
**transcript (1)**
9:10
**transfer (5)**
36:14;53:3;81:8;
101:9;137:9
**transfers (27)**
14:22;15:6,11;
19:14,23;52:24;
53:4;62:6;98:16;
100:7,18,21,21;
101:6;122:24;
130:17,20,25;131:2;
133:8;135:20;137:3,
10,20;138:5;143:13;
151:1
**tree (2)**
42:21;65:24
**trees (2)**
31:6,6
**trick (1)**
12:5
**true (3)**
34:15;81:10;
124:18
**trust (3)**
71:8;153:9;154:6
**truth (7)**
7:3,10,15,16;8:2;
10:13;79:22
**truthful (2)**
10:16;12:23
**try (2)**
66:5;77:7
**trying (7)**
77:21;97:4;151:9;

**turn (7)**
83:22;92:6;
117:19;118:18;
120:19;125:8;
150:14
**TV (1)**
145:22
**twice (1)**
111:2
**two (16)**
18:14;31:24;32:8;
57:22;60:7;73:7;
75:18;76:18;83:22,
24;87:14;89:10;
108:24;136:4,18;
151:21
**type (16)**
8:18;14:20;18:24;
22:24;23:6,8;60:19;
66:3;73:16,17,18;
75:10;96:15;104:22;
111:3;150:22
**typed (1)**
111:2
**types (5)**
12:7;76:20,25;
130:2;132:9
**typestyle (16)**
39:2;40:9,11;47:1;
58:8,17;60:20;72:8,
11,16,17;76:11;
78:20;79:11;85:19,
20
**typestyles (2)**
39:3;75:25

**U**

**Uh-uh (1)**
147:7
**under (12)**
10:7,8,22;37:21;
63:19;67:14;84:17;
129:24;130:2,5;
145:6;159:10
**United (2)**
36:13;109:18
**Unleash (3)**
135:9,12,14
**up (31)**
8:21;22:7;27:6,11;
31:25;36:18;46:23;
66:3;69:21;86:14,
22;87:17,18,22;88:5;
89:24;90:12;93:19;
95:21;107:22;
108:14;111:3;
114:17,22;131:12;
139:3,6,8;151:10,11;
158:14
**update (1)**
77:24
**upon (1)**

67:2
**USA (1)**
46:7
**usage (10)**
39:15,25;41:3,4;
42:18;43:24;55:6;
56:4,5;58:1
**use (40)**
35:10;36:10;39:1,
18,18;40:1,1,4;
42:10,25;45:25;
46:9;47:6;50:1,12;
53:4,20;55:11;
59:12;60:21;61:10,
13,20;75:15;77:9,25,
25;78:1,18;84:20;
111:12,23;112:13;
128:12,23;134:25;
135:5;139:24;
140:24;151:2
**used (27)**
32:6;35:20;36:21,
23,23;38:24;40:8,14;
43:7;45:7;54:5;
56:18;59:3,23;64:8;
72:18;76:7,21,24;
84:18;96:12;112:17,
18;113:9;122:24;
134:23;158:3
**users (1)**
81:8
**uses (1)**
30:15
**using (25)**
27:9;39:8;57:10;
59:22;65:4,17;77:9;
81:12;82:3,8,17,22;
83:11,15;114:2,4,16;
115:2,4;118:22;
122:18;130:3;
144:18,23;145:16
**Usually (2)**
7:12;41:4
**utilize (1)**
81:25
**utilized (2)**
81:7;96:15

**V**

**variation (1)**
96:15
**variations (2)**
81:25;96:22
**variety (5)**
39:15,24,24;
68:14;91:18
**various (1)**
96:13
**vehicles (1)**
145:19
**venture (4)**
20:7;22:7;99:10;

100:22
**verbal (8)**
106:16,16,18;
126:16,20,21;128:5,
15
**verify (1)**
115:15
**version (13)**
32:23;62:9;67:9;
70:17,18,19;78:2;
80:18;81:2;83:18;
98:13;122:22;
157:12
**versions (3)**
124:19,20;143:21
**versus (3)**
6:2;156:19,20
**vice (2)**
21:21;117:8
**video (2)**
6:6;159:25
**VIDEOGRAPHER (15)**
6:1,22;50:15;74:7,
12;95:8,11,22;96:1,
4;151:20,25;156:4,7;
159:24
**view (1)**
62:7
**violate (1)**
64:5
**Virgin (2)**
49:16,18
**visit (1)**
159:3
**voice (1)**
140:2
**volia (1)**
66:5
**voluntarily (1)**
102:20
**VP (1)**
117:8

**W**

**wait (2)**
9:11;51:4
**wall (1)**
15:2
**wants (1)**
75:15
**warehouse (1)**
87:12
**watch (1)**
64:10
**way (15)**
9:12;19:6,8;40:6,
19;48:17,17;53:3;
59:21;67:12;79:16;
86:1;102:11;110:21;
154:23
**ways (1)**
47:2

**wearing (1)**
145:22
**website (3)**
105:12;144:12,16
**Week (37)**
23:11,12,14,23;
24:1,5,22;25:25;
26:3,10,11,23;27:7,
11,12,13;55:23;
78:19;80:1,2;85:14;
86:22;97:21,25;
98:11;106:25;107:1,
16;108:5,17,21;
113:16;114:20;
126:24;127:3;145:3,
5
**weekend (1)**
126:6
**Weeks (4)**
24:18;97:18;
99:11;145:1
**weight (2)**
29:9;128:19
**Welcome (4)**
74:15,16;95:14,15
**weren't (3)**
83:10;123:17;
148:20
**What's (15)**
17:21;19:8;22:16;
41:9;69:9;73:14;
85:17;87:17;102:23;
112:11;143:10,10;
146:10;153:7;157:5
**wheel (3)**
35:22;57:9,10
**whenever (1)**
132:13;134:2
**Whereupon (1)**
7:23
**wherever (2)**
46:7;155:14
**white (2)**
157:7,9
**whole (7)**
36:8;58:8;71:16;
101:20;124:7;
132:15;134:7
**wholesale (5)**
15:14;16:1;81:21;
86:25;138:17
**who's (2)**
159:18,18
**whose (4)**
23:25;109:4,4;
135:5
**wide (2)**
39:24;133:18
**wider (1)**
157:1
**widespread (1)**
68:14
**wife (3)**

13:5,8;34:13
**Wildwood (4)**
119:8;122:1;
141:4;142:23
**willing (2)**
74:24,25
**wing (1)**
55:22
**without (7)**
50:5;62:22,23,23;
85:19;93:8;101:24
**witness (16)**
6:23;7:1,6,9,16;
8:2;31:1;33:23;
44:18;46:17;50:16;
52:14;59:10;115:23;
124:15;141:24
**wolf (2)**
47:16;61:24
**wondering (1)**
120:23
**word (7)**
7:18;9:10;10:8;
120:10,11,12;122:1
**words (13)**
9:17;40:14,20;
41:4;78:10;79:13,
16;80:9;100:5;
116:17;118:23;
158:4,7
**work (8)**
19:16;25:19;32:4;
34:17;69:22;76:19;
77:3,23
**worked (4)**
69:20;76:16;
115:7;127:15
**working (5)**
79:19;97:15;98:4;
99:15;115:9
**works (1)**
31:17
**world (2)**
49:19,23
**wrap (1)**
32:8
**write (1)**
34:13
**writing (4)**
53:1;71:24;80:3;
128:14
**written (8)**
9:9;11:22;12:2;
75:6;78:20;106:14,
15;126:7
**wrong (1)**
121:1
**wrote (6)**
26:20;27:6;34:13,
14;71:22;75:21

**Y**

**year (27)**
38:24;43:9;46:19;
53:9,24;54:16;
55:15;56:19,20;
57:4;58:23;70:7,8,8;
76:17;77:15,21,24;
87:6;92:20;97:22;
101:20,21;140:8,10;
142:11;153:7

**years (41)**
8:17,25;16:19;
18:14;24:12,19,23;
40:5;43:23;44:7;
46:1,19;50:3,20;
55:7;56:4,6,10;
60:18;64:1,2;81:7,
13,14,20;82:4;85:5;
86:21;87:2,7,10,20;
88:22;94:12;97:22,
23;143:15;148:11,
13,17;154:18

**yellow (10)**
34:12,15;42:16;
50:2;59:4,23;62:17,
23;91:22;138:2

**yesterday (3)**
11:5,18;139:15

**York (14)**
16:18;21:10;27:1;
49:24;117:22,25;
118:5;149:17,20,24;
150:6;151:6,10;
159:3

**Yosef (11)**
6:7;7:24;8:8,11;
73:2,10;74:8;
117:21;151:21;
152:1;159:25

**Y-o-s-e-f (1)**
8:11

**Z**

**zero (1)**
153:12

**1**

**1 (40)**
30:5,6,8;33:2,3,4;
35:25;37:1,12;38:2;
41:8,9,9,10;45:11;
62:8,25;63:20;
64:16;65:5;67:1,25;
69:5,24;78:3,10;
82:8;83:11,15;84:8;
94:25;98:6,13,17,24;
99:16;112:14,17;
115:5;125:9

**1:12 (1)**
95:9

**10/16/96 (2)**
43:9;53:25

**10/4/96 (1)**
53:10

**10:38 (1)**
6:5

**1052 (1)**
16:5

**11 (7)**
81:4;82:11,12,15,
20,21;83:10

**12/3/1993 (1)**
111:13

**12:30 (1)**
74:9

**12:43 (1)**
74:13

**14 (3)**
72:4;133:11;
156:13

**15 (1)**
99:24

**16,000 (1)**
87:12

**165 (1)**
6:7

**18 (3)**
8:17,25;87:10

**187 (1)**
6:12

**19 (4)**
51:3;79:16;83:16;
87:10

**1987 (2)**
27:10,13

**1990s (6)**
39:9;82:18,23;
83:12;87:5;96:13

**1991 (5)**
92:25;124:19,20,
22,24

**1993 (23)**
32:21;33:2;36:25;
37:8;57:4,4;67:9;
70:13;84:18,19,21;
85:7;86:6;87:8,25;
92:16;96:14;111:18;
112:11,17;113:9;
114:2,24

**1995 (3)**
47:15,15;55:14

**1996 (2)**
14:8;66:21

**1997 (11)**
54:25;56:2;79:13,
13,16,25;80:5,9,15;
94:1,15

**2**

**2:20 (2)**
95:12;96:2

**2:22 (1)**
96:5

**20 (11)**
12:7,8,9,11,12,15,
15,20;24:11,19;
32:10

**200 (3)**
30:11,13;136:4

**200,000 (1)**
136:15

**2000 (11)**
32:16,17;58:10,23,
25;66:15,19;70:21;
94:1,17,18

**2002 (4)**
57:16;65:7,8;
119:15

**2003 (4)**
70:2,5,6,10

**2004 (2)**
94:1,19

**2005 (6)**
54:17,18;58:10;
94:2,21;148:16

**2006 (1)**
58:11

**2008 (3)**
59:8;60:12,13

**2009 (1)**
143:22

**2010 (22)**
65:9,10,13;69:6;
70:20;83:19;94:23;
99:4,14;112:18;
115:6,12,13;119:25;
121:15;122:18,20;
126:4;140:10,11;
142:4;143:17

**2011 (5)**
72:4,6;142:11;
143:17;146:25

**2012 (1)**
6:4

**22 (3)**
11:11,12;12:6

**23 (7)**
11:23,24;12:8,10,
13;95:17;96:10

**24 (4)**
25:12,13;28:4;
50:20

**25 (9)**
28:20,21;30:23;
50:3;52:23,23,23;
67:13;68:24

**250 (1)**
136:18

**26 (8)**
30:23,23,25;
32:22;34:4,10;
92:22;114:11

**27 (2)**
35:6,7

**28 (6)**
38:19,20,22,23;
41:24;133:18

**29 (3)**
6:4;40:23,24

**3**

**3 (4)**
110:7;111:18;
112:17;114:24

**3:44 (1)**
151:22

**3:48 (1)**
152:2

**3:55 (1)**
156:5

**30 (5)**
24:19;42:5,6,8,9

**31 (2)**
43:12,13

**32 (2)**
44:16,17

**33 (2)**
46:15,16

**34 (2)**
47:3,4

**35 (6)**
47:19,20;51:15,
19;153:18,20

**36 (2)**
52:12,13

**37 (2)**
53:17,18

**38 (2)**
54:2,3

**39 (3)**
54:20,21;56:5

**3DL (121)**
9:4;26:4;29:17,19,
22,25;30:1,3,8;
32:16,17,21;33:11,
12,17;36:9;42:17;
43:22,23;44:6;
47:13;48:13,17,18,
20;51:3;55:2;62:2,9;
64:22,22,24;65:1;
67:25;68:3;73:17;
76:1;79:13;80:16;
81:6,13;82:4;91:21;
96:12,22;97:16;
98:10,13;99:12,16;
101:6,12;103:18;
104:1,16;105:2,11,
16;106:14;109:5,15;
122:1,18;124:6,19;
125:9,12;126:1,8,23,
25;127:6;128:12,23;
129:13,24;130:3,13;
131:10,11,12;132:4,
10,19;133:8;135:19;
137:2;139:20,21,22;
140:5,13,22;141:11,
13,15;142:3,11,17;
143:8,13,22;144:8,
18,23;145:4,12,16,
18,22,24;146:7,12,
14,15,21;149:15;
150:17;152:6;
153:11;156:16

**3DLs (2)**
99:12;138:13

**4**

**4 (3)**
113:5;115:14;
150:14

**4/21/2005 (1)**
54:17

**4:08 (1)**
156:8

**4:13 (2)**
160:1,3

**40 (6)**
24:19;56:14,15;
133:18;153:18,20

**41 (3)**
57:12,13,15

**42 (4)**
58:3,4,6,7

**43 (3)**
58:19,20,22

**44 (5)**
59:8,15,16,18,19

**45 (3)**
60:7,9,12

**46 (3)**
60:7,10,12

**47 (5)**
60:25;61:1,2,5,8

**48 (3)**
60:25;61:2,11

**49 (3)**
60:25;61:2,15

**5**

**50 (10)**
24:19;60:25;61:2,
21;63:2,3;105:16,20;
137:21,22

**50/50 (5)**
106:9,9,21;
128:18;139:4

**51 (3)**
60:25;61:2,23

**52 (3)**
61:1,2,25

**53 (5)**
61:1,1,2,6;62:3

**54 (2)**
66:22,23

**55 (3)**
71:10,11;74:18

**56 (3)**
55:23;94:6,11

**57 (1)**
94:6

**58 (1)**
94:6
**59 (2)**
94:6,11

## 6

**60 (4)**
109:11,12;116:9;
137:6
**61 (2)**
110:14,15
**62 (2)**
111:7,8
**63 (3)**
115:21,22;116:10
**64 (2)**
120:4,5
**65 (4)**
121:22,23;137:6,
10
**66 (4)**
139:12,13;142:2,
16
**67 (3)**
142:7,8,10

## 7

**7 (1)**
72:6
**70 (2)**
136:2,9
**70th (1)**
113:15
**715 (1)**
21:12
**716 (1)**
21:12
**719 (1)**
110:6

## 8

**80,000 (3)**
136:3,10,24
**87 (2)**
27:12,14

## 9

**9 (5)**
35:11;36:21;50:8;
66:19;98:20
**90s (5)**
55:16,20,23;
56:19;59:3
**91 (5)**
32:16,17;81:24;
83:3;114:15
**93 (17)**
32:17;33:6,7;
35:11,21;36:21;

66:15;67:6;70:9,14;
81:24;83:5;96:25;
98:22;154:17;
157:23,25
**94 (2)**
53:24;81:24
**95 (2)**
46:9;56:21
**96 (16)**
44:19;45:6,15;
48:13,17;49:1;50:1,
1;52:20;53:12,24;
61:12,13;62:1;
66:19;81:22
**97 (5)**
55:23;56:3;66:19;
80:1,2