**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION**

MONSTER ENERGY COMPANY, f/k/a
HANSEN BEVERAGE COMPANY, d/b/a        Case No. 6:11-CV-329-ORL-22DAB
MONSTER BEVERAGE COMPANY,

                Plaintiff,

vs.

CONSOLIDATED DISTRIBUTORS,
INC., METTEMP, INC., and DAVID
BAKSHT (a/k/a David Lipsker a/k/a David
Bakshet a/k/a D Bakht a/k/a DM
Schneerson a/k/a Abraham Shneorson),

                Defendants.

_____ /

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON PRIORITY AND DEFENDANT'S COUNTERCLAIMS

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Plaintiff Monster Energy Company ("MEC") respectfully moves for summary judgment dismissing with prejudice Counterclaims I-V of Defendant Consolidated Distributors, Inc. ("CDI") and Defendants' sixth affirmative defense.  In particular, MEC seeks summary judgment dismissing the claim that MEC's famous M Claw Trademark, which MEC first used in 2002, somehow infringes CDI's Three Drooping Lines ("3DL") design, which was first used in 2010.  This claim should be dismissed because MEC's famous trademark pre-dates the 3DL design by eight years, and also because CDI never acquired title to the 3DL design.  MEC also seeks summary judgment on CDI's claims for wrongful seizure and abuse of process because CDI has no standing to assert these claims.  CDI alleges harm to former defendant Joe Cool, Inc.

or to a joint venture it allegedly formed with Joe Cool, but alleges no harm to itself. Granting this motion would resolve all of CDI's claims against MEC for damages and injunctive relief and the sixth affirmative defense to MEC's trademark infringement claims.

## I. INTRODUCTION

MEC markets a wide variety of energy drinks throughout the United States and the world under its famous  trademark ("M Claw Trademark"). MEC's original MONSTER ENERGY® drink prominently displays MEC's M Claw Trademark in a distinctive green and yellow, varying in intensity from left to right, against a black background as shown below.

Since launching the MONSTER ENERGY® drink brand in 2002, MEC also has used, and continues to use, its M Claw Trademark in connection with t-shirts and other clothing.

In 2010, Defendants began to offer for sale and sell heat transfers and t-shirts that prominently display their so-called "3DL" design, which is very similar to MEC's federally registered M Claw Trademark, as shown below:

 

MEC'S M Claw T-Shirt                     Defendants' Infringing 3DL T-Shirt

Originally, the main issue in this case was whether Defendants could continue to sell their 3DL shirts without violating MEC's trademark rights.  However, two significant events have transpired since then.  First, former Defendant Joe Cool, Inc. settled with MEC, and, pursuant to a stipulated injunction, has stopped selling the disputed 3DL shirts.  The remaining Defendants have stated that they have not resumed sales of the 3DL shirts.  Second, after evading service for a year, remaining Defendant CDI asserted counterclaims against MEC, alleging that MEC's M Claw shirts actually violate *CDI's* alleged trademark rights in the 3DL design.  Thus, CDI seeks to turn the tables on MEC and become the effective plaintiff in this case.

As the basis for CDI's trademark counterclaims, CDI claims prior rights based on allegedly using the 3DL design since the mid-1990s.  However, the undisputed evidence establishes that the 3DL design was neither created nor used in commerce until 2010, long

after MEC's M Claw Trademark became famous.

Defendants' claim of prior rights is based solely on use by Yosef Amar's company, Joe Cool.  But Mr. Amar and two of his former employees testified at deposition that Joe Cool did not begin using the 3DL design until 2010.  Mr. Amar explained that the alleged prior rights are based upon sales of t-shirts with other designs, including lizards, birds, and wolves with claws.  Most of these designs have no resemblance, whatsoever, to the 3DL design used by Defendants, and none of the designs approach the "virtually identical" requirement for sustaining priority.  Additionally, Defendants lack evidence to show that these predecessor designs were continuously used from 2002 to 2010, a separate legal requirement to establish priority.  Furthermore, Defendants' alleged rights rest entirely upon an alleged oral assignment of the 3DL design from Joe Cool to CDI without any accompanying goodwill or business assets.  Oral assignments, and bare assignments "in gross," are invalid as a matter of law.

Defendant CDI has also asserted counterclaims for wrongful seizure and abuse of process based on MEC's seizure of infringing products and business records at Joe Cool's place of business, alleging $20 million in damages.  *See* D.I. 122, Counts IV and V.  However, CDI lacks standing to bring these claims, which accrued to the alleged joint venture formed between CDI and Joe Cool.  Under Florida law, "[p]artnership property is owned by the partnership as an entity, not by the partners as coowners."  § 620.8501, Fla. Stat. (2011).  Accordingly, any claims arising out of the seizure vested in the joint venture, and not CDI.  CDI is not the joint venture entity, but rather only a partner in that alleged entity, and thus lacks standing to assert counterclaims for wrongful seizure and abuse of

process.  In addition, consistent with a prior ruling of this Court in this case, CDI's

counterclaim for abuse of process is also barred by the litigation privilege.

## II.  STATEMENT OF UNCONTROVERTED FACTS

### A.   MEC Is A Market Leader In The Beverage Industry

Since introducing its M Claw Trademark with its MONSTER ENERGY® drink in

2002, MEC has developed immense good will and brand recognition in its creative and

distinctive trademark.  MEC has spent in excess of $1.68 billion in marketing and promoting

its MONSTER ENERGY® products and M Claw Trademark.  Declaration of Rodney Sacks

("Sacks Decl.") ¶ 8.  MEC's energy drinks sold using and displaying the M Claw Trademark

have become the most popular energy drinks in the U.S. with sales of more than 7 billion

cans bearing the M Claw Trademark and over $14 billion in total retail sales in the U.S.

Sacks Decl. ¶ 12.  Monster Energy® drinks bearing the M Claw Trademark currently hold a

33.1% market share of the energy drink market in the U.S.  Sacks Decl. ¶ 12.  MEC's

beverage products bearing its M Claw Trademark are sold throughout the U.S. in well over

300,000 retail stores, convenience stores and gas stations.  Sacks Decl. ¶ 7.

### B.   MEC Has Distributed And Licensed Over One Million T-Shirts And Other Clothing Items Bearing The M Claw Trademark

In addition to beverage products, MEC has distributed over a million articles of

clothing, including t-shirts, bearing the M Claw Trademark.   Declaration of Tom Kelly

("Kelly Decl.") ¶ 8.   MEC has licensed the M Claw Trademark to third parties for use on

clothing along with other items; these licensees have paid MEC over $4 million in royalties

on tens of millions of dollars worth of licensed apparel.  Kelly Decl. ¶¶ 4, 9.  Images of

MONSTER sponsored athletes wearing clothing and using gear adorned with the M Claw

Trademark have appeared extensively in print media, on television and on the Internet.  A few examples are shown in Exhibit 1.[1]

This widespread exposure has made MEC's brand well-known to consumers.   For example, the MONSTER Facebook page is among the top ten most "liked" pages on Facebook.  Sacks Decl. ¶ 10.  Unrebutted survey evidence establishes that two out of three consumers shown a t-shirt with only the M Claw Trademark on it will associate the shirt with MEC.  Ex. 2 ¶ 6.

**C.     MEC Has Received Six Federal Registrations For Its M Claw Trademark**

MEC diligently polices and enforces its trademark rights in its valuable M Claw brand and has consistently enforced its rights against numerous would-be infringers, such as Defendants.  MEC is the owner of six presumptively valid federal trademark registrations for its M Claw design, including Registration No. 4,051,650 for the M Claw Trademark on clothing.   Exs. 3-8.   In addition, Registration No. 2,903,214 for beverages has become incontestable under 15 U.S.C. § 1065.

**D.     Defendants Are In The Business Of Profiting From Others' Trademarks**

Defendant CDI operates out of Defendant Baksht's apartment.[2]  Ex. 9 at 19:15-17. Apart from its two principals, CDI has no employees.  *Id.* at 26:12-14.  CDI purports to be in the business of owning and licensing trademarks, but does not design logos or marks.  *Id.* at

---

[1] Unless otherwise noted, all Exhibits cited herein are attached to the Declaration of Lauren Keller Katzenellenbogen, filed concurrently herewith.

[2] Additional businesses, including Associated Business Consulting d/b/a National Trademark Center also operate out of the same residence.  Ex. 9 at 18:15-19:12.  Associated Business Consulting is allegedly a trademark consultant for other businesses, advising businesses on trademark issue as well as obtaining and protecting trademarks for them.  *Id.* at 19:18-20:3, 21:8-22:11, 26:22-28:25.

22:12-23:3, 24:25-25:19, 33:23-25.   Apart from this lawsuit, CDI has no current ongoing business. *Id.* at 143:4-6.  The only customer or business partner CDI has ever had is Joe Cool, and CDI conducted no business prior to its relationship with Joe Cool. *Id.* at 24:18-25:2.   CDI first became aware of the 3DL design in 2010 during a meeting with Joe Cool's owner, Yosef Amar. *Id.* at 65:4-15.  During that meeting, Mr. Amar expressed concern that the 3DL design was similar to MEC's M Claw Trademark. *Id.* at 65:12-66:23.  Defendant Baksht's opinion was that the similarity to MEC's M Claw Trademark was not a problem, and CDI subsequently entered into an alleged joint venture with Joe Cool to exploit the 3DL design. *Id.* at 65:12-67:24.

Defendant Baksht is a principal of CDI. *Id.* at 17:7-14.  Although he is not a lawyer, he advises clients regarding trademark law and files trademark applications on behalf of his clients.  Ex. 10 at 28:23-31:19.  On behalf of his clients, Baksht has registered trademarks based on very famous trademarks of third parties such as MONT BLANC, CADILLAC CLUB, CADILLAC-BEER, PINK CADILLAC, PORSCHE MARINE, OAKLEY WEAR, and MIDAS TOOL AND LOCK. *Id.* at 230:25-246:25; Exs. 11-17, 75, 78.  He has also formed corporations with names such as Lemon Coke Corp., Rolls Royce Industries Corp., and American Enterprise Institute, Inc.  Ex. 10 at 254:17-257:25; Exs. 18-20.  In addition, Baksht recently claimed to own the trademark for the 70 year old DAYTONA BEACH BIKE WEEK event, but after being sued by the Daytona Beach Chamber of Commerce, he defaulted on all claims.[3]

---

[3]  CDI and Joe Cool were sued for improperly obtaining and enforcing a Florida state trademark registration in "Daytona Beach Bike Week."  *See* Ex. 21 (Complaint in *Good Sports Daytona, Inc. v Consolidated Distributors, Inc.*, Case No 6:11-cv-00233-CE-DAB (M.D. Fla. February 11, 2011)).  That case

### III.  LEGAL STANDARD FOR SUMMARY JUDGMENT

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact."  Fed. R. Civ. P. 56(a).  Motions for summary judgment should be granted when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show there is no *genuine* issue as to any *material* fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "The existence of some factual disputes between the litigants will not defeat an otherwise properly supported summary judgment motion; 'the requirement is that there be no genuine issue of material fact.'"  *Ford Motor Co. v. O.E. Wheel Dist., LLC*, No. 8:09-CV-2137-T-30TBM, 2012 WL 1231877, at *3 (M.D. Fla. April 12, 2012) (quoting, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  There must be a conflict in substantial evidence to pose a jury question.  *Verbraeken v. Westinghouse Elec. Corp.*, 881 F.2d 1041, 1045 (11th Cir. 1989).

### IV.  CDI'S TRADEMARK CLAIMS FAIL BECAUSE THE UNDISPUTED EVIDENCE SHOWS THAT MEC, NOT CDI, HAS PRIOR TRADEMARK RIGHTS

CDI has brought three trademark-related counterclaims.  Count I seeks to cancel MEC's registration for its famous M Claw Trademark on clothing.  Count II alleges that the M Claw Trademark infringes the 3DL design under a theory of reverse confusion.  Count III alleges unfair competition and is essentially a trademark infringement claim by another name.  For each of these claims, CDI must show that the 3DL design is entitled to priority

---

was strikingly similar to the present case.  Ultimately, a default judgment and permanent injunction was entered against CDI preventing it from claiming ownership in or infringement of the Daytona Beach Bike Week mark, Ex. 22, Joe Cool stipulated to a settlement and permanent injunction, *See* Ex. 23 at 2, Ex. 24, and CDI and Joe Cool's trademark was cancelled, Ex. 25 at 2; Ex. 22 at 11.

Case 6:11-cv-00329-ACC-DAB   Document 173   Filed 10/01/12   Page 9 of 27 PageID 3989

over MEC's M Claw Trademark.   Similarly, Defendants' Sixth Affirmative Defense specifically alleges that the 3DL design is entitled to priority.   The undisputed evidence, however, shows that MEC was first to use the mark and has priority by many years. Accordingly, CDI's trademark-related claims fail, as does the Sixth Affirmative Defense.

**A.**     **MEC Has Used The M Claw Trademark On Clothing Continuously Since 2002**

MEC first began using the M Claw Trademark on t-shirts in commerce in 2002 in connection with the launch of the Monster Energy® beverage line.  *See, e.g.*, Ex. 26 at 9:11-29:16; Ex. 27 at 20:21-21:6; 28:18-29:10; Kelly Decl. ¶ 8.   MEC's accounting records confirm that MEC began distributing t-shirts and other apparel items bearing the M Claw logo in 2002, and that MEC has continuously distributed t-shirts and other apparel items bearing the M Claw logo since that time.  Kelly Decl. ¶¶ 6-8.  On an annual basis, MEC's clothing distribution has grown from just over five thousand units in 2002 to over one hundred thousand units each year since 2007, plus additional sales by MEC's licensees.[4] Kelly Decl. ¶ 8.

**B.**     **There Is No Genuine Dispute That The 3DL Design Was Not Used Until 2010**

To establish priority of trademark rights over MEC, Defendants bear the burden of proof and must show: (1) that their use of the 3DL design began before MEC's first use of the M Claw in 2002; and (2) continuous use of the 3DL design since that time.  *See Data*

---

[4] CDI has argued that MEC's distribution of its M Claw shirts does not qualify as trademark usage because the shirts have been given away as promotional items.  CDI is wrong factually and legally.  Factually, many of the M Claw shirts have been sold, rather than given away.  Kelly Decl. ¶ 10.  Legally, trademark usage occurs even when trademarked items are given away for promotional purposes.  *Planetary Motion, Inc. v. Techsplosion, Inc.*, 261 F.3d 1188, 1194-95 (11th Cir. 2001); *Bridgestone Tire Co. v. Bridgestone Trading Co.*, 221 U.S.P.Q. (BNA) 1012, 1013-14 (T.T.A.B. 1984); *Hurst Performance v. Torsten Hallman Racing*, 207 U.S.P.Q. (BNA) 671, 675 (T.T.A.B. 1980) (citing numerous cases).

*Concepts, Inc. v. Digital Consulting, Inc.*, 150 F.3d 620, 623 (6th Cir. 1998).

Defendants' claim of prior use is based solely upon alleged use by a prior defendant in this lawsuit, Joe Cool, owned by Yosef Amar.[5]  *See* Ex. 28 (Responses to Int. Nos. 1, 3, 5, and 19) & Ex. 29 (Responses to Int. Nos. 1, 3, and 19); *see also* Ex. 9 at 39:19-40:4.  During his deposition, Mr. Amar did not support Defendants' implausible claim of priority.  Instead, Mr. Amar admitted that Joe Cool did not design or begin using the 3DL design until 2010.  Ex. 30 at 65:4-13, 69:1-22, 98:16-99:17.  Two former Joe Cool employees also identified 2010 as the date that Joe Cool began selling shirts bearing the 3DL design.  *See* Ex. 31 at 9:17-10:25 (Kakol was a Joe Cool employee from 2007 until March or April 2011), 13:10-15:1 (Joe Cool began selling decals and t-shirts with the 3DL design in 2010), 24:6-9 ; Ex. 32 at 8:17-9:19, 19:6-20:23, 22:15-23:5 (3DL merchandise first sold "around June or July of 2010" based upon Joe Cool's records).  CDI's Rule 30(b)(6) witness did not dispute Mr. Amar's testimony on this point:

> Q.  Now, during his recent deposition, Yosef Amar testified that the final version of this design that's shown here in Exhibit 1 was created in 2010.
> A.  That's when I came into the picture.
> Q.  Yes.  Do you have any reason to doubt Mr. Amar's testimony that the final version of this design was created in 2010?
> A.  I believe Joe[6] -- whatever he said.  If he said that's the one, so that's the one.
> Q.  If Joe said it was 2010, it was 2010?
> A.  If he said so.

---

[5] Defendants claim to have entered into a joint venture with Joe Cool in 2010, and as part of the joint venture, Joe Cool allegedly assigned rights in the 3DL design to Defendants.  Both the joint venture agreement and the assignment are alleged to be oral agreements.  Ex. 9 at 67:25-68:4, 68:20-69:2, 86:1-8; Ex. 30 at 126:1-21.

[6] Yosef Amar also goes by the names Joe Amar and Joe Cool.

Ex. 9 at 39:19-40:4. CDI even concedes the point in its own summary judgment motion. D.I. 170 at 3 (citing Amar Depo. at 65-66).

Moreover, neither the 3DL design nor anything close to it appears in any of the product catalogs that Joe Cool produced dating from 1997, 2000, 2004, and 2005. *See* Exs. 33-36; Ex. 30 at 94:10-95:4. Thus, the uncontroverted evidence establishes that Defendants' first use of the 3DL design dates back only to 2010, eight years **after** MEC began using the M Claw on clothing, and after Monster and the M Claw had become wildly popular and nearly ubiquitous.

### 1. Defendants' Claim Of Priority Based Upon The Use Of Other Designs Is Meritless

Faced with the uncontroverted evidence that use of the 3DL design dates back only to 2010, Defendants claim priority based on Joe Cool's sales of t-shirts bearing other designs that allegedly bear some resemblance to the 3DL design. Mr. Amar contended that Joe Cool has nearly 200 prior t-shirt designs that show the general concept of three lines, which, he asserts, gives Defendants priority over MEC in the M Claw Trademark. Ex. 30 at 30:7-17; *see also* Ex. 37 at ¶¶ 7, 9; Ex. 30 at 95:16-97:12. Mr. Amar contended that the 3DL design was merely a "modified" version of these prior designs. *See, e.g.*, Ex. 30 at 98:12-99:5.

That contention is legally erroneous for three independent reasons. First, a claim of priority based on the use of a prior mark is permitted only where the previous mark is essentially indistinguishable from the later mark. Second, Defendants have no evidence that the prior designs were in continuous use from a time before MEC's first use date of 2002. Third, Defendants have offered no evidence that the use of any of Joe Cool's prior t-shirt designs was a trademark use. Thus, Mr. Amar's combing of Joe Cool's archives for evidence

of allegedly similar t-shirt designs does nothing for CDI's priority claim.

### a. Defendants Cannot Show The Prior Designs Are Virtually Identical To The 3DL Design

A trademark owner may "claim priority in a mark based on the first use date of a similar, but technically distinct, mark—but *only in the exceptionally narrow instance where the previously used mark is the legal equivalent of the mark in question or indistinguishable therefrom* such that consumers consider both as the same mark." *Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1047-48 (9th Cir. 1999) (internal quotation marks omitted) (emphasis added).  This is known as "tacking."  *Id.* at 1048.  "*The standard for 'tacking' . . . is exceedingly strict: [t]he marks must create the same, continuing commercial impression*, and the later mark should not materially differ from or alter the character of the mark attempted to be tacked."  *Brookfield*, 174 F.3d at 1048 (internal quotation marks omitted) (emphasis added).  "[T]he consumer should consider both as the same mark."  *Id.*  To meet this high standard, both marks must be "virtually identical." *One Indus., LLC v. Jim O'Neal Distrib.*, 578 F.3d 1154, 1161 (9th Cir. 2009).  "This standard is considerably higher than the standard for 'likelihood of confusion.'"  *Brookfield*, 174 F.3d at 1048; a*ccord Data Concepts*, 150 F.3d at 623; *Van Dyne-Crotty, Inc. v. Wear–Guard Corp.*, 926 F.2d 1156, 1159 (Fed. Cir. 1991).

The Federal Circuit has cautioned that tacking should be permitted "only in rare circumstances."  *Van Dyne-Crotty*, 926 F.2d at 1160; *accord also Data Concepts*, 150 F.3d at 623.  Cases from numerous circuit courts and the Trademark Board confirm that tacking will be allowed only if the marks are virtually identical.  Most relevant here, the Ninth Circuit affirmed on summary judgment that the following two stylized versions of the letter "o" were

not legal equivalents and could not be tacked:

          

Original trademark          Revised trademark

*One Indus.*, 578 F.3d at 1161.  The Ninth Circuit ruled as a matter of law that the relatively minor differences between these two versions of the letter "o" "establish that the two marks are not 'indistinguishable.'"  *Id.*  Other similar cases abound.[7]  Moreover, questions of tacking are commonly resolved on summary judgment.  *See, e.g., One Indus.*, 578 F.3d at 1158, 1161; *George & Co. v. Imagination Entm't*, 575 F.3d 383, 389, 402 (4th Cir. 2009); *Data Concepts, Inc.* 150 F.3d at 622.

The earlier designs that Mr. Amar contends establish priority do not, as a matter of law, satisfy the very strict tacking requirement.  Those designs include animals having claws, such as lizards, birds, a dinosaur, and wolves (Exs. 38-51), other designs that allegedly show the basic concept of three generally parallel lines, such as dreadlocks and palm fronds (Exs. 52-55), other designs that include the letter 'M' (Exs. 43, 56-66), and still other designs that involve three "skinny" lines (Ex. 54).  Ex. 30 at 30:7-63:13.  Two designs on which Mr. Amar relied most heavily are shown below.

---

[7] *See, e.g., Data Concepts, Inc.* 150 F.3d at 623-25 ("dci" in lowercase may not be tacked onto "DCI" in uppercase); *Van Dyne-Crotty*, 926 F.2d at 1160 ("CLOTHES THAT WORK.  FOR THE WORK YOU DO" cannot be tacked onto "CLOTHES THAT WORK"); *Am. Paging Inc. v. Am. Mobilphone Inc.*, 13 U.S.P.Q.2d (BNA) 2036 (T.T.A.B. 1989) (Trademark Board refused to tack the phrase "American Mobilphone Paging" with a "stars and stripes background" onto "American Mobilphone" with the same background); *Pro-Cuts v. Schilz-Price Enters. Inc.*, 27 U.S.P.Q.2d (BNA) 1224, 1227 (T.T.A.B. 1993) ("PRO-CUTS" may not be tacked onto "PRO-KUT.").



Ex. 33 at 14; *see also* Ex. 30 at 66:8-67:11.

None of the designs identified by Mr. Amar, however, is remotely close to the "legal equivalent" standard required to establish tacking for the 3DL design. And none of the designs were used in combination with the currently accused 3DL design. Accordingly, Defendants' contentions are simply frivolous and do not create a genuine issue of material fact concerning MEC's priority.

   **i.**  **The Myrtle Beach Design Does Not Create A Genuine Issue Of Material Fact On Priority**

In opposition to MEC's motion for a preliminary injunction, Mr. Amar filed a sworn declaration in which he captioned the following images as "DESIGNS FROM 1993":



D.I. 32-4 at Ex. A-6.   During his deposition, Mr. Amar conceded that the design shown above is different than the 3DL design.   Ex. 30 at 83:22-84:15.   Mr. Amar also revealed that the above images (and those in Exhibit A-6 to his declaration) are not photos of actual shirts, but were computer generated in 2011 to help oppose MEC's preliminary injunction motion, though Mr. Amar inexplicably could not remember exactly how they were created just a short time ago.   Ex. 30 at 89:1-92:5.   He did recall, however, that the colors of the images were doctored, presumably to make them more closely resemble the 2010 3DL design.   *Id.* at 89:13-18, 91:2-92:5.   Neither Mr. Amar nor Defendants produced any documentation, whatsoever, showing that such a t-shirt was ever sold.   This is so even though Mr. Amar and his wife spent 140 hours searching for evidence of priority.   *See* Ex. 67.   Instead, Defendants rely solely on the bare testimony of Mr. Amar and his memory of a fleeting and seemingly inconsequential event that allegedly occurred nearly twenty years ago.

Contrary to this factual record, to establish priority based on sales of the Myrtle Beach t-shirt, Defendants need to show both 1) that the Myrtle Beach design is the legal equivalent of the current 3DL design such that consumers consider both as the same mark;

and 2) that Joe Cool or CDI has continuously used the Myrtle Beach design from before 2002 to the present. *See Data Concepts, Inc.*, 150 F.3d at 623. Defendants cannot establish either requirement. First, as Mr. Amar concedes, there are obvious differences between the Myrtle Beach design and the 3DL design, including most obviously the presence of the words "Myrtle Beach." Second, Mr. Amar revealed that sales of the Myrtle Beach shirt ceased long ago. Ex. 30 at 86:15-22. There is no evidence to the contrary. The Myrtle Beach design does not appear in Joe Cool's 1997, 2000, 2004, or 2005 product catalogs.[8] *See* Exs. 33-36.

Moreover, even if Mr. Amar had testified that he continuously used the Myrtle Beach design, a party's "bare assertions of continuous use are insufficient to create a genuine issue of material fact" sufficient to survive summary judgment. *World Triathlon Corp. v. Dunbar*, No. Civ. 05-00351JMS/KSC, 2006 WL 897586, at *4 (D. Haw. 2006). Thus, Defendants are unable to establish either requirement to base priority on the Myrtle Beach design, even if it was sold at some point.

Construing the evidence in the light most favorable to Defendants, the most that they can show is some sales of the Myrtle Beach shirt in 1993, and even those alleged sales are unsupported by any documentation. Accordingly, Defendants cannot raise a genuine issue of fact concerning MEC's priority.

> ### ii.    The "Skinny Lines" Design Does Not Create A Genuine Issue Of Material Fact On Priority

Mr. Amar also contended that the use of three elongated or skinny lines, purportedly dating back to 1993, is a "skinnier" version of the 3DL design that gives Defendants priority.

---

[8] These are the only product catalogs produced by Joe Cool in discovery.

*See, e.g.*, Ex. 30 at 111:5-115:13; *id.* at 156:11-158:1 (discussing Ex. 68 a purported quality control test t-shirt made by Joe Cool no earlier than 2010).  The image below on the left, which comes from a 2011 shirt (Ex. 69), shows an example of a three skinny lines design to the left of the large 3DL design.  The image below on the right (Ex. 68), which is of the sleeve of another recent shirt, shows a different three skinny lines design as part of a larger design.

 

Mr. Amar testified that a "very similar" skinny scratch design was put on sweatshirt sleeves in 1993.[9]  Ex. 30 at 33:1-13.  This claim of priority suffers from precisely the same problems as the priority claim based on the Myrtle Beach logo.

---

[9] Mr. Amar clearly has a very generous view of the phrase "very similar."  For example, he also believed that the following skull-themed design was "very similar" to the 3DL design:



*See* Ex. 54 at 1.  Thus, there is substantial question as to what design was actually used by Joe Cool in 1993. CDI, of course, bears the burden of proof on this issue.

First, despite the Amar family's 140 hour search for such evidence there is again absolutely no evidence that either of the above "three skinny lines" designs was used prior to 2010, let alone continuously from the 1990s to 2010.  This is a mandatory requirement for any claim of priority.  *See Data Concepts, Inc.*, 150 F.3d at 623.  Moreover, as before, even if Mr. Amar had testified that he continuously used a single, consistent "three skinny lines" design since the 1990s, a party's "bare assertions of continuous use are insufficient to create a genuine issue of material fact" sufficient to survive summary judgment.  *World Triathlon*, 2006 WL 897586, at *4.

In addition, though MEC is not required to affirmatively prove a lack of continuous use, the evidence affirmatively shows that Joe Cool did not continuously use either of the "skinny lines" designs from the 1990s to the present.  These designs do not appear in the product catalogs Joe Cool produced from 1997, 2000, 2004, or 2005.  *See* Exs. 33-36. Moreover, Mr. Amar testified that he was unable to locate any sales records for the three skinny lines designs from before 2010.  Ex. 30 at 123:10-124:4.[10]

Second, in order to base priority on one of the three skinny lines designs, Defendants would need to show that the design is the legal equivalent of the current 3DL design such that consumers consider both as the same mark.  Again, this is an "exceedingly strict" standard, much stricter than the standard for infringement, and the two marks must be

---

[10] In explaining why he was unable to locate any sales records for the three skinny lines designs, Mr. Amar revealed a separate reason that Defendants cannot base priority on those designs — because it was merely decorative, and thus not a trademark use:  "I tell you why, because I don't think we ever give it a style number or something.  It was just like a sleeve design. So it's like an add-on to -- it's not like a design by itself, you know, the -- that represent itself.  It was an add-on back then, you know, so I don't think that I -- I was looking to see what I could find, but I don't think that we ever style number it."  Ex. 30 at 123:22-124:4.  This is discussed in more detail in the following section.

"indistinguishable" from each other.  *Brookfield*, 174 F.3d at 1047-48.  Even a slight modification of the letter "o" failed this strict test on summary judgment.  *One Indus.*, 578 F.3d at 1161.  The undisputed evidence — the actual 3DL design and the actual "skinny lines" designs — shows that the two are not the same or even close.  Thus, the three skinny lines designs do not create a genuine dispute of material fact concerning MEC's priority in the M Claw Trademark.

> **2.**   **Defendants Cannot Show The Prior T-Shirt Designs Were Used As Trademarks**

Even if Defendants were able to establish a genuine issue of fact that the prior t-shirt designs are indistinguishable from the 3DL design, and Defendants were able to establish continuous use from before 2002, Defendants still cannot defeat MEC's priority because there is no evidence that the prior t-shirt designs were used as trademarks.

"A trademark is a *designation*, 'any word, name, symbol, or device, or any combination thereof,' which serves 'to identify and distinguish [the] goods [of the mark's owner] ... from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown.'"  *Rock & Roll Hall of Fame & Museum, Inc. v. Gentile Prods.*, 134 F.3d 749, 753 (6th Cir. 1998) (quoting 15 U.S.C. § 1127).  "[I]t is not the case that all inherently distinctive symbols or words on a product function as trademarks."  *Id.*  "Rather, in order to be protected as a valid trademark, a designation must create 'a separate and distinct commercial impression, which ... performs the trademark function of identifying the source of the merchandise to the customers.'"  *Id.* (quoting *In re Chemical Dynamics, Inc.*, 839 F.2d 1569, 1571 (Fed. Cir. 1988)).  "Thus, whether alleging infringement of a registered trademark, pursuant to 15 U.S.C. § 1114(1), or infringement of an unregistered

trademark, pursuant to 15 U.S.C. § 1125(a)(1), *it is clear that a plaintiff must show that it has actually used the designation at issue as a trademark*." *Id.* (emphasis added).

"It is a matter of common knowledge that T-shirts are 'ornamented' with various insignia." *In re Dimitri's Inc.*, 9 U.S.P.Q.2d. (BNA) 1666, 1667 (T.T.A.B. 1988). "If such ornamentation is without any meaning other than as mere ornamentation it is apparent that the ornamentation could not and would not serve as an indicia of source" and would therefore not be a trademark use. *Id.* Defendants, as the parties claiming the prior t-shirt designs were used as trademarks, must show that the public associates those designs with them. *Major Pool Equip. v. Ideal Pool*, 203 U.S.P.Q. (BNA) 577, 583 (N.D. Ga. 1979).

Defendants have proffered no evidence that any of the prior t-shirt designs were used by Joe Cool as trademarks. The only evidence is that they were merely individual t-shirt designs among hundreds or thousands. There is no evidence that any of the prior designs created a commercial impression in consumers or that anyone associated those designs with Joe Cool. Indeed, Defendants cannot even show that consumers associate the 3DL design with CDI. CDI's own 30(b)(6) witness testified that CDI is not aware of any information that customers recognize the 3DL design as being associated with CDI.[11]  Ex. 9 at 130:23-131:25. Thus, Defendants' lack of evidence that any of the prior t-shirt designs were actually used as trademarks is a separate reason that there is no genuine issue of material fact concerning MEC's priority.

---

[11] This is confirmed by survey evidence. MEC's expert surveyed 470 consumers. He found that 58% identified a shirt with the 3DL design as coming from MEC, and only one percent identified the shirt as coming from Joe Cool or CDI. Ex. 70 ¶¶ 48, 33. Even that *de minimis* one percent response is likely due to the fact that each of the Joe Cool shirts had identified Joe Cool or CDI as the source, either on a hang tag or on the 3DL design itself. *See* Ex. 70 at p. 68; Ex. 71.

## V.  CDI LACKS STANDING TO BRING ITS TRADEMARK CLAIMS BECAUSE THE PURPORTED ORAL ASSIGNMENT OF THE TRADEMARK FROM JOE COOL TO CDI WAS INEFFECTIVE

Defendants' position is that before Joe Cool began doing business with CDI, Joe Cool owned the 3DL design.  *See, e.g.*, Ex. 30 at 125:11-25.  CDI contends that Joe Cool assigned its rights in the 3DL design to CDI in 2010, Ex. 9 at 67:2-7, when Defendants also filed for a federal registration of the 3DL design, Ex. 72.  Both CDI and Mr. Amar agree that the purported assignment of the 3DL design was made orally and never reduced to writing.  *Id.* at 67:25-68:4, 68:20-69:2; Ex. 30 at 126:1-21.  Both CDI's 30(b)(6) witness and Mr. Amar testified that no assets nor goodwill were transferred when Joe Cool purportedly assigned the 3DL design to CDI.  Ex. 9 at 77:24-79:7; Ex. 30 at 126:22-128:3.

It is black letter law that assignments of Federal Trademarks and Trademark Applications must be in writing, and oral assignments are ineffective. 15 U.S.C. § 1060(a)(3); *Gaia Tech., Inc. v. Reconversion Tech., Inc.*, 93 F.3d 774, 780 (Fed. Cir. 1996) (plaintiff lacks standing to bring registered trademark claim where assignment was not in writing).  Likewise it is black letter law that an assignment in gross of the trademark without an assignment of the underlying goodwill or business assets is ineffective.  *Mister Donut of Am., Inc. v. Mr. Donut, Inc.*, 418 F.2d 838, 842 (9th Cir. 1969) (a trademark cannot be sold or assigned apart from the goodwill it symbolizes); 3 J.T. McCarthy, *McCarthy on Trademarks & Unfair Competition* §§ 18:2-18:3 (4th ed. 2012).[12]  Thus, the purported

---

[12] Courts have identified a narrow exception to this rule where the assignment in gross is combined with a simultaneous license back to the assignor. *See, e.g.* 3 J.T. McCarthy, *McCarthy on Trademarks & Unfair Competition* § 18:9 (4th ed. 2012).  Here CDI has alleged that it provided such a license in the 3DL design to the joint venture.  However, the joint venture is not the assignor, Joe Cool.  Moreover, CDI terminated Joe Cool's license when Joe Cool settled with MEC without Joe Cool ever transferring its goodwill. Ex. 9 at 106:5-15.  In addition, the assignment was not in writing, as discussed above.

assignment of the 3DL design from Joe Cool to CDI was ineffective and CDI acquired no rights to the 3DL design.

Additionally, when Joe Cool later executed its written settlement agreement with MEC, Joe Cool transferred to MEC any trademark rights that it had in the 3DL design. Ex. 73 ¶ 7.5; Ex. 74 at 3. This expressly included a transfer of goodwill to MEC. Ex. 74 at 3. Because CDI's prior attempt to obtain an assignment was ineffective, MEC now owns the 3DL design in full and the priority issue is moot.

## VI.  CDI LACKS STANDING TO BRING COUNTERCLAIMS FOR WRONGFUL SEIZURE AND ABUSE OF PROCESS

### A.  CDI Lacks Standing To Recover Damages For The Temporary Seizure Of Property At Joe Cool's Place Of Business

Defendant CDI asserts counterclaims for wrongful seizure and abuse of process based on MEC's seizure of allegedly infringing products and related business records at Joe Cool's place of business. D.I. 122 at 25 (Count IV), 30 (Count V). CDI lacks standing to bring a claim for wrongful seizure of Joe Cool's property. To overcome this defect, CDI alleges that it orally entered a joint venture with Joe Cool, and that the seized property belonged to the joint venture, not to Joe Cool individually. *See* D.I. 122 at ¶ 150. Even accepting as true the existence of this oral joint venture, CDI, as a partner in the joint venture, has no standing to bring these claims. Only the joint venture has standing to do so.

This is due to basic legal principles governing partnerships. Under Florida law, the laws of partnerships apply equally to joint ventures. *Kislak v. Kreedian*, 95 So. 2d 510, 514 (Fla. 1957); *see also Pinnacle Port Cmty. Ass'n., Inc. v. Orenstein*, 872 F.2d 1536, 1539 n.3 (11th Cir. 1989). By statute, "[p]artnership property is owned by the partnership as an entity,

not by the partners as coowners." § 620.8501, Fla. Stat. (2011). Similarly, "[p]roperty acquired by a partnership is property of the partnership and not of the partners individually." § 620.8203, Fla. Stat. (2011).

Accordingly, CDI has no standing to pursue its alleged joint venture's claims for wrongful seizure and abuse of process. Only the joint venture partnership formed by CDI and Joe Cool has standing to pursue those claims. *See Toto v. McMahan, Brafman, Morgan & Co.*, 93 Civ. 5894 (JFK), 1997 U.S. Dist. LEXIS 11943, at *15-16 (S.D.N.Y. Aug. 11, 1997) ("individual partners cannot sue on a partnership claim in their individual capacity"); *Kleban v. S.Y.S. Restaurant Mgmt.*, 929 F. Supp. 294, 304 (N.D. Ill. 1996) ("an individual partner does not have standing to sue a third party to recover property belonging to the partnership"). That joint venture partnership, assuming it exists, is not a party to this case let alone the counterclaimant. CDI's counterclaims should thus be dismissed.

**B.**   **CDI Lacks Standing To Seek Damages For Alleged Harm To Joe Cool's Reputation**

CDI also claims reputational damages allegedly caused by the seizure at Joe Cool's place of business. However, CDI has very recently admitted that it is not seeking damages to any reputation that **CDI** enjoyed prior to the seizure. Instead, CDI admits that "Defendants' reputation was derivative of the reputation of Joe Cool, Inc. and Yosef Amar, and of the reputation of the 3DL marks." Ex. 77 (Response to Int. No. 20). Thus, CDI seeks damages for alleged harm to the reputation of Joe Cool and Yosef Amar, not damage to itself. CDI plainly lacks standing to do so. Moreover, claims by Joe Cool and Yosef Amar arising from the seizure were settled, released, and dismissed with prejudice. Ex. 73; D.I. 102 ¶ 10.

Claims on behalf of the defendants who have already settled are now barred.[13]

Furthermore, CDI's motive for recently seeking to recover damages for the reputational harm to Joe Cool rather than for any reputational harm to itself is apparent. The only reputational harm ever identified by CDI was the alleged refusal of two potential customers to engage in the 3DL business after the seizure. Ex. 9 at 81:6-82:24. However, the potential customers' refusal to do business was based only upon a general fear of doing business with anyone involved in litigation. *Id.*; Ex. 76 at 24:2-28:4. It had nothing to do with the seizure. In fact, the potential customers were not even aware of the seizure. Ex. 76 at 33:25-34:7; Ex. 9 at 81:6-82:24. Thus, any perceived reputational harm to CDI was not caused by the seizure and therefore is not recoverable for this reason as well.

## VII.  THE LITIGATION PRIVILEGE BARS CDI'S CLAIM FOR ABUSE OF PROCESS

This Court denied CDI's motion for leave to file an amended counterclaim to add MEC's CEO and MEC's outside counsel as counterdefendants to CDI's abuse of process claim. D.I. 140. In its order, the Court explained that "Florida's litigation privilege applies to CDI's proposed abuse of process claims against Hansen's CEO and counsel, and thus, leave to amend is futile." D.I. 140 at 5. The acts underlying CDI's abuse of process claims against MEC are the same as those in its failed allegations against MEC's CEO and outside counsel. Accordingly, the present abuse of process claim against MEC is also "clearly within Florida's litigation privilege because it was an act 'occurring during the course of a judicial

---

[13] The settlement with Joe Cool and the dismissal of Joe Cool's claims made clear that any claims of CDI were not affected by the settlement. Ex. 73 at ¶ 9; D.I. 102 ¶ 10. However, the claim at issue here — a claim for damage to the reputation of *Joe Cool and Yosef Amar*—is plainly a released claim of the settling defendants, not a preserved claim of CDI.

proceeding' that had 'some relation to the proceeding.'"   D.I. 140 at 7 (quoting *Levin, Middlebrooks, Mabie, Thomas, Mayes & Mitchell, P.A. v. U.S. Fire Ins. Co.*, 639 So. 2d 606, 608 (Fla. 1994)).   Consistent with the Court's prior ruling, CDI's abuse of process claim against MEC is barred by the litigation privilege and should be dismissed.

## VIII.   CONCLUSION

For the reasons set forth above, MEC respectfully requests that the Court grant summary judgment that MEC has priority in its M Claw Trademark over Defendants and the 3DL design, and grant summary judgment dismissing with prejudice Counterclaims I-V of Defendant CDI and Defendants' sixth affirmative defense of prior use.

Respectfully submitted,

Dated: October 1, 2012               By: /s/ *Lauren Keller Katzenellenbogen*
                                     JOHN B. SGANGA, JR. ESQ.
                                     (Admitted *Pro Hac Vice*)
                                     john.sganga@kmob.com
                                     PAUL A. STEWART, ESQ.
                                     (Admitted *Pro Hac Vice*)
                                     paul.stewart@kmob.com
                                     LAUREN K. KATZENELLENBOGEN, ESQ.
                                     (Admitted *Pro Hac Vice*)
                                     lauren.katzenellenbogen@kmob.com
                                     KNOBBE, MARTENS, OLSON & BEAR, LLP
                                     2040 Main Street, Fourteenth Floor
                                     Irvine, California  92614
                                     (949) 760-0404  Telephone
                                     (949) 760-9502  Facsimile

                                     Lead Trial Counsel for Plaintiff,
                                     MONSTER ENERGY COMPANY f/k/a
                                     HANSEN BEVERAGE COMPANY d/b/a
                                     MONSTER BEVERAGE COMPANY

                                     – and –

                                     RICHARD E. MITCHELL, ESQ.
                                     Florida Bar No.: 0168092
                                     rick.mitchell@gray-robinson.com
                                     GRAYROBINSON, P.A.

301 East Pine Street, Suite 1400
Orlando, Florida  32801
(407) 843-8880  Telephone
(407) 244-5690  Facsimile

Local Counsel for Plaintiff,
MONSTER ENERGY COMPANY f/k/a
HANSEN BEVERAGE COMPANY d/b/a
MONSTER BEVERAGE COMPANY

## CERTIFICATE OF SERVICE

I hereby certify that on this 1st day of October, 2012, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system.

   _/s/ *Lauren Keller Katzenellenbogen*_
Lauren Keller Katzenellenbogen

13946603