# EXHIBIT 9

## Page 1

```
 1          UNITED STATES DISTRICT COURT
            MIDDLE DISTRICT OF FLORIDA
 2              ORLANDO DIVISION
            Case No. 6:11-CV-329-ORL-22DAB
 3
 4   MONSTER ENERGY COMPANY, f/k/a
     HANSEN BEVERAGE COMPANY, d/b/a
 5   MONSTER BEVERAGE COMPANY,
 6        Plaintiff,
 7   vs.
 8   CONSOLIDATED DISTRIBUTORS, INC.;
     METTEMP, INC.; and DAVID BAKSHT
 9   (a/k/a DAVID LIPSKER a/k/a DAVID
     BAKSHET a/k/a D. BAKHT a/k/a
10   DM SCHNEERSON a/k/a ABRAHAM
     SHNEORSON),
11
          Defendants.
12   _____/
13
            Videotaped
14          Deposition of:  Menachem Schneorson
15   Taken by:   Plaintiff
16   Date:       September 12, 2012
17   Time:       9:27 a.m. - 3:01 p.m.
18   Location:   Gray Robinson P.A.
                 301 East Pine Street
19               Suite 1400
                 Orlando, Florida 32801
20
     Reported by:    Margaret Lowe, FPR
21
22
23
24      Zacco & Associates Reporting Services
        618 East South Street, Suite 500
        Orlando, Florida 32801
25          (407) 992-6214
```

## Page 2

```
 1   APPEARANCE FOR THE PLAINTIFF:
 2   Paul A. Stewart, Esquire
     Of: Knobbe, Martens, Olson & Bear, LLP
 3      2040 Main Street
        14th floor
 4      Irvine, California 92614
        (949) 760-0404
 5      paul.stewart@kmob.com
 6
     APPEARANCE FOR THE DEFENDANTS:
 7
     Moshe Mortner, Esquire
 8   Of: Mortner Law Office
        The Trump Building
 9      40 Wall Street
        28th floor
10      New York, New York 10005
        (646) 820-8770
11      mm@mortnerlaw.com
12
     ALSO PRESENT:
13
        Tony Rappa, CLVS
14      Capture Video & Photo
15
16
17
18
19
20
21
22
23
24
25
```

## Page 3

```
 1              I N D E X
 2                              Page
 3   Testimony of Menachem Schneorson     4
       Direct Examination by Mr. Stewart
 4
     Certificate of Oath/Reporter    152
 5   Read and Sign Letter to Witness    153
     Errata Sheet (forwarded upon execution)    154
 6
 7
 8
 9           E X H I B I T S
10   Plaintiff's                  Page
11
     68  Plaintiff's Second Amended Notice    7
12   69  Printout from NY State Dept. of State    27
           website
13    1  3DL mark                 36
     55  E-mail dated 3-15-11     41
14   24  Document dated 9-16-10    43
     70  Official specimen        47
15   63  Florida trademark application    47
     64  Trademark application    50
16   65  New Jersey trademark application    51
     72  Jurisdiction and Venue    54
17   73  Myrtle Beach claw mark    76
     60  Federal trademark application    114
18   61  Response to official action    115
     74  Household goods inventory    136
19   75  E-mail dated 8-1-11    143
     76  E-mail dated 8-1-11    144
20
21
22
23
24
25
```

## Page 4

```
 1            P R O C E E D I N G S
 2       VIDEOGRAPHER:  The date is September 12, 2012.
 3   This is the deposition of Menachem Schneorson being
 4   taken in the matter of Monster Energy Company, et al.
 5   versus Consolidated Distributors Incorporated, et al.
 6   This begins Tape 1.  The time is now 9:27 a.m.
 7       Counsel, please identify yourselves for the
 8   record.
 9       MR. STEWART:  This is Paul Stewart, the
10   attorney for the Plaintiff, Monster Energy.  And just
11   to clarify, this is the Rule 30(b)(6) corporate
12   deposition of Consolidated Distributors taken through
13   Menachem Schneorson.
14       MR. MORTNER:  Moshe Mortner, counsel for
15   Consolidated Distributors, Inc. and David Baksht.
16       VIDEOGRAPHER:  Thank you.  And will the court
17   reporter please swear in the witness.
18           MENACHEM SCHNEORSON
19   having been first duly sworn, testified as follows:
20       THE WITNESS:  Yes.
21           DIRECT EXAMINATION
22   BY MR. STEWART:
23   Q.  Okay.  Good morning, Mr. Schneorson.
24   A.  Good morning.
25   Q.  Could you please state your name for the
```

86ded466-e1ee-4ed4-8e01-ae0f5e5c0373

Page 5

1　record.
2　　　A.　Menachem Schneorson.
3　　　Q.　Okay.  And have you ever had your deposition
4　taken before?
5　　　A.　No.
6　　　Q.　Okay.  So I'm going to go over some of the
7　basic procedures with you here just to make sure we're
8　all on the same page.  I'm going to be asking you a
9　series of questions today, hopefully, just over the
10　course of not the full day, but we'll see how it goes.
11　And your job here is just to answer the questions to the
12　best of your ability.
13　　　The reporter is creating a written transcript
14　of every word that you and I say.  So it's important
15　that you wait until I finish my questions before you
16　start your answers so that way the reporter can take
17　down both what you say and what I say.  All of your
18　answers should be in words rather than shaking your head
19　or nodding or that sort of thing because the court
20　reporter can't take those things down.
21　　　A.　Yes.
22　　　Q.　Now, your attorney, Mr. Mortner, may object to
23　some of the questions that I have for you, but you must
24　still answer those questions unless he instructs you not
25　to answer the questions.  Do you understand that?

Page 6

1　　　A.　Yes.
2　　　Q.　So he may make objections that state points for
3　the record for the court to rule on later, but unless he
4　tells you specifically not to answer a question, you
5　should go ahead and answer.
6　　　A.　Yes.
7　　　Q.　Okay.  Now, the answers you're giving are under
8　oath just as if you were in front of a judge or jury in
9　a courtroom.  Do you understand that?
10　　　A.　Yes.
11　　　Q.　So you're obligated to tell the truth.  Do you
12　understand that?
13　　　A.　Yes.
14　　　Q.　Okay.  Good.  Is there any reason why you can't
15　give truthful testimony today?
16　　　A.　No.
17　　　Q.　You're not under any medication that would
18　impair your ability to testify?
19　　　A.　Just a painkiller but nothing serious, just for
20　the back aches.  I'm okay.
21　　　Q.　Good enough.  And one last background question
22　that we always ask:  Have you ever been convicted of a
23　felony?
24　　　A.　A felony.  I don't think so.
25　　　　　MR. MORTNER:  He mentioned to me that he had a

Page 7

1　suspended license, but that's not a felony.
2　　　　　THE WITNESS:  I don't know what is that.
3　　　　　MR. STEWART:  Okay.  Fair enough.
4　　　　　MR. MORTNER:  Before you begin, Mr. Stewart, I
5　just want to ask you to be aware of something.
6　Mr. Schneorson's -- his mother tongue, if you will,
7　the language that he grew up on is not English; it's
8　Hebrew.  He speaks English and he understands English
9　but not as a native speaker, and so I ask that you
10　try to make the questions slowly and simple for him
11　to hear and to respond to it.  And there may be some
12　instances where he may have -- and I've experienced
13　this with him -- where he may misinterpret a word.
14　So it may be necessary to clarify some of these
15　questions for him.
16　　　　　MR. STEWART:  Understood.
17　BY MR. STEWART:
18　　　Q.　Okay.  I'm going to show you a document and I'm
19　going to ask you if you have seen it before.  I'll ask
20　the reporter to mark it as Exhibit No. 68.
21　　　　　(Plaintiff's Exhibit No. 68 was marked for
22　identification.)
23　　　A.　No.
24　　　Q.　You've not seen it before.  Let me ask you to
25　look at --

Page 8

1　　　　　MR. MORTNER:  I think this is a document you
2　looked at.
3　　　　　THE WITNESS:  This document --
4　　　　　MR. MORTNER:  I know you were looking at it
5　last night to prepare.
6　　　　　MR. STEWART:  Let me ask you to look at
7　page 4 --
8　　　　　THE WITNESS:  One second --
9　　　　　MR. STEWART:  -- of the document.
10　　　　　THE WITNESS:  -- one second, one second.
11　　　　　MR. MORTNER:  Let me try to hear the question,
12　save you a little time.
13　　　　　THE WITNESS:  Is this from the court?
14　　　　　MR. STEWART:  It's actually from our offices.
15　　　　　THE WITNESS:  From your office?
16　　　　　MR. STEWART:  Yeah.
17　BY MR. STEWART:
18　　　Q.　And I'd like you just to look at page 4.
19　　　A.　Page 4.
20　　　Q.　That page with the Number 4 at the bottom.
21　There's a section called "Topics --
22　　　A.　Oh, yeah --
23　　　Q.　-- of Examination."
24　　　A.　-- now I remember.  I see that.  Yeah.
25　　　Q.　Okay.  Good.

86ded466-e1ee-4ed4-8e01-ae0f5e5c0373

Page 9

1    A.   Yeah.  Okay.
2    Q.   So you've seen these topics of examination
3  before?
4    A.   Yeah.  That's the one, yeah.  Okay.  Yeah.
5    Q.   Okay.  Very good.  Do you understand that you
6  have been designated or asked by Consolidated to testify
7  on its behalf on each of the topics listed in this
8  document?
9    A.   Okay.  Now I understand it more clear.  I saw
10  it but I didn't know exactly.  I just look at it.  I
11  don't read English so good but I can read but I don't
12  fully read English.  So I didn't -- actually was late in
13  the night.  I was tired.  That's before I went to sleep
14  That's when I saw it.
15    Q.   Okay.
16    A.   That's correct.  That's when I saw it.
17    MR. MORTNER:  There's a question.  He's asking
18  you a question.
19    THE WITNESS:  What's the question?
20    MR. MORTNER:  You need to listen to the
21  question that he's asking you and try to respond to
22  the question.
23  BY MR. STEWART:
24    Q.   And so the question is:  Do you understand that
25  the corporation, Consolidated, has designated you as the

Page 10

1  person that's going to give testimony regarding each of
2  the topics listed in this exhibit?
3    A.   Yes.
4    Q.   Okay.  Good.  Have you done anything to prepare
5  yourself to testify about these topics?
6    A.   No.
7    Q.   Okay.  Have you spoken with any of your
8  colleagues at Consolidated about any of these topics?
9    A.   Not really, but we spoke general things, not --
10  not specific in which -- things that you wrote down on
11  here.
12    Q.   Okay.  When you say "we spoke," is that you and
13  Mr. Baksht?
14    A.   Me and Mr. Baksht.
15    Q.   And what did you speak about generally?
16    A.   About 3DL, the way we start it, and just to
17  refresh my memory how we start it.
18    Q.   How you started the 3DL business?
19    A.   It was 2010 Joe Cool came to our office for
20  advice.
21    MR. MORTNER:  You want to wait for a question.
22    THE WITNESS:  Oh, okay.
23    Q.   So what you discussed with Mr. Baksht was how
24  you started the 3DL business; is that correct?
25    A.   Yeah.

Page 11

1    Q.   Okay.  I might as well ask you now:  How did
2  you start the 3DL business?
3    A.   We just spoke about that day that we started.
4  It was 2010.  I didn't remember exactly the year and the
5  time, but I said 2010.  That's all what I discussed.
6    Q.   Okay.  So to the best of your understanding,
7  you started the 3DL business in 2010; is that correct?
8    A.   Um-hmm.  Yes.
9    Q.   And how did that come about?
10    A.   He came to our office, Joe Cool, for advice
11  about his mark.  That's what we did.  We gave him
12  advice, and then he told us that that's a big project
13  for him and if we want to come as a partner.
14    Q.   Okay.  And you say Joe Cool came to your
15  office.  What office was that?
16    A.   That's 719 Eastern Parkway.
17    Q.   Okay.  And when you say "Joe Cool," do you mean
18  Yosef Amar?
19    A.   Yes.
20    Q.   Okay.  So Yosef Amar came to 1719 Eastern
21  Parkway for advice about the 3DL mark?
22    A.   Yes.
23    Q.   And what did he tell you about the 3DL mark?
24    A.   That this mark is popular and is getting orders
25  or pending orders on this mark.  And he wants to go and

Page 12

1  do a big business with this mark, but he cannot do it on
2  his own.  He needs somebody to register, to protect that
3  mark.  That's how he end up in our office.
4    Q.   Okay.  Did he mention to you how long he had
5  been using the 3DL mark?
6    A.   I remember that we ask him that question, and
7  he said since 1993 he started.  Yes.
8    Q.   Okay.  Did he provide you with any information
9  or evidence to back that up?
10    A.   Not what I recalling that time, but I remember
11  that we did speak about that time.  And we ask him how
12  long he's been using that and that's what came up, 1993.
13    Q.   Okay.  I want to get back to what you had --
14  what you had done to prepare to testify today.  Have you
15  spoken with Yosef Amar at all about this deposition?
16    A.   Not what I recall, no, no.
17    Q.   Okay.  It sounds like you did meet with your
18  counsel, and I don't want you to tell me what you
19  discussed with your counsel, but --
20    A.   Yes.
21    Q.   -- you met with your counsel and that was
22  yesterday you said?
23    A.   Yeah.
24    Q.   Okay.  And how long was that meeting?
25    A.   (No audible response.)

86ded466-e1ee-4ed4-8e01-ae0f5e5c0373

Page 13

1     Q.  How long was that meeting?
2     A.  Half an hour.
3     Q.  Okay.  Did you review any documents to help you
4   prepare for this deposition?
5     A.  No.
6     Q.  Okay.  Do you believe that you can provide me
7   with all of the information that Consolidated has for
8   each of the topics in this deposition?
9     A.  Much that I remember.
10    Q.  Much that you remember?  Are there any topics
11  that Mr. Baksht would have better information on than
12  you?
13    A.  Yes.
14    Q.  So which topics are those?  I think that it
15  would be useful to go through them one at a time, and
16  you can let me know which topics you believe Mr. Baksht
17  would have more information on than you.
18    A.  We're gonna have to read one by one.
19    Q.  Yeah.  Let's go ahead and do it.  If you can
20  turn back to page 4.
21    A.  Sure.
22       MR. MORTNER:  I think a better approach would
23    be to just simply ask him questions, and if it's a
24    question that he feels that he can't answer -- I
25    mean, this is sort of a hypothetical.  You don't have

Page 14

1     a question -- you have a question about general
2     information.  I would object to this approach.  I
3     think why don't you just proceed with the
4     examination, and if there's a question he can't
5     answer and he feels that Mr. Baksht would be able to
6     answer, then he can state that on the record with
7     respect to that question.  I just feel this is in the
8     realm of hypothetical because these are general
9     topics.  They're not specific questions.  It's hard
10    for him to know the scope of the questions that are
11    going to be asked on it.
12       MR. STEWART:  Well, let me go ahead and try it
13    this way first, and if it doesn't work out, we'll
14    move on.
15  BY MR. STEWART:
16    Q.  The first topic is the development of the 3DL
17  marks.  Is that something that you're better
18  knowledgeable of or that Mr. Baksht would be more
19  knowledgeable?
20    A.  What do you mean development?
21    Q.  The identity of the individuals who conceived
22  the art work for the trademark, the materials that they
23  used to come up with the trademark?
24    A.  I think Joe Cool has more information about it.
25  David also because he examined it.  He's the expert.  Of

Page 15

1   course, yes.
2     Q.  Okay.  How about the time when the 3DL marks
3   were first used?  Who would be the most expert on that
4   subject?
5     A.  The first use?
6     Q.  Yes.
7     A.  Joe Cool.
8     Q.  Okay.  And how about any use of the 3DL marks
9   before 2010?  Would that be Joe Cool as well?
10    A.  Yes.
11    Q.  How about advertising for the 3DL marks?
12       MR. MORTNER:  Can you narrow that to a time
13    period?
14    Q.  During any time, and I'm really looking for
15  just who at Consolidated would be the most
16  knowledgeable.
17    A.  Advertising?
18    Q.  About advertising, yes.
19    A.  Joe Cool will be the one, but since 2010 we
20  also try to marketing and investing.  But, yeah, most of
21  the time Joe Cool, yeah.
22    Q.  Okay.  But within Consolidated would you be as
23  knowledgeable as Mr. Baksht on the subject?
24    A.  You can say so.
25    Q.  Okay.  Efforts to enforce rights of the 3DL

Page 16

1   mark against third parties.  Who is the most
2   knowledgeable about that?
3     A.  David.
4     Q.  Okay.
5       MR. MORTNER:  What is the question?  Do you
6     understand the question?  What does that question
7     mean?
8       THE WITNESS:  To protect the mark.
9       MR. MORTNER:  Is that what you meant?
10    Registration?
11       MR. STEWART:  Well, I was thinking more in
12    terms of sending cease and desist letters to third
13    parties or instructing third parties that may be
14    violating your rights.
15       MR. MORTNER:  See, here again, this -- you
16    don't have any testimony as to whether there were
17    such things so, you know, it's very hypothetical.  I
18    mean, you ask him did you send any cease and desist
19    letters.  Then you can say, you know, who knows more
20    about it --
21       THE WITNESS:  I didn't send any cease and
22    desist letter.  I can say that clear.
23       MR. MORTNER:  And -- again, he answers -- that
24    aren't even -- well, you know, he doesn't understand
25    what you're referring to.  It's not a specific

86ded466-e1ee-4ed4-8e01-ae0f5e5c0373

Page 17

1    question.
2        MR. STEWART:  All right.  We will try it your
3    way, and if that doesn't work, we'll come back to
4    this.
5        MR. MORTNER:  Okay.  Thank you.
6    BY MR. STEWART:
7        Q.  Mr. Schneorson, what is your current position
8    with Consolidated?
9        A.  Officer, full partner, fifty-fifty.
10       Q.  So you're a fifty-fifty partner?
11       A.  (Nods head.)
12       Q.  And is the other fifty-fifty partner
13   Mr. Baksht?
14       A.  Yes.
15       Q.  Okay.  How long have you been with
16   Consolidated?
17       A.  More than three years.
18       Q.  Are you a founder of the company?
19       A.  What is that?  What do you mean?
20       Q.  Are you one of the people who started the
21   company?
22       A.  Yes.
23       Q.  Okay.  And that was more than three years ago?
24       A.  Yeah.
25       Q.  Was it more than five years ago?

Page 18

1        A.  I don't think so.
2        Q.  Okay.  And who else started the company with
3    you?
4        A.  David.
5        Q.  David Baksht?
6        A.  Yeah.
7        Q.  Okay.  And where is Consolidated currently
8    located?
9        A.  In Brooklyn, New York, 719.
10       Q.  Eastern Parkway?
11       A.  (Nods head.)
12       Q.  Okay.  And do any other businesses share that
13   address?
14       A.  (No audible response.)
15       Q.  Do any other businesses share the same address
16   with Consolidated?
17       A.  Other business?  Yes.
18       Q.  And what are those other businesses?
19       A.  Consulting.
20       Q.  What are the names of those other businesses?
21       A.  Consulting, Associated Business Consulting.
22       Q.  Associated Business Consulting.  Do any other
23   businesses share that address?
24       A.  Yes.
25       Q.  Which ones?

Page 19

1        A.  I don't recall the names but there is.
2        Q.  Is the National Trademark Center one of them?
3        A.  National Trademark is not.  It's a DBA.
4        Q.  It's a D --
5        A.  It's Associated.
6        Q.  Okay.  And it's a DBA of what?
7        A.  Associated Business Consulting.
8        Q.  Okay.  Can you think of any other businesses
9    that share the address with Consolidated?
10       A.  I don't have the names and I don't have the
11   exact names for sure so it's not -- if you have names,
12   you can tell me.
13       Q.  I will be going through some names with you.
14       A.  Okay.
15       Q.  And is Consolidated's address also Mr. Baksht's
16   home address?
17       A.  Yes.
18       Q.  Okay.  Describe for me what lines of business
19   Consolidated is involved in.
20       A.  Consulting for other businesses for trademark.
21       Q.  And what do you mean by that?  What types of
22   consulting does Consolidated do?
23       A.  Protecting trademark, registration of
24   trademark.
25       Q.  So Consolidated registers trademarks for other

Page 20

1    parties?
2        A.  They advise them and they consulting with them.
3    That's what they do.
4        Q.  Does Consolidated currently have any clients
5    for which it does these services?
6        A.  Yes.
7        Q.  And who are some of those clients?
8        A.  We don't give out clients' names.
9        Q.  Well, I think in this case there's lots of
10   information that the parties didn't want to give out
11   that they're giving out now.
12       A.  Okay.
13       Q.  So can you tell me who some of the clients are
14   that you're currently working with?
15       A.  I don't get permission from my partner.
16   Everything is confidential.  We don't give out those
17   things.
18       Q.  Well, there's no confidentiality provisions in
19   this case.
20       MR. MORTNER:  I think you can answer the
21   question.
22       THE WITNESS:  Huh?
23       MR. MORTNER:  You can answer the question.
24       THE WITNESS:  Yeah?
25       A.  Green Bakery, Parmagon (ph) Coney Island.

86ded466-e1ee-4ed4-8e01-ae0f5e5c0373

Page 21

1 Pashkas (ph), P-A-S-H.  You don't want me to go through
2 everything?
3 BY MR. STEWART:
4    Q.  No.  I don't think you need to list your entire
5 repertoire.  But about how many clients would it be, do
6 you think?
7    A.  A hundred, two hundred.
8    Q.  Okay.  And for these clients -- I'm trying to
9 make sure I understand what you do for them -- you
10 advise them about trademark issues; is that correct?
11    A.  Yes.
12    Q.  Do --
13       MR. MORTNER:  Can I just -- I don't mean to
14 interfere, but I want -- sometimes, you know, with
15 the language and all, I just want to make sure he's
16 clear on the line of questioning, though.  We're
17 asking here -- and I don't know what the answer is,
18 but the question here is about Consolidated and not
19 about National Trademark.  So I just want you to be
20 clear on that distinction.  I don't know if you
21 realized that he asked about Consolidated.
22       THE WITNESS:  Oh, that's Consolidated?
23       MR. STEWART:  Yes.  That's --
24       THE WITNESS:  That's nothing to do with
25 Consolidated.

Page 22

1       MR. STEWART:  Oh, I'm sorry.
2       MR. MORTNER:  Okay.  That's -- I --
3       MR. STEWART:  Which company were you testifying
4 about?
5       THE WITNESS:  What?
6       MR. STEWART:  Which company were you testifying
7 about that has these various clients?
8       THE WITNESS:  Which?
9 BY MR. STEWART:
10    Q.  Which company has the client --
11    A.  Associated Business Consulting.
12    Q.  Oh, okay.  What is the business of
13 Consolidated?
14    A.  Okay.  So that's a different question.
15    Q.  Yes.
16    A.  Okay.  Consolidated own trademark and we
17 license the trademark to others.
18    Q.  Okay.  And what trademarks does Consolidated
19 own?
20    A.  3DL.
21    Q.  Okay.  Any others?
22    A.  There's another one, Bike Week.
23    Q.  Oh, Daytona Beach Bike Week?
24    A.  Um-hmm, yes.
25    Q.  Okay.  So isn't this -- and correct me if I'm

Page 23

1 wrong, the business of Consolidated is to own trademarks
2 and license them to others; is that correct?
3    A.  Yes.
4    Q.  Okay.  Does Consolidated ever use the trademark
5 itself on products?
6    A.  Come again?
7    Q.  Does Consolidated ever sell products that have
8 the Consolidated trademarks on them?
9    A.  Yes.  The 3DL.
10    Q.  So is that -- the 3DL trademark products are
11 sold by Consolidated?
12    A.  Yes.
13    Q.  Independently of Joe Cool?
14    A.  What do you mean independently?  Joe Cool sold
15 it because we gave him the license to sell.
16    Q.  Yes.  Okay.  And I guess I'm trying to draw a
17 distinction between two different things.
18    A.  Okay.
19    Q.  And I know there is a language issue here.  In
20 one situation a company can license another company like
21 Joe Cool to sell licensed merchandise.  In another
22 situation a company can simply sell the merchandise
23 itself with the trademark on it.  And I'm asking does
24 Consolidated ever sell 3DL merchandise --
25    A.  We refer the customers to Joe Cool.

Page 24

1    Q.  Okay.  But the sales are through Joe Cool; is
2 that correct?
3    A.  Yes.
4    Q.  Okay.  So is it fair to say that Consolidated
5 is not in the business of directly selling --
6    A.  No.  It's not fair to say that.
7    Q.  Okay.
8    A.  Because we did have plans to market and
9 everything but we stop.  We couldn't.  Because of that,
10 we stop everything.
11    Q.  Because of the lawsuit?
12    A.  (Nods head.)
13    Q.  Is that a yes?
14    A.  Yes, yes.
15    Q.  Sorry.  That's one of the rules.  You have to
16 answer with words.
17    A.  Okay.  That's okay.
18    Q.  Has Consolidated ever had any customers or
19 business partners other than Joe Cool?
20    A.  Again, it's the same answer.  Not yet.  We
21 stopped because of that.
22    Q.  Okay.  So, so far the only customer or business
23 partner has been Joe Cool?
24    A.  Yes.
25    Q.  Okay.  What was Consolidated doing before it

6 (Pages 21 to 24)

Page 25

1  was introduced to Joe Cool?
2    A.  Consolidated, from what I recall, did nothing.
3    Q.  Okay.  It was just a corporation that had been
4  formed by yourself and Mr. Baksht?
5    A.  Yes.
6    Q.  Okay.  Was it formed with a specific purpose in
7  mind?
8    A.  Yes.
9    Q.  And what was that purpose?
10   A.  To own a trademark.
11   Q.  Okay.  And the first opportunity that came up
12  was the Joe Cool --
13   A.  Yes.
14   Q.  -- business?
15   A.  Yes.
16   Q.  Okay.  Does Consolidated engage in any other
17  forms of business other than the ownership and licensing
18  of trademarks?
19   A.  No.
20   Q.  Okay.  It wasn't a trick question.
21   A.  Oh, I hope not.
22     MR. MORTNER:  You'll tell us when the trick
23   questions come.
24     MR. STEWART:  Yeah.  I'll tell you when the
25   trick questions come, absolutely.

Page 26

1     THE WITNESS:  Yes, especially with my language.
2  BY MR. STEWART:
3    Q.  Does Consolidated have a board of directors?
4    A.  We didn't get that -- we didn't get that far.
5  That's me and David.
6    Q.  It's you and David.  Okay.  Is there a chairman
7  or a president of the corporation?
8    A.  I believe it's David.
9    Q.  Okay.  Is that written down anywhere, or is
10  that just based on your understanding?
11   A.  Basically, my understanding.
12   Q.  Okay.  Are there any employees of Consolidated
13  besides you and David?
14   A.  No.
15   Q.  What is Mettemp Inc.?
16   A.  Mettemp Inc.?  I don't recall it.
17   Q.  Okay.  M-E-T-T-E-M-P?  You don't recall it?
18   A.  No.
19   Q.  Okay.  You had mentioned Associated Business
20  Consultants previously.
21   A.  Yes.
22   Q.  And just because there was some confusion as to
23  who you were talking about, can you explain again what
24  it is that Associated Business Consultants does?
25   A.  Consulting to customers, business people, about

Page 27

1  trademark.
2    Q.  About trademark.  So does Associated Business
3  Consultants file trademark applications before the
4  Patent and Trademark Office?
5    A.  Only if that's belong to them.  Only if they
6  working in the company, only if the customers ask for
7  them to do that.  So they put us as officers and we do
8  that as behalf of the company.
9    Q.  Okay.  Let me make sure I understand.  If the
10  company invites you or Mr. Baksht to become -- well, I
11  shouldn't say you.  If the company invites somebody from
12  Associated Business Consultants to become an officer of
13  that company, then that individual will file --
14   A.  Then we can do that, yeah.
15   Q.  Okay.  And who are the principals of Associated
16  Business Consultants?
17   A.  What do you mean principal?
18   Q.  Who are the officers of Associated Business
19  Consultants?
20   A.  David and me.
21     MR. STEWART:  Okay.  I'm going to show you a
22   document that I'll ask the reporter to mark as
23   Exhibit 69.
24     (Plaintiff's Exhibit No. 69 was marked for
25   identification.)

Page 28

1  BY MR. STEWART:
2    Q.  And this is a printout from the New York State
3  Department of State website for Associated Business
4  Consultants?
5    A.  Yes.  That's the company.
6    Q.  Yes.  And do you see about halfway down the
7  page your name Menachem Schneorson, although I believe
8  the letter N is missing from your name?
9    A.  Yes.
10   Q.  And then right after that is an interesting
11  spelling of David Baksht.  Do you see that?
12   A.  Yes.
13   Q.  Do you know how that -- how Mr. Baksht's name
14  got spelled D-A-A-V-O-D B-A-K-S-H-E-T?
15   A.  I don't know, but I believe it's an error,
16  mistake and --
17   Q.  Okay.
18   A.  -- that's it.  That's all what I can say.
19   Q.  Okay.  Are there any other officers or
20  employees of Associated Business Consultants aside from
21  yourself and Mr. Baksht?
22   A.  No.
23   Q.  And you said National Trademark Center is just
24  a DBA of Associated Business Consultants?
25   A.  Yes.

7 (Pages 25 to 28)

Page 29

1    Q.   Okay.  So there's no additional officers or
2  employees of National Trademark Center either?
3    A.   No.
4    Q.   Is there an S.S. Stein that's affiliated with
5  the National Trademark Center?
6    A.   S.S. Stein.  I don't -- I remember something
7  Stein.  I don't remember exactly.  It could be it was
8  somebody that as a temporary, Stein, maybe for a couple
9  of weeks, and after that he left.  I remember something
10  -- I don't know.  I can't swear on that.
11    Q.   Okay.  Aside from applying for trademark
12  applications, what does National Trademark Center and
13  Associated Business Consultants do for its clients?
14    A.   Advise the customers about litigation, about
15  trademark.
16    Q.   Are you an attorney?
17    A.   No.
18    Q.   Is Mr. Baksht an attorney?
19    A.   No.
20    Q.   Okay.  Do you hold any positions with Joe Cool
21  Inc. as an officer or employee?
22    A.   No.
23    Q.   Does Mr. Baksht?
24    A.   No.
25    Q.   Okay.  Does anybody from Joe Cool Inc. hold a

Page 30

1  position with Consolidated?
2    A.   No.
3    Q.   Is Yosef Amar a vice president of Consolidated?
4    A.   No.
5    Q.   Was he ever a vice president of Consolidated?
6    A.   I can't swear on that, but I don't think so.
7    Q.   Okay.  Are you familiar with the company Joe
8  Cool Bike Week Inc.?
9    A.   Joe Cool Bike Week Inc., no.
10    Q.   You have not heard of that company?
11    A.   If I not heard of it?  I try to refresh my
12  memory.  Joe Cool Bike Week Inc.  Maybe I heard about
13  it, but there is nothing to do with us.
14    Q.   Okay.  So, to the best of your knowledge, it's
15  not --
16    A.   It's not.  We're not officers in Joe Cool Bike
17  Week, not me and not David.  That's what --
18    Q.   Okay.
19    A.   -- much to my knowledge.
20    Q.   Okay.  And, to the best of your recollection,
21  Consolidated didn't help form Joe Cool Bike Week?
22    A.   Consolidated didn't help?
23    Q.   To start Joe Cool Bike Week?
24    A.   No, to the best of my knowledge.
25    Q.   Okay.  Who is David Lipsker?

Page 31

1    A.   There's no David Lipsker.  David Lipsker is not
2  a person.
3    Q.   What is David Lipsker?
4    A.   That's an e-mail.
5    Q.   It's an e-mail account?
6    A.   E-mail account, David Lipsker.
7    Q.   Okay.  And is it an account that belongs to
8  Mr. Baksht?
9    A.   Yes.
10    Q.   Okay.  And does Mr. Baksht ever use the name
11  David Lipsker as his own name?
12    A.   No.
13    Q.   He just uses the e-mail account David Lipsker?
14    A.   Yes.
15    Q.   Do you know the origin of the name David
16  Lipsker that's used in the e-mail account?
17    A.   Somebody with the name Lipsker made him that
18  account, and since then he felt that this is -- give him
19  a good luck so he kept that, David Lipsker.  That's it.
20    Q.   Okay.  Do you know of an Abraham Schneorson?
21    A.   Of course.
22    Q.   Who is Abraham Schneorson?
23    A.   I have a brother, Abraham Schneorson.  What's
24  he got to do with that?
25    Q.   Is he affiliated in any way with Consolidated?

Page 32

1    A.   No.
2    Q.   Okay.  Do you know a D.M. Schneorson?
3    A.   D.M. Schneorson?
4    Q.   Yeah.  Just the initials D.M. Schneorson?
5    A.   You know what?  It could be me, and also, like
6  I said, maybe error or a mistake.  I don't know what's
7  D.M. Schneorson.
8    Q.   Okay.
9    A.   But I am M. Schneorson.
10    Q.   Yes.  I know you're M. Schneorson.  Do you know
11  a Menachem Hartman, H-A-R-T-M-A-N?
12    A.   Menachem Hartman is a friend of mine, yes.
13    Q.   Is he involved in any way with the Consolidated
14  business?
15    A.   No.
16    Q.   Okay.  What are your responsibilities at
17  Consolidated?
18    A.   We had a project to do and we felt to take it
19  to a next level and that the job was for both of us, me
20  and David, protecting the mark, registration the mark,
21  marketing and investors, bring investors to that
22  project.
23    Q.   The 3DL project?
24    A.   Yes.
25    Q.   Okay.  And I guess I may not have asked my

86ded466-e1ee-4ed4-8e01-ae0f5e5c0373

1 question as clearly as I should have.  Is there a
2 division of responsibility between you and David where
3 you're responsible for some things and David is
4 responsible for others?
5    A.  We do everything together.  There's things that
6 I don't understand, and he does, like, registration,
7 protecting the mark.
8    Q.  And what is it that you understand better than
9 David?
10    A.  Marketing, bring investors.
11    Q.  Okay.  Have you brought any investors into the
12 3DL project?
13    A.  Everything stop because of that.
14    Q.  Okay.  So you did not bring investors in?
15    A.  No.
16    Q.  Okay.  And when you say "because of that," you
17 mean --
18    A.  Because of the court.
19    Q.  Because of the court.  Okay.  Is there anybody
20 at Consolidated that's responsible for designing or
21 developing new trademarks or logos?
22    A.  Again?
23    Q.  Is there anybody at Consolidated who is
24 responsible for designing new trademarks or new logos?
25    A.  No.  We don't design.

1    Q.  Okay.  The task of filing trademark
2 applications, is that a task that David typically does?
3    A.  Yes.
4    Q.  Okay.  How about enforcing trademark rights --
5       MR. MORTNER:  Objection.  Can you -- oh, I'm
6    sorry.  Finish your question.
7    Q.  Who at Consolidated is responsible for
8 enforcing rights in trademarks against third parties to
9 prevent third parties from using Consolidated's
10 trademarks?
11       MR. MORTNER:  Now I'll object.  Can you just
12    define the word --
13       THE WITNESS:  I didn't understand the question.
14       MR. MORTNER:  Yeah.  It's a long -- too long --
15    maybe I interrupted it.  I don't think he understood
16    the question, but also I need you to, if you would,
17    please, to define the word "enforcing" more
18    specifically into specific tasks for him.
19 BY MR. STEWART:
20    Q.  Who would be responsible at Consolidated for
21 informing third parties that they are violating
22 Consolidated's trademarks?
23       MR. MORTNER:  Now I'm going to make an
24    objection.  There has been no testimony that any such
25    activity has occurred so --

1       THE WITNESS:  No.  He's asking if we'll be,
2    right?
3       MR. STEWART:  Yeah.  Who --
4       THE WITNESS:  If we'll be such a --
5       MR. MORTNER:  It's a hypothetical question
6    so --
7       THE WITNESS:  Yeah.
8 BY MR. STEWART:
9    Q.  All right.  Has Consolidated ever been in a
10 situation where it informed a third party that the third
11 party was violating Consolidated's trademark rights?
12    A.  I don't recall, but I cannot swear on it.
13    Q.  Okay.  Is your work for Consolidated your only
14 job right now?
15    A.  No.
16    Q.  So you do other things for a living?
17    A.  Yes.
18    Q.  Okay.  And I don't want to get into too much
19 detail about it, but what type of work do you do?
20    A.  Consulting, Associated Business Consulting.  I
21 work with David together.
22    Q.  Okay.  Anything else?
23    A.  A little real estate.  That's what I used to
24 do.
25    Q.  Okay.  Have you ever done any work with graphic

1 art design?
2    A.  No.
3    Q.  Okay.  Have you ever previously done any work
4 with T-shirt designs or T-shirt sales?
5    A.  No.
6    Q.  Okay.  Do you know if Mr. Baksht has ever done
7 any previous work with T-shirt designs or T-shirt sales?
8    A.  I don't know.
9       MR. STEWART:  Okay.  All right.  I'm going to
10    show you what's been previously marked as Exhibit 1,
11    and I'll ask the reporter to mark it as Exhibit 1
12    again because I don't have a copy with a sticker on
13    it.
14       (Plaintiff's Exhibit No. 1 was marked for
15    identification.)
16 BY MR. STEWART:
17    Q.  All right.  Have you seen this before?
18    A.  Yes.
19    Q.  And what is this?
20    A.  This is the mark.
21    Q.  This is the 3DL mark?
22    A.  The 3DL mark.
23    Q.  Okay.  Did Consolidated have any role in
24 designing this mark?
25    A.  No.

Page 37

1    Q.   Okay.  Who did design this mark?
2    A.   I believe Joe Cool.
3    Q.   Okay.  Do you know who at Joe Cool?
4    A.   No.
5    Q.   Okay.  And why do you believe that Joe Cool
6  designed the mark?
7    A.   If he himself designed it?  I didn't say that.
8  I just said that that's Joe Cool mark.  That used to be
9  his mark.  That's the mark that belong now to
10  Consolidated.
11    Q.   Okay.  Do you know when this trademark was
12  designed?
13    A.   I believe it's 1993.
14    Q.   Okay.  And why do you believe that?
15    A.   Because that's the 3DL mark that belong to
16  Consolidated and that's what -- that's the whole
17  project.  It was about the trademark.  I don't know
18  specific that's exactly the one because he modern [sic]
19  that a little bit or whatever, but that's the mark.
20    Q.   But what --
21    A.   I don't know exactly details about the mark if
22  it was a little longer or a little wider, but this is
23  the mark.  We never had an issue about it, but this is
24  the mark.
25    Q.   Okay.  What leads you to believe that this mark

Page 38

1  was designed in 1993?
2    A.   If I'm not mistaken, we also registration in
3  the Patent Office.  We said it.  This is 1993 mark that
4  was belong to Joe Cool.
5    Q.   Did Joe Cool tell you that he started using
6  this mark in 1993?
7    A.   Yeah.
8    Q.   Okay.  Is there anything in addition to that
9  that leads you to believe the mark was first used in
10  1993?
11    A.   I believe so.  I remember with his customer.
12  He has customers that bought it from him.  I don't know
13  exactly which year, but from early 2000 for sure we have
14  customers that know that that's what he sold them.
15    Q.   Okay.  And which customers are those?
16    A.   I don't remember the names, but I think it was
17  Danny -- I don't remember his last name, whatever, but
18  -- and a few customers I don't have the names but. . .
19    Q.   It would be important, I think, for both sides
20  in this case if you can --
21    A.   I didn't spoke --
22    Q.   -- remember the name.
23    A.   -- to the customers, but that's what I heard.
24    Q.   Okay.  And how did you hear that?
25    A.   That came to a conversation, me and David, and

Page 39

1  I remember we spoke about it.  He said that his
2  customers bought it.  That's what I remember.
3    Q.   Okay.  But you don't remember the names of the
4  customers?
5    A.   No.  I don't have this in my head, no.
6    Q.   Is there anything that would help you remember
7  the names of the customers?
8    A.   Yeah.  If you give me the list.  I don't know.
9    Q.   What list would that be?
10    A.   If you give me a list and I look at it, maybe
11  I'll see if I can refresh my memory and see if I
12  remember any name.
13    Q.   Okay.  Did Joe Cool provide you with any
14  documents to prove to you that this logo had been used
15  since 1993?
16    A.   To me personally?  No.  I don't recall.  I
17  can't swear on that.  I don't know what he gave to David
18  but, to me, I didn't get any documents.
19    Q.   Now, during his recent deposition, Yosef Amar
20  testified that the final version of this design that's
21  shown here in Exhibit 1 was created in 2010.
22    A.   That's when I came into the picture.
23    Q.   Yes.  Do you have any reason to doubt
24  Mr. Amar's testimony that the final version of this
25  design was created in 2010?

Page 40

1    A.   I believe Joe -- whatever he said.  If he said
2  that's the one, so that's the one.
3    Q.   If Joe said it was 2010, it was 2010?
4    A.   If he said so.
5    Q.   Okay.  Have you seen any earlier versions of
6  Exhibit 1 of the type that was sold before 2010?
7    A.   I saw, I think so, but if you can show it to
8  me, I'll try to refresh my memory.  I'll see if I can
9  tell you if I saw it or not.
10    Q.   Okay.  Yeah.  We'll be going through some
11  earlier --
12    A.   Maybe I'm not gonna be able to tell you.
13    Q.   We'll be going through some earlier T-shirts
14  and sketches soon.  One thing I did want to ask you more
15  about Exhibit 1 is if you look at -- there are some
16  words by the line on the far right.  It says
17  "Consolidated" and it has the copyright symbol and then
18  in real small numbers it says "2003."  Do you see that?
19  Just below the dated part of the --
20    A.   Yeah.  I see that.
21    Q.   What does that 2003 represent?
22    A.   You gonna have to ask somebody else.  I don't
23  know.  I don't have answer for that.
24    Q.   Okay.  Do you have any information on why Joe
25  Cool came up with this final design for the 3DL mark at

10 (Pages 37 to 40)

Page 41

1  about the same time Consolidated came into the picture?
2      A.  No.  I don't remember ever we spoke about it.
3      Q.  Okay.  But is this -- Exhibit 1, is this the
4  version of the 3DL mark that you were introduced to when
5  Joe Cool approached Consolidated?
6      A.  Yeah.
7      Q.  Okay.
8          VIDEOGRAPHER:  Five minutes of tape remaining.
9          MR. STEWART:  This is as good a time to make a
10  switch.
11          VIDEOGRAPHER:  The time is 10:23 a.m.  This
12  ends Tape 1.  We're off the record.
13          (Off the record.)
14          VIDEOGRAPHER:  The time is 10:28 a.m. this
15  begins Tape 2.  We are on the record.
16          MR. STEWART:  Okay.  I'm going to show you
17  another document that was previously marked as
18  Exhibit 55, and I'll ask the reporter to remark it as
19  55.
20          (Plaintiff's Exhibit No. 55 was marked for
21  identification.)
22  BY MR. STEWART:
23      Q.  Let me just ask you first.  Is -- three lines
24  down, the first line is "David Lipsker."  Then there's
25  "To amar," and then there is an e-mail address

Page 42

1  "menachemny@gmail.com."
2      A.  Yes.
3      Q.  Is that your e-mail address?
4      A.  Yeah.
5      Q.  Okay.  So have you seen this document before?
6      A.  Which document?
7      Q.  This e-mail.
8      A.  The e-mail is mine, menachemny.
9      Q.  Yeah, the e-mail address is yours.
10      A.  It's mine.
11      Q.  Yes.  Okay.  Have you seen this text before,
12  this actual e-mail?
13      A.  I'll tell you the truth.  I don't read English
14  so good.  If was in my e-mail, could be.  I don't read
15  all my e-mails.  A lot of things David send me.  He's my
16  partner.  Because I'm his partner so he send it to me.
17  I don't look on everything what he send me.  It's absurd
18  but I don't --
19      Q.  Okay.
20      A.  So I don't remember that now.  Even was in my
21  mail, doesn't mean I read it.
22      Q.  So you don't remember reading this e-mail?
23      A.  No.  Let me just see it again.  I don't
24  remember.
25      Q.  Okay.  So you --

Page 43

1      A.  I'm not going to swear that, but I'm not -- I
2  don't remember that e-mail.
3      Q.  So you don't remember -- well, if you turn to
4  page 2 --
5      A.  Yes.
6      Q.  -- you don't remember Mr. Amar saying that the
7  3DL logo was based on the fonts shown at the bottom of
8  page 2; is that correct?
9      A.  No.  That for sure I don't remember.  I don't
10  know anything about it, no.
11      Q.  Okay.  Did the company, Mettemp, ever use the
12  3DL trademark on a product?
13      A.  Mettemp.  Who's Mettemp?  I don't recall
14  Mettemp so --
15      Q.  You don't recall Mettemp at all?
16      A.  No.  Sorry.
17      Q.  Okay.  Well, let me show you another document.
18  And this was previously marked as Exhibit 24, and I'll
19  ask the reporter to mark it as 24 again.
20          (Plaintiff's Exhibit No. 24 was marked for
21  identification.)
22      A.  Maybe Mettemp is one of our customers.  Could
23  be.  National Trademark, but I don't recall it.  I can't
24  swear on it, but that's possible.
25      Q.  Okay.  Well, this document is on National

Page 44

1  Trademark Center letterhead; is that correct?
2      A.  Looks like.
3      Q.  Okay.  Do you recall seeing this document ever
4  before today?
5      A.  Before today?
6      Q.  Yeah.  This specific --
7      A.  No.  I don't remember.  Documents, I don't look
8  at documents.  I hardly read English so there's not even
9  point to send me document.  There's not my -- this I
10  leave to David.  That's why he's my partner.
11      Q.  Now, you see in the first two sentences
12  it says, Please be advised that we represent Mettemp,
13  Inc., a New York corporation.  Our client owns the
14  trademark 3 Drooping Lines.
15      A.  Um-hmm.
16      Q.  To your knowledge, has Mettemp ever owned the 3
17  Drooping Lines trademark?
18      A.  When I say that 3DL belongs to us, to Joe Cool,
19  if Joe Cool had a corporation maybe in Mettemp, I don't
20  know and he's -- I don't know.
21          MR. MORTNER:  Could you ask the question again?
22  Listen to the question.
23          MR. STEWART:  Can you read the question back,
24  please?
25          (The last question was read back.)

11 (Pages 41 to 44)

86ded466-e1ee-4ed4-8e01-ae0f5e5c0373

Page 45

1      MR. MORTNER:  To your knowledge.
2      THE WITNESS:  To my knowledge, no, but I don't
3  know.  To my knowledge, no.
4  BY MR. STEWART:
5      Q.  Okay.  Do you have any information as to why
6  the National Trademark Center would be telling someone
7  that Mettemp owned the 3 Drooping Lines instead of
8  Consolidated or Joe Cool owning the 3 Drooping Lines?
9      A.  I don't have any knowledge.
10     Q.  Okay.  And the third paragraph of the letter
11  says, "The above mark has been in continuous use by our
12  client since as early as 1987."
13      Do you have any information as to why the
14  National Trademark Center would be telling someone that
15  the 3 Drooping Lines had been in use since 1987?
16      A.  I don't recall 1987.  1987 you said?
17      Q.  1987, yes.
18      A.  I don't recall that -- that date, and I don't
19  understand why.  I don't have answer for that.
20      Q.  Okay.  The second paragraph here says, Our
21  official licensee for our above mark in the state of
22  Florida is Joe Cool.
23      Do you know whether -- didn't you testify
24  earlier that the license went from Consolidated to Joe
25  Cool and not from Mettemp to Joe Cool, correct?

Page 46

1      A.  Yes.  That's what I understood from my
2  knowledge.  That's what I understand till today.
3      Q.  Okay.  So you have no information about a
4  license from Mettemp to Joe Cool?
5      A.  I don't have information about it.
6      Q.  Okay.  And you're not personally involved with
7  Mettemp as a corporation; is that correct?
8      A.  No.
9      Q.  If you look at the very bottom of the letter,
10  there's that name "S.S. Stein," trademark counselor.  Do
11  you see that?
12      A.  Yes.
13      Q.  Does this refresh your recollection at all as
14  to who S.S. Stein might be?
15      A.  No.
16      Q.  Okay.  Is trademark counselor a title that's
17  used at National Trademark Center?
18      A.  Again?
19      Q.  Is trademark counselor a title that is used at
20  the National Trademark Center?
21      A.  I don't know about titles but -- I don't know.
22      Q.  Are there employees at the National --
23      A.  No.  I said no.
24      Q.  Okay.  So there are no employees who have the
25  title "trademark counselor" at National Trademark

Page 47

1  Center?
2      A.  No, not what I recall.
3      MR. STEWART:  Okay.  I'm going to show you a
4  document that I'll ask the reporter to mark as
5  Exhibit 70.
6      (Plaintiff's Exhibit No. 70 was marked for
7  identification.)
8      MR. MORTNER:  Is this page part of a larger
9  document?
10      MR. STEWART:  Yeah.  This actually came out of
11  the file history for the Florida registration of this
12  mark.
13      MR. MORTNER:  Would it be possible to show the
14  witness the entire document?
15      MR. STEWART:  Sure.  Let me just check on the
16  numbering of this.  I think this has been numbered
17  before.  This is No. 63.
18      (Plaintiff's Exhibit No. 63 was marked for
19  identification.)
20  BY MR. STEWART:
21      Q.  Looking at your choice of Exhibit 70 or the
22  final page of Exhibit 63 -- let's just go with Exhibit
23  70 since it's sitting in front of you.  Looking at
24  Exhibit 70, have you seen this logo before?
25      A.  It looks familiar, yeah.

Page 48

1      Q.  Okay.  Is this one of the logos that Joe Cool
2  presented to Consolidated as part of the 3DL project?
3      A.  For much that I remember, yes.
4      Q.  Okay.  Did Consolidated have any role in
5  designing this logo?
6      A.  Who?
7      Q.  Consolidated?
8      A.  Consolidated don't do designs.
9      Q.  Okay.  So Consolidated did not design this
10  logo?
11      A.  No.
12      Q.  To the best of your knowledge, is it Joe Cool
13  that designed this logo?
14      A.  Yes.
15      Q.  Okay.  And do you know when this specific logo
16  with all the words in it was designed?
17      A.  The mark?  I believe, like I said before, 1993.
18  The words, that's probably -- I don't know.  Maybe --
19  maybe 2010.  I don't know.
20      Q.  Okay.  And when you say the mark in 1993, you
21  mean the 3 Drooping Lines?
22      A.  Yes.
23      Q.  Okay.
24      A.  Yes.
25      Q.  And that's based on information that Joe Cool

86ded466-e1ee-4ed4-8e01-ae0f5e5c0373

Page 49

1  provided to you, correct?
2      A.  Yes.
3      Q.  Do you know when this particular logo with the
4  words "Florida Sunshine State" and "Florida" and
5  "Consolidated," when this entire logo was first used on
6  clothing?
7      A.  You mean the mark itself or with the words and
8  everything add to it.
9      Q.  With everything added to it.
10     A.  I don't know, but I can assume that those are
11  around 2000 --
12         MR. MORTNER:  You're here to testify what you
13     know.
14         THE WITNESS:  What I know?  I can't swear on
15     that, but I think it's 2010, yeah.
16     Q.  Okay.  You don't have any information
17  suggesting it was earlier than 2010, do you?
18     A.  Like I said, the mark itself, yes.  With the
19  word, I -- maybe he didn't use -- he did use the words
20  before.  I don't know.  I can't answer that for sure.
21     Q.  Okay.
22     A.  This I think one of the marks that he said that
23  he wants to register that he's using since 1993.  That's
24  what I remember.  But I don't know exactly, you know, if
25  it was -- that's what I remember that he came and he

Page 50

1  register that and the date of first use was 1993.
2      Q.  Okay.
3      A.  Refreshing my memory.
4         MR. STEWART:  I'm going to show you what's
5     previously been marked as Exhibit 64, and I'll ask
6     the reporter to mark it again as 64.
7         (Plaintiff's Exhibit No. 64 was marked for
8     identification.)
9  BY MR. STEWART:
10     Q.  And looking at the very last page that you're
11  looking at right now, have you seen that trademark
12  before?
13     A.  Yeah.
14     Q.  That logo?
15     A.  It looks familiar.
16     Q.  Okay.  Is this another one of the logos that
17  Joe Cool asked Consolidated to register for it?
18     A.  Yes.
19     Q.  Okay.  And did Consolidated have any role in
20  deigning this trademark?
21     A.  We don't design.
22     Q.  Okay.  Do you have any information as to when
23  this complete trademark with the words "Daytona Beach
24  Florida" was first used by Joe Cool?
25     A.  Like I said before, that's what he told us that

Page 51

1  the first use was 1993 and that's what we register.  We
2  register that first use was 1993.
3      Q.  Okay.  Did he tell you that the first use of
4  the 3 Drooping Lines with the words "Daytona Beach
5  Florida" was 1993?
6      A.  Yeah, probably.  Because that's the way we
7  register so we register.  We have to register exactly
8  the way it is.  So, yeah, that's exactly right.
9      Q.  Okay.
10         VIDEOGRAPHER:  Apologies.  The mike is getting
11     muffled.
12         THE WITNESS:  I'm sorry.
13         VIDEOGRAPHER:  That's fine.  You can even
14     raise it up, if you'd like to make it more -- thank
15     you.
16  BY MR. STEWART:
17     Q.  Did Joe Cool provide you with any documentation
18  to show that this logo had been used since 1993?
19     A.  No.  We don't -- I didn't take care of the
20  document.  If David took, maybe.  I didn't.
21         MR. STEWART:  Okay.  Now I'm going to show you
22     a document that previously we marked as Exhibit 65.
23     I'll ask the reporter to mark it again as 65.
24         (Plaintiff's Exhibit No. 65 was marked for
25     identification.)

Page 52

1  BY MR. STEWART:
2      Q.  And if you look at the second page, do you see
3  the various pictures of the logo?  Have you seen those
4  logos before?
5      A.  Yes.
6      Q.  Okay.  When did you see those logos?
7      A.  Probably the same time.
8      Q.  And when --
9      A.  2010.
10     Q.  2010?
11     A.  Yeah.
12     Q.  Okay.  And did Consolidated have any role in
13  preparing these logos?
14     A.  No.
15     Q.  Okay.  Again, was it Joe Cool that designed the
16  logos?
17     A.  Yes.
18     Q.  And do you know when the logo with the words
19  "Wildwood New Jersey" was designed by Joe Cool?
20     A.  That's the same time.  It's also 1993.
21     Q.  And that's based upon what Joe Cool told you?
22     A.  Yeah.
23     Q.  And just to clear up on the issue of documents
24  to make sure I've got your testimony clearly --
25     A.  Okay.

86ded466-e1ee-4ed4-8e01-ae0f5e5c0373

Page 53

1    Q.  -- do you have any documents showing that any
2  of the 3DL marks that we've looked at today were used on
3  products before July 1st of 2002?
4    A.  If I have any documents?
5    Q.  Yes, do you have any documents?
6    A.  I don't.
7    Q.  You don't.  Okay.  Do you know whether David
8  does?
9    A.  I don't know.
10   Q.  Do you have any documents showing that any of
11  the 3DL marks were used on any products before July of
12  2010?
13   A.  Again?
14   Q.  Do you personally have any documents showing
15  that the 3DL marks were used on products before July of
16  2010?
17   A.  Oh, I don't have any documents.
18   Q.  Okay.  And do you know whether David does?
19   A.  I don't.
20      MR. STEWART:  Okay.  I'm going to show you
21    another document, because I have documents, that I'll
22    ask the reporter to mark as Exhibit 71.
23      COURT REPORTER:  I think we have 71.
24      MR. STEWART:  71; is that right?
25      COURT REPORTER:  I think we have 71.

Page 54

1      MR. STEWART:  All right.  72.
2    (Plaintiff's Exhibit No. 72 was marked for
3    identification.)
4  BY MR. STEWART:
5    Q.  I'd like to ask you a question about paragraph
6  147 of this document which is on page 21.  It says, "The
7  3DL marks have been utilized for numerous years by a
8  multitude of clothing and heat transfer users."  Do you
9  see that?
10   A.  Yeah.
11   Q.  Is that a true statement that the 3DL marks
12  have been used by a multitude of clothing and heat
13  transfer users for numerous years?
14   A.  I have to understand.  What do you mean if it's
15  a true statement?
16   Q.  Is paragraph 147 stating the truth?  Are these
17  facts that you know to be true?
18   A.  What is it saying?
19   Q.  It says that the 3DL marks have been used for
20  numerous years, many years, by a multitude, again, many,
21  clothing and heat transfer users.
22   A.  I guess so.
23   Q.  So who are some of those clothing and heat
24  transfer users who have used the 3DL mark in the --
25   A.  Joe Cool is using that since 1993.

Page 55

1    Q.  Yeah.  Okay.  So that's one, Joe Cool is one?
2    A.  Yeah.
3    Q.  Is there anybody else who you can think of who
4  has been using the 3DL --
5    A.  Oh, if somebody infringe you mean about it?
6    Q.  I don't know if they would be infringers or
7  not, but this sentence says that there have been a
8  multitude of clothing and heat transfer users.  Usually,
9  a multitude means more than one.
10   A.  I cannot -- I don't know.  I know Joe Cool is
11  using that since 1993.  I don't know who else used it,
12  who else didn't use it.  I don't know.  I'm not in the
13  market.  I don't know.
14      MR. MORTNER:  I think, if I may, the paragraph
15    was referring to Joe Cool's customers.
16      MR. STEWART:  Okay.
17      MR. MORTNER:  So if you can answer the
18    question.
19      MR. STEWART:  I think he's -- it sounds like
20    he's answered the question to the best of his
21    ability.
22      MR. MORTNER:  Okay.
23  BY MR. STEWART:
24   Q.  If you look at paragraph 145 just above there,
25  it says, "Joe Cool Inc. has used, promoted and

Page 56

1  advertised the 3DL marks continuously since 1993."  Do
2  you see that?
3    A.  Yes.
4    Q.  Do you have any documents relating to Joe
5  Cool's promotion or advertising of the 3DL marks?
6    A.  I don't.
7    Q.  Does David Baksht?
8    A.  Maybe.  I can't -- I don't know.
9    Q.  Okay.  If you look at paragraph 146, it says,
10  "Since 1993, Joe Cool has extended considerable funds in
11  all terms of advertising, marketing and promotion of the
12  3DL marks to other distributors and end users."  Do you
13  see that?
14   A.  Yeah.
15   Q.  Is that an accurate statement about what
16  Joe Cool has done?
17   A.  I believe so.
18   Q.  And why do you believe it's accurate?
19   A.  Why do I believe?
20   Q.  Yeah.  On what do you base your belief that
21  it's accurate?
22   A.  You have to explain the question.  What I --
23   Q.  Sure.  Well, this is a statement about what Joe
24  Cool has done.  It says that Joe Cool has spent
25  considerable funds advertising and promoting the 3DL

14 (Pages 53 to 56)

Page 57

1 marks.
2    A.  Because he's in the market for so many years.
3 That's what he's doing.
4    Q.  Okay.  But what information do you have that
5 suggests that Joe Cool was promoting the 3DL mark since
6 1993?
7    A.  Because I know that's what he does for a
8 living, and that's what he does for so many years.
9 That's what I believe.  I believe when he said he did it
10 since 1993, he did it since 1993.
11    Q.  Okay.  So if I'm understanding you correctly,
12 Mr. Amar of Joe Cool told you he had been advertising
13 and promoting the 3DL marks since 1993; is that correct?
14    A.  Yes.
15    Q.  And you believe him?
16    A.  Yes.
17    Q.  Okay.  Is there any other information that he
18 gave you to suggest that he has been advertising since
19 1993?
20    A.  I don't have or I don't recall any other
21 information, but that's all what I can say right now.
22    Q.  Okay.  Did he show you any product catalogs
23 that included the 3DL marks going back to the '90s?
24    A.  I don't remember seeing that.
25    Q.  Okay.  If you look at paragraph 149, it says,

Page 58

1 "As a result of Joe Cool Inc.'s efforts, the 3DL marks
2 are known in biker circles, i.e. among motorcycle
3 enthusiasts, and in beach shops for novelty T-shirts,
4 sweatshirts and like clothing, as an indicator of the
5 source of products provided in connection with the marks
6 and establishing good will in the marks."  Do you see
7 that?
8    A.  Um-hmm.
9    Q.  Do you know whether it's true that the 3DL
10 marks are well known in biker circles?
11    A.  I think Joe Cool will be the one to answer that
12 because if that's what he said. . .
13    Q.  Is that what he said to you?
14    A.  I don't remember exactly specific motorcycle,
15 but I remember the stores that he sell that he selling
16 to, all the stores on the oceans.
17    Q.  All the stores where?
18    A.  On the oceans.
19    Q.  On the ocean.  So do you have any memory of Joe
20 Cool or Yosef Amar saying to you that the 3DL marks are
21 well known in biker circles?
22    A.  What's biker circle?  What is that?
23    Q.  Among motorcycle -- people who ride
24 motorcycles?
25    A.  Oh, yeah, yeah, yeah, yeah, yeah.  Of course.

Page 59

1    Q.  He did say that to you?
2    A.  Yeah, yeah.  I have to explain the things --
3       MR. MORTNER:  If you don't -- no, no.  If you
4 don't understand a question --
5       THE WITNESS:  Sometime I'm ashamed to say I
6 don't understand.
7       MR. MORTNER:  No, no, no, no.  Don't be
8 ashamed.  If you don't understand the question, you
9 have to -- you have to say I heard words I didn't
10 get.  Even if you think that you can figure it out by
11 interpreting it, maybe I don't know this word, but if
12 I put a few -- enough of the words together, I might
13 be able to -- no, no, no.  You have to understand
14 every word --
15       THE WITNESS:  Okay, okay.
16       MR. MORTNER:  -- of every question.  Even if
17 you --
18       THE WITNESS:  Yeah.  Motorcycle event --
19       MR. MORTNER:  -- think you know -- don't try to
20 imagine what Mr. Stewart's question might be if you
21 were a perfect English speaker.
22       THE WITNESS:  Okay.
23       MR. MORTNER:  Ask the question if you don't
24 know what's --
25       THE WITNESS:  I'll try my best.

Page 60

1       MR. STEWART:  Okay.
2       THE WITNESS:  Fair enough?
3 BY MR. STEWART:
4    Q.  Okay.  So let me make sure I understand.
5 Mr. Amar told you that the 3DL marks were well known
6 among people who ride motorcycles; is that correct?
7    A.  Yes.
8    Q.  Okay.  Did he provide you with any evidence of
9 that other than his own explanation to you?
10    A.  Not to me.
11    Q.  Okay.  Did he provide any other evidence to
12 David?
13    A.  Maybe.
14    Q.  But you don't know?
15    A.  I don't know.
16    Q.  Do you know of any other people other than
17 Yosef Amar who could testify that the 3DL marks are well
18 known among motorcycle enthusiasts?
19    A.  No.
20    Q.  Okay.  When did you first see the Monster
21 Energy claw icon on the energy drink?
22    A.  That what?
23    Q.  The Monster Energy M, my client's trademark?
24    A.  Oh.
25    Q.  When did you first see that M?

86ded466-e1ee-4ed4-8e01-ae0f5e5c0373

Page 61

1    A.  The choice -- I don't know.  I didn't recall
2  seeing that before.  Could be that I saw it in the
3  stores, but I don't recall knowing even Monster before.
4  I just heard about it only because of that.
5    Q.  Only because of --
6    A.  The court case.  We don't drink it.  I don't
7  think it's kosher so I don't know about it.  I didn't
8  know.
9    Q.  So is it your testimony that you don't recall
10 seeing the Monster M before this lawsuit?
11   A.  Yeah.  Could be I saw it.  I didn't pay
12 attention for that even.
13   Q.  Okay.
14   A.  Yeah.  That's what I meant to say.
15   Q.  Now, you're familiar with the Coca-Cola
16 trademark, correct?
17   A.  Of course.
18   Q.  And the Dr. Pepper trademark?
19   A.  Dr. Pepper?  No.
20   Q.  No, you don't know Dr. Pepper?
21   A.  No.
22   Q.  Okay.  Pepsi?
23   A.  Pepsi, yeah.
24   Q.  Okay.  But you don't think -- you don't
25 remember seeing the Monster Energy M until this lawsuit?

Page 62

1    A.  Exactly.  Coca-Cola, I drink.  I like it.  I
2  didn't -- it wasn't something that. . .
3    Q.  Do you shop at grocery stores?
4    A.  Yes.
5    Q.  But you don't remember seeing the Monster
6  Energy at the grocery stores?
7    A.  No.
8    Q.  Do you ever shop at convenience stores like
9  7-Eleven or Circle K or --
10   A.  Not really but, of course, now I see it all
11 over.  When I see Monster, I see Monster now but not
12 before.  Before, I didn't pay attention for that.
13   Q.  Okay.  So now you're --
14   A.  Even I saw it, I didn't -- like, I didn't see
15 that, but now I see.
16   Q.  Okay.  Do you see it now at gas stations?
17   A.  Oh, yes.
18   Q.  But you don't remember seeing it at gas
19 stations before the lawsuit?
20   A.  Exactly.
21   Q.  Do you know when you first saw the Monster M on
22 a shirt?
23   A.  Monster M on a shirt.  If I saw it, it's only
24 because of this court case, but I don't remember even
25 seeing it.  If you have one of those, maybe I'll look.

Page 63

1  It'll refresh my memory but I don't. . .
2    Q.  Okay.  If that's your answer, that's fine.
3  Have you ever been to Las Vegas?
4    A.  Yes.
5    Q.  When did you go?
6    A.  Many years -- I don't remember.
7    Q.  Would it be in the 2000s?
8    A.  Yeah, yeah.  I think so, yeah.
9    Q.  Do you remember the monorail connecting the
10 hotels on the strip?
11   A.  What is that?
12   Q.  The train that connects the hotels on the
13 strip?
14   A.  I didn't go with the train.
15   Q.  Okay.  You don't remember seeing that train?
16   A.  No.  Maybe I saw that, but I don't -- I didn't
17 use it.
18   Q.  Okay.  Have you ever seen anyone other than
19 Monster Energy use the Monster M on a T-shirt?
20   A.  Besides Joe Cool?
21   Q.  Well, has Joe Cool used the Monster M on a
22 T-shirt?
23   A.  Not Monster, the 3DL.
24   Q.  Yeah.
25        MR. MORTNER:  Are you asking -- I don't think

Page 64

1  he's clear.  Are you asking for the specific mark or
2  anything similar --
3        THE WITNESS:  Yeah.  You asking for the
4  specific mark?
5    Q.  I'm asking for the specific mark.
6    A.  Yeah.  If I know anyone that use it on the
7  shirt?
8    Q.  Yes.  Do you know anyone that's used the
9  Monster M on a shirt besides Monster?
10   A.  If I understand exactly the questions, if you
11 mean about the mark, the only one I know is 3DL, our
12 mark.  That's the only one I know about the shirts.
13 That's the only shirts that I know, but nothing to do
14 with Monster.
15   Q.  I understand it's nothing to do with Monster.
16 But, in your view, that's the same trademark as the
17 Monster M?
18   A.  No.
19   Q.  Then why are you mentioning it?
20   A.  Because you guys said it's the same thing.
21   Q.  Okay.
22   A.  Yeah.  That's why -- I'm not the expert, but
23 the expert says it's not.  David, when he look at it, he
24 said it's not.
25   Q.  Okay.  Well, let me ask my question this way:

16 (Pages 61 to 64)

Page 65

1  Are you aware of anyone that has used the Monster M or
2  the 3DL logo on a T-shirt besides Monster and Joe Cool?
3     A.  No.
4     Q.  Okay.  I'd like to turn back to Exhibit 1 and
5  just ask you:  When did Consolidated first become aware
6  of the 3DL logo shown in Exhibit 1?
7     A.  I don't remember the date exactly, but I
8  remember it was around 2010, beginning of 2010.  That's
9  my knowledge.
10    Q.  And what were the circumstances?
11    A.  What do you mean?
12    Q.  How did you become aware of the 3DL mark?
13    A.  Like I said before, Joe Cool came to our office
14 and he came to take advice and he want us to consult
15 him, me and David about this mark.  That's how we know.
16    Q.  Okay.  And what did he -- what were Joe Cool's
17 concerns that brought him to consult with you?
18    A.  Because he heard that there is some company
19 that they have similar marks that he's using for so many
20 years, and he's afraid that he's not going to be able to
21 control it, whatever.  So he came to ask for our help,
22 and that's how we got into the picture.
23    Q.  So did he mention what that other company was
24 that was using a similar mark?
25    A.  I don't remember specific if he said something.

Page 66

1  I just remember that he said that somebody is using -- a
2  big company using his mark and he's using that for so
3  many years and he wants to know if he can continue.
4  That's -- that's all what I remember.
5     Q.  In retrospect, did it turn out that that other
6  company was Monster Energy?
7     A.  Yes.
8     Q.  Okay.  So Joe Cool came to you and said that
9  another company, which turns out to be Monster Energy,
10 was using a similar mark to his 3DL mark and he wanted
11 you and David to assist him with the situation; is that
12 correct?
13    A.  Yeah.  And he look at it, he examined it, and
14 said it doesn't look the same and you can go ahead and
15 do that.  There's no problem.
16       COURT REPORTER:  I'm sorry.  I didn't get that.
17    Could you repeat your answer?
18       THE WITNESS:  Yeah.  He examined it.  He looked
19    at it and he said there's not problem.  It doesn't
20    look like and you continue to do that business.
21    Q.  Okay.  So David Baksht said it did not look
22 similar; you can continue to use --
23    A.  Yes.
24    Q.  -- the 3DL?  At some point did Consolidated
25 decide to acquire the 3DL mark from Joe Cool?

Page 67

1     A.  What do you mean?
2     Q.  At some point did Consolidated decide that it
3  wanted to be the owner of the 3DL mark?
4     A.  Yes, yes.
5     Q.  Okay.  And when did that happen?
6     A.  I don't know exactly the date, but that was
7  2010.
8     Q.  Okay.  And why did Consolidated decide that it
9  wanted to own the 3DL mark?
10    A.  First of all, that was our plan to own marks,
11 and that's it.  Like you said before, that was the first
12 opportunity and he needed help.  It's too big.
13    Q.  What do you mean it was too big for him?
14    A.  He said he had a lot of repeating customers.
15 They asking him for the mark and he wants to go -- to be
16 -- he's looking for a partner, so we offer him a
17 partnership.  The deal was that he's gonna write the
18 mark to us and we gonna license it.
19    Q.  Okay.  Was there something that caused
20 Consolidated to believe that this would be a good mark
21 to invest in?
22    A.  I believe we went and trust his word, and he
23 said that's a popular mark and -- yeah.  That's what
24 made us do it, his word.
25    Q.  Okay.  Is there a written contract that assigns

Page 68

1  the 3DL mark from Joe Cool to Consolidated?
2     A.  Not what I remember.
3     Q.  So it was just done orally?
4     A.  Yes.
5     Q.  And who participated in those oral discussions?
6     A.  You mean with this deal?
7     Q.  Who on Joe Cool's side said I am assigning to
8  Consolidated this trademark?
9     A.  Oh, on Joe Cool's side?
10    Q.  Yes.
11    A.  Joe Cool.
12    Q.  Yosef Amar?
13    A.  Yes.
14    Q.  And who on Consolidated's side said that's
15 terrific, we would like to have the trademark assigned
16 to us?
17    A.  David.
18    Q.  David.  Were you there as well?
19    A.  Not all the time but. . .
20    Q.  But when this assignment occurred, were you
21 there?
22    A.  What do you mean?  There was no written
23 agreement.  It was a. . .
24    Q.  But it was an oral agreement --
25    A.  Right.

86ded466-e1ee-4ed4-8e01-ae0f5e5c0373

Page 69

1   Q.  -- correct?
2   A.  Right.
3   Q.  So when these words were exchanged, assigning
4   the trademark from Joe Cool to Consolidated, were you
5   present?
6   A.  I don't remember exactly if I was there on that
7   time when he decide to give us the mark.  I don't
8   remember exactly.  That's not coming to my memory right
9   now.
10   Q.  Turning back to Exhibit 65, which is the
11   Wildwood logo, I think it's over here, the top one.
12   A.  Yes.
13   Q.  Was this logo included in the assignment from
14   Joe Cool to Consolidated?
15   A.  From what I understood, all the logos was
16   assigned to Consolidated, all the 3DL.
17   Q.  All the 3DL logos.
18   A.  Everything.
19   Q.  Okay.  And how did you distinguish whether
20   something was a 3DL logo or something was a completely
21   separate logo?
22   A.  Again?
23   Q.  Well, you said all of the 3DL logos were
24   assigned, correct?
25   A.  Yeah.

Page 70

1   Q.  So, you know, I could draw you a 4DL logo and
2   if Joe Cool was using the 4DL, how would you decide if
3   that was part of the assignment?
4   A.  (No audible response.)
5   MR. MORTNER:  Do you understand the question?
6   THE WITNESS:  Not really because I -- he's
7   not allowed -- what do you mean?  You mean if he's
8   gonna use 3DL with others?
9   BY MR. STEWART:
10   Q.  No.  I'm trying to understand what collection
11   of logos were assigned to Consolidated.  I understand
12   Exhibit 1 was assigned --
13   A.  Yeah.
14   Q.  -- and that's the basic 3DL logo.
15   A.  All of them.  That's what I understand, all of
16   them, everything.
17   Q.  Okay.  So Exhibit --
18   A.  Everything.
19   Q.  -- 65, all right, and Exhibit 64 which was the
20   Daytona Beach one?
21   A.  Yeah.
22   Q.  That was assigned?  Okay.  And -- this goes
23   after that.  All right.  Let me show you some other
24   designs.
25   A.  Okay.

Page 71

1   Q.  I'm going to show you a T-shirt that was
2   previously marked as Exhibit 47.  I want to ask you:
3   Was this design assigned to Consolidated?
4   A.  I'm not going to swear for that.  You know
5   that.  I understood everything was assigned to
6   Consolidated.  I don't know specific each one.  Maybe
7   David will have more information about it than me.
8   Q.  I'm not sure I understand your answer.  You
9   understand that everything was assigned?
10   A.  Yeah.
11   Q.  But you understood that Joe Cool had a broad
12   business with many different logos; isn't that correct?
13   A.  No, only the 3DL.  Not this one.  I'm
14   talking about the 3DL.
15   Q.  Okay.  So you don't consider this one to be
16   3DL?
17   A.  No.
18   Q.  Okay.  How about this one which is Exhibit 48?
19   Was this design assigned to Consolidated?
20   A.  Is this a 3DL?
21   Q.  I guess you should tell me.
22   A.  I don't know.
23   Q.  Do you consider this a 3DL?
24   A.  I don't, but if it is, that's assigned to us.
25   Q.  Well, how do you decide if something is a 3DL

Page 72

1   logo?
2   A.  This logo I remember, so I tell you I remember.
3   This one I don't remember.
4   Q.  Okay.  I'm going to show you what was marked as
5   Exhibit 49 and ask you whether this was assigned with
6   the 3DL logo to Consolidated.
7   A.  I don't -- I don't remember these things.  No,
8   I didn't see it.
9   VIDEOGRAPHER:  Five minutes of tape.
10   Q.  So you don't remember seeing this before and
11   you don't remember it being included in the assignment?
12   A.  No.
13   Q.  Okay.  I'm going to show you what's been marked
14   as Exhibit 50 and ask you the same question.  Was this
15   part of what was assigned to Consolidated with the 3DL
16   logo?
17   A.  I don't remember that, but that's -- I assume
18   if it is, maybe that's a 3DL.  It looks like a 3DL, but
19   I don't remember that.
20   Q.  Okay.  So you were not shown this T-shirt
21   before the assignment occurred?
22   A.  No.
23   Q.  Okay.  But to you, it looks kind of like the
24   3DL logo?
25   A.  Those shirts?

18 (Pages 69 to 72)

Page 73

1    Q. No, no. This top shirt.
2    A. Oh, that top shirt? If it looks like a 3DL?
3  It doesn't look like a 3DL because this is different.
4  I'm not an expert on these things, but this one I see
5  three lines. This one I don't see three lines. That's
6  what I meant to say. But I don't recall this, this
7  shirt.
8    Q. Okay. So I guess --
9    A. This doesn't look like a 3DL mark according to
10  my knowledge. I'm not an expert, but that doesn't look
11  like a 3DL mark. That looks like a 3DL mark that we
12  speak about.
13    Q. Okay.
14    A. That's all what I can say.
15    Q. All right. So, to your understanding, did
16  Consolidated acquire the trademark that consists of this
17  letter M?
18    A. Again? What do you say? The question again?
19    Q. Okay. To your knowledge --
20    A. To my knowledge, yeah.
21    Q. -- did Consolidated become the owner of the
22  trademark that is made up of this letter M?
23    A. To my knowledge? No.
24    MR. STEWART: Okay. I think we better change
25  the video.

Page 74

1    VIDEOGRAPHER: The time is 11:26 a.m. This
2  ends Tape 2. We are off the record.
3    (Off the record.)
4    VIDEOGRAPHER: Time is 11:31 a.m. This begins
5  Tape 3. We are on the record.
6  BY MR. STEWART:
7    Q. Okay. I'm going to show you a shirt that was
8  previously marked as Exhibit 51, and I'm going to ask
9  you the same question -- this is two-sided by the way --
10  whether this was part of the 3DL materials that were
11  assigned to Joe Cool?
12    A. Not what I recall, no.
13    Q. No? Okay. All right. And then this one is
14  Exhibit 52. Was this part of the 3DL materials?
15    A. (Shakes head.)
16    Q. Is that a no?
17    A. No.
18    Q. And, finally, Exhibit 53, was that part of the
19  3DL materials?
20    A. No.
21    Q. Okay.
22    A. But when I say no, it's only to my knowledge.
23    Q. I understand. I'm going to show you what was
24  previously marked as Exhibit 26, and I'd like you to
25  tell me whether this was among the materials that were

Page 75

1  assigned to Consolidated with the 3DL logo.
2    A. I can't tell you. I don't recall that.
3    Q. You don't recall that as being part of what was
4  assigned?
5    A. No. It looks like a lot of lines. Everything
6  is possible but not -- my knowledge, no.
7    Q. Okay. Just one more. I'm going to show you
8  what's been previously marked as Exhibit 30 and ask you
9  if this is among the materials that was assigned with
10  the 3DL logos.)
11    A. Same answer. No, no recall.
12    Q. No, you -- can you clarify what your answer
13  was? I'm sorry.
14    A. No recall. I didn't recall that.
15    Q. You don't recall as being part of what was
16  assigned?
17    A. No.
18    VIDEOGRAPHER: This is my mistake. Can you put
19  the mike on your jacket instead of the tie just
20  because your jacket is hitting it.
21    THE WITNESS: Sure.
22    VIDEOGRAPHER: The other side would be better.
23  That's my mistake.
24    THE WITNESS: That's okay.
25    MR. STEWART: Okay. I'm going to show you a

Page 76

1  document that I'll ask the reporter to mark as the
2  next exhibit in sequence.
3    (Plaintiff's Exhibit No. 73 was marked for
4  identification.)
5    MR. STEWART: What number are we at?
6    COURT REPORTER: 73. We skipped 71.
7    MR. MORTNER: I think that this document I've
8  seen before as being part of the document in this
9  case, but I think it's been redacted for this
10  particular version that we're seeing here.
11    MR. STEWART: I think that's correct.
12  BY MR. STEWART:
13    Q. My first question to the witness is: Have you
14  seen either this document or the shirts pictured in this
15  document before?
16    A. It could be that I saw these T-shirts. That
17  looks like 3DL but, again, don't take the last word from
18  me. But this is -- looks like 3DL. If that's assign --
19  if all of it was assign, I can't tell it so clear but,
20  like I said before, the 3DL, this one was -- yeah, yeah.
21    Q. So how --
22    A. This I remember more. You see it's more clear
23  to me. Now you show me a lot of things that I may saw
24  even if I saw it in the office, but exactly what was
25  assigned to our company I can't -- I can't be clear.

86ded466-e1ee-4ed4-8e01-ae0f5e5c0373

Page 77

1  I'm sorry.
2     Q.  So you can't be clear as to whether or not this
3  Exhibit 73 was assigned to your --
4     A.  You mean about all of them, right?  All of
5  this --
6     Q.  All of them.
7     A.  Yeah.
8     Q.  You can't be clear?
9     A.  No.  Like, if David told me this I assign to
10  our company so, yeah, so I'll take him word.  I
11  cannot be clear, no.
12     MR. MORTNER:  What is this marked?
13     MR. STEWART:  73.
14     Q.  Do you know whether this specific design was
15  shared with Consolidated before the assignment occurred?
16     A.  Which design?
17     Q.  Exhibit 73, all of them.
18     A.  If I -- no, I can't tell you.
19     Q.  You don't know whether --
20     A.  No.
21     Q.  Okay.  Would that be something David would
22  know?
23     A.  Yeah.  More than me.
24     Q.  When Joe Cool assigned Consolidated the 3DL
25  logo, did Joe Cool assign anything else to Consolidated,

Page 78

1  for example, any portion of its business?
2     A.  Of his business?
3     Q.  Yeah.
4     A.  No.
5     Q.  Did he assign any customer list to
6  Consolidated?
7     A.  If he assigned it?  No.
8     Q.  Did Joe Cool assign any physical assets to
9  Consolidated?
10     A.  No.
11     Q.  Did Joe Cool assign the good will from its
12  business to Consolidated?
13     A.  You talking about 3DL or his old business?
14     Q.  The good will associated with 3DL or the good
15  will associated with the rest of the business, yeah.
16     A.  3DL was assigned to us, to Consolidated, but
17  the rest of the business, no.
18     Q.  Okay.  Did Joe Cool assign the good will that
19  the 3DL logo represented to Consolidated?
20     MR. MORTNER:  Do you understand the question?
21     THE WITNESS:  Not exactly.  I want to get
22  clear.  You talking about the mark?  If he assigned
23  it to Consolidated?  That's what you meant?
24     Q.  That's part of what I meant.
25     A.  So that part of what you meant, the answer is

Page 79

1  yes.
2     Q.  Okay.  Do you understand what good will is?
3     A.  Good will.  I guess not.  What do you mean by
4  good will?
5     Q.  The business reputation that a trademark
6  represents.
7     A.  (No audible response.)
8     Q.  We can move on.
9     A.  Yeah.  That's -- sorry.
10     Q.  That's okay.  What did Joe Cool receive in
11  exchange for the assignment of the 3DL logo?
12     A.  What do you mean what did he receive?
13     Q.  Did Consolidated pay Joe Cool money for the
14  assignment?
15     A.  The deal was that we can invest money and we
16  can protect the registration and also marketing.  That
17  was the deal.
18     Q.  So the deal with Joe Cool would assign the 3DL
19  logo to Consolidated?
20     A.  Yes.
21     Q.  And what would Consolidated do again?  I didn't
22  fully understand your answer.
23     A.  Registration, protecting the mark, marketing
24  and investing.
25     Q.  And what marketing did Consolidated do?

Page 80

1     A.  Not much.  It was in the beginning.  Then we
2  stop.  We stop because of that.  We didn't go much.  We
3  didn't go far.
4     Q.  You stopped because of the lawsuit?
5     A.  Yes.
6     Q.  What marketing was Consolidated planning to do?
7     A.  Nationwide.
8     Q.  And how were you going to go about doing that?
9     A.  We had a plan.  We sat down with a couple
10  dealers, big dealers that they had direct buyers for
11  sellers for Kmart, big dealers that wanted to mark this.
12     Q.  So Consolidated sat down with dealers with
13  relationships with Kmart?  Is that what you're saying?
14     A.  Not only Kmart.  They sell to Kmart.  They sell
15  to a lot of big stores.
16     Q.  Okay.  And so the plan was to sell through
17  Kmart and other chain stores?
18     A.  That's correct.
19     Q.  What was Consolidated's connection to these
20  marketing companies?
21     A.  What Consolidated was connection to what?  To
22  the marketing?
23     Q.  Yeah.  You said that --
24     A.  To bring to the table and to sign a deal, to
25  sign the contract with them.

86ded466-e1ee-4ed4-8e01-ae0f5e5c0373

Page 81

1    Q.  So these are companies that Consolidated had
2  relationships with?
3    A.  Not necessarily, but we find them.  We sat down
4  with them and we wanted to have a relationship with
5  them.
6    Q.  Okay.  With any of these marketing companies,
7  did you get to the point where you sat down with them
8  and you showed them the 3DL logo?
9    A.  Yes.
10    Q.  And did any of them raise a concern that it
11  looked similar to the Monster Energy logo?
12    A.  Not what I recall, but we spoke about Monster
13  because we spoke about the case.  And that's why they
14  turn us down because they said finish with the court
15  case and then we'll -- they don't want to go because the
16  lawsuit.  So we discussed -- that was part of the
17  discussion, yeah.  They came up with it?  I don't know.
18    Q.  Which company was that that said they wanted to
19  wait until the lawsuit was over before doing business?
20    A.  It was -- what I recall was a couple of them.
21  One was Sidney Cohen; one was Goldman, Menachem Goldman
22    Q.  So Sidney --
23    A.  I don't have the company names in my head.
24    Q.  Sidney Cohen and Menachem Goldman?
25    A.  (No audible response.)

Page 82

1    Q.  And what did Mr. Cohen say exactly about doing
2  business with Consolidated?
3    A.  Finish with the litigation.  Then come back.
4  Then we'll do business.
5    Q.  Okay.  And how about Mr. Goldman?
6    A.  Same thing.
7    Q.  Were they aware of the seizure order that
8  occurred at the beginning of the case?
9    A.  I don't know if we spoke about it, if we
10  brought it up.  I don't remember.  Maybe.
11    Q.  Okay.  But they weren't aware on their own?
12    A.  No.  I don't think so.
13    Q.  Okay.  So their concern was just they didn't
14  want to --
15    A.  It may be one of them was on his own, maybe
16  search on the Internet.  I don't know.  Maybe one of
17  them, but I don't remember for sure.  So I don't know.
18  I don't want to -- no swear.
19    Q.  So is it fair to say that their concern was
20  they just wanted to wait to see what the court said
21  about the 3DL mark before purchasing --
22    A.  Yes.
23    Q.  -- 3DL merchandise?
24    A.  Yes.
25    Q.  Now, has Consolidated had the opportunity to

Page 83

1  invest in any other trademarks since the 3DL trademark?
2    A.  We didn't get that far.
3    Q.  Are you actively trying to?
4    A.  Um-hmm, yes.
5    Q.  But it just hasn't happened yet?
6    A.  No.
7    Q.  Okay.  Do you have any idea why?
8    A.  Probably we got stuck some place with this.  So
9  that's why it takes our full. . .
10    Q.  It takes your full --
11    A.  Full time.  Full --
12    Q.  Okay.  So you're concentrating your time on
13  this lawsuit?
14    A.  Yeah.
15    Q.  You had mentioned before that Consolidated's
16  responsibilities were registration, marketing, and
17  investing.  What were the responsibilities relating to
18  investing in the 3DL mark?
19    A.  We already invest $10,000.
20    Q.  Okay.  So --
21    A.  And much more.
22    Q.  What was the much more?
23    A.  What we doing right now.
24    Q.  Oh, the lawsuit.  Did Consolidated do any kind
25  of a trademark search before acquiring the rights to the

Page 84

1  3DL mark?
2    A.  I believe so.  David do a search all the time
3  before we register.
4    Q.  Okay.  Do you know the results of that search?
5    A.  Yeah.  The results was that it belonged to Joe
6  Cool.
7    Q.  Okay.  Do you know if that trademark search is
8  printed out in writing somewhere?
9    A.  I don't recall that.
10    Q.  Okay.  Now, when Joe Cool offered Consolidated
11  the opportunity to invest in the 3DL mark, was that the
12  first time that Consolidated had ever met with Joe Cool?
13    A.  No.
14    Q.  When had they previously met?
15    A.  I don't remember the day, but it was before.
16  It was Bike Week, I think.
17    Q.  Oh, for the Daytona Beach Bike Week?
18    A.  Yeah.  That's what I remember.  Don't -- again,
19  no swearing, but that's what --
20    Q.  Okay.  And Joe Cool did do business with
21  Consolidated in connection with Daytona Beach Bike Week;
22  is that correct?
23    A.  Yeah.
24    Q.  Okay.  And then also in connection, obviously,
25  with the 3DL mark?

86ded466-e1ee-4ed4-8e01-ae0f5e5c0373

Page 85

1    A.  Yeah.
2    Q.  Any other business that Joe Cool and
3    Consolidated have done together?
4    A.  Not what I recall.
5    Q.  Okay.  Are you familiar with the concept of a
6    joint venture?
7    A.  Not really, but I can -- I'm a good listener.
8    Q.  All right.  Well, your attorneys have said in
9    this case that Joe Cool and Consolidated entered into a
10   joint venture together.
11   A.  Yeah.  We're partners.
12   Q.  You were partners?
13   A.  Yeah.
14   Q.  Okay.  And did you give a name to the
15   partnership or the joint venture?
16   A.  A name?
17   Q.  A name, yes.
18   A.  What do you mean?  The 3DL mark?
19   Q.  No.  Like this -- we're sitting in the offices
20   of a law firm --
21   A.  Yeah.
22   Q.  -- it's a partnership.  Its name is Gray
23   Robinson.  Did you give a name to the partnership
24   between Joe Cool and --
25   A.  No.

Page 86

1    Q.  Okay.  Do you know when Consolidated and Joe
2    Cool entered into their partnership?
3    A.  I remember it was 2010.
4    Q.  Okay.
5    A.  Maybe the beginning of 2010, the middle --
6    again, date, it was 2010.  That's what I . . .
7    Q.  And is the partnership agreement in writing?
8    A.  No.
9    Q.  Okay.  Who were the individuals on
10   Consolidated's side that entered into the partnership
11   agreement?
12   A.  Me and David.
13   Q.  Okay.  And on the Joe Cool side?
14   A.  Joe Cool.
15   Q.  Yosef Amar?
16   A.  Yes.
17   Q.  Okay.  So were all three of you meeting
18   together?
19   A.  Yes.
20   Q.  Okay.  And at that meeting you decided to enter
21   into a partnership together?
22   A.  Yes.
23   Q.  Okay.  And what was the purpose of the
24   partnership?
25   A.  Again?

Page 87

1    Q.  Was the purpose of the partnership to sell 3DL
2    merchandise?
3    A.  Yes.
4    Q.  Did it have a broader purpose than that, or
5    that was really all that the purpose was?
6    A.  That's all what I recall.  That's all what I --
7    if it will be in the future or something, I don't know.
8    I can't predict.
9    Q.  Oh, no, but the immediate purpose --
10   A.  Yeah.  3DL.  That's it.
11   Q.  Okay.  Do you remember any of the terms of the
12   partnership agreement between Consolidated and Joe Cool?
13   A.  Fifty-fifty.
14   Q.  Okay.  What do you mean by that?
15   A.  I mean that every profit that will come will be
16   fifty-fifty.
17   Q.  Okay.
18   A.  Everything, customers fifty-fifty, the losses
19   fifty-fifty.  Everything is fifty-fifty.
20   Q.  Okay.  And who had the right to make business
21   decisions on behalf of the partnership?
22   A.  On behalf?
23   Q.  Of the partnership.  For example --
24   A.  Whatever we give them, the licensee.  He's
25   allowed to do it.  If we don't give licensee to nobody,

Page 88

1    nobody is allowed to use it.  Only us, me and Joe Cool.
2    Q.  Okay.  But, for example, if a question comes up
3    should we start selling merchandise to Canada, who
4    answers that question?  You, Mr. Baksht, Joe Cool, the
5    three of you together?
6    A.  We'll sit down -- what do you mean?  If we sell
7    to Canada?
8    Q.  Yes.
9    A.  That's probably I would say me and David
10   because the mark belong to us.  We did joint venture on
11   3DL, whatever Joe Cool sell.  If we sell to Canada, I
12   think it will be only me and David because that's belong
13   to us, the mark belong to us.  It doesn't belong to Joe
14   Cool.  He's not a part of the mark.
15   Q.  Okay.  But he's a licensee of the mark?
16   A.  Yes.
17   Q.  Is he the exclusive licensee of the mark?
18   A.  So far we didn't get that far with somebody
19   else.  So, yeah, so far he was the only one.
20   Q.  But Consolidated have the right to license
21   other people to the 3DL mark if it wanted to?
22   A.  Yes.
23   Q.  Okay.  Which party to the joint venture was
24   responsible for actually making the T-shirts with the
25   3DL logo on it?

22 (Pages 85 to 88)

Page 89

1    A.  That file was Joe Cool.  We thought to take
2  different companies to do it.  I don't know if we'll be
3  able to make everything but so far, yeah, only Joe Cool
4  did it.
5    Q.  Okay.  And which party was responsible for
6  making the heat transfers for the joint ventures?
7    A.  (No audible response.)
8    Q.  Joe Cool?
9    A.  Yeah.
10   Q.  Okay.  And which party owned the T-shirts and
11  the heat transfers after they were made by Joe Cool?
12   A.  You mean own the T-shirts?
13   Q.  Yes.
14   A.  That was both of us.  That's the partners,
15  fifty-fifty.
16   Q.  Okay.  I'd like you to turn back to Exhibit 72
17  which was the thick answer and counterclaim.  If you
18  turn to page 21, there's a paragraph 150(e) which says
19  that "CDI and Joe Cool, Inc. formed Joe Cool Bike Week,
20  Inc. as a legal entity through which to conduct some of
21  the joint venture's business through."
22   A.  Where is it?
23   Q.  150(3) at the very bottom of page 21.
24     THE WITNESS:  Do you see that?
25     MR. MORTNER:  This one.

Page 90

1    A.  Oh, okay.  CDI.
2    Q.  Yes.  It says.  "CDI and Joe Cool, Inc. formed
3  Joe Cool Bike Week, Inc. as a legal entity through which
4  to conduct some of the joint venture's business
5  through."
6    A.  What does that mean?
7    Q.  Do you not have an understanding of what that
8  means?
9    A.  No.  They open another corporation?
10   Q.  My understanding of this sentence is that CDI
11  and Joe Cool formed a new corporation called Joe Cool
12  Bike Week, Inc.
13   A.  We didn't form any such a company.
14   Q.  Okay.  What do you know about Joe Cool Bike
15  Week, Inc.?
16   A.  If I'm not mistaken, Joe Cool opened that
17  because he wanted to open a bank account, separate bank
18  account, for all because we are partners fifty-fifty.
19  He doesn't want to mix the money that he makes from a
20  different heat transfer with the 3DL.  So to separate
21  that, he had to open a bank account, so maybe for that
22  purpose he opened Joe Cool Bike Week, Inc.  According to
23  my knowledge, that's what I understood, but we didn't
24  open any other corporation.  Consolidated and Joe Cool
25  partners fifty-fifty.  He opened another corporation for

Page 91

1  another bank account, could be, but nothing to do with
2  us.
3    Q.  Okay.  Whether it was called Joe Cool Bike
4  Week, Inc. or not, you do think that Joe Cool opened a
5  separate bank account for the 3DL business?
6    A.  Yeah.  He spoke to us that he's gonna open a
7  separate bank account, yes.
8    Q.  Okay.  Did you or Mr. Baksht ever see the
9  records of that bank account?
10   A.  I don't think we got that file because all the
11  money went back into the -- nobody took anything, any
12  money from that account.  It was back into the business,
13  rolling back in, so I don't think so.  I didn't see it.
14   Q.  Okay.  How -- explain to me how that worked
15  with the money rolling back into the business because
16  let's suppose in the first month you have $50,000 in
17  expenses and $70,000 in revenue selling the 3DL
18  products.  Under your fifty-fifty agreement, you should
19  split that money $10,000 each, correct?
20   A.  No.  We decide first all the money will go
21  inside and only after a year, whatever, then that we
22  establish the 3DL mark.  And everything is already
23  stable, then we'll go -- go the record on this, but we
24  trust Joe Cool.  We have no problem with it.  Everything
25  went back into the business.

Page 92

1    Q.  Okay.  And you don't remember conducting any of
2  the 3DL business through Joe Cool Bike Week, Inc.; is
3  that correct?
4    A.  No, no.
5    Q.  So it was all conducted through the joint
6  venture between Joe Cool and Consolidated; is that
7  correct?
8    A.  Yes.
9    Q.  Did Consolidated sell any 3DL merchandise on
10  its own outside the joint venture?
11   A.  Not what I recall.
12   Q.  Okay.  Did Joe Cool sell any 3DL merchandise
13  outside the joint venture?
14   A.  No.  What do you mean we sold the -- everything
15  what he sold, it belong to Consolidated.  It's not
16  outside.  He's the licensee.
17   Q.  Yeah.  And --
18   A.  Of course, he sold.  But what do you mean
19  without Consolidated?  I didn't understand.
20   Q.  Okay.  Let me repeat the question.  When Joe
21  Cool made a sale as part of the joint venture, Joe Cool
22  had to split the profits fifty-fifty with Consolidated,
23  correct?
24   A.  That's correct.
25   Q.  Okay.  Did Joe Cool make any sales outside of

23 (Pages 89 to 92)

Page 93

1  the joint venture where Joe Cool would be entitled to
2  keep all of the profits for itself for 3DL merchandise?
3      A.  No.
4      Q.  Okay.  That was my question.  So the whole
5  operation of the 3DL merchandise was through the joint
6  venture; is that correct?
7      A.  Yes.
8      Q.  Okay.  Now, was the joint venture primarily
9  selling 3DL merchandise in Daytona Beach, Florida?
10     A.  Again?
11     Q.  I'm just trying to understand where the 3DL
12 merchandise was sold.  I know that Joe Cool was located
13 in Daytona Beach, correct?
14     A.  Yes.  But he has customers all over.
15     Q.  He has customers all over.  So Joe Cool was
16 selling 3DL merchandise through the joint venture all
17 over the country?
18     A.  I believe so.
19     Q.  Okay.  But Consolidated doesn't have any
20 records of that; is that correct?
21     A.  I'm not going to say for sure not.  I
22 don't. . .
23     Q.  Okay.  All right.  Turn to the next page, page
24 22, paragraph (f) at the top of the page.  It says, "CDI
25 agree to direct a nationwide sales marketing campaign,

Page 94

1  utilizing CDI's nationwide network of T-shirt and
2  preprinted apparel retailers."
3      A.  The first two lines?
4      Q.  Yes.
5      A.  To direct nationwide sales marketing.  Okay.
6      Q.  Okay.  And my question for you is:  Who is part
7  of CDI's nationwide network of T-shirt and preprinted
8  apparel retailers?
9      A.  What do you mean who is CDI?  CDI is me and
10 David.
11     Q.  CDI is you and David, but who is part of your
12 nationwide network of T-shirt and preprinted apparel
13 retailers?
14     A.  We didn't get that far yet.
15     Q.  Okay.  So you were -- CDI was going to develop
16 a network of retailers to assist with the sales; is that
17 correct?
18     A.  Yes.
19     Q.  But you had not yet developed that network?
20     A.  No.  The only one was Joe Cool that sold it
21 till now.
22         MR. STEWART:  Okay.  All right.  I can keep
23 going or we can take a lunch break if you're getting
24 hungry.
25         MR. MORTNER:  Yeah.  Let's break.

Page 95

1          MR. STEWART:  Okay.
2          VIDEOGRAPHER:  The time is 12:07 p.m.  This
3  ends Tape 3.  We are off the record.
4          (Lunch break was taken from 12:07 p.m. to 1:00
5  p.m.)
6          VIDEOGRAPHER:  The time is 1:24 p.m.  This
7  begins Tape 4.  We are on the record.
8          MR. STEWART:  Welcome back.
9          THE WITNESS:  Thanks.
10 BY MR. STEWART:
11     Q.  I'm going to show you a T-shirt that's
12 previously been marked as Exhibit 4, and if you open
13 that up?
14     A.  (Witness complies.)  Yes.
15     Q.  Is this one of the T-shirts, the 3DL T-shirts,
16 that the joint venture sold?
17     A.  I think so.
18     Q.  Okay.  Now, let me show you another shirt
19 that's been marked as Exhibit 14, and I have the same
20 question for you:  Is this one of the T-shirts that the
21 joint venture sold?
22     A.  I don't have the answer on this one.
23     Q.  So you just don't know one way or the other?
24     A.  Yeah.  I don't know.
25     Q.  You see on the back of the shirt there's the

Page 96

1  phrase "let out your beast"?
2      A.  Where is that?
3      Q.  That's right here.
4      A.  What happened to that?  So what's with that?
5      Q.  I'm asking you to confirm that you see that
6  there.
7      A.  If I saw that there?
8      Q.  Do you see it there now?
9      A.  Oh, I see it, yeah.
10     Q.  Okay.  Good.  Are you familiar with that phrase
11 being used on any of the 3DL shirts that were sold
12 through the joint venture?
13     A.  No, I'm not.
14     Q.  Okay.  I'd like you to turn back to Exhibit 72
15 which is the document in front of you, and I'd like you
16 to turn to page 22.
17     A.  Which page?
18     Q.  22.
19     A.  22, oh, yeah.
20     Q.  Okay.  Good.  Paragraph (i).  Let me ask you to
21 look at paragraph (j) on page 22.
22     A.  Which one?  A?
23     Q.  J, J as in Jack.
24     A.  Okay.
25     Q.  It says, "To get the joint venture started, CDI

Page 97

1 arranged an interest-free and collateral-free loan to
2 Yosef Amar, the principal of Joe Cool Inc., in the
3 amount of $10,000 for the purpose of financing the
4 production of heat transfer stickers utilizing the 3DL
5 marks to be used for the joint venture." Do you see
6 that?
7 A. Yes.
8 Q. Okay. First of all, is that true?
9 A. Yes.
10 Q. Okay. Why was the loan made to Mr. Amar rather
11 than being made to the joint venture?
12 A. I'm not sure where this $10,000 went into, but
13 I called Joe Amar, or he called me, and he gave me the
14 account number and I made the deposit, $10,000. I don't
15 remember what account number was, if it was Joe Cool or
16 Joe Yosef Amar. I don't remember if it was his private
17 account or his business account but, yes, I did the
18 deposit for $10,000.
19 Q. Okay. Was that out of your own personal
20 account?
21 A. No. From the business.
22 Q. From the Consolidated business?
23 A. Actually, I took it from my other business.
24 Q. Associated Business Consultants?
25 A. Yes.

Page 98

1 Q. Okay. Was there a written agreement
2 documenting the loan?
3 A. No.
4 Q. Do you have any documents that show that the
5 loan, in fact, did occur?
6 A. You mean a void check?
7 Q. Yeah. A check --
8 A. I'm sure it's no big deal to get it. It's a
9 bank check. We can get it.
10 Q. And what was the $10,000 actually used for?
11 A. For the joint venture for the stickers, for the
12 heat transfer.
13 Q. To create the --
14 A. For the 3D, yeah.
15 Q. To create the heat transfers?
16 A. Yes.
17 Q. Okay.
18 A. I'm sorry.
19 Q. No. That's okay. I know it gets confusing.
20 Was it also used to buy T-shirts or just to make heat
21 transfers?
22 A. We didn't put condition on that. You know,
23 just free sticker and not buy T-shirt. It could be
24 both.
25 Q. Okay. Has Mr. Amar paid the loan back to

Page 99

1 Associated Business Consultants or to Consolidated?
2 A. Not only he didn't pay it back, we thought to
3 put more money. That was the plan.
4 MR. STEWART: I'm sorry, can you read that
5 answer back?
6 COURT REPORTER: I didn't get that answer.
7 Could you repeat that?
8 THE WITNESS: Not that he didn't return the
9 money, we didn't even thought -- we even thought to
10 put more money inside the company for the 3DL.
11 BY MR. STEWART:
12 Q. All right. Consolidated considered --
13 A. Yeah. Of course.
14 Q. -- putting more money in?
15 A. Yeah.
16 Q. Okay. But it was a ten thousand dollar loan,
17 correct?
18 A. For the joint venture.
19 Q. Yes.
20 A. Yes.
21 Q. So the expectation was that the loan would be
22 paid back at some point; is that correct?
23 A. Of course. It can be paid in different way.
24 We are fifty-fifty partners so when we put $10,000,
25 that's going into the business. That's going to my --

Page 100

1 that's going to -- for that purpose for the stickers,
2 for these stickers, for the heat transfer.
3 Q. And my question before was: Was the $10,000
4 ever paid back?
5 A. No.
6 Q. Okay. So does Mr. Amar still owe Associated
7 Business Consultants $10,000?
8 A. If he owes $10,000? I would say it's fair to
9 say that the 3DL project own the $10,000 and from that
10 profit we'll pay $10,000 back. That's what I would say.
11 Q. So the 3DL project has the $10,000 and owes it
12 to Consolidated or Associated?
13 A. Yeah.
14 Q. Okay.
15 A. Again, according to my knowledge. You ask me a
16 question now if belong to me the $10,000 back. That's
17 what I think. That's the. . .
18 Q. Did Consolidated arrange for any additional
19 financing for the joint venture besides the $10,000?
20 A. Are you talking about for marketing?
21 Q. For any purpose. Did Consolidated contribute
22 additional money to the joint venture?
23 A. We didn't get yet to that. We didn't get to
24 that. We thought -- yeah. We had to -- yeah.
25 MR. MORTNER: Are you talking about whether

86ded466-e1ee-4ed4-8e01-ae0f5e5c0373

Page 101

1    they incurred costs and expenses, or are you asking
2    about whether there was some cash that was made
3    available?
4         MR. STEWART: I'm talking about whether there
5    was cash made available.
6         MR. MORTNER: Okay. Do you understand --
7         THE WITNESS: Cash made available --
8         MR. MORTNER: -- the difference --
9         THE WITNESS: -- for what?
10        MR. MORTNER: Do you understand the question I
11   just asked you?
12        THE WITNESS: No, I didn't.
13        MR. MORTNER: Would you --
14        MR. STEWART: Sure.
15   BY MR. STEWART:
16   Q.   You've testified that Consolidated through its
17   affiliate, Associated Business Consultants, made a ten
18   thousand dollar loan to Joe Cool.
19   A.   Not for his personal --
20   Q.   Not -- for purposes of the joint venture?
21   A.   For the 3DL, yeah.
22   Q.   Yes. Did Consolidated or Associated contribute
23   any other money to the joint venture?
24   A.   If they already gave any other money besides
25   the $10,000?

Page 102

1    Q.   Yes.
2    A.   Not what I recall.
3    Q.   Okay. And did Consolidated or Associated incur
4    any other kind of expenses?
5    A.   This is part of it where right now we are.
6    Q.   The lawsuit?
7    A.   Yeah.
8    Q.   So aside from the lawsuit, has Consolidated
9    incurred any other expenses in the 3DL project?
10   A.   Not what I recall.
11   Q.   Okay. And for the lawsuit, you've incurred
12   attorney's fees?
13   A.   I would think it's necessary.
14   Q.   Okay. If you look at paragraph (k) on page
15   22 --
16   A.   Yes.
17   Q.   -- it says, "Joe Cool, Inc. produced 100,000
18   heat transfer stickers utilizing the 3DL marks and began
19   the process of affixing the heat transfers to T-shirts
20   to create preprinted T-shirts for the joint venture."
21   A.   Okay.
22   Q.   Is it correct that Joe Cool produced
23   approximately a hundred thousand heat transfers?
24   A.   If he said so, I believe him. I didn't check
25   the records, and at that time, yes, I will take his

Page 103

1    word.
2    Q.   You would take his word. But this document is
3    actually a document prepared by Consolidated.
4    A.   Prepared by?
5    Q.   By Consolidated with the help of its attorney.
6    A.   Okay. So. . .
7    Q.   So I'm wondering does Consolidated have any
8    information to confirm that a hundred thousand heat
9    transfers were created?
10   A.   Maybe that was part of the $10,000. That was
11   the cost. Yeah, possible, yeah. I believe so.
12   Q.   Well, that was going to be my --
13   A.   Yeah. It makes sense, yeah.
14   Q.   So is it your understanding that the heat
15   transfers cost about 10 cents each to produce?
16   A.   I think it cost more. I don't know exactly the
17   price, but I think it cost more. I don't know.
18   Q.   Okay. So if Consolidated provided $10,000 to
19   the joint venture and the heat transfers cost more than
20   $10,000 to produce, where did the rest of the money come
21   from?
22   A.   I would say Joe Cool.
23   Q.   Okay. And also when you make something, I
24   don't think you need to pay right away, so I don't know.
25   I can't answer that Joe Cool put --

Page 104

1         MR. MORTNER: I just want to caution you with
2    this. You're supposed to testify what it is you
3    know, and if you don't know, you can say you don't
4    remember. If you're speculating, at least say you're
5    speculating.
6         THE WITNESS: Ah, I'm sorry. Okay. I don't
7    know. Okay.
8         MR. MORTNER: It sounds like you're sort of
9    trying to imagine something.
10   BY MR. STEWART:
11   Q.   All right. If you go back to paragraph (i) on
12   page 22, it says that, as you testified earlier, that
13   Joe Cool and Consolidated agreed to split the profits
14   fifty-fifty.
15   A.   That's correct.
16   Q.   Okay. That's correct. And so I believe you
17   testified earlier that there never were any profits to
18   split; is that correct?
19   A.   I didn't say that. I said everything roll in
20   back to the company to make more stickers. I didn't say
21   there was no profit.
22   Q.   Okay. You stated it better than I did. Are
23   there any records documenting the reinvestment of the
24   profits back into the business?
25   A.   I don't have.

86ded466-e1ee-4ed4-8e01-ae0f5e5c0373

|  | Page 105 |
| --- | --- |

1    Q.  You don't have.  Does Mr. Baksht have any of
2  those records?
3    A.  I don't know.
4    Q.  Okay.  Does Joe Cool have any of those records?
5    A.  I assume.
6    Q.  Okay.  Do you know how much profit was made and
7  reinvested?
8    A.  No.
9    Q.  What was done with the money that was
10  reinvested?  More heat transfers were produced?
11    A.  Yes.
12    Q.  So a total of more than a hundred thousand heat
13  transfers would be produced then?
14    A.  Yes.
15    Q.  Do you know about how many heat transfers were
16  produced?
17    A.  I don't know, but I can assume a couple hundred
18  thousand.
19    Q.  A couple hundred thousand is your best
20  estimate?
21    A.  Um-hmm.
22    Q.  And is the joint venture currently doing any
23  business at all?
24    A.  Right now?
25    Q.  Yes.

|  | Page 106 |
| --- | --- |

1    A.  No.
2    Q.  Have any steps been taken to formally dissolve
3  the joint venture?
4    A.  Again?
5    Q.  Have any steps been taken to officially
6  dissolve the joint venture to declare it to be over?
7    A.  Oh, yeah.  He's not a licensee.  He doesn't
8  sell anymore 3DL.
9    Q.  Okay.  So --
10    A.  He's not, yeah.
11    Q.  -- the license to Joe Cool has been revoked?
12    A.  Yes.
13    Q.  Okay.  And when did that occur?
14    A.  I think when he -- when was it.  On his own and
15  he made a settlement.  That's what I remember.
16    Q.  Okay.  And has Consolidated formed any other
17  joint ventures with Joe Cool aside from the 3DL joint
18  venture?
19    A.  Again?
20    Q.  Has Consolidated formed any other joint
21  ventures or partnerships with Joe Cool besides the 3DL
22  business?
23    A.  Not what I recall, no.
24    Q.  What about the -- you had mentioned briefly
25  earlier there was a Daytona Beach Bike Week business?

|  | Page 107 |
| --- | --- |

1    A.  Yeah.  But also we didn't get -- it didn't came
2  out.  The project didn't -- we didn't continue on this.
3    Q.  You didn't what on this?
4    A.  Continue on this.  Right now it doesn't -- we
5  don't own that mark.
6    Q.  Okay.  You know, there was -- did you work with
7  Joe Cool to try to obtain a trademark registration for
8  the trademark Daytona Beach Bike Week?
9    A.  Yes.
10    Q.  Okay.  And whose idea was it to register
11  Daytona Beach Bike Week as a trademark?
12    A.  I don't know.
13    Q.  Okay.  Do you know why you decided to try to
14  register the -- or why the group of Joe Cool and
15  Consolidated decided to try to register that trademark?
16    A.  They probably saw potential and they saw that
17  it's a good mark.
18    Q.  Had you heard of an annual event called
19  "Daytona Beach Bike Week" before you filed for the
20  registration?
21    A.  Again, I'm not so good with dates, but I heard
22  of such a thing because that came up, this event, yeah.
23    Q.  Okay.  Were you aware that the phrase "Daytona
24  Beach Bike Week" had been used by others for decades?
25    A.  No.

|  | Page 108 |
| --- | --- |

1    Q.  Okay.  Are you aware that the Daytona Beach
2  Chamber of Commerce filed a lawsuit to cancel the
3  Daytona Beach Bike Week trademark registration?
4    A.  Yes.
5    Q.  And why didn't Consolidated defend itself in
6  that particular lawsuit?
7    A.  I think I told him not to fight with them and
8  to leave it alone.  That's what I remember.  I'm not --
9  I'm not so sure.
10    MR. STEWART:  Can you read the answer back?
11    (The last answer was read back.)
12    THE WITNESS:  It was originally his trademark.
13  And they --
14    MR. MORTNER:  That wasn't his testimony.
15    THE WITNESS:  What?
16    MR. MORTNER:  That's not what he said.  He said
17  I think his rabbi told him.
18    MR. STEWART:  That's the part I didn't hear and
19  I guess the reporter didn't hear it either.
20    THE WITNESS:  Yeah.  Okay.  I think his rabbi
21  told him not to go ahead with that lawsuit and just
22  to leave it alone.
23  BY MR. STEWART:
24    Q.  That was Mr. Baksht's rabbi?
25    A.  No.

86ded466-e1ee-4ed4-8e01-ae0f5e5c0373

Page 109

1   Q.   Whose rabbi?
2   A.   Joe Cool.
3   Q.   Oh, okay.  Well --
4   A.   That's what I think.  That's what I understood.
5   That's to my knowledge.
6   Q.   My understanding is that Joe Cool actually did
7   fight the lawsuit and it was just Consolidated that
8   chose not to fight.  Is your understanding different?
9   A.   I understood different.
10  Q.   Okay.  Let me ask you to take a look back at
11  Exhibit 63 --
12  A.   63.
13  Q.   -- which is one of the registrations.
14  A.   Yes.  That's correct.
15  Q.   Okay.  Do you recognize this as being
16  Consolidated's registration for the 3 Drooping Lines
17  with the word "Florida," for the state of Florida?
18  A.   (Nods head.)
19  Q.   Was that a yes?
20  A.   Yes.
21  Q.   Okay.  Thank you.  Do you know who filed this
22  on behalf of Consolidated?
23  A.   I think it was Joe Cool.
24  Q.   Okay.  And if you look at page 5, you'll see a
25  signature there of Y. Amar?

Page 110

1   A.   Which signature?
2   Q.   Page 5, Yosef Amar?
3   A.   The last one, the last page?
4   Q.   No, page 5.  There's one, two --
5   A.   Two, three, four, five.
6   Q.   There you go.
7   A.   Okay.
8   Q.   Is that Yosef Amar's signature at the bottom?
9   A.   Whose signature is it?
10  Q.   Yosef Amar?
11  A.   It looks like.
12  Q.   Okay.  And right next to it, it has what looks
13  like the words "VP" to me?
14  A.   Yes, yes.
15  Q.   Does that indicate that he was the vice
16  president of Consolidated?
17  A.   I think in the beginning of time for some time
18  it was because he had to register, and for that purpose
19  we had to make him officer.  But I think we took him off
20  right after that.
21  Q.   Okay.  Earlier, I had asked whether Mr. Amar
22  had been an officer, and I guess basically this has
23  refreshed your recollection; is that correct?
24  A.   Yes, yes.  If I'm not mistaken, you also ask me
25  if he's an officer or he's a vice president.  Now he's

Page 111

1   not.
2   Q.   Yeah.  I did ask you if he was --
3   A.   Yeah.  Okay.  So he's not.
4   Q.   He's not currently.
5   A.   Okay.
6   Q.   So at the time this document was filed,
7   Mr. Amar was vice president of Consolidated?
8   A.   Yes.  I don't know about vice president, but I
9   see it said vice president.  Okay.  But I remember that
10  we had to put him as an officer because he had to file
11  the papers.
12  Q.   Okay.  All right.  If you look at page 2 of
13  this document --
14  A.   The same one?
15  Q.   The same document.
16  A.   Okay.
17  Q.   It says "cover letter" at the top.
18  A.   Um-hmm.
19  Q.   And it lists Mr. Amar's address as 719 Eastern
20  Parkway in Brooklyn.  Do you see that?
21  A.   That's not his address.
22  Q.   I understand that, and I wanted to ask you if
23  you knew why Yosef Amar's name is listed but the address
24  is 719 Eastern Parkway?
25  A.   Because the company Consolidated, though.

Page 112

1   Q.   Okay.  Do you know why Mr. Amar didn't simply
2   list his own address since he was signing this?
3   A.   Why should he put his own address?  That belong
4   to Consolidated.
5   Q.   And why was it Mr. Amar who was signing these
6   documents rather than yourself and Mr. Baksht?
7   A.   I don't remember.
8   Q.   Okay.  Let me ask you to look at Exhibit 64
9   which is the one with the big 884 at the top.  I think
10  it's in the stack right --
11  A.   This one?
12  Q.   Yeah.
13  A.   Okay.
14  Q.   The bottom there of that stack.  There you go.
15  A.   This one?
16  Q.   Correct.
17  A.   Okay.
18  Q.   And I wanted to ask you if this is the
19  application that Consolidated filed for the 3DL mark
20  with the words "Daytona Beach" or the state of Florida?
21  A.   It looks like it.
22  Q.   Okay.  Can you take a look at the second page
23  of the document?
24  A.   The second page of the document.
25  Q.   Do you know who filled out this page?

28 (Pages 109 to 112)

Page 113

1    A.  I can't tell.
2    Q.  You can't tell?
3    A.  No.
4    Q.  It's not your writing?
5    A.  Mine?  It's hard for me to recognize my own
6  handwriting, but I don't think so, no.  I don't think,
7  no.
8    Q.  Okay.  And I'm assuming it's not Mr. Amar
9  because he spelled his name wrong.
10    A.  Okay.  It could be.
11    Q.  Do you recognize Mr. Baksht's handwriting?
12    A.  I don't recognize Mr. -- I don't recognize his
13  handwriting.
14    Q.  Okay.  And if you keep looking at page 2,
15  you'll see under Joe Amar's name is listed the company
16  Joe Cool and then the address of 719 Eastern Parkway.
17  Do you know why Joe Cool is listed here as having an
18  address of 719 Eastern Parkway?
19    A.  No.
20    Q.  Do you know why Consolidated's name does not
21  appear on this page as the --
22    A.  Oh, that's not?  It's supposed to be.  It's
23  Consolidated, yeah.  Yeah, I see up here Consolidated.
24    Q.  Yeah.  Later on it's Consolidated.
25    A.  Yeah.  So maybe that's error.  I don't know.

Page 114

1    Q.  If you turn to the fourth page --
2    A.  Fourth page, yes.
3    Q.  -- did you fill out this page?
4    A.  It's not my handwriting.
5    Q.  Not even the signature?
6    A.  Where is the signature?
7    Q.  The signature is three lines from the bottom,
8  where it says "signature of the officer."
9    A.  It could be a signature that is mine.  It could
10  be.
11    Q.  But the rest of the writing you think is not?
12    A.  I don't think so, no.
13    MR. STEWART:  Okay.  Let me show you a document
14    that's been previously marked as Exhibit 60 and I'll
15    ask the reporter to redesignate it.
16    (Plaintiff's Exhibit No. 60 was marked for
17    identification.)
18  BY MR. STEWART:
19    Q.  Do you recognize this as the federal trademark
20  application for the 3DL mark?
21    A.  Yes.
22    Q.  Okay.  And if you look at the first page about
23  halfway down, it lists the owner of the mark as
24  Consolidated Distributors Inc.  Do you see that?
25    A.  Yes.

Page 115

1    Q.  And just below that it lists the address as 719
2  Eastern Parkway, Suite 3, in Brooklyn.  Do you see that?
3    A.  That's correct.
4    Q.  And then it says "North Carolina."  Do you know
5  why it says "North Carolina"?
6    A.  I would say again that's probably error.
7  That's supposed to be New York because 719 Eastern
8  Parkway is Brooklyn, New York.
9    Q.  Okay.
10    A.  So instead of North Carolina, they have to put
11  New York.
12    MR. STEWART:  I'm going to show you what's been
13    previously marked as Exhibit 61 which I'll ask the
14    reporter to mark again as well.
15    (Plaintiff's Exhibit No. 61 was marked for
16    identification.)
17  BY MR. STEWART:
18    Q.  And do you recognize this as a response to an
19  office action in connection with the 3DL trademark?
20    A.  I don't do office action, so I don't recognize
21  but I see that.  But I don't -- you asking me if I saw
22  it before?
23    Q.  Yes.  I'm asking you that.
24    A.  No.
25    Q.  Who is responsible for dealing with office

Page 116

1  actions?
2    A.  Office action?  We have lawyers do that.  From
3  our side, you mean?  From Consolidated?
4    Q.  Consolidated.
5    A.  David.
6    Q.  David.  Okay.  And for this particular
7  application, did David hire an attorney to prosecute it?
8    A.  I don't think so.
9    Q.  Okay.  So it would've been David who was doing
10  the prosecution?
11    A.  Yeah.
12    Q.  I'll try to not make this too complicated, but
13  I'd like to go back to Exhibits 63, 64, and 65.
14    A.  Okay.
15    Q.  If you can get those in front of you.  It looks
16  like the reporter is gathering them for you.  Those are
17  what I'd like you to look at.
18    A.  Oh, you want me to look at?
19    Q.  Yeah.
20    A.  Which page?
21    Q.  Well, in Exhibit 65 it should be on the first
22  page, I believe.  Yes, on the first page you'll see
23  paragraph No. 7 on the first page of Exhibit 65.  You
24  were in the right place.
25    A.  This one?

86ded466-e1ee-4ed4-8e01-ae0f5e5c0373

Page 117

1    Q.   Yeah.  There's a sentence numbered 7.
2    A.   Seven, yeah.
3    Q.   Date first used in New Jersey, 12-4-93.  Do you
4  see that?
5    A.   Yeah.
6    Q.   And then we can go through the exercise if
7  you'd like, but you'll see that the other two asks for
8  the date first used in Florida and it's 12-4-93 in each
9  instance.
10   A.   Again, I saw that.  Now what I have to look?
11   Q.   All right.  Well, let's look at Exhibit 64
12  which --
13   A.   This one?
14   Q.   -- is the one you're holding, yes.  Okay.  And
15  if you turn to the three pages from the back.
16   A.   Three pages from the back.
17   Q.   It should have the words "Part II" at the top.
18   A.   Okay.  Part II.
19   Q.   And, again, it says date first used in Florida,
20  12/04/1993.  Do you see that?
21   A.   Okay.
22   Q.   So the same date as Exhibit 65.
23   A.   The same date as what?
24   Q.   Same date as Exhibit 65.
25   A.   Which is?

Page 118

1    Q.   12/04/93.
2    A.   Okay.
3    Q.   And so my question for you is:  Is it your
4  understanding that Joe Cool began using the 3DL
5  trademark with the Wildwood logo on December 4, 1993, in
6  New Jersey and on the same December 4, 1993, was using
7  the 3DL logo in Florida with the Daytona Beach name on
8  it?
9    A.   Okay.  So, yeah.
10   Q.   Is that your understanding of what happened?
11   A.   That in the same day he start in New Jersey and
12  in Florida?
13   Q.   Yes.
14   A.   If that's what it said over here, that's what I
15  understood, yeah.
16   Q.   Okay.  Did you ever have any conversations with
17  Mr. Amar about that?
18   A.   No.  I don't do registration.
19   Q.   Okay.
20   A.   No, I don't go through that, no.
21   Q.   Okay.  You never had any conversations with
22  Mr. Amar about when he started using any trademarks in
23  New Jersey?
24   A.   No.
25   Q.   Okay.  Do you know whether or not Joe Cool was

Page 119

1  doing business in New Jersey in 1993?
2    A.   Why?
3    Q.   Do you know whether or not Joe Cool was --
4    A.   Oh, no, no.  I know in general that he does
5  business all over the state like I said before.
6  Specific, no.
7    Q.   So you don't know whether in 1993 he was doing
8  business in New Jersey?
9    A.   No.
10   Q.   Okay.  I'd like to turn back to the license
11  that Consolidated gave to the joint venture to use the
12  3DL trademarks.
13   A.   Yeah.  Where is that one?
14   Q.   That's not a document.  You testified that it
15  was oral.
16   A.   What?
17   Q.   The license.
18   A.   Yeah.  Okay.
19   Q.   What types of products is the joint venture
20  entitled to sell using the 3DL trademark?
21   A.   What I understood was clothing.
22   Q.   Okay.  So T-shirts, shorts, hats; is that
23  correct?
24   A.   Yes, yes.
25   Q.   Okay.  What about, like, beach towels?

Page 120

1    A.   I don't know.
2    Q.   Okay.  Who would know?
3    A.   Probably Joe Cool and David would know.
4    Q.   Okay.  Because they're the two individuals who
5  discussed the agreement?
6    A.   Yeah.
7    Q.   Okay.  If Mr. Amar decided to venture out into
8  a different type of product like bumper stickers, did
9  Consolidated have the right to reject requests like
10  that?
11   A.   I have to ask my lawyer.  I don't know.
12   Q.   You don't know?  Okay.  Have you ever been to
13  Joe Cool's place of business here in Florida?
14   A.   No.
15   Q.   Has David Baksht ever been to it?
16   A.   I don't know.
17   Q.   Okay.  Has Joe Cool ever shipped any 3DL
18  merchandise to Consolidated?
19   A.   You talking about samples?
20   Q.   Samples, yes.
21   A.   Yeah.
22   Q.   What types of samples were shipped?
23   A.   T-shirts.
24   Q.   Okay.  And why did Joe Cool ship those samples?
25   A.   Why he ship those samples?

86ded466-e1ee-4ed4-8e01-ae0f5e5c0373

Page 121

1   Q.  Yes.
2   A.  I think because the partners wanted to see
3 exactly the 3DL, how does it look.
4   Q.  Okay.  And were the samples shipped to you
5 personally or were they shipped to David or both?
6   A.  Probably to David.
7   Q.  To David.  Okay.  Do you remember ever seeing
8 any samples yourself?
9   A.  Yeah.
10   Q.  And when was that?
11   A.  A long time.  A couple years ago.
12   Q.  Okay.  And what did you do when you received
13 the samples?  What did you do with the shirts?
14   A.  I really don't know.
15   Q.  Okay.  Did you inspect --
16   A.  Oh, we looked at it.
17   Q.  You looked at it.  Okay.  Yeah, I'm asking real
18 basic stuff like that.
19   A.  Yeah.
20   Q.  And did you communicate anything to Joe Cool
21 about the shirts?
22   A.  Not me.
23   Q.  Did David?
24   A.  Maybe.
25   Q.  Is Consolidated looking for any new licensees

Page 122

1 to market the 3DL trademarks to?
2   A.  Not yet.  Till we finish with everything.
3   Q.  So you've kind of put it on hold for this
4 lawsuit?
5   A.  Yes.
6   Q.  But if this lawsuit were to end favorably to
7 Consolidated, you would then be looking for new
8 licensees?
9   A.  Yes.
10   Q.  Now, you testified before that Joe Cool, your
11 understanding, had been using the 3DL trademark since
12 1993; is that correct?
13   A.  Yes.
14   Q.  In the -- well, I guess it's 19 years since
15 that time.  Are you aware of any efforts by Joe Cool to
16 enforce its trademark rights in the 3DL mark against
17 others?
18   A.  In 1993?
19   Q.  No.  Since 1993.  In the whole --
20   A.  If he what?
21   Q.  In the whole time since 1993, are you aware of
22 any efforts by Joe Cool to try to prevent others from
23 using trademarks similar to the 3DL trademark?
24   A.  Not what I recall.
25   Q.  Okay.  And then since Consolidated acquired the

Page 123

1 3DL marks in 2010, has Consolidated made any efforts to
2 prevent third parties from using similar trademarks?
3   A.  Not what I recall.
4   Q.  Okay.  Well, let me ask you to take a look back
5 at Exhibit 24 which is a one-page letter from National
6 Trademark Center.
7   A.  One-page letter?
8   Q.  On the National Trademark Center.  I think the
9 reporter found that for you.
10   A.  Hard for me to read but I can try.  Yes.
11   Q.  So this appears to be a letter by National
12 Trademark Center trying to enforce rights for the 3DL
13 trademark.  Would you agree with that?
14   A.  I cannot say yes.  I cannot say no.  I don't
15 remember that letter but I see it says National
16 Trademark but I can't say about this letter.
17   Q.  So you don't recall this letter being sent?
18   A.  No.
19   Q.  Okay.  Do you recall the National Trademark
20 Center sending any other letters to try to prevent
21 companies from using trademarks similar to the 3DL
22 trademark?
23   A.  I don't recall.  I don't remember.
24   Q.  Has Consolidated ever filed any lawsuits to
25 prevent others from using trademarks that are similar to

Page 124

1 the 3DL trademark?
2   A.  No.
3   Q.  Okay.  Who kept the financial records for the
4 joint venture?
5   A.  You're talking about the bank account?
6   Q.  Who maintained the bank account and kept
7 records of how many items had been sold and what the --
8   A.  Joe Cool.
9   Q.  Joe Cool.  Okay.  And did Joe Cool share those
10 records with Consolidated?
11   A.  Not to me.
12   Q.  Not to you?
13   A.  No.
14   Q.  Do you know whether they shared them with David
15 Baksht?
16   A.  I don't know.
17   Q.  Okay.  Was there a separate -- I think you said
18 there was a separate bank account of some kind for the
19 3DL business; is that correct?
20   A.  That's correct.
21   Q.  And that was opened by Joe Cool?
22   A.  Yes.
23   Q.  And do you know if it was opened in the name of
24 the Joe Cool business or the name of the joint venture
25 or you don't know?

31 (Pages 121 to 124)

86ded466-e1ee-4ed4-8e01-ae0f5e5c0373

Page 125

1   A.  I don't know.  I don't want to estimate.
2   Q.  You don't want to what?
3   A.  Estimate.
4   Q.  You don't want to guess?
5   A.  Guess, yeah.
6   Q.  Do you know what bank the account was opened?
7   A.  No.
8   Q.  And, again, Joe Cool would have the records of
9  that account?
10   A.  Yes.
11   Q.  Do you know how many total heat transfers with
12  the 3DL logo were sold?
13   A.  Like I said before, I think it was a couple
14  hundred thousand.  I don't have exact numbers.
15   Q.  Okay.  I thought earlier you said a couple
16  hundred thousand were produced.
17   A.  Was produced, yeah.
18   Q.  Okay.  Well, because a lot of them, as you
19  know, there was a seizure and some of them were taken
20  and then Joe Cool shredded them --
21   A.  I understand.  So that's why I said.  I'm not
22  gonna take -- if it was 400 or 500 or 300.  I'm not
23  going to take a number, but it was in the hundreds.
24   Q.  In the hundreds of thousands?
25   A.  Yes.

Page 126

1   Q.  Okay.  And how about T-shirts with the 3DL logo
2  on them?  Do you know about how many of those were sold?
3   A.  No.
4   Q.  Do you know what the joint venture's total
5  revenues were of the sales of the 3DL merchandise?
6   A.  No.
7   Q.  And would that information again be in Joe
8  Cool's accounting records?
9   A.  Yes.
10   Q.  Okay.  How about the profits from the joint
11  venture of the sales of 3DL merchandise?  Do you know
12  what that was?
13   A.  No.
14   Q.  But you said all of that profit was reinvested
15  in the 3DL business?
16   A.  Yes.
17   Q.  So does Consolidated have any records at all
18  showing the joint venture's revenues, unit sales, or
19  profits?
20   A.  I don't have.  Not in my hand.
21   Q.  Okay.  Does David Baksht?
22   A.  I don't know.
23   Q.  Okay.  What type of advertising did
24  Consolidated do for the 3DL merchandise?
25   A.  You say advertising.  What you mean

Page 127

1  advertising?
2   Q.  Well, did it print any fliers, any product
3  catalogs?
4   A.  Not what I -- no, not what I remember.
5   Q.  Newspaper ads?
6   A.  No.
7   Q.  Television ads?
8   A.  No.
9   Q.  Did Consolidated do anything to promote public
10  awareness of the 3DL logo?
11   A.  You mean talking to dealers in the market,
12  talking to stores?
13   Q.  Sure.  Let's start with that.
14   A.  I don't have any record but I assume.
15   Q.  You didn't do that personally?
16   A.  No.
17   Q.  Who was responsible for that?
18   A.  Maybe David.
19   Q.  Well, it's just the two of you on the
20  Consolidated side.
21   A.  Yeah.  Right.
22   Q.  So that would have been David's responsibility?
23   A.  If he do it.  You asking -- I don't know it.
24  Yes.  Yeah.
25   Q.  Okay.  Are you aware of any advertising done by

Page 128

1  Joe Cool or by the joint venture itself for the 3DL
2  products?
3   A.  When you say advertising, that could be through
4  the sales people and everything and things like that.
5  So Joe Cool did it, of course.  He sold it.
6   Q.  Obviously, Joe Cool sold it.
7   A.  Yeah.
8   Q.  Did Joe Cool produce any newspaper advertising
9  with the 3DL --
10   A.  I don't know.
11   Q.  Okay.  Any product catalogs with the 3DL?
12   A.  I don't know.  I don't know, but if he has a
13  catalog, maybe it's there.  I don't know.  I don't want
14  to say something I don't know.
15   Q.  Okay.  Has Consolidated ever sponsored any
16  sporting events with the 3DL trademark?
17   A.  Not yet.  Soon.
18   Q.  Okay.  Soon.  Has Consolidated ever sponsored
19  any athletes using the 3DL trademark?
20   A.  No.
21   Q.  How about music festivals?
22   A.  No.
23   Q.  Has Consolidated ever placed the 3DL trademark
24  in any vehicles?
25   A.  No.

Page 129

1  Q.  Has Consolidated ever arranged for people to
2  appear on TV wearing clothing that has the 3DL logo on
3  it?
4  A.  Not yet.
5  Q.  Okay.  Has any 3DL merchandise been sold in
6  Mackinaw, Michigan?
7  A.  In what?
8  Q.  Mackinaw, Michigan?
9  A.  They have an ocean over there?
10  Q.  They have a lake.
11  A.  Yeah.  Maybe.  I don't know.  Again. . .
12  Q.  You don't know?
13  A.  (No audible response.)
14      MR. MORTNER:  It's a nice place.
15      THE WITNESS:  Yeah?
16      MR. STEWART:  I've never been.  I've heard it's
17  nice.
18  Q.  Have you ever been present when customers were
19  purchasing 3DL merchandise?
20  A.  No.
21      VIDEOGRAPHER:  Five minutes of tape.
22      MR. STEWART:  Why don't we switch the tape now.
23      VIDEOGRAPHER:  The time is 2:19 p.m.  This ends
24  Tape 4.  We're off the record.
25      (Off the record.)

Page 130

1      VIDEOGRAPHER:  The time is 2:24 p.m. this
2  begins Tape 5.  We are on the record.
3  BY MR. STEWART:
4  Q.  Okay.  Mr. Schneorson, are you aware of any
5  instances where customers have asked if there's any kind
6  of a connection between the 3DL products and Monster
7  Energy?
8  A.  No.
9  Q.  You've never heard of that happening?
10  A.  No.
11  Q.  Okay.  Have you heard of any instances where
12  customers thought that the 3DL products were actually
13  Monster products?
14  A.  No.
15  Q.  How about the opposite?  Have you encountered
16  any situations where people thought that Monster
17  products were actually coming from 3DL?
18  A.  No.
19  Q.  Okay.  Are you aware of any information that
20  suggests that customers recognize the 3DL logo as being
21  Consolidated's trademark?
22  A.  Again?
23  Q.  Are you aware of any information that suggests
24  that customers recognize the 3DL logo as being
25  Consolidated's trademark?

Page 131

1  A.  If the customers know that it belong to
2  Consolidated?
3  Q.  Correct.
4  A.  I don't know.
5  Q.  Well, let me phrase this a different way here.
6  I'm looking now at Exhibit 4 which is a T-shirt with the
7  3DL logo on it.
8  A.  Um-hmm.
9  Q.  And are you aware of any information indicating
10  that if a customer saw this T-shirt in the street, they
11  would know that that's a Consolidated T-shirt because of
12  the 3DL logo on it?
13      MR. MORTNER:  You're asking -- I'm not --
14  because you asked originally of any specific
15  instances, but now you're saying if.  So are you
16  asking a hypothetical or a specific case?
17      MR. STEWART:  I'm asking if he has any evidence
18  that people who see T-shirts like this bearing the
19  3DL logo recognize that T-shirt as being associated
20  with Consolidated.
21  A.  If I have evidence?
22  Q.  Yes.
23  A.  No.
24  Q.  Was that a no?
25  A.  No.

Page 132

1  Q.  Okay.  Do you know of any evidence that David
2  has of that type?
3  A.  I don't know.  You're talking about -- one
4  second, I'm sorry.  Customers that we sell them the
5  T-shirts?
6      MR. MORTNER:  Are you asking wholesale or
7  retail customers?
8  Q.  Both.
9  A.  Wholesale, I'm sure they would know.
10  Customers?  I don't know.  I can't tell.  I don't know.
11  Q.  And how would wholesale customers know about
12  Consolidated?
13  A.  Also from the label that they -- they
14  probably -- they would know from the label.
15  Q.  From the label.  And just from the label, or is
16  there anything else that would include --
17  A.  Probably the receipts.
18  Q.  The receipts.  Okay.  The receipt has the
19  Consolidated name on it?
20  A.  Has what?
21  Q.  The receipt would have the Consolidated name on
22  it?
23  A.  I don't know.  I don't have answer for that.
24  Q.  Because the receipt would come from Joe Cool,
25  wouldn't it?

33 (Pages 129 to 132)

Page 133

1     A.  Probably.  He's the licensee, so I don't know.
2     Q.  What label on Exhibit 4 would indicate to
3  wholesale customers that Consolidated is associated with
4  this T-shirt?
5     A.  I don't see anything on it.
6     Q.  Okay.  Do you believe that Consolidated was
7  harmed by the filing of the current lawsuit?
8     A.  Yes.
9     Q.  And how?
10     A.  First of all, for the expense that everything
11  went on till today and for the potential to take a good
12  mark and marketing that, and we have to stop everything
13  before we actually almost start it.  And that's how we
14  got hurt.
15     Q.  And why have you had to stop marketing
16  everything?
17     A.  Because of the lawsuit.
18     Q.  But is there a court order in place that you're
19  aware of that prevents Consolidated from marketing?
20     A.  No.  But they send letters to our customers,
21  they scare them, and all kind of things you know, was in
22  the paper, was in the news.  That's -- everybody heard
23  about it so they stopped buy, stopped orders.
24     Q.  So which customers are you aware of that have
25  heard of the lawsuit?

Page 134

1     A.  Of the lawsuit?
2     Q.  Yes.
3     A.  I don't have the list of the customers but a
4  lot of customers.
5     Q.  Okay.  Who would have that list?
6     A.  Probably Joe Cool.
7     Q.  Okay.  So Joe Cool would know better than you
8  which customers learned of the lawsuit and became
9  concerned?
10     A.  Yes.  And we cannot even go further to
11  nationwide with the other marketing that we try to do
12  like we spoke before because of that.
13     Q.  Have you spoken with any of these customers
14  about what their concerns are?
15     A.  About what?
16     Q.  About what their concerns are and --
17     A.  I didn't.
18     Q.  Has David Baksht?
19     A.  Maybe.
20     Q.  Has Joe Cool?
21     A.  Probably.  I don't know.
22     Q.  Okay.  So you don't know what --
23     A.  No.
24     Q.  -- what concerns these customers have
25  specifically?

Page 135

1     A.  No.  I know in general they were afraid from
2  lawsuits.  That's what I understood, but exactly, I
3  don't know.
4     Q.  So, basically, once they heard there was a
5  lawsuit involving a trademark --
6     A.  They didn't want -- yeah.
7     Q.  -- they wanted to stay away from that
8  trademark --
9     A.  Exactly.
10     Q.  -- until the lawsuit is resolved, basically?
11     A.  Yes.
12     Q.  Okay.  Are you aware that a seizure of
13  merchandise and business records took place at Joe
14  Cool's place of business on March 7, 2011?
15     A.  Yes.
16     Q.  Okay.  Good.  I figured you were.  Were you
17  present at that seizure?
18     A.  No.
19     Q.  Okay.  Did anyone call you during the seizure?
20     A.  To me, no.
21     Q.  Okay.  To David?
22     A.  Probably, yes.
23     Q.  Okay.  Do you know what items were taken during
24  the seizure?
25     A.  No.

Page 136

1     Q.  Okay.  Do you know whether any of the items
2  taken during the seizure belonged to Consolidated alone,
3  separate property of Consolidated?
4     A.  The merchandise?  The merchandise was belong to
5  all of us.
6     Q.  The merchandise was fifty-fifty, right?
7     A.  Yeah.
8     Q.  Okay.  Can you think of any separate property
9  of Consolidated that was being stored at Joe Cool's
10  place of business?
11     A.  I can't think about anything right now.
12     Q.  Okay.  I'll show you a document that I'll ask
13  the reporter to mark as the next exhibit in order.
14        (Plaintiff's Exhibit No. 74 was marked for
15  identification.)
16        MR. MORTNER:  What number was that?
17        MR. STEWART:  74.
18  BY MR. STEWART:
19     Q.  Mr. Schneorson, have you seen this document
20  before?
21     A.  No.
22     Q.  Okay.  I don't think we're going to ask
23  anything about that then.  Did Consolidated do anything
24  to publicize the fact that the seizure occurred?
25     A.  What's the question?

86ded466-e1ee-4ed4-8e01-ae0f5e5c0373

Page 137

1   Q.  Did Consolidated do anything to publicize the
2   fact that the seizure occurred?
3   A.  I don't understand.  If Consolidated did?
4   Q.  Yeah.  We talked about the fact that there was
5   a seizure.
6   A.  Yeah.
7   Q.  My understanding is that Consolidated would
8   want fewer people to know about the seizure rather than
9   more people to know about the seizure.  Is that a fair
10  estimate?
11  A.  Yes.
12  Q.  Okay.  So I was asking whether Consolidated did
13  anything to notify the public about the seizure to make
14  more people aware of the seizure.
15  A.  No.
16  Q.  Okay.  That was my assumption.  I just wanted
17  to check.
18  A.  I wasn't. . .
19  Q.  How would anyone -- anyone in the public that
20  was aware of the seizure -- well, let me step back.
21      The seizure took place at Joe Cool's place of
22  business; is that correct?
23  A.  Yes.
24  Q.  Okay.  How would anyone in the public know that
25  the seized property belonged partly to Consolidated?

Page 138

1   A.  How would the public?
2   Q.  Yeah.  How would the public be aware of that?
3   A.  Are you talking about customers, or are you
4   talking about the regular guy on the street?
5   Q.  All of them.
6   A.  All of them?
7   Q.  Yes.
8   A.  Probably I would say from the lawsuits.  That's
9   everything is published.  It's public.  I think it was
10  in the papers.  It was on the Internet.  I don't know
11  exactly, but it wasn't a secret.
12  Q.  Okay.  Let me ask you the question this way.
13  I've been involved in this lawsuit for a while and know
14  more about the filings with the court than most members
15  of the public.  And it wasn't until a year later when
16  Mr. Mortner filed his papers that I learned of the joint
17  venture between Consolidated and Joe Cool, and I
18  certainly didn't learn that from reading the court
19  papers.  So are you aware of anything in the court
20  papers or anywhere else that would have alerted the
21  public to the fact that Joe Cool and Consolidated were
22  splitting the 3DL profits fifty-fifty or sharing them in
23  any way?
24  A.  After the lawsuit that he -- he got back the
25  stuff.  It was published everywhere.  Everybody was

Page 139

1   talking about it.  I'm not talking about the regular guy
2   on the street, but I'm talking about all the customers,
3   Joe Cool customers.
4   Q.  They were talking about the fact that Joe Cool
5   had its property seized, correct?
6   A.  That what?
7   Q.  Were those customers talking about the fact
8   that Joe Cool had its property seized?
9   A.  Yeah.
10  Q.  And were those customers talking about
11  Consolidated having its property seized?
12  A.  No.  But they were talking about the 3DL which
13  belong to Consolidated, and that mark had a bad name
14  since then.
15  Q.  Okay.  But, to your knowledge, the customers
16  weren't talking about Consolidated as having a bad name
17  at that point, were they?
18  A.  I don't know about the -- like I said before,
19  it was not a secret.  People know the lawsuit was
20  against Joe Cool and Consolidated.
21  Q.  Okay.  Now, you're aware that Monster Energy
22  returned all the seized items to Joe Cool's place of
23  business by April 1, 2011, correct?
24  A.  Yes.
25  Q.  Okay.  And did the joint venture resume its

Page 140

1   sales of the 3DL merchandise at that time?
2   A.  Again?
3   Q.  Did the joint venture resume its sales of the
4   3DL merchandise after April 1st when the goods were
5   returned?
6   A.  Yeah.  He didn't sell that since then.
7   Q.  He stopped selling them?
8   A.  Stopped.
9   Q.  Okay.  So he did not resume sales?
10  A.  No.
11  Q.  Okay.  Why not?
12  A.  Because of the lawsuit.  Because the pressure
13  that they put on them.  The guy almost got nervous
14  breakdown.
15  Q.  Did Consolidated take any steps to notify the
16  public that the court ruled the seizure was a mistake?
17  A.  If it was a mistake, if they published it, that
18  was a mistake?
19  Q.  Yeah.  Did Consolidated publish the fact that
20  the court effectively reversed itself and said I should
21  not have issued the seizure order in the first place?
22  A.  I know.  We try to -- I don't remember exactly
23  to who but to convince Joe Cool to go to the customers
24  and tell them there was a mistake.  But the guy was
25  falling apart, so who to talk to.

86ded466-e1ee-4ed4-8e01-ae0f5e5c0373

Page 141

1  Q. Did Consolidated make any effort to go directly
2  to those customers?
3  A. Not what I recall.
4  Q. Not that you recall?
5  A. No.
6  Q. Why not?
7  A. Because a couple reason. First of all, we
8  didn't have the guy that work with us to continue to do
9  business, and to find new guys, when they heard about
10 the lawsuit, they want to put everything on hold.
11 Finish with the lawsuit and then we talk business.
12 Q. Okay. So did you go to potential new customers
13 other than Joe Cool and --
14 A. Not new customers. New dealers like Joe Cool
15 that they can sell it.
16 Q. Yeah. That's what I meant. I'm sorry. Did
17 you go to potential new dealers?
18 A. Yes.
19 Q. And they were uninterested because of the
20 lawsuit?
21 A. Yes.
22 Q. They wanted to wait to see who really owned the
23 3DL trademark?
24 A. Obviously.
25 Q. Okay. Were those potential dealers aware of

Page 142

1  the seizures specifically or just aware of the lawsuit?
2  A. Again?
3  Q. Were those potential dealers aware of the
4  seizures specifically or were they just aware of the
5  lawsuit?
6  A. I would say the lawsuit. I don't know
7  specifically if -- I don't know, but they know about the
8  lawsuit, yeah.
9  Q. Okay. Has any customer ever told Consolidated
10 that it would not do business with Consolidated because
11 of the seizure?
12 A. Customers of Joe Cool?
13 Q. Yeah. Let's start with customers of Joe Cool.
14 A. Not directly contact with them.
15 Q. Okay. How about any other customers?
16 A. Only the potential customers.
17 Q. Who were aware --
18 A. The dealers that we wanted them to market this
19 3DL again instead of Joe Cool to bring somebody else.
20 Q. And you had said that they were aware of the
21 lawsuit. You just weren't sure if they were aware of
22 the seizure?
23 A. Right.
24 Q. Okay. Were any of these potential dealers
25 companies that Consolidated did business with before?

Page 143

1  A. No.
2  Q. Okay. So these would have been new customers?
3  A. Yes.
4  Q. Okay. Does Consolidated currently have any
5  ongoing business aside from this lawsuit?
6  A. No.
7  Q. Do you know how much the property that was
8  seized during the seizure was worth?
9  A. Gross sale or just how much it cost to make
10 that?
11 Q. Whatever information you have I'll take.
12 A. I don't know. We spoke about a hundred
13 thousand dollars. That's what I remember.
14 Q. All right. Well, let me show you an e-mail.
15 That may be what you're talking about. And I'll ask the
16 reporter to mark this as Exhibit 75.
17   (Plaintiff's Exhibit No. 75 was marked for
18 identification.)
19 A. That's the e-mail that David sent them?
20 Q. This is an e-mail from David to Joe Cool?
21 A. I don't know. It says here that said David
22 Lipsker. That's the e-mail.
23 Q. Okay. And it's got your name on it near the
24 top as well, correct?
25 A. Oh, yeah? Where is it? Well, maybe because he

Page 144

1  send e-mails to me. Whatever he do, he send it to me
2  because I'm his partner. But I don't read e-mail so
3  much so I just do it just for the record but -- so I
4  remember something. I was correct. It was a hundred
5  thousand dollars I see here. Is that correct?
6  Q. Well, what I'm reading is that the heat
7  transfers would have generated sales which would have
8  produced a hundred thousand dollars in revenue.
9  A. Uh-huh. Okay.
10 Q. Do you have any information as to whether
11 that's correct or incorrect?
12 A. I would say that's correct. I would say that's
13 correct.
14 Q. Okay. Do you know how much total investment
15 Consolidated has made in the 3DL project?
16 A. No.
17 Q. Do you know what the total investment would be
18 excluding the cost of this lawsuit?
19 A. I'm gonna need accountant to count it. Not
20 right now.
21   MR. STEWART: All right. Well, let me show you
22 documents that I'll ask the reporter to mark as
23 Exhibit 76.
24   (Plaintiff's Exhibit No. 76 was marked for
25 identification.)

36 (Pages 141 to 144)

Page 145

1      THE WITNESS: Where I'm looking?
2    Q.   Okay. If you look right here in the first
3  sentence where there's actual text where it's got
4  somebody's name, it says, "We are now invested over
5  $16,000 in hard money and $60,000 in time into this and
6  sweat over seven months." Do you see that?
7    A.   Okay.
8    Q.   And that looks to be an e-mail from David
9  davidlipsker@gmail.com to anati@mail.com. Do you see
10  that?
11    A.   Yeah.
12    Q.   Do you know who anati@mail.com is?
13    A.   It's his rabbi.
14    Q.   Oh, okay. And then the whole thing was
15  forwarded to you; is that correct?
16    A.   Yeah. Usually, that's what he does.
17    Q.   So are you aware of how Mr. Baksht calculated
18  the $16,000 figure?
19    A.   What's the date on that?
20    Q.   This looks like August 1, 2011.
21    A.   Okay. That's with the 10,000 or without?
22    Q.   I'm sorry. The 10,000 is what?
23    A.   That's with the 10,000 or without the 10,000?
24    Q.   I would have assumed it was with the 10,000,
25  but I can't speak for Mr. Baksht.

Page 146

1    A.   Me either.
2    Q.   So you don't know how he came up with the
3  $16,000 figure?
4    A.   No.
5    Q.   And you don't know how he came up with the
6  $60,000 figure?
7      MR. MORTNER: He changed it on page 2.
8      MR. STEWART: Page 2 he changed it?
9      THE WITNESS: They gave him a discount.
10      MR. MORTNER: They gave him a discount.
11      THE WITNESS: Oh, okay. That's --
12      MR. STEWART: Oh, that's right.
13      THE WITNESS: You see? He's a nice guy.
14  BY MR. STEWART:
15    Q.   Now, if you look a little further down --
16    A.   What is that? The same thing?
17    Q.   The same document. Just above the word
18  "statement" that's centered in the middle, do you see
19  that?
20    A.   Okay.
21    Q.   The e-mail address is to Michal Amar,
22  M-I-C-H-A-L Amar. Do you know, is that the same person
23  as Yosef Amar?
24    A.   I don't know.
25      MR. MORTNER: That's Michal which translates

Page 147

1  into Michelle.
2      THE WITNESS: Maybe his wife?
3      MR. STEWART: Oh, it's his wife.
4      THE WITNESS: Ah, okay.
5      MR. STEWART: Well, thank you.
6      THE WITNESS: Not everything I know.
7  BY MR. STEWART:
8    Q.   Has Consolidated ever been accused of trademark
9  infringement in any other cases besides this one?
10    A.   No. I hope not.
11    Q.   Have you personally been accused of trademark
12  infringement in any case?
13    A.   No.
14      MR. STEWART: Okay. Why don't you give me a
15  few minutes to go over my notes and I'll see if we're
16  done.
17      VIDEOGRAPHER: Would you like to go off the
18  record?
19      MR. STEWART: Yes, please.
20      VIDEOGRAPHER: Sure. The time is 2:53 p.m.
21  We're off the record.
22      (Off the record.)
23      VIDEOGRAPHER: The time is 2:57 p.m. We're on
24  the record.
25  BY MR. STEWART:

Page 148

1    Q.   Okay. Mr. Schneorson, you mentioned earlier
2  that Consolidated was looking for new 3DL licensees or
3  partners; is that correct?
4    A.   Yes.
5    Q.   And you mentioned, I believe, that you have
6  approached some potential partners; is that correct?
7    A.   Yes.
8    Q.   Did you tell me who those potential partners
9  are?
10    A.   What I recall is Menachem Goldman and Sidney
11  Cohen.
12    Q.   And what type of business does Menachem Cohen
13  -- Menachem Goldman operate?
14    A.   They marketing T-shirts, dealers.
15    Q.   T-shirt dealers? Both of them?
16    A.   Both of them.
17    Q.   Okay. Are you aware of any connections they
18  have with major retailers like Kmart or Walmart?
19    A.   Yes. If I were? That's why I was sitting with
20  them. Somebody put me together with them because of
21  that.
22    Q.   Okay. So you're saying that Mr. Cohen and
23  Mr. Goldman have connections with major retailers?
24    A.   Yes.
25      MR. STEWART: Okay. I think that's all I have.

37 (Pages 145 to 148)

Page 149

1     THE WITNESS:  You want me to ask something?
2     (Witness and defense counsel conferring.)
3     THE WITNESS:  Yeah.  But I didn't sit down.  We
4   had to do a meeting with Jordache, but it didn't came
5   out because I told my partner there's no reason to
6   sit down.  Let's finish with the lawsuit; let's get
7   the mark; then we'll go on.  We gonna make fun of
8   ourselves, you know.  People said no, so that's why
9   -- but I didn't actually sit with Jordache.
10     MR. STEWART:  But you had --
11     THE WITNESS:  It was -- yeah.  That was the
12   next step, yeah.
13   BY MR. STEWART:
14     Q.  And was that through Mr. Goldman and Mr. Cohen
15   or --
16     A.  No, no, no, no.
17     Q.  So you had an opportunity to sit down with
18   Jordache?
19     A.  Yes, yes.
20     Q.  And you decided to wait until this lawsuit is
21   resolved?
22     A.  Yeah.
23     Q.  Okay.  So you never actually met with Jordache.
24     A.  We didn't, and now my partner wants to sit with
25   them no matter what.  Even if we didn't finish the

Page 150

1   lawsuit, he wants to sit.  So I don't know what it's
2   gonna be so we'll leave it.  That's not happen.  Yeah.
3   Maybe that's going to happen.  Right now I didn't sit
4   down with them, but maybe next week we'll sit down with
5   them.  So I cannot tell you what it's gonna be.
6     Q.  And when you say your partner wants to sit down
7   with him, that's Mr. Baksht?
8     A.  Yes.  He doesn't want to wait any longer, but
9   we'll see.
10     MR. STEWART:  All right.  I have no further
11   questions.
12     THE WITNESS:  Thank you.
13     VIDEOGRAPHER:  Is it okay to go off the record,
14   Mr. Mortner?
15     MR. MORTNER:  Yes.  Thank you.
16     VIDEOGRAPHER:  Okay.  The time is 3:01 p.m.
17   This ends Tape 5 and concludes the deposition.  We're
18   off the record.
19     COURT REPORTER:  Mr. Mortner, are we reading or
20   waiving?
21     MR. MORTNER:  We are reading.  Thank you for
22   asking.
23     COURT REPORTER:  Mr. Stewart, I guess you're
24   ordering?
25     MR. STEWART:  Yes.

Page 151

1     COURT REPORTER:  Mr. Mortner, do you want to
2   order a copy?
3     MR. MORTNER:  Yeah.
4     (The deposition concluded at 3:01 p.m.)
5             - - - - -

Page 152

1             CERTIFICATE OF OATH
2                   and
3         CERTIFICATE OF REPORTER
4
5   STATE OF FLORIDA
6   COUNTY OF ORANGE
7
8     I, Margaret Lowe, Florida Professional
    Reporter, Notary Public, certify that MENACHEM
9   SCHNEORSON personally appeared before me and was duly
    sworn on the 12th day of September, 2012.
10
      I certify that I was authorized to and did
11   stenographically report the videotaped deposition of
    MENACHEM SCHNEORSON, that a review of the transcript was
12   requested; and that the foregoing transcript, pages 4
    through 151, is a true and complete record of my
13   stenographic notes.
14     I FURTHER CERTIFY that I am not a relative,
    employee, attorney, or counsel of any of the parties,
15   nor am I a relative or employee of any of the parties'
    attorneys or counsel connected with the action, nor am I
16   financially interested in the action.
17     WITNESS my hand and official seal this 20th day
    of September, 2012.
18
19
20
21
22
      _____
23   Margaret Lowe, FPR
    Florida Professional Reporter
24   Notary Public - State of FL
25

86ded466-e1ee-4ed4-8e01-ae0f5e5c0373

Page 153

```
 1              UNITED STATES DISTRICT COURT
                MIDDLE DISTRICT OF FLORIDA
 2                   ORLANDO DIVISION
 3
   MONSTER ENERGY COMPANY, f/k/a
 4 HANSEN BEVERAGE COMPANY, d/b/a
   MONSTER BEVERAGE COMPANY,
 5
        Plaintiff,
 6
   vs.        Case No. 6:11-CV-329-ORL-22DAB
 7
   CONSOLIDATED DISTRIBUTORS, INC.;
 8 METTEMP, INC.; and DAVID BAKSHT
   (a/k/a DAVID LIPSKER a/k/a DAVID
 9 BAKSHET a/k/a D. BAKHT a/k/a
   DM SCHNEERSON a/k/a ABRAHAM
10 SHNEORSON),
11      Defendants.
        _____/
12
   IN RE:  DEPOSITION OF:  Menachem Schneorson
13 TAKEN ON:  9-12-12
14 TO: Moshe Mortner, Esquire
        Mortner Law Office, The Trump Building
15      40 Wall Street, 28th floor
        New York, New York 10005
16
   The above-referenced transcript has been completed and awaits
17 reading and signing.
18 Please notify the deponent to contact your office to make
   arrangements to read your copy of the transcript.  If the
19 reading and signing have not been completed by September 21,
   2012, we shall conclude that the deponent has waived the
20 reading and signing of the transcript.
21 The original of this deposition has been forwarded to the
   ordering party and the errata, once received, will be
22 forwarded to you and all ordering parties as listed below.
23 Thank you.
24 Zacco & Associates
25 Cc: Paul Stewart, Esquire
```

Page 154

```
 1              ERRATA SHEET
 2       Do not write on transcript - enter changes on this sheet.
 3
   IN RE:   Monster Energy vs. Consolidated Distributors
 4      Case No. 6:11-CV-329-ORL-22DAB
 5 DEPO OF: Menachem Schneorson      TAKEN ON: 9-12-12
 6 Page #   Line #     Change/Correction       Reason
 7      _____
        _____
 8      _____
        _____
 9      _____
        _____
10      _____
        _____
11      _____
        _____
12      _____
        _____
13      _____
        _____
14      _____
        _____
15      _____
        _____
16      _____
        _____
17      _____
        _____
18      _____
        _____
19      _____
20 Under penalties of perjury, I declare that I have read the
   foregoing document and that the facts stated in it are true.
21
22 _____
23 Date           Signature of Deponent

              Menachem Schneorson
24            Printed Name of Deponent
25 Reporter:  Margaret Lowe
```

86ded466-e1ee-4ed4-8e01-ae0f5e5c0373