# EXHIBIT 10

Page 1

```
 1          UNITED STATES DISTRICT COURT
 2          MIDDLE DISTRICT OF FLORIDA
 3             ORLANDO DIVISION
 4  -----------------------------------x
 5  MONSTER ENERGY COMPANY, f/k/a
    HANSEN BEVERAGE COMPANY, d/b/a
 6  MONSTER BEVERAGE COMPANY,
 7            Plaintiffs,
 8       vs.       Case No.:
 9             6:11-CV-329-ORL-22DAB
10  CONSOLIDATED DISTRIBUTORS, INC.,
    METTEMP, INC., and
11  DAVID BAKSHT (a/k/a David Lipsker
    a/k/a David Bakshet a/k/a
12  D Bakht a/k/a DM Schneerson
    a/k/a Abraham Schneerson),
13
           Defendants.
14  -----------------------------------x
15
16       DATE:  Monday, September 24, 2012
17       TIME:  10:34 a.m.
18
19       Videotaped deposition of DAVID BAKSHT,
20  held at the Residence/Office of David Baksht,
21  719 Eastern Parkway, Brooklyn, New York 11213,
22  before Suzanne J. Stotz, a Certified Court
23  Reporter and a Notary Public of the State of
24  New York.
25
```

Page 2

```
 1  A P P E A R A N C E S :
 2
 3    KNOBBE MARTENS OLSON & BEAR, LLP
 4    Attorneys for the Plaintiff
 5    2040 Main Street
 6    14th Floor
 7    Irvine, CA  92614
 8    949-760-0404
 9    paul.stewart@knobbe.com
10    BY:  PAUL A. STEWART, ESQ.
11
12    MORTNER LAW OFFICE
13    Attorneys for the Defendant
14    40 Wall Street
15    28th Floor
16    New York, NY  10005
17    646-820-8770
18    mm@mortnerlaw.com
19    BY:  Moshe Mortner, ESQ.
20
21  Also Present:  Peter Ledwith, Videographer
22
23
24
25
```

Page 3

```
 1            I N D E X
 2
 3          EXAMINATION
 4                 Page No.
 5  DAVID BAKSHT
 6    BY MR. STEWART          7
 7
 8
 9          E X H I B I T S
10
11  Exhibit
12  Name      Description        Page No.
13  92    Corporate records of      23
14    Mettemp, Inc.
15  93    Printout from the Patent and  33
16    Trademark Office website
17    entitled Revocation of
18    Attorney/Domestic
19    Representative and/or
20    Appointment of
21    Attorney/Domestic
22    Representative
23  94    E-mail correspondence     40
24  95    David Lipsker LinkedIn     42
25    profile
```

Page 4

```
 1           E X H I B I T S
 2  Exhibit
 3  Name      Description        Page No.
 4  96    E-mail correspondence     43
 5  1     Trademark Design drawing   46
 6  97    E-mail correspondence     53
 7  98    E-mail correspondence     60
 8  99    E-mail correspondence     68
 9  100   Defendant David Baksht's   75
10    Response to Plaintiff's
11    First Set of Interrogatories
12    (Nos. 1-19)
13  101   E-mail correspondence     88
14  73    Color diagrams of T-shirts  97
15  102   Black and white diagrams of 103
16    T-shirts
17  103   Trademark design drawing   127
18  104   Trademark design drawing   137
19  105   E-mail correspondence     152
20  106   Part of the National      166
21    Trademarks Center website
22  60    Printout from the Patent and 197
23    Trademark Office website
24  107   Seizure receipt         214
25
```

7065eec4-b2f1-4c8b-9b56-9cffeaea27b6

Page 5

1                E X H I B I T S
2
3   Exhibit
4   Name      Description            Page No.
5   108     Mark T15146           240
6   109     Mark T11289           243
7   110     Mark T15761           244
8   111     Mark T11287           247
9   112     Mark G98358           254
10  113     Plaintiff's Memorandum of   259
11          Law in Opposition to
12          Defendant's Motion to Compel
13          and Motion to Strike
14          Affirmative Defense of
15          Unclean Hands
16
17          (Exhibits attached to transcript.)
18
19
20
21
22
23
24
25

Page 7

1                D A V I D   B A K S H T,
2   719 Eastern Parkway, Brooklyn, New York 11213,
3   having first been duly affirmed by a Notary
4   Public, was examined and testified as follows:
5
6   EXAMINATION BY
7   MR. STEWART:
10:35  8   Q.   Good morning.  Could you please
10:35  9   state your name for the record please?
10:35  10   A.   David Baksht.
10:35  11   Q.   And how do you spell your first and
10:35  12   last names?
10:35  13   A.   You have the spelling.
10:35  14   Q.   So is it D-A-V-I-D?
10:35  15   A.   Yes.
10:35  16   Q.   B-A-K-S-H-T?
10:35  17   A.   That's correct.
10:35  18   Q.   Have you ever had your deposition
10:35  19   taken before?
10:35  20   A.   No.
10:35  21   Q.   Okay.
10:35  22       THE VIDEOGRAPHER:  I'm not picking
10:35  23   him up, sorry.  Off the record 10:35.
10:36  24       (Discussion held off the record.)
10:36  25       THE VIDEOGRAPHER:  10:36 on the

Page 6

10:34  1       THE VIDEOGRAPHER:  We are going on
10:34  2   the record.  The time is 10:34 a.m. on
10:34  3   September 24, 2012.  This is the
10:34  4   deposition of David Baksht in the matter
10:34  5   of Monster Energy v. Consolidated
10:34  6   Distributors.  We are at the offices of
10:34  7   David Baksht, located at 719 Eastern
10:34  8   Parkway, Brooklyn, New York.  The court is
10:34  9   the Middle District of Florida.
10:34  10       I am Peter Ledwith, the video
10:34  11   specialist.  The court reporter is Suzanne
10:34  12   Stotz.  We are from Barkley Reporting.
10:34  13       Would counsel please introduce
10:34  14   themselves and whom they represent?
10:34  15       MR. STEWART:  Paul Stewart
10:34  16   representing the plaintiff, Monster
10:34  17   Energy.
10:34  18       MR. MORTNER:  Moshe Mortner,
10:34  19   representing the defendant, Consolidated
10:34  20   Distributors, and defendant, David Baksht.
10:34  21       THE VIDEOGRAPHER:  Would the court
10:35       reporter please swear in the witness?
23   ///
24   ///
25   ///

Page 8

10:36  1   record.
10:36  2   BY MR. STEWART:
10:36  3   Q.   Okay.  So I'm going to explain to
10:36  4   you just the basic procedures.  Your counsel
10:36  5   may have already gone over them with you.
10:36  6   A.   Okay.
10:36  7   Q.   But I'm here to ask you a series of
10:36  8   questions.  Your job is just to answer the
10:36  9   questions to the best of your ability.
10:36  10   A.   Okay.
10:36  11   Q.   The court reporter is taking down
10:36  12   every word that both you and I say.  So please
10:36  13   wait until I finish my questions before you
10:36  14   start your answers so that the court reporter
10:37  15   could make a clear record of what was said.
10:37  16   All your answers should be in words rather than
10:37  17   nodding your head or saying uh-huh or uh-uh,
10:37  18   because those things are difficult for the
10:37  19   court reporter to take down.
10:37  20       And your attorney may object to
10:37  21   some of my questions.  But unless he
10:37  22   specifically instructs you not to answer, it is
10:37  23   still your job to go ahead and answer the
10:37  24   question.  Do you understand that?
10:37  25   A.   I do understand.

7065eec4-b2f1-4c8b-9b56-9cffeaea27b6

Page 9

| | | |
|---|---|---|
| 10:37 | 1 | Q.   Okay.  Now, the answers that you |
| 10:37 | 2 | give are under oath just as if you are in a |
| 10:37 | 3 | courtroom in front of a judge and a jury.  Do |
| 10:37 | 4 | you understand that? |
| 10:37 | 5 | A.   Yes. |
| 10:37 | 6 | Q.   Okay.  And is there any reason why |
| 10:37 | 7 | you can't give truthful and accurate testimony |
| 10:37 | 8 | today? |
| 10:37 | 9 | A.   I don't think so.  But I do need |
| 10:37 | 10 | you to know that I am on antibiotics I was |
| 10:37 | 11 | prescribed for knee pain.  I have cellulitis. |
| 10:38 | 12 | And the doctor prescribed antibiotics, he |
| 10:38 | 13 | prescribed codeine.  And you should know that I |
| 10:38 | 14 | am taking pills now. |
| 10:38 | 15 | Q.   But do you feel you are mentally |
| 10:38 | 16 | capable of testifying? |
| 10:38 | 17 | A.   I think so.  I hope so. |
| 10:38 | 18 | Q.   Okay. |
| 10:38 | 19 | A.   And this is why we're here.  But I |
| 10:38 | 20 | do want you to know that I am under those -- |
| 10:38 | 21 | that I have prescription pills and that I am |
| 10:38 | 22 | taking pills.  So I have cellulitis.  If |
| 10:38 | 23 | necessary, perhaps you would like to see it so |
| 10:38 | 24 | you know that it is really true.  Take a look |
| 10:38 | 25 | at my leg. |

Page 10

| | | |
|---|---|---|
| 10:38 | 1 | THE WITNESS:  I'm showing my leg. |
| 10:38 | 2 | Take a look. |
| 10:38 | 3 | THE VIDEOGRAPHER:  Should I tilt |
| 10:38 | 4 | down and show him? |
| 10:38 | 5 | MR. STEWART:  Sure, for just a |
| 10:38 | 6 | moment. |
| 10:39 | 7 | THE WITNESS:  Do you see it? |
| 10:39 | 8 | THE VIDEOGRAPHER:  I see it. |
| 10:39 | 9 | THE WITNESS:  Do you have a good |
| 10:39 | 10 | picture of it? |
| 10:39 | 11 | THE VIDEOGRAPHER:  Perfect. |
| 10:39 | 12 | BY MR. STEWART: |
| 10:39 | 13 | A.   And I made a special effort to be |
| 10:39 | 14 | here today, a special effort to be able to be |
| 10:39 | 15 | here today.  I am in a little bit of pain.  And |
| 10:39 | 16 | I would rather it would have been some other |
| 10:39 | 17 | time.  But in the spirit of the Court Order, |
| 10:39 | 18 | the Judge's Order, I am here. |
| 10:39 | 19 | Q.   Okay.  Have you ever been convicted |
| 10:39 | 20 | of a felony? |
| 10:39 | 21 | A.   No. |
| 10:39 | 22 | Q.   Okay.  Now, just before we went on |
| 10:39 | 23 | the record you were mentioning the confidential |
| 10:39 | 24 | documents of Monster Energy.  And you had |
| 10:39 | 25 | mentioned that they have not been shown to any |

Page 11

| | | |
|---|---|---|
| 10:39 | 1 | third-party at this point.  Is that accurate? |
| 10:39 | 2 | A.   To the best of my knowledge, yes. |
| 10:39 | 3 | Q.   Okay.  So far only you and your |
| 10:39 | 4 | counsel have reviewed them? |
| 10:39 | 5 | A.   Pardon? |
| 10:39 | 6 | Q.   So far only you, your counsel and |
| 10:39 | 7 | Mr. Schneerson? |
| 10:40 | 8 | A.   We have reviewed them. |
| 10:40 | 9 | Q.   Has anyone other than you or your |
| 10:40 | 10 | counsel or Mr. Schneerson reviewed them? |
| 10:40 | 11 | A.   Not that I know of. |
| 10:40 | 12 | Q.   Okay.  Very good. |
| 10:40 | 13 | A.   As before we continue any further, |
| 10:40 | 14 | you made a promise to me before we started this |
| 10:40 | 15 | deposition, and I would like to repeat it on |
| 10:40 | 16 | the record, that this video is going to remain |
| 10:40 | 17 | confidential. |
| 10:40 | 18 | Q.   Yes.  This video will be used only |
| 10:40 | 19 | for the judge and the jury of this trial and |
| 10:40 | 20 | the attorneys who need to review it. |
| 10:40 | 21 | A.   And not be disseminated to any |
| 10:40 | 22 | other parties. |
| 10:40 | 23 | Q.   It won't be disseminated to other |
| 10:40 | 24 | parties. |
| 10:40 | 25 | And I had asked you if you would |

Page 12

| | | |
|---|---|---|
| 10:40 | 1 | agree that you would not use the confidential |
| 10:40 | 2 | documents for any purpose only other than this |
| 10:40 | 3 | litigation.  Is that something you are willing |
| 10:40 | 4 | to agree to? |
| 10:40 | 5 | A.   That is something that I told you I |
| 10:40 | 6 | will consider after this deposition is over. |
| 10:40 | 7 | But we want to agree about the question of |
| 10:40 | 8 | video. |
| 10:40 | 9 | Q.   The question of the video is |
| 10:40 | 10 | resolved. |
| 10:40 | 11 | A.   Good. |
| 10:40 | 12 | Q.   So now I'm asking you a separate |
| 10:40 | 13 | question. |
| 10:40 | 14 | A.   I would like to discuss it after |
| 10:41 | 15 | this deposition, not tied into this deposition. |
| 10:41 | 16 | Q.   So as you sit here at this moment, |
| 10:41 | 17 | you are not prepared to agree to use the |
| 10:41 | 18 | confidential documents only for the purposes of |
| 10:41 | 19 | this litigation? |
| 10:41 | 20 | A.   I will consider the issue after |
| 10:41 | 21 | this deposition over.  If you wish to discuss |
| 10:41 | 22 | this issue, we will discuss it after the |
| 10:41 | 23 | deposition is over.  So far it has not been an |
| 10:41 | 24 | issue. |
| 10:41 | 25 | Q.   Have you done anything to prepare |

3 (Pages 9 to 12)

Page 13

10:41 1  yourself for today's deposition?
10:41 2       A.   Of course.
10:41 3       Q.   What have you done?
10:41 4       A.   Talked to my attorney.
10:41 5       Q.   When did you do that?
10:41 6       A.   Yesterday, the day before.
10:41 7       Q.   Okay.  Other than speaking with
10:41 8  your attorney, have you done anything to
10:41 9  prepare for this deposition?
10:41 10      A.   I don't know what you mean.  Do you
10:41 11 mean mentally or in any material way?  I don't
10:41 12 understand.
10:41 13      Q.   Have you spoken with Menachem
10:41 14 Schneerson about this case?
10:41 15      A.   Yes.
10:41 16      Q.   And what did you discuss with Mr.
10:41 17 Schneerson?
10:41 18      A.   I discussed the fact that there is
10:41 19 a deposition today.  And I asked him, How is
10:42 20 this guy Paul Stewart?  Is he a nice guy?  And
10:42 21 he said yes, to the best of his knowledge, yes.
10:42 22 And I asked him, Does Paul Stewart carry a
10:42 23 pistol with him?  Is he going to shoot me?  He
10:42 24 said, No, he is a nice guy.  That was the
10:42 25 substance of our conversation.

Page 14

10:42 1       Q.   That was it?
10:42 2       A.   It was a few months ago.  I don't
10:42 3  recall exactly word by word.  But we are
10:42 4  business associates and we are also personal
10:42 5  friends, so we discussed many issues, I'm not
10:42 6  sure exactly what.  But if you're asking me
10:42 7  specific, I am not sure.
10:42 8       Q.   Did you discuss what questions
10:42 9  might come up today?
10:42 10      A.   Did I discuss what questions?  Yes.
10:42 11 I asked him what kind of questions are you
10:42 12 going to ask me.  Is he going to ask me
10:42 13 something related to the issues involved or
10:42 14 does he concentrate only to the issues
10:42 15 involved?  And he thought that you pretty much
10:42 16 concentrated on the issues involved.  That was
10:42 17 it.
10:43 18      Q.   Have you spoken with Yosef Amar
10:43 19 about your deposition?
10:43 20      A.   Yes, I did.
10:43 21      Q.   When was that?
10:43 22      A.   A couple of days ago.
10:43 23      Q.   Okay.  And what did you discuss
10:43 24 with Mr. Amar?
10:43 25      A.   The same thing.  I asked him what

Page 15

10:43 1  type of person you are, should I be expecting
10:43 2  questions solely relating to this case or some
10:43 3  other issues.  He said no.  He thought you were
10:43 4  a nice guy too.  Two people thought you were a
10:43 5  nice guy.
10:43 6       Q.   Okay.
10:43 7       A.   Seriously.  I'm very serious.
10:43 8       Q.   I appreciate it.
10:43 9            Do you continue to have a friendly
10:43 10 relationship with Mr. Amar?
10:43 11      A.   Yes.
10:43 12      Q.   And did you discuss with Mr. Amar
10:43 13 any details of the questions that I asked of
10:44 14 him?
10:44 15      A.   Not specifically.  Just general
10:44 16 conversation.  Not specifically.  Not anything
10:44 17 in particular I don't remember that I did.  But
10:44 18 I don't remember the whole conversation.  It
10:44 19 was also a friendly conversation.  He is a
10:44 20 member of the same religious organizations I
10:44 21 am.  He is a very religious person.  He is a
10:44 22 member on the board of synagogue.  And we
10:44 23 discussed many other issues, not just this
10:44 24 case.
10:44 25      Q.   Okay.  Have you had any discussions

Page 16

10:44 1  with Michelle Amar about this deposition?
10:44 2       A.   No.
10:44 3       Q.   Have you reviewed any documents in
10:44 4  preparing for this deposition?
10:44 5       A.   No.
10:45 6            THE WITNESS:  This takes it up to
10:45 7       here or below it?
10:45 8            THE VIDEOGRAPHER:  Right here, yes.
10:45 9       BY MR. STEWART:
10:45 10      Q.   Did Yosef Amar discuss with you any
10:45 11 of the details about when his company began
10:45 12 using the three drooping lines trademark?
10:45 13      A.   I'm sorry, I didn't get the
10:45 14 question exactly.
10:45 15      Q.   Sure.
10:45 16      A.   Could you repeat it?
10:45 17      Q.   Absolutely.
10:45 18            Did Yosef Amar discuss with you any
10:45 19 of the details of when his company began using
10:45 20 the three drooping lines trademark?
10:45 21      A.   Do you mean in the recent
10:45 22 conversation or ever?
10:45 23      Q.   Yes, in recent conversations
10:45 24 preparing for the deposition?
10:45 25      A.   No.  There was before.

4 (Pages 13 to 16)

7065eec4-b2f1-4c8b-9b56-9cffeaea27b6

| | | Page 17 |
|---|---|---|
| 10:45 | 1 | Q. Okay. We'll get to your other |
| 10:45 | 2 | conversations with him shortly? |
| 10:45 | 3 | A. Yeah. I didn't know if you meant |
| 10:45 | 4 | ever since I know him. |
| 10:45 | 5 | Q. Fair enough. |
| 10:45 | 6 | Now, what is your current position |
| 10:45 | 7 | with Consolidated Distributors? |
| 10:45 | 8 | A. I am the chief executive officer. |
| 10:46 | 9 | Q. Okay. Are you a shareholder? |
| 10:46 | 10 | A. Yes. |
| 10:46 | 11 | Q. A 50 percent shareholder? |
| 10:46 | 12 | A. I don't think that's what I am. I |
| 10:46 | 13 | object to the question. I don't want to |
| 10:46 | 14 | answer. What percentage, how many shares, it |
| 10:46 | 15 | is not relevant to this deposition. It is not |
| 10:46 | 16 | relevant to the issues. |
| 10:46 | 17 | Q. So you are refusing to answer the |
| 10:46 | 18 | question? |
| 10:46 | 19 | A. That is correct. |
| 10:46 | 20 | MR. STEWART: Counsel, do you have |
| 10:46 | 21 | any advice or instructions you want to |
| 10:46 | 22 | provide your witness? |
| 10:46 | 23 | A. It is a question not intended to |
| 10:46 | 24 | lead to a discoverable answer. I will tell you |
| 10:46 | 25 | afterwards, after the deposition. But this has |

| | | Page 18 |
|---|---|---|
| 10:46 | 1 | nothing to do with this case. That's what I |
| 10:46 | 2 | think. |
| 10:46 | 3 | MR. MORTNER: Can I talk to him |
| 10:46 | 4 | privately? |
| 10:46 | 5 | MR. STEWART: Sure. |
| 10:46 | 6 | THE VIDEOGRAPHER: It is 10:46 off |
| 10:46 | 7 | the record. |
| 10:51 | 8 | (Discussion held off the record.) |
| 10:51 | 9 | THE VIDEOGRAPHER: 10:51 on the |
| 10:51 | 10 | record. |
| 10:51 | 11 | BY MR. STEWART: |
| 10:51 | 12 | Q. Okay. Before the break I was |
| 10:51 | 13 | asking you whether you would testify as to the |
| 10:51 | 14 | percentage of shares that you hold in the CDI. |
| 10:51 | 15 | Are you willing to testify? |
| 10:51 | 16 | A. No. |
| 10:51 | 17 | Q. You are not willing to testify? |
| 10:51 | 18 | A. No. |
| 10:51 | 19 | Q. Okay. |
| 10:51 | 20 | A. I don't think it is a question |
| 10:51 | 21 | intended to lead to a discoverable answer. And |
| 10:51 | 22 | I think it is not related to this case what |
| 10:51 | 23 | percentage Mr. Schneerson owns and what |
| 10:51 | 24 | percentage I own. I am chief executive |
| 10:51 | 25 | officer. |

| | | Page 19 |
|---|---|---|
| 10:51 | 1 | Q. Does anybody hold any shares other |
| 10:52 | 2 | than yourself and Mr. Schneerson? |
| 10:52 | 3 | A. No. |
| 10:52 | 4 | Q. How long have you been with |
| 10:52 | 5 | Consolidated? |
| 10:52 | 6 | A. Since the beginning. |
| 10:52 | 7 | Q. And when was that? |
| 10:52 | 8 | A. I believe it was the end of 2009 or |
| 10:52 | 9 | beginning of -- no. The end of 2008 or the |
| 10:52 | 10 | beginning of 2009. Either December of 2008 or |
| 10:52 | 11 | January of 2009 from my recollection. I am not |
| 10:52 | 12 | telling on the record that is exact. |
| 10:52 | 13 | Q. Why did you found Consolidated? |
| 10:52 | 14 | A. That is a big question. Do you |
| 10:52 | 15 | want a small answer, a big answer? |
| 10:52 | 16 | Q. I want a complete answer. So I |
| 10:52 | 17 | guess that means a big answer. |
| 10:52 | 18 | THE WITNESS: We are not taking his |
| 10:52 | 19 | video? Only mine? |
| 10:52 | 20 | THE VIDEOGRAPHER: Just you. |
| 10:52 | 21 | THE WITNESS: It is very unusual. |
| 10:53 | 22 | BY MR. STEWART: |
| 10:53 | 23 | A. Okay. Could you repeat the |
| 10:53 | 24 | question? |
| 10:53 | 25 | Q. Sure. Why did you start |

| | | Page 20 |
|---|---|---|
| 10:53 | 1 | Consolidated? |
| 10:53 | 2 | A. For the purpose of acquiring |
| 10:53 | 3 | trademarks and promoting them and marketing |
| 10:53 | 4 | them. |
| 10:53 | 5 | Q. Okay. And where is Consolidated's |
| 10:53 | 6 | place of business? |
| 10:53 | 7 | A. 719 Eastern Parkway. |
| 10:53 | 8 | Q. That's also your home; is that |
| 10:53 | 9 | correct? |
| 10:53 | 10 | A. That's correct. |
| 10:53 | 11 | Q. Has Consolidated been involved in |
| 10:53 | 12 | any businesses other than the acquisition and |
| 10:53 | 13 | promotion of trademarks? |
| 10:53 | 14 | A. No. |
| 10:54 | 15 | Q. So has Consolidated itself ever |
| 10:54 | 16 | sold any T-shirts with trademarks on them? |
| 10:54 | 17 | A. No. We promoted them. We marketed |
| 10:54 | 18 | them. No. |
| 10:54 | 19 | Q. Okay. Has Consolidated itself ever |
| 10:54 | 20 | sold any heat transfers for T-shirts? |
| 10:54 | 21 | A. No. |
| 10:54 | 22 | Q. Does Consolidated sell any products |
| 10:54 | 23 | directly to consumers? |
| 10:54 | 24 | A. No. |
| 10:54 | 25 | Q. Or to retail stores? |

7065eec4-b2f1-4c8b-9b56-9cffeaea27b6

| Page 21 |
|---|

| | | | |
|---|---|---|---|
| 10:54 | 1 | A. | No. |
| 10:54 | 2 | Q. | Or to wholesalers? |
| 10:54 | 3 | A. | No. |
| 10:54 | 4 | Q. | Okay. I'm just making sure. |
| 10:54 | 5 | | Does Consolidated have a board of |
| 10:55 | 6 | directors? | |
| 10:55 | 7 | A. | I don't know what you mean by that. |
| 10:55 | 8 | Q. | Very often a corporation would have |
| 10:55 | 9 | a board of directors to which the officers |
| 10:55 | 10 | report. | |
| 10:55 | 11 | A. | Well, it is me -- Mr. Schneerson |
| 10:55 | 12 | and I. | |
| 10:55 | 13 | Q. | Okay. |
| 10:55 | 14 | A. | But -- yes, go ahead. |
| 10:55 | 15 | Q. | And what is Mr. Schneerson's |
| 10:55 | 16 | position with Consolidated? | |
| 10:55 | 17 | A. | He is marketing director, promoter, |
| 10:55 | 18 | financial advisor, finances, he raises finance, |
| 10:55 | 19 | he also raises finance for various projects. |
| 10:55 | 20 | That is his position. | |
| 10:56 | 21 | Q. | Okay. And I take it from your |
| 10:56 | 22 | previous answer there is no employees that work |
| 10:56 | 23 | under you and Mr. Schneerson at Consolidated? |
| 10:56 | 24 | A. | That is correct. |
| 10:56 | 25 | Q. | Okay. What is Mettemp, Inc.? |

| Page 22 |
|---|

| | | | |
|---|---|---|---|
| 10:56 | 1 | A. | The same. It is a New York |
| 10:56 | 2 | corporation. | |
| 10:56 | 3 | Q. | And what type of business is it |
| 10:56 | 4 | involved in? | |
| 10:56 | 5 | A. | It to be doing the same thing as |
| 10:56 | 6 | Consolidated, the acquisition of trademarks and |
| 10:56 | 7 | promotion them and marketing them. |
| 10:56 | 8 | Q. | Is Mettemp an older company than |
| 10:56 | 9 | Consolidated? | |
| 10:56 | 10 | A. | About the same time. They are a |
| 10:56 | 11 | month apart. And, in fact, I think Mettemp is |
| 10:56 | 12 | much younger. I think Mettemp was formed in |
| 10:56 | 13 | January 2009 as opposed to Consolidated in |
| 10:57 | 14 | 2008, the end of 2008. |
| 10:57 | 15 | Q. | And why did you decide to |
| 10:57 | 16 | form two companies to do essentially the same |
| 10:57 | 17 | type of business? | |
| 10:57 | 18 | A. | They are different trademarks. |
| 10:57 | 19 | Many companies have subsidiaries of different |
| 10:57 | 20 | companies. We decide to for different |
| 10:57 | 21 | projects. | |
| 10:57 | 22 | Q. | And what is your position with |
| 10:57 | 23 | Mettemp? | |
| 10:57 | 24 | A. | The same position. I am the |
| 10:57 | 25 | chairman of Mettemp. | |

| Page 23 |
|---|

| | | | |
|---|---|---|---|
| 10:57 | 1 | Q. | Okay. I'm going to show you a |
| 10:57 | 2 | document that I will ask the reporter to mark |
| 10:58 | 3 | as Exhibit 92. | |
| 10:58 | 4 | | (Whereupon Exhibit 92, |
| 10:58 | 5 | | Corporate records of Mettemp, Inc., was |
| 10:58 | 6 | | marked for identification.) |
| 10:58 | 7 | Q. | My first question is, do you |
| 10:58 | 8 | recognize as the corporate records of Mettemp, |
| 10:58 | 9 | Inc.? | |
| 10:58 | 10 | A. | No. It is not an official record. |
| 10:58 | 11 | It is not an official record. It does not have |
| 10:59 | 12 | the seal of the Secretary of State, so I don't |
| 10:59 | 13 | know if it is an official document. |
| 10:59 | 14 | Q. | Okay. Do you see your name and |
| 10:59 | 15 | address about two-thirds of the way down on the |
| 10:59 | 16 | document? | |
| 10:59 | 17 | A. | Yes. |
| 10:59 | 18 | Q. | Do you know why there is an E in |
| 10:59 | 19 | your last name in this document? |
| 10:59 | 20 | A. | The only thing I could think of is |
| 10:59 | 21 | it is an typo. | |
| 10:59 | 22 | Q. | Okay. |
| 10:59 | 23 | A. | That is not the spelling of my |
| 10:59 | 24 | name. | |
| 10:59 | 25 | Q. | Okay. What is Associated Business |

| Page 24 |
|---|

| | | | |
|---|---|---|---|
| 10:59 | 1 | Consultants, Inc.? | |
| 10:59 | 2 | A. | It is a corporation. |
| 10:59 | 3 | Q. | And what type of business does it |
| 10:59 | 4 | do? | |
| 10:59 | 5 | A. | It is a trademark consulting |
| 10:59 | 6 | company. | |
| 10:59 | 7 | Q. | Is it the same type of business as |
| 10:59 | 8 | Mettemp and Consolidated? |
| 10:59 | 9 | A. | No. |
| 10:59 | 10 | Q. | How does its business differ? |
| 10:59 | 11 | A. | Excuse me? |
| 10:59 | 12 | Q. | How does its business differ from |
| 10:59 | 13 | that of Consolidated and Mettemp? |
| 10:59 | 14 | A. | Because it is a consulting company. |
| 10:59 | 15 | Q. | What type of consulting does it do? |
| 10:59 | 16 | A. | Trademark consulting to companies |
| 11:00 | 17 | like yours. Attorneys need to know what a |
| 11:00 | 18 | trademark is and does trademarks litigation |
| 11:00 | 19 | services. | |
| 11:00 | 20 | Q. | Trademark litigation services? |
| 11:00 | 21 | A. | Yes. |
| 11:00 | 22 | Q. | What types of trademark litigation |
| 11:00 | 23 | services? | |
| 11:00 | 24 | A. | Trademark litigation analysis and |
| 11:00 | 25 | the attorneys... | |

7065eec4-b2f1-4c8b-9b56-9cffeaea27b6

Page 25

| | | |
|---|---|---|
| 11:00 | 1 | Q.   Can you repeat your answer for the |
| 11:00 | 2 | reporter? |
| 11:00 | 3 | A.   Trademark litigation services.  And |
| 11:00 | 4 | we don't need to get further into it.  I don't |
| 11:00 | 5 | think that Associated Business Consultants is a |
| 11:00 | 6 | party to this case.  So we don't need to go |
| 11:00 | 7 | further into details about this company.  It's |
| 11:00 | 8 | a trademark consulting business.  It is part of |
| 11:00 | 9 | its business, it does trademark analysis for |
| 11:00 | 10 | companies and attorneys. |
| 11:00 | 11 | Q.   And where is it located? |
| 11:00 | 12 | A.   719 Eastern Parkway. |
| 11:00 | 13 | Q.   And what is your position with |
| 11:01 | 14 | Associated Business Consultants? |
| 11:01 | 15 | A.   Chairman. |
| 11:01 | 16 | Will you excuse me if I take a |
| 11:01 | 17 | bite?  I am on antibiotics and I have to eat |
| 11:01 | 18 | with the antibiotics. |
| 11:01 | 19 | Q.   I'm going to show you a document |
| 11:01 | 20 | that was previously marked as Exhibit 69. |
| 11:01 | 21 | A.   In this deposition? |
| 11:01 | 22 | Q.   It was marked in a prior deposition |
| 11:01 | 23 | as Exhibit 69.  So we're just -- |
| 11:01 | 24 | A.   So you are showing me a document |
| 11:01 | 25 | which is not marked in this deposition. |

Page 26

| | | |
|---|---|---|
| 11:02 | 1 | Q.   We are going to keep the same |
| 11:02 | 2 | number in this deposition that we used in the |
| 11:02 | 3 | prior deposition? |
| 11:02 | 4 | THE WITNESS:  Were you the same |
| 11:02 | 5 | court reporter in the prior deposition? |
| 11:02 | 6 | THE COURT REPORTER:  Depending on |
| 11:02 | 7 | which one. |
| 11:02 | 8 | BY MR. STEWART: |
| 11:02 | 9 | Q.   Do you recognize this as corporate |
| 11:02 | 10 | records for Associated Business Consultants? |
| 11:02 | 11 | A.   No, I don't, because, again, this |
| 11:02 | 12 | is not an official copy.  It has no seal.  And |
| 11:02 | 13 | it is just a photocopy of something. |
| 11:02 | 14 | Q.   Okay.  Do you see about halfway |
| 11:02 | 15 | down there is the name of Menachem Schneerson |
| 11:02 | 16 | and then the name of "D AAVODBAKSHET"? |
| 11:02 | 17 | A.   Yes. |
| 11:02 | 18 | Q.   Do you have any idea why your name |
| 11:02 | 19 | is spelled this way? |
| 11:02 | 20 | A.   It is the same, a typo.  But it is |
| 11:02 | 21 | not the spelling of my name. |
| 11:02 | 22 | Q.   Okay.  What is the National |
| 11:03 | 23 | Trademarks Center? |
| 11:03 | 24 | A.   The National Trademarks Center is a |
| 11:03 | 25 | division of Associated Business Consultants. |

Page 27

| | | |
|---|---|---|
| 11:03 | 1 | Q.   Okay.  So it is not a separate |
| 11:03 | 2 | corporate entity? |
| 11:03 | 3 | A.   No.  It is a d/b/a of Associated |
| 11:03 | 4 | Business Consultants. |
| 11:03 | 5 | Q.   Okay.  And is that also located at |
| 11:03 | 6 | the same address of 719 -- |
| 11:03 | 7 | A.   That is correct. |
| 11:03 | 8 | Q.   Okay.  Does the National Trademarks |
| 11:03 | 9 | Center have any employees other than yourself |
| 11:03 | 10 | and Mr. Schneerson? |
| 11:03 | 11 | A.   Yes. |
| 11:03 | 12 | Q.   Who are those employees? |
| 11:03 | 13 | A.   A secretary and some other |
| 11:03 | 14 | employees who are not here anymore. |
| 11:03 | 15 | Q.   Does it currently have any other |
| 11:03 | 16 | employees? |
| 11:03 | 17 | A.   Yes. |
| 11:03 | 18 | Q.   And who are those current |
| 11:03 | 19 | employees? |
| 11:03 | 20 | A.   I don't think that you need to -- |
| 11:03 | 21 | that the question is intended to lead to a |
| 11:03 | 22 | discoverable answer.  National Trademarks is |
| 11:04 | 23 | not a party to this lawsuit.  I am not sure we |
| 11:04 | 24 | need to divulge confidential information.  If |
| 11:04 | 25 | really has nothing to do with this case. |

Page 28

| | | |
|---|---|---|
| 11:04 | 1 | you tell me what it has to do with this case, I |
| 11:04 | 2 | will tell you.  Other than on the record, you |
| 11:04 | 3 | are welcome to sit here and see the operating |
| 11:04 | 4 | agreement, but not on the record.  But the |
| 11:04 | 5 | company has nothing to do with this case. |
| 11:04 | 6 | Q.   We'll be getting into some |
| 11:04 | 7 | documents that were by the National Trademarks |
| 11:04 | 8 | Center in this case relating to the three |
| 11:04 | 9 | drooping lines trademark. |
| 11:04 | 10 | A.   Okay. |
| 11:04 | 11 | Q.   So I'm trying to understand who |
| 11:04 | 12 | this entity, National Trademarks Center, is? |
| 11:04 | 13 | A.   We had a secretary and we had |
| 11:04 | 14 | persons working here who are no longer with |
| 11:04 | 15 | them. |
| 11:04 | 16 | Q.   Do you have any attorneys working |
| 11:04 | 17 | for National Trademarks Center? |
| 11:04 | 18 | A.   Not directly.  We do have attorneys |
| 11:04 | 19 | that we consult with if we need to. |
| 11:05 | 20 | Q.   Okay.  So you don't employ |
| 11:05 | 21 | attorneys, but you consult with them? |
| 11:05 | 22 | A.   That is correct. |
| 11:05 | 23 | Q.   Are you an attorney yourself? |
| 11:05 | 24 | A.   It depends what you call an |
| 11:05 | 25 | attorney.  I am not a lawyer.  I am not an |

7065eec4-b2f1-4c8b-9b56-9cffeaea27b6

Page 29

11:05 1   attorney at law, if that is what you mean.
11:05 2      Q.   Well, have you ever been admitted
11:05 3   to a bar?
11:05 4      A.   I am an attorney in fact.  I am not
11:05 5   an attorney at law.
11:05 6      Q.   Have you ever taken a bar exam?
11:05 7      A.   No, except for the Bar and Grille
11:05 8   in Manhattan.  I'm a member of the Bar and
11:05 9   Grille in Manhattan.
11:05 10      Q.   Do you have any training in
11:05 11   trademark law?
11:05 12      A.   Yes.
11:05 13      Q.   And what training is that?
11:05 14      A.   I have studied trademark law,
11:06 15   self-studies.
11:06 16      Q.   Okay.  Have you filed trademark
11:06 17   applications?
11:06 18      A.   Yes.
11:06 19      Q.   Roughly how many?
11:06 20      A.   I don't know exactly.  I would say
11:06 21   maybe 1,500.
11:06 22      Q.   1,500?
11:06 23      A.   Uh-huh.  But I am not sure about
11:06 24   that.  I may stand corrected.  If you need to
11:06 25   know for sure, if you need me to be more

Page 30

11:06 1   accurate, I can look at it at a later time and
11:06 2   tell you.
11:06 3      Q.   I think your estimate is good
11:06 4   enough for our conversation.
11:06 5      Is there an SS Stein employed by
11:06 6   the National Trademarks Center?
11:06 7      A.   Used to be.
11:06 8      Q.   Who is he?
11:06 9      A.   He was the person who worked here.
11:06 10      Q.   What was his job?
11:06 11      A.   He did various clerical work for
11:06 12   this office.  He did clerical work.
11:07 13      Q.   Did he have any responsibilities
11:07 14   for enforcing trademark rights?
11:07 15      A.   Sending out letters sometimes.
11:07 16   Composing letters mostly.
11:07 17      Q.   So what type of trademark work does
11:07 18   the National Trademarks Center conduct?
11:07 19      A.   Well, I think I told you already,
11:07 20   trademark consulting services.
11:07 21      Q.   Okay.  So does it assist companies
11:07 22   in registering trademarks before the Patent and
11:07 23   Trademark Office?
11:07 24      A.   Yes.
11:07 25      Q.   Does it assist companies in

Page 31

11:07 1   enforcing those rights against third-parties?
11:07 2      A.   Sometimes.
11:07 3      Q.   How does the National Trademarks
11:07 4   Center do those things without employing any
11:07 5   attorneys others?
11:07 6      A.   Oftentimes it assists the client
11:07 7   attorneys in doing it.  And oftentimes the
11:08 8   client attorney is not a trademark specialist,
11:08 9   is not a trademark expert.  Even though he may
11:08 10   be a patent trademark and copyright attorney,
11:08 11   he is not a trademark expert.  And oftentimes
11:08 12   we know more about this than he does.  And we
11:08 13   assist that person in doing it.  We assist the
11:08 14   attorney.
11:08 15      Q.   Does the National Trademarks Center
11:08 16   ever represent clients without the involvement
11:08 17   of an attorney?
11:08 18      A.   Depending on what kind of a case.
11:08 19   When he does not need an attorney, yes.
11:08 20      Q.   So what types of cases don't need
11:08 21   an attorney?
11:08 22      A.   I am not sure I want to -- I am not
11:08 23   sure that this is a discoverable answer -- that
11:08 24   this is a discoverable question.  For me to get
11:08 25   into what particular things exactly we do with

Page 32

11:08 1   National Trademarks Center, you are a
11:08 2   competitor of ours, I am not sure that this is
11:08 3   important.
11:08 4      Q.   Well, you can talk to your counsel
11:09 5   about the status of confidentiality in this
11:09 6   case.
11:09 7      A.   What?
11:08 8      Q.   You can talk to your counsel about
11:09 9   the status of confidentiality in this case.  It
11:09 10   was at your counsel's insistence that we do not
11:09 11   have a Protective Order.
11:09 12      A.   That we do not have a Protective
11:09 13   Order?
11:09 14      Q.   That is correct.
11:09 15      A.   What does that have to do with the
11:09 16   question that you are asking me?  The question
11:09 17   that you're asking me is not intended to lead
11:09 18   to a discoverable answer.  And you're asking me
11:09 19   to answer a question and you are not entitled
11:09 20   to this answer.  You are not entitled to ask
11:09 21   these questions about this company that has
11:09 22   nothing to do with this litigation.
11:09 23      Q.   Well, we'll get back into it when
11:09 24   I'm going over documents that is related to the
11:09 25   National Trademarks Center.

Page 33

| | |
|---|---|
| 11:09 | 1 |  Do you consider yourself to be an |
| 11:09 | 2 | expert in trademark law? |
| 11:09 | 3 |  A.   Yes. |
| 11:09 | 4 |  Q.   Have you ever told the United |
| 11:09 | 5 | States Patent and Trademark Office that you are |
| 11:09 | 6 | an attorney? |
| 11:09 | 7 |  A.   Absolutely not.  Not an attorney at |
| 11:09 | 8 | law. |
| 11:09 | 9 |  Q.   Let me show you a document that I |
| 11:10 | 10 | will ask the reporter to mark as Exhibit 93. |
| | 11 |  (Whereupon Exhibit 93, Printout |
| | 12 |  from the Patent and Trademark Office |
| | 13 |  website entitled Revocation of |
| | 14 |  Attorney/Domestic Representative and/or |
| | 15 |  Appointment of Attorney/Domestic |
| | 16 |  Representative, was marked for |
| | 17 |  identification.) |
| 11:10 | 18 |  Q.   And I will represent to you that |
| 11:10 | 19 | this is a printout from the Patent and |
| 11:10 | 20 | Trademark Office website.  About halfway down |
| 11:10 | 21 | in this document is a header New Attorney |
| 11:10 | 22 | Address and the Statement Text reads "By |
| 11:10 | 23 | submission of this request, the undersigned |
| 11:10 | 24 | revokes the power of attorney currently of |
| 11:10 | 25 | record, as listed above, and hereby appoints |

Page 34

| | |
|---|---|
| 11:10 | 1 | the following new attorney:  National |
| 11:10 | 2 | Trademarks Center, David Baksht."  Do you see |
| 11:10 | 3 | that? |
| 11:10 | 4 |  A.   This is not intended to -- yeah, go |
| 11:10 | 5 | ahead.  I will wait for the question. |
| 11:10 | 6 |  Q.   Okay.  So were you, in fact, |
| 11:10 | 7 | telling the Patent and Trademark Office of this |
| 11:10 | 8 | document that you were an attorney? |
| 11:11 | 9 |  A.   Absolutely not. |
| 11:11 | 10 |  Q.   Okay.  What were you doing with |
| 11:11 | 11 | this document? |
| 11:11 | 12 |  A.   This is what it looks like.  First |
| 11:11 | 13 | of all, I must point out that this is not a |
| 11:11 | 14 | certified copy of anything.  And I am not even |
| 11:11 | 15 | sure that I want to comment on it because it is |
| 11:11 | 16 | not a certified copy.  I don't know what this |
| 11:11 | 17 | is.  This is just a copy of something.  If you |
| 11:11 | 18 | have a certified copy, I will comment on a |
| 11:11 | 19 | certified copy.  But I never told the Patent |
| 11:11 | 20 | Office I am an attorney. |
| 11:11 | 21 |  What I will say about this is that |
| 11:11 | 22 | the Patent Office when you revoke the -- when |
| 11:11 | 23 | you want to revoke the powers of the existing |
| 11:11 | 24 | attorney there is a certain selection, a |
| 11:11 | 25 | certain button that you press on the computer/ |

Page 35

| | |
|---|---|
| 11:11 | 1 | and by pressing that button you are revoking |
| 11:11 | 2 | the previous attorney.  And then it asks you |
| 11:11 | 3 | who do you want new communications to be sent |
| 11:11 | 4 | to.  And somehow it comes out as a new |
| 11:12 | 5 | attorney.  But I must point out that this is |
| 11:12 | 6 | not -- first of all, it does not say attorney |
| 11:12 | 7 | at law, if that is what you are insinuating. |
| 11:12 | 8 | It could be an attorney in fact.  And the |
| 11:12 | 9 | second thing is that this is like an automatic |
| 11:12 | 10 | thing in the computer that when you press the |
| 11:12 | 11 | button it comes up by itself. |
| 11:12 | 12 |  This is not intended to say that |
| 11:12 | 13 | anyone is an attorney at law, not a previous |
| 11:12 | 14 | attorney, not a new attorney. |
| 11:12 | 15 |  Those are the choices they give you |
| 11:12 | 16 | on the Patent and Trademark Office website. |
| 11:12 | 17 | But then again, this is not an official |
| 11:12 | 18 | document.  This is not -- this is just a piece |
| 11:12 | 19 | of paper, a copy of a piece of paper.  If you |
| 11:12 | 20 | show me an official document, I will give you a |
| 11:12 | 21 | more precise answer, because I am not sure what |
| 11:13 | 22 | this is.  I have an idea it looks like |
| 11:13 | 23 | something, but... |
| 11:13 | 24 |  Q.   Do you represent clients in some |
| 11:13 | 25 | capacity before the Patent and Trademark |

Page 36

| | |
|---|---|
| 11:13 | 1 | Office? |
| 11:13 | 2 |  A.   No.  We file applications for |
| 11:13 | 3 | various companies. |
| 11:13 | 4 |  Q.   And how do you do that without |
| 11:13 | 5 | being the attorney at law for that company? |
| 11:13 | 6 |  A.   We don't need an attorney at law. |
| 11:13 | 7 | There is absolutely no requirement. |
| 11:13 | 8 |  Q.   So it is your understanding that |
| 11:13 | 9 | non-attorneys are authorized to file trademark |
| 11:13 | 10 | applications -- |
| 11:13 | 11 |  A.   That is correct. |
| 11:13 | 12 |  Q.   Let me finish my question.  It is |
| 11:13 | 13 | your understanding that non-attorneys are |
| 11:13 | 14 | permitted to file trademark applications on |
| 11:13 | 15 | behalf of third-party clients before the Patent |
| 11:13 | 16 | and Trademark Office? |
| 11:13 | 17 |  A.   Yes, that is correct. |
| 11:14 | 18 |  MR. MORTNER:  I don't think you |
| 11:14 | 19 | heard his question.  He said for |
| 11:14 | 20 | third-party.  You just said officers. |
| 11:14 | 21 |  THE WITNESS:  Yes, I did.  If there |
| 11:14 | 22 | are officers of those third-parties, they |
| 11:14 | 23 | can file an application. |
| 11:14 | 24 | BY MR. STEWART: |
| 11:14 | 25 |  Q.   Okay.  So let me just make sure I |

7065eec4-b2f1-4c8b-9b56-9cffeaea27b6

Page 37

| | | |
|---|---|---|
| 11:14 | 1 | understand your understanding correctly.  Is it |
| 11:14 | 2 | your understanding that an individual who is |
| 11:14 | 3 | not an attorney at law may file an application |
| 11:14 | 4 | with the Trademark Office on behalf of a |
| 11:14 | 5 | company of which he is an officer? |
| 11:14 | 6 | A.   That is absolutely correct. |
| 11:14 | 7 | Q.   Is it your understanding that being |
| 11:14 | 8 | an officer is a requirement to be able to do |
| 11:14 | 9 | that? |
| 11:14 | 10 | A.   No, it is not a requirement.  No, |
| 11:14 | 11 | it is not a requirement. |
| 11:14 | 12 | Q.   So is it your understanding that an |
| 11:14 | 13 | individual who's not an attorney at law can |
| 11:14 | 14 | file an application for a trademark on behalf |
| 11:14 | 15 | of a third-party with which he is not an |
| 11:15 | 16 | officer? |
| 11:15 | 17 | A.   That is correct. |
| 11:15 | 18 | Q.   Okay.  And is that something that |
| 11:15 | 19 | you have done through the National Trademarks |
| 11:15 | 20 | Center? |
| 11:15 | 21 | A.   I am not willing to discuss that. |
| 11:15 | 22 | I don't think that this question again is |
| 11:15 | 23 | intended to lead to a discoverable answer.  If |
| 11:15 | 24 | you show me later in the questions that it |
| 11:15 | 25 | does, I will tell you. |

Page 38

| | | |
|---|---|---|
| 11:15 | 1 | Q.   Have you represented clients before |
| 11:15 | 2 | the National -- have you on behalf of the |
| 11:15 | 3 | National Trademarks Center represented clients |
| 11:15 | 4 | before the Patent and Trademark Office where |
| 11:15 | 5 | you were an officer of those clients? |
| 11:15 | 6 | A.   Yes. |
| 11:16 | 7 | Q.   What is Trademark Associates, Inc.? |
| 11:16 | 8 | A.   I don't understand the question. |
| 11:16 | 9 | Q.   Are you familiar with a company |
| 11:16 | 10 | called Trademark Associates, Inc.? |
| 11:16 | 11 | A.   Yes. |
| 11:16 | 12 | Q.   And what was it or is it? |
| 11:16 | 13 | A.   It was a company in Florida.  That |
| 11:16 | 14 | is what you're talking about.  You need to tell |
| 11:16 | 15 | me Trademark Associates, Inc. in what state? |
| 11:16 | 16 | You need to give me more precise. |
| 11:16 | 17 | Q.   My understanding is it was located |
| 11:16 | 18 | in Florida. |
| 11:16 | 19 | A.   Okay.  Then there was a company |
| 11:16 | 20 | called Trademark Associates, Inc., yes. |
| 11:16 | 21 | Q.   What type of work did it do? |
| 11:16 | 22 | A.   Trademark consulting. |
| 11:16 | 23 | Q.   So similar to Associated Business |
| 11:16 | 24 | Consultants? |
| 11:16 | 25 | A.   Similar, yes. |

Page 39

| | | |
|---|---|---|
| 11:16 | 1 | Q.   Does it still exist? |
| 11:16 | 2 | A.   I don't think so.  No. |
| 11:17 | 3 | Q.   Now, you are familiar of course |
| 11:17 | 4 | with Joe Cool, Inc. in Florida, correct? |
| 11:17 | 5 | A.   Yes. |
| 11:17 | 6 | Q.   Do you hold any positions at Joe |
| 11:17 | 7 | Cool, Inc.? |
| 11:17 | 8 | A.   No. |
| 11:17 | 9 | Q.   Are you a shareholder of Joe Cool, |
| 11:17 | 10 | Inc.? |
| 11:17 | 11 | A.   No. |
| 11:17 | 12 | Q.   Does Yosef Amar hold any positions |
| 11:17 | 13 | with Consolidated? |
| 11:17 | 14 | A.   Excuse me? |
| 11:17 | 15 | Q.   Does Yosef Amar hold any positions |
| 11:17 | 16 | with Consolidated? |
| 11:17 | 17 | A.   No, he does not.  He was for a |
| 11:17 | 18 | certain -- a short period of time he was an |
| 11:17 | 19 | officer of Consolidated for the purpose of |
| 11:17 | 20 | filing an application, a trademark application, |
| 11:17 | 21 | several trademark applications.  And so he was |
| 11:17 | 22 | appointed an officer for a short period of |
| 11:17 | 23 | time.  And then after filing those applications |
| 11:17 | 24 | he ceased being an officer. |
| 11:18 | 25 | Q.   Have you heard of a company called |

Page 40

| | | |
|---|---|---|
| 11:18 | 1 | Joe Cool Bike Week, Inc.? |
| 11:18 | 2 | A.   Yes. |
| 11:18 | 3 | Q.   Do you hold any positions with Joe |
| 11:18 | 4 | Cool Bike Week, Inc.? |
| 11:18 | 5 | A.   No, not at all. |
| 11:18 | 6 | Q.   Are you a shareholder of Joe Cool |
| 11:18 | 7 | Bike Week, Inc.? |
| 11:18 | 8 | A.   No. |
| 11:18 | 9 | Q.   Who is David Lipsker? |
| 11:18 | 10 | A.   I have no idea. |
| 11:18 | 11 | Q.   Okay.  Is David Lipsker a name that |
| 11:18 | 12 | you've ever used? |
| 11:18 | 13 | A.   It is an e-mail address.  It is an |
| 11:18 | 14 | address I use. |
| 11:18 | 15 | Q.   And how did you come up with that |
| 11:18 | 16 | e-mail address? |
| 11:18 | 17 | A.   Someone by the name of Lipsker, who |
| 11:18 | 18 | created that e-mail for me, and he didn't know |
| 11:18 | 19 | my last name so he used his last name and my |
| 11:18 | 20 | first name and created that for me. |
| 11:18 | 21 | Q.   Okay.  Let me show you a document |
| 11:19 | 22 | that I will ask the reporter to mark as Exhibit |
| 11:19 | 23 | 94? |
| 11:19 | 24 | (Whereupon Exhibit 94, E-mail |
| 11:19 | 25 | correspondence, was marked for |

7065eec4-b2f1-4c8b-9b56-9cffeaea27b6

Page 41

```
11:19   1      identification.)
11:19   2      Q.   Let me ask you first, do you
11:19   3   recognize this document?
11:20   4      A.   I don't know what you mean by
11:20   5   recognize.
11:20   6      Q.   Have you --
11:20   7      A.   Do I remember writing it?  I don't
11:20   8   know what you mean.
11:20   9      Q.   Do you remember seeing this
11:20  10   document in the past?
11:20  11      A.   I don't know, but if you could
11:20  12   refresh my memory.
11:20  13      Q.   Do you remember communicating with
11:20  14   the South Carolina Secretary of State's Office?
11:20  15      A.   Yes, I do remember.
11:20  16      Q.   Okay.  And as part of that, do you
11:20  17   remember getting this e-mail from Renee --
11:20  18      A.   I don't remember getting this
11:20  19   particular e-mail.
11:21  20      Q.   All right.  Well, if you don't
11:21  21   recall receiving that e-mail, we can put this
11:21  22   aside for now.
11:21  23      A.   I don't know that I didn't receive
11:21  24   it.  You know, it looks -- but I don't recall
11:21  25   exactly.  I will leave it on the side.
```

Page 42

```
11:21   1      Q.   Do you recall ever informing Renee
11:21   2   Daggerhart that your name was Mr. Lipsker?
11:21   3      A.   Absolutely not.  I never said to
11:21   4   anybody that my name is Mr. Lipsker.
11:21   5      Q.   Okay.  I'm going to show you a
11:21   6   document that I will ask the reporter to mark
11:22   7   as Exhibit 95.
11:22   8         (Whereupon Exhibit 95, David
11:22   9         Lipsker LinkedIn profile, was marked for
11:22  10         identification.)
11:22  11      Q.   And have you seen this document
11:22  12   before?
11:22  13      A.   No.
11:22  14      Q.   Do you recall preparing a LinkedIn
11:22  15   profile for a David Lipsker?
11:22  16      A.   No.
11:22  17      Q.   Do you know anybody else who might
11:22  18   have prepared a LinkedIn profile for David
11:22  19   Lipsker, a trademark registration expert at
11:22  20   National Trademarks Center?
11:22  21      A.   No.  Can I consult with my attorney
11:22  22   for a moment?
11:22  23      Q.   Sure.
11:23  24         MR. MORTNER:  He has a speculation
11:23  25         as to the source of this, but he has no
```

Page 43

```
11:23   1   personal knowledge of this.
11:23   2      Q.   Okay.  Well, if you have some
11:23   3   information about it that you believe you have,
11:23   4   then please share it with me.
11:23   5         MR. MORTNER:  You could speculate
11:23   6         if you want to.
11:23   7      A.   Speculation is we had somebody
11:23   8   working one time and we had to fire them -- no,
11:23   9   I've never seen this document before.
11:24  10      Q.   Okay.  I'd like to show you a
11:24  11   document that I will ask the reporter to mark
11:24  12   as Exhibit 96.
11:24  13         (Whereupon Exhibit 96, E-mail
11:24  14         correspondence, was marked for
11:24  15         identification.)
11:24  16      Q.   And my first question to you:  Is
11:24  17   this a series of e-mails between yourself and a
11:24  18   reporter named Clayton Park?
11:25  19         My question is:  Is this an e-mail
11:25  20   between yourself and a reporter named Clayton
11:25  21   Park?
11:25  22      A.   I don't know.  It looks like it.
11:25  23      Q.   Okay.  And do you see just in the
11:25  24   upper third of the document there is an e-mail
11:25  25   from Clayton Park that says "Question:  Are you
```

Page 44

```
11:25   1   David Lipsker or David Baksht?"
11:25   2      A.   Yes, I see it.
11:25   3      Q.   And then above that your response
11:25   4   is "Two people.  Lipsker is trademark
11:25   5   attorney."  Do you see that?
11:25   6      A.   Where?  I'm sorry.
11:25   7      Q.   Just above the question are the
11:25   8   words "Two people.  Lipsker is trademark
11:25   9   attorney."
11:25  10      A.   I don't see that.  I don't get
11:25  11   where you are pointing to.
11:25  12      Q.   I'm pointing just above the
11:25  13   question, below your e-mail address, it says
11:25  14   "Two people.  Lipsker is tm attny."
11:26  15      A.   I don't know what that is.  I
11:26  16   didn't write this.  I didn't write this.
11:26  17      Q.   You did not write this?
11:26  18      A.   No.
11:26  19      Q.   It does say from
11:26  20   davidlipsker@gmail.com.  That is your e-mail
11:26  21   address, isn't it?
11:26  22      A.   It does say that, but I didn't
11:26  23   write this.
11:26  24         What is -- give me the question
11:26  25   again.  I want to make sure that I am answering
```

7065eec4-b2f1-4c8b-9b56-9cffeaea27b6

Page 45

11:26 1 correct. What is the question? Is there a
11:26 2 question?
11:26 3   Q.   The question was: Did you write
11:27 4 the e-mail that reads "Two people. Lipsker is
11:27 5 trademark attorney"?
11:27 6   A.   We don't have a Mr. Lipsker here,
11:27 7 so I don't know what you're talking about. And
11:27 8 secondly, trademark attorney, I don't know
11:27 9 whether you mean trademark lawyer, trademark
11:27 10 attorney or trademark in fact -- attorney in
11:27 11 fact. But we don't have a Mr. Lipsker.
11:27 12   Q.   Okay. So is it your testimony that
11:27 13 you did not write that e-mail?
11:27 14   A.   I don't know. I didn't write the
11:27 15 rest of the e-mail. I don't know where this
11:27 16 comes from. I don't have any idea who wrote
11:27 17 it. I am looking at the e-mail. I don't know.
11:27 18 I really don't know.
11:27 19         I don't know what to tell you. I
11:27 20 never held myself out to be a lawyer, if that's
11:27 21 what you're asking. And there is no Mr.
11:28 22 Lipsker here.
11:28 23   Q.   Okay. I'm going to show you what's
11:28 24 previously been marked as Exhibit 1. I will
11:28 25 ask the reporter to remark it as 1. This will

Page 46

11:28 1 be a familiar looking design I'm sure.
11:28 2         THE VIDEOGRAPHER: It is 11:28 off
11:28 3 the record.
11:28 4         (Whereupon a short break was
11:28 5 taken.)
11:28 6         (Whereupon Exhibit 1, Trademark
11:28 7 Design drawing, was marked for
11:38 8 identification.)
11:38 9         THE VIDEOGRAPHER: It is 11:39 on
11:39 10 the record.
11:39 11 BY MR. STEWART:
11:39 12   Q.   Okay. Mr. Baksht, do you have in
11:39 13 front of you what's been marked as Exhibit 1?
11:39 14   A.   Yes.
11:39 15   Q.   Have you seen this before?
11:39 16   A.   Yes.
11:39 17   Q.   What is it?
11:39 18   A.   It is Consolidated's.
11:39 19   Q.   Is it sometimes refer to as three
11:39 20 drooping lines?
11:39 21   A.   Yes.
11:39 22   Q.   And sometimes 3DL?
11:39 23   A.   Yes.
11:39 24   Q.   Did Consolidated have any role in
11:39 25 designing this?

Page 47

11:39 1   A.   No.
11:39 2   Q.   Who did?
11:39 3   A.   Yosef Amar and his company, Joe
11:39 4 Cool.
11:39 5   Q.   Okay. And do you know when Mr.
11:40 6 Amar designed this trademark?
11:40 7   A.   Yes, in 1993. But it looked a
11:40 8 little different, then it evolved into what it
11:40 9 is later.
11:40 10   Q.   Okay.
11:40 11   A.   But he originally designed it in
11:40 12 1993.
11:40 13   Q.   And when did it evolve to look
11:40 14 exactly like what it is in front of you?
11:40 15   A.   I see approximately 2010.
11:40 16   Q.   Can you describe in any way what
11:40 17 kind of changes were made between 1993 and
11:40 18 2010?
11:40 19   A.   I think it was just the enlargement
11:40 20 and widening of the mark.
11:40 21         MR. MORTNER: Are you referring to
11:40 22 additional sheets?
11:40 23         MR. STEWART: He said there were
11:40 24 some changes over time between '93 --
11:40 25         MR. MORTNER: Do you understand the

Page 48

11:40 1 question clearly? He's asking you about
11:40 2 additional or further changes besides the
11:40 3 changes in 2010.
11:40 4         MR. STEWART: No, no. I'm asking
11:40 5 about the changes that occurred from 1993
11:40 6 and 2010.
11:40 7         MR. MORTNER: Any and all changes
11:41 8 to that period.
11:41 9 BY MR. STEWART:
11:41 10   A.   Yes. It changed from the skinny
11:41 11 mark to this mark where we still kept the
11:41 12 skinny mark. And this is a variation of the
11:41 13 skinny mark.
11:41 14   Q.   Okay. Well, let me show you what's
11:41 15 been previously marked as Exhibit 14. And I'll
11:41 16 ask you if what you're referring to as the
11:41 17 skinny mark is what's shown on the shoulder of
11:41 18 Exhibit 14?
11:41 19   A.   Yes.
11:41 20   Q.   So how do you know that the skinny
11:41 21 mark was developed in 1993?
11:41 22   A.   Yosef Amar told us.
11:41 23   Q.   And what exactly did he tell you?
11:41 24   A.   That he designed it in 1993 from
11:42 25 artwork that he had prior to '93, from 1987.

12 (Pages 45 to 48)

7065eec4-b2f1-4c8b-9b56-9cffeaea27b6

Page 49

11:42 1    Q.   Did he tell you that he began using
11:42 2  the skinny mark on clothing in 1993?
11:42 3    A.   Yes.
11:42 4    Q.   Did you provide you with any
11:42 5  documentation to show that?
11:42 6    A.   I don't remember.
11:42 7    Q.   Did you do any --
11:42 8    A.   He dealt mostly with -- he dealt
11:42 9  with Mr. Schneerson.
11:42 10   Q.   Okay.  Did Consolidated do any kind
11:42 11 of an investigation to determine whether Mr.
11:42 12 Amar had, in fact, used the skinny mark back in
11:42 13 1993?
11:42 14   A.   Ask it again please.
11:42 15   Q.   Yes.  Did Consolidated do any kind
11:42 16 of an investigation to confirm that Joe Cool
11:43 17 had been used the skinny mark going back to
11:43 18 1993?
11:43 19   A.   Yes.  He showed us the actual
11:43 20 shirts that were made in 1993.
11:43 21   Q.   Where did he show you those shirts?
11:43 22   A.   Here.
11:43 23   Q.   So he brought them to New York?
11:43 24   A.   Yes.
11:43 25   Q.   Do you still have those shirts?

Page 50

11:43 1    A.   I don't think so.
11:43 2    Q.   Do you know what happened to them?
11:43 3    A.   No.  Menachem Schneerson would.
11:43 4    Q.   Now, you mentioned just a few
11:43 5  minutes ago that there were some changes that
11:43 6  occurred between 1993 and 2010 where the skinny
11:43 7  mark evolved into Exhibit 1.
11:43 8    A.   Yes.  I meant the skinny mark and
11:43 9  this mark.  So the skinny mark was evolved into
11:44 10 this in 2010, but we still kept the skinny
11:44 11 mark.  The skinny mark was still in production.
11:44 12 But this one became the size that it is and the
11:44 13 dimensions that it is in 2010.
11:44 14   Q.   Okay.  And the question I was going
11:44 15 to ask you is:  Did all of that evolution occur
11:44 16 in 2010 or was it a slow process that occurred
11:44 17 between 1993 and 2010?
11:44 18   A.   In 2010.
11:44 19   Q.   It all occurred in 2010?
11:44 20   A.   Yes.
11:44 21   Q.   Okay.  Do you have any of Joe
11:44 22 Cool's original design documents relating to
11:44 23 the skinny mark?
11:44 24   A.   I don't know what you mean.  I
11:44 25 personally don't have any documents, but I

Page 51

11:45 1  don't even know what you mean.
11:45 2    Q.   What I meant was Joe Cool
11:45 3  presumably went through some sort of process to
11:45 4  design the skinny mark, drew it out or printed
11:45 5  it out on a computer or did something.
11:45 6    A.   Yes.  Joe Cool, Yosef Amar, had
11:45 7  several hundred trademarks.  And many of them
11:45 8  had very similar green line designs, but not
11:45 9  exactly like the skinny mark.  And it evolved
11:45 10 throughout the years into what is -- what we
11:45 11 know today as the skinny mark.  I call it the
11:45 12 1993 mark.  It evolved into the 1993 mark from
11:45 13 the artwork that he had before with the similar
11:45 14 fonts as this.  And he had many, many of them
11:45 15 T-shirts from 1987.  But they weren't exactly
11:45 16 like the skinny mark.  The skinny mark became
11:45 17 exactly like the skinny mark, what I call the
11:46 18 1993 mark in 1993.  And it became exactly as it
11:46 19 looks in this document that you're showing me,
11:46 20 Exhibit Number 1, in 2010.
11:46 21   Q.   Okay.  I appreciate your testimony
11:46 22 on that.
11:46 23   Do you have any documents showing
11:46 24 the use of the skinny mark before 2010?
11:46 25   A.   I don't know exactly.  I don't know

Page 52

11:46 1  what you mean.  The documents?
11:46 2    Q.   Well, do you have any T-shirts
11:46 3  showing the use of the skinny mark --
11:46 4    A.   Yes.  We had T-shirts throughout
11:46 5  the years, but you have to ask Mr. Schneerson
11:46 6  this.  He took care of that part.
11:46 7    Q.   Okay.  So you personally don't have
11:46 8  any T-shirts?
11:46 9    A.   No.
11:46 10   Q.   Okay.  Do you have any financial
11:46 11 records showing the sale of T-shirts bearing
11:46 12 the skinny mark before 2010?
11:46 13   A.   No.  Not even in 2010 I don't have
11:47 14 these documents.  I think that you have them.
11:47 15 I think plaintiff has them.  When plaintiff
11:47 16 conducted its unlawful seizure, it seized a lot
11:47 17 of the documents, corporate records and massive
11:47 18 amounts of corporate records.  And in those
11:47 19 corporate records I believe exists what you're
11:47 20 asking me.
11:47 21   Q.   Well, we did return those corporate
11:47 22 records pursuant to the Court Order.
11:47 23   A.   Not all of them, but...
11:47 24   Q.   Well, we don't have to resolve that
11:47 25 today.

7065eec4-b2f1-4c8b-9b56-9cffeaea27b6

Page 53

| | | |
|---|---|---|
| 11:47 | 1 | Do you have any documents that you |
| 11:47 | 2 | can think of that would confirm that the skinny |
| 11:47 | 3 | mark was used at any time between 1993 and |
| 11:47 | 4 | 2010? |
| 11:47 | 5 | A.   I believe those documents exist |
| 11:47 | 6 | within the documents that plaintiff seized and |
| 11:48 | 7 | it says returned, but not in this office. |
| 11:48 | 8 | Q.   It's not in this office? |
| 11:48 | 9 | A.   That is correct. |
| 11:48 | 10 | Q.   Okay.  I'm going to show you a |
| 11:49 | 11 | document that I will ask the reporter to mark |
| 11:49 | 12 | as Exhibit 97. |
| 11:49 | 13 | (Whereupon Exhibit 97, E-mail |
| 11:49 | 14 | correspondence, was marked for |
| 11:50 | 15 | identification.) |
| 11:50 | 16 | Q.   Okay.  In looking at the e-mail on |
| 11:50 | 17 | the lower behalf of the page, is that an e-mail |
| 11:50 | 18 | from yourself to Michelle Amar? |
| 11:50 | 19 | A.   It could be. |
| 11:50 | 20 | Q.   Well, does it say from |
| 11:50 | 21 | davidlipsker@gmail.com? |
| 11:50 | 22 | A.   Is that a question? |
| 11:50 | 23 | Q.   Yes. |
| 11:50 | 24 | A.   You're asking me to read and |
| 11:50 | 25 | confirm what it says? |

Page 54

| | | |
|---|---|---|
| 11:50 | 1 | Q.   Yes. |
| 11:50 | 2 | A.   I don't understand.  This is |
| 11:50 | 3 | self-evident.  You're looking at the e-mail. |
| 11:50 | 4 | It is self-evident.  What are asking me? |
| 11:50 | 5 | Q.   I'm asking if this is, in fact, an |
| 11:50 | 6 | e-mail from yourself to Michelle Amar? |
| 11:50 | 7 | A.   I would presume.  I don't know.  It |
| 11:50 | 8 | looks like it, but I do not know. |
| 11:50 | 9 | Q.   Do you not remember sending this |
| 11:50 | 10 | e-mail? |
| 11:50 | 11 | A.   Not precisely.  I have sent many |
| 11:50 | 12 | e-mails to many people.  I don't remember the |
| 11:50 | 13 | exact, but it looks like it. |
| 11:51 | 14 | Q.   Okay.  Have you read through the |
| 11:51 | 15 | e-mail while you were sitting there? |
| 11:51 | 16 | A.   Right now? |
| 11:51 | 17 | Q.   Yes.  Have you? |
| 11:51 | 18 | A.   No. |
| 11:51 | 19 | Q.   You have not.  Well, read through |
| 11:51 | 20 | it and see if it refreshes your recollection |
| 11:51 | 21 | that that is something you sent to Michelle |
| 11:51 | 22 | Amar? |
| 11:51 | 23 | A.   It doesn't refresh my memory of |
| 11:51 | 24 | what transpired.  Are you asking me a specific |
| 11:51 | 25 | question? |

Page 55

| | | |
|---|---|---|
| 11:51 | 1 | Q.   Well, my specific question is going |
| 11:51 | 2 | to be about point number four in your e-mail. |
| 11:51 | 3 | A.   Right. |
| 11:51 | 4 | Q.   Which says "We have prior use 1987 |
| 11:51 | 5 | compared to their 2002." |
| 11:51 | 6 | A.   Okay. |
| 11:51 | 7 | Q.   And I wanted to know what the 1987 |
| 11:51 | 8 | referred to. |
| 11:51 | 9 | A.   1987 refers to the prior art that |
| 11:51 | 10 | Joe Amar and Joe Cool had which led to the |
| 11:51 | 11 | skinny mark.  So as we discussed before, the |
| 11:52 | 12 | skinny mark evolved -- the 1993 3DL mark |
| 11:52 | 13 | evolved from prior art that Joseph Amar and Joe |
| 11:52 | 14 | Cool had which used the same font, the same |
| 11:52 | 15 | green font.  And so, in essence, he started on |
| 11:52 | 16 | the passing of this mark in 1987 and it evolved |
| 11:52 | 17 | into exact to the skinny mark in -- to the |
| 11:52 | 18 | skinny 1993 mark in 1993.  So that's what this |
| 11:52 | 19 | refers to. |
| 11:52 | 20 | Q.   Okay.  Have you seen any of that |
| 11:52 | 21 | prior art from 1987 -- |
| 11:52 | 22 | A.   Yes, I have. |
| 11:52 | 23 | Q.   -- to 1993? |
| 11:52 | 24 | And what did it look like? |
| 11:52 | 25 | A.   I just had mentioned it.  It had |

Page 56

| | | |
|---|---|---|
| 11:52 | 1 | green fonts very similar to the green lines |
| 11:52 | 2 | that you see on the 3Dl mark both on the 1993, |
| 11:52 | 3 | the Joe Cool 3DL mark, and on the 2010 |
| 11:52 | 4 | Consolidated mark.  So it had similar art to |
| 11:53 | 5 | it, but it wasn't exactly as the skinny mark |
| 11:53 | 6 | looks or exactly as the 2010 mark looks.  But |
| 11:53 | 7 | it was very, very similar.  And that's why it |
| 11:53 | 8 | says 1987 in there, because he actually started |
| 11:53 | 9 | on the pass of these marks in 1987. |
| 11:53 | 10 | Q.   And where did you see these prior |
| 11:53 | 11 | art marks from 1987? |
| 11:53 | 12 | A.   He showed it to us here. |
| 11:53 | 13 | Q.   He showed them to you here in |
| 11:53 | 14 | Brooklyn? |
| 11:53 | 15 | A.   Yes.  He showed us massive amounts |
| 11:53 | 16 | of art, like 2,000 -- not 2,000.  About 200 |
| 11:53 | 17 | clipping marks.  He had marks with iguanas and |
| 11:53 | 18 | other animals and with those 3D -- with the 3D |
| 11:53 | 19 | lines, the green lines.  Very similar to the |
| 11:53 | 20 | 1993 3DL mark, skinny mark, and very similar to |
| 11:54 | 21 | the 2010 which we call the 2010 fat mark. |
| 11:54 | 22 | So... |
| 11:55 | 23 | Q.   All right.  Let me show you what's |
| 11:55 | 24 | previously been marked as Exhibit 53.  You can |
| 11:55 | 25 | pick it up if you want or you can just look at |

7065eec4-b2f1-4c8b-9b56-9cffeaea27b6

Page 57

11:55 1 it draped over, whatever is more convenient to
11:55 2 you. Is this one of the prior art designs that
11:55 3 Yosef Amar showed to you?
11:55 4     A. He showed us so many, but it looks
11:55 5 like it could have been one of them. I don't
11:55 6 remember exactly, but I can't -- it looks like
11:55 7 one of them because we have lizards and iguanas
11:55 8 and everything else, because it has like the
11:55 9 shorts here. What do you call this, a lizard?
11:55 10 This an animal that has the very similar 3D
11:56 11 lines. And he showed us all kinds of artwork
11:56 12 from where the 1993 skinny 3DL mark came from.
11:56 13 This is very possible it could have been one of
11:56 14 the things he showed us.
11:56 15         Will you excuse me? I will just
11:56 16 turn it off on. I am not going to pick it up.
11:56 17     (Discussion held off the record.)
11:56 18     A. Sorry about that.
11:56 19     Q. Okay.
11:57 20     (Discussion held off the record.)
11:57 21     Q. So is it your understanding then
11:57 22 that designs similar to the claws of these
11:57 23 lizards evolved into the skinny mark?
11:57 24     A. Yes, that is my understanding.
11:57 25     Q. Okay.

Page 58

11:57 1     A. But they were used before the 1993
11:57 2 mark. The 1993 was the skinny mark as you see
11:57 3 it, as the skinny 1993 3DL mark. It is not
11:57 4 this.
11:57 5     Q. Yes.
11:57 6     A. This was many -- one of many, many
11:57 7 T-shirts, one of many, many artworks that he
11:57 8 had. That's where he got the idea to do that
11:57 9 design.
11:58 10     Q. Okay.
11:58 11     A. And by the way, this has the green
11:58 12 and the yellow and so on on it.
11:58 13     Q. Is it your understanding that these
11:58 14 1987 styles have any relevance to
11:58 15 Consolidated's rights today?
11:58 16         MR. MORTNER: Do you understand the
11:58 17     question?
11:58 18         THE WITNESS: What? Yes.
11:58 19         MR. MORTNER: Because I am not
11:58 20     clear on the term relevant here. But if
11:58 21     he understands it, he can answer it.
11:58 22     Q. Yes. You can go ahead and answer
11:58 23 the question if you understood it.
11:58 24     A. I'm not sure I understand what you
11:58 25 mean by relevance. I think I understand, but

Page 59

11:58 1 why don't you make it clear to me.
11:58 2     Q. Is it your belief that the designs
11:59 3 from 1987, such as this lizard, provides
11:59 4 support for Consolidated's claim that it is the
11:59 5 first user of the 3DL mark?
11:59 6     A. Well, yes, because it shows where
11:59 7 this mark came from and where this mark evolved
11:59 8 from. And that the claw mark, a green and
11:59 9 yellow claw mark is not the creation of -- it
11:59 10 shows where Joe Amar got the idea of making and
11:59 11 producing the 1993 3DL mark. So in that sense
11:59 12 it shows great support for Consolidated's
11:59 13 position.
11:59 14         And you could see even in the
12:00 15 T-shirts that you just showed me, I don't know
12:00 16 what exhibit number the last exhibit, that
12:00 17 there is something very similar to the claw
12:00 18 mark in the feet of lizard. So it lends
12:00 19 support to Joe Amar's position of how his
12:00 20 skinny 1993 mark came about, where it evolved
12:00 21 from.
12:00 22         It didn't start out as that. It
12:00 23 started out with these lizards and the animals
12:00 24 and iguanas. And it evolved into Joe Amar's
12:00 25 thinking of just making the claw part of the

Page 60

12:00 1 mark, its main mark, rather than the whole
12:00 2 animal. But he had that idea, the claw marks,
12:00 3 from 1997. And there is support for it.
12:00 4     Q. Now, you just said 1997?
12:00 5     A. I'm sorry. I meant 1987. I meant
12:01 6 1987.
12:01 7         MR. MORTNER: Are you getting
12:01 8     tired?
12:01 9         THE WITNESS: What?
12:01 10         MR. MORTNER: Are you getting
12:01 11     tired?
12:01 12         THE WITNESS: Yes.
12:01 13 BY MR. STEWART:
12:01 14     Q. Let's go through one more exhibit
12:01 15 and then I guess if we want to take a lunch
12:01 16 break we can take a lunch break at that point.
12:01 17     A. It is up to you.
12:01 18     Q. I will show you what I will ask the
12:01 19 reporter to mark as Exhibit 98?
12:01 20         (Whereupon Exhibit 98, E-mail
12:01 21     correspondence, was marked for
12:02 22     identification.)
12:02 23     Q. And is this an e-mail from you
12:02 24 dated March 15, 2011?
12:02 25     A. Excuse me?

7065eec4-b2f1-4c8b-9b56-9cffeaea27b6

---

Page 61

12:02  1    Q.   Is this an e-mail from you dated
12:02  2  March 15, 2011?
12:02  3    A.   I don't see the date. I don't know
12:02  4  if it is, but I'm looking for the date. Yes, I
12:02  5  see Tuesday -- I can't read e-mails too good,
12:02  6  so I don't know whether the date refers to what
12:02  7  is on the top or it refers to what is on the
12:02  8  bottom.
12:02  9    Q.   Well, do you see about a third of
12:02  10  the way down there is the phrase "We created
12:02  11  this in 1987"?
12:02  12    A.   Yes.
12:02  13    Q.   Do you know what that refers to?
12:02  14    A.   I can only imagine that it refers
12:03  15  to the original artwork from where the 1993
12:03  16  mark was drawing from.
12:03  17    Q.   Okay. And if you look immediately
12:03  18  above, it says "Correction 1997."
12:03  19    A.   I don't know what this means. I
12:03  20  can only speculate, but I don't know if I
12:03  21  should speculate. I can only speculate it was
12:03  22  a minor correction to 1997. The 1997 is from
12:03  23  whom to whom?
12:03  24        THE WITNESS: Are you looking at
12:03  25  this, Moshe?

Page 62

12:03  1        MR. MORTNER: Yes, I'm looking at
12:03  2  it.
12:03  3        THE WITNESS: The 1987 is an e-mail
12:03  4  from whom to whom? I don't understand
12:03  5  e-mails like this. Well, when you see a
12:03  6  date, who sends this e-mail, the guy on
12:03  7  the top or the guy on the bottom?
12:03  8        MR. MORTNER: This is from you and
12:03  9  this preceded your e-mail.
12:03  10        THE WITNESS: Wait a second. Who
12:03  11  wrote this 1997, the guy on top?
12:03  12        MR. MORTNER: The guy on top.
12:03  13        THE WITNESS: I wrote to him
12:03  14  "Correction 1997," is that what it looks
12:03  15  like.
12:03  16        MR. MORTNER: That's what it
12:04  17  appears to say.
12:04  18  BY MR. STEWART:
12:04  19    A.   I know only 1987 date, 1993 date
12:04  20  and 2010 date. I don't know 1997 date.
12:04  21    Q.   Okay.
12:04  22    A.   I don't know what it is. I can
12:04  23  only speculate. I don't know if speculation is
12:04  24  good.
12:04  25    Q.   Do you see the title at the top of

Page 63

12:04  1  the page? It says "Forward: Typestyle that
12:04  2  looks like Monster"?
12:04  3    A.   Where?
12:04  4    Q.   Just below the gmail --
12:04  5    A.   "Forward: Typestyle that looks
12:04  6  like Monster."
12:04  7    Q.   Do you know what that is a
12:04  8  reference to?
12:04  9    A.   Again, there is so many e-mails
12:04  10  between us, I I'm not sure exactly. But I know
12:04  11  we once communicated about typestyles that, you
12:04  12  know, before 1993 and in 1987 that there were
12:04  13  already fonts and typestyles that looked like a
12:05  14  scratch design, like a monster scratch design.
12:05  15    Q.   Okay.
12:05  16    A.   So I don't know who put that in. I
12:05  17  don't remember putting it in. I can only
12:05  18  imagine speculate. But I know that we discuss
12:05  19  the fact that it was a typestyle -- like the
12:05  20  3DL green lines, that there were typestyles
12:05  21  like it way before, way before the plaintiff
12:05  22  used it, way before we used it. There were
12:05  23  typestyles on the web that you could take and
12:05  24  copy. So nobody really created the font and
12:05  25  those typestyles.

Page 64

12:05  1    Q.   And why were you interested in
12:05  2  learning about typestyles that predated Monster
12:05  3  Energy and Consolidated?
12:05  4    A.   Because when this lawsuit came
12:05  5  about, you know, and plaintiff was claiming
12:05  6  that it created those marks, and we knew that
12:06  7  not to be true. So we looked into it. And we
12:06  8  found other marks, typestyles that look exactly
12:06  9  like plaintiff claims it created.
12:06  10    Q.   So is it your understanding that
12:06  11  under the trademark law a trademark owner could
12:06  12  not use an old typestyle as his trademark?
12:06  13    A.   First of all, I am not here as a
12:06  14  trademark law expert. And I am not here to
12:06  15  give you legal advice. I am not a trademark,
12:06  16  patent or copyright lawyer to give you legal
12:06  17  advice, but -- so I don't know whether it is
12:06  18  appropriate.
12:06  19    Q.   I'm just trying to understand what
12:06  20  motivated Consolidated to make the decisions
12:06  21  that it made?
12:06  22    A.   What decision?
12:06  23    Q.   That would be the decision to go
12:06  24  forward and use the trademark shown in Exhibit
12:06  25  1.

16 (Pages 61 to 64)

Page 65

12:06 1   A.   Where is Exhibit 1?
12:06 2   Q.   Exhibit 1 was the colored 3DL --
12:07 3   A.   The colored --
12:07 4        MR. MORTNER:  Wait.  There is no
12:07 5   question.
12:07 6   Q.   So one thing that would help me
12:07 7   understand that is to understand what
12:07 8   Consolidated believed its lawful rights to be.
12:07 9   And so I'm asking whether Consolidated believed
12:07 10  that it was lawful to use any pre-existing
12:07 11  typestyle that it could find even if somebody
12:07 12  else was claiming it as a trademark?
12:07 13  A.   I really don't understand that
12:07 14  question.
12:07 15       MR. MORTNER:  Are you asking
12:07 16  whether it would have been -- whether he
12:07 17  thinks it would have been lawful in 2010
12:07 18  for Consolidated to have begun using a
12:07 19  mark based upon the existing font even
12:07 20  though it may confusingly similar to
12:07 21  Monster's font.
12:07 22       MR. STEWART:  That's the --
12:07 23       MR. MORTNER:  That's a hypothetical
12:07 24  question because he's testified that the
12:07 25  marks they were using was in existence in

Page 66

12:08 1   1993.
12:08 2        MR. STEWART:  Well, he testified
12:08 3   that a variation of the mark was in
12:08 4   existence in 1993.  We obviously dispute
12:08 5   what the legal consequence of that is.
12:08 6        MR. MORTNER:  So answer the
12:08 7   question.  Do you understand now?
12:08 8        THE WITNESS:  No.  Now I'm a little
12:08 9   more confused.
12:08 10  BY MR. STEWART:
12:08 11  Q.   So the question came up because you
12:08 12  mentioned that you had looked at typestyles of
12:08 13  the letter M that predated Monster --
12:08 14  A.   It wasn't a letter M.
12:08 15  Q.   Of many letters.
12:08 16  A.   It wasn't many letters.  It was
12:08 17  various green lines and claw mark, scratch mark
12:08 18  and various iguana marks that we were using.
12:08 19  And we were looking to see if there was any
12:08 20  pre-existing fonts available on the web free of
12:08 21  charge to anyone who wants to use it.
12:08 22  Q.   And is it your understanding that
12:08 23  if a font is available on the web free of
12:08 24  charge to anyone who wants to use it, then
12:09 25  everyone is free to use that as their own

Page 67

12:09 1   trademark?
12:09 2   A.   Not the font itself, but it can
12:09 3   make a design with that font.  And if it
12:09 4   doesn't infringe on anybody else's mark, then
12:09 5   they are allowed to use it.  If they are the
12:09 6   first user in particularly channels of trade in
12:09 7   a particular of business, they are allowed to
12:09 8   use it.  That is the concept of trademarks.
12:09 9   It's Trademark Law 101.
12:09 10  Q.   That is correct.
12:09 11  A.   Thank you.
12:09 12  Q.   Did you want to take a break now?
12:09 13  You mentioned you are getting tired.
12:09 14  A.   It is okay.
12:09 15  Q.   If you are okay to keep going --
12:09 16  A.   I don't know if I'm better off
12:09 17  continuing while I can, because I am getting a
12:09 18  little dizzy.  And sometimes when you get a
12:09 19  little dizzy it is better off continuing what
12:09 20  you're doing or take a break now.  But I'm
12:09 21  on -- my medications are getting to me.
12:10 22       THE WITNESS:  What time is it now?
12:10 23       MR. MORTNER:  12:08.
12:10 24       (Discussion held off the record.)
12:10 25       THE VIDEOGRAPHER:  12:10 off the

Page 68

12:10 1   record.  End of DVD 1.
12:10 2        (Whereupon a lunch break was
12:53 3   taken.)
12:53 4        THE VIDEOGRAPHER:  12:53 on the
12:53 5   record.  Beginning of DVD 2.
12:53 6        (Discussion held off the record.)
12:53 7        MR. STEWART:  Let the record
12:53 8   reflect that the witness generously
12:53 9   ordered lunch for the group.
12:53 10  A.   Say it to the microphone.  Now I
12:53 11  take it as a compliment.
12:53 12  BY MR. STEWART:
12:53 13  Q.   Okay.  I'd like to show you a
12:53 14  document that I'd like the reporter to mark as
12:53 15  Exhibit 99.
12:53 16       (Whereupon Exhibit 99, E-mail
12:53 17  correspondence, was marked for
12:53 18  identification.)
12:54 19  Q.   Okay.  Is this an e-mail from you
12:54 20  to Michelle Amar?
12:54 21  A.   It looks like it, yes.
12:54 22  Q.   Okay.  And in the first sentence of
12:54 23  the e-mail you wrote "Last week you again
12:54 24  confirmed to me in your e-mail that the dates
12:54 25  of first use of the 3D design is 1993 and 1997,

17 (Pages 65 to 68)

7065eec4-b2f1-4c8b-9b56-9cffeaea27b6

Page 69

12:55  1  amended to the exact present drawing." Do you
12:55  2  see that?
12:55  3      A.   Yes.
12:55  4      Q.   What event in 1997 is being
12:55  5  referred to in here?
12:55  6      A.   I think, but I am not sure -- I
12:55  7  need to see all of the shirts and all of the
12:55  8  marks. But I think in 1997 we had a change to
12:55  9  the name of the city. And maybe -- it is hard
12:55  10 to remember, but I think it was maybe an
12:55  11 addition of the name of a city. We had this
12:55  12 mark with different names of cities, Miami,
12:56  13 Myrtle Beach. And it may have been maybe a
12:56  14 change of the name of a city or it may have --
12:56  15 in 1997 I think that he made the mark a little
12:56  16 wider than the original skinny mark of 1993,
12:56  17 which we referred to as the 1993 skinny mark,
12:56  18 closer to how it looked in 2010.
12:56  19         But even when he made these slight
12:56  20 changes, he always kept and he always kept
12:56  21 using the 1993 mark. He never relinquished it,
12:56  22 never abandoned it, never stopped using the
12:56  23 1993 mark.
12:56  24         But he also had slightly different
12:56  25 variations also, particularly different names

Page 70

12:56  1  of cities, where he was marketing --
12:57  2          THE WITNESS:  Who is this?  Come on
12:57  3  in.  This is Menachem, my partner, who is
12:57  4  worried that we don't have enough drinks
12:57  5  over here.  So he called long distance.
12:57  6          MR. STEWART:  Let's go off the
12:57  7  record.
12:57  8          THE VIDEOGRAPHER:  12:57 off the
12:57  9  record.
12:58  10         (Discussion held off the record.)
12:58  11         THE VIDEOGRAPHER:  12:58 on the
12:58  12 record.
12:58  13 BY MR. STEWART:
12:58  14     Q.   Do you want to continue with your
12:59  15 answer?
12:59  16     A.   I think I am finished with my
12:59  17 answer.  Did you understand my answer?
12:59  18     Q.   Yes, I understood your answer.
12:59  19         Now, you had mentioned in your
12:59  20 answer that Yosef Amar had been using the
12:59  21 skinny mark, the 1993 mark, continuously up
12:59  22 until the present time?
12:59  23     A.   That is correct.
12:59  24     Q.   And how do you know that to be
12:59  25 true?

Page 71

12:59  1      A.   How do I know that to be true?
12:59  2  Because since we got involved I've always seen
12:59  3  it in the marketplace.  I've always seen it
12:59  4  until this issue.  I've always seen it, the
12:59  5  skinny mark, as well as the fat mark.
12:59  6      Q.   How do you know from 1993 to 2010
12:59  7  that Mr. Amar was always using the skinny mark?
12:59  8      A.   Because he told us.  He showed us.
12:59  9  When we got into this together he was giving us
13:00  10 details.  He was telling us that he was using
13:00  11 it.  I know it from him.
13:00  12     Q.   You know it from him?
13:00  13     A.   Yes.
13:00  14     Q.   Did he show you any documents to --
13:00  15     A.   He showed me shirts.
13:00  16     Q.   He showed you shirts.  Okay.  And
13:00  17 did he tell you that those were old shirts?
13:00  18     A.   Yes.  He showed me shirts that he
13:00  19 was using in 1993 and '94, '95 and throughout
13:00  20 the years.
13:00  21     Q.   Do you know where those shirts are?
13:00  22     A.   Joe Cool has them.
13:00  23     Q.   Okay.
13:00  24     A.   I think that you seized -- the
13:00  25 plaintiff seized all of those.  The plaintiff

Page 72

13:00  1  also destroyed some of those I believe.
13:00  2      Q.   Going back to the e-mail that's
13:00  3  Exhibit number 99?
13:00  4      A.   Please show it to me.  Yes.
13:00  5      Q.   In this e-mail you mention to
13:00  6  Michelle Amar concerns about fraud and perjury.
13:01  7  Do you see that?
13:01  8      A.   Yes.
13:01  9      Q.   Do you know what prompted you to
13:01  10 send this e-mail to Ms. Amar?
13:01  11     A.   No.
13:01  12     Q.   Do you recall if Ms. Amar was
13:01  13 indicating to you that Joe Cool had not been
13:01  14 using the skinny mark since the 1990s?
13:01  15     A.   No.
13:01  16     Q.   Were you trying to convince Ms.
13:01  17 Amar to tell the Court that Joe Cool was first
13:01  18 using the 3DL mark in 1993?
13:01  19     A.   No.  Only to tell the truth.
13:02  20         (Discussion held off the record.)
13:02  21     A.   I think, as I read it a little
13:02  22 further, I believe to remember that plaintiff
13:02  23 was casting doubt as to Joe Cool's use.  And
13:02  24 plaintiff was, in different ways, threatening
13:02  25 action against Yosef Amar and threaten to do

7065eec4-b2f1-4c8b-9b56-9cffeaea27b6

Page 73

13:02  1   something to him, to kill his business, put him
13:03  2   in jail, which prompted him to send to
13:03  3   plaintiff because of the threats that plaintiff
13:03  4   made to him.  And maybe that was what prompted
13:03  5   me to send this, that they would -- they are
13:03  6   insinuating that -- to back up what they've
13:03  7   done to him.  They're insinuating that he
13:03  8   didn't use these marks on the dates that he
13:03  9   said that he said that he did.
13:03  10        I remember hearing from persons
13:03  11  with different sources that plaintiff was
13:03  12  threatening Joe Amar and threatening his wife.
13:03  13  And his wife almost had a heart attack and a
13:03  14  seizure.  She didn't want to go through
13:03  15  anything else.  And they were forced into a
13:03  16  settlement because under threat that the worst
13:03  17  things will happen to them.
13:03  18        Maybe that's what prompted me to
13:04  19  send this.
13:04  20    Q.   How did you first learn of the 3DL
13:04  21  trademark?
13:04  22    A.   From Joe Amar.
13:04  23    Q.   From Joe Amar.  What were the
13:04  24  circumstances of that?
13:04  25    A.   I don't know what you mean, the

Page 74

13:04  1   circumstances.
13:04  2     Q.   Why did he show you the 3DL mark?
13:04  3     A.   Because he showed it to me to get
13:04  4   my opinion regarding various people who were
13:04  5   counterfeiting his mark, infringing on his
13:04  6   mark.
13:04  7          And then after talks with Menachem
13:04  8   it particularly evolved into a situation where
13:04  9   we decided to go into a partnership, basically
13:05  10  his interest was that we would help him advance
13:05  11  the course of this mark, help him with the
13:05  12  marketing, with financing and with protection.
13:05  13    Q.   Do you remember any of the
13:05  14  infringers that Mr. Amar identified?
13:05  15    A.   No, I don't remember now.  But
13:05  16  there were infringers of his mark.
13:05  17    Q.   Did he show you infringing samples?
13:05  18    A.   Yes, he did.
13:05  19    Q.   Okay.  When you first met with Mr.
13:05  20  Amar, did he ask you for any advice regarding
13:05  21  whether the 3DL trademark infringed the Monster
13:05  22  Energy M claw trademark?
13:05  23    A.   No.  It was the other way around.
13:05  24  He did show me the mark and he said there was
13:05  25  some company that started to use the mark very

Page 75

13:06  1   recently on clothing in 2010 and asked whether
13:06  2   it was infringing on his mark.
13:06  3     Q.   And that company turned out to be
13:06  4   Monster Energy?
13:06  5     A.   Yes.
13:06  6     Q.   Did Mr. Amar ask you whether it was
13:06  7   permissible for him to continue to use his own
13:06  8   3DL mark under those circumstances?
13:06  9     A.   No.  He asked me whether it was
13:06  10  permissible for Monster Energy to continue
13:06  11  using that mark.
13:06  12    Q.   Let me show you a document that I
13:06  13  will ask the reporter to mark as Exhibit 100?
13:06  14        (Whereupon Exhibit 100,
13:06  15  Defendant David Baksht's Response to
13:06  16  Plaintiff's First Set of Interrogatories
13:07  17  (Nos. 1-19), was marked for
13:07  18  identification.)
13:07  19    Q.   I'd like you to turn to page eight.
13:07  20    A.   Page?
13:07  21    Q.   Eight.
13:07  22    A.   Okay.
13:07  23    Q.   And you will see there is an
13:07  24  Interrogatory No. 2?
13:07  25    A.   Okay.

Page 76

13:07  1     Q.   And it says "Describe the
13:07  2   circumstances surrounding your first awareness
13:07  3   of Plaintiff's Claw Icon," and it goes from
13:07  4   there.  And in response, Consolidated had
13:07  5   responded that "Defendant's first awareness of
13:07  6   Plaintiff's Claw Icon occurred in or about
13:07  7   April 2010.  Yosef Amar contacted David Baksht
13:07  8   and said he was producing and using a mark
13:07  9   since 1993 and there is a company using a
13:08  10  similar mark on an energy drink, and asked
13:08  11  whether, in Baksht's opinion, he could continue
13:08  12  to use his mark on T-shirts.  The energy drink
13:08  13  was Monster Energy."  Does that sound accurate
13:08  14  to you?
13:08  15    A.   Yeah, accurate.
13:08  16    Q.   That sounds different to me than
13:08  17  what you just mentioned earlier.
13:08  18    A.   This was no question that Joe Cool
13:08  19  was using this mark from 1993.  So our opinion
13:08  20  was, first of all, that there was no
13:08  21  infringement.  It didn't look similar enough to
13:08  22  be infringing on each other.  But if there was
13:08  23  any similarity, any likelihood of confusion,
13:08  24  then they have to cease -- Monster Energy has
13:08  25  to cease because Joe Cool is the prior user.

7065eec4-b2f1-4c8b-9b56-9cffeaea27b6

Page 77

13:08  1    So I don't know if he asked me
13:08  2  first or I asked him first. I don't know what
13:08  3  you're insinuating, what you're getting at.
13:09  4    Q.   When I read the response to
13:09  5  Interrogatory No. 2 it seems like the concern
13:09  6  was whether or not Mr. Amar would be permitted
13:09  7  to use his trademark.
13:09  8    A.   He didn't need any permission to
13:09  9  use his mark because he was probably using it
13:09  10  from 1993. So the question was are the marks
13:09  11  similar enough? Is there a likelihood
13:09  12  confusion of between the marks? And if there
13:09  13  is, who is the prior user. Those are the
13:09  14  questions.
13:09  15    Since he was the prior user and if
13:09  16  there was any likelihood of confusion, then the
13:09  17  junior user must cease. So the question was
13:09  18  whether he can continue to use some mark.
13:10  19  There are some semantics involved here. There
13:10  20  is no question that he could continue to use
13:10  21  his mark. The question was is he going to have
13:10  22  a problem with his company. Because as it is
13:10  23  probably known to you and most likely known in
13:10  24  the marketplace, that big companies try to do
13:10  25  hostile takeover of small companies, of little

Page 78

13:10  1  companies, trademarks that are used before the
13:10  2  big companies started to use theirs. They just
13:10  3  file a over massive lawsuit and do a hostile
13:10  4  take over.
13:10  5    This is what his concern was, is
13:10  6  this big company going to try to do a hostile
13:10  7  over of my trademark, because it's a very big
13:10  8  company, a very well to do company, a
13:10  9  deep-pocketed company, and they are the junior
13:10  10  users. But are they going to try to pull one
13:10  11  of their so-called schticks like they did in
13:10  12  the marketplace and am I going to have a
13:10  13  problem with this company. And sure enough, he
13:10  14  did have a problem, his company tried to and
13:11  15  was successful in a way to do a hostile
13:11  16  takeover of the trademark. A junior user is
13:11  17  involved in a hostile takeover and he loses his
13:11  18  mark. That's what this case is about.
13:11  19    And he was concerned from the
13:11  20  beginning because he was savvy enough or smart
13:11  21  enough or, you know, whatever enough, to see
13:11  22  that a thing like this can happen. So he asked
13:11  23  and he said, There is no doubt in our mind,
13:11  24  based on the information that you are telling
13:11  25  us, that you have prior use and you have prior

Page 79

13:11  1  rights and you can continue to use the mark.
13:11  2  But we didn't even see they was similar enough
13:11  3  to cause confusion. But if there was one, he
13:11  4  was the senior user.
13:11  5    Q.   Okay. Now, during that initial
13:11  6  meeting did Mr. Amar explain to you that there
13:11  7  was a 1993 version of the mark and a 2010
13:11  8  version of the mark?
13:11  9    A.   Yes.
13:12  10    Q.   And you reached the conclusion and
13:12  11  recommended to him that the 1993 mark provided
13:12  12  him with priority over Monster Energy?
13:12  13    A.   Yes, because it was basically a
13:12  14  nonmaterial change.
13:12  15    Q.   Okay. And?
13:12  16    A.   It is called in the trademark
13:12  17  profession a nonmaterial change. He took the
13:12  18  skinny mark and enlarged it a little bit, it is
13:12  19  basically the same mark. And I think that your
13:12  20  CEO claims the same thing as us, your CEO of
13:12  21  the plaintiff.
13:12  22    Q.   I heard you.
13:12  23    A.   Claims is what I'm saying now was
13:12  24  the skinny mark and the fat mark are basically
13:12  25  the same. And, therefore, it gives -- and,

Page 80

13:12  1  therefore, if the skinny mark is used since
13:12  2  1993 you could fairly say that the fat mark is
13:13  3  also a 1993 trademark as to the date of this
13:13  4  use. This is according to your -- this is in
13:13  5  line with your with the plaintiff's CEO
13:13  6  deposition.
13:13  7    Q.   Okay.
13:13  8    A.   And, therefore, the user, the CEO
13:13  9  user of the skinny mark, can stop any
13:13  10  subsequent junior company from using the skinny
13:13  11  mark, from stopping the junior user's use of a
13:13  12  mark that the junior user claims is similar to
13:13  13  the 1993 mark, to the 1993 3DL mark.
13:13  14    The plaintiff itself claims that
13:13  15  their mark is very similar, may cause a
13:13  16  likelihood of confusion with a skinny mark or
13:13  17  vice versa. And, therefore, plaintiff claims
13:14  18  that the marks are the same. And, therefore,
13:14  19  whoever is the prior user should stay there and
13:14  20  the junior user should give it away. Justice
13:14  21  will prevail.
13:14  22    Q.   Now, when you advised Mr. Amar that
13:14  23  there was no likelihood of confusion between
13:14  24  the marks, were you comparing the Monster mark
13:14  25  to the skinny mark or the Monster mark to the

20 (Pages 77 to 80)

Page 81

| | | |
|---|---|---|
| 13:14 | 1 | fatter mark or both? |
| 13:14 | 2 | MR. MORTNER: Objection. I don't |
| 13:14 | 3 | think he testified to that. |
| 13:14 | 4 | MR. STEWART: I sure thought he |
| 13:14 | 5 | did. |
| 13:14 | 6 | MR. MORTNER: No likelihood of |
| 13:14 | 7 | confusion? |
| 13:14 | 8 | THE WITNESS: What? |
| 13:14 | 9 | BY MR. STEWART: |
| 13:14 | 10 | Q. Did you testify earlier that you |
| 13:14 | 11 | advised Mr. Amar that you felt there was no |
| 13:14 | 12 | likelihood of confusion between the Monster |
| 13:14 | 13 | Energy mark and Mr. Amar's mark? |
| 13:14 | 14 | A. Yes. |
| 13:14 | 15 | Q. Okay. And by Mr. Amar's mark -- |
| 13:15 | 16 | A. No. That is according to Mr. Amar, |
| 13:15 | 17 | not Amar. |
| 13:15 | 18 | Q. Amar. |
| 13:15 | 19 | A. Own answers at the preliminary |
| 13:15 | 20 | injunction hearing and according to the judge's |
| 13:15 | 21 | own analysis of the case, there is no |
| 13:15 | 22 | likelihood of confusion between the two marks. |
| 13:15 | 23 | Q. And I'm asking you what transpired |
| 13:15 | 24 | between you and Mr. Amar when he first showed |
| 13:15 | 25 | you the 3DL mark. I know that the court has |

Page 82

| | | |
|---|---|---|
| 13:15 | 1 | had some ruling since that time but I'm not |
| 13:15 | 2 | focusing on those rulings at this point during |
| 13:15 | 3 | the deposition. When you first met with Mr. |
| 13:15 | 4 | Amar about the 3DL mark did you advise him that |
| 13:15 | 5 | you believed there was no likelihood of |
| 13:15 | 6 | confusion between the 3DL mark and the Monster |
| 13:15 | 7 | Energy mark? |
| 13:15 | 8 | A. Yes. |
| 13:15 | 9 | Q. And did your advice pertain to the |
| 13:15 | 10 | skinny mark or to the fat mark or to both |
| 13:16 | 11 | marks? |
| 13:16 | 12 | A. To each mark. Particularly the |
| 13:16 | 13 | skinny mark, but also to the fat mark. And I'm |
| 13:16 | 14 | not sure whether, when you say mark, what you |
| 13:16 | 15 | mean. I'm not sure whether you're talking the |
| 13:16 | 16 | technical definition of a mark or the |
| 13:16 | 17 | everyday -- you know, the everyday man's |
| 13:16 | 18 | definition of the mark. I'm not sure the |
| 13:16 | 19 | lawyer or legal definition of the mark. When |
| 13:16 | 20 | you say mark, what do you mean? |
| 13:16 | 21 | Q. I'm just identifying the thing? |
| 13:16 | 22 | A. Was a mark? I'm asking you, what |
| 13:16 | 23 | is a mark? Just to understand, not to put you |
| 13:16 | 24 | to the test, but just to understand what you |
| 13:16 | 25 | mean by a mark. |

Page 83

| | | |
|---|---|---|
| 13:16 | 1 | Q. It is a symbol used by a company to |
| 13:16 | 2 | identify its goods. |
| 13:16 | 3 | A. What? |
| 13:16 | 4 | Q. A symbol used by a company to |
| 13:16 | 5 | identify its good. |
| 13:16 | 6 | A. That is not the definition of it. |
| 13:17 | 7 | It may be a definition at a certain level. I'm |
| 13:17 | 8 | not trying to put down what you're saying. |
| 13:17 | 9 | What you're saying is correct to a certain |
| 13:17 | 10 | level. |
| 13:17 | 11 | But when I say mark when I do an |
| 13:17 | 12 | analysis and I consider marks, comparison to |
| 13:17 | 13 | marks, I give it a different definition. A |
| 13:17 | 14 | mark is not just the symbol that you're |
| 13:17 | 15 | showing, it is a symbol as applied to the good |
| 13:17 | 16 | as applied to certain channels of trade. It |
| 13:17 | 17 | applies to many factors that are involved. And |
| 13:17 | 18 | when you take the many factors, such as the |
| 13:17 | 19 | DuPont factors into consideration, that's when |
| 13:17 | 20 | you consider the mark a likelihood of |
| 13:17 | 21 | confusion. Not just the green lines is similar |
| 13:17 | 22 | to another green line. |
| 13:17 | 23 | First of all, the markings are |
| 13:17 | 24 | different in that sense as well. But you have |
| 13:17 | 25 | to take the DuPont factors into consider. The |

Page 84

| | | |
|---|---|---|
| 13:17 | 1 | judicial definition of likelihood of confusion, |
| 13:17 | 2 | if you will. |
| 13:17 | 3 | Q. Yes. |
| 13:17 | 4 | A. And so if you're asking me in that |
| 13:17 | 5 | sense what the judicial, you know, about the |
| 13:17 | 6 | definition, the technical real definition of |
| 13:18 | 7 | what a trademark is, in my opinion there was no |
| 13:18 | 8 | likelihood of confusion. I am not talking |
| 13:18 | 9 | about certain colors, certain lines. The |
| 13:18 | 10 | totality total of what this mark is used for |
| 13:18 | 11 | and how it's used as compared to the other |
| 13:18 | 12 | mark, there was no likelihood of confusion in |
| 13:18 | 13 | my opinion. |
| 13:18 | 14 | Q. Okay. And all -- |
| 13:18 | 15 | A. As to both marks. An independent |
| 13:18 | 16 | opinion about the skinny mark and an |
| 13:18 | 17 | independent opinion on the 2010 mark. An |
| 13:18 | 18 | independent opinion on the 1993 Joe Cool 3DL |
| 13:18 | 19 | mark and an independent opinion on the 2010. |
| 13:18 | 20 | In total, when you compare the marks in total |
| 13:18 | 21 | by the real technical definition, in my opinion |
| 13:18 | 22 | there was no likelihood of confusion. |
| 13:18 | 23 | Q. Okay. |
| 13:18 | 24 | A. And if anybody tells you |
| 13:18 | 25 | differently they are slightly wrong, maybe a |

7065eec4-b2f1-4c8b-9b56-9cffeaea27b6

Page 85

13:18  1   lot.
13:18  2       Q.    And in performing your likelihood
13:18  3   of confusion analysis, did you take into
13:19  4   account fame of the Monster Energy mark?
13:19  5       A.    It's got -- it did not -- fame --
13:19  6   you will have to ask you question a little
13:19  7   more precisely what you mean by fame.
13:19  8       Q.    The strength of the trademark.
13:19  9       A.    Oh, the strength of the trademark?
13:19 10   Well, at that time I didn't really know exactly
13:19 11   the strength of the trademark.  But it didn't
13:19 12   matter so much as compared to the other
13:19 13   elements that didn't match.  And there are
13:19 14   certain criteria.  The DuPont factors are not
13:19 15   relevant, then the others don't matter.
13:19 16           But even today when I know the
13:19 17   strength of -- what I know better, now
13:19 18   precisely, what I know better the strength of
13:19 19   plaintiff's mark, I still see no likelihood of
13:20 20   confusion, if you take the DuPont factors into
13:20 21   consideration.
13:20 22       Q.    So comparing the 2010 3DL mark to
13:20 23   the Monster Energy M claw mark, what DuPont
13:20 24   factors do you feel weigh in favor of finding
13:20 25   of no likelihood of confusion?

Page 86

13:20  1       A.    Well, it depends.  I have to know
13:20  2   what mark you are speaking of.  And secondly,
13:20  3   you're asking me for an expert opinion now and
13:20  4   I am not here as an expert witness.  You have
13:20  5   to hire an expert witness to come and testify
13:20  6   because I am not that person right now.  I am
13:20  7   only here as a fact witness, not as a
13:20  8   speculative expert witness.
13:20  9       Q.    But you -- when you spoke with Mr.
13:20 10   Amar you did apply the full panoply of DuPont
13:20 11   factors to reach your conclusion?
13:21 12       A.    That's not what I said to you.
13:21 13       Q.    Well, I'm asking.
13:21 14       A.    I said to you if you take those
13:21 15   factors into consideration.  I did not say to
13:21 16   you that I took all those factors.  That's not
13:21 17   what I said.
13:21 18       Q.    Okay.
13:21 19       A.    I said if you take the DuPont
13:21 20   factors into consideration, in my opinion there
13:21 21   is no likelihood of confusion.  I stand by it
13:21 22   and I challenge any expert who says
13:21 23   differently, even if he gets paid $130,00, your
13:21 24   expert, it is incorrect.
13:21 25       Q.    What factors did you apply when you

Page 87

13:21  1   were advising Mr. Amar that there was no
13:21  2   likelihood of confusion between the 2010
13:21  3   mark --
13:21  4       A.    I don't remember exactly now what
13:21  5   factors.  But at the time I looked at it I
13:21  6   conducted the opinion that I did.
13:21  7       Q.    Okay.  Did you ever reconsider the
13:21  8   advice that you gave Mr. Amar?
13:21  9       A.    No.
13:21 10       Q.    Did you --
13:22 11       A.    In what sense?
13:22 12       Q.    Did you ever begin to think that
13:22 13   the 3DL mark might infringe the M claw mark?
13:22 14       A.    I don't know which marks you are
13:22 15   talking about.
13:22 16       Q.    I'm referring to the 2010 3DL mark
13:22 17   and the Monster Energy M claw mark.
13:22 18       A.    Whether they were infringing or
13:22 19   not?
13:22 20       Q.    Did you ever begin to think that
13:22 21   the 3DL mark might actually infringe the M claw
13:22 22   mark?
13:22 23       A.    No.  I had asked him whether the M
13:22 24   claw mark was infringing on the 3DL mark, but
13:22 25   even then I had my doubts.

Page 88

13:22  1           So until plaintiff brought this
13:22  2   action in this instant case we weren't going to
13:22  3   file an action against the plaintiff.  We
13:22  4   didn't see any infringement.  We didn't see any
13:22  5   likelihood of confusion in the marketplace.
13:22  6   And that is a test, a very good test, a very
13:22  7   good indication the likelihood of confusion of
13:22  8   whether there is any real confusion.  We didn't
13:23  9   see any real confusion.
13:23 10       Q.    Let me show you what I'll ask the
13:23 11   reporter to mark as Exhibit 101.
13:23 12           (Whereupon Exhibit 101, E-mail
13:23 13       correspondence, was marked for
13:23 14       identification.)
13:23 15       A.    Okay.
13:23 16       Q.    Okay.  I'd like you to focus on the
13:23 17   bottom half of the e-mail where it says "On
13:23 18   Monday, March 7, 2011 at 1:18 p.m.,
13:23 19   davidlipsker@gmail.com wrote."  Do you see
13:23 20   that?
13:23 21       A.    David Lipsker did not write.  David
13:23 22   Lipsker is an address.  And please don't try
13:23 23   to --
13:23 24       Q.    That's why I specifically --
13:24 25       A.    I would appreciate it if you

7065eec4-b2f1-4c8b-9b56-9cffeaea27b6

Page 89

13:24  1  don't -- I'm under medication.  I have a
13:24  2  little -- I feel a little nauseous.  I'm trying
13:24  3  to do my best in order to get this done in the
13:24  4  spirit of the Court Order.
13:24  5       Q.   Yes.
13:24  6       A.   And when you say David Lipsker
13:24  7  wrote this, I told you David Lipsker is an
13:24  8  address.  David Lipsker did not write this.
13:24  9       Q.   Well, that's why I said
13:24 10  davidlipsker@gmail.com.  I was specifically
13:24 11  trying to be respectful.
13:24 12       A.   Davidlipsker@gmail.com did not
13:24 13  write this.  It is written from this address.
13:24 14  It is a physical e-mail address.  This is all
13:24 15  that this is, an e-mail address.
13:24 16       Q.   Well, let me ask you:  Did you
13:24 17  write this e-mail?
13:24 18       A.   It could be, probably.  I'm looking
13:24 19  at it.  I don't recognize every e-mail that I
13:24 20  wrote, you know, that I personally wrote.
13:24 21  There are also other people in this office, not
13:24 22  just me, using that e-mail.  That e-mail is a
13:24 23  business e-mail.  Other people have access to
13:24 24  that e-mail.  So I am not the only person who
13:24 25  wrote it.  I'm trying to read this.  I'm trying

Page 90

13:24  1  to do my best under the circumstances to try to
13:25  2  read and refresh my memory.  There are
13:25  3  thousands and thousands of e-mails.  And you're
13:25  4  giving me one mail and saying, Do you remember
13:25  5  this?  I'm trying to refresh my memory.  I'm
13:25  6  trying to do the best I can.
13:25  7       Q.   Okay.  I appreciate that.
13:25  8       A.   So what is the question?
13:25  9       Q.   Well, the first question was:  Is
13:25 10  this an e-mail that you wrote?
13:25 11       A.   Is this an e-mail?  I don't know.
13:25 12  I am not sure.  But as I look at it a little
13:25 13  more, I will try to recall.  But it does say
13:25 14  davidlipsker@gmail.com, which is our e-mail
13:25 15  here.
13:25 16       Q.   Yes.
13:25 17       A.   And obviously no one falsified any
13:25 18  records.  And I imagine that if you didn't and
13:25 19  if we didn't, then this possibly came from here
13:25 20  most likely, I am presuming.  But whether I
13:25 21  physically personally wrote it or not, I'm
13:25 22  trying to recall.  But if you tell me -- why am
13:26 23  I holding this?  If you tell me what the
13:26 24  question is a little more precisely, I will try
13:26 25  to zoom in and see if I can recall this.

Page 91

13:26  1       Q.   Well, what I'm looking at now are
13:26  2  the third and fourth lines.
13:26  3       A.   Where it says what?
13:26  4       Q.   Where it says "Ours is similar to
13:26  5  their M design, but on angle."
13:26  6       A.   "Ours is similar to their M design,
13:26  7  but on angle to right and does not have the
13:26  8  word Monster."  Who is this to sent to?  Did I
13:26  9  send it?  It was sent to Pershes.
13:26 10       First of all, I object to this
13:26 11  e-mail being introduced into this deposition or
13:26 12  into evidence, because it is an e-mail between
13:26 13  this office and our personal attorney who
13:26 14  represented us in the case.  And I strenuously
13:26 15  object to using an e-mail exchanges myself and
13:26 16  our attorneys.  If this is indeed the e-mail
13:26 17  that I sent, and I don't see why not, I think
13:26 18  it is I sent it, I strenuously object to
13:27 19  confidential information between me and my
13:27 20  attorney, this office and our attorney at the
13:27 21  time.  It shouldn't be introduced into the
13:27 22  public record.  This is outrageous.
13:27 23       Q.   Well, this is a document that was
13:27 24  produced by your counsel to us.
13:27 25       A.   Under protest and under objections.

Page 92

13:27  1       Q.   Well, it was produced by your
13:27  2  counsel to ours.  And Mr. Pershes has denied
13:27  3  under oath that he was your counsel.
13:27  4       A.   He could deny many things under
13:27  5  oath, but I have a retainer agreement with the
13:27  6  attorney, a signed retainer agreement.
13:27  7       Q.   That was not produced to us.
13:27  8  Several unsigned retainer agreements were
13:27  9  produced to us.
13:27 10       A.   I have a signed, a blue ink signed
13:27 11  retainer agreement that he signed.  You should
13:27 12  know this.  And if you will ask Moshe, maybe he
13:27 13  will send it to you.
13:27 14       MR. STEWART:  Do you have a signed
13:27 15  retainer agreement with Bob Pershes?
13:27 16       MR. MORTNER:  I think we produced
13:27 17  it.  I think we -- I don't know -- I would
13:28 18  expect that we produced.  But if not, as a
13:28 19  backup I think we did include it as an
13:28 20  exhibit in the Motion to Vacate Default.
13:28 21       MR. STEWART:  I have not seen
13:28 22  anything signed by both parties.
13:28 23       THE WITNESS:  I have it in blue
13:28 24  ink.
13:28 25       MR. MORTNER:  I think the one I

23 (Pages 89 to 92)

7065eec4-b2f1-4c8b-9b56-9cffeaea27b6

Page 93

13:28 1    showed you was signed by Mr. Pershes only.
13:28 2        THE WITNESS: It was signed by him
13:28 3    and us. It was in blue ink.
13:28 4        MR. MORTNER: I don't think I
13:28 5    produced what was signed by Mr. Baksht.
13:28 6        (Discussion held off the record.)
13:28 7    Q.    I'm relying on the documents, the
13:28 8    few documents that were produced to us in this
13:29 9    litigation.
13:29 10   A.    So what are you saying? This is
13:29 11   advice that I'm giving our own attorney. I'm
13:29 12   giving him advice how to get the seizure back,
13:29 13   how to get the seizure reversed.
13:29 14       MR. MORTNER: Let's wait for a
13:29 15   question.
13:29 16       THE WITNESS: What?
13:29 17       MR. MORTNER: Wait for a question.
13:29 18   BY MR. STEWART:
13:29 19   Q.    I want to focus on the next line
13:29 20   where it says "It may be infringing, but not
13:29 21   counterfeit." Do you see that?
13:29 22   A.    Yes.
13:29 23   Q.    Is that advice that you were giving
13:29 24   to Mr. Pershes that --
13:29 25   A.    No, that is not the advice. What

Page 94

13:29 1    this is meant to say is that even if it's --
13:29 2    even if contrary to facts and contrary to law,
13:29 3    assuming innuendo, and again, contrary to facts
13:29 4    and contrary to law that it is infringing, it
13:29 5    is not still counterfeiting. I'm trying to
13:29 6    make the point the difference between
13:29 7    counterfeiting and infringement. On that date
13:29 8    and that date in court there was a question
13:29 9    whether it was counterfeit or not. And it is
13:29 10   absolutely positively by no stretch of the
13:30 11   imagination, by no stretch of any imagination
13:30 12   of any definition could it be categorized as
13:30 13   counterfeit. No matter what it was not
13:30 14   counterfeit.
13:30 15       I was trying to make a point to him
13:30 16   that even assuming innuendo and contrary to
13:30 17   fact and contrary to law it is found to be
13:30 18   infringing plaintiff still conducted an illegal
13:30 19   seizure because it is not counterfeit. Nobody
13:30 20   would make the argument that it is counterfeit.
13:30 21   That's what I was trying to impress on. And
13:30 22   this is what I do, I tell -- I counsel lawyers
13:30 23   on these cases. And then it goes into --
13:31 24       MR. MORTNER: Okay. Do you have a
13:31 25   question?

Page 95

13:31 1        MR. STEWART: I do have another
13:31 2    question.
13:31 3    Q.    Going back to the additional
13:31 4    meeting with Mr. Amar when you discussed the
13:31 5    3DL trademark, did you ever recommend to him
13:31 6    that he consult with a licensed attorney to
13:31 7    give further --
13:31 8    A.    Licensed in what?
13:31 9    Q.    A member of the State bar.
13:31 10   A.    Why would he want to consult with a
13:31 11   member of the State bar?
13:31 12   Q.    I'm asking you if you ever advised
13:31 13   him to consult with a member of the bar
13:31 14   regarding the 3DL trademark?
13:31 15   A.    Regarding what in the 3DL
13:31 16   trademark? I don't understand your question.
13:31 17   Q.    Whether --
13:31 18   A.    Why would he want to consult? He
13:31 19   is a consulting a trademark specialist, a
13:31 20   trademark consultant. What is it -- why would
13:31 21   he want to consult about dishwashing equipment
13:31 22   with a lawyer, a member of the bar? He can
13:31 23   consult with a dishwashing expert. Members of
13:31 24   the bar, they don't understand trademark, most
13:31 25   of them don't, very few of them do.

Page 96

13:31 1    Q.    Okay.
13:31 2    A.    Just remember that trademark
13:32 3    infringement -- the test of trademark
13:32 4    infringement is likelihood of confusion. And
13:32 5    likelihood of confusion is the question of fact
13:32 6    -- the question of law based on the question of
13:32 7    fact.
13:32 8        First you have to change it back?
13:32 9    What does lawyers have to do? He's not a
13:32 10   trademark expert. He's a litigation expert.
13:32 11   He is not a trademark expert.
13:32 12   Q.    So getting back to my question, is
13:32 13   it fair to say you did not recommend to Mr. --
13:32 14   A.    Huh?
13:32 15   Q.    Is it fair to say that you did not
13:32 16   recommend to Mr. Amar that he consult with an
13:32 17   attorney regarding the 3DL?
13:32 18   A.    I don't know.
13:32 19   Q.    Well, did you or did you not?
13:32 20   A.    Maybe Menachem did, Menachem
13:32 21   Schneerson.
13:32 22   Q.    I'm asking you what you did?
13:32 23   A.    That he should consult with an
13:32 24   attorney? No, I didn't.
13:32 25   Q.    Okay. That was all.

24 (Pages 93 to 96)

I'm going to show you a document that was previously marked as Exhibit 73. And I will ask the reporter to mark it as 73 again.

(Whereupon Exhibit 73, Color diagrams of T-shirts, was marked for identification.)

MR. MORTNER: I just want to point out that on this document this has been -- this is not the original form. This is not the original form of which the document was originally created. And it's been redacted by the plaintiff's counsel.

MR. STEWART: That's accurate.

MR. MORTNER: Do you understand that?

THE WITNESS: No. Say it again.

MR. STEWART: There were words on the bottom --

MR. MORTNER: This is a document that had words on it in its original form. It was used originally as an exhibit at Joe Amar's Declaration in Opposition to the Motion For Seizure.

THE WITNESS: Okay.

MR. MORTNER: And what they've done

is they've whited out --

THE WITNESS: It is not accurate.

MR. MORTNER: Yes, it is not an accurate reproduction.

BY MR. STEWART:

Q. Have you ever seen the images shown in this document before?

A. I won't comment on this document because it was --

Q. I'm sorry, I'm asking you to comment on this document.

A. Then I refuse. I am not going to comment on a document that was tampered with. This document was tampered with.

Q. This document is a new document based on an old document.

A. It doesn't matter. But it was tampered with. It was redacted and tampered with. I can't comment on such a document. If you show me a document exactly as it appears without any -- without any changes that you have made on the document, I will comment on it. I can't comment on a document that was doctored.

Q. I made no doctoring on any of the

images.

A. Somebody did.

Q. Nobody made any doctoring to any of the images on this document. I have some questions about the images on this document.

A. But the document itself was changed and, therefore, I cannot comment on it.

Q. You can comment on it. You may wish not to comment. But you are under Court Order to appear in the deposition. And the question is proper and I ask that you answer it. If you refuse to answer it, I will be back here again, not in your house, but in downtown New York or in Florida to take your deposition a second time. Please answer my questions.

A. No, I am not, not on a doctored document. This document is doctored. This document is not an exact reproduction.

MR. MORTNER: Why don't we do this. Ask your question -- let's hear what the question is.

And if you still refuse, we will discuss it.

And I will have words with my client. What is the question?

MR. STEWART: The question is: Has he seen the images in this document before?

BY MR. STEWART:

A. What is the next question too?

Q. The next question will probably be where and when?

A. I don't remember these exact ones. There were so many.

THE WITNESS: Where is the original of this document?

MR. MORTNER: The original was Exhibit A-6 to the Declaration of Joe Amar in Opposition to the Motion For a Preliminary Injunction in This Action.

THE WITNESS: I remember it.

MR. MORTNER: I remember it.

MR. STEWART: That is correct. I will confirm it.

MR. MORTNER: Do you have the pre-marked --

MR. STEWART: I do not have the declaration with me.

MR. MORTNER: Are you all right?

THE VIDEOGRAPHER: 1:37 off the

| | Page 101 |
|---|---|

13:37  1    record.
13:38  2        (Discussion held off the record.)
13:38  3        THE VIDEOGRAPHER:  1:38 on the
13:38  4    record.
13:38  5        THE WITNESS:  Counsel is asking me
13:38  6    to comment on a document that clearly was
13:38  7    doctored with.
13:38  8        MR. MORTNER:  Will you represent
13:38  9    what the words were that were redacted?
13:38  10       MR. STEWART:  Sure, if that will
13:38  11   make progress.  The words at the bottom
13:38  12   were "Designs from 1993."
13:38  13       MR. MORTNER:  That's what was taken
13:38  14   off?  It had words here "Designs from
13:38  15   1993."  And it was an exhibit and it had a
13:38  16   docket number on top from the Federal
13:38  17   Court.
13:38  18       MR. STEWART:  It may have.  That I
13:38  19   don't even know.
13:38  20       THE WITNESS:  So he is not even
13:38  21   sure himself.  That is not right to ask me
13:39  22   to comment on a document that is not the
13:39  23   exact reproduction of the document.  So we
13:39  24   need to do this again and he will produce
13:39  25   the exact documents without anybody having

| | Page 102 |
|---|---|

13:39  1    changed it, we will comment on it.  That's
13:39  2    it.
13:39  3    BY MR. STEWART:
13:39  4        Q.  So you are refusing to answer the
13:39  5    question?
13:39  6        A.  What?
13:39  7        Q.  You are refusing to answer the
13:39  8    question?
13:39  9        A.  Not -- based on a document that was
13:39  10   changed, I wouldn't comment on it.  I cannot
13:39  11   comment.
13:39  12       Q.  Well, I can tell you that the first
13:39  13   person who changed the document was Joseph
13:39  14   Amar.  And nobody knows what it looked like
13:39  15   before Joseph Amar changed the document.  Are
13:39  16   you going to refuse to testify because Joseph
13:39  17   Amar changed the document?
13:39  18       MR. MORTNER:  I don't understand
13:39  19   that question.
13:39  20       A.  I can't speculate.  I am not
13:39  21   speculating.
13:39  22       MR. MORTNER:  Let's take a recess.
13:39  23       THE VIDEOGRAPHER:  The time is 1:40
13:40  24   off the record.
13:40  25       (Whereupon a short break was

| | Page 103 |
|---|---|

13:40  1    taken.)
13:40  2        (Whereupon Exhibit 102, Black
13:40  3    and white diagrams of T-shirts, was marked
14:03  4    for identification.)
14:03  5        THE VIDEOGRAPHER:  2:30 on the
14:03  6    record.  Beginning of DVD 3.
14:03  7        MR. MORTNER:  I just had some
14:03  8    conversations with Mr. Baksht.  And with
14:03  9    all respect, Mr. Baksht, I have noticed
14:03  10   that you testified earlier that you are
14:03  11   taking some drugs and I noticed some of
14:03  12   your mental acuity is not at its peak here
14:03  13   today, because when we were speaking there
14:03  14   were things that I asked him that had been
14:03  15   said just a few minutes and he didn't
14:03  16   have -- he didn't realize it had been said
14:03  17   and didn't recall.  So I just have some
14:04  18   concern.  And I just want it to be on the
14:04  19   record that it is my observation that the
14:04  20   witness is not of the utmost clearest mind
14:04  21   right now.  But why don't we proceed and
14:04  22   see if we can get through this.
14:04  23   BY MR. STEWART:
14:04  24       Q.  All right.  I'd like to ask the
14:04  25   reporter to show you what was marked as Exhibit

| | Page 104 |
|---|---|

14:04  1    102.  And before today had you seen this
14:04  2    document?
14:04  3        THE WITNESS:  This is from my own
14:04  4    printing record?
14:04  5        MR. MORTNER:  Yes.
14:04  6        THE WITNESS:  How can printing be
14:04  7    an exhibit?  There is -- it has no colors.
14:04  8        MR. MORTNER:  Mr. Stewart asked
14:04  9    that it be marked as an exhibit for the
14:04  10   deposition.
14:04  11       THE WITNESS:  That's something that
14:04  12   I am opposed to because he is supposed to
14:04  13   provide us with the documents that he has.
14:04  14   And I didn't go over to see where this
14:05  15   came from.  And I have a problem with it.
14:05  16       A.  But go ahead ask a question.
14:05  17   BY MR. STEWART:
14:05  18       Q.  Have you seen this document before
14:05  19   today?
14:05  20       A.  I don't know.  I may have seen it.
14:05  21   I may not.  But again, you are showing me two
14:05  22   different documents.  You are showing me this
14:05  23   document and you've shown me another document
14:05  24   in color which does not have the wordings on it
14:05  25   and which seems to have been changed.  And I

26 (Pages 101 to 104)

7065eec4-b2f1-4c8b-9b56-9cffeaea27b6

| | Page 105 |
|---|---|

14:05  1   have doubts as to which is the real one.  And I
14:05  2   am hesitant to comment on any document that has
14:05  3   been changed.  And, therefore, if you show me a
14:05  4   document that you haven't changed --
14:05  5        Q.   Let's focus on the document that
14:05  6   your counsel printed out of your computer.
14:05  7   Will that work for you?
14:05  8        A.   I am not sure which document it was
14:05  9   printed from.
14:05  10       Q.   That would be 102.
14:05  11       A.   What?
14:05  12       Q.   Exhibit 102 has been printed from
14:05  13   your computer.  I'm sure your counsel will
14:05  14   verify that.
14:05  15       A.   I will not comment.
14:05  16            MR. STEWART:  Mr. Mortner, can you
14:05  17   please verify that Exhibit 102 is the
14:05  18   document that you printed from Mr.
14:06  19   Baksht's printer?
14:06  20            MR. MORTNER:  It is.
14:06  21       Q.   So do you have a problem with
14:06  22   Exhibit 102?
14:06  23       A.   Yes, I do have a problem.
14:06  24       Q.   What is your problem with 102?
14:06  25       A.   It is not the same exhibit as you

| | Page 106 |
|---|---|

14:06  1   had showed me, exhibit number -- what number is
14:06  2   that?
14:06  3        Q.   The other one is 72.  That's why
14:06  4   we're not talking about 72 anymore because you
14:06  5   had a problem with 72.
14:06  6        A.   Yes.  This is not the exact same
14:06  7   exhibit and I won't comment.
14:06  8        Q.   I know they are not the same
14:06  9   exhibit.  That is why we're relying exclusively
14:06  10  on Exhibit 102 at this point.
14:06  11       A.   I will not comment.
14:06  12       Q.   Why will you not comment on Exhibit
14:06  13  102?
14:06  14       A.   Because it is not the same
14:06  15  document.
14:06  16       Q.   It is not the same document as the
14:06  17  document you described as doctored which --
14:06  18       A.   Yes.
14:07  19            MR. STEWART:  Mr. Mortner, all I'd
14:07  20  like to do is enlist your support here.  I
14:07  21  think there is no basis for the refusal of
14:07  22  the witness to answer the questions.
14:07  23  There is no privilege issue.  There is no
14:07  24  other valid basis for not answering
14:07  25  questions.

| | Page 107 |
|---|---|

14:07  1            MR. MORTNER:  I have not advised
14:07  2        the witness not to answer the question.
14:07  3   BY MR. STEWART:
14:07  4        Q.   Will you answer questions about
14:07  5   Exhibit 102?
14:07  6        A.   No, no, because it is changed from
14:07  7   the other exhibit.  The other exhibit was
14:07  8   changed, was doctored.  And I won't comment on
14:07  9   it.
14:07  10       Q.   It is the original before the
14:07  11  changes were made.
14:07  12       A.   This is not the original.  This is
14:07  13  a copy.  This is not an original.  You're
14:07  14  showing me one original which was doctored and
14:07  15  then you're showing me a copy of something that
14:07  16  was printed out of the computer.  And I don't
14:07  17  know which part of which document it was.  I
14:07  18  need to see the original and I need to see it
14:07  19  within the context.  You yourself have said
14:07  20  that the original that you have showed me has
14:08  21  been changed.  And I won't comment on anything.
14:08  22  I can't.  I won't.
14:08  23       Q.   Let me ask you to put --
14:08  24       A.   If at any time you will send us a
14:08  25  copy of something that was not doctored with

| | Page 108 |
|---|---|

14:08  1   and that you certified that this was not
14:08  2   doctored with and you ask me to comment on it,
14:08  3   I will comment on it by mail, by Interrogatory,
14:08  4   by e-mail, however you want me to do it.  But I
14:08  5   won't comment now on an exhibit that is not
14:08  6   doctored.
14:08  7        Q.   I certify that Exhibit 102 was not
14:08  8   doctored.
14:08  9        A.   What?
14:08  10       Q.   I certify that Exhibit 102 was not
14:08  11  doctored.
14:08  12       A.   No.  But it is a copy of something
14:08  13  that I haven't seen.  At first you showed me
14:08  14  one document which you --
14:08  15       Q.   Let's do this.  Can you please hold
14:08  16  Exhibit 102 in front of you?  I will ask you
14:08  17  some questions.  If you don't want to answer
14:08  18  them, don't answer them.
14:08  19       A.   I will tell you now I won't comment
14:08  20  on anything that has anything to do with these
14:08  21  exhibits.  I'm telling you that I won't do it
14:08  22  based on the fact that one of them was
14:09  23  doctored.
14:09  24       Q.   Well, all I can do is tell you that
14:09  25  you are probably going to end up in Orlando for

7065eec4-b2f1-4c8b-9b56-9cffeaea27b6

Page 109

```
14:09   1   your next deposition, because this is mighty
14:09   2   frustrating and mighty improper. And I've
14:09   3   never had a witness pull anything like this
14:09   4   before.
14:09   5       A.   I don't see that you've shown the
14:09   6   document that was doctored to anybody. So that
14:09   7   has big problems. I don't think that you
14:09   8   showed the document to anyone that you yourself
14:09   9   admit was changed. And then you're showing me
14:09  10   a copy of something and I don't know where it
14:09  11   came from.
14:09  12       Q.   It came from your computer.
14:09  13       A.   It doesn't matter from which
14:09  14   computer. But from which document, from which
14:09  15   context, I have a problem with it.
14:09  16       Q.   All right. Did Yosef Amar ever
14:09  17   show to you an exhibit -- excuse me. Did Yosef
14:09  18   Amar ever show to you a T-shirt with the words
14:09  19   "Myrtle Beach" on it?
14:09  20       A.   Yes.
14:09  21       Q.   Was anything on that T-shirt other
14:09  22   than the words "Myrtle Beach"?
14:10  23       A.   Yes.
14:10  24       Q.   What was on that T-shirt other than
14:10  25   the words "Myrtle Beach"?
```

Page 110

```
14:10   1       A.   "Myrtle Beach" together with the
14:10   2   1993 3DL trademark.
14:10   3       Q.   And when did he show you this
14:10   4   T-shirt?
14:10   5       A.   He showed it to us when -- before
14:10   6   the seizure.
14:10   7       Q.   How long before the seizure?
14:10   8       A.   I don't recall exactly.
14:10   9       Q.   Was it in your first meeting with
14:10  10   Mr. Amar?
14:10  11       A.   The first meeting with Mr. Amar he
14:10  12   showed us, yes. He showed us many, many
14:10  13   designs and that I think was one of them.
14:10  14       Q.   Okay. And -- but you are not
14:10  15   prepared to say whether or not it was the
14:10  16   design in Exhibit 72 or 102?
14:10  17       A.   I am not prepared to comment on
14:10  18   those exhibits because it was doctored.
14:10  19       Q.   Okay. I just want to make sure.
14:10  20       And did Mr. Amar tell you directly
14:11  21   that the Myrtle Beach T-shirt with the 3DL logo
14:11  22   on it was produced in 1993?
14:11  23       A.   He said that these are the T-shirts
14:11  24   that were produced in 1993. And he showed us
14:11  25   those T-shirts with Myrtle Beach and the 3D
```

Page 111

```
14:11   1   1993 design, yes.
14:11   2       Q.   Okay. And was the 3DL logo that he
14:11   3   showed you from 1993 the long skinny logo we
14:11   4   have been discussing earlier today?
14:11   5       A.   Excuse me, I'm sorry. Please.
14:11   6       Q.   Was the 3DL logo that he showed you
14:11   7   on the Myrtle Beach shirt, was that the long
14:11   8   skinny 3DL logo we have been discussing today?
14:11   9       A.   He showed both, the skinny and the
14:11  10   wider variation.
14:11  11       Q.   Okay. And did he provide you with
14:11  12   any documents to show you that that T-shirt had
14:11  13   been produced since 1993?
14:12  14       MR. MORTNER:  Objection. Asked and
14:12  15   answered.
14:12  16       THE WITNESS:  Huh?
14:12  17       MR. MORTNER:  Objection. Asked and
14:12  18   answered. You can go ahead.
14:12  19       Q.   Please answer the question.
14:12  20       A.   I answered that question already.
14:12  21       MR. STEWART:  We have not
14:12  22   previously been talking about the Myrtle
14:12  23   Beach T-shirt until just now. So I don't
14:12  24   think the question was asked and answered.
14:12  25       MR. MORTNER:  You can answer it.
```

Page 112

```
14:12   1   BY MR. STEWART:
14:12   2       A.   If you could please ask the
14:12   3   question again.
14:12   4       Q.   Sure. Did Mr. Amar show you any
14:12   5   documents to establish that the Myrtle Beach
14:12   6   T-shirt had been on sale since 1993?
14:12   7       A.   I don't recall seeing any
14:12   8   documents. He probably showed it to Menachem
14:12   9   Schneerson. But I did see the T-shirts and he
14:12  10   did say it was from 1993.
14:12  11       Q.   And do you know where those
14:12  12   T-shirts are now?
14:12  13       A.   I think either at Joe Cool's or at
14:13  14   your place because you seized them.
14:13  15       Q.   Okay.
14:13  16       A.   Maybe Menachem Schneerson still has
14:13  17   a few of them.
14:13  18       Q.   I'm going to show you a document
14:13  19   that's already been marked as Exhibit 55.
14:14  20       A.   Yes.
14:14  21       Q.   Do you see there is an e-mail at
14:14  22   the bottom of the first page and at the top of
14:14  23   the second page?
14:14  24       A.   Yes.
14:14  25       Q.   Have you seen this e-mail before?
```

7065eec4-b2f1-4c8b-9b56-9cffeaea27b6

Page 113

| | | |
|---|---|---|
| 14:14 | 1 | A.   I think so, yes. |
| 14:14 | 2 | Q.   Okay.  And the first sentence reads |
| 14:14 | 3 | "These are fonts that are available in clipart |
| 14:14 | 4 | on the Internet for anyone who wants to use |
| 14:14 | 5 | them."  Do you see that? |
| 14:14 | 6 | A.   Yes. |
| 14:14 | 7 | Q.   Okay.  Is this a reference to the |
| 14:14 | 8 | fonts that are shown on the second page? |
| 14:14 | 9 | A.   I don't know.  You should ask him. |
| 14:14 | 10 | He wrote it.  Whoever wrote it.  I assume so. |
| 14:14 | 11 | Q.   Do you know who wrote it? |
| 14:14 | 12 | A.   It says from Joe Cool to Michelle |
| 14:14 | 13 | Amar.  I guess it was copied to me. |
| 14:15 | 14 | Q.   Okay. |
| 14:15 | 15 | A.   And I recall that these were green, |
| 14:15 | 16 | the letters.  So, again, you're showing me a |
| 14:15 | 17 | document which is not exactly as it appears in |
| 14:15 | 18 | its original because you showed them to me |
| 14:15 | 19 | without colors.  And colors are very important |
| 14:15 | 20 | when we talk about trademarks. |
| 14:15 | 21 | Q.   I'm showing it to you in the form |
| 14:15 | 22 | it was provided to us by your counsel. |
| 14:15 | 23 | A.   Okay.  All right.  My comment is |
| 14:15 | 24 | that now, right now you're asking me to comment |
| 14:15 | 25 | on an e-mail that doesn't have the colors as |

Page 114

| | | |
|---|---|---|
| 14:15 | 1 | the original had.  So, again, whoever provided |
| 14:15 | 2 | you with it, you have shown me a document that |
| 14:15 | 3 | is not an original. |
| 14:15 | 4 | MR. MORTNER:  I'm quite certain we |
| 14:15 | 5 | produced it in color. |
| 14:16 | 6 | A.   It was forwarded in color. |
| 14:16 | 7 | MR. MORTNER:  Because it was |
| 14:16 | 8 | actually never reduced to paper.  It was |
| 14:16 | 9 | just converted straight from an e-mail to |
| 14:16 | 10 | a PDF. |
| 14:16 | 11 | Q.   Okay.  Well, let me ask you a |
| 14:16 | 12 | question that's got nothing to do with the |
| 14:16 | 13 | color fonts that are attached.  Going back to |
| 14:16 | 14 | the e-mail at the bottom of the first page, it |
| 14:16 | 15 | says "These are the typestyle that our art |
| 14:16 | 16 | department created the letter M from 3DL |
| 14:16 | 17 | design." |
| 14:16 | 18 | A.   Hold it.  Wait, wait, wait.  Okay. |
| 14:16 | 19 | Start again.  Where are you? |
| 14:16 | 20 | Q.   Sure.  The second sentence in the |
| 14:16 | 21 | e-mail at the bottom of the page, it begins |
| 14:16 | 22 | with "These are the." |
| 14:16 | 23 | A.   Oh, the second sentence.  Okay. |
| 14:16 | 24 | Q.   Yes.  "These are the typestyle that |
| 14:16 | 25 | our art department created the letter M from |

Page 115

| | | |
|---|---|---|
| 14:16 | 1 | the 3DL design."  Do you see that? |
| 14:16 | 2 | A.   Yes. |
| 14:16 | 3 | Q.   Now, if you look above, at the |
| 14:16 | 4 | first page still, you'll see that the e-mail is |
| 14:17 | 5 | reproduced in large part there.  It's got the |
| 14:17 | 6 | same first sentence.  It says "These are |
| 14:17 | 7 | fonts" -- |
| 14:17 | 8 | A.   I didn't follow. |
| 14:17 | 9 | Q.   I'm sorry.  If you look above, you |
| 14:17 | 10 | will see that the e-mail below is reproduced. |
| 14:17 | 11 | And it says "These" -- |
| 14:17 | 12 | A.   What do you mean? |
| 14:17 | 13 | Q.   The e-mail we were just reading at |
| 14:17 | 14 | the bottom is reproduced at the top. |
| 14:17 | 15 | A.   Oh, okay. |
| 14:17 | 16 | Q.   And it says "These are fonts that |
| 14:17 | 17 | are available in clipart on the Internet for |
| 14:17 | 18 | anyone who wants to use them."  That sentence |
| 14:17 | 19 | is identical to the sentence that appears |
| 14:17 | 20 | below, which you can verify. |
| 14:17 | 21 | A.   So what is the question? |
| 14:17 | 22 | Q.   Well, I'm not at the question yet. |
| 14:17 | 23 | The second sentence is a little different.  It |
| 14:17 | 24 | says "These are the typestyle that our art 3DL |
| 14:17 | 25 | department created the letter M from the 3DL |

Page 116

| | | |
|---|---|---|
| 14:17 | 1 | design in 1997."  And if you look at the e-mail |
| 14:17 | 2 | below, you'll see the words "in 1997" are not |
| 14:17 | 3 | there.  Are you following me? |
| 14:18 | 4 | A.   Not exactly.  But I don't |
| 14:18 | 5 | understand what the point is, what the question |
| 14:18 | 6 | is. |
| 14:18 | 7 | Q.   My question is:  Do you know who |
| 14:18 | 8 | added the words "in 1997" to the top e-mail? |
| 14:18 | 9 | A.   No, I don't. |
| 14:18 | 10 | Q.   Okay. |
| 14:18 | 11 | A.   Because -- I don't.  And in 1997 |
| 14:18 | 12 | they could have used these fonts to make |
| 14:18 | 13 | different changes to the mark.  These are fonts |
| 14:18 | 14 | that are available free on the Internet.  These |
| 14:18 | 15 | are the true fonts if this is a true and |
| 14:18 | 16 | correct copy, which I am not sure.  I am not |
| 14:18 | 17 | sure if this is a true and correct copy of the |
| 14:18 | 18 | e-mail.  What you are showing me, this Exhibit |
| 14:18 | 19 | number 55, I'm not sure it is the same exact |
| 14:18 | 20 | copy because it is not in color.  And the |
| 14:18 | 21 | original is in color.  This could have been |
| 14:18 | 22 | very easily printed in color and it is not.  So |
| 14:18 | 23 | I will not answer the question. |
| 14:19 | 24 | Q.   Now, I am going to show you a |
| 14:19 | 25 | document that has been previously marked as |

29 (Pages 113 to 116)

Page 117

| | | |
|---|---|---|
| 14:19 | 1 | Exhibit 24. |
| 14:19 | 2 | A.    And this is also I object to this, |
| 14:19 | 3 | any question on this exhibit because this is |
| 14:19 | 4 | part of the Pershes communication. |
| 14:19 | 5 | MR. MORTNER:  All right. |
| 14:19 | 6 | THE WITNESS:  If he's asking me |
| 14:19 | 7 | questions that is part of the Pershes |
| 14:19 | 8 | communication it is not the right thing to |
| 14:19 | 9 | do. |
| 14:19 | 10 | Q.    My question to you is:  If you've |
| 14:19 | 11 | seen this document before? |
| 14:19 | 12 | A.    I don't know.  Can I look at it? |
| 14:19 | 13 | Q.    Yes.  Please do. |
| 14:19 | 14 | A.    It's okay with you that I look at |
| 14:19 | 15 | it? |
| 14:19 | 16 | Q.    Yes, absolutely. |
| 14:20 | 17 | A.    What is the question? |
| 14:20 | 18 | Q.    Have you seen this document before? |
| 14:20 | 19 | A.    I think so. |
| 14:20 | 20 | Q.    Okay. |
| 14:20 | 21 | A.    Even though this is not -- again, |
| 14:20 | 22 | this is not a replica of the original document. |
| 14:20 | 23 | It is in small print.  It is different types, |
| 14:20 | 24 | different fonts.  This is like a doctored |
| 14:20 | 25 | document that you are showing me.  And you're |

Page 118

| | | |
|---|---|---|
| 14:20 | 1 | asking me to comment on some doctored document. |
| 14:20 | 2 | You're saying, Well, if isn't doctored, can you |
| 14:20 | 3 | comment on it.  It is not right.  What is the |
| 14:20 | 4 | date?  It's faxed to who?  This is again looks |
| 14:20 | 5 | like Pershes.  It doesn't say to who.  It |
| 14:20 | 6 | wasn't our fax number.  It doesn't show where |
| 14:21 | 7 | it comes from.  It is some copy of some |
| 14:21 | 8 | doctored document and you're asking me to |
| 14:21 | 9 | comment on it.  It has our name on top, but I |
| 14:21 | 10 | don't know who it is. |
| 14:21 | 11 | Q.    So it is your testimony that you |
| 14:21 | 12 | don't know what this document is? |
| 14:21 | 13 | A.    It looks familiar, but I don't know |
| 14:21 | 14 | who sent it to whom and I don't know -- I'm not |
| 14:21 | 15 | sure of the authenticity of this document |
| 14:21 | 16 | because it's obviously a replica of some |
| 14:21 | 17 | doctored document.  This is not our stationery |
| 14:21 | 18 | even though it has our name on it.  I don't |
| 14:21 | 19 | know what to say. |
| 14:21 | 20 | Q.    Well, the name at the bottom is SS |
| 14:21 | 21 | Stein.  Is that somebody that was employed by |
| 14:21 | 22 | the National Trademarks Center? |
| 14:21 | 23 | A.    Yes. |
| 14:21 | 24 | Q.    And was his position trademark |
| 14:21 | 25 | counselor? |

Page 119

| | | |
|---|---|---|
| 14:21 | 1 | A.    Yes. |
| 14:21 | 2 | Q.    Do you know whether he sent this |
| 14:21 | 3 | document? |
| 14:21 | 4 | A.    It could be. |
| 14:21 | 5 | Q.    Okay. |
| 14:21 | 6 | A.    But I don't know.  I am not |
| 14:21 | 7 | testifying that he did, because you're not |
| 14:22 | 8 | showing me a real document.  You could have |
| 14:22 | 9 | really easily come here with a real document |
| 14:22 | 10 | and you're bringing me a replica. |
| 14:22 | 11 | Q.    You keep accusing me of doctoring |
| 14:22 | 12 | documents. |
| 14:22 | 13 | A.    I am not accusing you personally, |
| 14:22 | 14 | heaven forbid.  You don't look like the type |
| 14:22 | 15 | that doctors evidence.  You don't look to me |
| 14:22 | 16 | like that type.  But you are giving me a |
| 14:22 | 17 | document that you received from others, a |
| 14:22 | 18 | third-party, a fourth party.  You can't even |
| 14:22 | 19 | testify yourself that this is a duplicate of an |
| 14:22 | 20 | original.  You can't swear to it.  You don't |
| 14:22 | 21 | know.  You don't have firsthand knowledge of |
| 14:22 | 22 | it.  Somebody handed it to somebody who handed |
| 14:22 | 23 | it to somebody who handed it to you.  And now |
| 14:22 | 24 | you're handing it to me to comment on something |
| 14:22 | 25 | that is obviously -- you have no firsthand |

Page 120

| | | |
|---|---|---|
| 14:22 | 1 | knowledge that this is an original document. |
| 14:22 | 2 | And you're asking me to comment on it on a very |
| 14:22 | 3 | important case. |
| 14:22 | 4 | This case is very important to us. |
| 14:22 | 5 | Somebody is trying to do a hostile takeover of |
| 14:22 | 6 | our trademark.  It's very important.  And |
| 14:22 | 7 | you're trying to ask me questions, obviously |
| 14:23 | 8 | trying to elicit answers from me that are not |
| 14:23 | 9 | particularly beneficial to us on a document |
| 14:23 | 10 | that we don't know whether it is doctored or |
| 14:23 | 11 | not. |
| 14:23 | 12 | So you're asking me do I know an SS |
| 14:23 | 13 | Stein.  Yes, I know SS Stein.  He used to work |
| 14:23 | 14 | here.  That I can tell you.  Is that our |
| 14:23 | 15 | company name?  Yes that is our company name. |
| 14:23 | 16 | But as the rest, I need to see an original |
| 14:23 | 17 | document.  And you are not in possession of |
| 14:23 | 18 | that.  You're showing me a replica of a |
| 14:23 | 19 | replica.  This obviously was copied 32 times. |
| 14:23 | 20 | MR. MORTNER:  Well, let me just |
| 14:23 | 21 | state on the record that the |
| 14:23 | 22 | correspondence has a date of September 16, |
| 14:23 | 23 | 2010.  And what appears to be a fax |
| 14:23 | 24 | receipt logo on the top has February 22, |
| 14:23 | 25 | 2011, six months later.  And it refers to |

30 (Pages 117 to 120)

7065eec4-b2f1-4c8b-9b56-9cffeaea27b6

Page 121

14:24  1    this page we're looking as being page
14:24  2    three. So one would presume there were
14:24  3    two other pages before the pages
14:24  4    subsequent to it.
14:24  5           I think the point here is that the
14:24  6    source of the document is not clear and
14:24  7    the whole context where it came from is
14:24  8    unclear because it seems to be just one of
14:24  9    several pages. I don't know where you got
14:24  10   it from. I don't think you got it in our
14:24  11   possession.
14:24  12          MR. STEWART: I don't think so.
14:24  13   Anyhow.
14:24  14   BY MR. STEWART:
14:24  15     Q.    Well, has Mettemp, Inc. ever owned
14:24  16   the three drooping lines trademark?
14:24  17     A.    I don't think so.
14:24  18     Q.    Okay. So if this letter said that
14:24  19   Mettemp, Inc. owned the three drooping lines
14:24  20   trademark, that would be an inaccurate
14:24  21   statement?
14:24  22     A.    An erroneous statement, because
14:24  23   whoever wrote it says this is an authentic
14:24  24   letter. They probably meant to write
14:25  25   Consolidated. I don't know that they wrote

Page 122

14:25  1    Mettemp. I don't know that this letter was not
14:25  2    doctored. But it was Consolidated who owned
14:25  3    it. So this is an authentic letter. Somebody
14:25  4    made a mistake and wrote Mettemp instead of
14:25  5    Consolidated.
14:25  6           MR. MORTNER: Did you have an
14:25  7    opportunity to show this letter Carrie
14:25  8    Sadler?
14:25  9           MR. STEWART: Yes, I'm pretty sure
14:25  10   I did.
14:25  11          (Discussion held off the record.)
14:25  12   BY MR. STEWART:
14:25  13     Q.    So to the best of your knowledge,
14:25  14   Mettemp --
14:25  15     A.    Say that again.
14:25  16     Q.    To the best of your knowledge,
14:25  17   Mettemp has not been using the three drooping
14:25  18   lines trademark since 1987?
14:25  19     A.    Somebody -- I'm just assuming if
14:25  20   this is an authentic letter, that somebody just
14:25  21   made a mistake and wrote Mettemp instead of
14:26  22   Consolidated, because Mettemp also owned a
14:26  23   different trademark.
14:26  24     Q.    Okay.
14:26  25     A.    And maybe they made a mistake and

Page 123

14:26  1    switched the name, because they knew us both as
14:26  2    Mettemp and Consolidated.
14:26  3      Q.    If they wrote that the trademark
14:26  4    had been used since 1987, that also would have
14:26  5    been a mistake?
14:26  6      A.    I don't know since 1987. The
14:26  7    predecessor was 1987. But the mark -- the
14:26  8    predecessor mark was used since 1987.
14:26  9      Q.    You had mentioned earlier that
14:26  10   other people have access to your e-mail
14:26  11   account?
14:26  12     A.    Just to comment, you may know that
14:26  13   the date perceived has no legal place in court.
14:27  14   You keep concentrating on it. I think you are
14:27  15   concentrating on the wrong thing.
14:27  16     Q.    You had mentioned earlier that you
14:27  17   -- that others have access to your e-mail
14:27  18   account davidlipsker@gmail.com account. Who
14:27  19   else has access?
14:27  20     A.    People who work here.
14:27  21     Q.    So who else would have access to
14:27  22   that account?
14:27  23     A.    People who work here.
14:27  24     Q.    And who would they be?
14:27  25     A.    What difference does it make?

Page 124

14:27  1      Q.    You have questioned whether or not
14:27  2    some of the e-mails I've shown you from your
14:27  3    account originated from you.
14:27  4      A.    It could be a Mr. Stein. It could
14:27  5    be a Mr. Silverstein. It could be some other
14:27  6    people who work here.
14:27  7      Q.    Could it be Menachem Schneerson?
14:27  8      A.    It could be Menachem Schneerson.
14:27  9    He has access to this account obviously.
14:28  10     Q.    Okay. I'm going to show you
14:28  11   another document that's been marked as Exhibit
14:28  12   63.
14:28  13          THE WITNESS: Are we going to keep
14:28  14   copies of these documents?
14:28  15     Q.    Yes, you will.
14:28  16          And I'd like you to focus your
14:28  17   attention on the very last page of Exhibit 63.
14:28  18   The rest of it is just provided in case you
14:28  19   feel that you need the context.
14:28  20     A.    Okay.
14:28  21     Q.    And have you seen this trademark
14:28  22   before shown on the last page of Exhibit 63?
14:28  23     A.    Yes, I have.
14:28  24     Q.    And when did you first see that
14:28  25   trademark?

7065eec4-b2f1-4c8b-9b56-9cffeaea27b6

Page 125

14:28 1   A.   I'm looking for it. One second.
14:29 2   When Joe Cool showed us all the trademarks,
14:29 3   many of the trademarks. 12/4/93. What is the
14:29 4   question?
14:29 5       Q.   The question is: When did you
14:29 6   first see this trademark?
14:29 7       A.   When he first introduced us to many
14:29 8   of the marks that he's been using that are
14:29 9   related to this -- to the 1993 mark.
14:30 10      Q.   So would that be the same time that
14:30 11  Yosef Amar showed you the Exhibit 1 trademark?
14:30 12      A.   I don't know what Exhibit 1 is.
14:30 13      Q.   Exhibit 1 is the green one that
14:30 14  your counsel is now showing to you.
14:30 15      A.   Yes. At the same he introduced us
14:30 16  to this project.
14:30 17      Q.   Okay. I just -- I wanted to
14:30 18  confirm that he showed you this trademark of
14:30 19  Exhibit 63 as well as the one in Exhibit 1.
14:30 20      A.   It looks like it. But, again, I
14:30 21  have a problem with it because I object to
14:30 22  this, because you're showing me documents that
14:30 23  are not certified and this is not a
14:30 24  certification which you're looking at. This is
14:30 25  a certification without a seal, so it is not

Page 126

14:30 1   really a certification. It is a copy of a
14:30 2   certification. But you're not showing me a
14:30 3   certified copy. And, therefore, I am not going
14:30 4   to comment on this.
14:30 5       Q.   The same you way on comment on any
14:30 6   other document you see in your life.
14:30 7       A.   That is not true. You're showing
14:31 8   me a legal document. You're asking me to
14:31 9   comment on a legal document. And the document
14:31 10  that you're showing me is not a certified
14:31 11  document. Why don't you have a certified
14:31 12  document?
14:31 13      Q.   I'm just asking if you have seen
14:31 14  the trademark before. You've already confirmed
14:31 15  that you did and you told me when you saw it.
14:31 16      A.   But I have a problem doing it. And
14:31 17  I object to that question on the grounds that
14:31 18  you showed me a document which is not a
14:31 19  certified copy. I don't know whether this is a
14:31 20  doctored thing or not.
14:31 21      Q.   Well, your objection is noted for
14:31 22  the record. And the judge can rule on it at
14:31 23  the appropriate time.
14:31 24      A.   Good.
14:31 25      Q.   So I take it this is another

Page 127

14:31 1   trademark that was developed by Joe Cool; is
14:31 2   that correct?
14:31 3       A.   I take it also, as you take it, I
14:31 4   am assuming the same thing. But I can't
14:31 5   comment on it because you're showing me a
14:31 6   document which is not certified. You're
14:31 7   showing me a State document which is not
14:31 8   certified.
14:32 9       Q.   Did Yosef Amar tell you when he
14:32 10  first used this particular trademark in
14:32 11  commerce?
14:32 12      A.   Again, I am not going to comment on
14:32 13  something that is not a certified copy.
14:32 14      Q.   Here is a document of unknown
14:32 15  origins. I can't attest to where it came from.
14:32 16  I have no idea where it came from. Is this the
14:32 17  trademark that Yosef Amar showed to you?
14:32 18      A.   This is marked as an exhibit?
14:32 19      Q.   I will mark this as an exhibit.
14:32 20      A.   So let's mark it as an exhibit.
14:32 21          MR. STEWART: Okay. Let's mark
14:32 22  this as the next exhibit in line please.
14:32 23          (Whereupon Exhibit 103,
14:32 24  Trademark design drawing, was marked for
14:33 25  identification.)

Page 128

14:33 1       Q.   I'm asking you to look at what's on
14:33 2   that paper and tell me if that's one of the
14:33 3   trademarks Joseph Amar showed you?
14:33 4       A.   You are showing me a trademark that
14:33 5   is not in its true color. It's faded black and
14:33 6   white with a lot of dirt and dust on it. It
14:33 7   didn't come out very clearly. And I cannot
14:33 8   comment on this.
14:33 9       Q.   Just for the record, again, these
14:33 10  are questions that I do plan to ask you about
14:33 11  in Orlando during your second deposition.
14:33 12      A.   I understand what you're saying.
14:33 13      Q.   Just as long as we are on the same
14:33 14  page.
14:33 15      A.   I just want the record reflect if
14:33 16  you look at this --
14:33 17          THE WITNESS: See?
14:33 18      A.   If you look at this, this is a
14:33 19  black and white depiction of some original
14:33 20  artwork, which you could have shown me the
14:33 21  original artwork, but yet you're showing a
14:33 22  black and white paper copy, very hazy and
14:33 23  fuzzy. You're asking me to determine whether
14:33 24  this is a trademark that Joe Cool showed us
14:34 25  before. This is not a fair question, because

32 (Pages 125 to 128)

Page 129

14:34  1   if you look at this, it is not a depiction of
14:34  2   anything.  It was copied probably 30 times.  It
14:34  3   is not a true depiction of anything.
14:34  4       Q.   Okay.  The judge will rule on your
14:34  5   objection and he will impose whatever sanctions
14:34  6   he deems appropriate if he rules in our favor.
14:34  7   I'm --
14:34  8       MR. MORTNER:  Let me ask you:  Was
14:34  9   there any questions that -- what was the
14:34  10  question that you asked that you didn't
14:34  11  get an answer to?
14:34  12      Q.   I believe did Mr. Amar tell you
14:34  13  when he first used this trademark in commerce?
14:34  14      MR. MORTNER:  Or this image?
14:34  15      MR. STEWART:  This image.
14:34  16      MR. MORTNER:  Are you able to
14:34  17  answer that question?
14:34  18      THE WITNESS:  It looks like.  But
14:35  19  see, how could I affirm of something that
14:35  20  I see in a picture that I know was copied
14:35  21  30 times with haze and fuzz on it and it?
14:35  22  Is not a true depiction.  It is not in
14:35  23  color.
14:35  24      He could have brought a regular
14:35  25  picture in color or a T-shirt.  He took

Page 130

14:35  1   many of the T-shirts, many of the designs.
14:35  2   He could have showed me a live design.
14:35  3   Yet he's showing me a picture that was
14:35  4   reproduced 30 times in black and white.
14:35  5   He is asking me to comment on it on
14:35  6   something very important like this.  So
14:35  7   now he's little angry because I am not
14:35  8   answering.  But it is not correct that I
14:35  9   should answer, you know, pass judgment on
14:35  10  a picture of a picture of a picture that
14:35  11  was taken 30 times and it is not clear.
14:35  12  This is not a clear picture.  Take a look
14:35  13  at this.  It is not a clear picture.
14:36  14  BY MR. STEWART:
14:36  15      Q.   Mr. Baksht, is that a photocopy of
14:36  16  a check above your printer?
14:36  17      A.   I am not going to comment.
14:36  18      Q.   Okay.  Thank you.
14:36  19      Let me pass you what the reporter
14:36  20  has previously marked as Exhibit 64.  And I'd
14:36  21  like you ask you to focus on the final page
14:36  22  again.  Are you prepared to answer any
14:36  23  questions today about this trademark?
14:36  24      A.   No, because this is even worse than
14:36  25  the prior trademark.  You can't even tell what

Page 131

14:36  1   trademark it is.  You can't even tell the
14:36  2   outlines of it.  Take a look.
14:37  3       MR. MORTNER:  Let's take a break.
14:37  4       MR. STEWART:  I guess we are taking
14:37  5   a break.
14:37  6       THE VIDEOGRAPHER:  2:37 off the
14:37  7   record.
14:37  8       (Whereupon a short break was
14:43  9   taken.)
14:43  10      THE VIDEOGRAPHER:  2:43 on the
14:43  11  record.
14:43  12      MR. MORTNER:  Okay.  I've spoken
14:43  13  with Mr. Baksht and he has agreed to
14:43  14  answer questions on documents that he
14:43  15  feels are not clear to the best of his
14:43  16  ability.  And we'll just make an
14:43  17  objection.  It will be on the record.  But
14:43  18  you can go back, Mr. Stewart, over
14:43  19  whatever areas you did not feel he was
14:43  20  cooperating on now and ask those questions
14:43  21  and he's willing to cooperate with you.
14:43  22      MR. STEWART:  Very good.  Thank
14:43  23  you.
14:43  24  BY MR. STEWART:
14:43  25      Q.   I'd like to turn back to Exhibit

Page 132

14:44  1   63, and if you can turn to the last page.  I
14:44  2   believe you testified -- and forgive me if I'm
14:44  3   going over old ground because I don't know
14:44  4   exactly where we left off.  I believe you
14:44  5   testified --
14:44  6       A.   What I said before I'm sure that
14:44  7   you will understand that I meant no offense to
14:44  8   you.
14:44  9       Q.   I understand that.
14:44  10      This is one of the trademarks that
14:44  11  Mr. Amar showed you at your initial meeting
14:44  12  with him?
14:44  13      A.   It looks like, yes.
14:44  14      Q.   And did Mr. Amar explain to you
14:44  15  whether this particular version of this
14:44  16  trademark was used in 2010 or in 1993 or did he
14:44  17  not comment?
14:44  18      A.   I don't remember exactly.  But he
14:44  19  continues the mark that was used in 1993 in its
14:45  20  exact version and was modified in 1910.
14:45  21      Q.   2010?
14:45  22      A.   Yes.
14:45  23      Q.   Okay.  Did Mr. Amar provide you
14:45  24  with any documents demonstrating that the
14:45  25  particular trademark shown in Exhibit 63 had

33 (Pages 129 to 132)

Page 133

14:45   1    been used before 2010?
14:45   2    A.    Yes.
14:45   3    Q.    And what documentation did he
14:45   4    provide?
14:45   5    A.    The fact that he signed Affidavits.
14:45   6    Q.    And you're referring to Exhibit 63
14:45   7    itself?
14:45   8    A.    Yes.
14:45   9    Q.    Okay.
14:45  10    A.    And he testified in court as well.
14:45  11    Q.    This exact design with the word
14:46  12    "Florida" on it?
14:46  13    A.    Yes.  But this is -- this contains
14:46  14    a mark that was modified in 2010 and has
14:46  15    another mark that was used in exact form in
14:46  16    1993.  So altogether it goes back to the date
14:46  17    of use of 1993 because it contains a mark that
14:46  18    was used in its exact form in 1993 and in its
14:46  19    modified form -- I'm not sure I'm explaining it
14:46  20    right.
14:46  21    Q.    I'm following you.
14:46  22    A.    We --
14:46  23          MR. MORTNER:  Wait for a question.
14:46  24    Wait for a question.
14:46  25    Q.    So when you say a portion of the

Page 134

14:46   1    mark was used in its exact form since 1993,
14:47   2    you're referring to the three skinny lines?
14:47   3    A.    That is correct.
14:47   4    Q.    And the modified form you're
14:47   5    referring to is the three broader lines?
14:47   6    A.    Yes.  It is the skinny mark widened
14:47   7    up a little bit.
14:47   8    Q.    Okay.  And how about the group
14:47   9    together, the skinny mark with the widened up
14:47  10    mark with the word "Florida," did you have any
14:47  11    discussions with Mr. Amar about when that was
14:47  12    first used?
14:47  13    A.    Yes, since 1993.  But, again, I
14:47  14    don't want to get into semantics here because
14:47  15    it may get a little confusing.  When it comes
14:47  16    to the date of use, it predominantly -- if
14:47  17    there is a main portion of the mark that he
14:47  18    used since 1993, then it seems it is from 1993.
14:47  19    Q.    Okay.  And I guess -- I wasn't
14:47  20    asking you the legal question of date of first
14:47  21    use.  I'm asking you a slightly different
14:48  22    question, which is --
14:48  23    A.    That was not clear to me.
14:48  24    Q.    Okay.  Well, now I'm trying to make
14:48  25    it clear.

Page 135

14:48   1    A.    Okay.
14:48   2    Q.    The entirety of the mark shown in
14:48   3    Exhibit 63 with the word "Florida" and with the
14:48   4    widened out version of the three drooping
14:48   5    lines, did Mr. Amar tell you when that was
14:48   6    first placed on a product by him?
14:48   7    A.    I don't remember that he
14:48   8    specifically told me about this particular mark
14:48   9    as it looks here.  I don't remember.
14:48  10    Q.    Okay.  All right.  Let me ask you
14:48  11    to turn now to Exhibit 64, which is directly
14:48  12    below Exhibit 64 in your stack.
14:49  13    A.    Yes.
14:49  14    Q.    And if you would turn to the last
14:49  15    page.
14:49  16    A.    This is very, very fascinating.  If
14:49  17    you can look at it, you can't tell me the
14:49  18    outlines of the mark itself.  Not only is it
14:49  19    not in color -- and by the way, the previous
14:49  20    exhibit that you showed me was not in color.
14:49  21    So he never showed me a mark like this exhibit
14:49  22    in the previous -- what was the exhibit before
14:49  23    this one?  The mark that you showed me in
14:49  24    Exhibit number 63, this is black and white, he
14:49  25    never used any mark that, to my knowledge, was

Page 136

14:49   1    in black and white.  So this is not what he
14:49   2    showed me.  The mark in Exhibit 63 is not the
14:49   3    mark that he showed me because you're showing
14:49   4    me -- it shows a mark in black and white.  And
14:49   5    he never used a mark in black and white.
14:49   6          So the answer is I don't know.
14:50   7    Regarding the mark in 63, it is not the mark
14:50   8    that he had showed me.  He never showed me this
14:50   9    mark what is in Exhibit 63 because he never
14:50  10    showed me a mark in black and white, only in
14:50  11    color.  That is Exhibit 63.
14:50  12          Now we go to Exhibit 64.  Exhibit
14:50  13    64 is so fuzzy and so hazy, I am not sure
14:50  14    anybody can tell what it is, except for the
14:50  15    words "Daytona Beach," which are clear.  It is
14:50  16    very fuzzy.
14:50  17    Q.    All right.  Is it your testimony
14:50  18    you can't tell what this trademark is?
14:50  19    A.    That's correct.  And he never
14:50  20    showed me a trademark like this in this black
14:50  21    and white in this haziness and this unclarity.
14:50  22    Q.    Did he show you a trademark like
14:50  23    this in color?
14:50  24    A.    I don't know.  I don't know what
14:50  25    this trademark is in this.  I can't make it

7065eec4-b2f1-4c8b-9b56-9cffeaea27b6

Page 137

14:50  1    out.
14:50  2    Q.   Okay.  I'm going to show you a
14:51  3  document that I will ask the reporter to mark
14:51  4  as Exhibit 103.
14:51  5        THE COURT REPORTER:  It's 104.
14:51  6    Q.   104.
14:51  7        (Whereupon Exhibit 104,
14:51  8    Trademark design drawing, was marked for
14:51  9    identification.)
14:51  10   Q.   Have you ever seen this before?
14:51  11   A.   Yes, I have.
14:51  12   Q.   What is this?
14:51  13   A.   This is -- what do you mean what is
14:51  14  this?  I don't understand the question.
14:51  15   Q.   Okay.  Is this one of the
14:51  16  trademarks that Mr. Amar discussed with you
14:51  17  when you first met with him about the 3DL
14:51  18  trademarks?
14:51  19   A.   I don't know that he discussed this
14:52  20  specifically, but he discussed many of the
14:52  21  marks which are related to this.
14:52  22   Q.   Okay.
14:52  23   A.   Yeah.  I remember there was a mark
14:52  24  like this that said Wildwood New Jersey.  Yes.
14:52  25   Q.   And do you know when Mr. Amar or

Page 138

14:52  1  Joe Cool began using this exact trademark with
14:52  2  the words "Wildwood New Jersey" on them?
14:52  3    A.   I don't know, but it has -- I don't
14:52  4  know.
14:52  5    Q.   Do you see the copyright date of
14:52  6  2003 near the bottom?
14:52  7    A.   Yes, I do.  Yes.
14:52  8    Q.   Do you know what that signifies in
14:52  9  this context?
14:52  10   A.   I don't know.  I presume that it
14:52  11  may have been created in 2003.
14:52  12   Q.   Okay.  Well, let me ask you then to
14:52  13  turn back to Exhibit 1.  And I apologize for
14:52  14  jumping around.  Maybe the reporter can help
14:52  15  you locate Exhibit 1.
14:52  16        MR. MORTNER:  Here.
14:52  17   Q.   Here is Exhibit 1.
14:52  18   A.   Okay.
14:53  19   Q.   Do you know, next to the far right
14:53  20  line there is also a copyright date of 2003?
14:53  21   A.   No, I don't.  I can't read it.  I
14:53  22  can't see it.  I can't see it.  It is very
14:53  23  small.  I see Consolidated in the Hebrew
14:53  24  lettering's.  I see what is circled.
14:53  25   Q.   And then underneath it -- it is too

Page 139

14:53  1  small for you?
14:53  2    A.   Yes.
14:53  3    Q.   Well --
14:53  4        MR. MORTNER:  Can I see it?
14:53  5        MR. STEWART:  Sure.
14:53  6    Q.   Do you have any idea why a
14:53  7  copyright date of 2003 would be present on
14:53  8  Exhibit 1?
14:53  9    A.   I don't know.
14:53  10   Q.   Okay.  I believe you said earlier
14:54  11  that you personally have no documents relating
14:54  12  to the use of the 3DL trademarks before 2010;
14:54  13  is that correct?
14:54  14   A.   Yes.
14:54  15   Q.   Okay.  Let me show you a document
14:55  16  that's previously been marked as Exhibit 72.
14:55  17  And I'm going to ask you to turn to paragraph
14:55  18  147, which is on page 21.
14:55  19   A.   It is amazing, I just opened it
14:55  20  right to the paragraph.
14:55  21   Q.   And it says there "The 3DL" --
14:55  22        MR. STEWART:  Well, first of all,
14:55  23    for the record, this is Defendant's
14:55  24    Consolidated Distributors and David
14:55  25    Baksht's Answer to Affirmative Defenses,

Page 140

14:55  1  in this case, and Counterclaims.
14:55  2    Q.   Paragraph 147 says "The 3DL marks
14:55  3  have been utilized for numerous years by a
14:56  4  multitude of clothing and heat transfer users."
14:56  5  Do you see that?
14:56  6    A.   Yes.
14:56  7    Q.   To your knowledge, is that an
14:56  8  accurate statement?
14:56  9    A.   In different variations, yes.  It
14:56  10  may have been.  Yes.  Yes, it is an accurate
14:56  11  statement.
14:56  12   Q.   Who are the multitude of clothing
14:56  13  and heat transfer users?
14:56  14   A.   I don't know, but there were quite
14:56  15  a few of them in the marketplace, particularly
14:56  16  related to Joe Cool.
14:56  17   Q.   Particularly as related to?
14:56  18   A.   Related to Joe Cool.
14:56  19   Q.   Oh, he explained this to you?
14:56  20   A.   Yes.
14:56  21   Q.   Okay.  Well, were there companies
14:56  22  unrelated to Joe Cool that were using the 3DL
14:56  23  trademarks?
14:56  24   A.   No.  They were counterfeiting his
14:56  25  mark.  They were infringing on his mark.

7065eec4-b2f1-4c8b-9b56-9cffeaea27b6

Page 141

14:56  1      Q.   Okay.  Now, I will represent to you
14:57  2   that Joe Cool -- or, excuse me, Joseph Amar
14:57  3   testified in his deposition that he wasn't
14:57  4   aware of anybody that was infringing his 3DL
14:57  5   trademarks.  Does that sound consistent to you?
14:57  6      A.   Again, repeat the question please.
14:57  7      Q.   Yes.  Is that consistent with your
14:57  8   understanding?
14:57  9      A.   What is?  Can you repeat the
14:57 10   question?
14:57 11      Q.   Sure, sure.  Mr. Amar testified
14:57 12   that he was not aware of any counterfeiters or
14:57 13   infringers using the 3DL trademark.
14:57 14      A.   He told us that there were several
14:57 15   people using it that he was worried about it.
14:57 16   And since his mark became more and more well
14:57 17   known/famous, he was worried that infringers
14:58 18   were going to come into play.
14:58 19      Q.   All right.  If you look just above
14:58 20   at paragraph 145, it says "Joe Cool, Inc. has
14:58 21   used, promoted and advertised the 3DL marks
14:58 22   continuously since 1993 and acquired
14:58 23   substantially common law rights in the marks."
14:58 24   Do you see that?
14:58 25      A.   Yes.

Page 142

14:58  1      Q.   To your knowledge, is that an
14:58  2   accurate statement?
14:58  3      A.   Yes.
14:58  4      Q.   Do you know what advertising Joe
14:58  5   Cool, Inc. has done for the 3DL marks since
14:58  6   1993?
14:58  7      A.   I don't know exactly.  I think he
14:58  8   promoted it on the website.  He promoted it
14:58  9   between his dealers.  He has catalogues that he
14:59 10   distributes to all of his dealers promoting the
14:59 11   various marks that he makes, and that was one
14:59 12   of them.  So many of the dealers began to
14:59 13   associate this mark with him.
14:59 14      Q.   And by "this mark," since we're
14:59 15   talking about 1993, we're talking about the
14:59 16   skinny version of the mark; is that correct?
14:59 17      A.   We are talking about both marks,
14:59 18   because we are talking about the other mark
14:59 19   being the evolution of the skinny mark.  And in
14:59 20   our minds it is the same.
14:59 21      Q.   Okay.
14:59 22      A.   And in the mind of plaintiff it is
14:59 23   the same.  Plaintiff so testified.
14:59 24      Q.   Does Consolidated have any
14:59 25   documents relating to Joe Cool's advertising

Page 143

14:59  1   and promotion of the 3DL marks?
15:00  2      A.   I don't think so.  I think
15:00  3   everything was at Joe Cool, Inc.  And I think a
15:00  4   substantial portion of it was seized by
15:00  5   plaintiff.
15:00  6      Q.   Okay.  If you look down at
15:00  7   paragraph 149, it says "As a result of Joe
15:00  8   Cool, Inc.'s efforts, the 3DL marks are known
15:00  9   in biker circle, i.e., among motorcycle
15:00 10   enthusiasts, and in beach shops for novelty
15:00 11   T-shirts, sweatshirts and like clothing, as an
15:00 12   indicator of the source of products provided in
15:00 13   connection with the marks, and establishing
15:00 14   goodwill in the marks."  Do you see that?
15:00 15      A.   Yes.
15:00 16      Q.   To your knowledge, is that an
15:00 17   accurate statement?
15:00 18      A.   Yes.
15:00 19      Q.   What information do you have that
15:00 20   suggests that the 3DL marks are well known in
15:00 21   biker circles?
15:01 22      A.   I was told by various shops along
15:01 23   the beaches that cater to this market and by
15:01 24   Joe Cool himself that this is an accurate
15:01 25   statement.

Page 144

15:01  1      Q.   Do you remember what any of those
15:01  2   various shops were?
15:01  3      A.   What do you mean?
15:01  4      Q.   Well, you said you were told by
15:01  5   various shops along the beach.
15:01  6      A.   Right.
15:01  7      Q.   I'm asking if you can identify any
15:01  8   of those shops?
15:01  9      A.   Yes.
15:01 10      Q.   Please do.
15:01 11         THE WITNESS:  Moshe?
15:01 12         MR. MORTNER:  Go ahead.
15:01 13      A.   One of them that I recall is Ocean
15:01 14   Club, and they have all stores on the beaches,
15:01 15   and told me this is Joe Cool's marks are very,
15:01 16   very in serious demand for them.
15:01 17      Q.   Where is Ocean Club located?
15:01 18      A.   On beaches in Daytona.
15:01 19      Q.   Daytona, okay.
15:01 20         Any others that you can think of?
15:01 21      A.   Not that I can think of now because
15:01 22   Menachem Schneerson was more handling the
15:01 23   marketing aspect of it.  So he would know
15:02 24   better than I.
15:02 25      Q.   Okay.  Do you have any documents

7065eec4-b2f1-4c8b-9b56-9cffeaea27b6

Page 145

15:02  1  showing that the 3DL marks are well known in
15:02  2  the bikers circles?
15:02  3     A.   No, I don't have the name.  Perhaps
15:02  4  Mr. Schneerson does or Mr. Joe Amar from Joe
15:02  5  Cool, he probably has it.
15:02  6     Q.   When did you first see Monster's
15:02  7  claw --
15:02  8     A.   Excuse me.  I was yawning and from
15:02  9  the medication I didn't get the first part of
15:03 10  the question.
15:03 11     Q.   That's fine.
15:03 12          When did you first see the Monster
15:03 13  Energy M claw trademark?
15:03 14     A.   The M claw trademark?
15:03 15     Q.   Yes.  When did you first see that?
15:03 16     A.   I saw that after the seizure.  I
15:03 17  looked to see.  And according to the documents,
15:03 18  I saw it from there.
15:03 19     Q.   I thought you testified earlier
15:03 20  that Mr. Amar showed you the --
15:03 21     A.   Yes.  I have seen them before, but
15:03 22  I paid closer attention to it and became much
15:03 23  more familiar with it through the lawsuit.
15:03 24     Q.   Okay.
15:03 25     A.   I did see it before Joe Amar showed

Page 146

15:03  1  it to me.
15:03  2     Q.   So you think that was the first
15:03  3  time you saw it?
15:03  4     A.   When Joe Amar showed it to me, yes.
15:03  5     Q.   So you are obviously familiar with
15:03  6  the Coca-Cola trademark, correct?
15:03  7     A.   Yes.  I would say a little bit.
15:03  8     Q.   And the Pepsi trademark?
15:03  9     A.   Also a little bit.
15:03 10     Q.   Yes.  And have you heard of Dr.
15:04 11  Pepper?
15:04 12     A.   Yes, I did.
15:04 13     Q.   But you didn't learn about the
15:04 14  Monster's M claw until Joe Amar?
15:04 15     A.   No.  I seriously didn't.  And one
15:04 16  of the main reasons I didn't, you should know,
15:04 17  is because it is not kosher.  So it's not in
15:04 18  kosher shops.  I come into contact with
15:04 19  Coca-Cola all the time because it is in the
15:04 20  shops we frequent.  And Monster doesn't appear
15:04 21  in those because it is not kosher.  So Monster
15:04 22  is not that -- the kosher people are not that
15:04 23  familiar with Monster because of that.
15:04 24     Q.   Okay.  But you do shop at some
15:04 25  grocery stores, right, kosher grocery --

Page 147

15:04  1     A.   What?
15:04  2     Q.   You shop at kosher grocery stores?
15:04  3     A.   Yes.
15:04  4     Q.   Do you ever shop at convenience
15:04  5  stores?
15:04  6     A.   Once in a while.  Very rarely
15:04  7  because they carry very few kosher items.
15:04  8     Q.   Okay.  And what grocery stores in
15:04  9  this neighborhood do you shop at?
15:05 10     A.   Around here, a block away from
15:05 11  here.
15:05 12          And the first time I ever
15:05 13  encountered the Monster in the grocery store
15:05 14  was after the lawsuit, because then I saw it
15:05 15  and I paid attention to it.
15:05 16     Q.   Okay.
15:05 17     A.   And I didn't pay attention to it
15:05 18  before really.
15:05 19     Q.   I'm going just run through real
15:05 20  quickly a few names of the stores in your
15:05 21  neighborhood.  The Sunshine Deli Grocery on
15:05 22  Brooklyn Avenue, are you familiar with them?
15:05 23     A.   No.
15:05 24     Q.   Are you familiar with the store
15:05 25  called 273 Kingston Avenue?

Page 148

15:05  1     A.   273 Kingston Avenue?
15:05  2     Q.   Yes.  It is the name of the store
15:05  3  and the address.
15:05  4     A.   No.
15:05  5     Q.   Are you familiar with Hashanah Food
15:05  6  Corp.?
15:05  7     A.   No.  These are all non-kosher
15:05  8  grocery stores.
15:06  9          (Discussion held off the record.)
15:06 10     Q.   You are back?
15:06 11     A.   I am back.  But one of the grocery
15:06 12  stores you mentioned, the Sunshine is not at
15:06 13  the address that you gave.  Sunshine is here
15:06 14  over on Brooklyn Avenue.
15:06 15     Q.   I said Sunshine Deli on Brooklyn
15:06 16  Avenue?
15:06 17     A.   Yes, I do.  I buy cigarettes.
15:06 18     Q.   Oh, you do buy cigarettes there?
15:06 19     A.   Yes.
15:06 20     Q.   But you've never seen Monster
15:06 21  Energy there?
15:06 22     A.   I did lately.  And after the
15:06 23  lawsuit I paid attention, so I did see it.
15:06 24  But, otherwise, I wouldn't pay it attention
15:06 25  because it is in a non-kosher department that

7065eec4-b2f1-4c8b-9b56-9cffeaea27b6

| Page 149 |
|---|

```
15:06   1   they have.  I go there to buy cigarettes and I
15:06   2   walk out.
15:06   3       Q.    Have you ever been to the
15:06   4   Neighborhood Food Center on Kingston Avenue?
15:06   5       A.    Kingston and what?
15:06   6       Q.    225 Kingston.
15:06   7       A.    I have no idea.  It doesn't sound
15:06   8   familiar.
15:06   9       Q.    How about Diana Food Center?
15:07  10       A.    No, no.  Definitely not.
15:07  11       Q.    Edwin Deli Grocery Store?
15:07  12       A.    No, no.
15:07  13       Q.    Express Deli Supermarket?
15:07  14       A.    No.  You should know, again, they
15:07  15   are not kosher.
15:07  16       Q.    I don't know if they are not kosher
15:07  17   until you tell me.
15:07  18       A.    I am telling you.
15:07  19       Q.    How about Family Grocery on Albany
15:07  20   Avenue?
15:07  21       A.    No.
15:07  22       Q.    Freddie's Grocery and Deli?
15:07  23       A.    No.
15:07  24       Q.    Kumar Deli Corp.?
15:07  25       A.    No.  This is an Arabian food
```

| Page 150 |
|---|

```
15:07   1   company.
15:07   2       Q.    Here is one that I would suspect is
15:07   3   not kosher, but I want to ask you anyhow.  The
15:07   4   Rodriguez Mini Mart?  You don't shop there?
15:07   5       A.    No.
15:07   6       Q.    Okay.
15:07   7       MR. MORTNER:  Congratulations to
15:07   8   your research team.
15:07   9       MR. STEWART:  I was impressed by
15:07  10   them.  I was very impressed by them.
15:08  11       A.    Rodriguez Grocery Store, it is
15:08  12   funny in this neighborhood to say that.
15:08  13       Q.    Do you know when Yosef Amar first
15:08  14   saw the Monster --
15:08  15       A.    Amar, Yosef Amar.
15:08  16       Q.    Yosef Amar.  Do you know when Yosef
15:08  17   Amar first saw the Monster trademark?
15:08  18       A.    The Monster trademark, I don't know
15:08  19   what you're referring to as the Monster
15:08  20   trademark.
15:08  21       Q.    The M claw.
15:08  22       A.    Huh?
15:08  23       Q.    The M claw.
15:08  24       A.    Which one?  Monster Energy?
15:08  25       Q.    The Monster Energy M.
```

| Page 151 |
|---|

```
15:08   1       A.    You can say the second user's mark.
15:08   2   You can say the junior user's mark.  I will
15:08   3   understand.
15:08   4       Okay.  When he first saw it?
15:08   5       Q.    Yes.  Did he ever tell you that?
15:08   6       A.    No.
15:08   7       Q.    That was a no?
15:08   8       A.    No.  He showed it to me, so
15:08   9   obviously -- I first learned about it from him.
15:08  10   I didn't know this company existed.
15:08  11       THE WITNESS:  Come on in.
15:08  12       (Discussion held off the record.)
15:08  13       THE VIDEOGRAPHER:  3:08 off the
15:08  14   record.
15:10  15       (Discussion held off the record.)
15:10  16       THE VIDEOGRAPHER:  3:10 on the
15:10  17   record.
15:10  18       THE WITNESS:  What?
15:10  19       Q.    We are back on the record.
15:10  20       A.    I will tell you that I am not
15:10  21   feeling well on the record.
15:10  22       Q.    Have you ever been to Las Vegas?
15:10  23       A.    Yes.
15:10  24       Q.    Did you see the monorail on the
15:10  25   last Vegas strips that connects the large --
```

| Page 152 |
|---|

```
15:10   1       A.    No.  When I was in Las Vegas was in
15:10   2   1970 something.  It was 35 years ago.
15:10   3       Q.    Okay.  Fair enough.
15:11   4       Okay.  I'm going to show you a
15:11   5   document that I am going to ask the reporter to
15:11   6   mark as Exhibit 105.
15:11   7       (Whereupon Exhibit 105, E-mail
15:11   8   correspondence, was marked for
15:11   9   identification.)
15:11  10       Q.    Do you recognize this document?
15:11  11   Have you seen it before?
15:11  12       A.    November 1st, I'm trying to make it
15:11  13   out.
15:12  14       Q.    Sure.
15:12  15       A.    I'm not used to seeing e-mails on
15:12  16   paper.  This is to Michelle Amar.  It looks
15:12  17   like something I could have sent, but I don't
15:12  18   know.  I don't remember sending this.  What is
15:12  19   the question?
15:12  20       Q.    Well, that was the question, if you
15:12  21   were remember this document at all?
15:12  22       A.    I don't remember it, but it could
15:12  23   be something I sent.  What was it about?
15:12  24       Q.    Well, that's what I wanted to ask
15:12  25   you.  The text of it is "See re Monster."
```

7065eec4-b2f1-4c8b-9b56-9cffeaea27b6

Page 153

15:12  1    A.   What?
15:12  2    Q.   S-E-E re Monster.
15:12  3    A.   Where are you?  Show me.
15:12  4    Q.   Right in the middle there.
15:12  5    A.   I don't have it in yellow.  Next
15:12  6  time your assistant to mark it for
15:12  7  everybody to see.  "See re Monster."  It says
15:13  8  "Marvel company brands Monster."  I think
15:13  9  but -- I think that they had an article of all
15:13  10  kinds of Monster brands and this was to show
15:13  11  that Monster -- what is the date?
15:13  12    Q.   October 5, 2010.
15:13  13    A.   I don't remember this.  It does not
15:13  14  say anything.  It just says from...
15:13  15    Q.   All right.  Well, that's it for
15:13  16  that document then.
15:13  17       Now, at some point did Consolidated
15:13  18  decide to acquire the 3DL mark from Yosef Amar
15:14  19  or Joe Cool?
15:14  20    A.   Yes.
15:14  21    Q.   Okay.  And when was that?
15:14  22    A.   I don't remember the exact date,
15:14  23  but Menachem Schneerson would probably have the
15:14  24  precise date.  But long before this lawsuit
15:14  25  began.

Page 154

15:14  1    Q.   So sometime in 2010?
15:14  2    A.   Yeah.  Yeah, it could be.
15:14  3    Q.   And why did Consolidated decide to
15:14  4  acquire the 3DL trademark?
15:14  5    A.   Because it is an opportunity to
15:14  6  make money.  Like any company, the purpose of a
15:14  7  business is to make money.
15:14  8    Q.   But what was so appealing about the
15:14  9  3DL mark compared to other trademarks?
15:14  10    A.   We were trying to acquire other
15:14  11  marks as well where we saw few of these, like
15:14  12  Joe Cool had a trademark that was very
15:15  13  marketable and desirable to sell it in the
15:15  14  market.  And we felt that with proper
15:15  15  promotion, proper marketing, proper financing,
15:15  16  that a better job could be done with it, just
15:15  17  like the Saban Group, S-A-B-A-N.
15:15  18       The Saban Group is a company that
15:15  19  buys trademarks, promotes them and then
15:15  20  probably sells the trademark after they have
15:15  21  promoted it and expanded their business.  It's
15:15  22  very large business.  We are on a smaller scale
15:15  23  trying to do something small.
15:15  24    Q.   You mentioned that you knew the 3DL
15:15  25  mark had been profitable for Joe Cool.  How did

Page 155

15:15  1  you know that?
15:15  2    A.   Because other dealers, like Ocean
15:15  3  Club, told us and Joe Cool told us.  Joe Cool
15:15  4  is an honest man.  He tells us and he does it.
15:15  5  We won't have to verify what he says very much
15:15  6  because he is an honest person.  He just tells
15:16  7  the truth.
15:16  8    Q.   Did he show you the financial
15:16  9  records for the 3DL?
15:16  10    A.   No to me, but maybe he did to
15:16  11  Menachem Schneerson.
15:16  12       (Discussion held off the record.)
15:16  13    Q.   Now, by the time you decided to
15:16  14  acquire the 3DL mark had you reached any
15:16  15  conclusions about priority of rights between
15:16  16  Monster and Joe Cool?
15:16  17    A.   Between what date?  Just give me
15:16  18  the timeframe again.
15:16  19    Q.   Yes.  The time that you decided to
15:16  20  acquire the 3DL mark?
15:16  21    A.   And?
15:16  22    Q.   At that time had you reached any
15:16  23  conclusions yet about the priority of rights
15:17  24  between Monster and Joe Cool?
15:17  25    A.   Yes.

Page 156

15:17  1    Q.   And what conclusion had you
15:17  2  reached?
15:17  3    A.   That we had priority of use.
15:17  4    Q.   And how did you determine --
15:17  5    A.   We reached two conclusions.  Number
15:17  6  one, we had priority of use.  Number two, we
15:17  7  didn't see any likelihood of confusion.  So if
15:17  8  anybody ever determined that there was -- in
15:17  9  the unlikely event that anyone determines
15:17  10  determined that there was a likelihood of
15:17  11  confusion, we still had priority of use.
15:17  12  Nothing was stopping us from the flow of the
15:17  13  project for those two basic reasons.
15:17  14    Q.   And how did you determine Monster's
15:17  15  date of first use?
15:17  16    A.   How?  Because we asked store owners
15:18  17  in Daytona if they ever saw Monster's trademark
15:18  18  before, Monster's trademark, the junior user's
15:18  19  trademark, Monster Energy's trademark before
15:18  20  and they said they haven't seen it before 2010.
15:18  21       And there are people out in the
15:18  22  marketplace.  They know what is in the market,
15:18  23  they go to trade shows.  They are out in the
15:18  24  market.  They know better than anybody what is
15:18  25  in the marketplace.  And they haven't seen it.

39 (Pages 153 to 156)

Page 157

15:18  1    Q.    Did you do a trademark --
15:18  2    A.    And after the -- what?  Go ahead.
15:18  3  I'm sorry.
15:18  4    Q.    Did you do a trademark search to
15:18  5  assess when Monster may have began using its
15:18  6  trademark?
15:18  7    A.    No.  But we applied -- no, we did
15:18  8  not.
15:18  9    Q.    Okay.
15:19  10        MR. MORTNER:  Are you referring to
15:19  11  use of the trademark on clothing, beverage
15:19  12  or all things?
15:19  13        MR. STEWART:  I was referring on
15:19  14  all things.
15:19  15    A.    Oh, no.
15:19  16        MR. MORTNER:  I don't think he was
15:19  17  clear on that.
15:19  18    A.    I didn't understand that.  Can you
15:19  19  ask me again?
15:19  20    Q.    Yes.
15:19  21    A.    When I've spoken -- anything I said
15:19  22  about Monster Energy's trademark and the
15:19  23  Monster Energy as a junior user, I meant on
15:19  24  clothing because that is what comes to mind.
15:19  25  The drink doesn't even come to my mind.  It is

Page 158

15:19  1  a different category, different channels.  It
15:19  2  didn't even come to my mind.  So I'm referring
15:19  3  to junior users use that Monster Energy use of
15:19  4  clothing, that's what I'm referring to.
15:19  5    Q.    Okay.  That's what you looked into?
15:19  6  So you were looking into when Monster Energy
15:19  7  began --
15:19  8    A.    What?
15:19  9    Q.    You were looking into when Monster
15:20  10  Energy began using the trademark on clothing?
15:20  11    A.    Yes.
15:20  12    Q.    So I'm a little curious as to why
15:20  13  you were interested only in clothing.  Because,
15:20  14  just as an example, if somebody came out with
15:20  15  Coca-Cola T-shirts, I would think the Coca-Cola
15:20  16  Company would have an issue with that.
15:20  17    A.    It's a different set of
15:20  18  circumstances in Coca-Cola than Monster Energy.
15:20  19  It's a different set of circumstances.  I can
15:20  20  go into it, but I am not sure it is my role to
15:20  21  talk about trademark expertise.
15:20  22        MR. MORTNER:  Let's have a
15:20  23  question.
15:20  24        THE WITNESS:  What?
15:20  25        MR. MORTNER:  Let's have a

Page 159

15:20  1  question.
15:20  2    A.    Yes, let's have a question.
15:20  3    Q.    I guess my question is:  Why did
15:20  4  you think Monster's use on energy drinks was
15:20  5  completely irrelevant to your analysis?
15:20  6    A.    It is not in the same field.  It is
15:20  7  not related.
15:21  8    Q.    Okay.  But in the case of Coca-Cola
15:21  9  a T-shirt isn't necessarily related goods to
15:21  10  soda?
15:21  11    A.    Coca-Cola is different
15:21  12  circumstances, different facts to be
15:21  13  considered.  Coca-Cola is not Monster.  Monster
15:21  14  is not Coca-Cola.  There are different DuPont
15:21  15  factors to be considered.
15:21  16    Q.    And what are different elements?
15:21  17    A.    I am not here as an expert.  Maybe
15:21  18  you have to have an expert to explain it.  Maybe
15:21  19  off the record when we get off the deposition I
15:21  20  will be glad to help you out.
15:21  21    Q.    I'm not asking for your help.  I'm
15:21  22  asking for your testimony.
15:21  23    A.    You're not asking for my testimony
15:21  24  as an expert witness, correct?
15:21  25    Q.    Not as an expert witness.  I'm

Page 160

15:21  1  trying to understand what went into your
15:21  2  analysis historically as you were advising
15:21  3  Yosef Amar about his rights.
15:22  4        Is there a written contract that
15:22  5  assigns the 3DL mark from Joe Cool to
15:22  6  Consolidated?
15:22  7    A.    No.
15:22  8    Q.    Why was there were no written
15:22  9  contract?
15:22  10    A.    Because we are like family.  We are
15:22  11  from the same religious community.  We treat
15:22  12  each other as family.  We have the same rabbis,
15:22  13  same spiritual leaders.
15:22  14    Q.    Do you ever advise clients seeking
15:22  15  assignments of trademark rights?
15:22  16    A.    Excuse me?
15:22  17    Q.    Do you ever give advice to clients
15:22  18  who are seeking to acquire trademark rights?
15:22  19    A.    It is not relevant to this.  What
15:22  20  is the question, underlying question?  I don't
15:22  21  understand.
15:22  22    Q.    Well, my question to you is:  When
15:23  23  you advise clients who are seeking assignments,
15:23  24  do you advise them to get those assignments in
15:23  25  writing?

7065eec4-b2f1-4c8b-9b56-9cffeaea27b6

Page 161

15:23 1    A.   If they are not from the same
15:23 2  religious community, they do not have the same
15:23 3  spiritual background, yes, I do.
15:24 4    Q.   Did the assignment of the 3DL mark
15:24 5  include any assignments of other logos or
15:24 6  designs?
15:24 7    A.   Anything to do -- anything related
15:24 8  to the 3DL mark.
15:24 9    Q.   How is that expressed verbally in
15:24 10  the oral contract?
15:24 11    A.   Anything to do with -- just as I'm
15:24 12  saying, anything to do with this mark, anything
15:24 13  trademark related to it, any trademark that the
15:24 14  3DL was based off in 1987 as well.
15:24 15    Q.   Okay.  So going back to Exhibit
15:24 16  number --
15:24 17    A.   Yes.
15:24 18    Q.   -- 53 --
15:24 19    A.   Theoretically, yes.
15:24 20    Q.   So Consolidated has an assignment
15:24 21  of the design shown in Exhibit 53?
15:24 22    A.   Yes.  Anything that has anything to
15:24 23  do with 3DL mark, the skinny 1993 mark and the
15:24 24  fat mark was drawn from was assigned, yes.
15:25 25      (Discussion held off the record.)

Page 162

15:25 1    Q.   So is it your understanding that by
15:25 2  virtue of that assignment, Consolidated has the
15:25 3  right to make the lizard shown in Exhibit 53?
15:25 4    A.   Yes.
15:25 5    Q.   And is it your understanding that
15:25 6  because there was an assignment, that Joe Cool
15:25 7  no longer has the right to make what's shown in
15:25 8  Exhibit 53?
15:25 9    A.   No longer has the right.  If we no
15:25 10  longer permit, he not longer has the right.
15:25 11    Q.   So you would not permit Joe Cool to
15:25 12  make Exhibit 53?
15:25 13    A.   I did not say that.
15:25 14    Q.   Okay.  What did you say?
15:25 15    A.   That was not the question.
15:25 16      MR. STEWART:  All right.  Can you
15:25 17  read back the last couple of questions and
15:25 18  answers?
15:25 19      (At which time the following was
15:25 20  read back:
15:25 21      "Question:  And is it your
15:25 22  understanding that because there was an
15:25 23  assignment, that Joe Cool no longer has
15:25 24  the right to make what's shown in Exhibit
15:25 25  53?

Page 163

15:25 1      "Answer:  No longer has the right.
15:25 2  If we no longer permit, he not longer has
15:25 3  the right.
15:25 4      "Question:  So you would not permit
15:25 5  Joe Cool to make Exhibit 53.
15:25 6      "Answer:  I did not say that.")
15:26 7    A.   That should be perfectly clear.  It
15:26 8  is perfectly clear to me.
15:26 9    Q.   Okay.  Well, it is not clear to me,
15:26 10  so let me ask a couple of more questions.
15:26 11    A.   Sure.
15:26 12    Q.   Is it your understanding that Joe
15:26 13  Cool has the right to make what is shown in
15:26 14  Exhibit 53 only with Consolidated's permission?
15:26 15    A.   With Consolidated or maybe unless
15:26 16  we decide to ask him to stop.  Either way.  But
15:27 17  if it has anything to do with the 3DL mark, he
15:27 18  assigned all of those marks to us.
15:27 19    Q.   Let me show you what's previously
15:27 20  marked as Exhibit 48.  Is this another design
15:27 21  that was assigned by Joe Cool to Consolidated?
15:27 22    A.   I don't know about any particular
15:27 23  design, because what you are interested in and
15:27 24  what we are interested in was the designs from
15:27 25  1993.  So we don't have a particular interest

Page 164

15:27 1  in this design.  If we do we, will make a
15:27 2  determination that we should control.
15:27 3    Q.   How do you make the determination
15:27 4  that Exhibit number 53 --
15:28 5    A.   Because I see a claw mark.  And you
15:28 6  could see the idea for the claw mark and the
15:28 7  claw comes out.  We are taking from this part
15:28 8  to this.  You can see the evolution of the
15:28 9  1993.
15:28 10    Q.   Is it your understanding that Joe
15:28 11  Cool was the first to market T-shirts with
15:28 12  lizards or iguanas that had claws?
15:28 13    A.   I don't remember.
15:28 14    Q.   Okay.
15:28 15    A.   But it is my understanding of where
15:28 16  he drew the idea from to get to those claws.
15:28 17    Q.   And what process would you go
15:28 18  through to determine whether or not the design
15:28 19  shown in Exhibit 48 is included within the
15:28 20  assignment of rights that you received from Joe
15:29 21  Cool?
15:29 22    A.   I don't understand the question.
15:29 23    Q.   What process would you go through
15:29 24  to determine whether or not the design shown in
15:29 25  this Exhibit 48 was included within the

7065eec4-b2f1-4c8b-9b56-9cffeaea27b6

Page 165

15:29  1   assignment that you received from Joe Cool?
15:29  2       THE WITNESS:  Could you interpret
15:29  3   that?  I need an interpretation into
15:29  4   English.
15:29  5       MR. MORTNER:  How do you make a
15:29  6   decision that this is or is not part of
15:29  7   the assignment?
15:29  8       A.   That is a very good question.
15:29  9   Because if it has anything to do -- if it shows
15:29 10   the claw design in any way on it, we consider
15:29 11   it assigned.  If it doesn't have a claw design,
15:29 12   we don't consider it assigned.
15:29 13       The first T-shirt that you showed
15:30 14   me clearly shows the claw design, the 3D claw
15:30 15   design.  This doesn't so much show it.
15:30 16       Q.   This is a claw up here?
15:30 17       A.   Oh, yeah.  It doesn't interest us
15:30 18   that much, this particular thing.
15:30 19       Q.   Did Joe Cool and Consolidated ever
15:30 20   specifically discuss designs with animals and
15:30 21   claws?
15:30 22       A.   No.  We basically were
15:30 23   concentrating on the skinny 1993 mark and its
15:30 24   evolution into the 2010 mark.  Those are the
15:30 25   two marks that interested us, with and without

Page 166

15:31  1   the names of cities.
15:31  2       Q.   Okay.  I'm going to show you a
15:31  3   document that I will ask the reporter to mark
15:31  4   as Exhibit 106?
15:31  5       (Whereupon Exhibit 106, Part of
15:31  6   the National Trademarks Center website,
15:31  7   was marked for identification.)
15:32  8       (Discussion held off the record.)
15:32  9       A.   It is very small.  I can't make it
15:32 10   out.  Do you have a question?
15:32 11       Q.   Yes.  Do you recognize this as
15:32 12   being part of the National Trademarks Center
15:32 13   website?
15:32 14       A.   Part of the National Trademarks
15:32 15   website?  I don't know.  I don't remember
15:32 16   seeing this.
15:32 17       MR. MORTNER:  Do you know if you
15:32 18   authorized this website?
15:32 19       THE WITNESS:  I don't think so.
15:32 20   Hold on a second.
15:33 21       A.   No, I did not authorize this
15:33 22   website.
15:33 23       Q.   Okay.  Then I don't think I'm going
15:33 24   to have any further questions about it.
15:33 25       A.   Okay.

Page 167

15:33  1       MR. MORTNER:  They had an employee
15:33  2   that they had to fire.
15:33  3       THE WITNESS:  You should go off the
15:33  4   record.
15:33  5       MR. MORTNER:  So this might have
15:33  6   been something in connection with that.
15:33  7   BY MR. STEWART:
15:33  8       Q.   When did you first become aware
15:33  9   that Monster Energy had trademark registrations
15:33 10   for its M claw for any kind of product?
15:33 11       A.   Okay.  Just go slowly.
15:33 12       Q.   Sure, sure, sure.  When did you
15:33 13   personally first become aware that Monster
15:34 14   Energy had registrations for the M claw
15:34 15   trademark for any product?
15:34 16       A.   After this lawsuit came about.
15:34 17   When the lawsuit came about.
15:34 18       Q.   So you had not done any kind of
15:34 19   search or otherwise located any of the Monster
15:34 20   Energy trademarks?
15:34 21       A.   No, no, no.
15:34 22       Q.   Okay.
15:34 23       MR. MORTNER:  Are you sure about
15:34 24   the answer you just gave?
15:34 25       THE WITNESS:  What?  That's why I'm

Page 168

15:34  1   about to say something.
15:34  2       MR. MORTNER:  I want you to think
15:34  3   again whether or not you're sure about
15:34  4   that answer whether you did any trademark
15:34  5   searches.
15:34  6       THE WITNESS:  No, no, no.  First of
15:34  7   all...
15:34  8       MR. MORTNER:  You've got to make it
15:35  9   so she can hear you.  You are on the
15:35 10   record.  David, you've got to look at her.
15:35 11       THE WITNESS:  You've got to excuse
15:35 12   me.  I'm a little dizzy.
15:35 13       MR. MORTNER:  Do you want to take a
15:35 14   break?
15:35 15       MR. MORTNER:  Yes.
15:35 16       MR. STEWART:  That's fine.
15:35 17       THE VIDEOGRAPHER:  3:35 off the
15:35 18   record.  And the end of DVD 3.
15:35 19       (Whereupon a short break was
15:51 20   taken.)
15:51 21       THE VIDEOGRAPHER:  On the record
15:51 22   beginning of DVD four.
15:51 23       A.   I want to correct something about
15:52 24   prior depositions.  Number one, I was
15:52 25   deposed -- I was in Israel and I was deposed on

42 (Pages 165 to 168)

Page 169

15:52 1 film on the M&B case, which you are familiar
15:52 2 with. And there was one other case that I
15:52 3 recall now where I was deposed as an expert as
15:52 4 a trademark, whatever you want to call it.
15:52 5 This is about 20 years ago. I forget the style
15:52 6 of the case.
15:52 7      Q.   Okay. I appreciate the correction.
15:52 8      I'd like you to turn now to Exhibit
15:52 9 94.
15:52 10      A.   And on the -- excuse me for one
15:52 11 second. On the searches -- I mean we did a
15:52 12 search in the marketplace by asking various
15:53 13 dealers. But this wasn't a new mark. This was
15:53 14 a design mark. It's very difficult to search a
15:53 15 design mark in the Patent Office. In the State
15:53 16 trademark registration systems you can't take
15:53 17 really check a design mark because they have no
15:53 18 system by which to check it. And in the
15:53 19 federal system it's almost as hard to do a
15:53 20 search on design as opposed to search on a
15:53 21 name. So I don't recall that we did the search
15:53 22 on the design even though we checked the
15:53 23 market.
15:53 24      Q.   Okay.
15:53 25      A.   I don't know if that answers.

Page 170

15:53 1      Q.   I think that answers the question.
15:53 2      If you turn now to Exhibit 94,
15:53 3 which is on top of the stack.
15:54 4      A.   This is it?
15:54 5      Q.   And this is the e-mail
15:54 6 correspondence between yourself and Renee
15:54 7 Daggerhart of the South Carolina Secretary of
15:54 8 State's Office.
15:54 9      A.   We went over this before.
15:54 10      Q.   Yes, we did. I just have one
15:54 11 question, a different question about it.
15:54 12      If you look at the third page.
15:54 13      A.   Yes, I'm looking at the third page.
15:54 14      Q.   The e-mail there. And if you look
15:54 15 at the previous page, this e-mail is from you,
15:54 16 it says "Our application for Consolidated
15:54 17 preceding Hansen's."
15:54 18      A.   I don't see it. We have different
15:54 19 third pages.
15:54 20      Q.   Page --
15:54 21      MR. MORTNER: The very top.
15:54 22      Q.   Yes. The very, very top.
15:54 23      A.   "Our applic for Consolidated
15:54 24 preceding Hansen's." Yeah, okay.
15:54 25      Q.   Do you see that?

Page 171

15:54 1      A.   Yes.
15:54 2      Q.   First of all, do you have any
15:54 3 recollection of writing that?
15:55 4      A.   Yes.
15:55 5      Q.   Okay. And what did you mean by
15:55 6 "Our application for Consolidated preceding
15:55 7 Hansen's"?
15:55 8      A.   Just what it says.
15:55 9      Q.   That Consolidated --
15:55 10      A.   "Preceding Hansen's," I don't
15:55 11 recall what it is. I don't recall. But it
15:55 12 says what it means -- it means what it says,
15:55 13 Our application for the registration for
15:55 14 Consolidated precedes Hansen's.
15:55 15      Q.   Hansen's application?
15:55 16      A.   Yes. Hansen's I presume.
15:55 17      Q.   So what I'm trying to understand is
15:55 18 if by the time you wrote this e-mail you were
15:55 19 aware of a trademark application for Hansen's?
15:55 20      A.   In August 2011 --
15:55 21      Q.   2010.
15:55 22      A.   I don't recall. I don't recall
15:55 23 these dates. I don't recall.
15:56 24      Q.   Okay. By the way, did you, in
15:56 25 fact, have an application pending with the

Page 172

15:56 1 South Carolina Secretary of State's Office for
15:56 2 the three drooping lines trademark?
15:56 3      A.   I think Joe Cool -- Joe Amar.
15:56 4      Q.   Do you know what became of it?
15:56 5      A.   No, I don't remember.
15:56 6      Q.   What is the current business of
15:56 7 Consolidated?
15:56 8      A.   Acquisition of trademarks. But
15:56 9 right now it is dormant because of what
15:56 10 plaintiff did in this case, because of what
15:57 11 plaintiff has done to Consolidated, ruining its
15:57 12 business and its business potential.
15:57 13      Q.   How did what plaintiff has done
15:57 14 ruined Consolidated's business reputation?
15:57 15      A.   People, many dealers now perceive
15:57 16 Consolidated as counterfeiters. Plaintiff sent
15:57 17 out cease and desist letters. They painted
15:57 18 Consolidated as counterfeiters.
15:57 19      And many people know about the
15:57 20 seizure that happened. And they know that the
15:57 21 seizure was against Consolidated, not just Joe
15:57 22 Cool, Joe Cool and Consolidated. And Joe
15:57 23 Cool's reputation was also associated with
15:57 24 Consolidated. And many people thought directly
15:58 25 that Consolidated are counterfeiters.

7065eec4-b2f1-4c8b-9b56-9cffeaea27b6

Page 173

```
15:58   1      Q.    Name some dealers who now regard
15:58   2  Consolidated --
15:58   3      A.    Menachem Schneerson knows this
15:58   4  better.  He is involved in marketing and so on.
15:58   5  He would be better know.  But in large, people
15:58   6  now perceive Consolidated as a bunch of
15:58   7  counterfeiters.  They don't perceive
15:58   8  Consolidated as the first users.
15:58   9      Q.    And how do they -- how do they know
15:58  10  that Consolidated was associated with the
15:58  11  seizure?
15:58  12      A.    Because it was in the newspapers.
15:58  13  I think it was in broadcast news.  The news
15:58  14  spread like snowball with all the dealers.  All
15:58  15  the dealers found out within two days what
15:58  16  happened.
15:58  17      Q.    Which dealers found out within two
15:58  18  days?
15:58  19      A.    Well, first of all, the store
15:58  20  owners that buy these stickers, that buy these
15:59  21  heat transfers and T-shirts from Joe Cool from
15:59  22  this joint venture that we have.  So all these
15:59  23  people found out that these were seized from
15:59  24  us, that it was alleged that we were
15:59  25  counterfeiters, you know, by big a multibillion
```

Page 174

```
15:59   1  dollar company.  They didn't know it was like
15:59   2  sleazy paperwork was given to the judge.  They
15:59   3  thought it was the real thing that we were
15:59   4  counterfeiters.  And it did a lot of damage to
15:59   5  us.
15:59   6          Our reputation went down to almost
15:59   7  zero.  Joe Cool's business went down 60
15:59   8  percent.  And other items as well.  They now
15:59   9  perceive Joe Cool as a counterfeiters.  They
15:59  10  perceive Consolidated as counterfeiters.  The
15:59  11  only people who know us closely and know what
15:59  12  really happened understand that it is a Monster
15:59  13  Energy.
15:59  14      Q.    Can you name any of these companies
15:59  15  that perceive Consolidated --
16:00  16      A.    Menachem would know better because
16:00  17  that is his end of the business.
16:00  18      Q.    Okay.  Did he --
16:00  19      A.    And it damaged our business
16:00  20  potential.  We had serious business potential
16:00  21  and we got cut off at the knees.
16:00  22      Q.    Did you do anything to inform the
16:00  23  public that the seizure -- the Court ruled that
16:00  24  the Seizure Order was issued incorrectly?
16:00  25      A.    No.  Nothing serious, because it is
```

Page 175

```
16:00   1  very hard to overcome this massive information,
16:00   2  dissemination of information that was done in a
16:00   3  massive basis, you know, through the news
16:00   4  broadcast and the newspaper articles.  And
16:00   5  Monster Energy, plaintiff's own letters to
16:00   6  dealers don't deal with Consolidated, you know,
16:00   7  they are counterfeiters, basically in words.
16:00   8  It is very difficult to overcome.  You need
16:00   9  massive amounts of money to overcome.
16:01  10      Q.    Did you attempt to speak to the
16:01  11  reporters who ran the original articles and let
16:01  12  them know about the Court decision?
16:01  13      A.    No.  Because we are not really good
16:01  14  public relations people.  I don't know how to
16:01  15  do this.  There are people that know how to do
16:01  16  this.  I don't know who to do this.
16:01  17          And the reporter ran the story that
16:01  18  Joe Cool was busted for counterfeiting.  It is
16:01  19  was all over the newspaper.  Every dealer in
16:01  20  the area knows.  Every dealer up and down the
16:01  21  coast of the United States, the eastern
16:01  22  seaboard, they know that Joe Cool was
16:01  23  counterfeiters.  It makes headline news within
16:01  24  the T-shirt community and the T-shirt shop
16:01  25  owners.  It spread like wildfire.
```

Page 176

```
16:01   1      Q.    Do they know that Consolidated was
16:01   2  associated with Joe Cool?
16:01   3      A.    Sure.
16:01   4      Q.    And how do they know that?
16:01   5      A.    Because that was in the report, the
16:01   6  newspapers.  They gave each other copies of the
16:01   7  Complaint, of the Seizure Order that said the
16:02   8  Hansen Beverage versus Joe Cool, Inc.,
16:02   9  Consolidated, Mettemp and so on.  It ruined us
16:02  10  it is like the plague, it spread.
16:02  11      Q.    Can you --
16:02  12      A.    It is very hard to overcome.
16:02  13      Q.    Can you name any business that has
16:02  14  refused to do business with you since the
16:02  15  seizure?
16:02  16      A.    Not directly, but Menachem
16:02  17  Schneerson could.  Menachem Schneerson could
16:02  18  name many of them.
16:02  19      Q.    Did you consider doing business
16:02  20  under another name?
16:02  21      A.    And Joe Cool, you know.  If people
16:02  22  wouldn't buy from Joe Cool, they wouldn't buy
16:02  23  other items, let alone this item.  So they
16:02  24  associated it with Consolidated and Mettemp and
16:02  25  me personally as well, that somehow I was a
```

Page 177

16:02  1  partner in it and Menachem.  It ruined our
16:02  2  reputation in this business, in the T-shirt
16:02  3  shop business.  It ruined our potential
16:03  4  business.  It did serious damage.
16:03  5      Q.   Had you ever done any business in
16:03  6  the T-shirt shop business before?
16:03  7      A.   What.
16:03  8      Q.   Had you ever done any T-shirt shop
16:03  9  business beforehand?
16:03  10     A.   No.  We did some business with
16:03  11 Mettemp, but not with Consolidated.
16:03  12     Q.   Okay.
16:03  13     A.   I didn't personally.
16:03  14     Q.   If there's business out there to be
16:03  15 had, why don't you just have another company
16:03  16 like Mettemp do the business?
16:03  17     A.   I don't know.  Perhaps you should
16:03  18 be a consultant to our company and help us get
16:03  19 back on our feet to overcome this disaster.
16:03  20 It's serious disaster.  Once the word spreads
16:03  21 out that you are a counterfeiter, an alleged
16:03  22 counterfeiter, people break a deal with you.
16:04  23 It is very true.
16:04  24         (Discussion held off the record.)
16:04  25     Q.   So getting back to my original

Page 178

16:04  1  question, currently does Consolidated have any
16:04  2  business?
16:04  3      A.   Currently it suspended its
16:04  4  operation.
16:04  5      Q.   And other than the 3DL business,
16:04  6  has Consolidated conducted any business in the
16:04  7  past?
16:04  8      A.   It was formed for this.
16:05  9  Essentially it was formed for this, to buy
16:05  10 trademarks.
16:05  11     Q.   When did Consolidated enter into
16:05  12 the joint venture agreement with Joe Cool?
16:05  13     A.   I don't remember the exact date,
16:05  14 but I would say sometime in 2010.
16:05  15     Q.   Okay.
16:05  16     A.   Maybe at the end of 2009 or the
16:05  17 beginning of 2010.  I don't know the exact
16:05  18 date.
16:05  19     Q.   And is that joint venture agreement
16:05  20 in writing?
16:05  21     A.   What?
16:05  22     Q.   Is that joint venture agreement in
16:05  23 writing?
16:05  24     A.   No.  Oral.
16:05  25     Q.   So which specific individuals

Page 179

16:05  1  entered into the oral agreement to form the
16:05  2  joint venture?
16:05  3      A.   Yosef Amar, Menachem Schneerson and
16:06  4  myself.
16:06  5      Q.   Okay.  So the three of you
16:06  6  participated?
16:06  7      A.   Yes.
16:06  8          Will you excuse me a for second?
16:06  9          THE VIDEOGRAPHER:  4:06 off the
16:06  10 record.
16:08  11         (Discussion held off the record.)
16:08  12         THE VIDEOGRAPHER:  4:08 on the
16:08  13 record.
16:08  14     A.   Again, I'm sorry for having
16:08  15 something to eat, but I am on antibiotics.  On
16:08  16 the record.
16:08  17     Q.   Understood.
16:08  18         What were the terms of the oral
16:08  19 agreement that formed the joint venture?
16:08  20     A.   That we would be half and half
16:09  21 partners in this venture of the 3DL and various
16:09  22 other marks that we may own together,
16:09  23 specifically in the 3DL.
16:09  24     Q.   Were there other marks that were
16:09  25 part of the deal as well?

Page 180

16:09  1      A.   Not at that very time, but we were
16:09  2  going to get other marks together because we
16:09  3  had 200 trademarks and we were going to decide
16:09  4  which trademark was good for marketing.  Not
16:09  5  every trademark has a good potential.  We
16:09  6  deemed this to be a good potential.
16:09  7      Q.   Which party had the right to make
16:09  8  the basic business decisions for the joint
16:09  9  venture?
16:09  10     A.   I don't know what you mean business
16:09  11 decisions.
16:09  12     Q.   Who had the right to decide where
16:09  13 the 3DL T-shirts would be sold?
16:09  14     A.   We did here at Consolidated.
16:09  15     Q.   Consolidated?
16:09  16     A.   Because all the rights to the mark
16:09  17 were assigned to Consolidated.  The trademark
16:09  18 right, every right in the trademark was
16:10  19 assigned.  So we stepped into the shoes of the
16:10  20 prior trademark as the assignee.
16:10  21     Q.   Who was responsible for designing
16:10  22 the T-shirts that are featured in the 3DL main?
16:10  23     A.   Joe Cool.
16:10  24     Q.   Who was --
16:10  25     A.   Joe Cool, Joseph Amar.

7065eec4-b2f1-4c8b-9b56-9cffeaea27b6

Page 181

16:10  1   Q.   Yes. I know they are the same.
16:10  2   They are interchangeable, exactly.
16:10  3        Which party was responsible for
16:10  4   selecting the actual T-shirts, deciding what
16:10  5   brand T-shirt to use?
16:10  6   A.   Joe Cool.
16:10  7   Q.   And what party was responsible for
16:10  8   making the heat transfers that would be used?
16:10  9   A.   Joe Cool.
16:10 10   Q.   What party owned the T-shirts and
16:10 11   heat transfers?
16:10 12   A.   Both the joint venture.
16:11 13   Q.   You already said that you were
16:11 14   entitled to receive profits 50-50?
16:11 15   A.   Yes.
16:11 16   Q.   Any what party was required to
16:11 17   suffer any losses?
16:11 18   A.   The joint venture.
16:11 19   Q.   The joint venture 50-50?
16:11 20   A.   Yes.
16:11 21   Q.   Okay. Which party was responsible
16:11 22   for applying for trademark registrations?
16:11 23   A.   We did, Consolidated.
16:11 24   Q.   And which party was responsible for
16:11 25   defending those trademarks in court?

Page 182

16:11  1   A.   Consolidated.
16:11  2   Q.   Okay. And why didn't Consolidated
16:11  3   appear --
16:11  4   A.   Go ahead.
16:11  5   Q.   Why didn't Consolidated appear in
16:11  6   the current litigation for the first year?
16:11  7   A.   Because we didn't get served and
16:11  8   our attorney --
16:11  9        THE WITNESS: I don't know if I
16:11 10   should get into this, Moshe.
16:11 11        MR. MORTNER: I think you answered
16:11 12   the question already.
16:11 13   A.   Yeah, we weren't served.
16:11 14   Q.   All right. I'd like to go back to
16:12 15   the Counterclaim, which is Exhibit 72, which is
16:12 16   the thick document. And if you could turn to
16:12 17   page 21.
16:12 18   A.   You wouldn't believe it, I opened
16:12 19   it up right to it.
16:12 20   Q.   If you look at paragraph 150 c), do
16:12 21   you see there's --
16:12 22   A.   Say that again.
16:12 23   Q.   150 c). Do you see there is an a),
16:12 24   b) and a c)?
16:12 25   A.   Yes.

Page 183

16:13  1   Q.   I apologize. I want to go to 150
16:13  2   e) first.
16:13  3   A.   Okay.
16:13  4   Q.   And it says "CDI and Joe Cool, Inc.
16:13  5   Formed Joe Cool Bike Week as a legal entity
16:13  6   through which" --
16:13  7   A.   Which am I reading?
16:13  8   Q.   150 e).
16:13  9        MR. MORTNER: Which document?
16:13 10        MR. STEWART: Oh, which document.
16:13 11   I'm sorry.
16:13 12   Q.   This is Consolidated's and your
16:13 13   Answer and Counterclaims.
16:13 14   A.   Okay.
16:13 15   Q.   So paragraph e), "CDI and Joe Cool,
16:13 16   Inc. formed Joe Cool Bike Week, Inc. as a legal
16:13 17   entity through which to conduct some of the
16:13 18   joint venture's business through." Do you see
16:13 19   that?
16:13 20   A.   Yes.
16:13 21   Q.   Is that -- did CDI and Joe Cool
16:13 22   actually conduct business through Joe Cool Bike
16:13 23   Week, Inc.?
16:13 24   A.   Not at all.
16:13 25   Q.   And why not?

Page 184

16:13  1   A.   Because Joe Cool formed it, not
16:13  2   CDI. Joe Cool formed it just for bank account
16:14  3   purposes. We had nothing to do with that.
16:14  4   Q.   What do you mean for bank account
16:14  5   purposes?
16:14  6   A.   Huh?
16:14  7   Q.   What do you mean by the phrase for
16:14  8   bank account purposes?
16:14  9   A.   So he could separate the
16:14 10   segregation of these profits from our trademark
16:14 11   for the joint venture from his other trademarks
16:14 12   which we had nothing to do with. So to
16:14 13   segregate it you open another bank account. In
16:14 14   order to open a bank account you form this
16:14 15   company. We had nothing to do with it.
16:14 16   Q.   Okay. All right. If you will turn
16:15 17   the page you will see there is a paragraph f).
16:15 18   A.   What page? 22?
16:15 19   Q.   22.
16:15 20   A.   Okay.
16:15 21   Q.   And paragraph f) says "CDI agreed
16:15 22   to direct a nationwide sales marketing
16:15 23   campaign, utilizing CDI's nationwide network of
16:15 24   T-shirt and preprinted apparel retailers." Do
16:15 25   you see that?

7065eec4-b2f1-4c8b-9b56-9cffeaea27b6

| | Page 185 |
|---|---|

16:15  1     A.    Yes.

16:15  2     Q.    Who is part of CDI's nationwide

16:15  3   network?

16:15  4     A.    I don't know.  You would have to

16:15  5   ask Menachem.

16:15  6     Q.    So you don't know yourself?

16:15  7     A.    No.

16:15  8     Q.    Didn't you testify earlier that the

16:15  9   3DL trademark was CDI's first business venture?

16:15  10     A.    I did.

16:15  11     Q.    So CDI didn't have any experience

16:15  12   in the past in dealing with --

16:15  13     A.    No.  Menachem Schneerson did.  And

16:15  14   he brought his experience to CDI.  CDI had

16:16  15   experience through Menachem Schneerson.

16:16  16     Q.    Do you know whether the nationwide

16:16  17   marketing campaign ever took place?

16:16  18     A.    Huh?

16:16  19     Q.    Did the nationwide marketing

16:16  20   campaign mentioned in paragraph f) ever take

16:16  21   place?

16:16  22     A.    Uh-huh.  It started.  Menachem

16:16  23   Schneerson got some people in the business, he

16:16  24   brought some people together who were willing

16:16  25   to invest money and promote it with serious

| | Page 186 |
|---|---|

16:16  1   experience and promotion marketing these

16:16  2   things.  So he began to put this in place.

16:16  3     Q.    What types of promoting and

16:16  4   marketing took place?  Were there

16:17  5   advertisements?

16:17  6     A.    They were going to do whatever

16:17  7   needs to be done in the promotion and marketing

16:17  8   of these things.  I am not a marketing person,

16:17  9   so I don't know.

16:17  10     Q.    Okay.

16:17  11     A.    But I do know that it was already

16:17  12   began, the wheels were put in motion.

16:17  13     Q.    Okay.  Take a look at paragraph l),

16:17  14   which is the final paragraph before 151.  Do

16:17  15   you see that?

16:17  16     A.    Yes.

16:17  17     Q.    Okay.  It says "CDI and Joe Cool,

16:17  18   Inc. began marketing wholesale sales of the

16:17  19   preprinted T-shirts and the heat transfers."

16:17  20   Do you see that?

16:17  21     A.    Yes.

16:17  22     Q.    Did all of those sales occur

16:17  23   through the joint venture?

16:17  24     A.    I think so, yes.

16:17  25     Q.    So there were no separate sales by

| | Page 187 |
|---|---|

16:18  1   CDI of 3DL merchandise?

16:18  2     A.    No.

16:18  3     Q.    There were --

16:18  4     A.    There was promotion by CDI.  But

16:18  5   the actual sales were made by the joint

16:18  6   venture.

16:18  7     Q.    Okay.  So there were no separate

16:18  8   sales by Joe Cool as 3DL owners?

16:18  9     A.    That I am not sure.  People would

16:18  10   call Joe Cool and ask for this product.

16:18  11     Q.    Those were sales of the joint

16:18  12   venture; is that correct?

16:18  13     A.    Yes.  The profits were the joint

16:18  14   venture.

16:18  15     Q.    Okay.

16:18  16     A.    All profits were the joint venture.

16:18  17   All ownership of the goods and heat transfers

16:18  18   and T-shirts belonged to the joint venture.

16:19  19     Q.    I'm going to show you a shirt

16:19  20   that's previously been marked as Exhibit number

16:19  21   4.  And I just want to ask you if this is one

16:19  22   of the shirts that was sold by the joint

16:19  23   venture?  I can show you the back too.

16:19  24     A.    I see our marks there, so I presume

16:19  25   yes.  I see our skinny mark.  I see our wider

| | Page 188 |
|---|---|

16:19  1   mark.

16:19  2     Q.    Okay.

16:19  3     A.    I presume yes.

16:19  4     Q.    One more T-shirt.  This is the one

16:20  5   that was marked as Exhibit 14 that I showed you

16:20  6   earlier.  Do you know whether this shirt was

16:20  7   sold by the joint venture?

16:20  8     A.    I don't know.  I don't know.

16:20  9     Q.    I'm showing you the back just in

16:20  10   case it refreshes your recollection.

16:20  11     A.    I don't know.

16:20  12     Q.    Okay.  If you look at paragraph 150

16:20  13   i) of the Counterclaim on page 22, paragraph

16:20  14   i), it says "CDI and Joe Cool, Inc. agreed that

16:20  15   CDI" -- I'm on the wrong one.  I'm sorry.  I

16:21  16   wanted to be on 150 j).

16:21  17     A.    Huh?

16:21  18     Q.    It says "To get the joint venture

16:21  19   started, CDI arranged for an interest-free and

16:21  20   collateral-free loan to Yosef Amar, the

16:21  21   principal of Joe Cool, Inc., in the amount of

16:21  22   $10,000 for the purpose of financing the

16:21  23   production of heat transfer stickers utilizing

16:21  24   the 3DL marks to be used for the joint

16:21  25   venture."  Do you see that?

7065eec4-b2f1-4c8b-9b56-9cffeaea27b6

Page 189

16:21  1    A.    Yes.
16:21  2    Q.    Did CDI, in fact, loan $10,000 to
16:21  3  Yosef Amar?
16:21  4    A.    Yes.
16:21  5    Q.    And why was the money loaned to
16:21  6  Yosef Amar rather than to Joe Cool, Inc.?
16:21  7    A.    I think it was a loan to the joint
16:21  8  venture to -- I don't know.  You have to ask
16:22  9  Menachem Schneerson.
16:22  10    MR. MORTNER:  He testified that the
16:22  11    loan was really a loan to the joint
16:22  12    venture.
16:22  13    Q.    Is that your testimony, that the
16:22  14  loan was really to the joint venture?
16:22  15    A.    Absolutely.
16:22  16    Q.    Okay.  So it was not a loan to Mr.
16:22  17  Amar personally?
16:22  18    A.    Not personally.
16:22  19    Q.    Did the joint venture ever pay the
16:22  20  loan back to Consolidated?
16:22  21    A.    (Witness nodding.)
16:22  22    Q.    So does the joint venture still owe
16:22  23  that money to Consolidated?
16:22  24    A.    Absolutely.
16:23  25    Q.    Aside from the $10,000 loan, did

Page 190

16:23  1  the joint venture arrange for any other
16:23  2  financing -- excuse me.  Did Consolidated
16:23  3  arrange for any other financing to the joint
16:23  4  venture?
16:23  5    A.    In the process of it, and it also
16:23  6  did a lot of the paperwork for the joint
16:23  7  venture, which a lot of time and energy went
16:23  8  into it.
16:23  9    MR. MORTNER:  What was the
16:23  10    question?
16:23  11    Q.    The question was:  Did Consolidated
16:23  12  arrange for any additional financing for the
16:23  13  joint venture?
16:23  14    MR. MORTNER:  Yes or no?
16:23  15    A.    Did it give them any more money?  I
16:23  16  don't think so, but I'm not sure.  You've got
16:24  17  to ask Menachem.  Menachem did the finances.
16:24  18  So I don't know if it gave them more money or
16:24  19  not.  I don't think so.  You've got to ask
16:24  20  Menachem of that to make sure.
16:24  21    Q.    All right.  If you look at
16:24  22  paragraph 150 k), it says "Joe Cool, Inc.
16:24  23  produced" --
16:24  24    A.    150?
16:24  25    Q.    K) as in kangaroo.  It says "Joe

Page 191

16:24  1  Cool, Inc. produced 100,000 heat transfer
16:24  2  stickers utilizing the 3DL marks and began the
16:24  3  process of affixing the heat transfers to
16:24  4  T-shirts to create preprinted T-shirts for the
16:24  5  joint venture."  Do you see that?
16:24  6    A.    Yes.
16:24  7    Q.    Okay.  First of all, is that an
16:24  8  accurate statement?
16:25  9    A.    Yes.
16:25  10    Q.    Okay.  How do you know how many
16:25  11  heat transfers Joe Cool produced?
16:25  12    A.    Because he told us.
16:25  13    Q.    Okay.  Did it cost more than
16:25  14  $10,000 to produce those heat transfers?
16:25  15    A.    I think so, but I am not sure.
16:25  16  Obviously it cost more.  Just the material cost
16:25  17  10,000.  But there was labor involved and other
16:25  18  costs.
16:25  19    Q.    And do you know who financed those
16:25  20  additional costs?
16:25  21    A.    I don't know.
16:25  22    Q.    Okay.  Did the joint venture ever
16:25  23  realize any profits that were split 50-50?
16:25  24    A.    No.
16:25  25    Q.    Did it realize any profits at all?

Page 192

16:25  1    A.    Not yet.
16:25  2    Q.    Not yet?  Okay.  Well, Joe Cool did
16:26  3  sell some T-shirts, right, and some heat
16:26  4  transfers?
16:26  5    A.    Right.  I think it went into an
16:26  6  increase in production.  It was invested into
16:26  7  making more T-shirts.
16:26  8    Q.    It was --
16:26  9    A.    The transfers in shirts costs
16:26  10  money.
16:26  11    Q.    So the profits were reinvested in
16:26  12  the company basically?
16:26  13    A.    That's what I believe.
16:26  14    Q.    Does the joint venture still do any
16:26  15  business right now?
16:26  16    A.    No.
16:26  17    Q.    Okay.  Have any steps been taken to
16:26  18  formally dissolve the joint venture?
16:26  19    A.    No.
16:26  20    Q.    Have you formed any other joint
16:26  21  ventures with Joe Cool, Inc. besides the one
16:26  22  that sold the 3DL merchandise?
16:26  23    A.    Yes, with Mettemp.
16:27  24    Q.    And what was the subject matter of
16:27  25  that joint venture?

48 (Pages 189 to 192)

Page 193

16:27  1      A.    Daytona Beach Bike Week.
16:27  2      Q.    Okay.  So that was the Daytona
16:27  3  Beach Bike Week that was involved in the
16:27  4  litigation?
16:27  5      A.    That is correct.
16:27  6      Q.    And whose idea was it to register
16:27  7  Daytona Beach Bike Week as a trademark?
16:27  8      A.    Both Joe Amar and myself.  On the
16:27  9  Bike Week, not on the -- as separated from the
16:27 10  3DL, right?
16:27 11      Q.    As separate from 3DL, yes.
16:27 12          Why did you and Mr. Amar decide to
16:27 13  register Joe Cool -- Daytona Beach Bike Week as
16:27 14  a trademark?
16:27 15      A.    To protect the trademark.  Why does
16:27 16  anybody?  For the same reason Monster Energy
16:27 17  did the beverage.
16:27 18      Q.    Well, had you heard of an event
16:27 19  called Daytona Beach Bike Week?
16:27 20      A.    Absolutely, yes.
16:28 21      Q.    Were you aware of the phrase
16:28 22  Daytona Beach Bike Week used by others for
16:28 23  decades?
16:28 24      A.    For decades, no.  But they were
16:28 25  used by others infringing the trademark.

Page 194

16:28  1      Q.    So you were not aware of others who
16:28  2  had been using it before Joe Cool?
16:28  3      A.    Not that -- wait a minute.  Not
16:28  4  anyone who was using it before Joe Cool that
16:28  5  had a prior legal right.  There is a big
16:28  6  difference.
16:28  7          (Discussion held off the record.)
16:28  8      A.    Are you talking about anybody who
16:28  9  had a prior legal right or anybody just used it
16:28 10  before?
16:28 11      Q.    I'm starting off by just talking
16:28 12  about anybody who had use it before?
16:28 13      A.    Nobody else had a prior legal
16:28 14  right.
16:29 15          (Discussion held off the record.)
16:29 16      Q.    Okay.  And what do you mean when
16:29 17  you say that nobody else had a prior legal
16:29 18  right?
16:29 19      A.    We did a search on this one because
16:29 20  it was easy to do on words.  It is easy to do.
16:29 21  And we did a search.  And we determined that,
16:29 22  according to the search that we had done,
16:29 23  nobody had a prior legal right to use it.
16:29 24      Q.    So nobody had a prior registration?
16:29 25      A.    There was a registration.  I

Page 195

16:29  1  believe that was abandoned.
16:29  2      Q.    Okay.
16:29  3      A.    There was a registration that was
16:29  4  abandoned.
16:29  5      Q.    But did you limit your search to
16:29  6  registrations?
16:29  7      A.    Registrations and use in the
16:29  8  market.  Because we asked T-shirt shop owners
16:29  9  if they've seen it.  There were a whole lot of
16:30 10  other infringers.  They used it without any
16:30 11  rights.  Joe Cool has used the Bike Week and
16:30 12  Daytona Bike Week trademarks since 1987 or
16:30 13  whenever he opened up his shop.  I don't
16:30 14  remember the date, whenever he opened up his
16:30 15  shop.  That was one of the first marks he had
16:30 16  ever used.  He pioneered the Daytona Bike Week
16:30 17  mark.
16:30 18          There may have been others who used
16:30 19  it, there was an event that may have been using
16:30 20  it, but not as an indicator of source to print
16:30 21  an event.  You could have use as a
16:30 22  non-trademark use as well.  For informational
16:30 23  purposes, print it up on an T-shirt, but not as
16:30 24  an indicator of source.
16:30 25      Q.    What did Joe Cool do to make it an

Page 196

16:30  1  indicator of source?
16:30  2      A.    Put it in type in papers.  That is
16:30  3  an indicator of source.
16:31  4      Q.    And eventually there was a lawsuit
16:31  5  by the Daytona Beach Chamber of Commerce?
16:31  6      A.    That is correct.
16:31  7      Q.    Yes.  And my understanding is that
16:31  8  Joe Cool defended itself in that lawsuit, but
16:31  9  that Consolidated did not appear?
16:31 10      A.    Again, because Consolidated wasn't
16:31 11  served.  And we hired some fly-by-night lawyer
16:31 12  who took the money and absconded.  And the next
16:31 13  thing that happened our rabbi asked us to leave
16:31 14  it alone even though we had rights.  And he
16:31 15  said the City is involved.  He asked us to let
16:31 16  it go, so we did.  We did what the rabbi asked.
16:31 17      Q.    Okay.
16:31 18      A.    But we had every right to register
16:31 19  it.  There are other bike weeks registered with
16:31 20  other cities.  There were allegations in the
16:31 21  Complaint by people that the phrase Daytona
16:32 22  Beach Bike Week cannot be registered because it
16:32 23  is generic.  And this is simply preposterous.
16:32 24  Whoever it was should have their license taken
16:32 25  away.  But we didn't do anything about this

7065eec4-b2f1-4c8b-9b56-9cffeaea27b6

Page 197

16:32  1   because the rabbi asked us to leave.  Because
16:32  2   the Chamber asked the rabbi to leave it alone.
16:32  3       Q.   After Consolidated acquired the 3DL
16:32  4   mark --
16:32  5       A.   I didn't hear the first word.
16:32  6       Q.   After Consolidated acquired the 3DL
16:32  7   mark from Joe Cool, did Consolidated attempt to
16:32  8   obtain a federal registration for the 3DL mark?
16:32  9       A.   Yes.
16:32 10       Q.   Okay.  I'm going to show you what's
16:33 11   previously been marked as Exhibit 60 and ask
16:33 12   the reporter to remark it as 60, that would be
16:33 13   terrific.  And I will represent that this is a
16:33 14   printout from the Patent and Trademark Office
16:33 15   website.
16:33 16            (Discussion held off the record.)
16:33 17            (Whereupon Exhibit 60, Printout
16:33 18        from the Patent and Trademark Office
16:34 19        website, was marked for identification.)
16:34 20       Q.   All right.  I just have one or two
16:34 21   questions about this mark.  If you look at the
16:34 22   description of the mark about a quarter of the
16:34 23   way down the front page, there is a --
16:34 24       A.   The mark consists of three green
16:34 25   diagonal lines.

Page 198

16:34  1       Q.   Why did Consolidated choose to list
16:34  2   the color green as part of its trademark?
16:34  3       A.   Because it was green initially with
16:34  4   the specifications that we submitted.  It was
16:34  5   green.  I don't understand the question of why
16:34  6   do we want green as part of the mark.
16:34  7       Q.   Well, in your experience isn't it
16:34  8   true that if you don't mention the color of the
16:34  9   trademark you can obtain broad rights to cover
16:34 10   all colors?
16:34 11       A.   Yes.  But I am not describing what
16:34 12   I want registered.  I'm describing what it is
16:34 13   that I submitted.
16:34 14       Q.   Okay.
16:34 15       A.   That does not mean what I want
16:34 16   registered.  Even though -- so what we
16:35 17   submitted, we need to give a description of
16:35 18   what it is that you submitted.
16:35 19       Q.   Okay.
16:35 20       A.   This is just a description of what
16:35 21   we submitted.  It doesn't give you more rights.
16:35 22   It doesn't give you less rights.
16:35 23       Q.   All right.  Well, let me show
16:35 24   you --
16:35 25       A.   I know what you're talking about.

Page 199

16:35  1       Q.   All right.  Well, let me show you
16:35  2   another document which has previously been
16:35  3   marked as Exhibit 61 and has the sticker on it.
16:35  4   And I will represent to you that this was
16:35  5   printed out from the same United States Patent
16:35  6   and Trademark Office website.  And if you look
16:35  7   down about four or five lines, it says "Colors
16:35  8   claim."
16:35  9       A.   Yes.  We claimed the colors.
16:35 10       Q.   And my question to you is:  Why did
16:35 11   you choose to do that?
16:35 12       A.   Why did we choose to do that?  Now
16:35 13   you're asking for a legal opinion.  You're
16:35 14   asking for an expert opinion.  We choose to do
16:35 15   that.  It is perfectly right, perfectly legal.
16:35 16   It perfectly conforms with the application.
16:35 17   There is nothing wrong with it.  We claim the
16:36 18   color.  What was our reason?  There was no
16:36 19   reason.  Now you're asking me for an expert
16:36 20   opinion.
16:36 21       Q.   I'm not asking you for an expert
16:36 22   opinion.  I'm asking you what your reasoning
16:36 23   was in choosing the color green as part of the
16:36 24   mark?
16:36 25       A.   It is not a question of fact.  My

Page 200

16:36  1   reason at the time is not a question of fact.
16:36  2       Q.   I think it is a question of fact.
16:36  3            MR. MORTNER:  What was your state
16:36  4   of mind?
16:36  5            THE WITNESS:  That is a question of
16:36  6   fact.
16:36  7            MR. MORTNER:  Absolutely.
16:36  8            THE WITNESS:  I was in a New York
16:36  9   state of mind.
16:36 10   BY MR. STEWART:
16:36 11       A.   My state of mind is that we wanted
16:36 12   the color green because we thought it was nice
16:36 13   and we wanted the color green.  And if we
16:36 14   wanted it in any other color, by trademark
16:36 15   registration right, we could then apply for
16:36 16   black and white or different colors.  That was
16:36 17   important for us to get this mark in green
16:36 18   because that was our mark, originally it was
16:37 19   done in green.  So we wanted the original
16:37 20   protected first and then we will protect any
16:37 21   other side issues.  If that explains it right.
16:37 22   Otherwise, if you want me to go further.
16:37 23       Q.   If that's your testimony --
16:37 24       A.   What?
16:37 25       Q.   I said if that's your testimony,

7065eec4-b2f4-4c8b-9b56-9cffeaea27b6

## Page 201

16:37  1  there's nothing more I could ask for.
16:37  2      A.   Does that answer your question?
16:37  3      Q.   I think so.
16:37  4      A.   Okay.
16:37  5      Q.   Now, you also chose to register the
16:37  6  3DL marks at the State level; is that correct?
16:37  7      A.   That is correct.
16:37  8      Q.   And why did you choose to register
16:37  9  at the State level as well as the federal
16:37 10  level?
16:37 11      A.   To protect the registration rights.
16:37 12      Q.   And what benefits did you hope to
16:37 13  get from the State registration?
16:37 14      A.   The State registration rights gives
16:37 15  you practically theoretically the same rights
16:37 16  statewide as federally.  In fact, the State
16:38 17  trademark registration on the State level gives
16:38 18  you approximately the same rights as the
16:38 19  federal trademark registration does on a
16:38 20  nationwide level.  That is theoretical.
16:38 21      Q.   And in what states did you file
16:38 22  State trademark applications in?
16:38 23      A.   I think it was Florida, New Jersey.
16:38 24  I think it was also Maryland and one of the
16:38 25  Carolinas.

## Page 202

16:38  1      Q.   Do you know whatever became of the
16:38  2  Maryland application?
16:38  3      A.   No.
16:38  4      Q.   Do you know if was issued as a
16:38  5  registration?
16:38  6      A.   I don't know.  I know that New
16:38  7  Jersey did.  I know that Florida did.
16:38  8      Q.   And why did you choose those
16:38  9  particular states?
16:38 10      A.   Because some of the sales were
16:38 11  concentrated.  Those were good sales states.
16:39 12  You go down to register in all of the 50
16:39 13  states, but we didn't service North Dakota.  So
16:39 14  in beaches and those states that had the
16:39 15  beaches, Maryland, New Jersey, Florida,
16:39 16  Carolinas.  Those are the main centers of
16:39 17  attraction for beach shops.  If the seizure
16:39 18  didn't happen we would have registered in other
16:39 19  seaboard states on the east coast.
16:39 20      Q.   Okay.
16:39 21      A.   Is that responsive to you?
16:39 22      Q.   I think so.
16:39 23      A.   Okay.
16:39 24      Q.   Now, did you -- did Consolidated or
16:39 25  Joe Cool sell any T-shirts in states other than

## Page 203

16:39  1  Florida, New Jersey, Carolinas and Maryland?
16:40  2      A.   Yes, I believe so.
16:40  3      Q.   Do you know what other locations?
16:40  4      A.   No, but I believe it did,
16:40  5  especially in New York as well.
16:40  6      Q.   You think there were sales in New
16:40  7  York?
16:40  8      A.   Yes.
16:40  9      Q.   And who would have the records of
16:40 10  those sales?
16:40 11      A.   Joe Cool and maybe Menachem
16:40 12  Schneerson.
16:40 13      Q.   Did you ever seek a copyright
16:40 14  registration for the 3DL design?
16:40 15      A.   No.
16:40 16          (Discussion held off the record.)
16:41 17      Q.   Do you know whether Joe Cool or
16:41 18  Yosef Amar ever saw a copyright registration
16:41 19  for the 3DL design?
16:41 20      A.   I don't think so.
16:41 21      Q.   And once Consolidated acquired the
16:41 22  3DL mark did it grant the license to use the
16:41 23  mark for the joint venture?
16:41 24      A.   Verbal.
16:41 25      Q.   Verbal?

## Page 204

16:41  1      A.   Yes.
16:41  2      Q.   So, again, this was an oral
16:41  3  license?
16:41  4      A.   Yes.
16:41  5      Q.   Okay.  What are the terms of the
16:41  6  oral license?
16:41  7      A.   I don't understand your question.
16:41  8      Q.   Well, every license agreement has
16:41  9  its terms.
16:41 10      A.   Yes.
16:41 11      Q.   So what were the terms of the oral
16:41 12  license that was granted to the joint venture?
16:42 13      A.   That all profits would be shared by
16:42 14  the parties and that various T-shirts would
16:42 15  be -- various different T-shirts would be shown
16:42 16  to us for quality control, that we would need
16:42 17  to approve any changes in material and in
16:42 18  various marks if there was a drastic change
16:42 19  from the normal regular everyday, quality
16:42 20  control.
16:42 21      Q.   So did the joint venture actually
16:42 22  ship samples to Consolidated for its review?
16:42 23      A.   Yes, yes.
16:42 24      Q.   Do you still have any of those
16:42 25  samples?

51 (Pages 201 to 204)

7065eec4-b2f1-4c8b-9b56-9cffeaea27b6

Page 205

16:42  1    A.   No.  Menachem Schneerson has them.
16:42  2  I don't know if he kept them or he didn't keep
16:43  3  them.  From time to time they would send them,
16:43  4  yes.
16:43  5    Q.   Do you know how often Consolidated
16:43  6  was receiving those samples?
16:43  7    A.   I don't know.  Maybe a few months
16:43  8  perhaps.
16:43  9    Q.   Okay.
16:43  10   A.   Joe Amar kept them himself also.
16:43  11 He would bring T-shirts with him also and say
16:43  12 I'm going to do this color and this color.
16:43  13   Q.   Did you ever visit Joseph Amar's
16:43  14 facility?
16:43  15   A.   Yes.
16:43  16   Q.   When did you do that?
16:43  17   A.   25 years ago.
16:43  18   Q.   I'm sorry?
16:43  19   A.   25 years ago.
16:43  20   Q.   Did you ever visit his facility
16:43  21 during the joint venture?
16:43  22   A.   No.
16:43  23   Q.   Okay.  Is the license agreement
16:44  24 with the joint venture still in force?
16:45  25         (Discussion held off the record.)

Page 206

16:45  1    Q.   Okay.  So my question was --
16:45  2    A.   They are all checking to see if I
16:45  3  got food.
16:45  4    Q.   All right.  So my question before
16:45  5  the phone rang was is the license agreement
16:45  6  with the joint venture still in force?
16:45  7    A.   I don't know.
16:46  8         (Discussion held off the record.)
16:46  9         MR. MORTNER:  Are you all right?
16:46  10        THE WITNESS:  I think so.
16:46  11        MR. MORTNER:  Is the license
16:46  12 agreement with the joint venture still in
16:46  13 force?
16:46  14        THE WITNESS:  Yes, it is, but it is
16:46  15 not operating now.
16:46  16 BY MR. STEWART:
16:46  17   Q.   Okay.
16:46  18   A.   It is suspended.
16:46  19        MR. MORTNER:  I didn't hear you.
16:46  20   A.   It is not operating now.  It is in
16:46  21 suspended mode.  Joe Cool is not producing
16:46  22 anything.  So everything is suspended.
16:47  23 Actually, I misspoke.  His license was really
16:47  24 revoked.
16:47  25   Q.   It was revoked?

Page 207

16:47  1    A.   Yes.  His license was revoked.
16:47  2    Q.   When was it revoked?
16:47  3    A.   It was revoked when he agreed to
16:47  4  make a settlement against our advice.  I
16:47  5  misspoke a minute ago.
16:47  6    Q.   Okay.
16:47  7    A.   I didn't understand.
16:47  8    Q.   And was it revoked because he
16:47  9  entered into the settlement?
16:47  10   A.   Yeah.  It was revoked because he
16:47  11 entered into the settlement and because he was
16:47  12 giving plaintiff merchandise that belonged to
16:47  13 us, belonged to the joint venture.  He was
16:47  14 giving it away.  He had no right to do that.
16:47  15   Q.   Okay.  Has Consolidated granted a
16:47  16 license under the 3DL marks to anyone else
16:48  17 other than the joint venture?
16:48  18   A.   No.
16:48  19   Q.   I think you said that it was Joe
16:48  20 Cool that kept the financial records for the
16:48  21 joint venture; is that correct?
16:48  22   A.   Yes.
16:48  23   Q.   Did you ever review the financial
16:48  24 records for the 3DL business?
16:48  25   A.   No.

Page 208

16:48  1    Q.   Did you ever receive any financial
16:48  2  reports from Joe Cool?
16:48  3    A.   No.  When I said no, that does not
16:48  4  mean Menachem Schneerson.
16:48  5    Q.   You did receive any reports?
16:48  6    A.   No.
16:48  7    Q.   Do you know whether Menachem
16:48  8  Schneerson did?
16:48  9    A.   I don't know.  I think he did.
16:49  10   Q.   And I believe you testified earlier
16:49  11 that the bank account for the joint venture was
16:49  12 opened in the name of Joe Cool Bike Week, Inc.;
16:49  13 is that correct?
16:49  14   A.   That is correct.
16:49  15   Q.   Okay.  You don't know what bank
16:49  16 that was at, do you?
16:49  17   A.   No.  I have no idea.
16:49  18   Q.   And you don't have those records,
16:49  19 correct?
16:49  20   A.   No.  It wasn't our bank account.
16:49  21 It was Joe Cool's bank account.  As in personal
16:49  22 too for himself.
16:49  23   Q.   Do you know about how many of the
16:49  24 3DL heat transfers were sold in total?
16:49  25   A.   No.

7065eec4-b2f1-4c8b-9b56-9cffeaea27b6

Page 209

| | | |
|---|---|---|
| 16:49 | 1 | Q.   Do you have an estimate? |
| 16:49 | 2 | A.   Hundreds of thousands. |
| 16:49 | 3 | Q.   Hundreds of thousands.  And how |
| 16:49 | 4 | about T-shirts? |
| 16:50 | 5 | A.   I would say hundreds of thousands. |
| 16:50 | 6 | A couple of thousand of T-shirts. |
| 16:50 | 7 | Q.   Again, all those records were kept |
| 16:50 | 8 | by Joe Cool? |
| 16:50 | 9 | A.   Yes. |
| 16:50 | 10 | Q.   Do you know what the joint |
| 16:50 | 11 | venture's revenues were on those sales of |
| 16:50 | 12 | shirts and heat transfers? |
| 16:50 | 13 | A.   No.  Approximately I think it was |
| 16:50 | 14 | approximately 50 or 60 cents per heat transfer. |
| 16:50 | 15 | And I am not sure how much on the T-shirts. |
| 16:50 | 16 | Q.   Do you know what the joint |
| 16:50 | 17 | venture's profits were on the 3DL merchandise? |
| 16:50 | 18 | A.   No.  Menachem Schneerson has a |
| 16:50 | 19 | better idea. |
| 16:51 | 20 | Q.   Now, you mentioned briefly earlier |
| 16:51 | 21 | advertising by Consolidated of the 3DL marks. |
| 16:51 | 22 | Can you describe for me everything that |
| 16:51 | 23 | Consolidated has done to promote public |
| 16:51 | 24 | awareness of the 3DL marks? |
| 16:51 | 25 | A.   No, because it was Menachem |

Page 210

| | | |
|---|---|---|
| 16:51 | 1 | Schneerson's job, not mine. |
| 16:51 | 2 | When I say advertising, I mean |
| 16:51 | 3 | advertising/promotion/marketing, anything to do |
| 16:51 | 4 | to promote the sales of this. |
| 16:51 | 5 | Q.   Okay.  Have you ever been present |
| 16:52 | 6 | when consumers were purchasing 3DL merchandise? |
| 16:52 | 7 | A.   No. |
| 16:52 | 8 | Q.   Are you aware of any customers ever |
| 16:52 | 9 | having asked if there was a connection between |
| 16:52 | 10 | the 3DL merchandise and Monster? |
| 16:52 | 11 | A.   No. |
| 16:52 | 12 | Q.   How about the other way around, |
| 16:52 | 13 | have you ever heard if there is a connection |
| 16:52 | 14 | between Monster and 3DL merchandise? |
| 16:52 | 15 | A.   No.  But I heard from stores that |
| 16:52 | 16 | there was no confusion.  Nobody asked if we |
| 16:52 | 17 | were connected to Monster nor did they ask if |
| 16:52 | 18 | Monster is connected to us.  There was no |
| 16:53 | 19 | confusion or reverse confusion.  We didn't hear |
| 16:53 | 20 | it. |
| 16:53 | 21 | Q.   I'm sorry, you heard that from who? |
| 16:53 | 22 | A.   We did not hear of any confusion or |
| 16:53 | 23 | reverse confusion. |
| 16:53 | 24 | MR. STEWART:  Can you read back |
| 16:53 | 25 | just the very beginning of his answer, the |

Page 211

| | | |
|---|---|---|
| 16:53 | 1 | first half?  I just didn't hear what he |
| 16:53 | 2 | said. |
| 16:53 | 3 | (At which time the following was |
| 16:53 | 4 | read back: |
| 16:52 | 5 | "Answer:  No.  But I heard from |
| 16:52 | 6 | stores that there was no confusion.") |
| 16:53 | 7 | Q.   Now, we've mentioned a few times |
| 16:53 | 8 | today the seizure that occurred on March 7, |
| 16:53 | 9 | 2011 at Joe Cool's place of business.  You're |
| 16:53 | 10 | obviously familiar with that event? |
| 16:53 | 11 | A.   Yes. |
| 16:53 | 12 | Q.   Were you present during the |
| 16:53 | 13 | seizure? |
| 16:53 | 14 | A.   No, I was not. |
| 16:53 | 15 | Q.   Did anyone call you during the |
| 16:53 | 16 | seizure? |
| 16:53 | 17 | A.   Yes. |
| 16:53 | 18 | Q.   Who did? |
| 16:53 | 19 | A.   Yosef Amar's brother. |
| 16:54 | 20 | Q.   What is his name? |
| 16:54 | 21 | A.   I don't remember his name. |
| 16:54 | 22 | Q.   Okay.  What did you discuss? |
| 16:54 | 23 | A.   The fact of the seizure. |
| 16:54 | 24 | Q.   Okay.  Did you give him any advice? |
| 16:54 | 25 | A.   No.  I asked him to speak to the |

Page 212

| | | |
|---|---|---|
| 16:54 | 1 | attorney involved. |
| 16:54 | 2 | Q.   Okay.  Do you know what items were |
| 16:54 | 3 | taken during the seizure? |
| 16:54 | 4 | A.   I spoke to the attorney about it. |
| 16:54 | 5 | Q.   Oh, you asked for you to speak to |
| 16:54 | 6 | the attorney? |
| 16:54 | 7 | A.   Yes. |
| 16:54 | 8 | Q.   Oh, I'm sorry.  I misunderstood. |
| 16:54 | 9 | A.   I was wondering why you didn't |
| 16:54 | 10 | follow up. I'm saying, Hey, this guy is |
| 16:54 | 11 | remiss. |
| 16:54 | 12 | Q.   I misunderstood your answer. |
| 16:54 | 13 | A.   I asked to speak to the attorney |
| 16:54 | 14 | involved.  And he put him on.  And his name is |
| 16:54 | 15 | Rick Mitchell.  And so he was polite and I was |
| 16:54 | 16 | polite.  And I explained to him that this is a |
| 16:54 | 17 | wrongful seizure and that he needs to be very |
| 16:55 | 18 | careful because right now he is conducting |
| 16:55 | 19 | illegal and wrongful seizure, and I explained |
| 16:55 | 20 | to him why.  And he just discounted what I |
| 16:55 | 21 | said.  He was polite, but politely discounted |
| 16:55 | 22 | what I said. |
| 16:55 | 23 | And it turned out that the judge |
| 16:55 | 24 | told him exactly what I told him on the phone. |
| 16:55 | 25 | I told him exactly what the judge said.  I told |

7065eec4-b2f1-4c8b-9b56-9cffeaea27b6

Page 213

16:55   1    him to stop the seizure, it is illegal, you are
16:55   2    going to regret it because it is an unlawful
16:55   3    seizure. And I explained to him why. And he
16:55   4    was too much into it already. So he decided to
16:55   5    complete the seizure.
16:55   6        The newspapers were there. The
16:55   7    marshals were there. And police cars were
16:55   8    there. And television crews were there. And
16:55   9    he was too much invested into the seizure. He
16:55  10    understood that what I was saying was correct.
16:55  11    And he was too invested into the seizure to
16:55  12    stop. And he was told exactly what I told him
16:55  13    on the phone, he was told by the judge. He was
16:55  14    even harsher with him than I was.
16:56  15        Q.  Do you know what items were taken
16:56  16    during the seizure?
16:56  17        A.  They are all by receipts that
16:56  18    approximately 100,000 stickers were seized and
16:56  19    the whole file cabinet. Every document that
16:56  20    Joe Cool had there was seized. So it was
16:56  21    reported to me by Joe Amar's brother. And so I
16:56  22    saw the receipts, the marshal receipts. I saw
16:56  23    the file cabinets were taken away. And
16:56  24    approximately 100,000 stickers were seized and
16:56  25    T-shirts, boxes of T-shirts, which mainly

Page 214

16:56   1    basically just knocked the business right at
16:56   2    the knees, killed the baby right when it was
16:56   3    born.
16:56   4        Q.  I will show you a document which I
16:56   5    will ask the reporter to mark as the next
16:56   6    exhibit.
16:56   7        (Whereupon Exhibit 107, Seizure
16:57   8    receipt, was marked for identification.)
16:57   9        Q.  Is this the receipt that you were
16:57  10    referencing a few minutes ago?
16:57  11        A.  I don't know.
16:57  12        Q.  Okay.
16:57  13        A.  It looks like a receipt. It looks
16:57  14    similar, but I don't know if this is a receipt.
16:57  15    How could I tell now if this is a receipt that
16:57  16    I saw? How would you expect me to do this?
16:57  17        Q.  I don't know. I'm just checking
16:57  18    with you.
16:57  19        A.  But it looks like it. I don't
16:57  20    know. It looks like a seizure receipt, a goods
16:57  21    inventory, Robert Mitchell.
16:57  22        MR. MORTNER:  Richard Mitchell.
16:57  23        THE WITNESS:  Oh, Richard Mitchell.
16:58  24        A.  There is a lot of items. What can
16:58  25    I tell you? Okay.

Page 215

16:58   1        Q.  Did any of the items taken during
16:58   2    the seizure belong to Joe Cool alone, as far as
16:58   3    you know?
16:58   4        A.  Anything having to do with this
16:58   5    mark belonged to the joint venture. And I
16:58   6    presume that anything that was taken belonged
16:58   7    to the joint venture because it had to do with
16:58   8    this mark, because, otherwise, it would be an
16:58   9    illegal seizure, within an illegal seizure,
16:58  10    because the marshals and all the commissioners
16:58  11    who were there as an officer of the court is
16:58  12    not supposed to seize anything that has to do
16:58  13    with this mark. So this -- so presumably he
16:58  14    abided by the law, Richard Mitchell, he acted
16:59  15    lawfully within the illegal seizure that he
16:59  16    conducted by not seizing any goods that did not
16:59  17    have this mark on it or any mark similar to
16:59  18    this claw mark. Because if he did, he would
16:59  19    violate the law again.
16:59  20        So presumably everything that is
16:59  21    listed here has to do with this mark which
16:59  22    belonged to this joint venture.
16:59  23        Q.  Okay.
16:59  24        A.  Is that rational.
16:59  25        Q.  That's rational.

Page 216

16:59   1        So in other words, assuming that
16:59   2    everything seized --
16:59   3        THE WITNESS:  Is that rational,
16:59   4    Moshe, what I just said?
16:59   5        MR. MORTNER:  Say it a few more
16:59   6    times. Just kidding.
16:59   7    BY MR. STEWART:
16:59   8        Q.  So assuming that Mr. Mitchell and
16:59   9    the marshals seized only 3DL merchandise, then
16:59  10    everything that was seized belonged to the
16:59  11    joint venture?
16:59  12        A.  That is correct.
16:59  13        Q.  Okay. Specifically that's where I
16:59  14    was headed.
16:59  15        And nothing belonged to
16:59  16    Consolidated alone?
16:59  17        A.  What?
16:59  18        Q.  Nothing that was seized belonged to
16:59  19    just Consolidated alone?
16:59  20        A.  We owned half the merchandise. It
17:00  21    was owned half by Consolidated and half by Joe
17:00  22    Cool.
17:00  23        Q.  As part of the joint venture?
17:00  24        A.  Yes. Half of what they seized was
17:00  25    Consolidated's. It belonged to Consolidated.

7065eec4-b2f1-4c8b-9b56-9cffeaea27b6

Page 217

17:00  1   The other half belonged to Joe Cool.
17:00  2       That joint venture was not an
17:00  3   entity in its own right. It was a partnership
17:00  4   between two people. There was no entity, no
17:00  5   separate entity.
17:00  6       Q.   Okay. You agree with the
17:00  7   statements in the Answer and Counterclaim that
17:00  8   a joint venture was formed, correct?
17:00  9       A.   I don't know. You are asking me
17:00  10  for some legal conclusion. I don't know. Two
17:00  11  people get together, decide to make a
17:00  12  partnership. If that is a joint venture, then
17:01  13  that is a joint venture. But there was no
17:01  14  separate entity, no other corporation, no other
17:01  15  association, no other company, no other
17:01  16  anything, except two companies deciding to do
17:01  17  something as a partnership, only half each.
17:01  18      Q.   Okay.
17:01  19      A.   So what legal definition you're
17:01  20  giving to joint venture I will talk to Moshe
17:01  21  about it.
17:01  22      MR. MORTNER:  Do you have a
17:01  23  question?
17:01  24      MR. STEWART:  No. It was looked
17:02  25  like he was busy.

Page 218

17:02  1       A.   No, no. I was just trying to
17:02  2   figure out how many entries there are here.
17:02  3   There are 30 entries times 70 packs a piece.
17:02  4   That's like, quick numbers, is about 3,100
17:02  5   times 25 pieces, just approximately. That is a
17:02  6   serious number. That is on one page. That is
17:02  7   not the second page.
17:02  8       MR. MORTNER:  That's 80,000, a
17:02  9   little over.
17:02  10      THE WITNESS:  Huh?
17:02  11      MR. MORTNER:  That's about 80,000.
17:02  12      MR. STEWART:  I wasn't paying close
17:02  13  enough attention to confirm that or not.
17:02  14  I believe you.
17:02  15      MR. MORTNER:  I'm just doing the
17:02  16  math.
17:02  17      THE WITNESS:  What? 3,100 times
17:02  18  25? That's about 75,000, a little more,
17:02  19  maybe 100,000.
17:02  20  BY MR. STEWART:
17:03  21      Q.   Now, Mr. Baksht, are you aware that
17:03  22  Monster Energy returned all of the seized items
17:03  23  to Joe Cool's place of business on April 1,
17:03  24  2011?
17:03  25      A.   Say that again.

Page 219

17:03  1       Q.   Are you aware that Monster Energy
17:03  2   returned all of the seized items to Joe Cool's
17:03  3   place of business on April 1, 2011?
17:03  4       A.   No, I am not sure that is all of
17:03  5   the merchandise. I know that there was a
17:03  6   return of merchandise.
17:03  7       Q.   Okay.
17:03  8       A.   But I don't know that it was all of
17:03  9   the merchandise.
17:03  10      Q.   Okay.
17:03  11      A.   I don't know that anybody counted
17:03  12  and saw that there was nothing missing from
17:03  13  that. And I don't know that all the
17:03  14  merchandise returned. I don't know that.
17:03  15      Q.   Now, when at least some of the
17:03  16  merchandise was returned did the joint venture
17:03  17  resume its sales of the 3DL merchandise?
17:03  18      A.   No, it did not.
17:03  19      Q.   Why not?
17:03  20      A.   Because Joe Cool, after what
17:03  21  happened to him, he was a broken man. So he
17:03  22  almost got a heart attack, very serious. And
17:04  23  he was just paralyzed and he could not resume.
17:04  24  And he was scared that Monster Energy is going
17:04  25  to send a hitman after him with machine guns

Page 220

17:04  1   and shoot him. That's how scared he was. He
17:04  2   was actually physically worried about his
17:04  3   physical health. It is not rational, but
17:04  4   that's what happens to people who are seized.
17:04  5       Q.   Did Consolidated consider resuming
17:04  6   the 3DL business on its own?
17:04  7       A.   Yes. But what happened
17:04  8   additionally to early Consolidated damaging its
17:04  9   reputation and seizing its goods, plaintiff
17:04  10  actually almost murdered our partners. They
17:04  11  almost killed our partners. What happened was
17:04  12  we had partners who part of our joint venture
17:04  13  and suddenly they were shot down by Monster
17:04  14  Energy and they could not operate. So we did
17:05  15  not yet resume sales.
17:05  16      Q.   Now, before the seizure occurred
17:05  17  what kind of reputation did Consolidated have
17:05  18  in the T-shirt industry?
17:05  19      A.   A pretty good one. It was a new
17:05  20  company. It was associated with Joe Cool. It
17:05  21  was a nice established business. And
17:05  22  associated with a trademark that had a very
17:05  23  good reputation in the marketplace. So it was
17:05  24  pretty good stuff.
17:05  25      Q.   But it was a new company, correct?

7065eec4-b2f1-4c8b-9b56-9cffeaea27b6

Page 221

17:05 1   A.   Huh?
17:05 2   Q.   It was a new company, Consolidated?
17:05 3   A.   Of course.  By definition it was
17:05 4   recently incorporated.
17:05 5   Q.   So all of its reputation was based
17:05 6   upon its role in the sales of the 3DL
17:05 7   trademark; is that correct?
17:05 8   A.   Mostly, yes.
17:05 9   Q.   Is there --
17:05 10  A.   But also in our personal role in
17:05 11  being involved, myself and Menachem, Menachem
17:06 12  Schneerson and myself and Joe Amar, that we
17:06 13  were all personally involved in this joint
17:06 14  venture gave a very seriously good reputation.
17:06 15  Q.   And why did the involvement of
17:06 16  yourself and Menachem Schneerson give it a good
17:06 17  reputation?
17:06 18  A.   Because we were very good,
17:06 19  straight, honest people.
17:06 20  Q.   It is a softball question.
17:06 21  A.   It sounds weird if I say about
17:06 22  myself I'm good, smart, whatever, but that is
17:06 23  the truth.
17:06 24  Q.   What community did you enjoy this
17:06 25  good reputation?

Page 222

17:06 1   A.   T-shirt shop owners.
17:06 2   Q.   So what experience did you have,
17:06 3   other than the 3DL mark, in the community of
17:06 4   T-shirt shop owners?
17:06 5   A.   They knew us as trademark
17:06 6   consultants as well.  And from time to time we
17:06 7   would help them solve trademark problems.  We
17:07 8   were trademark consultants.  So they had pretty
17:07 9   much faith that whatever we were involved with
17:07 10  was nice, good, kosher, honest.  And here it
17:07 11  is, comes Monster Energy company, formally
17:07 12  known as Hansen, and tells people that we are
17:07 13  counterfeiters, that we are bad, to our
17:07 14  personal reputation, to our company's
17:07 15  reputation, to the business potential of this
17:07 16  trademark to which we had which is a seriously good
17:07 17  potential.
17:07 18       If the same thing happened to
17:07 19  Monster Energy by some other company, like
17:07 20  Michelob, Monster Energy would not be the
17:07 21  company it is today if they seized their goods.
17:07 22  You kill the company this way.  It kills the
17:07 23  reputation.
17:08 24  Q.   What were Consolidated's annual
17:08 25  revenues before the seizure occurred?

Page 223

17:08 1   A.   I don't know.  You would have to
17:08 2   ask Menachem Schneerson.
17:08 3   Q.   Did it have any annual revenues?
17:08 4   A.   I don't think so, because we just
17:08 5   started this mark.  Again, profits were
17:08 6   returning to inventory to make more
17:08 7   merchandise, that was basically our thinking
17:08 8   with inventory, and to become big.
17:09 9   Q.   Do you know what the value of the
17:09 10  seized property was?
17:09 11  A.   No.  I think a couple of hundred
17:09 12  thousand dollars.  But it had other value as
17:09 13  well, because at the time the goods were seized
17:09 14  there were orders which we didn't fill up which
17:09 15  amounted to a lot of money.
17:09 16  Q.   I'm going to show you what's been
17:09 17  previously marked as Exhibit 75.
17:09 18  A.   Yes.
17:09 19  Q.   And is this an e-mail from you the
17:10 20  Amars?
17:10 21  A.   Yes.
17:10 22  Q.   In this e-mail did you tell the
17:10 23  Amars that the seized merchandise would produce
17:10 24  sales of $100,000?
17:10 25  A.   This is a long e-mail.

Page 224

17:10 1   Q.   Sure.  Take your time reading it.
17:10 2   A.   Do you want me to read the whole
17:10 3   e-mail?
17:10 4   Q.   Yes.
17:10 5   A.   Or just one part of of it?
17:10 6   Q.   Well, I think it all kind of runs
17:10 7   together, so I think you may need to read at
17:10 8   least up until you see the number $100,000.
17:10 9   A.   What is the question so I could
17:10 10  look for the answer when I read it?
17:11 11  Q.   The question is:  Did you tell the
17:11 12  Amars that the seized heat transfers would have
17:11 13  produced revenues of $100,000?
17:11 14  A.   That's not what it says here.  I
17:11 15  said that the return, the ones that were
17:11 16  returned.  I didn't say the ones that were
17:11 17  seized.
17:11 18       THE WITNESS:  Moshe, you've got to
17:11 19  help me.  It is not accurate.
17:11 20  A.   I said the returned, not seized.
17:11 21  Q.   Okay.  The returned ones?
17:11 22  A.   This is different because I was
17:11 23  told 100,000 stickers were returned.
17:11 24  Q.   Okay.
17:11 25  A.   And what was seized I don't know.

7065eec4-b2f1-4c8b-9b56-9cffeaea27b6

Page 225

```
17:11   1   And I don't know if we have got a correct
17:11   2   number what was seized, but 100,000 stickers
17:11   3   were returned.  And by the way, a lot of it was
17:11   4   damaged.
17:11   5        So what is the question now?
17:11   6        Q.   The question now is:  Did you
17:11   7   indicate in this e-mail that the returned heat
17:11   8   transfers from the seizure would have produced
17:12   9   revenues of about $100,000?
17:12  10        A.   Yes.
17:12  11        Q.   And to the best of your knowledge,
17:12  12   was that an accurate estimate on your part?
17:12  13        A.   It was an approximate.  It would
17:12  14   probably be more than that.  This is the
17:12  15   minimal we said.  It was $1 each.  They sold at
17:12  16   more like $1.25, $1.35.
17:12  17        Q.   But at the time you wrote this
17:12  18   e-mail it was a good faith estimate on your
17:12  19   part?
17:12  20        A.   Yes, yes.  But that is only on
17:12  21   stickers.  Do you understand?
17:12  22        Q.   Yes, I understand.
17:12  23        A.   Because there were other things
17:12  24   that were seized, shirts and other things.  We
17:12  25   are talking stickers only.
```

Page 226

```
17:12   1        Q.   Yes.
17:12   2        A.   Stickers that you iron on the front
17:12   3   of shirts.
17:12   4        Q.   Yes.
17:12   5        How much did Consolidated invest in
17:12   6   the 3DL project in total?
17:12   7        A.   I don't know.  You asked me that.
17:12   8        Q.   Well, let me --
17:13   9        A.   Because it includes a lot of time
17:13  10   and effort, that we bill a lot of time and
17:13  11   effort that we didn't bill.  I don't remember.
17:13  12        Q.   Well, let me show you a document
17:13  13   that's previously been marked as Exhibit 76.
17:13  14   And I'd like to focus on the August 1, 2011
17:13  15   e-mail at 12:50 a.m. on the first page, which
17:13  16   appears to be an e-mail from you to an
17:13  17   anati@mail.com.  Do you see that?
17:13  18        MR. MORTNER:  Here.
17:13  19        A.   Oh, menachemny@gmail.com.
17:14  20        MR. MORTNER:  No, no, no.  Here,
17:14  21   let me point to it.  Here.
17:14  22        A.   Okay.  What is the question?
17:14  23        Q.   In this e-mail you said "We are now
17:14  24   invested over $16,000 in hard money and $60,000
17:14  25   in time into this and sweat over seven months."
```

Page 227

```
17:14   1   Do you see that?
17:14   2        A.   It could be.
17:14   3        Q.   Was that --
17:14   4        A.   I see it, yes.
17:14   5        Q.   Was that a good faith estimate at
17:14   6   the time you wrote this?
17:14   7        A.   It could be, yes.
17:14   8        Q.   Is that your best estimate at the
17:14   9   time that you wrote this?
17:14  10        A.   It was an estimate.  Best estimate
17:14  11   I don't know, but it was a relatively -- it was
17:14  12   an estimate.  It was an estimate.
17:14  13        Q.   Okay.  But it was your effort to
17:14  14   estimate how much money and time you had
17:14  15   invested; is that correct?
17:14  16        A.   How much money and time, yeah.  But
17:14  17   it is not all that we invested.  At that point,
17:15  18   if that's what we invested have in hard
17:15  19   money -- yeah, I would say it was a good faith
17:15  20   effort.
17:15  21        Q.   Okay.  Good.
17:15  22        A.   That does not include the lost
17:15  23   business opportunity.  It does not include the
17:15  24   lost business that we had.  That does not
17:15  25   include the lost orders we had.  It does not
```

Page 228

```
17:15   1   include the losses of the joint venture.  This
17:15   2   is only our share of some of the monies.  It
17:15   3   does not include losses of the joint venture.
17:15   4        Q.   How did you estimate the amount of
17:15   5   time that you had invested in it in terms of
17:15   6   dollars?  Did you have an hourly rate that you
17:15   7   had in mind?
17:15   8        A.   Yes, an hourly and on certain jobs
17:15   9   that we did.  We estimated a fair estimate of
17:15  10   time.
17:15  11        Q.   Okay.
17:16  12        A.   And not the person's work, but it's
17:16  13   trademark work and hard monies that were not
17:16  14   the marketing efforts...
17:16  15        Q.   Okay.  And whose e-mail address is
17:16  16   anati@mail.com?
17:16  17        A.   Where is this?
17:16  18        Q.   That is the person that received
17:16  19   this e-mail.
17:16  20        A.   Where do you see it?
17:16  21        Q.   In the "To" line.
17:16  22        A.   Anati, he is a friend.
17:16  23        Q.   He is a friend of yours?
17:16  24        A.   He is a rabbi.  He is a friend.
17:16  25        Q.   Okay.
```

7065eec4-b2f1-4c8b-9b56-9cffeaea27b6

Page 229

| | | |
|---|---|---|
| 17:16 | 1 | A.   And he's head of a Jewish community |
| 17:16 | 2 | in Brooklyn. |
| 17:17 | 3 | Q.   Are you able to quantify the total |
| 17:17 | 4 | harm that was caused to Consolidated by the |
| 17:17 | 5 | seizure? |
| 17:17 | 6 | A.   I could approximate it. |
| 17:17 | 7 | Q.   Sure. |
| 17:17 | 8 | A.   I would say at least $20 million. |
| 17:17 | 9 | Q.   And how do you arrive at that |
| 17:17 | 10 | figure? |
| 17:17 | 11 | A.   Because we estimated that this mark |
| 17:17 | 12 | would have made at least between $2, $3 million |
| 17:17 | 13 | a year in profit.  So it is worth at least ten |
| 17:17 | 14 | times the amount.  That's how we arrived at it. |
| 17:17 | 15 | Q.   Okay. |
| 17:17 | 16 | A.   That's without taking into account |
| 17:17 | 17 | damage to our personal reputation.  It is just |
| 17:17 | 18 | damage to our business reputation and damage to |
| 17:17 | 19 | our business. |
| 17:17 | 20 | Q.   Have you ever been accused of |
| 17:17 | 21 | trademark infringement aside from the current |
| 17:17 | 22 | lawsuit? |
| 17:17 | 23 | A.   Aside from the current lawsuit? |
| 17:18 | 24 | Personally? |
| 17:18 | 25 | Q.   Yes. |

Page 230

| | | |
|---|---|---|
| 17:18 | 1 | A.   I don't think so, no. |
| 17:18 | 2 | Q.   Okay. |
| 17:18 | 3 | A.   If you have something there to |
| 17:18 | 4 | would remind me. |
| 17:18 | 5 | Q.   I'm getting there.  Have any of |
| 17:18 | 6 | your companies ever been accused of trademark |
| 17:17 | 7 | infringement aside from the current lawsuit? |
| 17:18 | 8 | A.   I have no companies.  What do you |
| 17:18 | 9 | mean? |
| 17:18 | 10 | Q.   Have any of the companies that you |
| 17:18 | 11 | are a shareholder in? |
| 17:18 | 12 | A.   Oh, that's what you mean? |
| 17:18 | 13 | Q.   Have any of them been accused of |
| 17:18 | 14 | trademark infringement? |
| 17:18 | 15 | A.   I don't know, but if you remind me. |
| 17:18 | 16 | Companies that I was involved in?  I'm trying |
| 17:18 | 17 | to think.  This is not a trick question. |
| 17:18 | 18 | Q.   No, it is not a trick question. |
| 17:18 | 19 | A.   Do you imply that there was some |
| 17:18 | 20 | company that I was involved in?  But if you ask |
| 17:19 | 21 | me a specific company -- |
| 17:19 | 22 | Q.   I'm going to get into some specific |
| 17:19 | 23 | companies now, but not with respect to |
| 17:19 | 24 | infringement. |
| 17:19 | 25 | Did you ever try to register |

Page 231

| | | |
|---|---|---|
| 17:19 | 1 | Montblanc as a trademark? |
| 17:19 | 2 | A.   Yes, I did. |
| 17:19 | 3 | Q.   And did you do that on behalf of |
| 17:19 | 4 | one of your own companies or on behalf of a |
| 17:19 | 5 | client? |
| 17:19 | 6 | A.   On behalf of a client. |
| 17:19 | 7 | Q.   And did you become an officer of |
| 17:19 | 8 | that company? |
| 17:19 | 9 | A.   Absolutely, yes. |
| 17:19 | 10 | Q.   Okay.  And why did you try to |
| 17:19 | 11 | register Montblanc as a trademark? |
| 17:19 | 12 | A.   Because the company wanted it |
| 17:19 | 13 | registered as a trademark for watches. |
| 17:19 | 14 | Q.   Okay.  And did you consider whether |
| 17:19 | 15 | or not that was an appropriate type of |
| 17:19 | 16 | trademark to register? |
| 17:19 | 17 | A.   Yes, I did. |
| 17:19 | 18 | Q.   What did you conclude? |
| 17:19 | 19 | A.   That it was appropriate. |
| 17:19 | 20 | Q.   That it was appropriate? |
| 17:19 | 21 | A.   Yes, absolutely. |
| 17:19 | 22 | Q.   And on what did you base that |
| 17:19 | 23 | conclusion? |
| 17:19 | 24 | A.   That it was available for |
| 17:19 | 25 | registration.  I did a search and it was |

Page 232

| | | |
|---|---|---|
| 17:19 | 1 | available for registration. |
| 17:19 | 2 | Q.   Did you find any registrations for |
| 17:19 | 3 | the Montblanc Company of Europe? |
| 17:19 | 4 | A.   I don't remember.  And I am not |
| 17:20 | 5 | sure that I know what you're talking about, |
| 17:20 | 6 | Montblanc Company of Europe.  You have to be |
| 17:20 | 7 | specific.  When you are talking about |
| 17:20 | 8 | trademarks you have to be specific which |
| 17:20 | 9 | trademarks and which companies. |
| 17:20 | 10 | Q.   Are you familiar the Montblanc |
| 17:20 | 11 | Company that is famous for making pens? |
| 17:20 | 12 | A.   Yes. |
| 17:20 | 13 | Q.   Did you find any trademark |
| 17:20 | 14 | registrations for that company? |
| 17:20 | 15 | A.   I think we did, but I am not sure. |
| 17:20 | 16 | Q.   Okay. |
| 17:20 | 17 | A.   I am not sure.  But I knew of the |
| 17:20 | 18 | company, but I am not sure that they had a |
| 17:20 | 19 | registration. |
| 17:20 | 20 | Q.   But regardless, you knew of the |
| 17:20 | 21 | company? |
| 17:20 | 22 | A.   Yes. |
| 17:20 | 23 | Q.   Okay.  And did the fact that that |
| 17:20 | 24 | company had been selling pens under the |
| 17:20 | 25 | Montblanc name cause you any concern for the |

7065eec4-b2f1-4c8b-9b56-9cffeaea27b6

Page 233

17:20   1    registration?
17:20   2        A.   Not at all.
17:20   3        Q.   Why not?
17:20   4        A.   For the same reason the Patent
17:20   5    Office didn't see any concern.
17:20   6        Q.   And what was that reason?
17:20   7        A.   What?  The reason they approved it?
17:20   8        Q.   What was your conclusion as to why
17:20   9    it would be okay to try to register that
17:20  10    trademark?
17:20  11        A.   Because it wasn't related goods.
17:20  12        Q.   Okay.
17:21  13        A.   The Patent Office thought, like I
17:21  14    did, when they approved it for registration.
17:21  15    Does that sound rational?
17:21  16        Q.   That sounds rational.  I am not
17:21  17    sure it got approved.
17:21  18        A.   It did get approved.  But at the
17:21  19    end Montblanc opposed it after it was approved
17:21  20    by the examining attorney.  It went to
17:21  21    publication.  Are you familiar with
17:21  22    publication?
17:21  23        Q.   Absolutely.
17:21  24        A.   Then it was opposed by Montblanc.
17:21  25    And we went to Leslie's office and she gave us

Page 234

17:21   1    the opinion that we can definitely do it and so
17:21   2    on.  And I sat down with her and then she told
17:21   3    me the client didn't want to continue because
17:21   4    the service was disrupted.  But I believe that
17:21   5    if we defended it at the TTAB level, if we
17:22   6    defended the series began by Montblanc the pen
17:22   7    company against this Montblanc the watch
17:22   8    company I believe that we would prevail.  But
17:22   9    the company doesn't go through and expend the
17:22  10    money.  So that's the story with Montblanc.
17:22  11        Q.   Okay.  And I'd like you to tell me
17:22  12    more stories about a few more companies.
17:22  13        A.   That is very interesting.  I'm
17:22  14    going to write books.  There is going to be a
17:22  15    movie.
17:22  16        Q.   We will get through this.  This
17:22  17    shouldn't be too long.
17:22  18            Did you ever try to register
17:22  19    Cadillac Club as a trademark?
17:22  20        A.   Yes, I did.
17:22  21        Q.   Was that on behalf of a company?
17:22  22        A.   Yes.
17:22  23        Q.   A client of yours?
17:22  24        A.   A client.  And I was also an
17:22  25    officer and shareholder.

Page 235

17:22   1        Q.   Okay.  And what position did you
17:22   2    hold with the company, do you remember?
17:22   3        A.   Secretary, whatever.  I was the
17:22   4    incorporator of the company and secretary of
17:23   5    the company and the shareholder of the company.
17:23   6        Q.   Okay.  Why did you pick Cadillac
17:23   7    Club as the trademark?
17:23   8        A.   I didn't.  Some other person picked
17:23   9    it.
17:23  10        Q.   Okay.  Were you familiar with the
17:23  11    Cadillac brand of cars at the time?
17:23  12        A.   Absolutely.
17:23  13        Q.   And was it your conclusion that it
17:23  14    was --
17:23  15        A.   One of the reasons that the client
17:23  16    picked Cadillac is because they wanted to pick
17:23  17    Rolls Royce and I told them that was not
17:23  18    possible.  I gave an opinion that that was
17:23  19    not -- that that would infringe on Rolls Royce.
17:23  20    So they chose Cadillac instead.
17:23  21        Q.   And how did you reach the
17:23  22    conclusion that the Cadillac Club does not
17:23  23    infringe?
17:23  24        A.   Because it was not an infringement.
17:23  25    The Patent Office agreed with it.

Page 236

17:23   1        Q.   But why were you concerned that
17:23   2    Rolls Royce would be an infringement?
17:23   3        A.   Because there is questions they are
17:23   4    the only ones -- there are many questions about
17:23   5    that.  I don't know -- right now you're asking
17:24   6    me for an expert opinion.  I am not here as an
17:24   7    expert.  I would love to give you it to you
17:24   8    after we shut off the camera and get a cup of
17:24   9    coffee.
17:24  10        Q.   No.  At that point I am going home.
17:24  11        A.   Because you have no personal
17:24  12    interest.
17:24  13            But, anyway, Cadillac -- the mark
17:24  14    Cadillac did not belong to General Motors.  And
17:24  15    if anybody is giving you a different opinion,
17:24  16    they should have bar license revoked.
17:24  17        Q.   Did you also seek to register
17:24  18    Cadillac Beer as a trademark?
17:24  19        A.   Cadillac what?
17:24  20        Q.   Beer.
17:24  21        A.   I don't remember.  It could have
17:24  22    been.  I just don't recall.  I don't remember
17:24  23    that one in particular.  But it could be, yes.
17:24  24        Q.   Okay.  Did you ever try to register
17:24  25    Pink Cadillac?

7065eec4-b2f1-4c8b-9b56-9cffeaea27b6

Page 237

| | | |
|---|---|---|
| 17:24 | 1 | A.   Yes. |
| 17:24 | 2 | Q.   And did you do that on behalf of a |
| 17:24 | 3 | client? |
| 17:24 | 4 | A.   Yes.  If it is the same company, |
| 17:24 | 5 | then it is the same story. |
| 17:24 | 6 | Q.   I am not sure if it is the same |
| 17:25 | 7 | company. |
| 17:25 | 8 | A.   What is the name of the company? |
| 17:25 | 9 | Q.   I am not sure.  I can look it up. |
| 17:25 | 10 | A.   Yeah.  If you tell me the name of |
| 17:25 | 11 | company, I will tell you if I was associated |
| 17:25 | 12 | with it, if it rings a bell.  Is it for |
| 17:25 | 13 | clothing?  Do you want me to look it up on the |
| 17:25 | 14 | website? |
| 17:25 | 15 | Q.   Perfume, cologne and toilet water. |
| 17:25 | 16 | A.   Yes, I remember. |
| 17:25 | 17 | Q.   For Cadillac Club Fashions. |
| 17:25 | 18 | A.   So that was our company. |
| 17:25 | 19 | Q.   So you did, in fact, seek a |
| 17:25 | 20 | registration for Pink Cadillac? |
| 17:25 | 21 | A.   Yes. |
| 17:25 | 22 | Q.   Okay.  And you reached the |
| 17:25 | 23 | conclusion that it was appropriate to seek that |
| 17:25 | 24 | registration notwithstanding the General Motors |
| 17:25 | 25 | Cadillac registration? |

Page 238

| | | |
|---|---|---|
| 17:25 | 1 | A.   General Motors does not have a |
| 17:25 | 2 | trademark for Cadillac. |
| 17:25 | 3 | Q.   In any class? |
| 17:26 | 4 | A.   General Motors did not own the word |
| 17:26 | 5 | Cadillac.  General Motors owned the word |
| 17:26 | 6 | Cadillac for exclusive use on automobiles.  But |
| 17:26 | 7 | even then they did not have absolute right to |
| 17:26 | 8 | Cadillac.  That is not trademark.  A trademark |
| 17:26 | 9 | is not absolute property.  It is only property |
| 17:26 | 10 | as to particular goods and particular channels |
| 17:26 | 11 | of trade.  So Cadillac did not own this at the |
| 17:26 | 12 | time we did this. |
| 17:26 | 13 | For your information, there was |
| 17:26 | 14 | Cadillac Dog Food before we applied for it. |
| 17:26 | 15 | There was Cadillac Bar and there is Cadillac |
| 17:26 | 16 | Shoes and many other Cadillacs.  And we were |
| 17:26 | 17 | Cadillac number seven.  And it was this, your |
| 17:26 | 18 | very own trademark expert, Attorney Leslie |
| 17:26 | 19 | Lott, is the one who defended this when |
| 17:26 | 20 | Cadillac applied to cancel working on our |
| 17:27 | 21 | behalf to prove that we had every right to |
| 17:27 | 22 | register, your very own expert witness. |
| 17:27 | 23 | Think about what you're doing. |
| 17:27 | 24 | You're taking something perfectly legal that we |
| 17:27 | 25 | did and trying to turn it around like we did |

Page 239

| | | |
|---|---|---|
| 17:27 | 1 | something wrong, when your own expert witness |
| 17:27 | 2 | was the attorney for us, for Cadillac Club |
| 17:27 | 3 | Fashions, to defend our right to use this mark |
| 17:27 | 4 | of clothing.  Think about what you're doing. |
| 17:27 | 5 | It is ethically wrong. |
| 17:27 | 6 | Q.   She disagrees that that's what |
| 17:27 | 7 | happened -- |
| 17:27 | 8 | A.   What? |
| 17:27 | 9 | Q.   She disagrees that that's what |
| 17:27 | 10 | happened, but we don't need to resolve that |
| 17:27 | 11 | now. |
| 17:27 | 12 | A.   She disagrees that she defended |
| 17:27 | 13 | this?  She disagrees that I was her client. |
| 17:27 | 14 | But she disagrees that she defended this?  It |
| 17:27 | 15 | is on the record.  I will show it to you right |
| 17:27 | 16 | now on the computer. |
| 17:27 | 17 | Q.   That's fine. |
| 17:27 | 18 | A.   This is very important to you for |
| 17:27 | 19 | yourself to know what you're doing.  If she's |
| 17:27 | 20 | pretending that she did not defend us and you |
| 17:27 | 21 | look right now at the Cadillac Club Fashions at |
| 17:27 | 22 | the TTAB, you will see that Cadillac Club |
| 17:27 | 23 | Fashions, this company that you are talking |
| 17:27 | 24 | about, was defended at the TTAB level by Leslie |
| 17:27 | 25 | Lott, coming to the TTAB meeting saying that |

Page 240

| | | |
|---|---|---|
| 17:28 | 1 | Cadillac Club Fashions has every right to |
| 17:28 | 2 | register this trademark.  And we won.  So she |
| 17:28 | 3 | comes now or you come now and say that we did |
| 17:28 | 4 | something wrong, when your own very trademark |
| 17:28 | 5 | expert was fighting on behalf of Cadillac Club |
| 17:28 | 6 | Fashions at the TTAB level, check it out now. |
| 17:28 | 7 | It is not a question of who says what.  The |
| 17:28 | 8 | TTAB, right now, check it out, they still have |
| 17:28 | 9 | her as the attorney of record for Cadillac Club |
| 17:28 | 10 | Fashions.  Think about it. |
| 17:28 | 11 | Q.   Okay. |
| 17:28 | 12 | A.   It's morally wrong. |
| 17:28 | 13 | Q.   Did you ever try to register Midas |
| 17:28 | 14 | Tool and Lock as a trademark? |
| 17:28 | 15 | A.   I don't remember.  It rings a bell. |
| 17:28 | 16 | I don't remember. |
| 17:28 | 17 | Q.   Let me show you a document that I |
| 17:28 | 18 | will ask the reporter to mark as the next |
| 17:28 | 19 | exhibit in sequence. |
| 17:28 | 20 | (Whereupon Exhibit 108, Mark |
| 17:29 | 21 | T15146, was marked for identification.) |
| 17:29 | 22 | Q.   If you look at the cover page, you |
| 17:29 | 23 | will see that it is for the trademark Midas |
| 17:29 | 24 | Tool and Lock. |
| 17:29 | 25 | A.   Yes. |

7065eec4-b2f1-4c8b-9b56-9cffeaea27b6

Page 241

17:29  1      Q.    Then on the second page in the
17:29  2  upper right corner is some small print that
17:29  3  appears to be your name, David Baksht, and then
17:29  4  an address in Miami.
17:29  5      A.    Right.
17:29  6      Q.    Does this refresh your recollection
17:29  7  that you registered a Midas Tool and Lock
17:29  8  trademark?
17:29  9      A.    A little bit.  It does refresh.  I
17:29  10  see my name.
17:29  11          I object because this is not a
17:30  12  certified copy.  It doesn't have a seal.  So
17:30  13  with that objection, you can go forward and I
17:30  14  will answer your question.
17:30  15      Q.    Okay.  And my question is just the
17:30  16  same as it was for the other marks.  Were you
17:30  17  aware of Midas, the auto parts --
17:30  18      A.    The muffler company?
17:30  19      Q.    The muffler company.
17:30  20      A.    Yes.  I think I once had a muffler
17:30  21  installed by them.  What does muffler have to
17:30  22  do with locks?
17:30  23      Q.    So you reached a conclusion that
17:30  24  mufflers and locks were far enough apart --
17:30  25      A.    The Trademark Office thought that

Page 242

17:30  1  it didn't have anything to do with this
17:30  2  trademark registration.  I don't know why
17:30  3  anybody who really knows trademark law would
17:30  4  raise a question that there was something
17:30  5  improper with this.  You are thinking -- this
17:30  6  is back in -- this was far back.
17:31  7      Q.    Registered in '91.
17:31  8      A.    Registered in '91.  So you would
17:31  9  say about 21 years ago?
17:31  10      Q.    Yes.
17:31  11      A.    The dilution laws were different.
17:31  12  The laws were changed.  So if you think about
17:31  13  this in the context of 1991, and I'm not even
17:31  14  sure right now if I checked Midas how many
17:31  15  Midases are registered, how many Midas
17:31  16  corporations there are.  There is like a
17:31  17  seriously diluted name in my opinion now
17:31  18  without checking.  I don't see anything wrong
17:31  19  with registering the Midas mark.
17:31  20      Q.    Okay.
17:31  21      A.    The Secretary of State did not
17:31  22  imply there was anything wrong with it, only
17:31  23  some low life that you hired as an expert.
17:31  24      Q.    Did you ever try to register Oakley
17:31  25  Wear as a trademark?

Page 243

17:31  1      A.    I don't remember.  But if you show
17:31  2  it to me.
17:31  3      Q.    I can show it to you.
17:32  4          MR. STEWART:  I ask the reporter to
17:32  5  mark this as Exhibit 109.
17:32  6          (Whereupon Exhibit 109, Mark
17:32  7  T11289, was marked for identification.)
17:32  8          (Discussion held off the record.)
17:32  9      Q.    On page two in the same location as
17:32  10  before in the upper right corner there is what
17:33  11  appears to be your name and a Miami address.
17:33  12      A.    I don't recall this.  It does not
17:33  13  have my signature on it.  This is not my
17:33  14  signature on this one.  But I don't see
17:33  15  anything wrong with it, registering Oakley.
17:33  16  What is this?  I don't see anything wrong with
17:33  17  that.
17:33  18          MR. MORTNER:  Wait for a question.
17:33  19  Wait for a question.
17:33  20      Q.    Well, if you don't remember it, I
17:33  21  think you've done enough on that document?
17:33  22      A.    Okay.  If you see my name --
17:33  23          MR. MORTNER:  Where is your name?
17:33  24          MR. STEWART:  Page two.  It is
17:33  25  somewhat blurred.

Page 244

17:34  1          MR. MORTNER:  Was that your
17:34  2  address?
17:34  3          THE WITNESS:  Yeah, this was my
17:34  4  address.
17:34  5      A.    This trademark is descriptive of
17:34  6  bathtubs (sic).
17:34  7      Q.    She didn't understand you.
17:34  8          MR. MORTNER:  Let's get a question
17:34  9  and we will go from there.
17:34  10  BY MR. STEWART:
17:34  11      Q.    Did you ever try to register Polo
17:34  12  Classic PC as a trademark?
17:34  13      A.    I don't remember.  If you show me.
17:34  14      Q.    I'll show you right now...
17:35  15      A.    Polo Classic PC?
17:35  16          MR. STEWART:  I ask the reporter to
17:35  17  mark this document as Exhibit 110.
17:35  18          (Whereupon Exhibit 110, Mark
17:36  19  T15761, was marked for identification.)
17:36  20      A.    I don't remember.  Also, again, it
17:36  21  does not have my signature.  It has a form that
17:36  22  has my name on the top right.  And at that
17:36  23  time --
17:36  24      Q.    If you look at the final page --
17:36  25      A.    What?

7065eec4-b2f1-4c8b-9b56-9cffeaea27b6

Page 245

17:36  1      Q.   If you look at the final page you
17:36  2  will see your name is mentioned again.
17:36  3      A.   Yes.  On what date is this?  This
17:37  4  is March 6, 1993.  When was this done?  In
17:37  5  other words, it was assigned to me, not
17:37  6  registered by me.  The registration is to
17:37  7  somebody else.  The assignment is to me.  And
17:37  8  the assignment does not even have my signature
17:37  9  on it.  Anybody could sign it.  What is the
17:37 10  point of this?
17:37 11      Q.   The question was:  Do you now
17:37 12  recall having either acquired by assignment or
17:38 13  by registration a trademark for Polo Classic
17:38 14  PC?
17:38 15      A.   I don't remember.  I don't recall,
17:38 16  but it could have been.  I mean I see it.  It
17:38 17  could have been.  If this is a true document.
17:38 18  But we can note for the record that many
17:38 19  clients at the time had applications that I
17:38 20  sent them for registration marks which they did
17:38 21  on their own.  And these applications had my
17:38 22  name on the top right corner of the
17:38 23  application.  And they would take an
17:38 24  application that I gave them, because we had
17:38 25  them in our office, and they would take my

Page 246

17:38  1  applications that I sent them and fill it up
17:38  2  themselves and send it to the Trademark Office
17:38  3  in Florida.
17:38  4      So anything that has my name on the
17:38  5  top right is not necessarily an application I
17:38  6  filed.  It could be that we did or didn't.
17:38  7  Because it had my name on top, it could be that
17:38  8  we filed, but it could also be that it is a
17:38  9  blank form that our clients used to register on
17:39 10  their own.
17:39 11      But Polo Classic PC -- Polo did not
17:39 12  belong to Polo.  Polo is a generic term.  Polo
17:39 13  did not belong to Polo.  Polo is a generic and
17:39 14  descriptive term that belonged to Polo Ralph
17:39 15  Lauren with a particular logo, a particular
17:39 16  name together with the logo.
17:39 17      But if you check Polo, there are
17:39 18  countless of Polos.  There are hundreds and
17:39 19  hundreds of Polo corporations and many, many
17:39 20  Polo marks that are registered to different
17:39 21  companies.
17:39 22      Q.   Okay.  Did you ever try to register
17:39 23  Porsche Marine as a trademark?
17:39 24      A.   I remember the name, but I think I
17:39 25  did.

Page 247

17:39  1      Q.   You think you did.  Well, let's go
17:40  2  ahead and get the exhibit marked.  Maybe it
17:40  3  will help refresh your recollection a little
17:40  4  more.
17:40  5      MR. STEWART:  This will be Exhibit
17:40  6  111.
17:40  7      (Whereupon Exhibit 111, Mark
17:40  8  T11287, was marked for identification.)
17:40  9      Q.   So the question is:  Do you see on
17:40 10  the front page where the Secretary of State
17:40 11  certifies that "the attached is a true and
17:40 12  correct copy of the trademark, Porsche Marine"?
17:41 13      A.   There is no copy of the trademark.
17:41 14      Q.   Well, I think if you look on the
17:41 15  third page at the top middle you will see a
17:41 16  picture of a boat with Porsche Marine of North
17:41 17  America.
17:41 18      A.   That is not a trademark
17:41 19  registration.
17:41 20      Q.   It is not?
17:41 21      A.   No.  That is a specimen.  This is
17:41 22  not a trademark.
17:41 23      Q.   Well, do you recall filing for a
17:41 24  trademark registration for Porsche Marine?
17:41 25      A.   I don't know.  I would have to see

Page 248

17:41  1  the^ seat document.
17:41  2      And I must tell you that now I
17:41  3  object to all the other documents that you
17:41  4  showed me with the State of Florida Department
17:41  5  of State because none of them have a trademark
17:41  6  registration on them.  So I withdraw all my
17:41  7  answers from them because you're asking me
17:41  8  questions on them without showing me a
17:41  9  registration.  You haven't shown me one Florida
17:41 10  State trademark registration.
17:41 11      Q.   Well, your objection is noted for
17:42 12  the record.
17:42 13      A.   Okay.
17:42 14      THE WITNESS:  There is no
17:42 15  registration.  There is no registration
17:42 16  attached...
17:42 17      MR. MORTNER:  Speak to the
17:42 18  reporter.
17:42 19      THE WITNESS:  I was speaking to
17:42 20  you.  I was asking you, to ask you to do
17:42 21  intervention.
17:42 22      MR. MORTNER:  You're doing good.
17:42 23  You're doing fine on your own.
17:42 24      (Discussion held off the record.)
17:42 25  BY MR. STEWART:

7065eec4-b2f1-4c8b-9b56-9cffeaea27b6

Page 249

17:42 1    Q.   Okay.  Well, documents aside, do
17:42 2  you recall applying for a registration for the
17:42 3  Porsche Marine trademark?
17:42 4    A.   I'm not sure.  If I see the
17:43 5  document, if I see the registration, I will
17:43 6  know.
17:43 7    Q.   So you would need to see the
17:43 8  actual --
17:43 9    A.   The registration, yes.
17:43 10   Q.   As opposed to the materials that
17:43 11 you have here which you conclude are not a
17:43 12 registration?
17:43 13   A.   It is nothing.  It is not a
17:43 14 registration.  You have a document on top that
17:43 15 says it enclosed is a true and correct copy of
17:43 16 the registration.  And the registration is not
17:43 17 there.  I'm telling you there is no
17:43 18 registration there if you think there is.
17:43 19   Q.   I think this whole thing is the
17:43 20 registration.  This is the way the State of
17:43 21 Florida issues them.
17:43 22   A.   It is not correct.  I know.  They
17:43 23 thought that they could include a registration.
17:43 24 This is a certification that encloses a true
17:43 25 and correct copy, but the registration is not

Page 250

17:43 1  enclosed.
17:43 2    Q.   Okay.  That is your interpretation.
17:43 3    A.   But if you have a different
17:43 4  interpretation, tell me.
17:43 5    Q.   My interpretation is that this is
17:43 6  what the State of Florida issues.  This is all
17:44 7  I've got.
17:44 8    A.   But that's not the issue.  The
17:44 9  issue is a certificate of registration that
17:44 10 looks similar to this and it says registration,
17:44 11 registration number, what it is registered for.
17:44 12 This certificate that you have right now
17:44 13 attests to the fact that the registration
17:44 14 attached is a true and correct copy, but they
17:44 15 didn't attach the registration.  They only
17:44 16 attached a copy of the application, not the
17:44 17 registration.
17:44 18   Q.   I don't need to fight with you over
17:44 19 this.
17:44 20   A.   But I know the State of Florida, it
17:44 21 says Florida trademark registration, number so
17:44 22 and so, registered for goods so and so,
17:44 23 classification so and so, date of use.  I've
17:44 24 never seen a trademark registration, federal or
17:44 25 State, that doesn't have the dates of use and

Page 251

17:44 1  the goods of services.  This is not a trademark
17:44 2  registration.  They forgot to enclose the
17:44 3  registration.  They meant to.  They didn't do
17:44 4  it.
17:45 5       None of them enclose the
17:45 6  registration.  Neither do the other ones
17:45 7  everything that we talked about.  The previous
17:45 8  ones, the Consolidated ones.
17:45 9       MR. MORTNER:  Those were
17:45 10 application.
17:45 11      THE WITNESS:  Which ones?  The
17:45 12 Consolidated?
17:45 13      MR. MORTNER:  Yes.
17:45 14      THE WITNESS:  None of them were
17:45 15 registrations.  And counsel here showed me
17:45 16 what was supposed to be registrations and
17:45 17 they were not.  They were just
17:45 18 applications.
17:45 19      THE VIDEOGRAPHER:  5:45 off the
17:45 20 record.  End of tape 4.
17:45 21      (Whereupon a short break was
18:00 22 taken.)
18:03 23      THE VIDEOGRAPHER:  It is 6:03 on
18:03 24 the record.  Beginning of DVD 5.
18:04 25      MR. STEWART:  Okay.  This is Paul

Page 252

18:04 1  Stewart, counsel for Monster Energy.  And
18:04 2  I've been informed by the witness that he
18:04 3  feels he cannot medically continue today.
18:04 4  And I am noting for the record my
18:04 5  objection that I do think that we should
18:04 6  be able to proceed today and finish the
18:04 7  deposition.
18:04 8       I've discussed the matter with
18:04 9  counsel for Mr. Baksht.  And what we are
18:04 10 going to do without, waiving our
18:04 11 objection, I am going to read into the
18:04 12 record the remainder of my questions,
18:04 13 because they are fairly few, and then when
18:04 14 Mr. Baksht fills out the errata he can at
18:04 15 that point insert his answers.
18:04 16      And, again, this is without
18:04 17 prejudice to our objection, that this
18:04 18 procedure is a little unorthodox and
18:04 19 not -- and we think we are entitled to an
18:04 20 actual deposition.
18:04 21      Do you have anything to add to
18:05 22 that, Mr. Mortner?
18:05 23      MR. MORTNER:  No.  It is accurate.
18:05 24 I would only add that Mr. Baksht has
18:05 25 described to us that he's feeling

63 (Pages 249 to 252)

7065eec4-b2f1-4c8b-9b56-9cffeaea27b6

Page 253

18:05  1    extremely ill right now and that is the
18:05  2    reason that he is unable to continue, that
18:05  3    he has made every effort to go as far as
18:05  4    he could.
18:05  5        THE WITNESS:  We went over seven
18:05  6    hours.  It is from 10:30 to 6.  It is over
18:05  7    seven and a half hours I have been here.
18:05  8    I did my best.
18:05  9        MR. MORTNER:  I understand that.
18:05 10        MR. STEWART:  Let me go ahead and
18:05 11    read my questions then.  I'm just trying
18:05 12    to decide if I really want to do this.
18:05 13    Hold on one second.  Yes, I think I do.
18:05 14  BY MR. PAUL STEWART:
18:06 15    Q.   My first question is:  Did you ever
18:06 16  form a corporation named Lemon Coke
18:06 17  corporation?  Why did you form this corporation
18:06 18  and how did you pick the name?
18:06 19        My next set of questions is:  Did
18:06 20  you ever form a corporation named Rolls Royce
18:06 21  Industries Corp.?  And the follow-up questions
18:06 22  are:  Why did you form this corporation and how
18:06 23  did you pick its name?
18:06 24        MR. MORTNER:  Obviously if the
18:06 25    answer to the first question is no, then

Page 254

18:06  1    there would be no further answer.
18:06  2        MR. STEWART:  Sure.
18:06  3        MR. MORTNER:  Okay.
18:06  4    Q.   The third question is:  Did you
18:06  5  ever form a corporation named American
18:06  6  Enterprise Institute, Inc.?  And then why did
18:06  7  you form this corporation and how did you pick
18:06  8  the name?
18:06  9    A.   How many of these questions do you
18:06 10  have?
18:06 11    Q.   I had those three and one other
18:06 12  short topic.
18:06 13    A.   Go ahead.  Ask it, ask me.  If I
18:07 14  get dizzy, I will tell you.  But if you could
18:07 15  do this real quick.
18:07 16    Q.   Sure, absolutely.
18:07 17        Did you ever form a corporation
18:07 18  named Lemon Coke Corp.?
18:07 19    A.   I don't remember doing that.  I
18:07 20  don't remember doing that.
18:07 21    Q.   I've got a document.  This may take
18:07 22  a little bit longer.  This is Exhibit Number
18:07 23  112?
18:07 24        (Whereupon Exhibit 112, Mark
18:08 25    G98358, was marked for identification.)

Page 255

18:08  1    A.   Yes.  It looks like me, yes.
18:08  2    Q.   Okay.  Do you remember why you
18:08  3  formed this corporation?
18:08  4    A.   Why I formed this corporation?
18:08  5  1984.  Yeah, 1984.  It is 28 years ago.
18:08  6        MR. MORTNER:  It looks like just
18:08  7    the standard Articles of Incorporation.
18:08  8    It looks like a standard Articles of
18:08  9    Incorporation.
18:08 10        The question is:  Do you have
18:08 11    formal knowledge why you formed this
18:08 12    company?
18:08 13        THE WITNESS:  No.
18:08 14  BY MR. STEWART:
18:08 15    Q.   Do you know why you picked the name
18:09 16  Lemon Coke for this company?
18:09 17    A.   I don't remember.
18:09 18    Q.   Okay.
18:09 19    A.   I don't see anything wrong with
18:09 20  picking that name.
18:09 21    Q.   Okay.  Did you ever form a
18:09 22  corporation named Rolls Royce Industries Corp.?
18:09 23    A.   Lemon Coke is a generic name.  Coke
18:09 24  is a generic name.  Coke is Coke.  It was lemon
18:09 25  Coke.  There was no problem.

Page 256

18:09  1    Q.   Did you ever form a corporation --
18:09  2    A.   In fact, the name of the
18:09  3  corporation doesn't mean that you are using it
18:09  4  on the marketplace as a trademark.  It has
18:09  5  nothing to do with it.  The fact that you own a
18:09  6  trade name -- I think I know where you are
18:09  7  going with this.  The fact that you have a
18:09  8  corporation by a certain name doesn't mean that
18:09  9  you will be allowed to go into the marketplace
18:09 10  and use it as a product.
18:09 11    Q.   I understand.
18:09 12    A.   So there is nothing wrong with it
18:09 13  whatsoever.
18:10 14    Q.   Did you ever form a corporation
18:10 15  named Rolls Royce Industries Corp.?
18:10 16    A.   I think I did, yes.
18:10 17    Q.   And why did you form that
18:10 18  corporation?
18:10 19    A.   A client asked me to.  I was in the
18:10 20  business of forming corporations.
18:10 21    Q.   So it was not for yourself?  It was
18:10 22  for a client?
18:10 23    A.   That is correct.
18:10 24    Q.   So the client picked the name?
18:10 25    A.   Yes.

7065eec4-b2f1-4c8b-9b56-9cffeaea27b6

Page 257

18:10  1    Q.   Okay.  Did you ever form a
18:10  2  corporation named American Enterprise
18:10  3  Institute, Inc.?
18:10  4    A.   Yes, I did.
18:10  5    Q.   Did you do that for yourself or on
18:10  6  behalf of a client?
18:10  7    A.   For myself.  I never used it.  I
18:10  8  thought I was going to use it.  I never really
18:10  9  used it.  Why did I pick the name?  I loved it.
18:10 10    Q.   What did you love about the name?
18:10 11    A.   I love it, American Enterprises
18:10 12  Institute.
18:10 13    Q.   Have you ever heard of another
18:10 14  organization called the American Enterprises
18:10 15  Institute?
18:10 16    A.   Yes.
18:10 17    Q.   And did the existence of that
18:10 18  organization have anything to do with the name
18:11 19  that you selected?
18:11 20    A.   I liked it.  I liked the name.
18:11 21    Q.   Okay.
18:11 22    A.   I never used that corporation.  I
18:11 23  was going to use it for something, for some
18:11 24  asset or something.  But I never did get to use
18:11 25  the name.

Page 258

18:11  1    Q.   So the last topic, which we'll race
18:11  2  through in just a couple of minutes.
18:11  3         You mentioned earlier the M&B
18:11  4  Beverage lawsuit involving the New York New
18:11  5  York Casino.  Is it your testimony that you
18:11  6  personally hired Leslie Lott to represent you?
18:11  7    A.   Is a fact.  Not testimony.
18:11  8    Q.   Is it also your testimony that you
18:11  9  consulted --
18:11 10    A.   Slow down.
18:11 11    Q.   I was going fast for your benefit.
18:11 12    A.   Yes, I know, but I don't
18:11 13  understand.
18:11 14    Q.   Is it also your testimony that you
18:11 15  consulted with Ms. Lott throughout the case?
18:11 16    A.   Not throughout the case, but right
18:11 17  in the beginning through a major portion of the
18:11 18  case.
18:11 19    Q.   Okay.  Isn't it true that you were
18:12 20  in Israel during the M&B case?
18:12 21    A.   During part of the case.
18:12 22    Q.   During part of the case?
18:12 23    A.   Yes.
18:12 24    Q.   And isn't it true that you were
18:12 25  institutionalized in Israel for psychological

Page 259

18:12  1  treatment during that case?
18:12  2    A.   That is not true.
18:12  3    Q.   That is not true?
18:12  4    A.   No.
18:12  5    Q.   Let me show what is going to be the
18:12  6  last exhibit, Exhibit 113.
      7         (Whereupon Exhibit 113,
      8  Plaintiff's Memorandum of Law in Opposition to
      9  Defendant's Motion to Compel and Motion to
     10  Strike Affirmative Defense of Unclean Hands,
     11  was marked for identification.)
18:12 12    Q.   When you get the document I will
18:12 13  ask you to turn to page three.
18:12 14    A.   I have no comment on this document.
18:13 15  I wasn't here.  I don't know who filed it.  I
18:13 16  don't know what it is.  And I have no comment
18:13 17  on it.
18:13 18    Q.   So you don't know who wrote the
18:13 19  words that are in this document?
18:13 20    A.   No.  I am not even looking at the
18:13 21  document.  It doesn't interest me.  It is not
18:13 22  related to this case.
18:13 23         MR. MORTNER:  What is the question?
18:13 24    Q.   Is it your testimony that you have
18:13 25  no -- that you had no input into the

Page 260

18:13  1  preparation of this document?
18:13  2    A.   Not into this document, no.  That
18:13  3  is correct.
18:13  4    Q.   Do you know how your attorneys got
18:13  5  the information about you that they put in this
18:13  6  document?
18:13  7    A.   I don't know.  I don't know what is
18:13  8  about me in this document and I am not
18:13  9  interested.
18:13 10    Q.   Well, the document said that you
18:13 11  were not competent to testify or travel.  It
18:13 12  enclosed an Affidavit of an Israeli
18:13 13  psychiatrist.
18:13 14    A.   That is a concoction of Ms. Leslie
18:13 15  Lott, which she will come to be accounted for
18:13 16  that.
18:13 17    Q.   And it further states that you
18:13 18  cannot work, you refuse to leave your
18:14 19  apartment, and your condition deteriorates each
18:14 20  day, his family has made the difficult decision
18:14 21  to have you involuntarily institutionalized for
18:14 22  treatment.
18:14 23    A.   That is not true.  That is not true
18:14 24  to the best of my knowledge.
18:14 25    Q.   Okay.  And you don't know how Ms.

7065eec4-b2f1-4c8b-9b56-9cffeaea27b6

Page 261

| | | |
|---|---|---|
| 18:14 | 1 | Lott got that information to put into this |
| 18:14 | 2 | brief? |
| 18:14 | 3 | A.   What? |
| 18:14 | 4 | Q.   You don't know how Ms. Lott got |
| 18:14 | 5 | that information to put into this brief? |
| 18:14 | 6 | A.   No. |
| 18:14 | 7 | MR. STEWART:  Okay.  I think we can |
| 18:14 | 8 | all go home, except those of us who are |
| 18:14 | 9 | already home. |
| 18:14 | 10 | THE VIDEOGRAPHER:  That concludes |
| 18:14 | 11 | the deposition of David Baksht.  The time |
| 18:14 | 12 | is 6:14 p.m.  Off the record.  End of DVD |
| 18:14 | 13 | 5. |
| | 14 | (The witness is excused.) |
| | 15 | (Videotaped deposition of David |
| | 16 | Baksht concluded at 6:14 p.m.) |
| | 17 | |
| | 18 | |
| | 19 | |
| | 20 | |
| | 21 | |
| | 22 | |
| | 23 | |
| | 24 | |
| | 25 | |

Page 263

| | |
|---|---|
| 1 | E R R A T A   S H E E T |
| 2 | I have read my testimony in the foregoing |
| 3 | transcript and believe it to be true and |
| 4 | correct to the best of my knowledge and belief |
| 5 | with the following changes: |
| 6 | PAGE    LINE       CHANGE |
| 7 | _____ _____ _____ |
| 8 | _____ _____ _____ |
| 9 | _____ _____ _____ |
| 10 | _____ _____ _____ |
| 11 | _____ _____ _____ |
| 12 | _____ _____ _____ |
| 13 | _____ _____ _____ |
| 14 | _____ _____ _____ |
| 15 | _____ _____ _____ |
| 16 | _____ _____ _____ |
| 17 | |
| 18 | _____ _____ |
| 19 | WITNESS SIGNATURE        DATE |
| 20 | |
| 21 | Sworn and subscribed to before me this |
| 22 | _____ day of _____ , 2012. |
| 23 | |
| 24 | Notary Public of the |
| 25 | State of _____. |

Page 262

| | |
|---|---|
| 1 | C E R T I F I C A T E |
| 2 | |
| 3 | |
| 4 | I, SUZANNE J. STOTZ, a Certified |
| 5 | Shorthand Reporter and Notary Public in and for |
| 6 | the State of New Jersey, and Notary Public in |
| 7 | and for the State of New York, do hereby |
| 8 | certify that the foregoing is a true and |
| 9 | accurate transcript of the stenographic |
| 10 | above-captioned matter. |
| 11 | |
| 12 | |
| 13 | |
| 14 | SUZANNE J. STOTZ, C.S.R. |
| 15 | LICENSE NO. 1845 |
| 16 | |
| 17 | |
| 18 | DATED:  SEPTEMBER 28, 2012 |
| 19 | |
| 20 | NOTE:  THE CERTIFICATE APPENDED TO THIS |
| 21 | TRANSCRIPT DOES NOT APPLY TO ANY REPRODUCTION |
| 22 | OF THE SAME BY ANY MEANS, UNLESS UNDER THE |
| 23 | DIRECT CONTROL AND/OR DIRECTION OF THE |
| 24 | CERTIFYING COURT REPORTER. |
| 25 | |

7065eec4-b2f1-4c8b-9b56-9cffeaea27b6