1

```
 1          THE VIDEOGRAPHER:  Today's date is September

 2     the 21st, 2012.  The time is approximately 11:15

 3     a.m.  My name is Jamie Hollingsworth, the

 4     videographer.  The court reporter is June Harrison.

 5     We are present at the offices of Sclafani Williams

 6     in Orlando, Florida.  We're here for the purpose of

 7     taking the deposition of the corporate

 8     representative of Monster Energy Company.  The case

 9     is instituted in United States District Court,

10     Middle District, Orlando Division.  The short style

11     of the case is Monster Energy Company versus

12     Consolidated Distributors, Incorporated, et al.

13     I'll now ask the attorneys to introduce themselves

14     beginning with the plaintiff's attorney.

15          MR. SGANGA:  This is John Sganga of Knobbe

16     Martens representing Monster Energy Company and the

17     witness.

18          MR. MORTNER:  This is Moshe Mortner

19     representing the defendant Consolidated

20     Distributors, Incorporated and defendant David

21     Baksht.

22          THE VIDEOGRAPHER:  Would the court reporter

23     kindly swear in the witness.

24          MR. MORTNER:  Just a note, with us today also

25     is Memachem Schneoason, an officer of defendant
```

1     Consolidated Distributors, Incorporated.

2          THOMAS KELLY, called as a witness by the

3   Defendant, having been first duly sworn, testified as

4   follows:

5          THE WITNESS:  I do.

6                    DIRECT EXAMINATION

7   BY MR. MORTNER:

8     Q.   Good morning, Mr. Kelly.  Thank you for coming

9   today.

10    A.   Good morning.

11    Q.   I'm Moshe Mortner, an attorney representing the

12  defendants.  This is a deposition in which I'll ask you

13  questions and you must answer them truthfully unless

14  your attorney tells you clearly and directly not to

15  answer.  Although no judge is present, this is a formal

16  legal proceeding just like testifying in court and you

17  are under the same legal obligation to tell the truth,

18  the whole truth and nothing but the truth.  If you do

19  not understand any of my questions, feel free to say so

20  and I will rephrase it.  Before the deposition can be

21  used in court, you'll have the opportunity to read it

22  over and correct any mistakes.  Do you understand this?

23    A.   Yes.

24    Q.   Okay.  Have you ever given a deposition before?

25    A.   Yes.

1    Q.    What was the circumstances of that?

2    A.    There were two, maybe three other depositions

3  that I gave.  One took place in the '90s and it had to

4  do with a distributor dispute that we had.

5    Q.    You represented Monster in that deposition,

6  Monster Energy Company, the plaintiff?

7    A.    I can't recall.  I can't recall if we were the

8  defendant or the plaintiff.  It was in the '90s.

9    Q.    You represented the plaintiff in this case in

10  that deposition?  I was referring to your client today.

11    A.    Yes, but you were referring to that prior case.

12    Q.    No, no, sorry.  Not clear.

13    A.    Okay.  Sorry.  But we were talking about the

14  deposition from my prior experience with depositions.

15    Q.    Okay.

16    A.    I don't know if we were the plaintiff or the

17  defendant in those.  I thought that's what the question

18  was.

19    Q.    Fine.  Thank you.

20    A.    So. . .there was another one we had a case

21  involving blue sky and there was some -- I believe it

22  was a class action lawsuit that was filed against the

23  company in which I gave deposition on.

24    Q.    Did it have to do with the location where the

25  product was manufactured?

1    A.    That is correct.

2    Q.    Yeah.  How did that -- do you know how that

3  action turned out, how it concluded?

4    A.    I believe we settled.

5    Q.    Okay.  So your name is Tom Kelly.  And would

6  you state your address, please?

7    A.    4472 Torrey, T-o-r-r-e-y, Pines Drive, Chino

8  Hills, California.

9    Q.    Thank you.  Your age?

10    A.    58.

11    Q.    The date -- and the place of birth?

12    A.    Chicago, Illinois.

13    Q.    What year was that?

14    A.    1954.

15    Q.    So I don't have to do the math.

16    A.    Okay.

17    Q.    And how long have you lived in -- I take you

18  live in California, yes.  How long have you lived in

19  California?

20    A.    Since 1960.

21    Q.    1960.  Are you in good health today?

22    A.    Yes.

23    Q.    Do you have any issues with drugs or alcohol?

24    A.    No.

25    Q.    Do you have any disabilities?

1    A.    No.

2    Q.    Your eyesight, your hearing is accurate and not

3  disabled?

4    A.    Except for reading glasses, yes.

5    Q.    Okay.  And you're not suffering from any mental

6  illnesses?

7    A.    No.

8    Q.    Have you ever been -- are you under the care of

9  a doctor or therapist?

10    A.    No.

11    Q.    Okay.  Do you a criminal record of any kind?

12    A.    No.

13    Q.    Would you be kind enough to give -- well, let's

14  start with your educational background.  What is your

15  educational background, sir?

16    A.    I received a bachelor of science degree from

17  California State University at North Ridge and graduated

18  there in 1978.

19    Q.    Do you have any further degrees beyond that?

20    A.    No further degrees.  I am a certified public

21  accountant in the state of California, inactive.

22    Q.    And what -- following graduating North Ridge,

23  what was your job history?

24    A.    I worked for a small certified public

25  accounting firm beginning in January of 1979.  I worked

1   for that firm through December of 1985.  I was asked and

2   accepted the role of controller for a company called

3   Hansen Foods, Inc., and that was for the years of

4   1985 -- December of 1985 through October 1988.  During

5   the 1989 year I worked for a start up company called

6   Apple Made and in 19 -- January of 1990 I worked for a

7   company called California CoPackers, Inc. which acquired

8   the Hansen business out of bankruptcy.

9       Q.   One question.  Now, Hansen Foods, Inc., is that

10  what you're referring to, acquired that business out of

11  bankruptcy?

12      A.   Yes.

13      Q.   And is that company related to the plaintiff in

14  this action?

15      A.   No.

16      Q.   Monster Energy?

17      A.   None.

18      Q.   And in those positions you were functioning as

19  controller or --

20      A.   That's correct.

21      Q.   Okay.  So yes, please continue.

22      A.   In 1990 to 1992 I worked for California

23  CoPackers again which operated the Hansen business.  At

24  that time the primary products were apple juice and

25  sodas, other juice products.  And in June of 1992 the

1   California CoPackers sold the -- certain assets

2   including the Hansen trademarks to Hansen Beverage

3   Company.  Hansen Beverage Company -- I remained employed

4   with Hansen Beverage Company since 1992.  We change our

5   name this year -- Hansen Beverage Company changed its

6   name this year in January of 2012.

7       Q.   So were you with the Hansen Beverage Company

8   prior to Mr. Sacks and Mr. Schlosberg becoming officers

9   of the company?

10      A.   Technically Hansen Beverage Company started

11  when they acquired the business in June of 1992, but

12  that was the business that we operated so it was just

13  under California Co-Packers was the name, three private

14  investors during the years of 1990 to 1992.

15      Q.   Okay.  Could you state your present employment?

16      A.   My --

17      Q.   Your present employment?

18      A.   I'm a senior vice president of Monster Energy

19  Company.

20      Q.   Do you have any other titles?

21      A.   I also am the secretary of Monster Energy

22  Company.

23      Q.   Who do you report to?

24      A.   The executive committee made up of Hilton

25  Schlosberg and Rodney Sacks.

1    Q.    Is there a CFO at Monster Energy Company?

2    A.    Yes, there is.

3    Q.    Who is that?

4    A.    Hilton Schlosberg.

5    Q.    What is your function as a secretary of the

6  corporation?

7    A.    There are certain documents which require

8  secretaries to sign and, you know, my primarily function

9  at the company is senior vice president of finance which

10  oversees the accounting, oversees the public filings,

11  and just running the day-to-day financial aspects of the

12  business.

13    Q.    Okay.  What public filings were you referring

14  to?

15    A.    The public filings that primarily would be the

16  company's form 10-K filed with the SCC, form 10-Qs on a

17  quarterly basis filed with the SCC.  Those are the

18  primary ones.

19    Q.    What portion of those documents do you have

20  responsibility for?

21    A.    Oversight of the entire document.

22    Q.    Who do you report to with respect to that

23  aspect of your functions?

24    A.    I have a financial controller who does the

25  preparation of the reports.  They're submitted to me for

1   my review.  They are also reviewed by both Hilton

2   Schlosberg and Rodney Sacks.  Also reviewed by, you

3   know, in-house counsel.  There are certain aspects of

4   those documents that have litigation aspects on it so I

5   rely on, you know, the legal -- in-house legal counsel

6   to provide the information for that.

7        Q.   So do you function also on the written portions

8   as well as the financial statements in the SCC filings?

9        A.   Yes.

10       Q.   Do you have any special training with respect

11   to SCC compliance?

12       A.   I took one course in the '90s with respect to

13   SCC form 10-K and 10-Q preparation.

14       Q.   Have you taken any subsequent training or

15   courses?

16       A.   No, sir.

17       Q.   Have you done any review of recent laws such as

18   Sarbanes-Oxley?

19       A.   Yes.

20       Q.   What did that constitute, what did you do in

21   that regard?

22            MR. SGANGA:  I just want to caution the witness

23       that the question may get into advice that you got

24       from attorneys.  If you can answer it, but if the

25       answer requires you to talk about advice you got

```
 1    from attorneys, I instruct you not to answer.
 2         MR. MORTNER:  Okay.  So let me just make clear
 3    that the question is not regarding any specific
 4    documents that may have been produced, I'm just
 5    asking about your general background and knowledge.
 6         MR. SGANGA:  Well, it doesn't change my
 7    instruction.  He's asking you about what -- the
 8    question is what --
 9         MR. MORTNER:  I'm not trying to change your
10    instruction.
11         MR. SGANGA:  But your question is about what he
12    did to --
13         MR. MORTNER:  To educate himself.
14         MR. SGANGA:  -- educate yourself about
15    Sarbanes-Oxley.  It's a law.  If that education
16    involved getting advice from an attorney, I don't
17    want you to reveal that.  If that's the case, you
18    can say you spoke with attorneys or got information
19    from attorneys, but don't reveal the content of that
20    information.
21    A.   Okay.  I understand.
22    Q.   Can you answer the question?
23    A.   The -- most of the knowledge that I've acquired
24    is just my own reading and then had discussions with our
25    external auditors, Deloitte and Touche.
```

1           MR. MORTNER:  Thank you.  I'm going to put

2       something on the record here, it's not a question.

3       We had documents that were produced to us on Sunday

4       just five days ago prior to the Rosh Hashanah

5       holiday which were responsive to the earlier

6       document request that were -- documents were

7       produced in respect to those requests on August 9th.

8       Those documents produced last Sunday were documents

9       that the plaintiff had withheld on the basis of

10      claim of confidentiality subsequent to the Court's

11      ruling that there would be no protective order they

12      were produced to us.  We have not had sufficient

13      time to review and analyze those documents for

14      purposes of preparing for this deposition today.

15      And in fact, today Mr. Sganga has produced what I

16      would characterize, and you can correct me,

17      Mr. Sganga, if you would, but revised versions of

18      some of those documents; in fact, two large banker

19      boxes full of documents.  I believe that those

20      documents may have some relevance to this

21      deposition, and so after we have concluded our

22      review of those documents, it may be necessary for

23      us to call this witness back as a -- for a second

24      continuation of his deposition, and so we're going

25      to reserve our right to that.

```
 1        And I'm going to -- I also have some documents
 2   in addition to ones just previously mentioned that
 3   were produced today as well which are revised
 4   versions of documents that were produced originally,
 5   I believe, on August 9th.  Is that correct?
 6        MR. SGANGA:  I don't know offhand the date that
 7   those were initially produced.
 8        MR. MORTNER:  I think they were.  You can tell
 9   by the numbers they were produced August 9th.  So
10   we're now getting these for the first time.  But
11   we're going to soldier on and try to question the
12   witness on these documents.
13        MR. SGANGA:  Okay.  I'd like to make a comment
14   in response just to clarify.  The documents that
15   were produced this morning reflect inventory detail
16   transactions that are essentially a subset of what
17   had been produced previously.  Mr. Mortner
18   characterized them as revised.  They've been revised
19   only in the sense that sales of apparel by the
20   plaintiff outside of the U.S. have been removed.  So
21   what we've given you today is information you
22   already had, it's just been put in a format that is
23   focused only on domestic sales.  And in addition, we
24   did provide summary data which breaks down the sales
25   by year.  And additionally a -- in addition to the
```

1     annual summary documents which we provided you,

2     we've also provided you with a one page high level

3     summary that just -- that indicates the number of

4     units of apparel that were distributed in the U.S.

5     so that you have it in a convenient format.

6          And as I mentioned yesterday, there were --

7     certainly the defendant could have expedited this

8     process themselves if they had agreed to any kind of

9     confidentiality, which they've refused to agree to.

10    And I'll again remind you, as I did yesterday, that

11    since the plaintiff is a publicly traded company,

12    there are securities laws governing the

13    dissemination of information that you may learn from

14    the company, and you should be aware of those laws

15    before you do anything with this confidential

16    information we're providing other than to use it in

17    this deposition, and we reserve all rights in that

18    regard.

19          MR. MORTNER:  It's not accurate that we could

20    have had these documents because we did actually

21    offer a confidentiality agreement, but this is old

22    ground, we don't need to plow over it.  We offered a

23    standard confidentiality agreement.

24          MR. SGANGA:  Which you then refused, which you

25    then rescinded that offer.

1        MR. MORTNER:  Yes, subsequent to the Court's

2    determination on September 4th so -- and then we

3    didn't get the documents until last Sunday.  So now

4    let's see what we can do with these.

5        Let me show you one of the documents that's

6    been produced today, Mr. Kelly, and ask you to --

7    let's ask -- I'll ask the reporter to mark this

8    as -- what are we, Defendant's Exhibit. . .

9        MR. SGANGA:  I think you're up to Number 17.

10        MR. MORTNER:  Thank you.  We'll mark it as

11    Defendant's Exhibit 17.

12        (Defendant's Exhibit No. 17 was marked for

13     identification.)

14    Q.   This is a spreadsheet, appears to be 18 inches

15    by 11 inches in size and some 23 pages long

16    approximately.  It's entitled Monster Energy Company

17    Support for Monster Trademark Apparel Inventory Detail

18    Transaction Report 2002.  Mr. Kelly, would you look at

19    this document please.  Have you seen this document

20    before, Mr. Kelly?

21    A.   Yes, sir.

22    Q.   Where did you see it before?

23    A.   I saw that in our offices in Corona,

24    California.

25    Q.   When was that?

1    A.    In -- I would say over the last two weeks.

2    Q.    Okay.  Was this document --

3    A.    You know, within the two week range.  I don't

4  know exactly.  Could have been sooner than that.

5    Q.    Was this document prepared by you or by anyone

6  that works under you at Monster?

7    A.    Yes.

8    Q.    And is this a document that was prepared for

9  this litigation or is this a document that existed

10  within Monster's records?

11    A.    For this litigation.

12    Q.    What is the source of this data in this

13  document?

14    A.    We have an accounting system that's referred to

15  as MAS-200, MAS-200.  Previously it was referred to as

16  MAS-90.  They changed the name so. . .the accounting

17  system itself contains -- in the accounting system is

18  made up of a lot of different files, inventory

19  transaction files, sales transaction files, our general

20  ledger, everything that we would use in a company to

21  produce financial statements, hands to operate the

22  business.  So the system would -- it records

23  transactions of the company, whether that be sales

24  transactions, whether that be purchased transactions,

25  other types of expenses are all included in this MAS-200

1   accounting system.

2           This one report comes from that system which is

3   made up of many, many files.  They're really programmed

4   files, you know, they have a lot of acronyms as to their

5   names, but all these literally hundreds if not maybe up

6   to a thousand different individual files where data is

7   captured and held.  And so these reports were based off

8   of that system by looking into those specific files.

9       Q.   Now, the data on this document is from 2002; is

10  that correct?

11      A.   That's correct.

12      Q.   Did you have the MAS-200 or the MAS-90 system

13  in 2002?

14      A.   Yes, we had that system since 1992.

15      Q.   Okay.  Can you describe the -- what is

16  contained in this document, what does it reflect?

17      A.   For the items that are listed in the item

18  description of this schedule, it is an accounting of

19  when certain products were purchased and when they were

20  sold.

21      Q.   Does -- by whom were these products sold that

22  are reflected in this document?

23      A.   Your question, sir?  I'm sorry.

24      Q.   My question is sold by whom?

25      A.   Well, the company made sales to -- they were

1  recorded -- transactions were recorded to the names

2  listed on the right-hand side of the schedule under the

3  column of customer name.

4      Q.   Okay.

5      A.   So in a transaction when product is delivered

6  to those customers and it's recorded in this inventory

7  detail transaction report.

8      Q.   So then these would be sales made by the

9  company?

10     A.   Yes.

11     Q.   All right.  Thank you.  May I have the

12  document?  Do you know by looking at this document,

13  Defendant's Exhibit 17, whether this reflects all of the

14  apparel sales made by Monster in 2002?

15     A.   To the best of my knowledge that's the way that

16  the system was designed.  So to the best of my knowledge

17  that's the purpose of the accounting system was to

18  capture all those transactions and then to report those,

19  you know.

20     Q.   Does this document reflect receipts of income?

21     A.   May I see the report again?

22     Q.   Yeah.

23         MR. SGANGA:  Object to the question as vague.

24     Q.   Do you understand my question?

25     A.   You're -- specifically you said does this

1  report show income.

2      Q.    Yeah.

3      A.    And I'm looking at the report and. . .no, it

4  does not.

5      Q.    May I see it again?

6      A.    (Complies.)

7      Q.    Does this document reflect the price that

8  would've been charged to the customer in these sales

9  transactions?

10      A.    No, sir.

11      Q.    So Mr. Kelly, you testified that this is a

12  document that reflects all of the sales transactions and

13  apparel by Monster Energy in 2002 and yet it does not

14  contain within it information regarding the price

15  charged or whether any revenue was received in

16  connection with this sale.  So can you draw any

17  conclusions from that?

18          MR. SGANGA:  Object, vague.

19      A.    The -- the report does show the transactions

20  that I referred to in my prior answer, you know, it does

21  show quantities that have been sold to or invoiced to

22  our distributors or customers.  So I don't think my

23  answer was different from before.  It does show the

24  transactions.

25      Q.    Let me explain something just to make it clear,

1   I'm not trying -- it's not a trick question.  I'm really

2   trying to understand what this reflects.  I just -- you

3   know, it's --

4        A.   I didn't want you to look at my prior answer

5   and say, well, you said one thing and then you mean

6   another.

7        Q.   No, no, that's not my intention.  Please, I

8   don't do it that way.

9        A.   But the report does show issuances and product

10  sold to our distributors and -- but you then became

11  specific, talked about the sales price, and the sales

12  price is not on that report.

13       Q.   Would there be another report that would

14  reflect the price and would reflect the revenues or any

15  accounts received in connection with those transactions?

16       A.   Not for the years when we were on the MAS-200

17  system.

18       Q.   I notice -- okay.

19       A.   The data is contained within our system.  I

20  believe that the -- because it was not a standard report

21  and because the system did have some limitations before

22  the compilation of getting the sales prices merged into

23  all that activity, it was very burdensome and onerous,

24  but the data is contained and manually we could get you

25  to that data.

1     Q.    Okay.   I notice that there's a column here

2   that -- for each record that is entitled Transaction

3   Type or Trans Type?

4     A.    Uh-huh.

5     Q.    And I see that quite a number of these records

6   refer to sale and then I see p-u-r-c-h, I assume that

7   means purchase?

8     A.    Correct.

9     Q.    Would that be a purchase of apparel by the

10  company, by Monster?

11    A.    I believe in our reference there would be

12  purchases that we had made.

13    Q.    Uh-huh.

14    A.    From a supplier.

15    Q.    As opposed to a sale?

16    A.    That's correct.

17    Q.    And then I see also transaction type, i-n-v,

18  what does that refer to?

19    A.    If I could see the report, sir.

20    Q.    Sure.

21    A.    Those would be items that were not a purchase,

22  they were not a sale, but we would've recorded some sort

23  of an adjustment to the inventory that we had in our

24  system.   That could've been for a books to count

25  physical adjustment that may have taken place, but it

1  was something to adjust our records to the inventory

2  counts.  That's one of the primary reasons.  There could

3  have been others that we produced some that are labeled

4  here.  So we purchased materials, we produced some

5  materials, and sometimes just in the normal course we

6  adjust our records to reflect our on hand stock, and I

7  presume that that's what that is for.

8      Q.   There's another transaction type that's

9  p-r-o-d.

10     A.   That would be a production.

11     Q.   What does that mean?

12     A.   To give you an example, we may have a hat, a

13  plain colored hat, we may have an emblem that has the

14  Monster logo on it.  In the production of a Monster hat,

15  we would just decrease the two raw materials.  We would

16  decrease the hat inventory and the patch inventory and

17  now we've produced the hat.  So now we have a hat that's

18  an inventory item.  So that would've been from a

19  production, something that we would've produced.

20     Q.   Thank you.  Looking where it refers -- there's

21  a column here that says customer name, and one of the

22  things it says is -- it looks like miscellaneous -- I'm

23  going to let you describe what it is, m-i-s-c, p-o-s,

24  shipments, what does that represent?

25     A.   That could have gone to either an individual or

1  a firm for which we just did not have the name of the

2  specific distributor.

3      Q.   POS is point of sale?

4      A.   Correct.  Just a generic term that we use for

5  those types of transactions.  If I may see that report

6  one more time, sir.

7      Q.   Yes.

8      A.   Yes.  It could have been to employees, it could

9  have been to somebody who is not our customer, so could

10 have been for various reasons.

11         MR. MORTNER:  Okay.  I want to show you another

12     document that was produced today, and we'll mark

13     this as Defendant's Exhibit 18.

14         (Defendant's Exhibit No. 18 was marked for

15      identification.)

16     Q.   Was that document prepared in connection with

17 this litigation?

18     A.   Yes, sir.

19     Q.   It was prepared by your office?

20     A.   Yes, sir.

21     Q.   Does the data -- that's a compilation, is it

22 not?

23     A.   A summary, yes.

24     Q.   Would you describe what that document is?

25     A.   For the year 2002 for items that are listed as

1  apparel and non-apparel, it shows the summary of

2  purchases made for various apparel products.  One, an

3  example would be a Monster Energy t-shirt, and during

4  that year we, you know, we purchased 214 of those.  If

5  during that year there were any that were produced,

6  which I've explained that process a minute ago, they

7  would show that also, and then it would show a summary

8  totals for those selected items and what was sold and

9  distributed to -- either in quantities, the quantities

10  that we would have sold to our distributors, customers,

11  employees, other -- I'll just put a general other

12  category also.

13     Q.   Does the data in Defendant's Exhibit 18, the

14  summary that you just referred to, come from the

15  document we've looked at in Defendant's Exhibit 17?

16     A.   I believe so.  Let me just cross reference

17  that.  I was hoping that this report had totals on it,

18  it does not so that I would be able --

19     Q.   So was I.

20     A.   -- to cross check it.  It does not have those

21  totals, but I believe that it was from this report or a

22  similar report where these totals had come from.

23     Q.   Again, there are no indications there of

24  financial transactions, there's no indication there of

25  any money paid or received in either of these documents,

1  and I'm just -- want to know where would that data be?

2     A.    It -- contained in one of those many files that

3  I explained to you in our MAS-200 system.  We do have

4  the records of what we did.  It was just the compilation

5  and the merging of the records that produced some

6  problematic issues since it was not a customized report

7  or an every day report.

8     Q.    Okay.  Let's look at Defendant's Exhibit 17

9  again.  There are -- there are eight columns that refer

10  to quantity and value.  In other words, you have -- you

11  have a group under a heading Purchases (Actual Costs),

12  and then it says Quantity and Value.  Then you have

13  Production and then it says Standard Cost, Quantity and

14  Value, Sales and Distribution, Quantity and Value, and

15  Transfers, Disposals and Count Adj -- I guess Count

16  Adjustment, a-d-j, Quantity and Value.  Would you

17  explain what those columns would reflect?

18        MR. SGANGA:  I'm going to just object for lack

19     of foundation and compound, but if you can

20     understand the question, you can answer.

21     Q.    I've identified columns in the document, Mr.

22  Kelly, do you know which column I'm identifying?

23     A.    Yes, sir.

24     Q.    And this is a document produced by your office?

25     A.    Yes, sir.

1      Q.   So would you explain what those columns

2   represent?

3          MR. SGANGA:   Still compound, but you can go

4      ahead and answer.

5      A.   That's fine.   The data that we received -- or

6   when we prepared the report, it goes through a lot of

7   downloading of information.   Again, it's -- some of this

8   information is so generic that it needs to be, you know,

9   put into an organized and summary report.   The initial

10  columns that I referred to and the columns, I'm going

11  from left to right so I'll say one, two, three, four,

12  five, six, seven, eight, nine, on the tenth column

13  there's a column that's called Quantity, and next to

14  that is the Standard Cost, and then the columns to the

15  right of that is the Extension, which just is the

16  multiplication of the quantity times the standard cost.

17  That's the initial data that we received from our

18  system.   To segregate that into categories such as

19  purchases, production, sales, what was done was to

20  identify the amounts on the left column, the column that

21  I referred to, and put that respective transaction into

22  one of those three columns or four columns to the right.

23     Q.   So then --

24     A.   So -- I'm sorry.   If you look at this, I mean,

25  the way that the report would read is that for every

1   item that you see in these four columns, there would be

2   one unique amount referred to the left.  So it was

3   really no more than just taking this column and saying

4   does this belong in this column, does this belong in the

5   purchases column, does this belong in the production

6   column.  So these columns that you see to the right,

7   which you referred to as purchases, production, sales

8   and distribution and trademark -- I'm sorry, not

9   trademark, but transfer and disposals, the sum of those

10  quantities would agree back to the one single column

11  that was not segregated.

12      Q.   So those columns would then -- if I may, those

13  columns would reflect a refinement of the definition of

14  the cost reflected in the initial column?

15      A.   No.

16      Q.   No?

17      A.   Wouldn't word it that way.  It would just be

18  taking the data that you see on the left, which

19  consisted of standard cost and the extension, and that

20  amount was just copied over --

21      Q.   But it's which type of cost, is that what it

22  is?

23      A.   It was our purchase -- standard purchase cost

24  that we would have on that, yes.

25      Q.   May I see?

1    A.   Sure.

2    Q.   Okay.  So where it says sales and distribution,

3  quantity 50 -- actually, it's -- these are in

4  parenthesis so that's a --

5    A.   A deduction.

6    Q.   A deduction.  And quantity 50 and then value

7  200 in parenthesis.  What would that 200 represent to

8  the company, a cost --

9    A.   Which 200, sir?

10    Q.   Where it says -- let's look at the first record

11  here.  It says two -- the value -- sales and

12  distribution value 200 on this particular sales

13  transaction.  What would that 200 represent?

14    A.   That would be the quantity that was issued out

15  or sold to the distributor, what was the cost of that

16  product, and each one of those refers to the items that

17  are on the left.  So it's -- on a cost basis it was --

18  if I bought something at $10 and sold it at $10, then

19  $10 was shown as a positive, the other negative cost

20  would be the same cost.

21    Q.   But where does this -- okay.  So that's the --

22  this first item it says Monster Energy matchbook,

23  quantity 50, value 200, so then the purchase of that --

24  those -- that 50 count of Monster Energy matchbooks

25  you're saying was a cost to the company of $200?

1    A.   That's correct.

2    Q.   Now, where does it show the -- where would it

3 show -- which column would it show the sale of that

4 anywhere?

5    A.   We show --

6    Q.   I thought you mentioned that.

7    A.   We showed the 50 going out, but the sales price

8 was not listed on that so. . .

9    Q.   How do we know if there was a sales price?  How

10 do we know it was a sale that involved a promotional or

11 a giveaway or some other form of transaction to the

12 company that didn't involve receipt of funds in exchange

13 for these products?

14    A.   From that report I could not look at that

15 report and tell you which, you know, the value that I

16 charged our customers.  I mean, it's in the system, it's

17 in our details of -- might help to explain when I issue

18 out a product or shirts in this example to a

19 distributor, an invoice is created and, you know, you

20 ask how do I know.  Well, it's got invoice numbers so I

21 know that for every one of those sales items there's an

22 invoice number for it.

23    Q.   Do you only issue an invoice when there's a

24 sale that involves a payment in exchange for the goods,

25 or do you ever issue an invoice that has a zero balance?

1    A.   Yes, there could be times when I issue out an

2  invoice with a zero balance.

3    Q.   Okay.  Okay.  Now, may I look at that?

4    A.   Of course.

5         MR. MORTNER:  Let me show you another document

6         we'll mark as Defendant's Exhibit 19.  This was a

7         document that was produced today, and it's entitled

8         Summary of Distributions of Apparel Inventory from

9         MEC Inventory Detail Reports US Sales Only.  Ask the

10        reporter to mark it, please.

11        (Defendant's Exhibit No. 19 was marked for

12         identification.)

13    Q.   Was that document produced by your office, Mr.

14  Kelly?

15    A.   Yes, sir.

16    Q.   It shows in 2000 -- it shows in 2002 units

17  5,542.  I'd just like you to look at Defendant's

18  Exhibit 18.  Does that appear -- the last column is sold

19  and distributed quantity, and this is Defendant's

20  Exhibit 18, Summary of Key Inventory Transactions for

21  2002 on Apparel, it has the some number 5,542.  Is that

22  the same -- that's a reduction of -- from that

23  information?

24    A.   That's correct.  If you'll note that this is a

25  2002 report, and so what was summarized on this other

1   report, the one that you just referred to, was

2   information from the individual year -- yearly reports

3   as I'm referring to Exhibit 18, and we just summarized

4   that information on the yearly basis on Exhibit 19.

5       Q.   Okay.  So I haven't been through this box, but

6   I would imagine then that there's going to be a set of

7   spreadsheets for each year from 2002 to 2011 in there

8   like what we have in Exhibit 17, and that from there

9   you're going to get a document -- you're going to derive

10  a document like Exhibit 18, which is the summary of the

11  inventory?

12      A.   I'm going to say for the most part, yes.  They

13  have -- four might just take it a little bit of a

14  difference or might be the same.  I just know that in

15  the year 2010 and 2011 we converted to a more

16  sophisticated accounting system.  So the -- your -- the

17  concept is yes, I would agree with the concept that you

18  would you see a detailed report for the two summary

19  schedules referred to in Exhibits 18 and 19.

20          MR. MORTNER:  Okay.  Thanks.  I'm just going to

21      take a minute see if I can pick out one of those

22      2010 or 2011 reports from the box that was produced

23      today.

24          THE WITNESS:  Certainly.  Are we off record

25      now?

1          THE VIDEOGRAPHER:  We're off the video record

2      at 11:04.

3          (Recess from 11:04 until 11:21 a.m.)

4          THE VIDEOGRAPHER:  We are back on the video

5      record, 11:21.

6      Q.   Okay.  I was able to find the document.  This

7  is the 2011 report.  It has a different title, it says

8  2011 Premium Shipments.  Do you know what the reason for

9  that change is?

10     A.   I do not.  I don't know if it was part of our

11  configuration with the new system that -- I don't know

12  why the document titles were changed.  I believe the

13  information -- if I looked at the report I could verify

14  if the information was the same.

15     Q.   It says here filters.  I suppose that's the

16  way -- drew the data from your overall database, says

17  filters, sales org 0102, material group premiums,

18  product hierarchy Monster brand.  What does the word

19  premiums mean?

20         MR. SGANGA:  I'm just going to object for lack

21      of foundation.  You've got -- you've had your

22      explanation of what you thought all of that meant

23      here and your question now is much more focused.  So

24      the question is what does premiums mean?

25         MR. MORTNER:  What's the objection?

1          MR. SGANGA:  Lack of foundation.  You had a

2     monolog about what you thought everything meant.

3          MR. MORTNER:  I didn't say what anything means.

4     I just read what is written here.  I don't know what

5     it means.

6          MR. SGANGA:  You said --

7          MR. MORTNER:  I'm asking the witness what it

8     means.

9          MR. SGANGA:  Okay.  So the question -- if your

10    question is just what does the word premiums mean,

11    is that your question?

12    Q.   My question is what does the word premiums mean

13    in the context of what I just read.  And I'll show you

14    the document so you can see where I read it.

15    A.   Premiums refers to a category which we have for

16    primarily apparel, shirts, caps, things of that nature.

17    It could include other items, but you know, when we --

18    refers to a premium in our general ledger, we isolate

19    that or we, you know, categorize premiums differently

20    than we would for insurance expense or legal expense.

21    It's just more of a general ledger account title.  And

22    in that category would be those items that we referred

23    to as the shirts and the premiums and could be other

24    odds and ends, but -- so that's what premiums would be.

25    Q.   Would all apparel sold by Monster fall into the

1  premiums category?

2      A.   Your question's not correct in that the

3  premiums would be more of an expense that -- you know,

4  that we have -- when refers to the purchases of

5  premiums, we would, just as I mentioned before,

6  designate that to be purchases of hats and shirts and

7  things and apparel.  When we sell premiums it refers to

8  the same items.

9      Q.   Okay.  What was wrong with my question because

10  I don't -- I'm not sure --

11     A.   If you could read back the question.

12     Q.   I'll try to rephrase it for you.

13     A.   Okay.

14     Q.   I'm just trying to understand whether all of

15  the sales transactions by Monster in 2012 would be

16  reflected in a report that deals with premiums?

17     A.    I don't mean to be disrespectful, but as I

18  understand it --

19     Q.   No, listen, you have the CPA.

20     A.   I'm just trying to -- give it to me one more

21  time and I'll see if I can't give you a straightforward

22  answer.  Okay?

23     Q.   Well, may I see the document?

24     A.   Sure.

25          MR. MORTNER:  Do you see where it says filters

1      in the upper left-hand corner of the first page.

2      Let's mark this document.  I'll tell you what we're

3      going to do, this is a document that in total is 357

4      pages long, each page is 18 inches by 11 inches, so

5      we're not going to mark the whole document, be too

6      burdensome, what I'd like to do is we'll mark the

7      first page of this document as Defendant's

8      Exhibit 19.

9      A.   I think we had 19.

10          MR. SGANGA:  Yeah, I think you're --

11          MR. MORTNER:  Oh, 18.  Sorry.

12          MR. SGANGA:  No, you're up to 20.

13          MR. MORTNER:  Oh, my goodness.  Moving right

14     along.

15          (Defendant's Exhibit No. 10 was marked for

16      identification.)

17          MR. SGANGA:  The exhibit is the first page

18     only, correct?

19          MR. MORTNER:  Yes.

20          MR. SGANGA:  Okay.

21     Q.   You see where it says Filters in the upper

22     left-hand corner?

23     A.   Yes, I do.  Sales org, 102, material group,

24     premiums, product hierarchy is Monster branded, yes.

25     Q.   Okay.  Do you know if this report reflects all

1  of the sales transactions involving clothing by Monster

2  in the year 2012?

3     A.   First, let's be clear on the date, it's 2011

4  premium shipments, not 2012.

5     Q.   That's fine.

6     A.   Grab that first.

7     Q.   Thanks for that clarification.  When I refer to

8  this document, I'm referring to all 300 --

9     A.   All these pages, I understand.

10        MR. SGANGA:  Okay.  Then you want to give the

11        witness a chance to confirm what the rest of it is

12        here?

13     Q.   Sure.  Weighs about five pounds.

14     A.   Five?

15     Q.   Maybe more.

16     A.   You've got more muscles than me.  Sorry for the

17  pause.  Just repeat the question or just answer it

18  straight away, I don't want to answer yes or no for fear

19  that I didn't understand your question.  But yes, this

20  is a report that shows out of the US company all of the

21  apparel, and when I say all of the apparel, I would say

22  that the report was designed to capture all sales of our

23  apparel sold by our US company during the year 2011.  I

24  did not review this report in detail to see that if it

25  may have items outside the US, but you know, it was

1   items that were shipped out the US.  It could have been

2   primarily mostly to US customers, but I just haven't

3   checked this report in detail to see if this may have

4   gone to some customer outside the US.

5      Q.   Does the report include non-apparel items,

6   sales of non-apparel items?

7      A.   I did not check all of this report, but it

8   would not be surprising to me that they had non-apparel

9   items in here also.  Let me just check this report.  And

10  I can see here that we have a Monster counter bar mat,

11  and I haven't seen anybody wearing those, so I would say

12  that, yes, that includes more than just apparel.

13         MR. MORTNER:  Off the record.

14         (Discussion off the record.)

15     Q.   Back on the record.  So that is the format you

16  were referring to that is the updated format as opposed

17  to the format we looked at in Defendant's Exhibit 17

18  which was the report from 2002?

19     A.   No.  I believe that the reports are different,

20  sir.  Looking at this report, it appears to me that it's

21  just a report of sales to -- a report of sales and it

22  has the ship to location on that, it's got the name of

23  the customer and the ship to, so whereas the prior

24  reports that we referred to in the earlier exhibits

25  was -- showed purchases of these items and whether they

1   were produced or purchased and shipped to.  This is a

2   report that has in it the information strictly of the

3   sales of those -- of those products.  And I could see

4   here that on this report it includes the unit price that

5   we have charged to our customers, whereas, the other

6   reports -- early reports did not have the sales price on

7   it.

8       Q.   All right.  Thank you.  Does it reflect in the

9   report from 2011 that you're looking at whether there

10  was a revenue received in connection with the sales

11  transactions?

12      A.   I'm looking at the total of this report which

13  refers to the amount that we've billed to distributors,

14  so yes, it shows the revenue from --

15      Q.   Would -- okay.  That would be what you would

16  bill, it's not necessarily what you received; is that

17  correct?

18      A.   We would've credited the customer's account, so

19  we may not have received cash for that.  If I owe you

20  and you owe me, there could be an offsetting amount, you

21  know, so it wouldn't necessarily be settled in terms of

22  cash, but it would've been an invoice that we have given

23  to our distributors and. . .you know.

24      Q.   If you had an arrangement with your

25  distributors to give them a certain number of pieces of

1   apparel without charge in connection with their work as

2   a distributor, would that still be reflected in this

3   report as a sales?

4       A.   It could have -- we could have generated an

5   invoice for that, but if the $0 invoice was given, the

6   detail could be here, but when the total that I

7   referred -- the total of this report would have had only

8   the amounts that shows up as an invoice amount.

9       Q.   I see.  Thank you.  Would you look at the last

10  page of that report?

11      A.   Yes, sir, I've got it.

12      Q.   Okay.  I'd like to show you another -- you see

13  those totals on that report on the last page?

14      A.   Yes, sir.

15      Q.   And we didn't have totals on the other report;

16  is that right?

17      A.   On the other reports, earlier exhibits?

18      Q.   Yeah, the earlier --

19      A.   That's correct, sir.

20      Q.   The ones that were based on the earlier system.

21      A.   Yes.  Which showed the purchase activity and

22  quantity activity of -- yes, you're correct.  This has

23  totals, the others did not.  Although may I see the

24  other report?

25      Q.   Yeah, that's Defendant's Exhibit 17 which

1   is the 2002 --

2       A.   Let me just refer to that one more time.

3   That's correct.

4           MR. MORTNER:  Like to show you another document

5       which was produced today, Defendant -- we'll mark

6       this please as Defendant's Exhibit 21.

7           (Defendant's Exhibit No. 21 was marked for

8        identification.)

9       Q.   Mr. Kelly, would you look at that document,

10  please.  When you're ready, would you describe what that

11  document is, Defendant's Exhibit 21?

12      A.   Yes.  Just a second here.  Okay.  Sir, I've

13  looked at the two.

14      Q.   What is Defendant's Exhibit 21?

15      A.   The -- in Exhibits 20 we have a column that is

16  called apparel with a question mark, and included in

17  that column is a description of what is apparel and

18  non-apparel.  On that same Exhibits 20 there's also a

19  category description on the far right-hand side of that

20  schedule which lists in it certain items such as

21  clothing on premise, dealer loaders and other items that

22  it refers to.  So the Exhibits 21 is a summary of this

23  357 pages, although I don't see where you got the 357

24  unless you subtracted, which you probably did.  So the

25  357 page document that we referred to in Exhibits 20 is

1  summarized in a more concise manner.  And I'll refer to

2  Exhibits 21 for that aggregation.  And then on that

3  schedule it has on it in the right-hand side up at the

4  top the amounts that corresponds to Exhibit Number 20 in

5  that how much was billed to our distributors, what was

6  billed to our Army E store and billed to employees.

7      Q.   Are you looking -- are you looking at the last

8  page?

9      A.   Of Exhibit 20.

10     Q.   Right.  So since we haven't marked that page,

11 let's mark that as Defendant's Exhibit -- can we do it

12 20-A or something like that?  Yeah, let's mark that as

13 20-A, and that will be the last page of this large

14 multi-page document.  And that's the page that has at

15 the end of it the totals that you were referring to; is

16 that correct?

17     A.   That's correct.

18         MR. MORTNER:  Okay.  I ask the reporter to mark

19     that.

20         (Defendant's Exhibit No. 20-A was marked for

21      identification.)

22     A.   Which upon looking at this summary on Exhibits

23 21, it more clarifies my answer from before that this

24 357 page Exhibits 20 and 20-A includes other items than

25 apparel which I've established before when we were

1  talking about the maps.

2      Q.   Does the totals break out the difference

3  between apparel and non-apparel?

4      A.   On this new Exhibits 21 it does, sir.  It has

5  an apparel column, a non-apparel column and then the

6  total which was billed, and the totals I see that agrees

7  to this Exhibits 20, it agrees to the totals on Exhibits

8  20-A.

9      Q.   Understood.  Thank you.  Let me show you

10  Defendant's Exhibit 19 again.  If you would, take a look

11  at the entry for quantities under 2011.  Does that --

12  may I just take a look at this?

13      A.   Of course.

14      Q.   Does that -- what's -- that's the quantity

15  of -- this is -- quantity of apparel sales US only and

16  it shows a number 382,676.  Is that -- is that number

17  derived from either Defendant's Exhibit 21 or 20 the

18  summary or the original data set?

19      A.   In Exhibits 21 is a summary -- again, a summary

20  of Exhibit 20 and 20-A, and the amounts shown on

21  Exhibit 19 only reflect the apparel portion on this list

22  so. . .

23      Q.   Are you saying that the amounts shown -- the

24  summary in Exhibit 19 is the break out of apparel

25  portion that's shown in Exhibit 21, the summary?

1    A.   Yes.

2    Q.   Okay.  So --

3    A.   So I could see that the extended invoiced

4  amount and the unit -- the unit price and quantity

5  amounts that show on schedule 20-A were further refined

6  to show the apparel and non-apparel portion on Exhibits

7  21.  The amounts shown on Exhibits 19 reflects those

8  amounts on Exhibits 20 and 20-A, but they were not

9  summarized on Exhibits 21.

10   Q.   Okay.  Thank you.  Thanks for clarifying that.

11   A.   I can see this.  Sorry.

12   Q.   Well, let's keep -- yeah, we'll take that.  The

13 reporter's going to need those exhibits.

14   A.   Got that, sir.

15   Q.   Thanks.

16   A.   Thanks.

17   Q.   In preparing for this deposition or preparing

18 for the document production in this case, do you have

19 any recollection whether you created a summary of income

20 to the company as a result of sales of apparel in any

21 particular years?

22   A.   We wouldn't use the word income, so it needs to

23 be clarified as whether it was invoiced or revenue.

24   Q.   Revenue.  Let's say revenue.

25   A.   So if we could go back and just -- I'm sorry.

1   I was caught on that word then I --

2       Q.   I'm sorry.  I'm asking you whether or not in

3   your preparation for production of documents or

4   preparation for your deposition today whether you

5   produced any reports that would reflect revenues earned

6   by the company on an annual basis from the sale of

7   apparel?

8       A.   In connection with this deposition, sir?  This

9   report, if I could just refer to --

10      Q.   Or in connection with the document productions

11  that we've had in this case.  You testified, I think

12  earlier, that some of these reports were generated by

13  your office so --

14      A.   Yeah, that's correct.  I did refer to having

15  that information available and summarized in these

16  reports for 2011 and 2010.

17      Q.   Okay.

18      A.   And --

19      Q.   I'm trying to find out whether there's another

20  set of reports out there that have been produced that

21  will show revenue --

22      A.   No, sir.

23      Q.   -- from apparel sales?

24      A.   No, sir.

25      Q.   Thanks.  Thanks for clearing that.  Do you have

1   any knowledge about the revenues that were received by

2   the company on an annual basis from apparel sales as

3   you're sitting here today?

4       A.   Yes.   The amounts that we invoiced -- I know

5   from the time period of 2002 to 2009 was in excess of

6   about $2 million.  I don't have that report.  I don't

7   want to specify that.

8            MR. MORTNER:   Let me show you another document.

9       I'll ask the reporter to mark this as Defendant's

10      Exhibit 22.  After she marks it, she will give it to

11      you.

12           (Defendant's Exhibit No. 22 was marked for

13            identification.)

14      Q.   I will represent to you Defendant's Exhibit 22

15  is the cover page and Page 33 from the 10-K -- Form 10-K

16  report issued by Hansen which is available to the public

17  from Monster's -- one of Monster's own websites as well

18  as from the SCC's website Edgar.  Would you look at Page

19  33, please?

20      A.   Yes.

21      Q.   Which is the second page of this document.

22      A.   Yes, I have.

23      Q.   Okay.  That shows a spreadsheet titled Results

24  of Operations.  Would have been involved in the

25  preparation of this report?

1    A.   Yes.

2    Q.   Do you have any recollection of it as you're

3  sitting here today?

4    A.   Do I have any recollection of the preparation

5  of the 2005 --

6    Q.   I'll tell you -- I'll tell you what, let me

7  clarify that.  The reason I'm asking you is that may

8  know that this was your -- part of your duties, I'm just

9  wondering --

10    A.   That's correct.

11    Q.   -- if you have a clear recollection of working

12  on this one, you know, do you remember the 2005 sitting

13  there?

14    A.   I would think that I did.

15    Q.   Okay.  Thank you.  Now, this document refers to

16  sales in the first -- on the upper -- the first row.

17    A.   Yes.

18    Q.   Gross sales, then it refers to net sales.

19    A.   Yes.

20    Q.   Do you know if it was referring to -- this is

21  referring to sales of beverage only or if it's referring

22  to sales of beverage and non-beverage items?

23    A.   Primarily beverage items.  And my recollection

24  during these years is that they were all beverage items.

25  I say 99.5 or 99.9 percent because there could be some

1   non-beverage sales that we had that may have been

2   recorded, and these numbers I just don't know if -- but

3   primarily beverage sales.

4        MR. MORTNER:  Okay.  Let me show you another

5        document.  I'll ask the reporter to mark this as

6        Defendant's Exhibit 23.

7        (Defendant's Exhibit No. 23 was marked for

8         identification.)

9        Q.   And this is the Form 10-K report from Hansen

10  Natural Corporation which is the former name of Monster

11  for the period ending December 31, 2006.  And I provided

12  the cover page and Page 41 which is also the Results of

13  Operations spreadsheet report.  Do you have a

14  recollection of this report, Mr. Kelly?

15       A.   Yes, I have a recollection of this report.

16       Q.   And again, let me ask you, the figures provided

17  here for sales, do those represent beverage items only

18  or do they represent items in addition to beverage being

19  sold by Monster?

20       MR. SGANGA:  Object.  Vague, compound.

21       Q.   Did you understand the question?  I can re-ask

22  it if you like.  It's the same question we had on the

23  last document.

24       A.   Uh-huh.  It's a primarily beverages.

25       Q.   Okay.  And you use the qualifier primarily.

1  Can you just clarify that a little bit for me?

2      A.   Without seeing actual detail, I always a little

3  cautious of answering 100 percent items for fear that

4  some miniscule amount would pop up and then I would be

5  incorrect in my statement and so I say primarily

6  beverages.

7      Q.   That's certainly a fair approach.  Did there

8  come a time when you began reporting in the Results of

9  Operations section of the 10-K income from sources other

10 than beverage sales?

11     A.   You have to be cautious on the term income.

12     Q.   Revenues.

13     A.   Okay.  In these two years it would have been

14 primarily beverages that we reported in our Results of

15 Operations.

16     Q.   Why was that?

17     A.   Why was what?

18     Q.   Why would it be primarily beverage?

19     A.   Because we're primarily -- that's what our

20 investors look at us to as being a beverage company.

21          MR. MORTNER:  Okay.  Let me show you another

22          document.  We're just going to go through the 10-Ks

23          on these operations reports.  So this is -- this is

24          number -- this is the Form 10-K report on Results of

25          Operations from the period ending December 31, 2007.

1      Ask the reporter to mark it Defendant's Exhibit 24.

2          (Defendant's Exhibit No. 24 was marked for

3       identification.)

4      Q.   Do you have a role in preparing this Results of

5  Operations for this period?

6      A.   Yes, sir.

7      Q.   And again, let me ask you the question, the

8  sales figures here, would you indicate whether these

9  represent sales for beverage only or sales for beverage

10 and other items?

11         MR. SGANGA:  Again, I'm going to object.  It's

12     vague and compound.  You can answer.

13         MR. MORTNER:  There's only one part to the

14     question.

15         MR. SGANGA:  Well, talking about figures plural

16     here, I'm not sure even which ones you're talking

17     about.

18         MR. MORTNER:  All of the sales figures reported

19     in the Results of Operation.

20         MR. SGANGA:  So every single figure on this

21     page?

22         MR. MORTNER:  All of the sales figures.

23         MR. SGANGA:  Same objection.

24     A.   The reports that I've just shown is just -- is

25  for clarification just shows a new column as the 2007

1  column.  You'll see that the 2006 column in this Page 39

2  of Exhibit 24 in the column of 2005 are replicas of the

3  prior Exhibits 23 and 22.  So then only new portion of

4  this schedule except for what may be included in the

5  footnote, which I didn't go word for word by, would be

6  the 2007 information.

7      Q.   Okay.

8      A.   The question, as I understand it, is

9  there -- the sales figures, the gross sales figures, net

10 of discounts and returns and the net sales figures that

11 appear on this Page 39 are primarily beverage sales.  I

12 do want to say though that with just these documents in

13 front of me, there could be some additional revenue that

14 were recorded in the 2007 year.  During that year we did

15 receive additional revenue from distributors from the

16 sale of certain distribution rights.

17     Q.   Okay.  Thank you for that answer.  I want to

18 show you another document.  This will be -- you noted

19 that some of the data carried over from the prior

20 reports.  I'll skip now ahead to 2000 -- the report

21 ending -- for the period ending 12/31/09.  We'll skip

22 '08 since it contains the '08 data as well.

23     A.   Got you.

24          MR. MORTNER:  We'll mark this one as

25          Defendant's Exhibit 25.  Let me give this to you.

1          (Defendant's Exhibit No. 25 was marked for

2      identification.)

3      Q.   I note that this also -- let me just say, this

4  has the Results of Operations report attached to it.

5  Mr. Kelly, did you have a role in preparing that report?

6      A.   Yes, sir.

7      Q.   I note that there's an additional row included

8  in this report which refers to other income.  Can you

9  explain what that is?

10     A.   Point me to your sentence that you're looking

11  at, sir, now.

12     Q.   I'm looking at -- are we on Page 42.

13     A.   42 of Exhibits 25?

14     Q.   Okay.  See where it says other income?

15     A.   Yes.

16     Q.   What are those -- what do those records

17  reflect?

18     A.   That line item --

19     Q.   Line item.

20     A.   -- would reflect in the income portion where it

21  says interest and other income would be interest income.

22  It would also include a pro rata portion of the amount

23  of recognize -- the amount of revenue that we recognized

24  and the distribution -- and the sale of certain

25  distribution rights that we had.  That's explained in

1  this Form 10-Q for 2009.  And briefly what it was is

2  that we sold the distribution rights to either

3  Anheuser-Busch or Coca-Cola and -- you know, for their

4  rights to distribute our product in certain territories.

5  So we received monies from them, upfront monies, which

6  according to generally accepted accounting principles,

7  could only be taken into income over a certain time

8  period, 20 years is the most used time period that we

9  use in recording this income.

10         The corresponding amount is -- of how much we

11  received as detailed in these financial statements, the

12  amount that we received also shows as a deferred revenue

13  item on the face of our balance sheet for these years,

14  and again, what's included in interest and other income,

15  again, aside from the interest that I spoke about, was

16  these amounts that we recognized as revenue in

17  connection with the sale of those distribution

18  agreements.

19     Q.   So you would be carrying --

20     A.   Distribution rights.

21     Q.   You would be carrying forward each over a

22  period could be 20 years?

23     A.   Yes.  We have on our balance sheet a line item

24  of referred revenue that we record a portion of that

25  liability income for that 20 year period.

 1    Q.   Is there any other income that is reflected in

 2   the line item other income besides what you've just

 3   described?

 4    A.   I don't have the breakdown, sir.  So we could.

 5   I know that in dealing with certain foreign subsidiaries

 6   we have certain gain or losses on the foreign currency

 7   exchanges rates which is something that we deal with

 8   with respect to our subsidiaries, and there could be

 9   some gains or losses on foreign currency transactions

10   that also flow through that particular line item.

11    Q.   Do you have any recollection in the year 2008

12   what revenues were earned from the sale of apparel by

13   Monster?

14    A.   2008, no, sir.

15    Q.   How about 2009?

16    A.   No, sir.

17    Q.   2010?

18    A.   I believe that that's shown on this report

19   similar to the 2011 report that you showed me.

20    Q.   Okay.  We'll look at that.  But before we do,

21   is there anywhere in this Results of Operations report

22   from the period ending in 2000 -- December 31, 2009,

23   Defendant's Exhibit 25, that is reflected income --

24   revenue, excuse me, revenue from the sale of apparel by

25   Monster?

1    A.    Not in the gross sales line.

2    Q.    And not in the other income?

3    A.    Not in the other income line.

4    Q.    Is there another line item that would contain

5  that revenue?

6    A.    Yes, sir.

7    Q.    What would that be?

8    A.    Operating expenses.

9    Q.    Can you explain why it would appear there?

10    A.    The amounts billed and invoiced to our

11  distributors for the apparel we recorded that as an

12  offset to our overall cost of the purchase price of

13  those apparels, and we just netted the apparel expense,

14  the premium expense, and we offsetted the amounts from

15  distributors against that line item.

16    Q.    So was that -- is that reflected as a liability

17  or --

18    A.    No, it credits to an expense.  So we -- you

19  know, we billed the customer and then offset that

20  against our total purchases.

21    Q.    Okay.  So if we look at this line item here for

22  2009, it has a figure 275,000 --

23    A.    I'm sorry?

24    Q.    -- and 7 --

25    A.    Rounded to the millions, sir.

1      Q.    Oh, 275 million.  So is that revenue to the

2   company or is that an expense that's --

3      A.    What is it?  Is it --

4      Q.    That figure 275 million.

5      A.    275 million is the operating expenses of the

6   company.  It's selling, general and administrative

7   expenses of the company for that year of 2009.

8      Q.    So your -- I'm going to try to see if I can

9   paraphrase in my layman's terms what I understand from

10   your statements.

11      A.    Yes.

12      Q.    So then are you saying that revenues received

13   from the sale of apparel would be reflected in this

14   operating expense figure in that it would have resulted

15   in a reduction in that figure?

16      A.    Yes.  I'm going to say yes and then I'm going

17   to use my terms.

18      Q.    Go please, go ahead.

19      A.    The amounts that we received from our

20   distributors would've offset an expense.  Had we not

21   billed out, that operating expense amount would have

22   been a larger amount and the amount that we billed to

23   our distributors decreased our expenses and therefore we

24   show a lower expense, operating expense than we would

25   have had we not billed our distributors.

1     Q.   Are you able to determine what the amount of

2   decrease was from the sale of apparel?

3     A.   We have the detail, we have the ability to

4   burdensomely get to that number.  I do not have that

5   number.

6     Q.   Okay.  One other question on Exhibit 25.

7     A.   Yes, sir.

8     Q.   The testimony you just gave regarding the

9   offset from apparel sales on the operating expense

10   number, would that hold true for the -- for the figure

11   reported on that line item for 2008 and 2007?

12     A.   Yes, sir.

13        MR. MORTNER:  Now -- I see -- okay.  Thank you.

14     Thank you.  All right.  I'm going to jump ahead to

15     Form 10-K for the period ending December 31, 2011.

16     Mark that as Defendant's Exhibit 26, please.  26, I

17     guess.

18        (Defendant's Exhibit No. 26 was marked for

19         identification.)

20        MR. SGANGA:  Just so the record is clear, all

21     of these exhibits that you've been marking here

22     relating to the Form 10-Ks are excerpted versions

23     with a selection of pages that defendant's counsel

24     has chosen.

25        MR. MORTNER:  That's right, because these 10-Ks

1       they run about, I think, about 200 pages.

2             THE WITNESS:  With exhibits maybe so.  I think

3       the document's about 100 pages.

4             MR. MORTNER:  Yeah.  So to reduce the waste of

5       paper and the burden, I've just excerpted the

6       portions that I wanted to examine you on.

7             MR. SGANGA:  Yeah.  I just wanted to be clear

8       when you call it a 10-K, it's a --

9             MR. MORTNER:  That's perfectly fine.

10            MR. SGANGA:  -- less than the whole 10-K.

11            MR. MORTNER:  That's perfectly fine.

12      Q.   Okay.  This really is just -- now I'm going to

13   ask you to look at Page 40 that I excerpted here, and

14   it's Results from Operations, and this includes the line

15   item operating expenses, it includes the data for the

16   years 2011 and 2010.  I'll just ask you, those operating

17   expenses also will reflect income from apparel sales in

18   the form of an offset of those expense figures as you've

19   previously testified; is that correct?

20      A.   Yes, sir.

21            MR. MORTNER:  Okay.  All right.  Thank you.

22      See what time is it?  How we doing on the tape

23      there, sir?

24            THE VIDEOGRAPHER:  This is 49 minutes into this

25      tape.

1          MR. MORTNER:  You have 58?

2          THE VIDEOGRAPHER:  We have 82.

3          MR. MORTNER:  82.

4          MR. SGANGA:  How much longer do you think you

5     have here today?

6          MR. MORTNER:  I don't have much more.  Let's go

7     off the record for a second.

8          THE VIDEOGRAPHER:  Were off the video record at

9     12:11.

10         (Discussion off the record.)

11         (Recess from 12:11 until 12:36 p.m.)

12         THE VIDEOGRAPHER:  We are back on the video

13    record.

14    Q.   So sitting here today, Mr. Kelly, does Monster

15    know for any year the amount of revenues it earned from

16    the sale of apparel?

17    A.    Again, we talked about the 2002 to 2009 that

18    there's data there that, you know, just hasn't been

19    compiled in a report that I could answer that question.

20    So I know we talked about the 2010 and '11 that

21    there's -- you know, when we consider revenue is listed

22    on the 10-K and sales, it was that more specific of your

23    question?

24    Q.   No.  I'm just -- what's on the 10-K or not on

25    the 10-K, the question is could you put your finger --

1   could you go back to your office and say this is -- and

2   say, yes, here's the number, this is what we earned in

3   revenues for the sale of apparel for any year in the

4   last ten years?

5       A.   Without running a specialized report.  I

6   couldn't just run that report for you or get that number

7   for you so. . .

8       Q.   You have not run that report in preparation for

9   this -- in connection with this litigation; is that

10  correct?

11      A.   Well, we submitted this one for 2011 and 2010,

12  I believe.  We, you know -- we produced this report

13  which shows the amount of, you know, the sales price

14  of -- that was charged to a distributor, and then in the

15  column of net -- net invoice -- sorry, the extended

16  invoice amount would have been the amount that it is

17  shown on the bottom of an invoice of how much that we

18  had charged to a distributor or customer.

19      Q.   Okay.  You said before that you would have to

20  run reports for other years; is that right?

21      A.   For the 2002 to 2009, yes.

22      Q.   I think you testified that would be a

23  burdensome task?

24      A.   If you want to define burdensome.  It's doable.

25      Q.   I think it was your term, I think it was your

1  term.

2      A.   Burdensome, yes.

3      Q.   What about revenue from licensing agreements?

4      A.   Yes.

5      Q.   Is that reported in any of the documents that

6  we've looked at today or reflected?

7      A.   Yes.  In -- I think I had mentioned when we had

8  talked about the term -- you know, referring to -- I'll

9  just refer specifically to one of the most recent 10-Ks,

10 I'll look at the -- you've got a 10-K here, Exhibit 26,

11 and on Page 40 of that exhibit you had asked me, you

12 know, like explain what is an interest and other income.

13     Q.   Uh-huh.

14     A.   And you notice the word net next to that, so we

15 would have had some pluses and minuses within that line

16 item.  To answer your question specifically just now,

17 the royalty income from licensing agreements would've

18 also been in that interest and other income net.  Now,

19 if you look at that number 1,619,000 for 2011, that

20 could have been interest income could have been in

21 there, royalty income could have been in there, revenues

22 from, you know, the distribution agreements.

23     Q.   Do you have any ability to break out that

24 number into those --

25     A.   Certainly.

1     Q.    -- respective categories?

2     A.    Certainly, yes.

3     Q.    Have you done that for this case?

4     A.    No, sir, have not.  I believe the data is

5   readily available though.  But anyway, just to finish my

6   thought on that, the --

7     Q.    Please do.

8     A.    Any of the licensing agreements, licensing

9   revenue would have been in that number, and then it

10  would've been decreased by say interest expense or some

11  other gains or losses on foreign currency transactions,

12  so that interest and other income -- I believe that

13  there's some additional information in the 10-K on those

14  numbers of what it consists of.  I don't know if it goes

15  down to royalty income or not.  I do want to make just

16  one note, sir, the items that I talked about about

17  deferred revenue --

18    Q.    That was the distribution fees?

19    A.    That's correct.  That deferred revenue that we

20  taken over 20 years, I'd have -- I know that it's either

21  recorded in the gross sales amount or the other income.

22  Right now --

23    Q.    You testified previously that it was in the --

24    A.    In other income.

25    Q.    Yeah.

1    A.    I could be -- it could've been in gross sales.

2  I just don't have the documents or the detail for that.

3  Certainly it's readily available.

4    Q.    Thanks for that clarification.

5    A.    You know, now that I recollect a little bit

6  more clearly because I was looking at the -- you known,

7  the 10-K just recently, and I think that if you look at

8  one of the footnotes that we have we talk about energy

9  sales or DSD sales and warehouse sales and it breaks up

10  into carbonated and non-carbonated, I think there's an

11  amount there of other income, and I believe that's where

12  the deferred revenue now that I --

13    Q.    What does DSD represent?

14    A.    Direct store delivery is the acronym.

15    Q.    That's referring to beverage, right?

16    A.    That's correct, yeah.  So my apologies for not

17  being clearer before, but I believe that looking at

18  other income, distributor income is up in the gross

19  sales numbers.  So just to go back to other income, for

20  certain that's where we have the royalty income.

21    Q.    Okay.  Do you have any recollection what the

22  royalty income was for any particular years?

23    A.    Between -- recently between 1 to 2 million for

24  the latest couple of years.  Could be up to

25  two-and-a-half million for one of those years.  I

1  believe we have a schedule for that that's been

2  presented.

3         MR. SGANGA:  Yeah, we produced an itemization

4     of the royalty revenue to you.

5         MR. MORTNER:  Was that in the most recent

6     production of documents that have been withheld on

7     the basis of confidentiality?

8         MR. SGANGA:  I don't know the exact timing of

9     the production.  I do have a photocopy of it here if

10    you'd like to use it.

11        MR. MORTNER:  That would be great.

12        MR. SGANGA:  This is document MEC-CONF0031317.

13        THE WITNESS:  May I take a look at it first?

14        MR. SGANGA:  Previously produced.

15    A.   And if I may point out, sir, that this is a --

16 the actual amount of checks that we received in those

17 respective years, you know, in those periods that's on

18 this newly formed exhibit.  It may not be.  In fact, I

19 would say in most years that it's not the actual amount

20 that we recorded as other income, and the difference

21 being we're on an accrual basis which means that our

22 amounts that we would reflect in our government reports

23 or SCC reports would be on an accrual basis.  The

24 schedule that you see before you is cash received in the

25 actual year.  The difference being that if I received a

1   check in January pertains to the prior year, I would've

2   recorded that in the prior year as -- appropriately as

3   income.  Even though that the check I did not get until

4   January the following year.  So it's just setting up an

5   accounts receivable.  And so the schedule that is before

6   you is the dates in which the checks actually were

7   received.

8           MR. MORTNER:  Okay.  Let's mark this document

9       as Defendant's Exhibit 27.

10          (Defendant's Exhibit No. 27 was marked for

11       identification.)

12          MR. MORTNER:  Off the record.

13          (Discussion off the record.)

14      Q.   So just to make sure we're absolutely clear in

15  our understanding of the Defendant's Exhibit 27, I'm

16  looking at the line item titled total, and I see total

17  2008 and prior on that line item it says $124,381.34.

18  So that would be the total revenues earned from license

19  agreements, which is royalty income, for all years prior

20  to 2008 and including 2008; is that correct?

21      A.   That's correct.  If you see the first column on

22  that is Q1 2008 and prior.  You can see that column

23  there in Q1 of 2008 totals $27,760.  I don't have the

24  date in front of me so I don't know if one of those --

25  if those are one checks or a series of checks and if

1  they were all received in that Q1 or something that was

2  from 2007 or prior, but you can see that 27,000 from

3  prior, I just don't know.  The other ones are more

4  accurate as to the next line item, Q4 2008 we received

5  the $93,396, and down below in Q3 of 2008 we received

6  from Slednecks $3,284.  So the first section that you

7  see there of 2008 would represent 124,981, as you said,

8  for those time periods and maybe something from prior.

9  The following years though --

10      Q.   381.

11      A.   I'm sorry?

12      Q.   Really small but it's --

13      A.   I can't even see.  3 or 5?  Yeah, 124,381.  The

14  other periods shown here for 2009, '10 and '11 and '12

15  would be the amounts that we received in those

16  respective quarters.

17      Q.   Understood.  Now, you have a column titled

18  Licensees.  Do you know how those particular licensees

19  were selected for this report?

20      A.   Every -- every check that we received from a

21  license agreement would be segregated out from receipts

22  from other purposes, whether they be for customer sales

23  or not, and put into an account in our general ledger

24  system.  That account named royalties received or

25  royalty income, it's in our general ledger, we would've

1  received those checks and coded it to that account.  And

2  we did that method the same in 2008 all the way to

3  current.  So this particular report was based on an

4  analysis of that account that I -- royalty received,

5  royalty income, and the system is set up so that's where

6  royalty checks would be coded to.

7      Q.   So then if you have a licensee from whom you

8  did not receive a royalty check, they simply would not

9  be reflected in this report?

10      A.   They should not be.

11      Q.   So then this is the set of all licensees from

12  whom royal revenues have been received?

13      A.   That's correct, sir.

14      Q.   Thank you.

15      A.   That's my understanding, sir.

16      Q.   Thanks for that clarification.  Do you have any

17  knowledge of the value of Monster's trademarks in

18  connection with -- in relation to the company's overall

19  net worth?

20          MR. SGANGA:  Beyond the scope of the 30(b)(6)

21      notice.

22      A.   I don't know what the word value would imply.

23      Q.   Well, the company has a net worth; is that

24  correct?

25      A.   It has on the balance sheet a net -- net equity

1  it refers to.

2     Q.    Let's look at it.  Which document are you

3  looking at, 26?

4     A.    I'm looking at 26.

5     Q.    Yeah.  Okay.  Defendant's Exhibit 26.

6     A.    They have in there the latest balance sheet

7  from a 10-K.  We produced other balance sheets from

8  10-Qs and Q1, 2 and --

9     Q.    That's Page 70?

10    A.    That's Page 70, that's correct, sir.

11    Q.    Thank you.  You were saying, please?

12    A.    I say from an accounting -- generally accepted

13  accounting principles really, produce numbers on more of

14  a historical cost basis than a value basis.

15    Q.    Understood.

16    A.    And the net equity according to our balance

17  sheet is $979,158,000.

18    Q.    Okay.

19    A.    On the balance sheet up above we have a line

20  item called intangibles where the 48,396,000.  I believe

21  that's detailed a little bit more in the footnotes.

22    Q.    Well, let me get to that line item.

23    A.    I'm sorry.  48,396,000, these are rounded,

24  might be looking --

25    Q.    Okay.  Intangible.  Got it.  It says

 1  intangible, net, right?

 2      A.   Yes.  I think that information on that is more

 3  detailed in the footnotes of the financial statements.

 4  That's different than value that you asked for those,

 5  sir.

 6      Q.   Okay.  What is this?  This is -- what -- how

 7  would you describe this figure?

 8          MR. SGANGA:  Object.  Vague.  Which figure now

 9      are you --

10      Q.   48,396,000, that's an asset value, asset --

11      A.   Yeah, I think the footnotes to the financial

12  statements describe it a little bit more in detail.

13  Those were amounts that we either -- and I've got to say

14  that the intangible amount that you see there covers

15  trademarks, and not only the Monster trademark but other

16  trademarks.  And those would be the cost associated in

17  connection with those trademarks, whether they be

18  acquisition costs, legal defense cost, other types of

19  incidental cost, those would be amounts that we've paid

20  out in cash, you know, related to the trademarks, all

21  company trademarks.

22      Q.   And the line item that says property and

23  income, net, that would be intangible, that would be --

24  excuse me, that would be tangible property of the

25  company?

1    A.    That -- yes, property and equipment, net.  The

2    45,150,000 -- I'm sorry.  Yes.  45,151,000 is the net

3    amount.  When we say net, after depreciation of vehicle

4    cot, cooler cost, other fixed assets, office equipment.

5    There would not be any intangibles or trademark related

6    items in that number.

7    Q.    Understood.  Do you know if Monster's ever used

8    its trademarks as collateral in a debt transaction?

9    A.    Ever you used in your sentence.

10    Q.    To your knowledge --

11    A.    No, you used the word ever.  Going back to

12    1992 --

13    Q.    Yeah.

14    A.    -- we could have had our trademarks as

15    collateral for a line of credit that we had with our

16    bank.

17    Q.    Does Monster currently use their trademarks as

18    collateral for a credit?

19    A.    I don't believe so, sir.  The loan documents

20    would be specific to that.  I just -- I know currently

21    the -- we have a $10 million line of credit with our

22    bank that we've had for 15 odd years.  I thought at one

23    time that we removed the collateral portion from that

24    line of credit as a security, but I'd rather just defer

25    to the examination of the loan documents to answer that

1   correctly.  That would be the only -- aside from some

2   small capital leases that we have in respect of our

3   transportation equipment, that would be the only debt

4   that we would be committed to.

5       Q.   That's a line of credit?

6       A.   A line of credit, yes.

7           MR. MORTNER:  Okay.  I think we're finished.

8       I'd like to just take a couple of minutes and then

9       I'll let you know if we're actually --

10          THE WITNESS:  Certainly.  Want to excuse us?

11          THE VIDEOGRAPHER:  We're off the video record.

12      It's 12:56.

13          (Recess from 12:56 until 1:04 p.m.)

14          THE VIDEOGRAPHER:  We're back on the video

15      record at 1:04.

16          MR. MORTNER:  Mr. Kelly, I have no further

17      questions at this deposition.  If your counsel had

18      some questions, I may have some follow-up questions

19      to that, otherwise, I thank you for coming today and

20      giving your testimony.

21          THE WITNESS:  Thank you, sir.

22          MR. SGANGA:  I don't have any questions so we

23      can go off the record.

24          THE VIDEOGRAPHER:  We're off the video record

25      at 1:04.

```
 1          Monster Energy vs. Consolidated Distributors

 2          Date:  September 21, 2012

 3          Deposition of:  Thomas Kelly

 4          THIS IS AN UNOFFICIAL DRAFT TRANSCRIPT

 5

 6

 7     1.  The following file is not an official

 8     transcript.  It is intended only to aid in case

 9     preparation.  It cannot be quoted from or used to

10     perjure a witness.  The final transcript will be

11     different from this rough draft in terms of

12     Q/A/Colloquy formatting, page and line numbers, and

13     substance.  The final transcript will be edited,

14     proofread, and quality-checked.

15

16

17     2.  This draft transcript is supplied to you on the

18     condition that, upon receipt of the certified

19     transcript, this draft and any copies thereof (in

20     condensed format or otherwise) will be destroyed.

21     The certified transcript is the only official

22     transcript which may be relied upon for purposes of

23     verbatim citation of testimony.

24     _____

25
```