1          UNITED STATES DISTRICT COURT

2           MIDDLE DISTRICT OF FLORIDA

3                ORLANDO DIVISION

4    ----------------------------------x

5    MONSTER ENERGY COMPANY, f/k/a
     HANSEN BEVERAGE COMPANY, d/b/a
6    MONSTER BEVERAGE COMPANY,

7                     Plaintiffs,

8         vs.              Case No.:

9                          6:11-CV-329-ORL-22DAB

10   CONSOLIDATED DISTRIBUTORS, INC.,
     METTEMP, INC., and
11   DAVID BAKSHT (a/k/a David Lipsker
     a/k/a David Bakshet a/k/a
12   D Bakht a/k/a DM Schneerson
     a/k/a Abraham Schneerson),

13                     Defendants.
14   ----------------------------------x

15

16             DATE:  Friday, August 17, 2012

17             TIME:  10:06  a.m.

18

19       Videotaped deposition of MENACHEM OHANA,

20   held at the offices of Barkley Court Reporters,

21   750 Third Avenue, 9th Floor, New York, New York

22   10017, before Suzanne J. Stotz, a Certified

23   Court Reporter and a Notary Public of the State

24   of New York.

25

1

BARKLEY
Court Reporters

```
 1   A P P E A R A N C E S:

 2

 3        KNOBBE MARTENS OLSON & BEAR, LLP

 4        Attorneys for the Plaintiff

 5        2040 Main Street

 6        14th Floor

 7        Irvine, CA  92614

 8        949-760-0404

 9        kenneth.nielsen@kmob.com

10        BY:  Kenneth R. Nielsen, ESQ.

11

12        MORTNER LAW OFFICE

13        Attorneys for the Defendant

14        40 Wall Street

15        28th Floor

16        New York, NY  10005

17        646-820-8770

18        mm@mortnerlaw.com

19        BY:  Moshe Mortner, ESQ.

20

21

22   Also Present:  Jim Brady, videographer

23

24

25
```

2

BARKLEY
Court Reporters

```
 1                    I N D E X

 2

 3          EXAMINATION

 4                                         Page No.

 5  MENACHEM OHANA

 6       BY MR. NIELSEN                    5

 7

 8              E X H I B I T S

 9

10  Exhibit

11  Name        Description              Page No.

12  10      Plaintiff's Amended Notice of    13

13          Subpoena to Testify and for

14          Production of Documents and

15          Things Menachem Ochana

16

17

18

19

20

21

22

23

24

25
```

BARKLEY
Court Reporters

1           THE VIDEOGRAPHER:  Today's date is

2      August 17, 2012.  The time is 10:06 a.m.

3      My name is Jim Brady.  I am the

4      videographer.  We're here today at Barkley

5      Court Reporters, 750 Third Avenue, New

6      York, New York.

7           We're here today in the matter of

8      Monster Energy versus Consolidated

9      Distributors.  Today's witness's name is

10      Menachem Ohana.

11           I ask now that the attorneys

12      introduce themselves and for the court

13      reporter to swear in the witness.

14           MR. NIELSEN:  Ken Nielsen of Knobbe

15      Martens on behalf of Monster Energy.

16           MR. MORTNER:  Moshe Mortner,

17      Mortner Law Office on behalf of

18      Consolidated Distributors and David

19      Baksht.

20           M E N A C H E M   O H A N A,

21   having first been duly affirmed, was examined

22   and testified as follows:

23           MR. MORTNER:  Before we begin, I'd

24      just like to put a couple of things on the

25      record.  Yesterday's deposition of --

4

BARKLEY
Court Reporters

1          MR. NIELSEN:  Menachem Goldman.

2          MR. MORTNER:  -- Menachem Goldman,

3      that we -- let me clarify, that we did not

4      waive reading for the transcript for the

5      witness and the same thing here.

6          Also, I just want to state a

7      general objection.  Mr. Nielsen is here

8      today, but he has not entered an

9      appearance in this case; and so I have a

10     general objection to the entire deposition

11     since he is not an attorney of record in

12     this proceeding.  You may go ahead.

13                  EXAMINATION

14  BY MR. NIELSEN:

15     Q.    Will you please state and spell

16  your name for the record.

17     A.    Menachem, M-E-N-A-C-H-E-M.  The

18  last name is Ohana, O-H-A-N-A.

19     Q.    Could you state your address for

20  the record?

21     A.    431 Kingston Avenue, Brooklyn, New

22  York 11213.

23     Q.    Is that a business address or a --

24     A.    No.  It's a house, residence.

25     Q.    Have you ever been deposed before?

5

BARKLEY Court Reporters

1     A.     No.

2     Q.     So I will talk you through the

3  basic procedure, and then we can get started.

4  Basically, I'm going to ask you questions.  You

5  answer them to the best of your ability.  If

6  you don't understand one of my questions, let

7  me know.  Otherwise, I'll understand that you

8  understand my question.

9          The court reporter is creating a

10  written record of every question and answer.

11  So please wait until I finish my question

12  before you answer.  That way she can get a

13  clear transcript.  All your answers should be

14  in words.  Please don't nod or shake your head.

15     A.     Yes.

16     Q.     The answers that you give are under

17  oath just as if you were in a courtroom and in

18  front of the judge or jury.  In fact, the

19  transcript of today's proceedings can be given

20  to the judge or jury.  Do you understand?

21     A.     Yes.

22     Q.     Is there any reason why you can't

23  give truthful testimony today?

24     A.     Excuse me?

25     Q.     Is there any reason why you cannot

BARKLEY
Court Reporters

1    give truthful testimony today?

2        A.    Nope.

3        Q.    Are you on any medication today

4    that might affect your testimony?

5        A.    Nope.

6        Q.    Are you represented by an attorney

7    today?

8        A.    No.

9        Q.    Mr. Mortner may object to some of

10   my questions.  You should go ahead and answer

11   them -- after he makes his objection, you

12   should go ahead and answer them to the best of

13   your ability?

14       A.    Okay.

15       Q.    Are you here today on behalf -- as

16   a result of the deposition subpoena issued by

17   Monster Energy?

18       A.    Yes.

19       Q.    Have you done anything to prepare

20   for today's deposition?

21       A.    Not really.

22       Q.    What have you done?

23       A.    Just came here.

24       Q.    Did you review -- did you review

25   any documents?

```
 1        A.     The subpoena you sent me.

 2        Q.     Any other documents?

 3        A.     No.

 4        Q.     Did you speak to anyone?

 5        A.     No.

 6        Q.     Where do you currently work?

 7        A.     I work for myself in Brooklyn,

 8   wholesale distributor and closeout.

 9        Q.     Can you tell me more about that?

10        A.     I'm in the business about 20 years.

11   We do specialty and closeout.  So it could be

12   one day shoes, one day food, and one day

13   anything.

14        Q.     Is it a retail store?

15        A.     No.  Wholesale.

16        Q.     No retail?

17        A.     No.

18        Q.     And are you the owner of the

19   company?

20        A.     Yes.

21        Q.     And you have been the owner for 20

22   years?

23        A.     Yes.

24        Q.     Approximately?

25        A.     Yes.
```

8

BARKLEY
Court Reporters

1      Q.      Who are your customers?

2      A.      Anybody in the tri-state area,

3   anywhere from biggest wholesaler to the

4   smallest retailer.

5      Q.      Can you walk me through exactly --

6   not exactly.  Can you give me more information

7   about what your business does, where you get

8   your merchandise?

9      A.      There's a bunch of wholesalers in

10   the tri-state area that I am in contact with

11   them, and every day I either call them or they

12   call me.  They offer the deal.  Then I go on

13   and pass it.  I don't have a warehouse.  I'm

14   like, I wouldn't say a broker.  I am an

15   end-user customer; so whenever they give me the

16   right item, I buy it and I sell it.

17      Q.      So it is a lot like a broker.  You

18   are a middleman?

19      A.      You can call me a middleman.

20      Q.      Do you have employees?

21      A.      No.

22      Q.      Do you contract with other people

23   to do work?

24      A.      No.

25      Q.      So who moves the goods around?

9

BARKLEY
Court Reporters

1          A.      I'm the salesman, the driver, and

2    everything.

3          Q.      And what is the address of your

4    business?

5          A.      My house.  I don't have a

6    warehouse.  So it's my house.

7          Q.      It is the same address that you

8    gave before?

9          A.      I do have a mailbox.

10         Q.      What is that?

11         A.      P.O. box.

12         Q.      Right.  What is the address for

13   that?

14         A.      383 Kingston Avenue.

15         Q.      What is the company name?

16         A.      C and H Import and Export.

17         Q.      Do you have a web site?

18         A.      No.

19         Q.      And is it correct that you only

20   sell in bulk quantities?

21         A.      Most of the time.  Sometimes I do

22   take an item -- if the item is good, I buy it

23   in bulk and then sell it to small stores or

24   small wholesaler.

25         Q.      Do any of your items involve

10

BARKLEY
Court Reporters

1   clothing?

2        A.     Yes.

3        Q.     What kind of clothing?

4        A.     Mainly I do a lot of used clothing.

5        Q.     Did you say "used"?

6        A.     Used clothing.  But from time to

7   time when I get clothing -- they come to me all

8   the time.

9        Q.     Do you ever have goods

10  manufactured?

11       A.     No.  For me, no.

12       Q.     So your products that you deal with

13  are pre-existing products?

14       A.     Yes.

15       Q.     Sort of like distressed products,

16  excess supply?

17       A.     Wholesale, excess, anything.

18       Q.     Can you give me the names of some

19  of your customers?

20       A.     Yes.  I have a customer list.  So

21  it is like 190 customers, 200 customers.

22       Q.     Some examples?

23       A.     What do you want?  A wholesaler?

24  Stores?

25       Q.     Stores.

11

BARKLEY
Court Reporters

```
1        A.      Stores?  King Department Store,
2   they have like five stores.  Ava Stores has
3   like four stores.  I have a lot of
4   supermarkets, Associated, C-Town, Bravo.  In
5   the city I have a couple of small wholesalers.
6   I could give you a list if you want to, and you
7   can have all of them.
8        Q.      And in addition to this C and H
9   imports -- or C and H Import and Export --
10       A.      Right.
11       Q.      -- do you do any other work?
12       A.      Meaning what other work?
13       Q.      Do you have other businesses?  Do
14   you have any side businesses?  Do you work for
15   anyone else?
16       A.      No.
17       Q.      No to all of those?  No to all of
18   those?
19       A.      Yes.  No at the moment.
20       Q.      When is the last time you've had
21   some other work?
22       A.      A couple of years ago I used to do
23   management for somebody, just in charge of
24   somebody.  They are doing some maintenance with
25   the building, five years ago.
```

12

BARKLEY
Court Reporters

1    Q.    Building management?

2    A.    Yes.

3    Q.    Have you ever been in the T-shirt

4  business?

5    A.    Not heavily.  Yes.

6    Q.    Explain.

7    A.    From time -- as soon as we came in

8  the train, as soon as somebody called me maybe

9  a couple of minutes before, there is 2000 cases

10  of Escada skirt, which I understand -- I turn

11  it down because it was too expensive.  Last

12  night somebody called me had some cereal,

13  Kellogg cereal.  See normally if I see the

14  price is right, I don't say no.

15    Q.    So the T-shirt activity was in the

16  context of the C and H business?

17    A.    Yes.

18    Q.    I'm going to mark as Exhibit 10 --

19          (Whereupon Exhibit 10,

20  Plaintiff's Amended Notice of Subpoena to

21  Testify and for Production of Documents and

22  Things Menachem Ochana, was marked for

23  identification.)

24  BY MR. NIELSEN:

25    Q.    I'm going to mark as Exhibit 10 a

13

1   document entitled Plaintiff's Amended Notice of

2   Subpoena to Testify and for Production of

3   Documents and Things Menachem Ochana.

4               Can I direct you to the first page

5   of this document?

6       A.      Yes.

7       Q.      Is the spelling of your name

8   correct?

9       A.      Let me see my name.  On the first

10  page?

11      Q.      It is underlined here.

12      A.      Yes.  Maybe the C.

13      Q.      No C?

14      A.      Yes.

15      Q.      In your last name?

16      A.      That's the C of the last name,

17  Ochana.  But it is -- basically it is -- it

18  could be the same.

19      Q.      We got that spelling from

20  defendants so... can I turn you to Exhibit 1

21  of this exhibit?

22      A.      Where is Exhibit 1?

23      Q.      It is about -- I guess it is -- the

24  fifth page starts Exhibit 1.

25      A.      Yes.


14

BARKLEY
Court Reporters

1   Q.      Have you seen this document before?

2   A.      Briefly yes.  That's what I got in

3   the mail.

4   Q.      And this is the subpoena to testify

5   at a deposition in a civil action.  That's why

6   you're here today?

7   A.      Yes.

8   Q.      Thank you.

9           And three more pages in there is an

10  Exhibit 2?

11  A.      Yes.

12  Q.      This is a subpoena to produce

13  documents, information, or objects or to permit

14  inspection of premises in a civil action.  Do

15  you see that?

16  A.      Yes.

17  Q.      Have you seen this document before?

18  A.      Yes.

19  Q.      Did you produce any documents in

20  response to this?

21  A.      No.

22  Q.      Why is that?

23  A.      I don't have any at the moment.

24  Q.      Have you had any previously?

25  A.      Document for what?

15

BARKLEY
Court Reporters

1     Q.      Responsive to the requests in this

2   subpoena?

3     A.      No.

4     Q.      Let me direct your attention to

5   Exhibit A of Exhibit 2 which is entitled

6   Definitions.  I think you just passed it.

7     A.      Definitions, okay.

8     Q.      In the first paragraph there's a

9   gentleman named David Baksht?

10     A.      Yes.

11     Q.      Are you familiar with that name?

12     A.      Yes.

13     Q.      How do you know him?

14     A.      We go to the same synagogue.

15     Q.      For how long have you known him?

16     A.      A couple of good years, maybe

17   seven.

18     Q.      Seven years?

19     A.      Seven, six.  I wouldn't know, but

20   it's couple of good years.

21     Q.      And when did you meet?

22     A.      In the synagogue a couple of years

23   ago.  I can't -- I don't remember exactly the

24   time.

25     Q.      By a couple, are you saying two or

16

MENACHEM OHANA

BARKLEY
Court Reporters

1    three or six or seven?

2         A.     Five, six I would say.

3         Q.     Have you ever worked with

4    Mr. Baksht?

5         A.     No.

6         Q.     Have you ever been in business with

7    Mr. Baksht?

8         A.     No.  Supposed to, but no.

9         Q.     Can you explain?

10        A.     I was supposed to be in business

11   with him to buy these T-shirts; but as soon as

12   I discovered that there is some problem with

13   it, I dropped it.

14        Q.     What T-shirts?

15        A.     The T-shirts that they offer me.

16   The T-shirt that they are selling.

17        Q.     When was this?

18        A.     I would say about a year ago.

19        Q.     Do you recall any more specifically

20   than a year ago?

21        A.     No.  About a year ago.

22        Q.     Summer of 2011?

23        A.     Probably.

24        Q.     Could it have been later than that?

25        A.     I can't tell you exactly, but a

17

BARKLEY
Court Reporters

```
 1    year.  I won't remember if it is a year or 13
 2    months or 10 months.
 3         Q.     Can you tell me more about your
 4    interactions in this business?
 5              MR. MORTNER:  Objection.  Can you
 6         give the witness a clear question, please?
 7    BY MR. NIELSEN:
 8         Q.     You can answer if you understand.
 9         A.     I call a couple -- like I said, I'm
10    like a broker.  I call a couple of wholesalers,
11    and they was very interested to do business.
12    And they said they were going to call me back
13    a couple of days later.  They said they won't
14    be interested because they understand there is
15    some -- they have some lawsuit, so they
16    wouldn't get involved.
17         Q.     So let's step back.  So when did
18    Mr. -- did Mr. Baksht approach you or did you
19    approach him?
20         A.     He approach he.  I mean, we always,
21    like I said, we once a week go to the
22    synagogue.  We meet.  Then we go outside and
23    talk.  I don't remember who asked who, but I
24    know that -- like I said, I'm a broker.  Any
25    business offer I hear, I get involved.
```

```
 1          Q.      So you are on a friendly basis with
 2   Mr. Baksht?
 3          A.      Yes.
 4          Q.      Was anyone else involved in the
 5   dealings?
 6          A.      His partner is Menachem Schneerson.
 7          Q.      Can you spell that for the record?
 8          A.      S-H -- I wouldn't know exactly the
 9   spelling, but I'm going according to your paper
10   S-H-N-E-O-R-S-O-N.
11          Q.      And what did Mr. Baksht ask you to
12   do?
13          A.      To be a distributor.
14          Q.      He had some distressed merchandise?
15          A.      Yes.
16          Q.      Did he show you the merchandise?
17          A.      I think he showed me once.
18          Q.      What type of merchandise was it?
19          A.       It was actually the label itself,
20   the label that we go over to the store; and
21   they have to iron them.  So it wasn't -- it was
22   nothing -- like I say, I don't buy before I
23   sell.  So I call first.  Seeing the product
24   wasn't that important.  I called up a couple of
25   company.  I e-mailed them the information, and
```

BARKLEY
Court Reporters

1    then they got back to me that they are not

2    interested.

3         Q.      How much was he asking for the

4    merchandise?  What was the quantity involved?

5         A.      I wanted to get 10,000 T-shirts at

6    the first time.

7         Q.      Were they the T-shirts or were they

8    iron-ons?

9         A.      The iron-on T-shirts.  As I said, I

10   am not involved in anything -- they have to

11   give me finished product.  I will start with

12   10,000 because I call one -- we used to do a

13   lot of the used clothing and T-shirts back in

14   the day, and I call a couple of wholesalers;

15   and they said they can by tremendous quantity.

16   But like I said, the minute they hear there is

17   some problem with it, they didn't want to get

18   in touch with it.  So since then, I dropped it.

19   It was irrelevant for me to continue to ask.

20   Obviously, if the guy don't want to take it, I

21   don't want to take it either.

22        Q.      How did the person that -- so who

23   were the buyers that you talked to?

24        A.      Somebody in Manhattan.

25        Q.      Do you have a name?

                        20

BARKLEY
Court Reporters

1        A.     I don't know if I can give the

2   names.  If you want to have any objection --

3   I'm not sure.  But one of the very big

4   wholesaler in the city.

5        Q.     You can't give a name?

6        A.     I guess I will have to call him up

7   and see if he agrees to give the name.

8        Q.     Why are you concerned about giving

9   the name?

10        A.     The way he told me, look, I don't

11   want to get involved; and then I am not

12   interested.  He make it like something wrong

13   with it.

14        Q.     So you know the name?

15        A.     He is a good friend of mine, and he

16   says don't touch it.  I hear there is a problem

17   with it.

18        Q.     You know the person's name.  You

19   just don't want to tell me the name; is that

20   accurate?

21        A.     Yes.

22             MR. MORTNER:  May I interrupt?

23        You're under subpoena today.  So you are

24        required to answer questions unless you

25        have some -- I don't think that is a

21

BARKLEY
Court Reporters

1          legitimate basis in my opinion to not

2          answer the question under subpoena.

3          A.      You want to know his name or the

4    company name?

5          Q.      Both.

6          A.      Sidney Cohen.  BRK Industry.

7          Q.      Were there any other buyers that

8    you approached?

9          A.      Yes.

10         Q.      Who else?

11         A.      A guy that has a couple of stores.

12   I know his name, not the company.  Meir Malka

13   in Myrtle Beach.  Meir Malka.

14         Q.      Can you spell that?

15         A.      I guess M-A-L-K-A, the last name.

16   You want the first name too?  Meir, M-E-I-R, I

17   guess.

18         Q.      And was he interested in buying?

19         A.      Not him direct.  One of the guys

20   who works for his store.  I don't know if he's

21   manager or supervisor or something.

22         Q.      And did he buy -- end up buying

23   T-shirts?

24         A.      No.

25         Q.      Why was that?

                            22

BARKLEY
Court Reporters

1          A.      The same problem.

2          Q.      And what was the problem?

3          A.      I wouldn't know.  They told me,

4     look, there was a company suing these people;

5     and we are not sure we want to touch it.

6          Q.      So because of the lawsuit?

7          A.      Yes.

8          Q.      They thought there was a lawsuit.

9          A.      Yes.

10         Q.      They didn't want to be involved?

11         A.      Yes.

12         Q.      What lawsuit was that?

13         A.      Somebody was suing them in Florida.

14    That's what I hear.  I didn't get involved.

15    It's enough for me.

16         Q.      And you said somebody was suing

17    them?

18         A.      There was a raid.  There was a raid

19    by somebody, and they took the company -- or

20    the government took the product, and that's

21    enough.

22         Q.      Where did you hear that?

23         A.      Sidney Cohen told me that.

24         Q.      Can you spell Sidney's name?

25         A.      The first name, no.  Cohen,

23

BARKLEY
Court Reporters

1    C-O-H-E-N.

2         Q.    Where is his business located?

3         A.    In Seventh Avenue.

4         Q.    Do you have an address?

5         A.    No.

6         Q.    Have you done business with him

7    before?

8         A.    Back, way, way before yes.

9         Q.    How long ago?

10        A.    About ten years.  Ten years.

11        Q.    So the last time you did business

12   with Sidney Cohen was ten years ago?

13        A.    Yes, but I do talk to him.  We are

14   good friend too.

15        Q.    You're friends with Sidney Cohen?

16        A.    Yes.

17        Q.    Did you approach anyone else about

18   the T-shirts?

19        A.    Just small customer.

20        Q.    Who?

21        A.    Stores.  Stores.  Brooklyn, many

22   stores.

23        Q.    How many did you approach?

24        A.    I would say about 50, 50 stores.

25        Q.    And who was interested?

24

BARKLEY
Court Reporters

1        A.      The way I work in the business,

2   most of the time I've got to give credit, kind

3   of credit consignment.  So any store that I

4   came in told me to have a problem to take it

5   because it is consignment.

6        Q.      I didn't understand that.

7        A.      Normally any regular company charge

8   the customer and COD.  I give credit.  So any

9   store I gave in, they were willing to take the

10  product and put it on the shelf.

11       Q.      So did they take the T-shirts?

12       A.      No.  I never got them.

13       Q.      Why is that?

14       A.      Because I didn't want to get

15  involved.  There was a suit.  Somebody was

16  suing them.  And even then he was telling me

17  they was running into some problems.  So I

18  didn't want to get involved in it.

19       Q.      So you had stores that would

20  probably buy the merchandise, but you didn't

21  want to be involved?

22       A.      Yes.

23       Q.      Have you heard of a company called

24  Consolidated Distributors?

25       A.      Yes.

25

BARKLEY
Court Reporters

```
 1          Q.      How so?

 2          A.      That's David I guess, David Baksht.

 3          Q.      That's his company is your

 4   understanding?

 5          A.      Consolidated, yes.

 6          Q.      Your understanding is Consolidated

 7   Distributors is his company?

 8          A.      Yes.

 9          Q.      When did you come to know that?

10          A.      I think when we spoke, I ask him

11   what is the company name; and that's when they

12   gave me the name.

13          Q.      When you spoke at what time?

14          A.      About a year ago.

15          Q.      So you've known him for several

16   years, but you didn't know what he did for

17   work?

18          A.      Yeah, I didn't know.

19          Q.      What did you think he did for work?

20          A.      I have no idea.  I see hundreds of

21   people in that place.  I had no idea.

22          Q.      Do you know anything about

23   Consolidated Distributors?

24          A.      Not really.

25          Q.      What do you know?
```

26

BARKLEY
Court Reporters

1          A.      They are trying to do business.

2    They approached me once, and I say no after I

3    discovered there is a problem.  And that's the

4    end of it.

5          Q.      Did David tell you there was a

6    problem?

7          A.      I don't remember; but because like

8    I said, Sidney says there is a problem with it,

9    there was -- he says come down if you want.  I

10   didn't want to come.  There is a problem.  I

11   don't touch.

12         Q.      Does Sidney work with David?

13         A.      No, I don't think so.

14         Q.      Does Sidney know David?

15         A.      I have no idea.

16         Q.      Do you know a David Lipsker?

17         A.      I think he is -- David Baksht is

18   David Lipsker.

19         Q.      He goes by David Lipsker?

20         A.      I know him as David.  I never look

21   at his last name.  I call him David.

22         Q.      You're not sure if his last name is

23   Baksht or Lipsker, but you've heard both?

24         A.      I know it is Baksht, but I hear

25   David Lipsker too.

27

BARKLEY
Court Reporters

1       Q.      Do you know why he goes by two

2    different names?

3               MR. MORTNER:  Objection.  He didn't

4       say he goes by two different names.

5       A.      I have no idea.  I just don't know.

6       Q.      Do you know an Abraham Schneerson?

7       A.      Yes.

8       Q.      Who's that?

9       A.      That's his partner.

10      Q.      Whose partner?

11      A.      David.

12              MR. MORTNER:  Can you repeat the

13      question back to the witness?  I don't

14      think he heard it clearly.

15              MR. NIELSEN:  Could you read it

16      back?

17              (At which time the following was

18      read back:

19              "Question:  Do you know an Abraham

20      Schneerson?

21              "Answer:  Yes.

22              "Question:  Who's that?

23              "Answer:  That's his partner.

24              "Question:  Whose partner?

25              "Answer:  David.")


                          28

BARKLEY
Court Reporters

```
 1                    THE WITNESS:  I guess it is his
 2        partner.
 3                    MR. MORTNER:   Okay.
 4   BY MR. NIELSEN:
 5        Q.      Turning to paragraph 2 of the
 6   definitions there, of the same page but just
 7   paragraph 2, have you heard of Joe Cool Inc.?
 8        A.      Maybe I hear it but not -- I think
 9   I heard the name, but I don't remember where I
10   heard from.
11        Q.      When do you think you heard the
12   name?
13        A.      During the last year.
14        Q.      Within the last year?
15        A.      (Indicating).
16        Q.      Do you recall in what context?
17        A.      No.
18        Q.      Related to your interactions with
19   David Baksht?
20        A.      No.
21        Q.      Do you know the name Yosef Amar?
22        A.      No.
23        Q.      Michelle Amar?
24        A.      No.
25        Q.      What business is David in?
```

1      A.      I wouldn't know.  I don't know.

2      Q.      You don't know the business David's

3  in?

4      A.      No.  I see every Saturday in the

5  synagogue about a thousand people.  I have no

6  idea what anybody does.

7      Q.      How did he know to approach you?

8      A.      Probably somebody told him that I

9  do closeout, and he approached me.

10     Q.      Do you usually see samples of the

11  merchandise before you agree to purchase it?

12     A.      Not all the time.

13     Q.      Sometimes right over the phone

14  or --

15     A.      Right over the phone, I pass it on;

16  and I tell the guy that's the deal.  If it is a

17  sale, I will take it to the next step.  If it

18  is not a sale, I am dropping it right there.

19     Q.      Do you do any independent

20  investigation into your customers?

21     A.      No.

22     Q.      Do you do any independent

23  investigation into your suppliers?

24     A.      No.

25     Q.      Did you do any independent

30

BARKLEY
Court Reporters

1    investigation into David?

2        A.    No.

3        Q.    I think you said earlier that David

4    Baksht also said there was some lawsuit

5    ongoing; is that accurate?

6        A.    When Sidney Cohen told me that

7    there was a problem, I went back to him; and I

8    said listen, I couldn't deal with you.  He says

9    why.  I said that they hear something.  He said

10   yes, we have something but not -- I didn't even

11   wait for the answer.  He says -- I ask him he

12   is not a hundred percent kosher.  He said yes.

13   I said not good enough for me.

14       Q.    So David Baksht said it wasn't a

15   hundred percent kosher and you said --

16       A    No, I didn't say that.  I said I

17   asked him is this a hundred percent because

18   somebody told me there was a problem.  He says

19   it is a hundred, but I told him it's not good

20   for me.

21       Q.    So he said it was a hundred percent

22   kosher?

23       A.    Yes.

24       Q.    But you didn't believe him?

25       A.    I believe him; but if a customer

31

BARKLEY
Court Reporters

1    don't want it, I have no use for it.

2         Q.     Earlier you said you had a number

3    of customers that potentially would buy it?

4         A.     But at the minute that the -- I'm a

5    wholesaler and retail.  So at the minute they

6    say they didn't want it, even I could go and

7    sell it on my own.  I didn't want to touch it.

8         Q.     Now, earlier you said you were a

9    wholesaler only.  So you do wholesale and

10   retail?

11        A.     Yes.  I told -- you asked if I am

12   retailer.  I do wholesale and retail.

13        Q.     Can you explain what you mean by

14   "retail"?

15        A.     I sell direct to small mom-and-pop

16   store.

17        Q.     So by "retail," you mean your

18   customers are retailers, not that you are a

19   retail store?

20        A.     I am not a retail; but my

21   customers, most of them are retailer.

22        Q.     So I'm trying to understand.

23   Sidney told you there's something wrong; is

24   that right?

25        A.     Right.

                        32

```
 1        Q.      David said there's nothing wrong?

 2        A.      Right.

 3        Q.      And you didn't believe him?

 4                MR. MORTNER:  Objection.  He didn't

 5        testify to that.  That is the second time

 6        you asked.  That is the second time he is

 7        correcting you.

 8        A.      I didn't say I didn't believe him;

 9   but if somebody offer me an item out of the

10   blue and something doesn't make sense, for

11   example, if the guy offer me Kellogg for 50

12   cents, I don't investigate who is the supplier.

13   I know something is wrong with it, and I am

14   staying away.  Here at the minute Sidney say --

15   he just say something, I say it's not for me.

16        Q.      Was the price too low?

17        A.      No.  The price was all right.

18        Q.      What was the price?

19        A.      It was supposed to be 75 cents.  If

20   I get the T-shirts, it should be more.  But

21   like I say, I never -- it never went into the

22   next step because at the minute Sidney tell me

23   something wrong, I didn't want to touch it.  I

24   didn't went into the next step.  I guess if the

25   guy says yes, then I go to the next step, then
```

```
1   we negotiate the price.  I know he order 10,000
2   from me.  That's what I know.
3        Q.    Who ordered 10,000 units?
4        A.    Sidney.
5        Q.    Sidney ordered 10,000 units?
6        A.    Yeah.
7        Q.    Okay.  Now I'm confused.  Sidney
8   ordered 10,000 units of what?
9        A.    Of the T-shirts, but he says give
10  me a day.  Like I say, a day or two he called
11  me back; and he said he cannot touch it, and he
12  advised me not to touch it.
13       Q.    So Sidney wanted to buy 10,000
14  shirts after you approached Sidney?
15       A.    Yes.
16       Q.    Sidney researched something and got
17  back to you and said I don't want to buy it.
18       A.    No.
19       Q.    Is that accurate?
20       A.    Yes.
21       Q.    Have you ever dealt with iron-ons
22  before?
23       A.    While -- not really.  A while back.
24  Maybe 13 years ago when it came out, I think it
25  was -- came out, somebody has invented
```

34

BARKLEY
Court Reporters

1    something.   I don't remember.

2        Q.    Did David approach you with -- did

3    he transfer the iron-ons or did he --

4        A.    He didn't do anything.  We were

5    just talking.

6        Q.    What was he offering to you?

7        A.    Both of them, either iron-ons or

8    the T-shirts.

9        Q.    What was the cost for the T-shirt

10   finished?

11       A.    Like I said, we never came up to

12   the price for the T-shirts; but he offer me the

13   labels.

14       Q.    Why do you say the labels were

15   distressed?

16            MR. MORTNER:  Objection.  He

17       didn't.  That was your term.

18       A.    He didn't say they were distressed,

19   but he said a couple of thousand of labels that

20   they want to sell; and it never took off from

21   there.  I talk every day with businesses with

22   anybody on so many things that is, like, it is

23   crazy; but whatever come out, that's what

24   count.  95 percent of the business I get

25   offered I don't do.

35

BARKLEY
Court Reporters

1    Q.    Why don't you do 95 percent of the

2    business?

3    A.    Crazy stuff, price not right, I

4    don't know the source of the product; many,

5    many things involved.

6    Q.    What was Mr. Baksht's reaction when

7    you indicated you were not interested?

8    A.    Maybe was upset.  I have no idea.

9    I just told him it is not for me period.

10   Q.    He couldn't convince you otherwise?

11   MR. MORTNER:  Objection.

12   A.    Maybe he was trying to convince me

13   but it -- he was trying to, but I don't know.

14   I was not interested.

15   Q.    What did he say?

16   A.    There is nothing wrong with it.

17   Everything is a hundred percent kosher, and

18   there is no reason why you shouldn't take it;

19   and I said okay.  It is still not for me.

20   Q.    Was there any other merchandise

21   that he offered to you?

22   A.    No.

23   Q.    Has he ever offered you merchandise

24   other than this one time?

25   A.    No.

36

BARKLEY
Court Reporters

1      Q.      What was your impression of

2  Mr. Baksht?

3      A.      Be more specific.  What do you

4  mean?  I'm not marrying his daughter.

5      Q.      Did you have any impression of

6  Mr. Baksht?

7      A.      Nice gentleman.  Nice older man.

8      Q.      Have you ever heard of National

9  Trademark Center?

10      A.      Yes.

11      Q.      What is it?

12      A.      I think it is the same people,

13  David.  I really don't know what they do.

14      Q.      Where did you hear of it?

15      A.      Two friend was talking about

16  something, and I hear the name come across.

17      Q.      Who was talking about it?

18      A.      Two friend in the synagogue was

19  talking about it, and I hear the name.

20      Q.      Who were those friends?

21      A.      Two guys.  I don't remember their

22  names.

23      Q.      You don't remember their names?

24      A.      No.

25      Q.      But you remember that they were

37

```
1   friends?
2        A.      They were friends, not my friends.
3   I hear two people talking about it, mentioning
4   the name.
5        Q.      When was that?
6        A.      Around the same time, maybe around
7   a couple of weeks after I hear, I was talking
8   to them.
9        Q.      Who is them?
10        A.      David and Mr. Schneerson.
11        Q.      What did you understand about
12   National Trademark Center?
13        A.      It is their business, and I really
14   don't know what is -- I have no idea.
15        Q.      And "they're," talking about David
16   and Mr. Schneerson?
17        A.      Yes.
18        Q.      Do you know what that business
19   does?
20        A.      Not really.
21        Q.      What do you know?
22        A.      Nothing.  Not really.  I don't
23   know.  I don't know what they do.
24        Q.      Have you heard of Mettemp,
25   M-E-T-T-E-M-P, Inc.?
```

38

BARKLEY Court Reporters

```
 1          A.      No.
 2          Q.      Have you heard of Associated
 3   Business Consulting Inc.?
 4          A.      No.
 5          Q.      Have you heard of someone named SS
 6   Stein?
 7          A.      No.
 8          Q.      So it is your testimony that you
 9   never saw the merchandise that David Baksht was
10   offering?
11          A.      I saw once.  They send me an
12   e-mail.
13          Q.      What was the e-mail of?
14          A.      Of the logo.
15          Q.      Do you still have -- of the logo
16   that --
17          A.      On the T-shirts.
18          Q.      They sent you an e-mail of the
19   logo?
20          A.      (Nodding).
21          Q.      Do you still have that e-mail?
22          A.      Probably.  I don't have the
23   Internet, so I go to a coffee place, a coffee
24   -- an Internet cafe.  So from time to time,
25   like every two weeks, three weeks I go and
```

39

BARKLEY
Court Reporters

1   check.

2       Q.      So turning to page 5 of the

3   document of Exhibit A, at the bottom of the

4   page it says "request for the production of

5   documents and things."

6       A.      Right.

7       Q.      Number 1 is all communications and

8   correspondence between you and either of the

9   defendants?

10      A.      Right.

11      Q.      So you've got the one e-mail with

12  the defendants.  Do you have any others?

13      A.      No.

14      Q.      Did you reply?

15      A.      No.

16      Q.      Did you look to see if you had a

17  copy of that that you could produce in this

18  litigation?

19      A.      I could look.  I don't think --

20  like I said, I sit on the Internet once a week

21  maybe; and most of the mail is like junk.  So I

22  erase them.  I don't remember if I erased them

23  or not.

24      Q.      What did the logo look like?

25      A.      Like this one (indicating).

40

BARKLEY
Court Reporters

```
1          Q.      And you are indicating the logo
2    adjacent to on page 3 of Exhibit A, adjacent to
3    where it says 23557; is that accurate?
4          A.      I think so.  Like I said, I saw it
5    once; and I didn't pay attention and --
6          Q.      Had you seen that logo before?
7          A.      No.
8          Q.      Let me hand to you an exhibit
9    marked Exhibit 1.
10              MR. MORTNER:  It's okay.  I have
11      it.  Thank you.
12   BY MR. NIELSEN:
13         Q.      Do you recognize Exhibit 1?
14         A.      I think so.  I saw it once briefly.
15   It looked like -- I think as best as my memory
16   could do, it was this one (indicating).
17         Q.      You think that is the logo that was
18   in the e-mail that you received from David
19   Baksht?
20         A.      Yeah, I think so.
21         Q.      What color shirts was he going to
22   put the logo on?  Did you discuss that?
23         A.      No.
24         Q.      Did you pass this logo on to any of
25   your potential customers?
```

41

BARKLEY
Court Reporters

1      A.      No.

2      Q.      How did the potential customers

3  know what they would be buying?

4      A.      Told them I am going to buy the

5  T-shirts.  I am going to get them the logo, and

6  they will have to iron it on; and they agreed.

7  All agreed to take it.

8      Q.      So you were offering to them?

9      A.      T-shirts.

10     Q.      And iron-ons?

11     A.      And they all have iron-ons in the

12  store.  They don't even care what's the name,

13  what's the logo.

14     Q.      So they didn't care with the logo.

15  They were more interested in the T-shirts?

16     A.      T-shirts and the logo.  They want

17  to get T-shirts with the logo.

18     Q.      They didn't care what the logo was?

19     A.      Like I say, I think the e-mail came

20  after we discussed; and we talk about that.  So

21  the minute there was a problem, I didn't care

22  for anything after that.

23     Q.      But your customers, they didn't

24  know what the logo was; is that right?

25     A.      Yes.  Maybe I did show it to them.

42

BARKLEY
Court Reporters

1    I don't remember.  I just don't remember.

2         Q.     You don't recall if you showed them

3    the logo or not?

4         A.     No.

5         Q.     Did Sidney Cohen explain to you --

6    strike that.  What did Sidney Cohen explain to

7    you when he said he wasn't interested?

8         A.     He told me, look, listen, Menachem,

9    don't touch it.  Something wrong about it.  I

10   didn't want to know much.  Even the minute he

11   tells me that somebody says it's good, I'm not

12   touching it.  When something is not a hundred

13   percent, I'm not getting involved.

14        Q.     What details did he provide?

15        A.     He didn't provide me much detail.

16   He said don't get involved in it.  It's a

17   problem.

18        Q.     What did he say about the lawsuit?

19        A.     I don't think he knew at that time,

20   didn't know much; but he said I know there is a

21   problem.  Don't touch it.

22        Q.     Did you ask him how he learned

23   that?

24        A.     No.  I know his -- he knows

25   everything.

43

BARKLEY
Court Reporters

1      Q.      He knows everything?

2      A.      In the clothing business he knows

3   everything.

4      Q.      What business does he do, Sidney

5   Cohen?

6      A.      Clothing, 100 percent clothing.

7      Q.      What do you --

8      A.      I think he is producing the jeans.

9   It's a huge company.  I think they -- maybe

10   they have -- own manufacturer in China.  I'm

11   not sure.

12      Q.      Tell me more about the products

13   that you are aware of.

14      A.      A lot of Levis brand name, J.Crew,

15   something Crew.  Mainly Levis, Crew, private

16   label everything.  As good as friend we are, I

17   can't go into the warehouse.

18      Q.      Where is his warehouse?

19      A.      I think he has something in the

20   Brooklyn Navy Yard, but I wouldn't know.

21      Q.      Have you done business with him

22   before?

23      A.      Yes.

24      Q.      How many times?

25      A.      A couple of times.  A year, couple

44

BARKLEY
Court Reporters

1    -- like I say, maybe 12 or 15 years.  Most of

2    the time we were just connecting him between --

3    maybe once or twice we saw him.  It was so long

4    back, I don't remember.

5         Q.     Has he ever been a supplier to you

6    or distressed goods or goods?

7         A.     No.

8         Q.     So your business interactions with

9    him have been you selling product to him?

10        A.     Yes.

11        Q.     And that background goes back how

12   many years?

13        A.     12.  I wouldn't -- way, way back.

14        Q.     Did Sidney tell you that the

15   lawsuit had anything to do with the products

16   you were trying to market?

17        A.     Not really.  It didn't concern me.

18   The minute it is not good, I couldn't care if

19   somebody sued them or it's stolen or anything

20   else.  I couldn't care.  I don't want to get

21   involved.

22        Q.     Your concern was that Mr. Baksht

23   was in a lawsuit, not that a particular product

24   was involved; is that accurate?

25             MR. MORTNER:  Objection.


                           45

BARKLEY
Court Reporters

```
 1        A.      I was concerned about, I don't want
 2   to touch the item because a good friend of mine
 3   know the business, advise me do not touch it.
 4   And since that day, I drop it; and that's the
 5   end of it.  I didn't care about the rest.
 6        Q.      Do you recall sending -- strike
 7   that.  When you approached Sidney Cohen about
 8   the deal from David Baksht, what did you
 9   provide to Sidney Cohen?
10        A.      I says I have two gentlemen that
11   they have a good product.  I want to be
12   involved.  I want to sell you, and you might
13   like it.  He says okay.  I don't remember if --
14   I remember if I send him the e-mail or somebody
15   send him something; but the next day he called
16   me, and says he is not interested.  So a day or
17   two -- so he said he made some phone calls,
18   said he is not interested.  I said what is the
19   reason.  He said, look, if I'm not touching it,
20   you shouldn't touch it.  That was enough for
21   me.
22        Q.      Did you tell him who was the
23   seller?
24        A.      I think at the second time when we
25   spoke, maybe I mentioned or not or maybe they
```

46

BARKLEY
Court Reporters

1    met later; but I didn't want to get involved.

2    I really don't know if I told them something in

3    the e-mail.  The minute I hear something wrong,

4    I erase it.  I don't want to deal with it.

5        Q.    Do you recall whether you told

6    Sidney Cohen who the sellers were?

7        A.    I don't remember.  It is a small

8    business.  Maybe he knew as soon as he ask a

9    couple of -- I don't remember.

10       Q.    If you're selling T-shirts,

11   wouldn't your customers want to see the

12   T-shirt, know the material involved, the

13   quality of it?

14       A.    First, I want to know if the guy

15   want to buy it, if he's interested at all to

16   buy the item that I sell.  The next step, he

17   says I don't want.  I am not interested.

18   Business is slow.  Whatever the reason is, if

19   they say yes, I go to the next step.

20       Q.    I've handed you a document that's

21   been marked Exhibit 9.  Have you seen this

22   document before?

23       A.    I think I saw it.

24       Q.    Do you recall when?

25       A.    When I got the e-mail for the

47

BARKLEY
Court Reporters

1    subpoena.

2         Q.      E-mail from whom?

3         A.      I didn't even check who I got it

4    from.

5         Q.      When did you receive this e-mail?

6         A.      Three weeks ago, two weeks ago.

7    When I saw it -- I could tell you when I saw

8    it.  About two weeks ago.

9         Q.      You received this Exhibit 9 --

10        A.      I see a bunch of --

11        Q.      You received more --

12        A.      -- of paper.

13        Q.      How many documents did you receive

14   with that e-mail?

15        A.      I wouldn't know.

16        Q.      Was it from Mr. Mortner?

17        A.      I don't know.  I don't even check

18   where it came from.

19        Q.      What did the e-mail say?

20        A.      A bunch of paper, subpoena.

21        Q.      It had the subpoena attached?

22        A.      Yes.

23        Q.      Exhibit 9 was attached?

24        A.      Yes.

25        Q.      What else was attached?

48

BARKLEY
Court Reporters

1      A.      It was a bunch of paper.  I didn't

2   -- I just didn't see everything.

3      Q.      Did you look through them all?

4      A.      Look, yes, just briefly like this

5   (indicating), you know, just going over the --

6      Q.      What do you recall the other

7   documents being?

8      A.      That I need to show up in court or

9   somewhere.

10     Q.      Do you recall what the other

11  documents were?

12     A.      Not really.  A bunch of -- like I

13  said, I got a bunch of paper in the e-mail.

14     Q.      Was there any text in the e-mail?

15     A.      I don't think so.

16     Q.      And you don't know who the e-mail

17  was from?

18     A.      I didn't even check.  Like I say, I

19  don't do business -- it sounds awkward, but I

20  didn't do business with e-mail.  Somebody

21  opened me, actually, an e-mail about a couple

22  of years ago; but I only start to use it in the

23  last year or so.  And I get more than what I

24  send.  I hardly send any e-mail.

25     Q.      How often do you get court

49

BARKLEY
Court Reporters

1    documents in your e-mail?

2         A.    Never.

3         Q.    So you get an e-mail with court

4    documents attached to it?

5         A.    Yes.

6         Q.    And you don't recall who they came

7    from?

8         A.    I could check and find out.

9         Q.    Well, I'm asking if you recall.

10        A.    Not really.

11        Q.    What do you recall about the

12   e-mail?

13        A.    There is a subpoena and I need to

14   show up.  I went briefly -- I don't read that

15   excellent, that quick; but I know I've got to

16   be in court, and that is the end of it.

17        Q.    But you don't know who it was sent

18   by?

19        A.    I've got to check.

20        Q.    I'm just trying to understand.

21   This is the first time you've ever received

22   court documents in e-mail?

23        A.    Yes.

24        Q.    And you don't recall who it was

25   sent by?

50

BARKLEY
Court Reporters

```
 1          A.      I didn't even know before how
 2   important is the subpoena.  Only the last
 3   couple of days.  I thought maybe it is not that
 4   important.  And no, I didn't check.
 5          Q.      Who told you the subpoena was
 6   important?
 7          A.      I spoke with a friend of mine.  I
 8   told him this is a subpoena.  Do I need to
 9   come?  He says you must.  It is a court.
10          Q.      Who is the friend?
11          A.      A friend of mine that I do business
12   with.
13          Q.      What is his name?
14          A.      Moshe, Moshe Cohen.
15          Q.      What kind of business do you do
16   with Moshe?
17          A.      I don't do business.  Neighbor and
18   friend.  I don't do business with nobody in my
19   neighborhood.
20          Q.      So you showed the documents to
21   Moshe?
22          A.      I didn't show.  I just ask him.  I
23   said, listen, I've got something in my e-mail,
24   subpoena.  And he says it is something very
25   important and you can't skip it.
```

51

BARKLEY
Court Reporters

1      Q.      Did Moshe look at the e-mail?

2      A.      No.

3      Q.      Did Moshe ask who the e-mail was

4    from?

5      A.      No.  He didn't bother.  All I know

6    is subpoena is important, and you've got to

7    come here.

8      Q.      Turning to page 6 of Exhibit 9.

9      A.      Yes.

10      Q.      The second row down lists Menachem

11    Ochana.

12      A.      Which one?  Okay.

13      Q.      Of C and H Imports?

14      A.      Yes.

15      Q.      Understanding that your name is not

16    spelled -- that is last name doesn't have an H

17    in it -- I'm sorry, doesn't have a C in it.

18    Understanding that your last name does not have

19    a C in it, this is you, correct?

20      A.      Yes.

21      Q.      Is this your phone number

22    917-335-2668?

23      A.      Correct.

24      Q.      Do you see in the last column it

25    says CDI's damages by reason of the wrongful

BARKLEY
Court Reporters

1    seizure and injury business reputation?

2         A.    Right.

3         Q.    Do you know what that's referring

4    to?

5         A.    Damage by reason to wrongful

6    seizure, not really.

7         Q.    Do you know who CDI is?

8         A.    What is a CDI?

9         Q.    Is that Consolidated Distributors?

10        A.    Huh?

11        Q.    So that is Consolidated

12   Distributors Inc.  Do you know what it is

13   talking about?

14        A.    Damage by reason?  Yes.  They got

15   hurt, yes.  They got hurt something.

16        Q.    Do you know anything about

17   Consolidated Distributors --

18             MR. MORTNER:  Objection.  He's

19        already discussed it.

20        Q.    -- reputation?

21             MR. MORTNER:  Oh reputation.

22        A.    What do you mean "reputation"?

23        Q.    What is their reputation?

24        A.    I guess he can't deal with them for

25   some reason.  I don't know.

                         53

BARKLEY
Court Reporters

1    Q.    Does Consolidated Distributors have

2  a reputation to you, to your line of business?

3    A.    After I hear about the problem, I

4  don't want to do business with them.

5    Q.    Which problem is that?

6    A.    Either something -- like I say,

7  somebody's suing them or I know something -- I

8  wouldn't know, but somebody is suing them; and

9  I don't want to get involved with them ever.

10    Q.    Do you know the subject matter of

11  the lawsuit?

12    A.    Yes, of course.  Somebody's suing

13  them that they have something similar to them.

14    Q.    When you say "something similar,"

15  what do you mean?

16    A.    Somebody is suing them.  I really

17  don't know what is exactly the details.

18    Q.    What details?  Do you know?

19    A.    That somebody sue them, and I

20  should stay away from them.

21    Q.    What is your understanding of the

22  subject matter of the lawsuit?

23    A.    Some people said that there's

24  something illegal or something.  I don't get

25  into details.

54

BARKLEY
Court Reporters

1      Q.      Anything else that you know about

2   it?

3      A.      When I go to a wholesaler I know

4   there is a problem there, I never ask.  I

5   couldn't care.  I stay away from them.  I mean,

6   in any business I do.

7      Q.      So a lawsuit could be about stolen

8   merchandise, as far as you know?

9      A.      Something wrong, they're probably

10  stolen.  But like I say, I didn't ask; and I

11  couldn't care.  It is not my business.

12     Q.      I'm just trying to find out what

13  you do know or what you did know then.

14     A.      Something is wrong there.  Illegal

15  maybe.  They did something illegal or

16  something, so I don't want to get involved.

17     Q.      In that same box that says wrongful

18  seizure, do you know what that -- do you know

19  anything about a wrongful seizure?

20     A.      Like they confiscate something.

21     Q.      I'm asking you.

22     A.      Seizure I know it's like somebody

23  takes something, no?

24     Q.      Do you know about any goods being

25  seized?

55

BARKLEY
Court Reporters

```
 1          A.      I think I hear about something that
 2    the FBI raid them.
 3          Q.      FBI raided whom?
 4          A.      This product.  Somebody took the
 5    product from them, and that's where this
 6    problem start.
 7          Q.      Which product?
 8          A.      Those sticker, the label, the
 9    T-shirts.  I really don't know.  Anything that
10    they sell, so it's enough for me.
11          Q.      Where did you learn that from?
12          A.      I don't remember, but I hear
13    something like that.  They had some problem in
14    Florida.  Florida right?
15          Q.      Who had some problem in Florida?
16          A.      These people, Consolidated --
17    Consolidate something, yes.
18          Q.      Did you know that Consolidated
19    Distributors has any facility in Florida?
20          A.      I don't know.
21          Q.      You don't know whether they do or
22    not?
23          A.      No, I have no idea.
24          Q.      What is the source of your
25    information about the seizure?
```

56

BARKLEY
Court Reporters

```
 1          A.      I just don't remember where I hear
 2     it from.
 3          Q.      Was your source another person?
 4          A.      A person, yes.
 5          Q.      Who might it have been to the best
 6     of your recollection?
 7                  MR. MORTNER:  It calls for
 8          speculation.  Objection.  You can answer
 9          the question, if you know.
10          A.      I just don't know.
11          Q.      David Baksht?
12          A.      We live in a small neighborhood.
13     When somebody bump into something, everybody
14     knows.  So there was probably people know
15     everything.  I think maybe David mentioned it.
16     I just don't remember.
17          Q.      Did you read about it anywhere?
18          A.      No.
19          Q.      It was word of mouth; is that
20     accurate?
21          A.      Yes.
22          Q.      Also on page 6 there is a Sidney
23     Cohen?
24          A.      Right.
25          Q.      In the fourth row down?
```

57

BARKLEY
Court Reporters

```
 1        A.    Yes.
 2        Q.    Is that the gentleman that you're
 3   referring to?
 4        A.    Yes.
 5        Q.    Do you know the gentleman above
 6   that, Danny Sade or Sade?
 7        A.    No.
 8        Q.    Do you know the name in the first
 9   row, Rachamim Cudaytov?  I will spell that,
10   R-A-C-H-A-M-I-M, C-U-D-A-Y-T-O-V.
11        A.    Yes.
12        Q.    Do you know that person?
13        A.    I think I know him, yeah.
14        Q.    How does he say his name?
15        A.    Cudaytov or Cudaytov.
16        Q.    How do you know him?
17        A.    We live in the same neighborhood
18   for a long time.
19        Q.    Do you know him through the
20   neighborhood?
21        A.    Yes.
22        Q.    That's in Brooklyn?
23        A.    (Nodding).
24        Q.    Is 1553 Union Street a business
25   address or a residence?  Do you know?
```

58

BARKLEY
Court Reporters

```
 1          A.     I wouldn't know.
 2          Q.     Do you know where he lives in your
 3   neighborhood?
 4          A.     I think he lives on Union.
 5          Q.     I'm sorry.  I didn't catch that.
 6          A.     I think he lives on Union.  I
 7   really don't know where he lives.
 8          Q.     He may have lived on Union?
 9          A.     Right.
10          Q.     Have you discussed this case with
11   him?
12          A.     Once I think we spoke about it.
13   Nothing major.
14          Q.     What did you guys discuss?
15          A.     He asked me if I'm going to be a
16   distributor, and he don't want to compete or
17   something.  I said no, I am not; and that's the
18   end of it.
19          Q.     A distributor of what?
20          A.     Of the T-shirts.
21          Q.     Which T-shirts?
22          A.     The T-shirts that they offer me.
23          Q.     He was offered the same T-shirts;
24   is that your understanding?
25          A.     My understanding is he was offered
```

BARKLEY
Court Reporters

1    the same thing.

2         Q.    When did you discuss this with him?

3         A.    About as soon as I hear that the

4    answer's no from Sidney.

5         Q.    When did you discuss it with him?

6         A.    As soon as I know, like, about a

7    year ago when they called me and we spoke about

8    it.  Then Sidney say no maybe a week later or

9    something.  I guess they were looking for

10   somebody else to distribute the product.  Then

11   he saw me, and I told him I have no -- I have

12   no interest in the deal and he could take it.

13        Q.    Where did he see you?

14        A.    In the same place we meet, in the

15   synagogue.

16        Q.    In the synagogue you met?

17        A.    (Nodding).

18        Q.    How long have you known him?

19        A.    A good 20 years.

20        Q.    Turning to the previous page, the

21   last row, Danni -- I'm not going to say this

22   right either -- Tzanani, T-Z-A-N-A-N-I?

23        A.    Yes.  What is about it him?

24        Q.    Do you recognize the name?

25        A.    No.

60

BARKLEY
Court Reporters

```
 1        Q.    You don't know that person?

 2        A.    No.

 3        Q.    Danni Waknin right above?

 4        A.    No.

 5        Q.    Do you know that name?

 6        A.    No.

 7        Q.    Menachem Goldman, do you know that

 8   name?

 9        A.    No.

10        Q.    Are you aware that a seizure of

11   merchandise took place on March 7, 2011, at the

12   place of business of Joe Cool Inc. in Florida?

13        A.    I wouldn't know where there was a

14   seizure, but I hear something about seizure.

15        Q.    Where did you hear about that?

16              MR. MORTNER:  Objection.  Asked and

17        answered.

18        A.    Where I heard about it?  I just

19   don't remember.

20        Q.    The seizure that you heard about,

21   do you know if it was this seizure that I asked

22   you about?

23              MR. MORTNER:  Objection.  It calls

24        for speculation.

25        A.    I wouldn't know.
```

MENACHEM OHANA

BARKLEY
Court Reporters

1      Q.      You don't know?

2      A.      No.

3      Q.      Do you know why Consolidated

4    Distributors would be in any way affiliated

5    with a seizure that took place in Florida?

6      A.      No idea.

7      Q.      Is it your understanding that

8    Consolidated Distributors was involved in the

9    seizure that took place in Florida?

10      A.      I know something was involved

11    concerning the product.  I really don't know if

12    it was them.  I have no idea.

13      Q.      Concerning what product?

14      A.      The product that they offer me, I

15    wouldn't know what the seizure.  I wasn't

16    there.  I can't.

17      Q.      Is your understanding that the

18    product that was seized is the same as the

19    product they offered you?

20      A.      Yes, probably.  I can imagine.

21              MR. MORTNER:  The witness is

22          instructed to answer based upon his

23          personal knowledge not -- do you

24          understand what I'm saying?  You're not

25          asked to come here and guess.

62

BARKLEY
Court Reporters

```
 1                  THE WITNESS:  He asked me a
 2        question that I have no idea.
 3   BY MR. NIELSEN:
 4        Q.     So you don't know?
 5        A.     I don't know.
 6        Q.     You don't know whether the seizure
 7   in Florida at Joe Cool was related to the
 8   merchandise you were offered at all?
 9        A.     I wouldn't know.
10        Q.     Are you aware of -- strike that.
11   Do you know whether the court that issued the
12   seizure order retracted that order?
13        A.     I know that I hear that they
14   retract an order.
15        Q.     Who did you hear that from?
16        A.     I think Cudaytov told me that --
17   tried to convince me that it was seized
18   something illegal, but then they got it back.
19        Q.     I'm not sure I heard right.  Did
20   you say David was the one that told you that?
21        A.     Cudaytov.
22        Q.     Who is that?
23        A.     Rachamim, the guy who is here
24   somewhere.
25        Q.     Are you talking about the gentleman
```

63

BARKLEY
Court Reporters

1    on page 6 first row?

2         A.    Yes.

3         Q.    Whose name I could not pronounce

4    and still can't?

5         A.    Yeah.

6         Q.    When did he tell you that the

7    seizure order had been retracted?

8         A.    At the same time -- soon as I gave

9    an answer I can't work with them, and he

10   approached me if he will go into the business,

11   he want to fact me because he hear I am going

12   to be the one at the same time he said don't

13   worry because it is the seizure that they took

14   it back; but like I said, I was not interested.

15        Q.    So Rachamim told you that --

16        A.    Yes.

17        Q.    Let me finish the question before

18   you agree.  Rachamim told you that the seizure

19   order had been retracted and they got the

20   merchandise back?

21        A.    Yes.

22              MR. MORTNER:  Objection.  He just

23        answered.

24   BY MR. NIELSEN:

25        Q.    Did you know about a seizure order

                           64

1   prior to that?

2                MR. MORTNER:   Objection.   Answered.

3        A.     I don't think so.

4                MR. MORTNER:   I thought you

5        answered that.

6   BY MR. NIELSEN:

7        Q.     So prior to learning from Rachamim

8   that the seizure order having cancelled, you

9   didn't know of a seizure?

10       A.     Yes.

11       Q.     Yes you did know a seizure or --

12       A.     I didn't know.

13       Q.     And how did that affect your view

14  of the deal?

15       A.     It didn't change much.

16       Q.     How did that affect your

17  willingness to work with David Baksht?

18       A.     Not by much.   I was not interested.

19       Q.     Why is that?

20       A.     There was some problem there, and I

21  wasn't interested.

22       Q.     But for Mr. Cudaytov, he was not

23  concerned?

24       A.     I have no idea.

25       Q.     Do you know whether Consolidated

                          65

BARKLEY
Court Reporters

1  Distributors has ever been accused of trademark

2  infringement?

3      A.      Nothing specific.  I heard, but I

4  think there was the rumor that they have some

5  problem.

6      Q.      How does that affect your

7  impression of Consolidated Distributors?

8      A.      Stay away from the product.

9      Q.      Which product?

10      A.      That they are selling, any product.

11      Q.      All of their products?

12      A.      Anything.

13      Q.      Don't do business with them?

14      A.      Yes.

15      Q.      Do you know whether Mr. Baksht has

16  ever been accused of trademark infringement?

17      A.      It seems to me a very gentleman.  I

18  would never think so.

19      Q.      Do you know if Mr. Baksht has

20  sought to register trademarks that are similar

21  to the famous marks of others?

22      A.      I don't know.

23      Q.      You are not aware of that?

24      A.      I don't know what he's doing in his

25  personal life or in his business.

66

BARKLEY
Court Reporters

1      Q.     Are you aware that Mr. Baksht tried

2    to register Montblanc?

3      A.     No.

4      Q.     If you would have learned that

5    Mr. Baksht tried to register Montblanc, would

6    that affect your impression of him?

7      A.     I wouldn't know.  When it come up,

8    I will think about it; but I won't believe it.

9      Q.     You don't believe what?

10     A.     I really don't know.

11     Q.     Are you aware that Mr. Baksht tried

12   to register Pink Cadillac?

13     A.     No.

14     Q.     If you were to learn that

15   Mr. Baksht had tried to register Pink Cadillac,

16   how would that affect your impression of him?

17          MR. MORTNER:  Objection.  But what

18      is the question here?  The fact is that he

19      did register those.  So why are you saying

20      if he tried?  Those registrations were

21      accepted by the examiners.  You're making

22      an implication that there is something

23      wrong with that.  I object to that.

24   BY MR. NIELSEN:

25     Q.     You can answer the question.

67

BARKLEY
Court Reporters

1      A.      Yes.  I didn't think about it.  I

2  guess if I hear it, I will think about it.  I

3  didn't hear none of that.  I didn't hear what

4  he did.

5      Q.      Now, that you've heard from

6  Mr. Mortner that he registered -- that he

7  registered Pink Cadillac, how does that affect

8  your impression?

9      A.      He registered and who do it in

10  the -- the department approve it.  I don't

11  know.  Did he approve?  Was he registered or

12  not?  If he tell me that he did try to rob

13  somebody, no but -- I really don't know.  Did

14  he register them?

15      Q.      Would that improve your impression

16  of him?

17      A.      If somebody approve it, I know

18  nothing about the trademark.  What do you mean?

19      Q.      If he gets away with it, then it

20  wouldn't bother you?

21          MR. MORTNER:  Objection.

22      A.      I don't know.  Maybe it will.  I

23  will have to look in what happened; but just,

24  you know, in general, I wouldn't know.  I

25  wouldn't know.  I have to see the specific what

68

BARKLEY
Court Reporters

```
 1    he did, why, when.  Never know what -- did he
 2    register it?  I really don't know.  This is the
 3    first time you are telling me this.
 4         Q.     Are you aware that Mr. Baksht tried
 5    to form a corporation called Lemon Coke
 6    Corporation?
 7         A.     No.
 8                MR. MORTNER:  Objection.  I'm
 9         objecting to this whole line of
10         questioning, the way you're asking these
11         questions.
12    BY MR. NIELSEN:
13         Q.     If you were to learn that
14    Mr. Baksht tried to form a corporation called
15    Lemon Coke Corporation, how would that affect
16    your impression of him?
17         A.     Lemon Coke?  Nothing.
18         Q.     You've heard of Coke before?
19         A.     Coke, yes.  Lemon Coke?
20         Q.     If you were to learn that
21    Mr. Baksht had tried to form a corporation
22    named Rolls Royce Industries Corporation, how
23    would that affect your impression of him?
24         A.     Rolls Royce Corporation?  It
25    doesn't make sense, but I wouldn't know.
```

69

BARKLEY
Court Reporters

1      Q.      We have been going an hour.  Let's

2   take a short break.

3                THE VIDEOGRAPHER:  We will go off

4        the record.  The time is 11:27.

5                (Whereupon a short break was

6        taken.)

7                THE VIDEOGRAPHER:  We will go back

8        on the record.  The time is 11:43.

9        Beginning DVD No. 2.

10  BY MR. NIELSEN:

11     Q.      Mr. Ohana, did you graduate from

12  high school?

13     A.      Yeshiva, I don't know if it is a

14  high school.  It is a Yeshiva.  That's what you

15  call it.

16     Q.      Where was that?

17     A.      Eastern Parkway, 770 Eastern

18  Parkway.

19     Q.      Did you go to college?

20     A.      No.

21     Q.      Have you ever been convicted of a

22  felony?

23                MR. MORTNER:  Objection.

24     A.      No.

25     Q.      When is the last time you saw

70

BARKLEY
Court Reporters

 1    Mr. Baksht?

 2         A.      Saturday, not this one, the one

 3    before.

 4         Q.      When is the last time you spoke to

 5    Mr. Baksht?

 6         A.      Maybe two month ago.  I don't talk

 7    to him.  We have nothing to do with the chart.

 8    I don't talk to him a long time.

 9         Q.      Where did you see him the Saturday

10    before the last?

11         A.      The main synagogue.

12         Q.      Has Mr. Baksht talked to you about

13    the litigation?

14         A.      No.

15         Q.      Not at all?

16         A.      In the beginning yes, but it wasn't

17    my interest.

18         Q.      What did he talk to you about?

19         A.      He says that they gave them, like

20    what Cudaytov said, they gave them the stuff

21    back, and it's a business.  It's not like what

22    I'm thinking, that they're a hundred percent

23    kosher.  I tell him it is all right, fine.

24         Q.      When was this?

25         A.      The last time we spoke about this

                        71

BARKLEY
Court Reporters

1    case, it was maybe eight months or nine months.

2         Q.     What did you speak about most

3    recently?

4         A.     Not on this case.

5         Q.     What was it about?

6         A.     Just good Sabbath, good Sabbath.

7         Q.     Personal in nature?

8         A.     No.  We have no -- I've got to see

9    a thousand people, so it is not on top of my

10   list.

11        Q.     Did he ask you to be a witness in

12   this case?

13        A.     As soon as I got subpoena, I spoke

14   with Menachem Schneerson and Abraham and said

15   listen what is going on.  Look, you might have

16   to go to court to testify that why you're not

17   doing business with us.  I says okay.  I didn't

18   know we have to come in, but he took my

19   information.  He says my name, my phone number.

20   That is it.

21        Q.     When was that?

22        A.     Menachem Schneerson?  I think about

23   two month ago, three month ago.  A couple of

24   months, maybe two months ago.

25        Q.     Did he contact you?

72

BARKLEY
Court Reporters

```
 1         A.      Yes.  I see him a lot.

 2         Q.      Where do you see him?

 3         A.      In the same synagogue.

 4         Q.      Just at the synagogue?

 5         A.      Time to time I go to eat breakfast.

 6  Maybe we cross in the street, something.

 7         Q.      He lives in your neighborhood?

 8         A.      Yes.

 9         Q.      Does Mr. Baksht live in your

10  neighborhood?

11         A.      Mr. Baksht live in my neighborhood.

12  Menachem I think in Florida.  I really don't

13  know.

14         Q.      Who don't you know?

15         A.      I don't know where he live,

16  Menachem.

17         Q.      Menachem Schneerson?

18         A.      Yes.

19         Q.      Did I mishear or did you say that

20  Menachem Schneerson lived in your neighborhood?

21         A.      He used to.  He is, like, always

22  moving around.  I wouldn't know where he live.

23         Q.      How often do you talk to

24  Mr. Schneerson?

25         A.      The last time I saw him was about I
```

73

BARKLEY
Court Reporters

```
 1    would say two or three month ago.
 2        Q.     How about prior to that?
 3        A.     Every -- like I say, he disappear.
 4    It is like I see him.  I don't see him.  Every
 5    couple of month.
 6        Q.     Are you on a friendly basis with
 7    him?
 8        A.     Yes.
 9        Q.     And Mr. Baksht, a friendly basis as
10    well?
11        A.     Not really.
12        Q.     Why is that?
13        A.     He is kind of a little bit older,
14    you know.  I don't know, about 70.  We have
15    nothing in -- we are not friend.
16        Q.     What did Mr. Schneerson tell you
17    about the case?
18        A.     He says that the same thing with
19    the other guy says.  You can still do business.
20    Go ask anybody you want.  It's legal.  It's a
21    hundred percent.  But I says that it's not for
22    me.  I am not interested.  That is the end of
23    it.  I don't want to talk about it.
24        Q.     When did that conversation take
25    place?
```

74

BARKLEY
Court Reporters

1      A.      Probably the prior time I saw him

2  two, maybe five -- maybe four, five months.

3      Q.      So is the time line correct, that

4  about a year ago he approached you initially?

5      A.      Right.

6      Q.      And they continued to approach you

7  after you said you weren't interested?

8      A.      They didn't continue.  Just

9  Cudaytov spoke with me, and David spoke with me

10  once; and Menachem spoke with me once.  And I

11  told them I am not interested.  And this is it.

12      Q.      Who is the first person you said

13  spoke with you?

14      A.      Rachamim Cudaytov.

15      Q.      How many times total did they

16  approach you after you said you weren't

17  interested?

18      A.      Each person maybe once.  I just

19  made it clear that I'm not interested.  That's

20  the end of it.

21      Q.      So apart from the purchasing of the

22  T-shirts, what else did they tell you about the

23  litigation?

24      A.      Not much.  I couldn't care much.

25      Q.      Did they say your testimony would

MENACHEM OHANA

BARKLEY
Court Reporters

1    be important?

2         A.      They said they want me to come in.

3    I says why should I.  I am not involved.  They

4    said yeah; but if it was legal, would you buy

5    it?  I said yes.  If everything was a hundred

6    percent kosher, yes.  But right now, no.

7         Q.      If what was legal?

8         A.      Everything was kosher, that what

9    happened with the company.  I don't know what

10   problem they have.

11        Q.      So --

12        A.      Like I said, they have some issue.

13   That is the end of it.

14        Q.      So if the lawsuit were resolved,

15   you would do business with them?

16        A.      Yes.

17        Q.      Did they tell you they listed you

18   in their disclosures, that Exhibit 9?  Did they

19   tell you they listed you there?

20        A.      Somebody told me they listed me,

21   yes.

22        Q.      Who told you that?

23        A.      Schneerson.

24        Q.      When was that?

25        A.      Probably two month ago, the last

76

MENACHEM OHANA

```
 1   time I saw him.
 2        Q.     What --
 3        A.     About two month ago.
 4        Q.     What did he tell you?
 5        A.     They need my name, my company
 6   information, and somebody might call me.
 7        Q.     What did you tell him?
 8        A.     It is not a problem.
 9        Q.     Why is that?
10        A.     Because I wanted to do business
11   with them.  Then because they have a lawsuit,
12   I'm not interested.  He claimed that he lost a
13   lot of business, and he wants me to be a
14   witness.
15        Q.     Do you believe him?
16        A.     Believe him what?  That I could do
17   a lot of business?  Yes.
18        Q.     So did he ask you to help him out
19   basically?
20             MR. MORTNER:  Objection.
21        A.     Not help.  I just said, listen, we
22   have a business here; and it is our name, and
23   we just have a problem.  We shut down.  He was
24   telling me the whole story.  I didn't want to
25   hear much.  I said I cannot -- whenever it's
```

77

BARKLEY
Court Reporters

1  settled, call me.

2      Q.      What was the whole story?

3      A.      They can't -- the company stopped

4  them or something happened.

5      Q.      When did he tell you this?

6      A.      The last time, like I say, about --

7  we saw maybe about two month -- it could be

8  five weeks.  It could be eight week, but around

9  two month ago.

10      Q.      What else did he tell you at that

11  time?

12      A.      Not much.  That he need my

13  permission -- he -- actually, I don't know if

14  he asked.  He says I am putting your name, that

15  he was supposed to do business; and I tell him,

16  but I don't want to do business.  He said yeah.

17  So I am putting you as one of the potential

18  customers.

19      Q.      Customers for what?

20      A.      For the product they want to sell

21  me.

22      Q.      Did they only have one product?

23      A.      I think one product, yeah.

24      Q.      You are not aware of any other

25  products that Consolidated has?

78

BARKLEY
Court Reporters

1          A.     I have no idea.

2          Q.     The only product that you're aware

3    that Consolidated has is the iron-ons?

4          A.     Yeah, that's it.

5          Q.     So you testified earlier that you

6    had received an e-mail from Consolidated or

7    David Baksht with a logo similar to Exhibit 1

8    attached; is that correct?

9          A.     I don't remember -- yeah, I got an

10   e-mail.  I have to check who I got it from.

11         Q.     Can you produce that to us in

12   response to the subpoena?

13         A.     Probably.

14         Q.     Would you like to send it to my --

15   do you want to do it through Mr. Mortner, or do

16   you want to send it to me directly?  How should

17   we effectuate that?

18              MR. MORTNER:  Why don't you -- can

19         you print it out?  If you have it -- you

20         said you might have erased it; but if you

21         have it, can you print it out?

22              THE WITNESS:  If I have it, I will

23         print it out and give it to you.

24              MR. MORTNER:  And I'll forward it

25         to you.  How's that?

BARKLEY
Court Reporters

```
 1                    MR. NIELSEN:   Okay.
 2   BY MR. NIELSEN:
 3        Q.     And you also testified that you
 4   received an e-mail with a subpoena attached?
 5        A.     Yes.
 6        Q.     With the plaintiff's initial
 7   disclosures attached and some other documents?
 8        A.     Yes.
 9                    MR. MORTNER:   No.   No, he didn't
10        testify to that.   He said he thinks.
11        A.     I've got a bunch of paper.   To tell
12   you which exhibit, what exhibit, no.
13        Q.     When I said plaintiff's initial
14   disclosure, I want to correct that.   It is the
15   defendant's initial disclosures.
16                    MR. MORTNER:   Yes.
17   BY MR. NIELSEN:
18        Q.     Can you forward that e-mail along
19   as well?
20        A.     Of course.
21        Q.     Are there any other documents that
22   you might have that might be relevant to this
23   litigation?
24        A.     Not that I think of, no.
25        Q.     Do you still have that e-mail?
```

80

BARKLEY
Court Reporters

1       A.     I've got to check.

2       Q.     How long ago did you receive it?

3       A.     Which one?  The subpoena?

4       Q.     Right, the subpoena and what you

5 thought was the defendant's disclosures.

6       A.     When I saw it -- I don't know when

7 I receive it.  I saw it about around a week to

8 ten days, something.

9       Q.     Recently?

10      A.     Recently.

11      Q.     Do you have any reason to believe

12 it would have been deleted?

13      A.     What happened is I get in my

14 e-mail, so much junk mail like.  So I always

15 erase a couple at a time.  Sometimes I erase

16 things by mistake, very rare.  Because the way

17 I go, I delete together.  So I mark them one,

18 two, three, four, five.  There is so many of

19 them, sometime in between; but I will check,

20 and I will get back to you.

21      Q.     But if you have it, you will pass

22 it along to Mr. Mortner?

23      A.     Absolutely.

24      Q.     Are there any other documents that

25 you have that you think might be relevant in

1    response to the subpoena?

2         A.    No.

3         Q.    Has anyone asked you about

4    appearing at trial in Florida?

5         A.    No.

6         Q.    Mr. Schneerson suggest that might

7    happen?

8         A.    No.

9         Q.    Anyone else at Consolidated that

10   you have ever spoken to?

11        A.    No.

12        Q.    Just Mr. Baksht and Mr. Schneerson?

13        A.    Yes.

14             MR. NIELSEN:   I have no further

15        questions for this witness.

16             THE VIDEOGRAPHER:   That's it.

17             MR. MORTNER:   No questions.

18             THE VIDEOGRAPHER:   That concludes

19        today's deposition.   The time is 11:57.

20             (The witness is excused.)

21             (Videotaped deposition of Menachem

22        Ohana was concluded at 11:57 a.m.)

23

24

25

82

MENACHEM OHANA

```
1                 C E R T I F I C A T E

2

3

4          I, SUZANNE J. STOTZ, a Certified

5   Shorthand Reporter and Notary Public in and

6   for the State of New Jersey, do hereby certify

7   that the foregoing is a true and accurate

8   transcript of the stenographic above-captioned

9   matter.

10

11

12              Suzanne J. Stotz, CSR

13

14              SUZANNE J. STOTZ, C.S.R.

15              LICENSE NO. 1845

16

17

18   DATED:  August 24, 2012

19

20

21   NOTE:  THE CERTIFICATE APPENDED TO THIS

22   TRANSCRIPT DOES NOT APPLY TO ANY REPRODUCTION

23   OF THE SAME BY ANY MEANS, UNLESS UNDER THE

24   DIRECT CONTROL AND/OR DIRECTION OF THE

25   CERTIFYING COURT REPORTER.
```

83

1     E R R A T A   S H E E T

2         I have read my testimony in the foregoing

3    transcript and believe it to be true and

4    correct to the best of my knowledge and belief

5    with the following changes:

6    PAGE      LINE          CHANGE

7    _____ _____ _____

8    _____ _____ _____

9    _____ _____ _____

10   _____ _____ _____

11   _____ _____ _____

12   _____ _____ _____

13   _____ _____ _____

14   _____ _____ _____

15   _____ _____ _____

16   _____ _____ _____

17

18   _____  _____

19   WITNESS SIGNATURE              DATE

20

21   Sworn and subscribed to before me this

22   _____ day of _____ , 2012.

23

24   Notary Public of the

25   State of _____.

84

MENACHEM OHANA

BARKLEY
Court Reporters

## A

**ability (2)**
6:5;7:13
**above (2)**
58:5;61:3
**Abraham (3)**
28:6,19;72:14
**Absolutely (1)**
81:23
**accepted (1)**
67:21
**according (1)**
19:9
**accurate (6)**
21:20;31:5;34:19;
41:3;45:24;57:20
**accused (2)**
66:1,16
**across (1)**
37:16
**action (2)**
15:5,14
**activity (1)**
13:15
**actually (3)**
19:19;49:21;78:13
**addition (1)**
12:8
**address (7)**
5:19,23;10:3,7,12;
24:4;58:25
**adjacent (2)**
41:2,2
**advise (1)**
46:3
**advised (1)**
34:12
**affect (9)**
7:4;65:13,16;66:6;
67:6,16;68:7;69:15,
23
**affiliated (1)**
62:4
**affirmed (1)**
4:21
**ago (25)**
12:22,25;16:23;
17:18,20,21;24:9,12;
26:14;34:24;48:6,6,
8;49:22;60:7;71:6;
72:23,23,24;74:1;
75:4;76:25;77:3;
78:9;81:2
**agree (2)**
30:11;64:18
**agreed (2)**
42:6,7
**agrees (1)**
21:7
**ahead (3)**
5:12;7:10,12

**along (2)**
80:18;81:22
**always (3)**
18:20;73:21;81:14
**Amar (2)**
29:21,23
**Amended (2)**
13:20;14:1
**answered (2)**
61:17;64:23;65:2,
5
**answer's (1)**
60:4
**apart (1)**
75:21
**appearance (1)**
5:9
**appearing (1)**
82:4
**approach (9)**
18:18,19,20;24:17,
23;30:7;35:2;75:6,
16
**approached (7)**
22:8;27:2;30:9;
34:14;46:7;64:10;
75:4
**approve (3)**
68:10,11,17
**Approximately (1)**
8:24
**area (2)**
9:2,10
**around (6)**
9:25;38:6,6;73:22;
78:8;81:7
**Associated (2)**
12:4;39:2
**attached (7)**
48:21,23,25;50:4;
79:8;80:4,7
**attention (1)**
16:4;41:5
**attorney (2)**
5:11;7:6
**attorneys (1)**
4:11
**August (1)**
4:2
**Ava (1)**
12:2
**Avenue (4)**
4:5;5:21;10:14;
24:3
**aware (9)**
44:13;61:10;
63:10;66:23;67:1,
11;69:4;78:24;79:2
**away (5)**
33:14;54:20;55:5;
66:8;68:19
**awkward (1)**
49:19

## B

**back (21)**
18:12,17;20:1,13;
24:8;28:13,16,18;
31:7;34:11,17,23;
45:4,11,13;63:18;
64:14,20;70:7;
71:21;81:20
**background (1)**
45:11
**Baksht (39)**
4:19;16:9;17:4,7;
18:18;19:2,11;26:2;
27:17,23,24;29:19;
31:4,14;37:2,6;39:9;
41:19;45:22;46:8;
57:11;65:17;66:15,
19;67:1,5,11,15;
69:4,14,21;71:1,5,
12;73:9,11;74:9;
79:7;82:12
**Baksht's (1)**
36:6
**Barkley (1)**
4:4
**based (1)**
62:22
**basic (1)**
6:3
**Basically (3)**
6:4;14:17;77:19
**basis (4)**
19:1;22:1;74:6,9
**Beach (1)**
22:13
**begin (1)**
4:23
**Beginning (2)**
70:9;71:16
**behalf (1)**
4:15,17;7:15
**best (4)**
6:5;7:12;41:15;
57:5
**big (1)**
21:3
**biggest (1)**
9:3
**bit (1)**
74:13
**blue (1)**
33:10
**Both (3)**
22:5;27:23;35:7
**bother (2)**
52:5;68:20
**bottom (1)**
40:3
**box (2)**
10:11;55:17
**Brady (1)**

4:3
**brand (1)**
44:14
**Bravo (1)**
12:4
**break (2)**
70:2,5
**breakfast (1)**
73:5
**Briefly (4)**
15:2;41:14;49:4;
50:14
**BRK (1)**
22:6
**broker (4)**
9:14,17;18:10,24
**Brooklyn (5)**
5:21;8:7;24:21;
44:20;58:22
**building (2)**
12:25;13:1
**bulk (2)**
10:20,23
**bump (1)**
57:13
**bunch (7)**
9:9;48:10,20;49:1,
12,13;80:11
**business (56)**
5:23;8:10;9:7;
10:4;13:4,16;17:6,
10;18:4,11,25;24:2,
6,11;25:1;27:1;
29:25;30:2;35:24;
36:2;38:13,18;39:3;
44:2,4,21;45:8;46:3;
47:8,18;49:19,20;
51:11,15,17,18;53:1;
54:2,4;55:6,11;
58:24;61:12;64:10;
66:13,25;71:21;
72:17;74:19;76:15;
77:10,13,17,22;
78:15,16
**businesses (3)**
12:13,14;35:21
**buy (13)**
9:16;10:22;17:11;
19:22;22:22;25:20;
32:3;34:13,17;42:4;
47:15,16;76:4
**buyers (2)**
20:23;22:7
**buying (3)**
22:18,22;42:3

## C

**Cadillac (3)**
67:12,15;68:7
**cafe (1)**
39:24
**call (14)**

**9:11,12,19;18:9,
10,12;19:23;20:12,
14;21:6;27:21;
70:15;77:6;78:1
**called (9)**
13:8;12:19:24;
25:23;34:10;46:15;
60:7;69:5,14
**calls (2)**
46:17;57:7;61:23
**came (9)**
7:23;13:7;25:4;
34:24,25;35:11;
42:19;48:18;50:6
**can (30)**
6:3,12,19;8:9;9:5,
6,19;11:18;12:7;
14:4,20;17:9;18:3,5,
8;19:7;20:15;21:1;
22:14;23:24;28:12;
32:13;57:8;62:20;
67:25;74:19;79:11,
18,21;80:18
**cancelled (1)**
65:8
**care (10)**
42:12,14,18,21;
45:18,20;46:5;55:5,
11;75:24
**case (6)**
5:9;59:10;72:1,4,
12;74:17
**cases (1)**
13:9
**catch (1)**
59:5
**CDI (2)**
53:7,8
**CDI's (1)**
52:25
**Center (2)**
37:9;38:12
**cents (2)**
33:12,19
**cereal (2)**
13:12,13
**change (1)**
65:15
**charge (2)**
12:23;25:7
**chart (1)**
71:7
**check (10)**
40:1;48:3,17;
49:18;50:8,19;51:4;
79:10;81:1,19
**China (1)**
44:10
**city (2)**
12:5;21:4
**civil (2)**
15:5,14
**claimed (1)**

77:12
**clarify (1)**
5:3
**clear (3)**
6:13;18:6;75:19
**clearly (1)**
28:14
**closeout (3)**
8:8,11;30:9
**clothing (9)**
11:1,3,4,6,7;20:13;
44:2,6,6
**COD (1)**
25:8
**coffee (2)**
39:23,23
**Cohen (14)**
22:6;23:23,25;
24:12,15;31:6;43:5,
6;44:5;46:7,9;47:6;
51:14;57:23
**C-O-H-E-N (1)**
24:1
**Coke (6)**
69:5,15,17,18,19,
19
**college (1)**
70:19
**color (1)**
41:21
**column (1)**
52:24
**communications (1)**
40:7
**company (16)**
8:19;10:15;19:25;
22:4,12;23:4,19;
25:7,23;26:3,7,11;
44:9;76:9;77:5;78:3
**compete (1)**
59:16
**concern (2)**
45:17,22
**concerned (3)**
21:8;46:1;65:23
**concerning (2)**
62:11,13
**concluded (1)**
82:22
**concludes (1)**
82:18
**confiscate (1)**
55:20
**confused (1)**
34:7
**connecting (1)**
45:2
**consignment (2)**
25:3,5
**Consolidate (1)**
56:17
**Consolidated (20)**
4:8,18;25:24;26:5,

6,23;53:9,11,17;
54:1;56:16,18;62:3,
8;65:25;66:7;78:25;
79:3,6;82:9
**Consulting (1)**
39:3
**contact (2)**
9:10;72:25
**context (1)**
13:16;29:16
**continue (2)**
20:19;75:8
**continued (1)**
75:6
**contract (1)**
9:22
**conversation (1)**
74:24
**convicted (1)**
70:21
**convince (3)**
36:10,12;63:17
**Cool (3)**
29:7;61:12;63:7
**copy (1)**
40:17
**corporation (7)**
69:5,6,14,15,21,
22,24
**correcting (1)**
33:7
**correspondence (1)**
40:8
**cost (1)**
35:9
**count (1)**
35:24
**couple (24)**
4:24;12:5,22;13:9;
16:16,20,22,25;18:9,
10,13;19:24;20:14;
22:11;35:19;38:7;
44:25,25;47:9;
49:21;51:3;72:23;
74:5;81:15
**course (2)**
54:12;80:20
**Court (11)**
4:5,12;6:9;49:8,
25;50:3,16,22;51:9;
63:11;72:16
**courtroom (1)**
6:17
**crazy (2)**
35:23;36:3
**creating (1)**
6:9
**credit (3)**
25:2,3,8
**Crew (2)**
44:15,15
**cross (1)**
73:6

**C-Town (1)**
12:4
**Cudaytov (9)**
58:9,15,15;63:16,
21;65:22;71:20;
75:9,14
**C-U-D-A-Y-T-O-V (1)**
58:10
**currently (1)**
8:6
**customer (5)**
9:15;11:20;24:19;
25:8;31:25
**customers (14)**
9:1;11:19,21,21;
30:20;32:3,18,21;
41:25;42:2,23;
47:11;78:18,19

**D**

**Damage (2)**
53:5,14
**damages (1)**
52:25
**Danni (2)**
60:21;61:3
**Danny (1)**
58:6
**date (1)**
4:1
**daughter (1)**
37:4
**David (35)**
4:18;16:9;26:2,2;
27:5,12,14,16,17,18,
19,20,21,25;28:11,
25;29:19,25;31:1,3,
14;33:1;35:2;37:13;
38:10,15;39:9;
41:18;46:8;57:11,
15;63:20;65:17;
75:9;79:7
**David's (1)**
30:2
**day (11)**
8:12,12,12;9:11;
20:14;34:10,10;
35:21;46:4,15,16
**days (3)**
18:13;51:3;81:8
**deal (9)**
9:12;11:12;30:16;
31:8;46:8;47:4;
53:24;60:12;65:14
**dealings (1)**
19:5
**dealt (1)**
34:21
**defendants (3)**
14:20;40:9,12
**defendant's (2)**
80:15;81:5

**Definitions (3)**
16:6,7;29:6
**delete (1)**
81:17
**deleted (1)**
81:12
**Department (2)**
12:1;68:10
**deposed (1)**
5:25
**deposition (7)**
4:25;5:10;7:16,20;
15:5;82:19,21
**detail (1)**
43:15
**details (4)**
43:14;54:17,18,25
**different (2)**
28:2,4
**direct (4)**
14:4;16:4;22:19;
32:15
**directly (1)**
79:16
**disappear (1)**
74:3
**disclosure (1)**
80:14
**disclosures (4)**
76:18;80:7,15;
81:5
**discovered (2)**
17:12;27:3
**discuss (4)**
41:22;59:14;60:2,
5
**discussed (3)**
42:20;53:19;59:10
**distressed (5)**
11:15;19:14;
35:15,18;45:6
**distribute (1)**
60:10
**distributor (4)**
8:8;19:13;59:16,
19
**Distributors (14)**
4:9,18;25:24;26:7,
23;53:9,12,17;54:1;
56:19;62:4,8;66:1,7
**document (8)**
14:1,5;15:1,17,25;
40:3;47:20,22
**documents (17)**
7:25;8:2;13:21;
14:3;15:13,19;40:5;
48:13;49:7,11;50:1,
4,22;51:20;80:7,21;
81:24
**done (4)**
7:19,22;24:6;
44:21
**down (5)**

13:11;27:9;52:10;
57:25;77:23
**driver (1)**
10:1
**drop (1)**
46:4
**dropped (2)**
17:13;20:18
**dropping (1)**
30:18
**duly (1)**
4:21
**During (1)**
29:13
**DVD (1)**
70:9

**E**

**earlier (4)**
31:3;32:2,8;79:5
**Eastern (2)**
70:17,17
**eat (1)**
73:5
**effectuate (1)**
79:17
**eight (2)**
72:1;78:8
**either (6)**
9:11;20:21;35:7;
40:8;54:6;60:22
**else (11)**
12:15;19:4;22:10;
24:17;45:20;48:25;
55:1;60:10;75:22;
78:10;82:9
**e-mail (33)**
39:12,13,18,21;
40:11;41:18;42:19;
46:14;47:3,25;48:2,
5,14,19;49:13,14,16,
20,21,24;50:1,3,12,
22;51:23;52:1,3;
79:6,10;80:4,18,25;
81:14
**e-mailed (1)**
19:25
**employees (1)**
9:20
**end (8)**
22:22;27:4;46:5;
50:16;59:18;74:22;
75:20;76:13
**end-user (1)**
9:15
**Energy (3)**
4:8,15;7:17
**enough (5)**
23:15,21;31:13;
46:20;56:10
**entered (1)**
5:8

**entire (1)**
5:10
**entitled (2)**
14:1;16:5
**erase (4)**
40:22;47:4;81:15,
15
**erased (2)**
40:22;79:20
**Escada (1)**
13:10
**even (9)**
25:16;31:10;32:6;
42:12;43:10;48:3,
17;49:18;51:1
**everybody (1)**
57:13
**exactly (6)**
9:5,6;16:23;17:25;
19:8;54:17
**EXAMINATION (1)**
5:13
**examined (1)**
4:21
**examiners (1)**
67:21
**example (1)**
33:11
**examples (1)**
11:22
**excellent (1)**
50:15
**excess (2)**
11:16,17
**Excuse (1)**
6:24
**excused (1)**
82:20
**Exhibit (23)**
13:18,19,25;14:20,
21,22,24;15:10;16:5,
5;40:3;41:2,8,9,13;
47:21;48:9,23;52:8;
76:18;79:7;80:12,12
**expensive (1)**
13:11
**Explain (5)**
13:6;17:9;32:13;
43:5,6
**Export (2)**
10:16;12:9

**F**

**facility (1)**
56:19
**fact (3)**
6:18;64:11;67:18
**familiar (1)**
16:11
**famous (1)**
66:21
**far (1)**

55:8
**FBI (2)**
56:2,3
**felony (1)**
70:22
**fifth (1)**
14:24
**find (2)**
50:8;55:12
**fine (1)**
71:23
**finish (2)**
6:11;64:17
**finished (2)**
20:11;35:10
**first (14)**
4:21;14:4,9;16:8;
19:23;20:6;22:16;
23:25;47:14;50:21;
58:8;64:1;69:3;
75:12
**five (7)**
12:2,25;17:2;75:2,
2;78:8;81:18
**Florida (11)**
23:13;56:14,14,15,
19;61:12;62:5,9;
63:7;73:12;82:4
**following (1)**
28:17
**follows (1)**
4:22
**food (1)**
8:12
**form (3)**
69:5,14,21
**forward (2)**
79:24;80:18
**four (3)**
12:3;75:2;81:18
**fourth (1)**
57:25
**friend (11)**
21:15;24:14;
37:15,18;44:16;
46:2;51:7,10,11,18;
74:15
**friendly (3)**
19:1;74:6,9
**friends (5)**
24:15;37:20;38:1,
2,2
**front (1)**
6:18
**further (1)**
82:14

**G**

**gave (6)**
10:8;25:9;26:12;
64:8;71:19,20
**general (3)**

5:7,10;68:24
**gentleman (6)**
16:9;37:7;58:2,5;
63:25;66:17
**gentlemen (1)**
46:10
**gets (1)**
68:19
**given (1)**
6:19
**giving (1)**
21:8
**goes (4)**
27:19;28:1,4;
45:11
**Goldman (3)**
5:1,2;61:7
**good (15)**
10:22;16:16,20;
21:15;24:14;31:13,
19;43:11;44:16;
45:18;46:2,11;
60:19;72:6,6
**goods (5)**
9:25;11:9;45:6,6,
55:24
**government (1)**
23:20
**graduate (1)**
70:11
**guess (11)**
14:23;21:6;22:15,
17;26:2;29:1;33:24;
53:24;60:9;62:25;
68:2
**guy (8)**
20:20;22:11;
30:16;33:11,25;
47:14;63:23;74:19
**guys (3)**
22:19;37:21;59:14

**H**

**hand (1)**
41:8
**handed (1)**
47:20
**happen (1)**
82:7
**happened (4)**
68:23;76:9;78:4;
81:13
**hardly (1)**
49:24
**head (1)**
6:14
**hear (28)**
18:25;20:16;
21:16;23:14,22;
27:24;29:8;31:9;
37:14,16,19;38:3,7;
47:3;54:3;56:1,12;

57:1;60:3;61:14,15;
63:13,15;64:11;68:2,
3,3;77:25
**heard (17)**
25:23;27:23;
28:14;29:7,9,10,11;
37:8;38:24;39:2,5;
61:18,20;63:19;
66:3;68:5;69:18
**heavily (1)**
13:5
**help (2)**
77:18,21
**high (2)**
70:12,14
**hour (1)**
70:1
**house (3)**
5:24;10:5,6
**How's (1)**
79:25
**huge (1)**
44:9
**Huh (1)**
53:10
**hundred (10)**
31:12,15,17,19,21;
36:17;43:12;71:22;
74:21;76:5
**hundreds (1)**
26:20
**hurt (2)**
53:15,15

**I**

**idea (13)**
26:20,21;27:15;
28:5;30:6;36:8;
38:14;56:23;62:6,
12;63:2;65:24;79:1
**identification (1)**
13:23
**illegal (4)**
54:24;55:14,15;
63:18
**imagine (1)**
62:20
**implication (1)**
67:22
**Import (2)**
10:16;12:9
**important (7)**
19:24;51:2,4,6,25;
52:6;76:1
**imports (2)**
12:9;52:13
**impression (9)**
37:1,5;66:7;67:6,
16;68:8,15;69:16,23
**improve (1)**
68:15
**Inc (5)**

29:7;38:25;39:3;
53:12;61:12
**independent (3)**
30:19,22,25
**indicated (1)**
36:7
**Indicating (5)**
29:15;40:25;41:1,
16;49:5
**Industries (1)**
69:22
**Industry (1)**
22:6
**information (6)**
9:6;15:13;19:25;
56:25;72:19;77:6
**infringement (2)**
66:2,16
**initial (3)**
80:6,13,15
**initially (1)**
75:4
**injury (1)**
53:1
**inspection (1)**
15:14
**instructed (1)**
62:22
**interactions (3)**
18:4;29:18;45:8
**interest (2)**
60:12;71:17
**interested (23)**
18:11,14;20:2;
21:12;22:18;24:25;
36:7,14;42:15;43:7;
46:16,18;47:15,17;
64:14;65:18,21;
74:22;75:7,11,17,19;
77:12
**Internet (3)**
39:23,24;40:20
**interrupt (1)**
21:22
**into (10)**
25:17;30:20,23;
31:1;33:21,24;
44:17;54:25;57:13;
64:10
**introduce (1)**
4:12
**invented (1)**
34:25
**investigate (1)**
33:12
**investigation (3)**
30:20,23;31:1
**involve (1)**
10:25
**involved (24)**
18:16,25;19:4;
20:4,10;21:11;23:10,
14;25:15,18,21;36:5;

43:13,16;45:21,24;
46:12;47:1,12;54:9;
55:16;62:8,10;76:3
**iron (2)**
19:21;42:6
**iron-on (1)**
20:9
**iron-ons (7)**
20:8;34:21;35:3,7;
42:10,11;79:3
**irrelevant (1)**
20:19
**issue (1)**
76:12
**issued (2)**
7:16;63:11
**item (1)**
9:16;10:22,22;
33:9;46:2;47:16
**items (1)**
10:25

**J**

**JCrew (1)**
44:14
**jeans (1)**
44:8
**Jim (1)**
4:3
**Joe (3)**
29:7;61:12;63:7
**judge (2)**
6:18,20
**junk (2)**
40:21;81:14
**jury (2)**
6:18,20

**K**

**Kellogg (2)**
13:13;33:11
**Ken (1)**
4:14
**kind (4)**
11:3;25:2;51:15;
74:13
**King (1)**
12:1
**Kingston (2)**
5:21;10:14
**knew (2)**
43:19;47:8
**Knobbe (1)**
4:14
**knowledge (1)**
62:23
**known (3)**
16:15;26:15;60:18
**knows (4)**
43:24;44:1,2;
57:14

**kosher (7)**
31:12,15,22;
36:17;71:23;76:6,8

**L**

**label (4)**
19:19,20;44:16;
56:8
**labels (3)**
35:13,14,19
**last (24)**
5:18;12:20;13:11;
14:15,16;22:15;
24:11;27:21,22;
29:13,14;49:23;
51:2;52:16,18,24;
60:21;70:25;71:4,10,
25;73:25;76:25;78:6
**later (4)**
17:24;18:13;47:1;
60:8
**Law (1)**
4:17
**lawsuit (13)**
18:15;23:6,8,12;
31:4;43:18;45:15,
23;54:11,22;55:7;
76:14;77:11
**learn (4)**
56:11;67:14;
69:13,20
**learned (2)**
43:22;67:4
**learning (1)**
65:7
**legal (3)**
74:20;76:4,7
**legitimate (1)**
22:1
**Lemon (4)**
69:5,15,17,19
**Levis (2)**
44:14,15
**life (1)**
66:25
**line (3)**
54:2;69:9;75:3
**Lipsker (5)**
27:16,18,19,23,25
**list (3)**
11:20;12:6;72:10
**listed (3)**
76:17,19,20
**listen (5)**
31:8;43:8;51:23;
72:15;77:21
**lists (1)**
52:10
**litigation (4)**
40:18;71:13;
75:23;80:23
**little (1)**

74:13
**live (6)**
57:12;58:17;73:9,
11,15,22
**lived (2)**
59:8;73:20
**lives (5)**
59:2,4,6,7;73:7
**located (1)**
24:2
**logo (18)**
39:14,15,19;
40:24;41:1,6,17,22,
24;42:5,13,14,16,17,
18,24;43:3;79:7
**long (7)**
16:15;24:9;45:3;
58:18;60:18;71:8;
81:2
**look (13)**
21:10;23:4;27:20;
40:16,19,24;43:8;
46:19;49:3,4;52:1;
68:23;72:15
**looked (1)**
41:15
**looking (1)**
60:9
**lost (1)**
77:12
**lot (8)**
9:17;11:4;12:3;
20:13;44:14;73:1;
77:13,17
**low (1)**
33:16

**M**

**mail (3)**
15:3;40:21;81:14
**mailbox (1)**
10:9
**main (1)**
71:11
**Mainly (2)**
11:4;44:15
**maintenance (1)**
12:24
**major (1)**
59:13
**makes (1)**
7:11
**making (1)**
67:21
**Malka (2)**
22:12,13
**M-A-L-K-A (1)**
22:15
**man (1)**
37:7
**management (2)**
12:23;13:1

**manager (1)**
22:21
**Manhattan (1)**
20:24
**manufactured (1)**
11:10
**manufacturer (1)**
44:10
**many (10)**
24:21,23;35:22;
36:4,5;44:24;45:12;
48:13;75:15;81:18
**March (1)**
61:11
**mark (3)**
13:18,25;81:17
**marked (3)**
13:22;41:9;47:21
**market (1)**
45:16
**marks (1)**
66:21
**marrying (1)**
37:4
**Martens (1)**
4:15
**material (1)**
47:12
**matter (3)**
4:7;54:10,22
**may (4)**
5:12;7:9;21:22;
59:8
**maybe (29)**
13:8;14:12;16:16;
29:8;34:24;36:8,12;
38:6;40:21;42:25;
44:9;45:1,3;46:25,
25;47:8;51:3;55:15;
57:15;60:8;68:22;
71:6;72:1,24;73:6;
75:2,2,18;78:7
**mean (8)**
18:20;32:13,17;
37:4;53:22;54:15;
55:5;68:18
**Meaning (1)**
12:12
**medication (1)**
7:3
**meet (3)**
16:21;18:22;60:14
**Meir (3)**
22:12,13,16
**M-E-I-R (1)**
22:16
**memory (1)**
41:15
**Menachem (18)**
4:10;5:1,2,17;
13:22;14:3;19:6;
43:8;52:10;61:7;
72:14,22;73:12,16,

17,20;75:10;82:21
**M-E-N-A-C-H-E-M (1)**
5:17
**mentioned (2)**
46:25;57:15
**mentioning (1)**
38:3
**merchandise (14)**
9:8;19:14,16,18;
20:4;25:20;30:11;
36:20,23;39:9;55:8;
61:11;63:8;64:20
**met (2)**
47:1;60:16
**Mettemp (1)**
38:24
**M-E-T-T-E-M-P (1)**
38:25
**Michelle (1)**
29:23
**middleman (2)**
9:18,19
**might (10)**
7:4;46:12;57:5;
72:15;77:6;79:20;
80:22,22;81:25;82:6
**mine (4)**
21:15;46:2;51:7,
11
**minute (9)**
20:16;32:4,5;
33:14,22;42:21;
43:10;45:18;47:3
**minutes (1)**
13:9
**mishear (1)**
73:19
**mistake (1)**
81:16
**mom-and-pop (1)**
32:15
**moment (2)**
12:19;15:23
**Monster (3)**
4:8,15;7:17
**Montblanc (2)**
67:2,5
**month (9)**
71:6;72:23,23;
74:1,5;76:25;77:3;
78:7,9
**months (7)**
18:2,2;72:1,1,24;
24;75:2
**more (11)**
8:9;9:6;15:9;
17:19;18:3;33:20;
37:3;42:15;44:12;
48:11;49:23
**MORTNER (39)**
4:16,16,17,23;5:2;
7:9;18:5;21:22;28:3;
12:29;3;33:4;35:16;

36:11;41:10;45:25;
48:16;53:18,21;
57:7;61:16,23;
62:21;64:22;65:2,4;
67:17;68:6,21;69:8;
70:23;77:20;79:15,
18,24;80:9,16;81:22;
82:17
**Moshe (7)**
4:16;51:14,14,16,
21;52:1,3
**Most (6)**
10:21;25:2;32:21;
40:21;45:1;72:2
**mouth (1)**
57:19
**moves (1)**
9:25
**moving (1)**
73:22
**much (11)**
20:3;43:10,15,20;
65:15,18;75:24,24;
77:25;78:12;81:14
**must (1)**
51:9
**Myrtle (1)**
22:13
**myself (1)**
8:7

## N

**name (50)**
4:3,9;5:16,18;
10:15;14:7,9,15,16;
16:11;20:25;21:5,7,
9,14,18,19;22:3,4,12,
15,16;23:24,25;
26:11,12;27:21,22;
29:9,12,21;37:16,19;
38:4;42:12;44:14;
51:13;52:15,16,18;
58:8,14;60:24;61:5,
8;64:3;72:19;77:5,
22;78:14
**named (3)**
16:9;39:5;69:22
**names (6)**
11:18;21:2;28:2,4;
37:22,23
**National (2)**
37:8;38:12
**nature (1)**
72:7
**Navy (1)**
44:20
**need (5)**
49:8;50:13;51:8;
77:5;78:12
**negotiate (1)**
34:1
**Neighbor (1)**

51:17
**neighborhood (9)**
51:19;57:12;
58:17,20;59:3;73:7,
10,11,20
**New (3)**
4:5,6;5:21
**next (7)**
30:17;33:22,24,
25;46:15;47:16,19
**Nice (2)**
37:7,7
**NIELSEN (20)**
4:14,14;5:1,7,14;
13:24;18:7;28:15;
29:4;41:12;63:3;
64:24;65:6;67:24;
69:12;70:10;80:1,2,
17;82:14
**night (1)**
13:12
**nine (1)**
72:1
**nobody (1)**
51:18
**nod (1)**
6:14
**Nodding (3)**
39:20;58:23;60:17
**none (1)**
68:3
**Nope (2)**
7:2,5
**normally (2)**
13:13;25:7
**Notice (2)**
13:20;14:1
**number (4)**
32:2;40:7;52:21;
72:19

## O

**oath (1)**
6:17
**object (2)**
7:9;67:23
**objecting (1)**
69:9
**objection (21)**
5:7,10;7:11;18:5;
21:2;28:3;33:4;
35:16;36:11;45:25;
53:18;57:8;61:16,
23;64:22;65:2;
67:17;68:21;69:8;
70:23;77:20
**objects (1)**
15:13
**Obviously (1)**
20:20
**Ochana (4)**
13:22;14:3,17;

52:11
**off (2)**
35:20;70:3
**offer (8)**
9:12;17:15;18:25;
33:9,11;35:12;
59:22;62:14
**offered (7)**
35:25;36:21,23;
59:23,25;62:19;63:8
**offering (3)**
35:6;39:10;42:8
**Office (1)**
4:17
**often (2)**
49:25;73:23
**Ohana (4)**
4:10;5:18;70:11;
82:22
**O-H-A-N-A (1)**
5:18
**older (2)**
37:7;74:13
**once (12)**
18:21;19:17;27:2;
39:11;40:20;41:5,
14;45:3;59:12;
75:10,10,18
**one (21)**
6:6;8:12,12,12;
20:12;21:3;22:19;
36:24;40:11,25;
41:16;52:12;63:20;
64:12;71:2,2;78:17,
22,23;81:3,17
**ongoing (1)**
31:5
**only (6)**
10:19;32:9;49:22;
51:2;78:22;79:2
**opened (1)**
49:21
**opinion (1)**
22:1
**order (8)**
34:1;63:12,12,14;
64:7,19,25;65:8
**ordered (3)**
34:3,5,8
**others (2)**
40:12;66:21
**Otherwise (2)**
6:7;36:10
**out (10)**
33:9;34:24,25;
35:23;50:8;55:12;
77:18;79:19,21,23
**outside (1)**
18:22
**over (4)**
19:20;30:13,15;
49:5
**own (2)**

32:7;44:10
**owner (2)**
8:18,21

## P

**page (11)**
14:4,10,24;29:6;
40:2,4;41:2;52:8;
57:22;60:20;64:1
**pages (1)**
15:9
**paper (6)**
19:9;48:12,20;
49:1,13;80:11
**paragraph (3)**
16:8;29:5,7
**Parkway (2)**
70:17,18
**particular (1)**
45:23
**partner (6)**
19:6;28:9,10,23,
24;29:2
**pass (4)**
9:13;30:15;41:24;
81:21
**passed (1)**
16:6
**pay (1)**
41:5
**people (10)**
9:22;23:4;26:21;
30:5;37:12;38:3;
54:23;56:16;57:14;
72:9
**percent (12)**
31:12,15,17,21;
35:24;36:1,17;
43:13;44:6;71:22;
74:21;76:6
**period (1)**
36:9
**permission (1)**
78:13
**permit (1)**
15:13
**person (7)**
20:22;57:3,4;
58:12;61:1;75:12,18
**personal (3)**
62:23;66:25;72:7
**person's (1)**
21:18
**phone (5)**
30:13,15;46:17;
52:21;72:19
**Pink (3)**
67:12,15;68:7
**place (8)**
26:21;39:23;
60:14;61:11,12;62:5,
9;74:25

**Plaintiff's (4)**
13:20;14:1;80:6,
13
**please (4)**
5:15;6:11,14;18:6
**PO (1)**
10:11
**potential (3)**
41:25;42:2;78:17
**potentially (1)**
32:3
**pre-existing (1)**
11:13
**premises (1)**
15:14
**prepare (1)**
7:19
**previous (1)**
60:20
**previously (1)**
15:24
**price (7)**
13:14;33:16,17,
18;34:1;35:12;36:3
**print (3)**
79:19,21,23
**prior (4)**
65:1,7;74:2;75:1
**private (1)**
44:15
**Probably (10)**
17:23;25:20;30:8;
39:22;55:9;57:14;
62:20;75:1;76:25;
79:13
**problem (26)**
17:12;20:17;
21:16;23:1,2;25:4;
27:3,6,8,10;31:7,18;
42:21;43:17,21;54:3,
5;55:4;56:6,13,15;
65:20;66:5;76:10;
77:8,23
**problems (1)**
25:17
**procedure (1)**
6:3
**proceeding (1)**
5:12
**proceedings (1)**
6:19
**produce (4)**
15:12,19;40:17;
79:11
**producing (1)**
44:8
**product (24)**
19:23;20:11;
23:20;25:10;36:4;
45:9,23;46:11;56:4,
5,7;60:10;62:11,13,
14,18,19;66:8,9,10;
78:20,22,23;79:2

**Production (3)**
13:21;14:2;40:4
**products (7)**
11:12,13,15;
44:12;45:15;66:11;
78:25
**pronounce (1)**
64:3
**provide (3)**
43:14,15;46:9
**purchase (1)**
30:11
**purchasing (1)**
75:21
**put (3)**
4:24;25:10;41:22
**putting (2)**
78:14,17

## Q

**quality (1)**
47:13
**quantities (1)**
10:20
**quantity (2)**
20:4,15
**quick (1)**
50:15

## R

**Rachamim (6)**
58:9;63:23;64:15,
18;65:7;75:14
**R-A-C-H-A-M-I-M (1)**
58:10
**raid (3)**
23:18,18;56:2
**raided (1)**
56:3
**rare (1)**
81:16
**reaction (1)**
36:6
**read (4)**
28:15,18;50:14;
57:17
**reading (1)**
5:4
**really (21)**
7:21;26:24;34:23;
37:13;38:13,20,22;
45:17;47:2;49:12;
50:10;53:6;54:16;
56:9;59:7;62:11;
67:10;68:13;69:2;
73:12;74:11
**reason (10)**
6:22,25;36:18;
46:19;47:18;52:25;
53:5,14,25;81:11
**recall (12)**

17:19;29:16;43:2;
46:6;47:5,24;49:6,
10;50:6,9,11,24
**receive (4)**
48:5,13;81:2,7
**received (6)**
41:18;48:9,11;
50:21;79:6;80:4
**recently (3)**
72:3;81:9,10
**recognize (2)**
41:13;60:24
**recollection (1)**
57:6
**record (8)**
4:25;5:11,16,20;
6:10;19:7;70:4,8
**referring (1)**
53:3;58:3
**register (8)**
66:20;67:2,5,12,
15,19;68:14;69:2
**registered (1)**
68:6,7,9,11
**registrations (1)**
67:20
**regular (1)**
25:7
**Related (2)**
29:18;63:7
**relevant (2)**
80:22;81:25
**remember (22)**
16:23;18:1,23;
27:7;29:9;35:1;
37:21,23,25;40:22;
43:1,1;45:4;46:13,
14;47:7,9;56:12;
57:1,16;61:19;79:9
**repeat (1)**
28:12
**reply (1)**
40:14
**reporter (2)**
4:13;6:9
**Reporters (1)**
4:5
**represented (1)**
7:6
**reputation (6)**
53:1,20,21,22,23;
54:2
**request (1)**
40:4
**requests (1)**
16:1
**required (1)**
21:24
**researched (1)**
34:16
**residence (2)**
5:24;58:25
**resolved (1)**

76:14
**response (3)**
15:20;79:12;82:1
**Responsive (1)**
16:1
**rest (1)**
46:5
**result (1)**
7:16
**retail (9)**
8:14,16;32:5,10,
12,14,17,19,20
**retailer (3)**
9:4;32:12,21
**retailers (1)**
32:18
**retract (1)**
63:14
**retracted (3)**
63:12;64:7,19
**review (2)**
7:24,24
**right (26)**
9:16;10:12;12:10;
13:14;30:13,15,18;
32:24,25;33:2,17;
36:3;40:6,10;42:24;
53:2;56:14;57:24;
59:9;60:22;61:3;
63:19;71:23;75:5;
76:6;81:4
**rob (1)**
68:12
**Rolls (2)**
69:22,24
**row (5)**
52:10;57:25;58:9;
60:21;64:1
**Royce (2)**
69:22,24
**rumor (1)**
66:4
**running (1)**
25:17

## S

**Sabbath (2)**
72:6,6
**Sade (2)**
58:6,6
**sale (2)**
30:17,18
**salesman (1)**
10:1
**same (18)**
5:5;10:7;14:18;
16:14;23:1;29:6;
37:12;38:6;55:17;
58:17;59:23;60:1,
14;62:18;64:8,12;
73:3;74:18
**samples (1)**

30:10
**Saturday (3)**
30:4;71:2,9
**saw (16)**
39:9,11;41:4,14;
45:3;47:23;48:7,7;
60:11;70:25;73:25;
75:1;77:1;78:7;81:6,
7
**saying (3)**
16:25;62:24;67:19
**Schneerson (14)**
19:6;28:6,20;
38:10,16;72:14,22;
73:17,20,24;74:16;
76:23;82:6,12
**school (2)**
70:12,14
**second (4)**
33:5,6;46:24;
52:10
**Seeing (1)**
19:23
**seems (1)**
66:17
**seized (3)**
55:25;62:18;63:17
**seizure (23)**
53:1,6;55:18,19,
22;56:25;61:10,14,
14,20,21;62:5,9,15;
63:6,12;64:7,13,18,
25;65:8,9,11
**sell (11)**
9:16;10:20,23;
19:23;32:7,15;
35:20;46:12;47:16;
56:10;78:20
**seller (1)**
46:23
**sellers (1)**
47:6
**selling (4)**
17:16;45:9;47:10;
66:10
**send (7)**
39:11;46:14,15;
49:24,24;79:14,16
**sending (1)**
46:6
**sense (2)**
33:10;69:25
**sent (4)**
8:1;39:18;50:17,
25
**settled (1)**
78:1
**seven (4)**
16:17,18,19;17:1
**Seventh (1)**
24:3
**several (1)**
26:15

**S-H (1)**
19:8
**shake (1)**
6:14
**shelf (1)**
25:10
**shirts (2)**
34:14;41:21
**S-H-N-E-O-R-S-O-N (1)**
19:10
**shoes (1)**
8:12
**short (2)**
70:2,5
**show (5)**
19:16;42:25;49:8;
50:14;51:22
**showed (3)**
19:17;43:2;51:20
**shut (1)**
77:23
**side (1)**
12:14
**Sidney (27)**
22:6;23:23;24:12,
15;27:8,12,14;31:6;
32:23;33:14,22;34:4,
5,7,13,14,16;43:5,6;
44:4;45:14;46:7,9;
47:6;57:22;60:4,8
**Sidney's (1)**
23:24
**similar (4)**
54:13,14;66:20;
79:7
**sit (1)**
40:20
**site (1)**
10:17
**six (3)**
16:19;17:1,2
**skip (1)**
51:25
**skirt (1)**
13:10
**slow (1)**
47:18
**small (7)**
10:23,24;12:5;
24:19;32:15;47:7;
57:12
**smallest (1)**
9:4
**somebody (28)**
12:23,24;13:8,12;
20:24;23:13,16,19;
25:15;30:8;31:18;
33:9;34:25;43:11;
45:19;46:14;49:20;
54:8,16,19;55:22;
56:4;57:13;60:10;
68:13,17;76:20;77:6
**somebody's (2)**

54:7,12
**someone (1)**
39:5
**sometime (1)**
81:19
**Sometimes (3)**
10:21;30:13;81:15
**somewhere (2)**
49:9;63:24
**soon (8)**
13:7,8;17:11;47:8;
60:3,6;64:8;72:13
**sorry (2)**
52:17;59:5
**Sort (1)**
11:15
**sought (1)**
66:20
**sounds (1)**
49:19
**source (3)**
36:4;56:24;57:3
**speak (2)**
8:4;72:2
**specialty (1)**
8:11
**specific (3)**
37:3;66:3;68:25
**specifically (1)**
17:19
**speculation (2)**
57:8;61:24
**spell (5)**
5:15;19:7;22:14;
23:24;58:9
**spelled (1)**
52:16
**spelling (3)**
14:7,19;19:9
**spoke (13)**
26:10,13;46:25;
51:7;59:12;60:7;
71:4,25;72:13;75:9,
9,10,13
**spoken (1)**
82:10
**SS (1)**
39:5
**start (3)**
20:11;49:22;56:6
**started (1)**
6:3
**starts (1)**
14:24
**state (3)**
5:6,15,19
**stay (3)**
54:20;55:5;66:8
**staying (1)**
33:14
**Stein (1)**
39:6
**step (7)**

18:17;30:17;
33:22,24,25;47:16,
19
**sticker (1)**
56:8
**still (6)**
36:19;39:15,21;
64:4;74:19;80:25
**stolen (3)**
45:19;55:7,10
**stopped (1)**
78:3
**store (9)**
8:14;12:1;19:20;
22:20;25:3,9;32:16,
19;42:12
**stores (13)**
10:23;11:24,25;
12:1,2,2,3;22:11;
24:21,21,22,24;
25:19
**story (2)**
77:24;78:2
**Street (2)**
58:24;73:6
**strike (3)**
43:6;46:6;63:10
**stuff (2)**
36:3;71:20
**subject (2)**
54:10,22
**subpoena (24)**
7:16;8:1;13:20;
14:2;15:4,12;16:2;
21:23;22:2;48:1,20,
21;50:13;51:2,5,8,
24;52:6;72:13;
79:12;80:4;81:3,4;
82:1
**sue (1)**
54:19
**sued (1)**
45:19
**suggest (1)**
82:6
**suing (8)**
23:4,13,16;25:16;
54:7,8,12,16
**suit (1)**
25:15
**Summer (1)**
17:22
**supermarkets (1)**
12:4
**supervisor (1)**
22:21
**supplier (2)**
33:12;45:5
**suppliers (1)**
30:23
**supply (1)**
11:16
**Supposed (4)**

17:8,10;33:19;
78:15
**sure (5)**
21:3;23:5;27:22;
44:11;63:19
**swear (1)**
4:13
**synagogue (10)**
16:14,22;18:22;
30:5;37:18;60:15,
16;71:11;73:3,4

**T**

**talk (10)**
6:2;18:23;24:13;
35:21;42:20;71:6,8,
18;73:23;74:23
**talked (2)**
20:23;71:12
**talking (9)**
35:5;37:15,17,19;
38:3,7,15;53:13;
63:25
**telling (3)**
25:16;69:3;77:24
**tells (1)**
43:11
**ten (4)**
24:10,10,12;81:8
**term (1)**
35:17
**testified (3)**
4:22;79:5;80:3
**Testify (6)**
13:21;14:2;15:4;
33:5;72:16;80:10
**testimony (5)**
6:23;7:1,4;39:8;
75:25
**thinking (1)**
71:22
**Third (1)**
4:5
**thought (4)**
23:8;51:3;65:4;
81:5
**thousand (3)**
30:5;35:19;72:9
**three (7)**
15:9;17:1;39:25;
48:6;72:23;74:1;
81:18
**times (3)**
44:24,25;75:15
**today (10)**
4:4,7;5:8;6:23;7:1,
3,7,15;15:6;21:23
**Today's (5)**
4:1;9:6;19:7;20:
82:19
**together (1)**
81:17

**told (25)**
21:10;23:3,23;
25:4;30:8;31:6,18,
19;32:11,23;36:9;
42:4;43:8;47:2,5;
51:5,8;60:11;63:16,
20;64:15,18;75:11;
76:20,22
**took (9)**
23:19,20;35:20;
56:4;61:11;62:5,9;
64:13;72:18
**top (1)**
72:9
**total (1)**
75:15
**touch (13)**
20:18;21:16;23:5;
27:11;32:7;33:23;
34:11,12;43:9,21;
46:2,3,20
**touching (2)**
43:12;46:19
**Trademark (5)**
37:9;38:12;66:1,
16;68:18
**trademarks (1)**
66:20
**train (1)**
13:8
**transcript (3)**
5:4;6:13,19
**transfer (1)**
35:3
**tremendous (1)**
20:15
**trial (1)**
82:4
**tried (9)**
63:17;67:1,5,11,
15,20;69:4,14,21
**tri-state (2)**
9:2,10
**truthful (2)**
6:23;7:1
**try (1)**
68:12
**trying (7)**
27:1;32:22;36:12,
13;45:16;50:20;
55:12
**T-shirt (5)**
13:3,15;17:16;
35:9;47:12
**T-shirts (27)**
17:11,14,15;20:5,
7,9,13;22:23;24:18;
25:11;33:20;34:9;
35:8,12;39:17;42:5,
9,15,16,17;47:10;
56:9;59:20,21,22,23;
75:22
**turn (2)**

13:10;14:20
**Turning (4)**
29:5;40:2;52:8;
60:20
**twice (1)**
45:3
**two (23)**
16:25;28:1,4;
34:10;37:15,18,21;
38:3;39:25;46:10,
17;48:6,8;71:6;
72:23,24;74:1;75:2;
76:25;77:3;78:7,9;
81:18
**type (1)**
19:18
**Tzanani (1)**
60:22
**T-Z-A-N-A-N-I (1)**
60:22

**U**

**under (3)**
6:16;21:23;22:2
**underlined (1)**
14:11
**Union (4)**
58:24;59:4,6,8
**units (3)**
34:3,5,8
**unless (1)**
21:24
**up (7)**
19:24;21:6;22:22;
35:11;49:8;50:14;
67:7
**upon (1)**
62:22
**upset (1)**
36:8
**use (2)**
32:1;49:22
**used (7)**
11:4,5,6;12:22;
20:12,13;73:21
**usually (1)**
30:10

**V**

**versus (1)**
4:8
**VIDEOGRAPHER (6)**
4:1,4;70:3,7;
82:16,18
**Videotaped (1)**
82:21
**view (1)**
65:13

**W**

MONSTER ENERGY COMPANY v.
CONSOLIDATED DISTRIBUTORS, INC.

MENACHEM OHANA
August 17, 2012

**wait (2)**
6:11;31:11
**waive (1)**
5:4
**Waknin (1)**
61:3
**walk (1)**
9:5
**wants (1)**
77:13
**warehouse (4)**
9:13;10:6;44:17,
18
**way (10)**
6:12;21:10;24:8,8;
25:1;45:13,13;62:4;
69:10;81:16
**web (1)**
10:17
**week (5)**
18:21;40:20;60:8;
78:8;81:7
**weeks (7)**
38:7;39:25,25;
48:6,6,8;78:8
**weren't (2)**
75:7,16
**what's (2)**
42:12,13
**whenever (2)**
9:15;77:25
**Whereupon (2)**
13:19;70:5
**whole (3)**
69:9;77:24;78:2
**wholesale (5)**
8:8,15;11:17;32:9,
12
**wholesaler (7)**
9:3;10:24;11:23;
21:4;32:5,9;55:3
**wholesalers (4)**
9:9;12:5;18:10;
20:14
**Who's (2)**
28:8,22
**Whose (3)**
28:10,24;64:3
**willing (1)**
25:9
**willingness (1)**
65:17
**Within (1)**
29:14
**witness (12)**
4:13;5:5;18:6;
28:13;29:1;62:21;
63:1;72:11;77:14;
79:22;82:15,20
**witness's (1)**
4:9
**word (1)**
57:19

**words (1)**
6:14
**work (13)**
8:6,7;9:23;12:11,
12,14,21;25:1;26:17,
19;27:12;64:9;65:17
**worked (1)**
17:3
**works (1)**
22:20
**worry (1)**
64:13
**written (1)**
6:10
**wrong (11)**
21:12;32:23;33:1,
13,23;36:16;43:9;
47:3;55:9,14;67:23
**wrongful (4)**
52:25;53:5;55:17,
19

**Y**

**Yard (1)**
44:20
**year (12)**
17:18,20,21;18:1,
1;26:14;29:13,14;
44:25;49:23;60:7;
75:4
**years (17)**
8:10,22;12:22,25;
16:16,18,20,22;
24:10,10,12;26:16;
34:24;45:1,12;
49:22;60:19
**Yeshiva (2)**
70:13,14
**Yesterday's (1)**
4:25
**York (3)**
4:6,6,6;5:22
**Yosef (1)**
29:21

**1**

**1 (7)**
14:20,22,24;40:7;
41:9,13;79:7
**10 (4)**
13:18,19,25;18:2
**10,000 (7)**
20:5,12;34:1,3,5,8,
13
**10:06 (1)**
4:2
**100 (1)**
44:6
**11:27 (1)**
70:4
**11:43 (1)**

70:8
**11:57 (2)**
82:19,22
**11213 (1)**
5:22
**12 (2)**
45:1,13
**13 (2)**
18:1;34:24
**15 (1)**
45:1
**1553 (1)**
58:24
**17 (1)**
4:2
**190 (1)**
11:21

**2**

**2 (5)**
15:10;16:5;29:5,7;
70:9
**20 (3)**
8:10,21;60:19
**200 (1)**
11:21
**2000 (1)**
13:9
**2011 (2)**
17:22;61:11
**2012 (1)**
4:2
**23557 (1)**
41:3

**3**

**3 (1)**
41:2
**383 (1)**
10:14

**4**

**431 (1)**
5:21

**5**

**5 (1)**
40:2
**50 (3)**
24:24,24;33:11

**6**

**6 (3)**
52:8;57:22;64:1

**7**

**7 (1)**

61:11
**70 (1)**
74:14
**75 (1)**
33:19
**750 (1)**
4:5
**770 (1)**
70:17

**9**

**9 (5)**
47:21;48:9,23;
52:8;76:18
**917-335-2668 (1)**
52:22
**95 (2)**
35:24;36:1