## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

MONSTER ENERGY COMPANY, f/k/a
HANSEN BEVERAGE COMPANY, d/b/a          Case No. 6:11-CV-329-ORL-22DAB
MONSTER BEVERAGE COMPANY,

               Plaintiff,

vs.

CONSOLIDATED DISTRIBUTORS, INC.,
METTEMP, INC., and DAVID BAKSHT
(a/k/a David Lipsker a/k/a David Bakshet
a/k/a D Bakht a/k/a DM Schneerson a/k/a
Abraham Shneorson),

               Defendants.

_____/

### PLAINTIFF'S OPPOSITION TO DEFENDANT CONSOLIDATED DISTRIBUTORS, INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT

CDI's motion is extraordinary. CDI seeks *summary judgment* that MEC acted in ***bad faith*** in obtaining the seizure order against Joe Cool. CDI cites no case in which any court has affirmatively found bad faith on summary judgment, and MEC has been unable to find any such case. Equally extraordinary, CDI seeks summary judgment of no likelihood of confusion in the face of an unrebutted survey showing that 58% of consumers believed that Defendants' 3DL merchandise comes from MEC. This is an astonishingly high rate of confusion, far higher, for example, than the 15% rate of confusion found to "indicate a high possibility of confusion" in *Exxon Corp. v. Texas Motor Exch.*, 628 F.2d 500, 507 (5th Cir. 1980). For the reasons discussed below, the Court should deny CDI's motion in its entirety. If any summary judgment were appropriate regarding likelihood of confusion, it would be summary judgment in favor of MEC.

## I. **THE 3DL PRODUCTS CAUSE CONFUSION AS A MATTER OF LAW**

CDI asks the Court to dismiss Counts 1, 3, 5-7 and 9 of MEC's Second Amended Complaint (D.I. 130) because CDI argues that the 3DL design is not confusingly similar to MEC's M Claw Trademark. The undisputed facts demonstrate that the Court should find the opposite, that Defendants' 3DL goods are likely to cause confusion with MEC's M Claw Trademark goods as a matter of law. Indeed, the evidence shows that actual consumer confusion is rampant, and this is the strongest possible evidence that confusion is likely. Moreover, when asked in an interrogatory to identify all evidence supporting its contention that there is no likelihood of confusion, CDI responded with ***no evidence***. D.I. 177, Ex. 28 at 11 (Response to Interrogatory No. 7); *see also* D.I. 177, Ex. 29 at 11. CDI stated only that the evidence was in the hands of its expert, *id.*, but CDI has no expert on likelihood of confusion. Accordingly, this Court should not only deny CDI's motion, but grant summary judgment that the 3DL design is likely to cause confusion. *See Cool Fuel, Inc. v. Connett*, 685 F.2d 309, 311 (9th Cir. 1982) (a court may *sua sponte* grant summary judgment to the *non-moving* party where the moving party cannot prove its case on the undisputed facts).

The Court considers seven factors in assessing whether consumer confusion is likely: (1) the type of the mark, that is, whether the mark is strong or weak; (2) the similarities between the parties' marks; (3) the similarities of the parties' products sold under the marks; (4) the similarities of the parties' retail outlets and customers; (5) similarities in advertising media; (6) the Defendants' intent; and (7) actual confusion. *Frehling Enters. v. Int'l Select Group, Inc.*, 192 F.3d 1330, 1335 (11th Cir. 1999). "The court need not address all of the factors, nor must the claimant establish that each weighs in [its] favor in order to establish a likelihood of confusion." *Glow Indus. v. Lopez*, 273 F. Supp. 2d 1095, 1116-17 (C.D. Cal. 2003); *see also Brookfield Commc'ns., Inc. v. West*

*Coast Entm't. Corp.*, 174 F.3d 1036, 1054 (9th Cir. 1999). Significantly, this standard is easier to satisfy than the standard for counterfeiting that was at issue on MEC's motion for a seizure order. *See* 4 J.T. McCarthy, *McCarthy on Trademarks & Unfair Competition* §§ 25:10, 25:15 (4th ed. 2012). Moreover, since CDI seeks summary judgment on all of MEC's trademark infringement and unfair competition claims, the Court should consider all of MEC's trademark rights and claims. These include: (a) MEC's numerous federal registrations, all of which claim use since 2002, namely MEC's federal registrations for  ("M Claw Trademark"), including incontestable U.S. Reg. No. 2,903,214 for beverages and No. 4,051,650 for clothing, which issued in November 2011; and registrations for the  mark, the predominant feature of which is the M Claw Trademark, for clothing, beverages, and other goods; and (b) MEC's common law trademark rights in the M Claw Trademark; and (c) MEC's common law and statutory unfair competition claims, which are based in part on passing off. Applying the likelihood of confusion factors in light of MEC broad range of rights and claims shows there is no genuine dispute that Defendants' 3DL design is likely to cause consumer confusion.

### 1.    Actual Confusion Is Rampant

MEC will address actual confusion first because of its importance. As this Court has instructed, "while very little proof of actual confusion is necessary to establish a likelihood of confusion, once a plaintiff identifies evidence of actual confusion, an almost overwhelming amount of proof is necessary to refute such evidence." *Ford Motor Co. v. O.E. Wheel Distributors, LLC*, Case No. 8:09-cv-2137-T-30TBM, __ F. Supp. 2d __, 2012 WL 1231877, *6 (M.D. Fla. April 12,

2012) (quotations omitted).  Proof of actual confusion commonly takes the form of a consumer survey.  *See, e.g., Fiji Water Co. v. Fiji Mineral Water USA*, 741 F. Supp. 2d 1165, 1179 (C.D. Cal. 2010) (relying on survey evidence to demonstrates actual confusion).  Here, MEC has powerful evidence of actual confusion, both in the form of a survey and in the form of other evidence that was not even addressed by CDI.

First and foremost, MEC commissioned a survey, conducted by nationally-renowned survey expert Philip Johnson, to explore the extent to which prospective purchasers of 3DL shirts sold by Defendants would believe that the shirts came from MEC.  D.I. 178, Ex. 70 ¶ 4.  The survey confirmed that confusion was highly likely.  Indeed, the survey showed that a solid *majority* of consumers — 58% — mistakenly believed Defendants' 3DL merchandise was made by MEC. *Id.* ¶ 48.  This evidence of confusion is simply overwhelming.  Mr. Johnson commented that "in [his] experience the level of source confusion found for the 3DL design is remarkably high.  Such a level is not only rare but is generally found only for very famous marks." *Id.* ¶ 53.

This rate substantially exceeds those previously found to support a conclusion that consumer confusion is likely.  *See, e.g.*, *Exxon*, 628 F.2d at 507 (15% confusion rate showed "a high possibility of confusion"); *Fiji Water,* 741 F. Supp. 2d at 1179 (24.3% confusion rate provided "solid support" for finding of likelihood of confusion); *RJR Foods, Inc. v. White Rock Corp.*, 603 F.2d 1058, 1061 (2d Cir. 1979) (15-20% confusion rate); *E. & J. Gallo Winery v. Pasatiempos Gallo, S.A.*, 905 F. Supp. 1403, 1409, 1413 (E.D. Cal. 1994) (18-20% confusion rate).  CDI has offered no evidence criticizing or rebutting MEC's extraordinary survey results.

CDI nonetheless makes attorney argument criticizing the MEC survey because it did not test the purported "skinny 3DL" design.  D.I. 170 at 22.  This criticism is unfounded.  The t-shirts

in the MEC survey included a "skinny 3DL" in the way it is used by Defendants, as an additional ornamental element.  For example, a "skinny" design appears on the front of one of the t-shirts to the left of the large 3DL design.  *See id.* (right most t-shirt); D.I. 178, Ex. 70 at 10 (of 75).  A "skinny" design also appears alone on the back of some of the t-shirts.  D.I. 178, Ex. 70 at 62, 63 (of 75).  More importantly, MEC's survey was testing confusion arising from the actual accused 3DL design as sold by CDI, not any theoretical shirt having only the "skinny" design.  MEC is unaware of any shirt that was ever marketed having only the "skinny" design, and CDI offers no reason why MEC should be required to test confusion arising from such a hypothetical shirt.[1]

CDI offers further attorney argument that the survey is flawed because it was conducted at shopping malls among consumers of t-shirts bearing a logo, rather than being limited to the narrow universe of "beachgoers who shop in inexpensive beach shops."  D.I. 170 at 23.  However, the cases cited by CDI do not even involve surveys and do not suggest there was any flaw in the universe of consumers selected by MEC's expert.  Indeed, the law is to the contrary.  Courts routinely caution against consumer surveys that employ too narrow a universe of consumers.[2]  Moreover, there is no evidence that beachgoers never visit malls, or mall shoppers avoid the beach.

In addition to survey evidence, MEC has other evidence of actual confusion.  For example,

---

[1] CDI refers to the "skinny" design as a 1993 design.  D.I. 170 at 3.  However, there is no documentary evidence that the "skinny" design existed prior to 2010.  The 'Figure 3' image of the skinny design in CDI's brief is without citation (D.I. 170 at 3) and appears to come from CDI's State of New Jersey Wildwood Trademark, dated September 29, 2010.  *See* Ex. 96.  The 'Figure 5' image of a t-shirt with both the 3DL and a different skinny design in CDI's brief, dates no earlier than 2010, and is purportedly a Joe Cool quality control shirt.  D.I. 177, Ex. 30 at 133:10-134:18.

[2] *See Brooks Shoe Mfg. Co. v. Suave Shoe Corp.*, 716 F.2d 854, 860-61, n.16 (11th Cir. 1983) (plaintiff's survey universe of serious runners was too narrow and of only limited value, while defendant's broader survey universe of individuals who had purchased athletic-type shoes was much more appropriate); *Scott Fetzer Co. v. House of Vacuums, Inc.*, 381 F.3d 477, 487-88 & n.6 (5th Cir. 2004) (survey of little value because limited to owners of Kirby vacuums).

Carie Sadler, a former Joe Cool employee, testified that 10% of Joe Cool's customers asked for 3DL merchandise by the **_Monster_** name.  D.I. 177, Ex. 32 at 31:11-21.  Consistently, when MEC's investigator asked a Joe Cool sales person for "Monster" merchandise, the sales person responded by providing "a pile" of 3DL shirts.  D.I. 16 ¶ 6.  The sales person also responded affirmatively when asked if Joe Cool "had any other selections with the 'Monster logo.'"  *Id.*  Thus, Joe Cool was passing off its 3DL products as MEC products, which necessarily creates actual confusion.

Moreover, MEC has discovered two separate instances in which Defendants' 3DL t-shirts have been offered for sale on eBay.  In each instance, the sellers identified the shirt as a genuine Monster Energy shirt.  *See* Exs. 91, 92.[3]  Thus, even the sellers of the merchandise were confused as to its source.  In addition, Menachem Goldman, who is listed in CDI's initial disclosures, testified that he first saw the 3DL design on a "big can" in a gas station in Brooklyn.  D.I. 178, Ex. 76 at 28:23-29:25.  This is an obvious reference by Mr. Goldman to a display for Monster Energy products.  Thus, CDI's own witness was a victim of actual confusion.

### 2.      MEC's M Claw Trademark Is Strong

MEC's M Claw Trademark is inherently distinctive.  It is an arbitrary mark that in no way suggests the nature of MEC's products.  As an inherently distinctive mark, MEC's M Claw Trademark is strong.  *See Frehling,* 192 F.3d at 1335-36.  MEC has strengthened the M Claw Trademark through a massive promotional campaign ($1.68 billion in marketing) resulting in enormous commercial success for MONSTER ENERGY® drinks (over $14 billion in total retail sales in the U.S.).  *See John H. Harland Co. v. Clarke Checks, Inc.*, 711 F.2d 966, 974-75 n.13 (11th Cir. 1983) (a mark may acquire strength through "promotional efforts"); *Homes & Land*

*Affiliates, LLC v. Homes & Loans Magazine, LLC*, 598 F. Supp. 2d 1248, 1260 (M.D. Fla. 2009) ("Plaintiff's promotional efforts have strengthened its otherwise weak marks"); D.I. 175 ¶¶ 8-9, 12. As a result of this commercial success, the M Claw has become nearly ubiquitous.  In fact, MEC is now among the top ten most liked companies on Facebook.  D.I. 175 ¶ 10.

The strength of the M Claw Trademark is further confirmed by unrebutted consumer survey evidence by Dr. Gerald Ford, which establishes that two out of three consumers shown a t-shirt with only the M Claw Trademark on it will associate the shirt with MEC.  D.I. 177, Ex. 2 ¶ 6.  Dr. Ford explained that this is a significantly high level of secondary meaning, and that the survey clearly supports a finding that the M Claw Trademark is strong.  *Id.* ¶¶ 6-7.

CDI argues that the M Claw Trademark is weak because it alleges that "many third-parties" use similar marks.  D.I. 170 at 16.  In support, CDI cites to various claw trademark registrations, none of which it produced during discovery.[4]  *Id.*  Most of these designs, however, bear no resemblance to the M Claw or the 3DL design:



*See* D.I. 170-1 at 1-33.  Moreover, many of them are for very different goods, like chemical

---

[3] Unless otherwise noted, all exhibits herein are attached to the declaration of Paul A. Stewart, filed concurrently herewith.

[4] CDI also relies upon various non-trademark uses of type fonts, book covers, movie posters, and the like.  D.I. 170 at 16-17.  CDI offers no evidence that these various fonts and other items were actually used by anyone **as trademarks.**  *See* 1 J.T. McCarthy, *McCarthy on Trademarks and Unfair Competition* § 3:3 (4th ed. 2012).  That is, CDI offers no evidence that these items were used in any way to identify the source of a product.  *Id.*  Accordingly, these non-trademark uses have absolutely no relevance to the strength of MEC's M Claw as a trademark and should be stricken.

reagents.  *Id.* at 15.  Many have even been abandoned.  *Id.* at 8-10, 12, 15, 19, 22, 23, 25-28, 31.

For these reasons, MEC has no dispute with these third party uses.[5]  Dissimilar marks plainly

cannot weaken MEC's trademark rights, especially when used on dissimilar goods.

### 3.       The Marks Are Very Similar

As is apparent from the images of the parties' t-shirts shown below, the parties' marks are

so similar that consumer confusion is inevitable.  Not only are the shapes of the marks extremely

similar, the color schemes are nearly the same.  Both include a yellowish green on one side of each

"leg" of the "M" shape, blending into a darker green on the other side.





MEC'S M Claw T-Shirt                                Defendants' Infringing 3DL T-Shirt

In addition, in a non-final Office Action, the Patent and Trademark Office refused CDI's trademark

application for the 3DL design because it found the 3DL design to be "nearly identical" to MEC's

M Claw Trademark, and "confusion as to source is likely."  Ex. 93 at MEC0013345-46.

Moreover, unrebutted survey evidence establishes the similarity of the designs.  Again,

---

[5] MEC briefly had a dispute with the owner of the mark shown on Page 12 of D.I. 170-1.  That mark
included an M in the shape of a claw and was for use with "energy chews and energy mints," products closely
associated with energy drinks.  As indicated in the status report submitted by CDI, the application to register
this mark has been abandoned.  *Id.*  Accordingly, MEC no longer has a dispute with this party.

MEC's expert found that 58% of those shown a shirt bearing the 3DL design identified that shirt as coming from MEC, and only one percent identified the shirt as coming from Joe Cool or CDI. D.I. 178, Ex. 70 ¶¶ 48, 33.

CDI also argues that because Mr. Sacks described the 3DL design as a "bad replica" and identified subtle differences between the 3DL design and the M Claw Trademark that this somehow supports a finding that the designs are not similar.  D.I. 170 at 17-18.  Mr. Sacks, however, testified that CDI's bad replica is very similar to the M Claw Trademark.[6]  Mr. Sacks' acknowledgement of trivial differences between the 3DL design and the M Claw is hardly an admission that they are dissimilar.  Moreover, as a matter of law, a bad replica is just as infringing as a good replica as long as confusion is likely.  4 J.T. McCarthy, *McCarthy on Trademarks & Unfair Competition* § 23:20 (4th ed. 2012).

CDI also argues that the use of the 3DL design along with other decorative elements somehow prevents a finding of similarity.  However, CDI cites no authority suggesting that decorative adornments can reduce the likelihood of confusion between two similar trademarks, and, in any event, MEC often uses decorative adornments with its M Claw Trademark.  *See* D.I. 5 ¶ 6.  Moreover, there is no evidence in the form of a survey or otherwise that the use of such decorative elements diminishes confusion in this case.  This is not surprising since CDI's 3DL design is clearly the predominant element on its shirts and MEC uses and has federal registrations

---

[6] *See* D.I. 177, Ex. 27 at 79:19-24 ("In other words, what I'm saying, it's the base design has been, has been stolen.  And that's been taken and tried to be redesigned on something that looks as close to the uninformed, quick viewer as the original, but at the same time has got little points of difference."); 80:9-11 ("But when you look at the overall impression, you still get the impression that that is a copy of our mark, to any average reader."); 67:22-68:2 ("But again, it was the same thing.  And so for the uninformed person they don't get the little finety that the claw -- that little twist gets turned the other way around.  But really, the whole image and the whole purpose of that particular claw was to basically copy our claw.").

and common law rights to the M Claw Trademark alone, and also uses and has federal registrations



and common law rights to the ⟨MONSTER⟩ mark, which has the M Claw Trademark as its predominant element.

### 4.   **Defendants' Intent In Selecting Its 3DL Design**

"The law has long been established that if an infringer adopts his designation with the intent of deriving benefit from the reputation of the trade-mark or trade name [of another], its intent may be sufficient to justify the inference that there are confusing similarities." *Brookfield*, 174 F.3d at 1059 (quotations and citations omitted); *CytoSport, Inc. v. Vital Pharms., Inc.*, 617 F. Supp. 2d 1051, 1072 (E.D. Cal. 2009) ("An intent to copy is strong evidence of likelihood of confusion").

A reasonable jury easily could find that Defendants intended to exploit MEC's M Claw Trademark through use of the 3DL design.  Defendants' 3DL design is very similar to MEC's M Claw Trademark, including employing a similar green and yellow color scheme that varies from left to right.  The uncontested evidence shows that the 3DL design was developed in 2010 after the M Claw Trademark was nearly ubiquitous.  D.I. 177, Ex. 30 at 65:4-13, 69:1-22, 98:16-99:17; D.I. 177, Ex. 31 at 13:10-15:1, 24:6-9; D.I. 177, Ex. 32 at 19:6-20:23, 22:15-23:5; D.I. 177, Ex. 9 at 39:19-40:4; D.I. 170 at 3.  Defendants were well aware of the M Claw Trademark before they adopted the 3DL design.  Yosef Amar even expressed concern to CDI that the 3DL design was similar to MEC's M Claw Trademark.   D.I. 177, Ex. 9 at 65:12-66:23.   CDI's principal, David Baksht, dismissed Mr. Amar's concern and moved forward with exploiting the 3DL design. *Id.* at 65:12-67:24.  Mr. Baksht considers himself to be an expert in trademark law.  D.I. 177,

Ex. 10 at 33:1-3.  Accordingly, a reasonable jury could find that he sought to exploit the 3DL

design knowing that it would derive a benefit from MEC's M Claw Trademark.

Defendants also increase the likelihood of confusion by using hang tags with a miniature

3DL design labeled "TM" adjacent to the designation "OFFICIAL LICENSED PRODUCT."  This

labeling strongly implies that Defendants' 3DL shirts are licensed by MEC.  *See* D.I. 178, Ex. 71.

Defendants further increase confusion by using the phrase "let out your beast" on some of their

3DL t-shirts (*see* Ex. 94), which is similar to MEC's federally registered well-known trademark

"UNLEASH THE BEAST!" (*see* Ex. 95).  Accordingly, Defendants have taken proactive steps to

confuse consumers and trade off of MEC's enormous goodwill in its M Claw Trademark.

### 5.     Relatedness Of The Goods

There can be no dispute that Defendants sell the same goods, t-shirts and other clothing

products that MEC and its licensees sell.  CDI argues that because it purports to sell cheap low

quality t-shirts, that somehow negates a finding of relatedness.  Such an argument is frivolous.  *See*

*Drexel Ent., Inc. v. Hermitage Cabinet Shop, Inc.*, 266 F. Supp. 532, 538-39 (N.D. Ga. 1967).

### 6.     Similarity Of Trade Channels

MEC's beverage products are ubiquitously sold through nearly every retail channel for

beverages.  D.I. 175 ¶ 7.  MEC's clothing products are distributed directly through MEC's websites

and through retail channels, and MEC sponsors sporting events, including AMA Supercross

motorcycle racing events.  *Id.* at ¶¶ 4-5, 9.  Defendants have sold 3DL t-shirts over the internet, at

beach shops, and at motorcycle events.  *See, e.g.*, D.I. 4 ¶¶ 7-9.  Finally, the Joe Cool Defendants

have already conceded that their sales methods were similar to those of MEC.  *See* D.I. 32 at 11.

Thus, this factor favors a likelihood of confusion.

### 7.      <u>Similarity Of Advertising</u>

CDI argues that its failure to advertise somehow weighs against confusion.  D.I. 170 at 21.

CDI cites no authority for this proposition, and MEC is unaware of any.  More importantly, CDI's

licensee, Joe Cool, did advertise, including promoting 3DL t-shirts online, and in the context of

motorcycle events, including the 2011 Daytona Beach Bike Week.  MEC also promotes its

products online and at motorcycle events, including as a sponsor of AMA Supercross motorcycle

racing events.  D.I. 175 ¶ 9.  Finally, the Joe Cool Defendants have already conceded that their

advertising methods were similar to those of MEC.  *See* D.I. 32 at 11.

Because none of the factors weigh meaningfully in CDI's favor, and most of the factors,

including the most important factor, actual confusion, weigh overwhelmingly in MEC's favor,

there can be no genuine dispute that consumers are likely to be confused into believing that

Defendants' clothing products are affiliated with MEC.

## II.  <u>SUMMARY JUDGMENT OF WRONGFUL SEIZURE SHOULD BE DENIED</u>

As discussed in detail in MEC's own Motion for Summary Judgment (D.I. 173 at 22-24),

CDI lacks standing to bring a counterclaim for wrongful seizure based on the seizure that took

place at Joe Cool's place of business.  This is because any harm was either to Joe Cool, which has

settled and dismissed its wrongful seizure counterclaim with prejudice, or the alleged joint venture

between CDI and Joe Cool, which is not a party to this action.  *Id.*  For this reason alone, CDI's

motion must be denied.

Even if CDI could establish through uncontroverted evidence that it has standing to bring a

wrongful seizure claim, CDI's motion still must be denied.  To prevail on summary judgment, CDI

must establish that there is no genuine issue of fact that (1) MEC acted in bad faith in seeking the

seizure order, or (2) the goods seized are "predominantly legitimate" merchandise. *Ford Motor*, 2012 WL 1231877 at *15; *Hidalgo Corp. v. J. Kugel Designs, Inc.*, 509 F. Supp. 2d 1247, 1264 (S.D. Fla. 2007); Fed. R. Civ. P. 56(c). Because there are, at minimum, genuine issues of material fact concerning MEC's good faith, and because the seized goods were plainly not legitimate, CDI's motion should be denied.

**A.      The Court's Prior Orders Are Not Dispositive Of CDI's Wrongful Seizure Claim**

CDI argues that the Court's prior orders on MEC's motion for preliminary injunction and reconsideration thereof compel summary judgment in CDI's favor on its wrongful seizure counterclaim. *See* D.I. 40, D.I. 52. CDI, however, misunderstands both the law of the case doctrine and this Court's prior rulings.

Under the law of the case doctrine, a court generally will not revisit its prior rulings. *See Aldana v. Del Monte Fresh Produce N.A., Inc.*, 578 F.3d 1283, 1288-89 (11th Cir. 2009). Here, this Court found that MEC was not entitled to a seizure order and is not entitled to a preliminary injunction. *See* D.I. 40. MEC is not asking the Court to revisit these rulings.

CDI also relies upon subsidiary findings made by the Court in denying MEC preliminary equitable relief. However, it is well settled that findings made in connection with preliminary relief are indeed preliminary and will be freely revisited by the court when presented with a full record at trial. *See Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981); *David Vincent, Inc. v. Broward County, Fla.*, 200 F.3d 1325, 1331 n.8 (11th Cir. 2000) (findings of fact and conclusions of law by a court during preliminary injunction proceedings are not binding at a subsequent trial on the merits); *Country Floors, Inc. v. Gepner*, 930 F.2d 1056, 1061-63 (3d Cir. 1991).

Indeed, any attempt to treat this Court's earlier findings as binding at trial would violate

MEC's Seventh Amendement right to jury trial on CDI's wrongful seizure claim for damages.  It is well settled that a Court's prior findings of fact cannot be given preclusive effect to deprive a party of its right to a jury trial on a legal claim for damages.  *Burns v. Lawther*, 53 F.3d 1237, 1242 (11th Cir. 1995) (citing *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 509-12 (1959)); *Healthcare Affiliated Services v. Lippany*, 701 F. Supp. 1142, 1149 (W.D. Pa. 1988).

In addition, as CDI's own cited treatise explains, "[t]he law of the case must be followed . . . unless the evidence on a subsequent trial was substantially different . . . ."  D.I. 170 at 7 (quoting *Wright, Miller & Cooper*).  That is the situation here.  The evidence is different in myriad ways.  For instance, CDI has abandoned the argument that the 3DL design predates MEC's M Claw Trademark and now admits that the 3DL design was created in 2010, eight years after MEC began using its M Claw Trademark on clothing.  CDI has also failed to pursue the arguments Joe Cool made to the Court during briefing on MEC's preliminary injunction that Defendants were the senior users based on Myrtle Beach t-shirt designs purportedly from 1993.  *See* D.I. 32-4, at Ex. A-6.  Instead, CDI now for the first time characterizes the 3DL design as the "modified 'fat' 3DL mark," and offers a new theory, hatched near the close of discovery, that there is a separate "1993 'skinny' 3DL mark."  D.I. 170 at 12.  There was no evidence of this alleged mark at the preliminary injunction stage.  In addition, MEC has now offered unrebutted survey evidence showing a staggering 58% of respondents identified a shirt bearing the 3DL design as coming from MEC, further supporting MEC's claim that the 3DL shirts are substantially indistinguishable from MEC's M Claw Trademark, and thus counterfeit.  Finally, as discussed below, the testimony of MEC's Chairman and CEO provides affirmative evidence that MEC sought the seizure order in good faith.  Indeed, good faith was not even an issue on the seizure motion, and thus MEC had no

reason to present any evidence of good faith intent at that time.

Finally, the burden of proof is now very different than it was when MEC was seeking preliminary relief.  At that early stage of the case, MEC bore the burden of showing that equity favored preliminary relief.  D.I. 52 at 9.  Now, CDI bears the burden of proving that MEC acted in bad faith in seeking the seizure order.  *See Martin's Herend Imports, Inc. v. Diamond & Gem Trading United States Co.*, 195 F.3d 765, 774 (5th Cir. 1999).  Moreover, CDI must show that there is no genuine issue of material fact on the question of bad faith.  This Court has never held that there is no genuine issue of material fact that MEC acted in bad faith.  Rather, this Court made its findings on a preliminary record, as finder of fact.  Accordingly, the Court's prior orders on MEC's preliminary injunction are not dispositive of CDI's present wrongful seizure claim.

**B.      CDI Is Not Entitled To Summary Judgment That MEC Acted In Bad Faith**

Because it is such a highly factual issue, bad faith is rarely appropriate for adjudication on summary judgment.  *See Royal Marco Point I Condo. Ass'n v. QBE Ins. Corp.*, No. 3:07CV16, 2010 WL 2757240, *4 (M.D. Fla. July 13, 2010); *Kearney v. Auto-Owners Ins. Co.*, 664 F. Supp. 2d 1234, 1243 (M.D. Fla. 2009).  Here, CDI invites the Court to interpret the evidence, make inferences, and draw conclusions in CDI's favor and find that MEC sought the seizure order in bad faith.  This is wholly improper on summary judgment.  There is ample evidence upon which a reasonable jury could find that MEC acted in good faith in seeking the seizure order.

**1.      MEC Believed In Good Faith That The Defendants' Merchandise Was Counterfeit**

Rodney Sacks, the Chairman and Chief Executive Officer of MEC, testified that as the popularity of Monster Energy® brand grew, counterfeiting had become a significant problem for MEC.   D.I. 177, Ex. 27 at 26:11-27:5, 30:12-35:25, 41:9-42:11.   Mr. Sacks testified that he

believed that Joe Cool was one such counterfeiter and that the 3DL shirts are counterfeits. *Id.* at 68:20-69:13, 77:3-78:8.

CDI argues, without authority, that because Mr. Sacks characterized the Joe Cool t-shirts as a "bad replica" of MEC's M Claw, and some of the shirts included non-trademark decorations such as an eagle or skull, that MEC could not have had a good faith belief that the t-shirts were counterfeit. D.I. 170 at 9. However, the fact remains that Mr. Sacks testified that he believed that Joe Cool's shirts were counterfeit. D.I. 177, Ex. 27 at 68:20-69:13, 77:3-78:8. CDI cannot and does not rebut this testimony to demonstrate an absence of a genuine issue of fact as to Mr. Sacks' state of mind.

Moreover, reasonable jurors easily could find that Mr. Sacks' state of mind was consistent with the legal standard for assessing whether an infringing copy is a counterfeit. A counterfeiter cannot escape liability simply by making trivial modifications to a mark or adding ornamentation. In a Congressional joint report on trademark counterfeiting legislation, (130 Cong. Rec. H12078 (Daily Ed. Oct. 10, 1983), Congress emphasized that:

> obviously, a mark need not be absolutely identical to a genuine mark in order to be considered "counterfeit." Such an interpretation would allow counterfeiters to escape liability by modifying the registered trademarks of their honest competitors in trivial ways.

*Pepe, Ltd. v. Ocean View Factory Outlet Corp.*, 770 F. Supp. 754, 758 (D.P.R. 1991). Indeed, 15 U.S.C. § 1127 provides that a good is "counterfeit" if it is only "substantially indistinguishable" from the registered mark. Courts have confirmed a design does not have to be identical to the registered mark to be counterfeit. For example, in *Consolidated Cigar Corp. v. Monte Cristi de Tabacos*, 58 F. Supp. 2d 188, 196 & n.7 (S.D.N.Y. 1999), the defendant copied the plaintiff's cigar band but substituted the word "Habano" at the bottom of the band for "M&G." The court found

that the defendant's cigars were counterfeit because they were nearly identical to the plaintiff's mark "with only minor differences which would not be apparent to an unwary observer and which are legally insignificant."  *Id.* at 196; *see also Consolidated Cigar Corp. v. Monte Cristi de Tabacos*, No. 96 Civ. 4209, 2000 U.S. Dist. LEXIS 21017 (S.D.N.Y. Nov. 14, 2000) (reconsidering and reinstating the foregoing decision).  Mr. Sacks characterized the Joe Cool design in the same way: "And so for the uninformed person they don't get the little finety that the claw -- that little twist gets turned the other way around.  But really, the whole image and the whole purpose of that particular claw was to basically copy our claw."  D.I. 177, Ex. 27 at 67:22-68:2.

CDI cites no authority suggesting that a defendant can avoid liability as a counterfeiter merely by omitting or obscuring a portion of the registered mark.  And MEC has not been able to find any such authority.  Moreover, MEC has used the M Claw in combination with other designs:

  

*See* D.I. 5 ¶ 6.  In fact, most of MEC's licensees use the M Claw in combination with their own trademarks.  D.I. 177, Ex. 27 at 44:2-6, 44:24-45:4.

Finally, Mr. Sacks' subjective good faith belief that the 3DL design was a counterfeit is also supported by the objective evidence.  A survey commissioned by MEC found that a staggering 58% of respondents identified a shirt bearing the 3DL design as coming from MEC.  D.I. 178, Ex. 70 ¶ 48.  Moreover, the hang tag label on Joe Cool's shirts displayed the 3DL standing alone in miniature labeled "TM," and adjacent to the designation "OFFICIAL LICENSED PRODUCT."

*See* D.I. 178, Ex. 71.   This, too, provided a separate basis for MEC to believe that the 3DL merchandise was counterfeit.

### 2.   MEC Did Not Intend To Mislead This Court in Seeking a Seizure Order

CDI further suggests that MEC misrepresented the nature of Joe Cool's business and 3DL products when seeking the seizure order.  For example, CDI argues that MEC acted in bad faith in seeking the seizure order because Joe Cool had an established business address and was not a "fly by night" counterfeiter.  D.I. 170 at 11.  But CDI's argument must fail because MEC informed the Court what it believed to be true about Joe Cool's operation: "Defendants will have a large tent set up during Daytona Beach Bike Week outside of the building that houses Joe Cool, Inc.'s business offices and warehouse located at 1052 North Beach Street, Holly Hill, Florida."  D.I. 3 at 22.

Moreover, there is no requirement that the counterfeiter be "fly by night," nor is there a safe harbor that shields a counterfeiter with a business address from *ex parte* seizure.  15 U.S.C. § 1116 requires only a showing that "the person against whom seizure would be ordered, or persons acting in concert with such person, would destroy, move, hide, or otherwise make such matter inaccessible to the court."  It is undisputed that a significant number of the subject Joe Cool goods were for the 2011 Daytona Beach Bike Week, an event which lasts only a short period of time in March of 2011, and other goods were for spring break events, which again last only a few weeks.  Thus, Joe Cool's use of the 3DL design on t-shirts with a limited shelf-life helped dictate the urgent nature of the relief sought by MEC.  As Mr. Sacks testified, MEC sought the seizure order because the t-shirts were going to be sold "from a tent at a Bike Week that was to take place for a brief period of time" and that "that's where the inventory will be, and then it will be gone.  It's going to be temporary."  D.I. 177, Ex. 27 at 73:17-25.

Similarly, CDI's many arguments about the purported differences between the 3DL design and merchandise and MEC's M Claw Trademark do not in any way evidence bad faith by MEC, because MEC did not conceal the nature of Joe Cool's t-shirts when seeking the seizure order. On the contrary, MEC prominently displayed pictures of Joe Cool's t-shirts, both in MEC's brief in support of the seizure order, and in Mr. Sacks' supporting declaration. D.I. 3 at 9, 15; D.I. 5 at ¶ 49. MEC cannot be found guilty of bad faith on summary judgment under these circumstances.

Finally, MEC did not intend to deceive the Court by claiming to have a trademark registration for clothing for the M Claw alone, without the words "Monster Energy" beneath it. MEC acknowledges that its brief in support of a seizure order did not distinguish between the following two trademarks.



MEC understands and regrets that this caused the Court to believe that MEC had a trademark registration for clothing for the M Claw alone, without the words "Monster Energy." However, as explained in detail in the accompanying declaration of MEC's counsel, MEC never intended to deceive this Court. Symes Decl. ¶¶ 3-20. In the rush to file its seizure papers with this Court, MEC simply overlooked the fact that its brief did not distinguish between the two marks. *Id.* ¶¶ 17-20.

MEC understands that it was MEC's responsibility to get it right, and that MEC did not do so. However, that does not mean that MEC acted in bad faith. To the contrary, MEC acted in good faith. *Id.* Certainly, the testimony of MEC's attorney establishes that there is a triable question of fact on the issue of good faith.

**C.    The Seized Goods Were Not Legitimate**

CDI cannot satisfy the second prong of the wrongful seizure test because the seized 3DL

t-shirts were not "legitimate."  There is absolutely no evidence that the seized shirts were made by or authorized by MEC.  As described in detail above, the 3DL t-shirts are infringing goods that are likely to cause confusion with MEC's M Claw Trademark.  At the very least, there are genuine issues of fact as to whether the t-shirts are legitimate goods.

### D.   **CDI's Request For Wrongful Seizure Punitive Damages Should Be Denied**

For the reasons discussed above, there are, at minimum, genuine disputes of material fact that MEC acted in good faith in seeking the seizure order.  CDI's motion for summary judgment of punitive damages should be denied on that basis alone.   Moreover, 15 U.S.C. § 1116(d)(11) provides in part that "A person who suffers damage by reason of a wrongful seizure under this subsection . . . shall be entitled to recover such relief as ***may be appropriate***, including damages for lost profits, cost of materials, loss of good will, and punitive damages in instances where the seizure was sought in bad faith."  Under the plain language of the statute, even where a seizure is found to have been sought in bad faith, punitive damages are not compulsory.  Thus, MEC is entitled to a jury determination as to whether punitive damages are appropriate on the facts of the present case.

## III.  CONCLUSION

MEC respectfully requests that the Court deny Defendant's Motion for Partial Summary Judgment in its entirety, and enter an order finding that CDI's 3DL design is likely to cause confusion with MEC's M Claw Trademark as a matter of law.

Respectfully submitted,

Dated:   October 30, 2012          By: /s/ *Paul A. Stewart*
                                      JOHN B. SGANGA, JR. ESQ.
                                      (Admitted *Pro Hac Vice*)
                                      john.sganga@kmob.com
                                      PAUL A. STEWART, ESQ.
                                      (Admitted *Pro Hac Vice*)

paul.stewart@kmob.com
LAUREN K. KATZENELLENBOGEN, ESQ.
(Admitted *Pro Hac Vice*)
lauren.katzenellenbogen@kmob.com
KNOBBE, MARTENS, OLSON & BEAR, LLP
2040 Main Street, Fourteenth Floor
Irvine, California  92614
(949) 760-0404  Telephone
(949) 760-9502  Facsimile

Lead Trial Counsel for Plaintiff,
MONSTER ENERGY COMPANY f/k/a HANSEN
BEVERAGE COMPANY d/b/a MONSTER
BEVERAGE COMPANY

– and –

RICHARD E. MITCHELL, ESQ.
Florida Bar No.: 0168092
rick.mitchell@gray-robinson.com
GRAYROBINSON, P.A.
301 East Pine Street, Suite 1400
Orlando, Florida  32801
(407) 843-8880  Telephone
(407) 244-5690  Facsimile

Local Counsel for Plaintiff,
MONSTER ENERGY COMPANY f/k/a HANSEN
BEVERAGE COMPANY d/b/a MONSTER
BEVERAGE COMPANY

## CERTIFICATE OF SERVICE

I hereby certify that on this 30th day of October, 2012, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system.

/s/ *Paul A. Stewart*
Paul A. Stewart

14094112