UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

MONSTER ENERGY COMPANY, f/k/a
HANSEN BEVERAGE COMPANY, d/b/a          Case No. 6:11-CV-329-ORL-22DAB
MONSTER BEVERAGE COMPANY,

          Plaintiff,

vs.

CONSOLIDATED DISTRIBUTORS, INC.,
METTEMP, INC., and DAVID BAKSHT
(a/k/a David Lipsker a/k/a David Baksht
a/k/a D Bakht a/k/a DM Schneerson a/k/a
Abraham Shneorson),

          Defendants.

_____/

**PLAINTIFF'S REPLY BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY
JUDGMENT ON PRIORITY AND DEFENDANT'S COUNTERCLAIMS**

**I.   THERE IS NO GENUINE ISSUE OF MATERIAL FACT THAT MEC HAS PRIOR
TRADEMARK RIGHTS**

**A.**    **CDI Fatally Admits It Only Began Using The Current 3DL Design In 2010,  Eight
Years After MEC First Used Its M Claw Trademark On Clothing**

    CDI admits that it and Joe Cool did not begin using the current (or "fat") 3DL design

until 2010.  *See* D.I. 185 at 11 (referring to 3DL as "2010 3DL"), 12 ("Fat" 3DL created in

2010).  Thus, CDI's claim of priority presumptively fails, regardless of its unwarranted cries of

spoliation.  No matter what materials Joe Cool destroyed when it settled with MEC, the fact

remains that Joe Cool and CDI admittedly did not begin using the 3DL design until 2010, long

after MEC began using its M Claw Trademark.  CDI does not dispute on this motion that MEC

began using its M Claw Trademark on clothing eight years earlier, in 2002.

CDI's only way out of this conundrum is to claim that Joe Cool's alleged use of a different design — the "three skinny lines" — somehow gives CDI prior rights to use the later and different 3DL design.  Under the law, the two designs must be "virtually identical" for CDI to make a claim for priority.  *One Indus., LLC v. Jim O'Neal Distrib.*, 578 F.3d 1154, 1161 (9th Cir. 2009).  Again, this is true no matter what materials were destroyed when Joe Cool settled with MEC.  Even if Joe Cool's destroyed materials could somehow show that the "three skinny lines" design had been used continuously since 1993, CDI still would be required as a matter of law to prove that the "three skinny lines" are virtually identical to the 3DL design in order to claim priority.  *Id*.  This standard is "exceedingly strict," *Brookfield Commc'ns. v. W. Coast Entm't*, 174 F.3d 1036, 1048 (9th Cir. 1999), and CDI cannot satisfy it as a matter of law.

Here, the undisputed product samples show that the "three skinny lines" are markedly different from the 3DL design.  *See* D.I. 173 at 17 (showing the three skinny lines and 3DL).  The two designs simply are not virtually identical and no reasonable jury could find otherwise.  Indeed, the undisputed testimony of Yosef Amar is that in 2010 he hired an artist to create the 3DL design.  D.I. 177, Ex. 30 at 69:5-22, 65:4-67:11.  One does not need to hire an artist to make a virtually identical copy of an existing design.

CDI essentially conceded this point, perhaps inadvertently, when, in its own Motion for Summary Judgment, CDI criticized MEC's survey evidence because the survey did not test the likelihood of confusion "with respect to CDI's 'skinny' 1993 3DL mark."  D.I. 170 at 22.  The premise for this argument by CDI is that there is some important, material difference between the three skinny lines design and the 3DL design, which would affect the results of MEC's survey.  This confirms that tacking between the two designs is inappropriate.

CDI's attempt to distinguish the *Jim O'Neal* case is meritless.  The two "o" trademarks at issue in that case are plainly more similar to each other than the 3DL design and the "three skinny lines" design.  *See Jim O'Neal*, 578 F.3d at 1161.  Both "o" trademarks were stylized, slanted, flattened "o's" with an arrow-shaped apostrophe next to the upper right corner of the "o".  Here, in contrast, the "three skinny lines" design is so long and thin that it does not even resemble a letter "M."  The two trademarks in *Jim O'Neal* were held on summary judgment not to be "not 'indistinguishable,'" and priority based on the prior design was denied.  *Id.*  The same result necessarily follows here.[1]

## B.   CDI's Allegations Of Spoliation Are Baseless

CDI concocts a story out of whole cloth that smoking gun evidence establishing CDI's priority was destroyed by MEC when, in accordance with the Consent Judgment entered by this Court, MEC disposed of the infringing 3DL heat transfers and t-shirts surrendered by Joe Cool. D.I. 185 at 6.  CDI ignores the inconvenient fact that there can be no "1990's 3DL Evidence," D.I. 185 at 6, because the uncontroverted evidence is that the 3DL design was created in 2010. *See supra* at 1.  Thus, CDI's claim that Joe Cool surrendered "art work, heat transfers and t-shirts dating from the 1990's that bore CDI's 3DL marks," is pure fiction.  D.I. 185 at 6.

Likewise, any suggestion that Joe Cool turned over evidence of usage of the "three skinny lines" design from the 1990s is pure fiction.  It was Joe Cool's existing inventory that was surrendered, not historical archives or business records.  *See* D.I. 102 ¶ 9; Declaration of Richard E. Mitchell ("Mitchell Decl.") ¶¶ 3, 4, 7-9, Exs. 1, 7, 9.  Mr. Amar never testified that he

---

[1] CDI criticizes MEC for presenting "distorted" images of the two "o" trademarks from *Jim O'Neal*. D.I. 185 at 10.  But MEC took its images directly from the official published report of the *Jim O'Neal* case in West's Federal Reporter.  The analysis above applies equally to the images presented by CDI.

destroyed or turned over for destruction any materials from the 1990s.[2]  CDI had every opportunity at Mr. Amar's deposition to elicit testimony about the materials that Joe Cool destroyed as part of the settlement; but CDI did not ask a single question about this topic.  Thus there is no evidence that any shirts from the 1990s existed, remained, were destroyed, or that there ever was a shirt with three skinny lines on it that was dated in any way.

CDI also ignores that it was its joint venture partner, Joe Cool, that insisted upon destroying the heat transfers and t-shirts prior to turning them over to MEC.  Joe Cool demanded that the settlement agreement contain the right for Joe Cool to "damage the goods so that they are not useable."  Declaration of Paul A. Stewart, Ex. 97 at ¶ 7.2; *see also* D.I. 178, Ex. 73 at ¶ 7.2; Mitchell Decl. ¶ 5, Ex. 2 at *4.  The Amar Defendants interpreted this provision aggressively, and thoroughly cut up and shredded the t-shirts and heat transfers before delivering them to MEC.  Mitchell Decl. ¶ 7, Exs. 1, 3 at *1, 4, 7, 9.

Moreover, the case law on spoliation in no way supports CDI's position.  CDI first argues that "without actually finding that there was in fact spoliation . . . a jury could draw a negative inference."  D.I. 185 at 9.  But this argument is directly contrary to the law.  In the Eleventh Circuit, "an adverse inference is drawn from a party's failure to preserve evidence ***only when the absence of that evidence is predicated on bad faith***."  *Bashir v. Amtrak*, 119 F.3d 929, 931 (11th Cir. 1997) (*per curiam*) (emphasis added); *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1310 (11th Cir. 2009).  CDI next invites the Court "to go further and enter a finding of bad faith spoliation,"

---

[2] To the contrary, Mr. Amar spent 140 hours locating dozens of pieces of artwork and hundreds of pages of business records that related to alleged predecessors of the 3DL mark.  D.I. 178, Ex. 67; D.I. 177, Ex. 30 at 123:10-124:4; D.I. 177-178, Exs. 38, 40-41, 52-53, 61-62.  None of these documents related to the "three skinny lines."  CDI has offered no reason why Mr. Amar would keep all of these records but throw out materials relating to the "three skinny lines."  It is rank speculation, unsupported by even a hint of evidence.

D.I. 185 at 9, shamelessly arguing that "it was reasonable for Plaintiff to foresee that CDI would claim in this pending litigation that the 3DL marks had priority." *Id*. However, when the Joe Cool goods were discarded there was no ongoing litigation because CDI was still dodging service and the Court's process. It was only after settlement with the Amar Defendants was final and a Clerk's default had been entered against the remaining Defendants, D.I. 105, that MEC authorized its vendor to dispose of the Joe Cool t-shirts and heat transfers that Joe Cool had already shredded.[3] Thus, at that time, MEC reasonably believed the litigation was over. In fact, the final consent judgment approved by the Court acknowledged that the Joe Cool merchandise was to be surrendered to MEC "for destruction." D.I. 102 at ¶ 9.

Moreover, while Joe Cool delivered the items in such a damaged condition that MEC was not able to inventory most of the items (*see* Mitchell Decl. ¶¶ 3-4, 7, 10, Exs. 1, 3 at *1, 4, 7, 9), MEC did retain representative samples of the shredded Joe Cool clothing items. *See id.* Ex. 4. Not surprisingly, none of this merchandise supports CDI's far-fetched allegations. Each item bears the accused "fat" 3DL design, and therefore dates no earlier than 2010. *See id.* Thus, CDI's reckless spoliation accusations provide no basis for defeating MEC's present Motion for Summary Judgment.

**C.**     <u>**CDI Offers No Evidence That The Three Skinny Lines Design Was Used As A Trademark**</u>

CDI's complete failure to offer any evidence that the skinny lines design was used as a trademark is a second independent basis upon which the Court should grant MEC's summary judgment of priority. As MEC explained in its moving papers, CDI has no evidence that the

---

[3] The vendor disposed of the materials on March 8, 2012. Mitchell Decl. Ex. 8. This is **before** March 16, 2012, when Defendants CDI and Baksht first appeared and moved to set aside the Clerk's default. D.I. 110.

three skinny lines design was used as a trademark, a requirement for priority. *See* D.I. 173 at 19-20.  The only evidence is to the contrary — that the design was decorative, and, thus, not a trademark use. *Id.* at 18 n.10.  CDI has come forward with no evidence to the contrary, nor any legal argument disputing MEC's position.  CDI has simply ignored MEC's showing.  On summary judgment, once the moving party meets its initial burden on an issue, the burden of production then shifts to the non-moving party to present evidence showing that a reasonable jury could find in the non-moving party's favor. *Fickling v. United States*, 507 F.3d 1302, 1304 (11th Cir. 2007).

**D.      CDI Has No Evidence Of Continuous Use Of The Skinny Lines Design**

A third independent reason why CDI's claim of priority based on the three skinny lines fails as a matter of law is the complete absence of evidence that the skinny lines design was used continuously by Joe Cool since 1993. *See Data Concepts, Inc. v. Digital Consulting, Inc.*, 150 F.3d 620, 623 (6th Cir. 1998) (continuous use is required to establish priority).

The skinny lines design does not appear in any of the product catalogs produced by Joe Cool, nor are there any invoices, receipts, or other business records showing sales of the skinny lines design prior to 2010, despite the Amar family's 140-hour search for such evidence. *See* D.I. 173 at 17-18.  Notably, no invoices, receipts, or other business records were surrendered by Joe Cool as part of the settlement agreement, so CDI's lack of evidence is necessarily unrelated to CDI's present spoliation allegations. *See* Ex. D.I. 178, Ex. 73 at ¶ 7.2 (listing inventory of materials provided by the Amar Defendants); Mitchell Decl. ¶¶ 7, 9, Ex. 1.

CDI asserts that Mr. Amar testified he used the skinny lines design continuously from 1993 until the seizure.  D.I. 170 at 3 (citing Amar Depo. (D.I. 177, Ex. 30) at 113).  This simply

is not true.  *See* D.I. 177, Ex. 30 at 113.  He testified only that there was some use in 1993, *id.*, not continuous use since that time.  In addition, Mr. Amar's bare assertion of prior use — even if it included testimony of continuous use — would be insufficient to defeat summary judgment on MEC's priority claims.  *World Triathlon Corp. v. Dunbar*, No. Civ. 05-00351JMS/KSC, 2006 WL 897586, at *4 (D. Haw. 2006).  Contrary to CDI's argument, D.I. 185 at 12, nothing in *World Triathlon* suggests that this rule is limited to the testimony of a party.  In any event, Mr. Amar, as the joint venturer of existing defendant CDI, is hardly a disinterested third party.

Moreover, Mr. Amar's testimony concerning the three skinny lines design is not just uncorroborated, but is inconsistent with his own prior representations to this Court.  In opposing MEC's motion for preliminary injunction, Mr. Amar filed a sworn declaration claiming priority based on certain "Myrtle Beach" designs, which he captioned "DESIGNS FROM 1993," D.I. 32-4 at Ex. A-6, even though he later revealed they were computer generated in 2011.  *See* D.I. 173 at 14-15.  Notably, Mr. Amar did not premise his priority claim on any "skinny lines" design at the preliminary injunction phase.  Nor did he in his response to MEC's document subpoena, dated August 27, 2012.  There, Mr. Amar stated in relevant part:

> The 3DL mark has been used in various shapes of 3 lines as early as the mid 1990's as early as 1993.  The design is a variation of fonts, different typestyles, utilized with dragons, skulls, scratch marks, different claws like eagle claws, iguana claws, and lizard claws, dinosaur claws, dragon claws and bear claws etc. Samples, copyrights, documents, catalogs, original art, will be attached.

D.I. 177, Ex. 37 at ¶ 7.  A review of the referenced materials shows that those designs — mostly associated with animals — look nothing like the 3DL design or the purported "skinny" design. *See* D.I. 177-178, Exs. 38-65.

The equivocal testimony of Danniel Sadeh does not help CDI either.  *See, e.g.*, D.I. 185-10 at 21:10-16 (Q:  When did you first see it [referring to Plaintiff's Exhibit 1, the 3DL mark]?   A. When I cannot tell you, but many years ago, a couple of years ago.   I don't remember.), 23:21-24:14.   Moreover, Mr. Sadeh was never asked about any "skinny" design. His testimony entirely concerns the 3DL design, which even Defendants have conceded was first used in 2010.

## II.  AS A MATTER OF LAW, CDI HAS NO STANDING TO PURSUE ITS WRONGFUL SEIZURE AND ABUSE OF PROCESS COUNTERCLAIMS

CDI contends that joint ventures differ fundamentally from partnerships under Florida law.  According to CDI, individual members of a joint venture own the property of the joint venture as co-owners and individually have standing to pursue claims for injury to the joint venture.  In contrast, CDI maintains, the partnership entity owns partnership property and only the partnership entity itself has standing to pursue claims for injury to the partnership.

CDI cites no support for this proposed critical distinction between joint ventures and partnerships, and there is none.  To the contrary, it has been settled for more than half a century that the law of partnerships applies to joint ventures.  *Kislak v. Kreedian*, 95 So. 2d 510, 514 (Fla. 1957).   Indeed, joint ventures and partnerships "are both governed by the Florida's Revised Uniform Partnership Act, chapter 620, Florida Statutes."   *Hallock v. Holiday Isle Resort & Marina*, 885 So. 2d 459, 462 (Fla. Dist. Ct. App. 3d Dist. 2004).  Under that Act, "[p]artnership property is owned by the partnership as an entity, not by the partners as coowners."  § 620.8501, Fla. Stat. (2011).   *See also* § 620.8203, Fla. Stat. (2011).   Thus, only the partnership, not individual partners, has standing to sue for injury to partnership property. *See Toto v. McMahan,*

*Brafman, Morgan & Co.*, 93 Civ. 5894 (JFK), 1997 WL 458764, at \*5 (S.D.N.Y. Aug. 11, 1997); *Kleban v. S.Y.S. Restaurant Mgmt.*, 929 F. Supp. 294, 304 (N.D. Ill. 1996).

CDI cites no case in Florida or elsewhere in which an individual joint venturer has been permitted to sue for damage to joint venture property. Instead, CDI argues that individual joint venturers have a "joint proprietary interest" in joint venture property. D.I. 185 at 17. This supposedly distinguishes joint ventures from partnerships. However, individual partners have precisely the same "joint proprietary interest" as individual joint venturers. *See, e.g., Dreyfuss v. Dreyfuss*, 701 So. 2d 437, 439 (Fla. Dist. Ct. App. 3d Dist. 1997). Despite this interest, it remains true that "[p]artnership property is owned by the partnership as an entity, not by the partners as coowners," § 620.8501, Fla. Stat. (2011), and individual partners have no standing to pursue claims for injury to partnership property.

CDI's claim of reputational harm is similarly flawed. CDI concedes that the harm for which it is seeking compensation is the impaired salability of the 3DL shirts. D.I. 185 at 19-20. However, as just discussed, those shirts were the property of the joint venture, not CDI individually. Thus, CDI has no standing to redress this alleged harm.

CDI also lacks standing for the independent reason that the purported oral assignment of the trademark from Joe Cool to CDI was ineffective. CDI's opposition ignores 15 U.S.C. § 1060(a)(3) entirely and also demonstrates one reason why oral assignments are not permitted for Federal Trademarks and Applications — they are unreliable. In its opposition, CDI asks the Court to ignore the testimony of CDI's 30(b)(6) witness, Mr. Schneorson, and the testimony of Mr. Amar, and instead rely on a wholly conclusory declaration from Mr. Baksht claiming that the oral assignment between Joe Cool and CDI did, in fact, include goodwill. However, a

"conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence, is insufficient to create a genuine issue of material fact." *F.T.C. v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997); *Kirleis v. Dickie, McCamey & Chilcote, P.C.*, 560 F.3d 156, 161 (3d Cir. 2009); *Hall v. Bellmon*, 935 F.2d 1106, 1111 (10th Cir. 1991).  Moreover, CDI is bound by the testimony of its 30(b)(6) witness.  *Craig Air Center, Inc. v. City of Jacksonville*, No. 3:10-cv-48-J-32TEM, 2012 WL 3139547, at *7 n.22 (M.D. Fla. Aug. 1, 2012).  If that testimony was erroneous or incomplete, CDI was required to serve an errata sheet correcting Mr. Schneorson's testimony.  CDI failed to do so.  In any event, even if Mr. Baksht's conclusory declaration was legally entitled to some weight, the assignment was still oral in violation of 15 U.S.C. § 1060(a)(3).[4]

## III.  CONCLUSION

MEC respectfully requests that the Court grant summary judgment that MEC has priority in its M Claw Trademark over Defendants' 3DL design, and grant summary judgment dismissing Defendant CDI's Counterclaims I-V, and Defendants' sixth affirmative defense of prior use.[5]

Respectfully submitted,

Dated:  November 1, 2012          By: /s/ Paul A. Stewart
                                   JOHN B. SGANGA, JR. ESQ.
                                   (Admitted *Pro Hac Vice*)
                                   john.sganga@kmob.com
                                   PAUL A. STEWART, ESQ.
                                   (Admitted *Pro Hac Vice*)
                                   paul.stewart@kmob.com
                                   LAUREN K. KATZENELLENBOGEN, ESQ.

---

[4] CDI's abuse of process claim also suffers from another fundamental problem — the litigation privilege.  *See* D.I. 173 at 24-25.  CDI completely ignores this in its opposition.

[5] If this relief is granted, the case will be sufficiently narrowed such that the primary dispute will be MEC's claim of infringement of its M Claw Trademark.  At that point, the case will be sufficiently simplified that MEC would be amenable to conducting a second round of mediation to resolve all remaining claims.

(Admitted *Pro Hac Vice*)
lauren.katzenellenbogen@kmob.com
KNOBBE, MARTENS, OLSON & BEAR, LLP
2040 Main Street, Fourteenth Floor
Irvine, California  92614
(949) 760-0404  Telephone
(949) 760-9502  Facsimile

Lead Trial Counsel for Plaintiff,
MONSTER ENERGY COMPANY f/k/a HANSEN
BEVERAGE COMPANY d/b/a MONSTER
BEVERAGE COMPANY

– and –

RICHARD E. MITCHELL, ESQ.
Florida Bar No.: 0168092
rick.mitchell@gray-robinson.com
GRAYROBINSON, P.A.
301 East Pine Street, Suite 1400
Orlando, Florida  32801
(407) 843-8880  Telephone
(407) 244-5690  Facsimile

Local Counsel for Plaintiff,
MONSTER ENERGY COMPANY f/k/a HANSEN
BEVERAGE COMPANY d/b/a MONSTER
BEVERAGE COMPANY

14183306

**CERTIFICATE OF SERVICE**

I hereby certify that on this 1st day of November, 2012, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system.

_/s/ *Paul A. Stewart*_____
Paul A. Stewart