**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

MONSTER ENERGY COMPANY, f/k/a
HANSEN BEVERAGE COMPANY,                    Case No. 6:11-CV-329-ORL-22DAB
d/b/a MONSTER BEVERAGE
COMPANY,

               Plaintiff,

vs.

CONSOLIDATED DISTRIBUTORS,
INC., METTEMP, INC., and DAVID
BAKSHT (a/k/a David Lipsker a/k/a
David Bakshet a/k/a D Bakht a/k/a DM
Schneerson a/k/a Abraham
Shneorson),

               Defendants.

_____ /

## PLAINTIFF MONSTER ENERGY COMPANY'S OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE EVIDENCE AND ARGUMENT ABOUT DAVID BAKSHT'S PRIOR BUSINESS ACTIVITIES

Plaintiff Monster Energy Company ("MEC") hereby submits this opposition to

Defendants Consolidated Distributors, Inc. ("CDI") and David Baksht's Motion to

Exclude Evidence and Argument about David Baksht's Prior Business Activities

(D.I. 197).

## I. INTRODUCTION

The evidence the Defendants seek to exclude shows that Mr. Baksht has a

history of attempting to register and otherwise using the famous trademarks of

others, including such famous trademarks as Coke, Rolls Royce, Ramada, Mont

Blanc, and Cadillac.  This evidence is relevant to the Defendants' intent in choosing to exploit a mark which is nearly identical to MEC's M Claw trademark.  This intent in turn is an important factor tending to prove MEC's claim that the Defendants have infringed MEC's trademark, and MEC's claim that the infringement was willful.

Under the Lanham Act, the Defendants' intent in choosing to exploit their trademark is among the most probative evidence on the issue of trademark infringement.  In fact, when a defendant deliberately chooses a trademark similar to the plaintiff's trademark, a presumption arises that the defendant's actions will cause public confusion and thus constitute trademark infringement.  Mr. Baksht has a pattern of seeking to register and use the famous trademarks of others.  He was also aware of MEC's mark when he decided to adopt the accused 3DL design.  Thus, Defendants' use of a design that is very similar to Monster's famous "M Claw" trademark is no coincidence.  It reflects a deliberate intent by the Defendants to pass off the Defendants' t-shirts as genuine Monster t-shirts, and a deliberate intent to cause public confusion.

Mr. Baksht's history is also relevant to Defendant CDI's counterclaim for wrongful seizure.  To prevail on its wrongful seizure counterclaim, CDI must show that MEC acted in bad faith in seeking a seizure of the Defendants' infringing 3DL merchandise.  However, prior to seeking a seizure order in this case, MEC undertook an investigation of Mr. Baksht which showed that CDI was likely not a legitimate business and that a seizure order therefore was an appropriate remedy.  In particular, MEC's investigation showed that Mr. Baksht was the principal or

registered agent of dozens of companies, nearly all of which had been involuntarily dissolved.  This evidence reasonably led MEC to conclude that CDI was a mere corporate shell, and was likely to evade this Court's legal processes if notified of MEC's trademark infringement claims.  This evidence thus tends to show that MEC formed a good faith belief that a seizure order was an appropriate remedy.  For this reason as well, the evidence of Mr. Baksht's prior activities should not be excluded.

## II. BACKGROUND

Defendant Baksht considers himself to be an expert in trademark law.  Ex. 1[1] (Baksht Dep. Tr.) at 33:1-3.  While Mr. Baksht is not an attorney, and is admittedly not a member of any state bar, he claims to be an "attorney in fact" and has filed numerous trademark applications on behalf of others.  *Id.* at 28:23-29:9.  In fact, Mr. Baksht reports he has filed 1,500 trademark applications.  *Id.* at 29:16-30:2.

Mr. Baksht is one of two principals of Defendant CDI.  CDI purports to be in the business of owning and licensing trademarks.  Ex. 2 (CDI 30(b)(6)) at 22:12-23:3, 24:25-25:19.  CDI does not actually design new logos or trademarks.  *Id.* at 33:23-25.  Apart from this lawsuit, CDI currently has no ongoing business.  *Id.* at 143:4-6.  Throughout its entire existence, CDI claims to have owned only two trademarks: the 3DL design and the phrase "Daytona Beach Bike Week."  *Id.* at 22:18-24.  CDI has been sued for attempting to exploit each of these marks.

---

[1] Unless otherwise noted, all exhibits herein are attached to the Declaration of Paul A. Stewart, filed concurrently herewith.

A.    **Mr. Baksht's Prior Business Dealings**

    With respect to the Daytona Beach Bike Week mark, CDI and former defendant Joe Cool obtained a State of Florida registration and claimed ownership of the phrase Daytona Beach Bike Week as their trademark.  *See* Ex. 3 (Complaint in *Good Sports Daytona, Inc. v Consolidated Distributors, Inc.*, case no 6:11-cv-00233-CE-DAB (M.D. Fla. February 11, 2011)).  CDI and Joe Cool then attempted to enforce the mark and were sued by the Daytona Beach Chamber of Commerce and others.  *Id.*  Ultimately, a default judgment and a permanent injunction were entered against CDI preventing it from claiming ownership in or alleging infringement of the Daytona Beach Bike Week mark, Ex. 4 (D.I. 42), Joe Cool stipulated to a settlement and permanent injunction, *see* Ex. 5 (D.I. 38) at 2, Ex. 6 (D.I. 40) at 2, and CDI and Joe Cool's trademark was cancelled, Ex. 7 (D.I. 43) at 2; Ex. 4 (D.I. 42) at 11.

    In addition to Defendants' dealings with the Daytona Beach Bike Week mark, Mr. Baksht has years of additional prior trademark experience.  MEC's expert located at least 148 federal trademark applications filed by Mr. Baksht with the United States Patent and Trademark Office ("Trademark Office").  Ex. 8 (Lott Rpt.) at 16.  Of those, only three are live files.  *Id.*  MEC's expert examined approximately half of the 148 filings, and in each case the filing had been abandoned due Mr. Baksht's failure to comply with the rules, such as by failing to respond to an office action issued by the Trademark Office or by failing to file a statement of use.  *Id.*  In those filings, Mr. Baksht identified himself as an attorney for the applicant.  *Id.* at 17.

MEC's expert also discovered that Mr. Baksht repeatedly filed trademark applications that included the famous trademarks of others. *Id.* at 18. For example, Mr. Baksht filed two trademark applications for "MONTBLANC" on behalf of Montblanc International Corporation of Florida. *Id.* Those applications were opposed by Montblanc-Simplo GmbH, the owner of the famous "MONT BLANC" trademarks used on writing instruments. *Id.* Mr. Baksht failed to respond and the Trademark Office sustained the oppositions by default. *Id.* at 17-18. Mr. Baksht also filed several "Cadillac" trademark applications, including "CADILLAC CLUB," "CADILLAC-BEER," AND "PINK CADILLAC." *Id.* at 18-19. General Motors, the maker of Cadillac vehicles, opposed the application for "PINK CADILLAC." *Id.* at 19. All of Baksht's Cadillac applications were abandoned. *Id.* at 18-19.[2]

Mr. Baksht also formed numerous Florida corporations whose names contain the famous names of others, including "Ramada Restaurants Corporation," "Trump the Travel Consultants People Inc.," "Prince Charles Licensing Corp.," "Rolls Royce Enterprises Corp.," and "Lemon Coke Corp." *Id.* at 19-20. Each of these corporations was involuntarily dissolved. *Id.*

**B.    Defendants Chose To Exploit The 3DL Design With Knowledge Of MEC's M Claw trademark**

Defendants first became aware of the 3DL design in 2010 during a meeting with Joe Cool's owner, Yosef Amar. Ex. 2 (CDI 30(b)(6)) at 65:4-15. During that

---

[2] Defendants state, without citation, that the Trademark Office "approved" Baksht's registrations. D.I. 197 at 2. MEC does not know to which registrations Defendants refer or what Defendants mean by that assertion.

meeting, Mr. Amar expressed concern that the 3DL design was similar to MEC's M Claw trademark. *Id.* at 65:12-66:23. Mr. Baksht evaluated the designs and dismissed Mr. Amar's concern. *Id.* at 65:12-67:24. CDI then entered into a joint venture with Joe Cool to exploit the 3DL design. *Id.* Thus, Defendants admittedly elected to begin dealing in the 3DL design with full knowledge of MEC's M Claw trademark, and did so at Mr. Baksht's direction. In light of Mr. Baksht's extensive experience in filing for trademark registrations that incorporate famous marks of third parties, he was well aware of the potential legal consequences of his decision.

### III. MR. BAKSHT'S PRIOR BUSINESS ACTIVITES ARE RELEVANT TO MEC'S CLAIMS AND DEFENSES

#### A. Trademark Infringement

To prove its claim for trademark infringement, MEC must show that there is a likelihood of confusion between products bearing the Defendants' 3DL design and those bearing the M Claw trademark. *Frehling Enters. v. Int'l Select Group, Inc.*, 192 F.3d 1330, 1335 (11th Cir. 1999). Under the law, one of the factors to be considered in this analysis is Defendants' intent in adopting the 3DL design. *Id.* at 1335, 1340. Indeed, Defendants' bad intent alone can be sufficient to warrant an inference of confusing similarity. *Id.* at 1340 (citing *John H. Harland Co. v. Clarke Checks, Inc.*, 711 F.2d 966, 977 (11th Cir. 1983)). *See also Brookfield Commc'ns., Inc. v. West Coast Entm't. Corp.*, 174 F.3d 1036, 1059 (9th Cir. 1999). "[E]ven an intent to come as close as the law will allow is an intent to derive benefit from the other party's reputation and is therefore probative on the likelihood of confusion issue." *AmBrit, Inc. v. Kraft, Inc.*, 812 F.2d 1531, 1543 (11th Cir. 1986). The rationale underlying

this rule is clear: "[w]hen the alleged infringer knowingly adopts a mark similar to another's, reviewing courts presume that the defendant can accomplish his purpose: that is, that the public will be deceived." *AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341, 354 (9th Cir. 1979). Thus, an important issue at trial in the likelihood of confusion analysis will be the Defendants' intent in adopting their 3DL design.

The evidence of Mr. Baksht's substantial trademark experience, including his prior attempts to derive benefit from trading on the famous marks of others, is plainly relevant to the Defendants' intent here. The evidence shows that Mr. Baksht has repeatedly sought to register and use the famous trademarks of others. This strongly supports an inference that the Defendants intentionally chose a design very similar to the famous M Claw trademark in an effort to pass off their t-shirts as genuine Monster products. In fact, the District Court for the Southern District of Florida has drawn precisely this inference at least twice, concluding that infringement of third party trademarks supports a finding of bad intent. *See Rolex Watch U.S.A., Inc. v. Forrester*, No. 83-8381-Civ-Paine, 1986 U.S. Dist. LEXIS 16961, at *9-*10 (S.D. Fla. Dec. 9, 1986) (citing *Polo Fashions, Inc. v. Magic Trimmings, Inc.*, 603 F. Supp. 13, 16 (S.D. Fla. 1984)). At the very least, the evidence warrants an inference that the Defendants intended to come as close to the line as the law allows, which is itself "probative on the likelihood of confusion issue." *AmBrit*, 812 F.2d at 1543.

Moreover, this type of evidence is clearly permitted by Rule 404(b) of the Federal Rules of Evidence.[3] Rule 404(b) expressly permits the introduction of a party's prior acts for the purpose of showing motive or intent. Fed. R. Evid. 404(b)(2); *Jannotta v. Subway Sandwich Shops, Inc.*, 125 F.3d 503, 517 (7th Cir. 1997) (approving district court's admission of evidence from prior Subway landlords concerning prior misrepresentations by and unpaid judgments against Subway to show intent in commercial lease fraud action). Under controlling precedent, such evidence is admissible provided that it has "probative value that is not substantially outweighed by its undue prejudice," and "the other requirements of Rule 403" are met. *United States v. Giordano*, 261 F.3d 1134, 1140 (11th Cir. 2001).

Here, as already explained, the evidence of Mr. Baksht's past registration and use of famous trademarks is highly relevant to the Defendants' intent, and this bad intent alone may be sufficient to prove infringement. This high probative value is not "substantially outweighed" by any "undue" prejudice to the Defendants. Particularly with appropriate instructions from the Court, no jury is likely to find that the Defendants infringed MEC's rights in this case just because the Defendants have copied the trademarks of others in other cases. Rather, the jury can be instructed to rely upon Mr. Baksht's past conduct solely to decide whether the similarities between the 3DL design and the M Claw trademark are a mere coincidence or due to the intentional efforts of the Defendants to copy MEC's trademark.

---

[3] Rule 404 "applies in both civil and criminal cases." *Huddleston v. United States*, 485 U.S. 681, 685 (1988).

**B.    Willful Trademark And Copyright Infringement**

In addition to alleging simple trademark infringement, MEC has also alleged that the Defendants have willfully infringed MEC's M Claw trademark, warranting additional remedies.   D.I. No. 130 ¶¶ 51-53; *Babbit Electronics, Inc. v. Dynascan Corp.*, 38 F.3d 1161, 1182-83 (11th Cir. 1994) (awarding the defendant's profits and treble damages to the plaintiff because of willful infringement).   Similarly, MEC has alleged that the Defendants have willfully infringed MEC's copyright in the M Claw design.   D.I.  No. 130 ¶ 76.

Defendants are liable for willful trademark infringement if they acted "in a way that was calculated to appropriate or otherwise benefit from the good will the plaintiff had nurtured."  *Abercrombie & Fitch Trading Co. v. Importrade USA*, Case No. 07-23212-CIV-ALTONAGA, 2009 U.S. Dist. LEXIS 127132, at *4 (S.D. Fla. Aug. 18, 2009) (quoting *SecuraComm Consulting Inc. v. Securacom Inc.*, 166 F.3d 182, 187 (3d Cir. 1999)).  Defendants are liable for willful infringement under the Copyright Act if they acted with either actual knowledge of infringement or reckless disregard for whether their conduct was infringing.  *Arista Records, Inc. v. Beker Enter., Inc.*, 298 F. Supp. 2d 1310, 1312 (S.D. Fla. 2003); *In re Barboza,* 545 F.3d 702, 707 (9th Cir. 2008).  For the reasons just discussed, Mr. Baksht's prior actions are relevant to the issue of willfulness.   Mr. Baksht's prior registration and use of the famous trademarks of others tends to show that he acted willfully and deliberately in imitating the M Claw trademark, and that the similarities between the 3DL design and the M Claw trademark are no mere coincidence.

C.    **Wrongful Seizure**

Mr. Baksht's prior activities are also relevant to MEC's defenses to CDI's counterclaim for wrongful seizure.  To establish its counterclaim of wrongful seizure, CDI must prove that MEC acted in bad faith or that the seized goods were predominantly legitimate merchandise.  *Ford Motor Co. v. O.E. Wheel Distributors, LLC*, Case No. 8:09-cv-2137-T-30TBM, 2012 WL 1231877, at *40 (M.D. Fla. April 12, 2012).  Here, Mr. Baksht's prior activities, and MEC's knowledge of those activities, are relevant to MEC's good faith in bringing its seizure motion.  For example, CDI may contend that MEC did not form a good faith belief that CDI was a counterfeiter before seeking a seizure order.  *See generally* D.I. 170.  To rebut this, MEC seeks to present evidence uncovered in its pre-filing investigation that supported its conclusion that CDI was not a reputable business.

Specifically, MEC discovered that Mr. Baksht had been a principal or registered agent of twenty-six different companies, including those identified above, most of which had been involuntarily dissolved.  *See* D.I. 189 ¶ 8.  MEC also learned of Defendants' improper claims to the "Daytona Beach Bike Week" mark.  *Id.* ¶ 12; D.I. 4 ¶¶ 12, 13.  The suspect nature of Defendants' prior dealings helped shape MEC's belief that Defendants were deliberate infringers of the M Claw trademark who would avoid the Court's authority and evade its legal process if notified of MEC's trademark claims.  Thus, Mr. Baksht's prior activities, and MEC's knowledge of those activities, are relevant to MEC's defense to the Defendants' wrongful seizure counterclaim.

## IV.  DEFENDANTS OFFER NO LEGITIMATE BASIS FOR EXCLUDING MR. BAKSHT'S PRIOR BUSINESS ACTIVITIES

Defendants cite only one case in support of their motion:  *In re Seroquel Products Liability Litigation*, 601 F. Supp. 2d 1313, 1318 (M.D. Fla. 2009).  *See* D.I. 197 at 3.  That case is entirely irrelevant.  It was a products liability action brought against a drug manufacturer.  It did not concern trademarks at all.  The excluded evidence related to the actions of certain foreign country regulators concerning the drug at issue.  The court excluded the evidence because of its concern that admitting it "without providing context concerning the regulatory schemes and decision-making processes involved" in those foreign countries "would strip the jury of any framework within which to evaluate the meaning of that evidence."  *Seroquel*, 601 F. Supp. 2d at 1318.  No parallels can be drawn here.  The prior business activities of Mr. Baksht occurred under the same general legal framework as the present action.

The Defendants also protest that the evidence of Mr. Baksht's past activities will require "litigation of multiple satellite issues."  D.I. 197 at 1.  This is simply untrue.  The trademark applications filed by Mr. Baksht have reached their final dispositions in the Trademark Office.  Similarly, the litigation in this district concerning Defendants' prior attempts to exploit the Daytona Beach Bike Week mark has reached its full and final conclusion.  There is no reason to revisit and relitigate the findings of the Trademark Office and this Court in those cases.

## V. <u>CONCLUSION</u>

For the foregoing reasons, Plaintiff respectfully requests that this Court enter

an order denying Defendants' motion *in limine*.

Respectfully submitted,


Dated:  November 19, 2012          By:  /s/ *Paul A. Stewart*
                                   JOHN B. SGANGA, JR. ESQ.
                                   (Admitted *Pro Hac Vice*)
                                   john.sganga@kmob.com
                                   PAUL A. STEWART, ESQ.
                                   (Admitted *Pro Hac Vice*)
                                   paul.stewart@kmob.com
                                   LAUREN K. KATZENELLENBOGEN, ESQ.
                                   (Admitted *Pro Hac Vice*)
                                   lauren.katzenellenbogen@kmob.com
                                   KNOBBE, MARTENS, OLSON & BEAR, LLP
                                   2040 Main Street, Fourteenth Floor
                                   Irvine, California  92614
                                   (949) 760-0404  Telephone
                                   (949) 760-9502  Facsimile

                                   Lead Trial Counsel for Plaintiff,
                                   MONSTER ENERGY COMPANY f/k/a
                                   HANSEN BEVERAGE COMPANY d/b/a
                                   MONSTER BEVERAGE COMPANY

                                   – and –

                                   RICHARD E. MITCHELL, ESQ.
                                   Florida Bar No.: 0168092
                                   rick.mitchell@gray-robinson.com
                                   GRAYROBINSON, P.A.
                                   301 East Pine Street, Suite 1400
                                   Orlando, Florida  32801
                                   (407) 843-8880  Telephone
                                   (407) 244-5690  Facsimile

                                   Local Counsel for Plaintiff,
                                   MONSTER ENERGY COMPANY f/k/a
                                   HANSEN BEVERAGE COMPANY d/b/a
                                   MONSTER BEVERAGE COMPANY

**CERTIFICATE OF SERVICE**

I hereby certify that on this 19th day of November, 2012, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system.

/s/ *Paul A. Stewart*
Paul A. Stewart

14279407