UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

**MONSTER ENERGY COMPANY,**

**Plaintiff,**

v.                                            **Case No:  6:11-cv-329-Orl-22DAB**

**CONSOLIDATED DISTRIBUTORS,
INC., METTEMP, INC. and DAVID
BAKSHT,**

**Defendants.**
_____/

## ORDER

This cause comes before the Court on the "Dispositive Motion for Partial Summary Judgment by Defendant Consolidated Distributors, Inc. ("CDI")" (Doc. No. 170), filed on September 30, 2012, and Plaintiff Monster Energy Company's ("MEC") response thereto (Doc. No. 191), filed on October 30, 2012.

## I.    PROCEDURAL BACKGROUND

On March 3, 2011, MEC filed under seal an action, *inter alia*, for trademark infringement and copyright infringement, claiming that Defendants were infringing its famed M Claw ( ⵜ ) trademark by selling and advertising goods containing the mark.  (Doc. Nos. 1 & 2).  At that time, MEC requested that the Court enter an *ex parte* seizure order to obtain the alleged "counterfeit products" Defendants[1] intended to sell during Daytona Bike Week 2011.

---

[1] When MEC initially filed this action, it sued Consolidated Distributors, Inc. ("CDI"); David Baksht; Mettemp, Inc.; Joe Cool, Inc.; Joe Cool Bike Week, Inc.; Michelle Amar; and Yosef Amar ("Defendants").  MEC and Joe Cool, Inc.; Joe Cool Bike Week, Inc.; Michelle Amar; and Yosef Amar later entered into a settlement agreement.  (Doc. No. 102).

After the Court entered a temporary restraining order and *ex parte* seizure order arising out of the alleged use of MEC's famed ⚡ trademark (the logo without text) on clothing by CDI and others, deputy United States Marshals arrived at the Florida warehouse and office of Joe Cool, Inc., CDI's joint venturer, and seized merchandise and business records.[2]  Soon after this seizure, it was clarified that at the time of seizure, MEC's registered trademark for its famed ⚡ trademark (the logo without text) was limited to beverage cans while the ⚡ (the logo with text) was the mark trademarked for shirts, stickers, and other apparel.  MEC's representations to the Court suggested that at the time of the seizure, the ⚡ mark also applied to stickers and clothing. Based on this clarification, the Court denied MEC's request for a preliminary injunction and ordered it to return the seized items to the Defendants.[3]  (Doc. No. 40).  As well, the Court denied MEC's motion for reconsideration of the denial of a preliminary injunction (Doc. No. 52) and MEC's request to vacate the order pursuant to a settlement agreement (Doc. No. 101).

On January 19, 2012, the Court entered a Consent Final Judgment and Permanent Injunction as to Defendants Joe Cool, Inc.; Joe Cool Bike Week, Inc.;[4] Michelle Amar; and Yosef Amar ("Amar Defendants").[5]  (Doc. No. 102).  The settlement agreement was limited to the Amar Defendants.  Pursuant to the settlement, the Amar Defendants admitted that they sold and distributed items bearing designs that the parties contended might have a likelihood of being

---

[2] The word "Defendants" refers to all of the original Defendants to this action.  In its filings, CDI claimed that Joe Cool Bike Week, Inc. is a part of a joint venture between CDI and Joe Cool, Inc.  However, it appears CDI has since abandoned this theory.

[3] At that time, CDI had not yet appeared in the case.

[4] Yosef Amar signed the settlement as president and authorized signatory of Joe Cool, Inc. and Joe Cool Bike Week, Inc.

[5] The settlement did not apply to David Baksht; Consolidated Distributors, Inc.; and Mettemp, Inc., who at the time had failed to plead or respond to MEC's Amended Complaint.

found to be confusingly similar to MEC's ⫴ mark. (*Id.* at ¶ 7). As well, among other representations, the Amar Defendants asserted that they would not claim ownership in any trademarks that the parties contended were confusingly similar to MEC's ⫴ mark. (*Id.* at ¶ 8). Finally, according to the settlement, the Amar Defendants agreed that all of their claims and defenses asserted by them, including their wrongful seizure claim, were dismissed with prejudice. (*Id.* at ¶ 10); (*see* (Doc. No. 85 at ¶¶ 145-161)).

On January 30, 2012, the Magistrate Judge granted MEC's motion for entry of a clerk's default against CDI; Mettemp, Inc.; and David Baksht. (Doc. No. 104). However, on April 25, 2012, upon the motion of David Baksht and Consolidated Distributors, Inc. ("Baksht Defendants") (Doc. No. 110), the Court set aside the default only as to the Baksht Defendants and not as to Mettemp, Inc. (Doc. No. 120).

On March 16, 2012, the Baksht Defendants filed their answer and CDI filed a counterclaim (Doc. No. 109), and on April 27, 2012, the Baksht Defendants filed an amended answer and CDI filed its amended counterclaim (Doc. No. 122). On June 6, 2012, the Baksht Defendants filed their amended answer and affirmative defenses to MEC's Second Amended Complaint. (Doc. No. 137). On June 28, 2012, the Court denied CDI leave to amend its amended counterclaim: (1) to join MEC's Chief Executive Officer ("CEO") Rodney Sacks ("Sacks"), MEC's local counsel Richard E. Mitchell ("Mitchell") and his law firm GrayRobinson, P.A., and MEC's lead counsel Lynda Zadra-Symes ("Zadra-Symes") and her law firm Knobbe Martens Olson & Bear, LLP to the existing abuse of process claim and (2) to seek punitive damages under CDI's wrongful seizure and abuse of process claims. (Doc. No. 140).

## II.     FACTUAL BACKGROUND

### A. *MEC's Development of the M Claw*

To understand fully MEC's claims for trademark infringement and unfair competition, the Court must first discuss MEC's business and how MEC utilizes the mark in that business, particularly in the apparel arena.

MEC designs, creates, develops, markets, and sells beverages ranging from fruit juices to energy drinks.  (Sacks Dec. (Doc. No. 175 at ¶ 2)).[6]  In March 2002, MEC launched its now popular Monster Energy® drink line.  (*Id.* at ¶ 3); (Sacks Dep. (Doc. No. 177-27 at 17:13-21)).[7]  In conjunction with the launch of its energy drink, MEC employee Mark Hall and outside graphics designer Ian McClain developed MEC's  mark at issue.  (Sacks Dep. at 18:25-19:16).






(Examples of MEC's M Claw Mark)

---

[6] The Court, at times, may cite to documents in the record that the parties cited in filings other than their summary judgment submissions.  *See* Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record.").

[7] For simplicity, the Court will only refer to the docket entry number for depositions and declarations the first time they are cited.

MEC's CEO Sacks testified that the 〽 mark was first used on clothing at the same time MEC launched its Monster Energy® drink line in 2002. (*Id.* at 20:21-21:6); (Kelly Dec. (Doc. No. 176 at p. 5 ("I confirmed that MEC began distributing t-shirts and other apparel items bearing the M Claw logo in 2002, and that MEC has continuously distributed t-shirts and other apparel items bearing the M Claw logo since that time."))). MEC sold the clothing to distributors and to customers and supplied apparel to professional athletes MEC was sponsoring. (Sacks Dep. at 21:17-22:5). Eventually, MEC began selling to third parties through the Internet and licensing agreements. (*Id.* at 21:17-23:7).

According to Nancy Ridenbaugh, as part of her marketing job,[8] in the spring of 2002, she began working with the vendor The Image Factor to develop t-shirts containing the 〽 mark. MEC made its first purchase order for 1,000 t-shirts on April 25, 2002. (Ridenbaugh Dep. at 10:17-12:13). Ridenbaugh explained the t-shirt had many purposes with the main goal being the development of brand recognition by the general public. She explained that MEC: (1) provided t-shirts to distributors for supply to retailers and sales people, (2) used the t-shirts at tradeshows, (3) provided apparel to athletes sponsored by MEC, (4) sold the t-shirts to customers, and (5) gave the t-shirts away for promotional purposes. (*Id.* at 18:20-20:13).

According to MEC's Senior Vice President of Finance Thomas J. Kelly, MEC's clothing currently reaches the public through direct sales at its website (www.monsterarmy.com), through its customer loyalty program called Monster Gear, through giveaways via its "ambassador

---

[8] From September 1997 until April 2007, Nancy Ridenbaugh worked as a project manager in MEC's sales and marketing division. (Ridenbaugh Dep. (Doc. No. 177-26 at 5:11-6:15)). According to Ridenbaugh, as project manager in the marketing division, she worked on trade show coordination and organization, aided in product development, and worked with graphic designers to develop different graphics for point of sales items such as stickers, t-shirts, hats, and refrigeration racks and displays. (*Id.* at 6:3-15).

teams", through provisions to its distributors so they can promote the brand, and through licenses to third parties.   (Kelly Dec. at p. 2).[9]   According to Kelly, excluding apparel distributions through MEC's licensees, MEC has distributed apparel bearing the ⑪ mark on a yearly basis as follows:[10]

| YEAR | UNITS |
|------|-------|
| 2002 | 5,542 |
| 2003 | 10,116 |
| 2004 | 20,227 |
| 2005 | 47,871 |
| 2006 | 75,148 |
| 2007 | 120,105 |
| 2008 | 102,881 |
| 2009 | 159,666 |
| 2010 | 259,235 |
| 2011 | 382,676 |
| **TOTAL** | **1,183,467** |

[9] To account for its apparel, Kelly explains that MEC includes the revenue and expenses for its clothing transactions in its financial statements.  Specifically, Kelly notes that MEC includes the Monster Gear program and giveaways to promote its brand as an operating expense line item; it includes the revenue from direct sales to consumers through the Monster Army program as a reduction in the operating expenses line item; it includes the sales of the clothing to MEC's distributors as a reduction in the operating expenses line item; and includes the revenues received by MEC from licensing as "other income."   (Kelly Dec. (Doc. No. 176 at p. 3)); (*see also* (Ridenbaugh Dep. at 21:21-23:9 (explaining how the accounting system worked for shirts delivered to distributors))).

[10] This amount includes apparel distributed to MEC's distributors and apparel distributed through MEC's Monster Army and Monster Gear programs.  (Kelly Dec. at ¶ 7).

(*Id.* at pp. 4-5).  As well, MEC has received, excluding non-clothing licensees, "over $4 million in royalties from licenses directed to apparel and related items from licensees whose territories included the United States."  (*Id.* at p. 6).

Although much of the present motion will turn on common law trademark rights, MEC does hold the following trademark and copyright registrations:

| MARK | REG. No. | GOODS/ SERVICES | DATE OF FIRST USE | REG. DATE |
|---|---|---|---|---|
|  | 2903214 | Drinks, namely, carbonated soft drinks, carbonated drinks enhanced with vitamins, minerals, nutrients, amino acids and/or herbs, carbonated and non-carbonated energy or sports drinks, fruit juice drinks having a juice content of 50% or less by volume that are shelf stable, and water, in class 32 (U.S. CLS. 45, 46 AND 48). | 03/27/2002 | 11/16/2004 |
| M MONSTER ENERGY | 3044314 | Nutritional supplements in liquid and non-liquid form, but excluding perishable beverage products that contain fruit juice or soy, whether such products are pasteurized or not, in Class 5 (U.S. CLS. 6, 18, 44, 46, 51 AND 52) | 03/27/2002 | 01/17/2006 |
| MONSTER ENERGY | 3044315 | Nutritional supplements in liquid and non-liquid form, but excluding perishable beverage products that contain fruit juice or soy, whether such products | 03/27/2002 | 01/17/2006 |

| | | | | |
|---|---|---|---|---|
| | | are pasteurized or not, in Class 5 (U.S. CLS. 6, 18, 44, 46, 51 AND 52) | | |
| MONSTER ENERGY | 3057061 | Fruit juice drinks having a juice content of 50% or less by volume that are shelf stable, carbonated soft drinks, carbonated drinks enhanced with vitamins, minerals, nutrients, amino acids and/or herbs, aerated water, soda water, but excluding perishable beverage products that contain fruit juice or soy, whether such products are pasteurized or not, in Class 32 (U.S. CLS 45, 46 AND 48) | 03/27/2002 | 02/07/2006 |
| M MONSTER ENERGY | 3134842 | Beverages, namely, carbonated soft drinks, carbonated drinks enhanced with vitamins, minerals, nutrients, amino acids and/or herbs, carbonated and noncarbonated energy or sports drinks, fruit juice drinks having a juice content of 50% or less by volume that are shelf stable, and water, but excluding perishable beverage products that contain fruit juice or soy, whether such products are pasteurized or not, in Class 32 (U.S. CLS. 45, 46 AND 48) | 03/27/2002 | 08/29/2006 |

| | 3134841 | Beverages, namely, carbonated soft drinks, carbonated soft drinks enhanced with vitamins, minerals, nutrients, amino acids and/or herbs, carbonated and non-carbonated energy and sports drinks, fruit juice drinks having a juice content of 50% or less by volume that are shelf stable, and aerated water, soda water and seltzer water, but excluding perishable beverage products that contain fruit juice or soy, whether such products are pasteurized or not, in Class 32 (U.S. CLS. 45, 46 AND 48) | 03/27/2002 | 08/29/2006 |
|---|---|---|---|---|
| | 3434822 | Non-alcoholic beverages, namely, energy drinks, excluding perishable beverage products that contain fruit juice or soy, in Class 32 (U.S. CLS. 45, 46 AND 48) | 03/27/2002 | 05/27/2008 |
| | 3434821 | Nutritional supplements, in Class 5 (U.S. CLS. 6,18, 44,46, 51 AND 52) | 03/27/2002 | 05/27/2008 |
| | 3908600 | Stickers; sticker kits comprising stickers and decals; decals, in Class 16 (U.S. CLS. 2, 5, 22, 23, 29, 37, 38 AND 50) | 01/00/2004 | 01/18/2011 |

| | 3908601 | Clothing, namely, t-shirts, hooded shirts and hooded sweatshirts, sweat shirts, jackets, pants, bandanas, sweat bands and gloves; headgear, namely, hats and beanies, in Class 25 (U.S. CLS. 22 AND 39) | 05/24/2002 | 01/18/2011 |
|---|---|---|---|---|
| | 3963668 | Stickers; sticker kits comprising stickers and decals; decals; posters in Class 16 (U.S. CLS. 2, 5, 22, 23, 29, 37, 38 AND 50) | 01/00/2004 | 05/17/2011 |
| | 4011301 | Sports helmets; video recordings featuring sports, extreme sports, and motor sports, in Class 9 (U.S. CLS. 21, 23, 26, 36 AND 38) | 05/24/2002 | 08/16/2011 |
| | 4051650 | Clothing, namely, t-shirts, hooded shirts and hooded sweatshirts, sweat shirts, jackets, pants, bandanas, sweat bands and gloves; headgear, namely hats and beanies, in Class 25 (U.S. CLS. 22 and 39) | 05/24/2002 | 11/08/2011 |
| | | | | |
| **Copyright** | **REG. No.** | **Description** | **DATE Of First Publication** | **REG. DATE** |
| For an image of the claw, See (Doc. No. 130-14). | VA 1-789-900 | Stylized claw with jagged edges (original version) | 03/27/2002 | 10/11/2011 |
| For an image of the can art work, See (Doc. No. 130-15). | VA-1-727-577 | Monster Energy Can Art | 03/27/2002 | 08/02/2010 |

(Doc. Nos. 130-1 to 130-15).

According to MEC, since 2002 it has spent over $1.68 billion promoting its Monster Energy®

drinks and the ||| mark; in 2011 alone, it spent more than $380 million on these promotional

efforts.  (Sacks Dec. at ¶ 8).

## B.  *The Development of the 3DL Design*[11]

To understand fully CDI's claims for trademark infringement and unfair competition, the

Court must first discuss how CDI was formed and how it obtained the 3DL mark.  As well, the

Court must discuss the use of the 3DL mark by Joe Cool, Inc. prior to CDI's alleged ownership

in 2010.

According CDI's corporate representative Menachem Schneorson ("Schneorson"),[12] CDI

is composed of Schneorson and David Baksht ("Baksht"), each owning fifty percent of the

corporation.  (Schneorson Dep. (Doc. No. 177-9 at 17:7-14)).  CDI's business entails owning

trademarks and then licensing those trademarks.  Presently, its alleged trademark ownership is

limited to the 3DL (  ) mark, the one at issue, and the purported "Daytona Bike Week" mark.

(*Id.* at 22:16-24).  Before CDI began working with Yosef Amar ("Amar") and Joe Cool, Inc. in

2010, CDI had no specific business purpose.  (*Id.* at 24:18-25:12).

According to CDI, in 2010, Joe Cool, Inc.'s president, Yosef Amar,[13] came to CDI's

office in Brooklyn, New York to discuss a mark Amar called the 3DL mark that Joe Cool, Inc.

was producing on heat transfers to be applied to t-shirts.  (*Id.* at 10:18-12:7).  Amar told CDI that

Joe Cool, Inc.'s mark was popular and that Joe Cool, Inc. wanted to expand its business and

---

[11] Throughout this Order, the Court may refer to the actions of Yosef Amar ("Amar") and Joe Cool, Inc. when describing CDI's claims regarding the 3DL mark and its use of the mark prior to 2010 because CDI allegedly did not own the 3DL mark until 2010.

[12] CDI designated Menachem Schneorson as its corporate representative for its *Federal Rule of Civil Procedure* 30(b)(6) deposition.  (Schneorson Dep. (Doc. No. 177-9 at 4:9-13, 9:24-10:3)).

[13] Throughout the depositions, Yosef Amar is also referred to as Joe Cool.

needed help registering and protecting the mark.  (Id.).[14]  Amar was afraid Joe Cool, Inc. would

not be able to control the mark because MEC had a similar mark.  (*Id.* at 65:16-66:7).  According

to CDI, Amar told CDI that Joe Cool, Inc. had been using the mark since 1993.  (*Id.* at 12:4-7).[15]



(Example of 3DL mark in 2010 at time of the meeting between CDI and Joe Cool, Inc.)

After their initial meeting, according to CDI, Joe Cool, Inc., through its president Yosef

Amar, orally assigned the common law ![mark] mark to CDI.  As well, Joe Cool, Inc. and CDI

entered into an oral joint venture to exploit the ![mark] mark.[16]  According to CDI, Joe Cool, Inc. did

not assign any physical assets or customer lists to CDI with the ![mark] mark.  (*Id.* at 77:24-79:11;

85:8-88:14 (describing the details of the joint venture)).  However, CDI now disclaims its

allegation in its Amended Counterclaim that it formed with Joe Cool, Inc. the entity "Joe Cool

---

[14] Interestingly, during this time frame, MEC was distributing over 259,235 pieces of apparel
with the ![mark] mark and was ascending towards its status as one of the ten most "Liked" brands
worldwide on the social media website Facebook, according to business news channel CNBC.
(Sacks Dec. at ¶ 10).

[15] CDI could not explain why the 3DL mark it registered in 2010 shows a 2003 copyright.
(Schneorson Dep. at 40:13-23). CDI repeatedly testified that Yosef Amar was the source for any
information regarding the first use of the 3DL mark in 1993 and its general use and popularity.
(*See, e.g.*, *id.* at 58:9-12; 60:16-19).  As well, Schneorson, CDI's corporate representative,
repeatedly testified that Baksht, his partner, was more knowledgeable regarding the details
surrounding the 3DL mark and the joint venture with Joe Cool, Inc.  During Baksht's deposition,
Baksht repeatedly testified that Schneorson was more knowledgeable about the details
surrounding the 3DL mark and the joint venture with Joe Cool, Inc.

[16] There is no documentary proof of the assignment and the joint venture as all agreements
between Joe Cool, Inc. and CDI were oral.

Bike Week, Inc. as an (sic) legal entity through which to conduct some of the Joint Venture's business through [sic]." *Compare* (Doc. No. 122 at ¶ 150(e))*, with* (Schneorson Dep. at 90:2-91:1 (claiming that Joe Cool Bike Week, Inc. was simply a bank account Amar opened up to separate the receipts for sales of the  mark from purchases of other heat transfers and clothing)).[17]

Once CDI and Joe Cool, Inc. formed their joint venture, Amar became a vice president of CDI for a temporary period. (Shneorson Dep. at 111:6-11). CDI then filed the following registrations:

| MARK | STATE OF REG. | REG. No. | REG. DATE |
|---|---|---|---|
|  | New Jersey | TM23557 | 09/29/2010 |
|  | Florida | T10000001063 | 10/07/2010 |
| [18] | Florida | T100000001102 | 10/21/2010 |

---

[17] (*See also* (Baksht Dep. (Doc. No. 177-10 at 183:15-24 (testifying that CDI and Joe Cool, Inc. did not actually conduct business through Joe Cool Bike Week, Inc.))).

[18] For this mark, it appears Joe Cool (aka Yosef Amar) registered this mark under Joe Cool, Inc. with CDI's business address in Brooklyn, New York. (Doc. No. 185-7 at p. 2). No party has discussed this discrepancy.

| |  | Florida | T10000000884 | 08/09/2010 |
|---|---|---|---|---|

C.  *MEC's Second Amended Complaint and CDI's Answer and Counterclaim*

In MEC's Second Amended Complaint, it alleges, *inter alia*, that CDI's 3DL mark infringes upon MEC's trademarked M Claw mark.





(MEC's M Claw Mark)                    (CDI's 3DL Mark in 2010)

Specifically, MEC alleges the following claims:

1.  Trademark infringement and counterfeiting pursuant to 15 U.S.C. § 1114 (Count I);

2.  Federal dilution pursuant to 15 U.S.C. § 1125(c) (Count II);

3.  False designation of origin pursuant to 15 U.S.C. § 1125(a) (Count III);

4.  Copyright infringement pursuant to 17 U.S.C. § 501 (Count IV)

5.  Cancellation of Florida trademarks pursuant to Fla. Stat. § 495.101 (Count V);

6.  Florida statutory unfair competition (Count VI);

7.  Florida common law unfair competition (Count VII);

8.  Florida statutory dilution pursuant to Fla. Stat. § 495.151 (Count VIII); and

14

9.   Cancellation of New Jersey trademark pursuant to N.J. Stat. Ann. § 56:3-13.8

(Count IX).

(Doc. No. 130).

In the present motion for summary judgment, CDI requests the Court to grant it summary judgment on its counterclaim for wrongful seizure and to award it punitive damages for that claim.  (Doc. No. 170).  As well, CDI requests the Court to grant CDI summary judgment on Count I of MEC's Second Amended Complaint (MEC's trademark counterfeit claim) based on the law of the case doctrine with respect to counterfeiting and summary judgment on Count I (trademark infringement claim), Count III (false designation of origin claim), Count V (cancellation of Florida trademarks claim), Count VI (Florida statutory unfair competition claim), Count VII (Florida common law unfair competition claim), and Count IX (cancellation of New Jersey trademark claim) of MEC's Second Amended Complaint.  (*Id.*).

### III.   LEGAL STANDARD FOR SUMMARY JUDGMENT

A court should grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  It is the movant who bears the initial burden of "identifying for the district court those portions of the record 'which it believes demonstrates the absence of a genuine issue of material fact.'" *Cohen v. United Am. Bank of Cent. Fla.*, 83 F.3d 1347, 1349 (11th Cir. 1996) (quoting *Cox v. Adm'r U.S. Steel & Carnegie*, 17 F.3d 1386, 1396, *modified on other grounds*, 30 F.3d 1347 (11th Cir. 1994)).  In the case in which the non-movant bears the burden of proof at trial, the movant may carry its initial burden by either negating an essential element of the non-movant's case or by demonstrating the absence of evidence to prove a fact

15

necessary to the non-movant's case.  *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115-16 (11th Cir. 1993) (citation omitted).

Once the movant carries its initial burden, the non-movant may avoid summary judgment by demonstrating an issue of material fact.  *Id.* at 1116.  If the movant demonstrates the absence of evidence on a material fact for which the non-movant bears the burden of proof, then the non-movant must either show that the record contains evidence that the movant "overlooked or ignored" or "come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency."  *Id.* at 1116-17 (citation omitted). The non-movant must provide more than a "mere scintilla of evidence" supporting its position, and "there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citation omitted).

Further, when analyzing a motion for summary judgment, a court draws all inferences from the evidence in the light most favorable to the non-movant and resolves all reasonable doubt in the non-movant's favor.  *Porter v. Ray*, 461 F.3d 1315, 1320 (11th Cir. 2006). Notwithstanding this inference, "[t]here is [still] no genuine issue for trial unless the non-moving party establishes, through the record presented to the court, that it is able to prove evidence sufficient for a jury to return a verdict in its favor."  *Cohen*, 83 F.3d at 1349.

## IV.    CDI'S COUNTERCLAIM FOR WRONGFUL SEIZURE

The basis for CDI's counterclaim for wrongful seizure arises out of the Court-ordered seizure discussed above.  Pursuant to 15 U.S.C. §1116(d), a Court may grant an *ex parte* seizure order providing for the seizure of goods and counterfeit marks in actions arising under 15 U.S.C. § 1114(1)(a).  *See* 15 U.S.C. § 1116(d)(1)(A).  As noted previously, after the seizure in the

present case, the Court ordered the return of the seized items and denied MEC's motion for preliminary injunction. (Doc. No. 40).

At the time of seizure, based on MEC's filing, the Court was under the impression that MEC's registered trademark for its famed  trademark by itself (the logo without writing) was not limited to only beverage cans. In reality, at that time, the  mark (the logo with writing) was the only mark trademarked for shirts, stickers, and other apparel. (Doc. No. 40 at p. 3 (noting that the inclusion of the words "Monster Energy" with M Claw mark meant the 3DL and the M Claw were not identical for purposes of granting a preliminary injunction)). MEC's representations to the Court suggested that the M Claw mark alone (logo without text) also applied to stickers and clothing at that time. Based on this finding, the Court denied MEC's request for a preliminary injunction and ordered it to return the seized items to the Defendants.[19] (Doc. No. 40). Later, the Court denied MEC's motion for reconsideration of the denial of a preliminary injunction (Doc. No. 52) and MEC's request to vacate the order pursuant to a settlement agreement (Doc. No. 101). However, when denying the motion to vacate the order, the Court reiterated that in denying MEC preliminary injunctive relief, the Court was not denying it all relief but simply denying MEC preliminary injunctive relief at that stage of the proceedings. MEC's claims, including its counterfeit claim, still remained to be resolved at trial. (*Id.* at pp. 2-3, 4 (citations omitted)).

At summary judgment, CDI argues that the Court's earlier orders denying MEC preliminary injunctive relief and undoing the seizure order and the language used therein are the law of the case. Based on this premise, CDI concludes that the seized goods were not counterfeit

---

[19] At that time, CDI had not yet appeared in the case.

and that MEC acted in bad faith.  (Doc. No. 170 at pp. 7-8 (citing Doc. Nos. 40 & 52)).  The Court finds that the law of case does not apply and that CDI overstates the Court's language in its prior orders.

First, to prove a claim for wrongful seizure, CDI must show that: (1) MEC, as the applicant for the seizure order, acted in bad faith in seeking the order, or (2) "that the goods seized are predominately legitimate merchandise, even if [MEC] acted in good faith." *Hidalgo Corp. v. J. Kugel Designs, Inc.*, 509 F. Supp. 2d 1247, 1264 (S.D. Fla. 2007) (citation omitted); *see also* 15 U.S.C. § 1116(d)(11) ("A person who suffers damage by reason of a wrongful seizure under this subsection has a cause of action against the applicant for the order under which such seizure was made.").

CDI cites the Court's orders denying MEC's request for preliminary injunctive relief and denying MEC's motion for reconsideration in which the Court stated, "[MEC] misrepresented Defendants as counterfeiters and their goods as counterfeit" (Doc. No. 52 at p. 4) and that the designs on Defendants' t-shirts were not identical to the Plaintiff's federal trademark for clothing (Doc. No. 40 at p. 2).  (Doc. No. 170 at p. 8).  However, CDI fails to include in its argument that the Court further stated that "Defendants' goods do not appear to qualify as counterfeits" rather than definitively finding as a matter of law that the Defendants' good were not counterfeits.  (*See* Doc. No. 52 at p. 5).  Moreover, the Court reiterated multiple times that its denial of a preliminary injunction was not a ruling on whether MEC would ultimately prevail on its counterfeit claim but rather was a determination that MEC had not satisfied its burden for preliminary injunctive relief.  (*See* (*id.* at p. 9); (Doc. No. 101 at pp. 2-3)).[20]

---

[20] *See also Davidoff & CIE, S.A. v. PLD Int'l Corp.*, 263 F.3d 1297, 1300 (11th Cir. 2001) ("A party seeking a preliminary injunction for trademark infringement must establish four elements: (1) substantial likelihood of success on the merits; (2) that it would be irreparably harmed if

18

CDI also cites to the Court's prior orders in which the Court stated that "Defendants[21] are not typical 'fly by night' counterfeiters."  (Doc. No. 170 at p. 8 (citing (Doc. No. 52 at p. 3))).  Again, the Court's statement was made at the preliminary injunction stage before a record was fully developed on the issue of whether Defendants are counterfeiters.   Additionally, as previously noted, CDI highlights the Court's statement regarding MEC's failure to clarify that at the time of the seizure, the ||| symbol without the words "Monster Energy" was only a common law trademark.   However, although the ||| mark was not yet registered for clothing, MEC did have an application for registration pending.  (Doc. No. 170 at p. 8).

For its law of the case argument, CDI relies heavily on situations involving a district court revisiting a decided issue on remand, which is not the situation before the Court.  (*See* Doc. No. 170 at pp. 6-7).  Instead, the situation before the Court is one in which CDI is requesting the Court to use statements made at the preliminary injunction stage of the proceedings to find that there is no question of material fact that MEC committed a wrongful seizure.   The Supreme Court has rejected such an approach.

In *University of Texas v. Camenisch*, the Supreme Court explained,

> The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held.  Given this limited purpose, and given the haste that is often necessary if those positions are to be preserved, a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on

---

injunctive relief were denied; (3) that the threatened injury to the trademark owner outweighs whatever damage the injunction may cause to the alleged infringer; (4) that the injunction, if issued, would not be adverse to the public interest. It is well established in this circuit that '[a] preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly established the 'burden of persuasion' as to all four elements." (citations omitted)).

[21] When the Court used the word "Defendants," it referred to the Amar Defendants as they were the only ones appearing in the case at that time.

> the merits.  A party thus is not required to prove his case in full at a preliminary-injunction hearing . . . and the findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at a trial on the merits.  In light of these considerations, it is generally inappropriate for a federal court at the preliminary-injunction stage to give a final judgment on the merits.

*Camenisch*, 451 U.S. 390, 395 (1981) (citations omitted).  The Eleventh Circuit has also stated, "Notably, however, 'a court's previous rulings may be reconsidered as long as the case remains within the jurisdiction of the district court.'"  *Aldana v. Del Monte Fresh Produce N.A., Inc.*, 578 F.3d 1283, 1289 (11th Cir. 2009) (citation omitted).  Elaborating, Circuit Judge Stanley Marcus further noted that the law of the case doctrine does not "require rigid adherence to rulings made at an earlier stage of a case in all circumstances."  For example, Judge Marcus explained that one of the three carved-out exceptions to the doctrine is when "a subsequent trial produces substantially different evidence." *Id.* (citation omitted).[22]

In the present case, the parties have developed an extensive record regarding bad faith and counterfeiting.  As well, at the preliminary injunction stage, MEC bore the burden of proof; however, to prove its counterclaim for wrongful seizure, CDI bears the burden of proof and must meet a completely different standard.  *See Martin's Herend Imps., Inc. v. Diamond & Gem Trading United States of Am. Co.*, 195 F.3d 765, 774-75 (5th Cir. 1999).  Therefore, the Court finds that the law of the case doctrine does not apply to CDI's wrongful seizure claim.[23]

---

[22] *See also* 18B Charles Alan Wright et al., <u>Federal Practice & Procedure: Jurisdiction 2d</u> § 4478.1 (2d ed. 2002) ("The pretrial rulings that may be reconsidered in continuing pretrial proceedings span the full range of pretrial activity.  Some pretrial rulings are avowedly preliminary, designed to maintain order while gathering information and resources for reconsideration.  An order granting or denying a preliminary injunction, for example, rests on tentative findings that are subject to reconsideration, either at trial or during later stages of pretrial proceedings.").

[23] In the opening section of CDI's motion for partial summary judgment, it states that it is seeking summary judgment on MEC's counterfeit claim based on the law of the case doctrine.

Besides attempting to rely on the Court's prior orders, CDI cites the deposition of Monster CEO Rodney Sacks for support that MEC lacked good faith when it procured the seizure order. (Doc. No. 170 at pp. 8-9). Specifically, CDI argues that Sacks testified that although he thought CDI's design was counterfeit, he also stated that the alleged counterfeit design was used with other illustrations such as eagles and skulls. (*Id.* (citing (Sacks Dep. at 77:14-78:24))). From this testimony, CDI concludes that MEC was "aware that Defendants' t-shirts were not identical with, or substantially indistinguishable from Monster's apparel" and thus MEC lacked good faith in arguing that CDI's apparel was counterfeit. (*Id.* (noting that Sacks refers to the design as a bad replica)). CDI fails to place this testimony in context.

For example, when Sacks refers to the design as a bad replica, he means the quality of the product is bad—"The actual quality of the printing. The quality of the way it was designed. The colors that were utilized were, we believed, were cheap." (*See* (Sacks Dep. at 74:24-75:14)). Further, Sacks testified, "You can see the similarity [between the marks]. You can see the marks. I've seen thousands and thousands of, of infringing articles and copies, and this is classic of one of them. And this is a copy, and it's a bad copy. And the quality was bad, and the circumstances surrounding it." (*Id.* at 74:24-75:4). MEC thus argues that Sacks' testimony

---

(Doc. No. 170 at pp. 1-2). However, CDI fails to develop this argument in its filing. Even if the Court were to consider such an argument, the Court still finds that the law of the case doctrine does not apply for the same reason as set forth above. Therefore, CDI's motion for summary judgment on this basis is denied. As well, CDI fails to set forth even the standard for proving a counterfeit claim. *See Babbit Elecs., Inc. v. Dynascan Corp.*, 38 F.3d 1161, 1181 (11th Cir. 1994) (per curiam) ("In order for [MEC] to prevail on its counterfeiting claim, it must demonstrate that [CDI] infringed a registered trademark in violation of 15 U.S.C. § 1114(1)(a) and it must prove that [CDI] 'intentionally used a mark, knowing such mark is a counterfeit mark.' 15 U.S.C. § 1117(b).").

shows that he believed CDI's  mark to be a counterfeit even with CDI's additional skulls and eagles on the shirts.  (Doc. No. 191 at p. 16 (citing Sacks Dep. at 77:3-78:8)).

Notwithstanding, CDI argues that Sacks testified that MEC sought to procure the seizure without considering that CDI's joint venturer Joe Cool, Inc. was selling from an established business address.  (Doc. No. 170 at pp. 9-10 (citing (Sacks Dep. at 71:14-73:25))).  However, again, CDI fails to put Sacks' testimony in context.  During CDI's examination of Sacks, it questioned whether Sacks placed significance on the fact that Joe Cool, Inc. ran its business out of a warehouse at a fixed location.  In response, Sacks emphasized the concern that Joe Cool, Inc. was holding a tent sale during Daytona Bike Week and that based on an investigative report, the allegedly infringing inventory would possibly be gone after the tent sale.  (Sacks Dep. at 73:5-74:20).  Thus, the thrust of Sacks' testimony focuses on the portable nature of the inventory rather than on the building that held the inventory.  As well, Sacks testified that MEC did not find the permanent address significant because it believed counterfeiters move their products quickly.  Therefore, CDI fails to show that no reasonable jury could find that MEC considered Joe Cool, Inc.'s established business address when deciding whether to procure a seizure order.  Additionally, beyond its reliance on the law of case doctrine, CDI does not offer any additional evidence showing that no reasonable jury could find that CDI's apparel bearing the  design was counterfeit.

MEC further argues, in response to CDI's motion for summary judgment, that Sacks also testified that counterfeiting was becoming "a big problem" for MEC and that MEC had sought seizures in prior cases to protect its marks.  (Doc. No. 191 at pp. 15-16); (Sacks Dep. at 33:17-25; 36:1-7).  Additionally, MEC argues that the hang tags for CDI's shirts displayed "™"

alone in miniature, which MEC argues provides a basis to believe that CDI's apparel was counterfeit. (Doc. No. 191 at pp. 17-18). However, the hang tag also contained, in full:



(Doc. No. 178-26).[24]  The Court also notes that the  symbol in (Doc. No. 178-26) uses a

green color scheme that is similar to the one MEC uses for the  t-shirt.

Therefore, based on the foregoing, the Court denies CDI's motion for summary judgment on its counterclaim for wrongful seizure.[25]

Although the Court need not reach CDI's request for punitive damages based on its wrongful seizure claim, the Court finds clarification is needed on this point.  On June 28, 2012, the Court denied CDI leave to amend its amended counterclaim to, *inter alia*, seek punitive damages under its wrongful seizure claim. (Doc. No. 140).  In that Order, the Court held,

> Pursuant to 15 U.S.C. § 1116(d)(11), CDI may seek punitive damages for its wrongful seizure count if the seizure was sought in bad faith.  *See* 15 U.S.C. § 1116(d)(11).  For support, CDI notes several findings by the Court that [MEC] made multiple misleading statements and representations to the Court when [MEC] sought a temporary restraining order and seizure order. (Doc. No. 127-1 at ¶¶ 57-59).  However, CDI had the opportunity to include punitive damages in its first amended counterclaim but failed to do so.  It is unclear why CDI did not include punitive damages in its first amended counterclaim.  The Court will not

---

[24] The Court notes that the green outlining around the wording is not exact. (*See* Doc. No. 178-26).

[25] MEC also raises the argument that based on Florida's laws regarding joint ventures, CDI lacks standing to bring a wrongful seizure claim. (Doc. No. 191 at p. 12).  MEC cites to its argument in its motion for summary judgment. (*See* Doc. No. 173).  The Court has fully addressed this argument in a separate order and found that the Court could not fully reach the argument as the parties failed to address in their filings the nuances of this argument.  Therefore, the Court will not discuss the argument further in this Order.

> reward parties that engage in sloppy pleadings.  *See Foman*, 371 U.S. at 182 (listing other reasons for denial such as undue delay, bad faith or dilatory motive on movant's part, undue prejudice to opposing party, or repeated failure to cure deficiencies by amendment).  Therefore, leave to amend to seek punitive damages under the wrongful seizure count is denied.

(Doc. No. 140 at p. 15).  By assuming that it pleaded punitive damages, CDI either failed to read this Order or simply ignored it.  (*See* (Doc. No. 202 (noting CDI's failure to read the Case Management and Scheduling Order and failure to follow Local Rule 3.01(g) when filing motions))).[26]  Failure to follow the Court orders and instructions results in needless delay and a waste of judicial resources.

## V.   MEC'S TRADEMARK-RELATED CLAIMS

### A.  *CDI's Failure to Brief the Claims Fully*

CDI also seeks the Court to grant it summary judgment on MEC's claims for:

1.  Trademark infringement pursuant to 15 U.S.C. § 1114 (Count I);[27]

2.  False designation of origin pursuant to 15 U.S.C. § 1125(a) (Count III);

3.  Cancellation of Florida trademarks pursuant to Fla. Stat. § 495.101 (Count V);

4.  Florida statutory unfair competition (Count VI);

5.  Florida common law unfair competition (Count VII);

---

[26] As the Court notes in the next section, CDI also, at times, fails to cite to any portion of the record when making factual assertions in its arguments.  *See* Fed. R. Civ. P. 56(c)(1)(A) ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by (A) citing to particular parts of materials in the record . . . ."); Fed. R. Civ. P. 56(c)(3) ("The Court need consider only the cited materials, but it may consider other materials in the record."); (*see also* (Doc. No. 121 at p. 6 (The Case Management and Scheduling Order clearly states, "Both the movant and the party opposing summary judgment shall provide pinpoint citations to the pages and lines of the record supporting each material fact.  General references to a deposition are inadequate."))).

[27] It appears CDI is only seeking summary judgment on the trademark infringement aspect of this count.  (Doc. No. 170 at pp. 1-2); *see supra* note 23.

6.   Cancellation of New Jersey trademark under N.J. Stat. Ann. § 56:3-13.8 (Count IX).

(Doc. No. 130).

CDI argues that MEC cannot prove these claims with respect to CDI's 1993  mark ("Skinny 3DL Mark") and with respect to CDI's  mark ("Fat 3DL mark") because there is no likelihood of confusion between these 3DL marks and MEC's  mark.  (Doc. No. 170 at p. 12).[28]



[28]

(Skinny 3DL mark)                    (Fat 3DL mark)

First, CDI is now alleging there are two versions of the 3DL mark (the ⬛ mark and the ⬛ mark).  (*See* Doc. No. 191 at p. 14 (MEC noting that CDI raised this new theory at the end of discovery)).  However, CDI's amended counterclaim never raises such a distinction or even the existence of the ⬛ mark.  In fact, when CDI provided a description of the 3DL, there was no mention of a skinny version.  (*See* Doc. No. 122 at ¶ 139).  Therefore, CDI, in essence, appears to be attempting to amend its amended counterclaim at the summary judgment stage.  Such actions are impermissible and demonstrate a disregard for the *Federal Rules of Civil Procedure* and the Court's case management deadlines.  Further, as the Court explained in its Order relating to MEC's motion for summary judgment, these two marks cannot be tacked onto each other. However, out of an abundance of caution, the Court will address both alleged versions of the 3DL design.

Second, rather than setting forth the legal standards for MEC's claims and the elements the Court must reach before addressing the issue of likelihood of confusion, CDI simply states the likelihood of confusion standard without acknowledging the other elements.  *See Times Newspapers, Ltd. v. Times Publ'g Co.*, No. 92-1435-CIV-T-15(A), 1993 WL 120614, at *2 (M.D. Fla. Feb. 16, 1993).  Because the Court finds that setting forth the standards clarifies the issues and shows the factors CDI appears to be conceding for purposes of summary judgment, the Court will set forth the applicable standards.

With respect to the trademark infringement in Count I, under 15 U.S.C. § 1114(1), "a defendant is liable for trademark infringement, if, without consent, he uses 'in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark' which 'is likely to

cause confusion, or to cause mistake, or to deceive.'" *Frehling Enters., Inc. v. Int'l Select Grp., Inc.*, 192 F.3d 1330, 1335 (11th Cir. 1999); *see also Carnival Corp. v. Seascape Casino Cruises, Inc.*, 74 F. Supp. 2d 1261, 1264-65 (S.D. Fla. 1999) ("To prevail on a trademark infringement claim under 15 U.S.C. § 1114, the plaintiff must show that it owns a valid trademark, that its mark has priority, that the defendant used such mark in commerce without the plaintiff's consent, and that the defendant's use is likely to cause consumer confusion as to the source, affiliation or sponsorship of its goods or services." (citations omitted)).   Therefore, to prove a claim for trademark infringement pursuant to 15 U.S.C. § 1114(1)(a),[29] MEC must show: "(1) that its mark has priority and (2) that [CDI's] mark is likely to cause consumer confusion." *Frehling Enters., Inc.*, 192 F.3d at 1335 (citations omitted).

With respect to Count III, to state a claim for false designation of origin under 15 U.S.C. § 1125(a),[30] MEC must show "(1) that it had trademark rights in the mark or name at issue and

---

[29] 15 U.S.C. § 1114(1)(a) states, in pertinent part:

> (1) Any person who shall, without the consent of the registrant--
> (a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive.

15 U.S.C. § 1114(1)(a).

[30] 15 U.S.C. § 1125(a) states in pertinent part:

> (a) Civil action
> (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

(2) that [CDI] had adopted a mark or name that was the same, or confusingly similar to its mark, such that the consumers were likely to confuse the two." *Tana v. Dantanna's*, 611 F.3d 767, 773 (11th Cir. 2010) (citation omitted).  As well, in *Tana*, the Eleventh Circuit explained that the likelihood of confusion test required for claims under § 1114(1)(a) is the same as the one required for claims under § 1125(a).  *Id.* at 767 n. 5.  Additionally, the Eleventh Circuit has held that the analysis for Florida statutory and Florida common law claims of trademark infringement and unfair competition are the same as that used for a federal trademark infringement claim.  *See Gift of Learning Found., Inc. v. TGC, Inc.*, 329 F.3d 792, 802 (11th Cir. 2003) (per curiam) (citations omitted); (*see* (Doc. No. 130 (setting forth counts for Florida statutory unfair competition (Count VI) and Florida common law unfair competition (Count VII)))).

With respect to the cancellation claims, again, CDI fails to provide the legal standards for cancellation under Florida statutory law and New Jersey statutory law.  Additionally, CDI does not provide any case law or argument that the same elements in the standard for trademark infringement apply to the cancellation argument.  Because CDI fails to brief fully, or perhaps at all, this argument, the Court denies CDI's motion for summary judgment on Count V

---

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a).

(cancellation of Florida trademarks) and Count IX (cancellation of New Jersey trademark) of MEC's Second Amended Complaint.[31]

Additionally, because CDI solely addresses the likelihood of confusion test in its motion, the Court will assume for purposes of this motion for summary judgment that CDI does not challenge that MEC is the valid owner and holds priority over the ⫿⫿⫿ mark and all of its registered trademarks listed in this action.   (*See supra* chart showing registered trademarks). Therefore, the Court will only address the likelihood of confusion factors.[32]

## B.  *Likelihood of Confusion Test*

To determine whether a likelihood of confusion exists between the two marks, the Eleventh Circuit applies a multifactor test, evaluating seven factors:

> (1) strength of the mark alleged to have been infringed;[33] (2) similarity of the infringed and infringing marks; (3) similarity between the goods and services offered under the two marks; (4) similarity of the actual sales methods used by the holders of the marks, such as their sales outlets and customer base; (5) similarity of advertising methods; (6) intent of the alleged infringer to misappropriate the proprietor's good will; and (7) the existence and extent of actual confusion in the consuming public.

*Tana*, 611 F.3d at 774-75 (citation omitted).   Of these factors, the strength of the mark and evidence of actual confusion are the most important.  *See Frehling Enters., Inc.*, 192 F.3d at

---

[31] Even if the Court were to lump the state law cancellation actions into the same analysis as the trademark infringement and unfair competition claims, the Court still finds there remains a question of material fact as to whether there is a likelihood of confusion between the marks.

[32] In response to CDI's motion for partial summary judgment that argues that there is no likelihood of confusion, MEC replies that during discovery, CDI responded with the following to an interrogatory inquiring about evidence supporting CDI's contention that there was no likelihood of confusion: "Defendant objects on the grounds that the information sought calls for facts known and opinions held by consulting experts and calls for legal conclusions."  (Doc. No. 177-28 at p. 15).   MEC expounds further that CDI has no expert regarding the likelihood of confusion.  (Doc. No. 191 at p.  2); (*see also* (Doc. No. 217 at p. 26 (showing CDI listing no expert witness on the Joint Final Pretrial Statement))).   Nonetheless, the Court will still address CDI's motion for partial summary judgment.

[33] This factor is sometimes described as the "type of mark" factor.

1335 (citation omitted).   Nonetheless, the seven-factor test "entails more than the mechanistic summation of the number of factors on each side . . . [and] involves an evaluation of the overall balance" that also takes into account the unique facts of each case.  *Caliber Auto. Liquidators, Inc. v. Premier Chrysler, Jeep, Dodge, LLC*, 605 F.3d 931, 939 (11th Cir. 2010) (citations omitted); *see also Popular Bank of Fla. v. Banco Popular de P.R.*, 9 F. Supp. 2d 1347, 1358 (S.D. Fla. 1998) ("In applying this test, no single factor is dispositive, but in the 11th Circuit, greater weight is given to the type of mark and evidence of actual confusion." (citations omitted)).

i.    <u>Strength or Type of the ⅢⅠ mark</u>

CDI argues that MEC's ⅢⅠ mark is weak because of alleged third party use.  (Doc. No. 170 at p. 15).  Again, however, CDI fails to apply the proper Eleventh Circuit standard for evaluating the strength of a mark.

Although CDI focuses on the ⅢⅠ mark, MEC bases some of its claims on registered marks that they registered over five years ago for other products.  In its response to the present motion, MEC contends that certain of its marks are incontestable.  *See* 15 U.S.C. § 1065(3); (Doc. No. 191 at p. 3).  Incontestable status means that a mark is presumed to be at least descriptive with secondary meaning and thus is a relatively strong mark.  *Dieter v. B& H Indus. of Sw. Fla., Inc.*, 880 F.2d 322, 329 (11th Cir. 1989).  Although a mark is incontestable, an opposing party may still challenge its strength.  *See HBP, Inc. v. Am. Marine Holdings, Inc.*, 290 F. Supp. 2d 1320, 1329 (M.D. Fla. 2003).  However, to achieve incontestable status, MEC must file an affidavit with the U.S. Patent and Trademark Office five years after registering the trademark and have the trademark declared "incontestable."   MEC has not provided the Court

any proof of filing the required affidavits; however, CDI appears to concede incontestable status for certain marks for non-clothing products.  (*See* Doc. No. 170 at p. 15).

The strength of a mark is relevant to determining the scope of protection. The Eleventh Circuit has explained that "only those marks that are capable of distinguishing the owner's goods from those of others, i.e., that are sufficiently 'distinctive,' are eligible for federal registration or protection as common law marks under the Lanham Act." *Tana*, 611 F.3d 773-74 (citations omitted).  There are four types of marks:

> (1) generic—marks that suggest the basic nature of the product or service; (2) descriptive—marks that identify the characteristic or quality of a product or service; (3) suggestive—marks that suggest characteristics of the product or service and require an effort of the imagination by the consumer in order to be understood as descriptive; and (4) arbitrary or fanciful—marks that bear no relationship to the product or service, and the strongest category of trademarks.

*Id.* at 774 (citation omitted).

CDI fails to address this analysis while MEC argues that its marks are "arbitrary and fanciful" because "their intrinsic nature serves to identify a particular source of a product."  (Doc No. 191 at pp. 6-7); *see Tana*, 611 F.3d at 774 (citations omitted); *see, e.g.*, (Doc. No. 177-1 (showing various media clips in which the M Claw mark is displayed or worn by athletes)).  As well, MEC notes that since 2002 it has expended over $1.68 billion in promotional campaigns using the $\rlap{\text{\textbf{M}}}$ mark and the Monster Energy® drinks.  (Sacks Dec. at ¶ 8).  Such promotional expenses may be used to strengthen an initially weak mark.  *See John H. Harland Co. v. Clarke Checks, Inc.*, 711 F.2d 966, 974 n.13 (11th Cir. 1983); *see also Coach House Rest., Inc. v. Coach and Six Rests., Inc.*, 934 F.2d 1551, 1560 (11th Cir. 1991) ("In the absence of consumer survey evidence, four factors can be considered in determining whether a particular mark has acquired a secondary meaning: (1) [T]he length and manner of its use; (2) the nature and extent of

advertising and promotion; (3) the efforts made by the plaintiff to promote a conscious connection to the public's mind between the name and the plaintiff's . . . business; and (4) the extent to which the public actually identifies the name with the plaintiff's [product]." (citation omitted)).

However, the Ⲙ mark may be construed as a variation of the letter "M."  As such, it may be considered a common term and, though arbitrary, may not be "accorded the same degree of protection given such coined and fanciful terms such as 'Kodak' or 'Xerox.'"  *Michael Caruso & Co.  v. Estefan Enters., Inc.*, 994 F. Supp. 1454, 1459 (S.D. Fla. 1998).  The Eleventh Circuit, when addressing the use of the letter "V" on a shoe, explained that the court should consider whether the mark is "a 'common' basic shape or design, whether it [is] unique or unusual in a particular field, [and] whether it [is] a mere refinement of a commonly-adopted and well-known form of ornamentation for a particular class of goods viewed by the public as a dress or ornamentation for the goods . . . ."  *See Brooks Shoe Mfg., Co. v. Suave Shoe Corp.*, 716 F.2d 854, 857-58 (11th Cir. 1983) (citation omitted).

In the present case, the Ⲙ mark is not in a common design of an "M" and does not appear to be a mere refinement of a commonly adopted ornamentation.  Moreover, the Ⲙ mark is still an arbitrary mark even if weakened slightly by its roots in the letter "M."  Its well-established secondary meaning more than compensates for such diminished strength.

Dr. Gerald L. Ford designed and conducted a survey to determine the secondary meaning or acquired distinctiveness of the Ⲙ mark on t-shirts.  (Ford Dec. (Doc. No. 177-2 at p. 3)).[34]

---

[34] Below are the samples used in the survey.

Using a standard shopping center intercept methodology, Ford caused to be conducted interviews at "shopping centers in metropolitan markets in eight (8) states, two (2) shopping centers located in each of the four (4) U.S. Census regions." (*Id.*). After adjusting for survey data mismeasurement error based upon the control cell, Ford found that sixty-seven percent (66.66%) of the relevant universe associates the �III mark on t-shirts with MEC,[35] or with a sole, yet anonymous source.[36] (*Id.* at pp. 3-4); *see also* 6 J. Thomas McCarthy, McCarthy on Trademarks & Unfair Competition § 32:190 (4th ed. 2012) (noting that courts generally regard figures over 50% as clearly sufficient to prove secondary meaning in a designation). Additionally, Ford conducted a survey at shopping centers in four Florida metropolitan markets (Daytona Beach, Fort Lauderdale, Orlando, and Tampa) and found similar results. (Ford Dec. at p. 16). After adjusting for survey data mismeasurement error based upon the control cell, Ford found that approximately seventy-three percent (73.21%) of the relevant universe of Florida respondents associates the �III mark on t-shirts with MEC,[37] or a sole, yet anonymous source. (*Id.* at pp. 18-




(Test Cell Symbol)          (Control Cell Symbol)

---

[35] Ford reports shows that 65.28% of the respondents shown the �III mark on t-shirts associated the shirt with MEC. (Ford Dec. (Doc. No. 177-2 at p. 13)).

[36] "Sole, yet anonymous source" means that the respondent associates the t-shirt with a single company but is unable to identify the company spontaneously by name.

[37] Ford reports shows that 75.00% of the respondents shown the �III mark on t-shirts associated the shirt with MEC. (Ford Dec. at 177-2 at p. 19)).

19).[38]  Therefore, based on the analysis thus far, the Court finds that the |||mark is an arbitrary or

fanciful mark.

However, "important in gauging the strength of a mark is the degree to which third

parties make use of the mark."  *Frehling Enters., Inc. v. Int'l Select Grp., Inc.*, 192 F.3d 1330,

1336 (11th Cir. 1999) (citation omitted); *see also John H. Harland Co.*, 711 F.2d at 975 ("The

words of a mark are not, however, the sole factors determining its strength.  Also important is the

extent of third party use of the mark." (citations omitted)).

When there is a lack of a third party use, a mark's strength and distinctiveness are

enhanced and thus more easily recognized by consumers.  *Frehling Enters., Inc.*, 192 F.3d at

1336 (citations omitted).  Conversely, a mark is weakened, the greater the use by third parties.

*See id.*  In the present case, CDI argues: (1) there are thirty-three active and inactive federal

trademarks using a claw mark similar to the |||mark for a variety of goods and services; (2) there

are six type fonts with a letter "M" that are currently available on the Internet that resemble the

|||mark; and (3) there are designs on book covers, movie posters, and athletic uniforms that are

similar to the |||mark.  (Doc. No. 170 at pp. 16-17 (citing (Doc. No. 170-1); (Doc. No. 170-2);

(Doc. No. 170-3))).

MEC counters that most of the thirty-three marks cited by CDI "bear no resemblance" to

the |||mark and that many are for unrelated products and industries or are abandoned.  (Doc.

No. 191 at pp. 7-8);  *see also Ambrit, Inc. v. Kraft, Inc.*, 812 F.2d 1531, 1539 (11th Cir. 1986)

("Use of isolated elements of [the plaintiffs'] trade dress that do not convey the same total image

_____

[38] Ford's survey targeted respondents who in the past three months purchased a t-shirt with a logo on it or who in the next three months were likely to purchase a t-shirt with a logo on it. (Ford Dec.  at pp. 10-11)).

does not, however, lead to the [plaintiff's trade dress] being stripped of protection." (citation omitted)).[39]

*See* examples below



Second, not all of the six type fonts with a letter "M" appear to be similar to the Ⱳ mark but a reasonable jury may see some similarities between the Ⱳ mark and the letter "M" displayed on page 2 of Document No. 170-2.  Third, the designs on the book covers, movie posters, and uniforms, again, do not appear to resemble the Ⱳ mark and thus a reasonable jury may not find them to be examples of third party use.

*See* examples below



Finally, the Eleventh Circuit has clarified that with third party uses, it believes "a further consideration relevant in determining the significance of third-party use is the entire name a third party uses, as well as the kind of business in which the user is engaged.  Third party users that incorporate the [mark] along with distinctive additional words, or engage in a business different

_____

[39] MEC also notes that CDI failed to produce these marks during discovery.  (Doc. No. 191 at p. 7).

from that of [the plaintiff], may not diminish the strength of the [plaintiff's] mark." *See Safeway Stores, Inc. v. Safeway Discount Drugs, Inc.*, 675 F.2d 1160, 1165 (11th Cir. 1982); *see also Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 260 (5th Cir. 1980) ("The third-party uses and registrations discussed above merely limit the protection to be accorded plaintiff's mark outside the uses to which plaintiff has already put its mark." (citations omitted)).[40]  *But see Sun Banks of Fla., Inc. v. Sun Fed. Sav. & Loan Ass'n*, 651 F.2d 311, 316-17 (5th Cir. Jul. 1981) (noting the weakening effect of use of the "Sun" mark in related and unrelated business).[41]  As MEC notes in its argument, the evidence produced by CDI shows that these marks, even if construed as similar to the  mark, were used in businesses different from MEC.  Therefore, the Court concludes that a reasonable jury may find that MEC's  mark is at least a relatively strong mark.

   ii. <u>Similarity of the Infringed and Infringing Marks</u>

  Next, when comparing the similarity of the  mark with the  mark and the  mark, the Court considers the overall impression that the marks create, including the sound, appearance, and manner in which they are used.  *Frehling Enters., Inc.*, 192 F.3d 1337 (citation omitted).  The Court considers the total effect of the mark and its commercial impression as a whole rather than a comparison of individual features.  *See Amstar Corp.*, 615 F.2d at 260-61 (citation omitted).

---

[40]*See Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc) (adopting as binding precedent all decisions of the former Fifth Circuit prior to the close of business on September 20, 1981).

[41]Based on the language of *Amstar*, it appears *Sun Banks of Florida, Inc.* overstates the impact of the third-party users in this circuit.

CDI argues that the marks are not similar, relying on the testimony of MEC's CEO Sacks, who testified that the 3DL mark was a "bad replica" while describing the differences in the claw directions.   (*See* Doc. No. 170 at pp. 17-18 (citing (Sacks Dep. at 79:11-19))).   However, as noted previously, CDI takes Sacks' testimony out of context.   First, as previously stated, when Sacks refers to the  mark as a bad replica, he means the quality of the product is bad—"The actual quality of the printing.  The quality of the way it was designed.  The colors that were utilized were, we believed, were cheap."   (*See* (Sacks Dep. at 74:24-75:14)).   Further, Sacks testified, "You can see the similarity [between the marks].  You can see the marks.  I've seen thousands and thousands of, of infringing articles and copies, and this is classic of one of them.  And this is a copy, and it's a bad copy.  And the quality was bad, and the circumstances surrounding it."   (*Id.* at 74:24-75:4).   MEC thus argues that Sacks' testimony shows that he believed CDI's  mark to be a counterfeit even with CDI's additional skulls and eagles on the shirts.   (Doc. No. 191 at p. 16 (citing (Sacks Dep. at 77:3-78:8))).   Additionally, when CDI quotes Sacks in its motion regarding Sacks' description of the differences between the marks, CDI fails to includes Sacks' conclusion that

> [i]n other words, what I'm saying, [the 's] base design has been, has been stolen.  And that's been taken and tried to be redesigned on something that looks as close to the uninformed, quick viewer as the original, but at the same time has got little points of difference.  That's what that is.  That is not something that just was come up with independently, honestly, and independently of our trademark.  That is my view.

(Sacks Dep. at 79:19-80:2).

As well, CDI relies on the Court's earlier statements in the preliminary injunction context.  As noted above, the Court's statements at the preliminary injunction stage are not the

law of the case and do not have preclusive effect at the summary judgment stage.  (*See* (Doc. No. 170 at p.18)).

Next, CDI claims that it uses the ▯ mark and the ▯ mark together on t-shirts consistently.  (Doc. No. 170 at p. 18).  However, the only proof for this assertion is t-shirts from 2011 shown in MEC's Second Amended Complaint.  (*Id.* (citing (Doc. No. 130 at p. 14))).  CDI also notes that it places the name of geographic locations along with its 3DL mark on t-shirts. (*Id.*).

Finally, CDI cites a series of non-binding, non-Eleventh Circuit cases to argue, without citation to the record, that when MEC uses the ▯ mark on clothing, MEC usually includes the words "Monster Energy."  (Doc. No. 170 at pp. 18-19).  Besides failing to cite any evidence to support this argument,[42] the cases CDI relies upon are distinguishable as they involved two competing companies distinguishing their product with their well-established brand name on their respective products.  *See, e.g.*, *Bristol-Myers Squib Co. v. McNeil-P.P.C., Inc.*, 973 F.2d 1033, 1047 (2d Cir. 1992) (noting the prominent names of "Excedrin" and "Tylenol" distinguished the origin of the products).

MEC responds that the ▯ mark, in comparison to the ▯ mark and the ▯ mark, have similar shapes and color schemes, including "a yellowish green on one side of each 'leg' of the 'M' shape, blending into a darker green on the other side."  (Doc. No. 191 at p. 8).

---

[42] *See supra* note 26.





MEC's M Claw Shirt                      CDI's 3DL Shirt

(*See* Doc. No. 191 at p. 8).

MEC also notes that the U.S. Patent and Trademark Office ("Trademark Office") suspended

CDI's application to register the  design because it was "nearly identical" to  the  mark

and "confusion as to source [was] likely."  (*Id.* (citing Doc. No. 190-3 at pp. 13-14)).   The

Trademark Office also noted that the "addition of the wording MONSTER ENERGY by [MEC]

[did] not obviate the similarity between the marks."  (Doc. No. 190-3 at p. 13).

Finally,  MEC  cites  Philip  Johnson's  survey  ("Johnson  Survey")  that  shows  that

consumers confuse the  mark and the  mark as originating from MEC.  (Doc. No. 191 at pp.

8-9).  In the Johnson Survey, Johnson designed and conducted a survey to determine the extent

to which prospective purchasers of logo t-shirts would falsely believe that CDI's t-shirt using the

mark and the  mark would originate from or be related to MEC.  (Doc. No. 178-25 at p.

39

6).[43]  Johnson Survey involved interviews at shopping malls across the four major U.S. Census

Regions and specifically in Jacksonville, Florida and Tampa, Florida and heavily in the Eastern

---

[43] Below are some of the samples used in the survey.

| **WOMEN'S TEST CELL** | **WOMEN'S CONTROL CELL** |
|---|---|
| **Black/Green Florida** | **Black/Green Florida** |

   

**Yellow/Pink Florida**            **Yellow/Pink Florida**

   

Seaboard where CDI has heavier distribution. (*Id.* at p. 8). The qualified respondents were adults eighteen years of age or older that were prospective purchasers of logo t-shirts. (*Id.*). The methodology followed the general pattern of the "Everready" test. (*Id.* at p. 12).

According to the study, when respondents were asked "who they believe is the source of the t-shirt they were shown, overall, Monster was spontaneously named as the source by nearly half (49%) in the test cell compared to just 6% in the control cell. Just 1% in the test cell and 2% in the control cell named Joe Cool or Consolidated as the source." (*Id.* at p. 20). Of those test cell respondents who named Monster as the source, "the most frequently cited reason [was] the logo (44%) . . . [while] [o]ther frequently mentioned reasons include[d] the colors (12%) and the look and style of it (7%)." (*Id.* at p. 21).

| **MEN'S TEST CELL** | **MEN'S CONTROL CELL** |
|---|---|
| **Black/Green Bike Week** | **Black/Green Bike Week** |
|  |  |
| **Black/Green New York** | **Black/Green New York** |
|  |  |

Therefore, based on the foregoing, the Court finds that a reasonable jury could find that the marks are similar.

      iii.    <u>Similarity Between the Goods and Services Offered Under the Two Marks</u>

For the similarity of goods factor, the Court must determine "whether the products are the kind that the public attributes to a single source, not whether or not the purchasing public can readily distinguish between the products of the respective parties." *Frehling Enters., Inc.*, 192 F.3d at 1338 (citation omitted).

CDI, again, cites to non-binding, non-Eleventh Circuit case law, to argue that CDI's t-shirts are not competing with MEC's energy drinks.  (Doc. No. 170 at pp. 19-20).  The cases relied upon by CDI involve clearly distinct products while the present case involves competing t-shirts.  *See, e.g.*, *Heartsprings, Inc. v. Heartspring, Inc.*, 143 F.3d 550, 552 (10th Cir. 1998) (involving competing use of a mark between a publisher of books and pamphlets teaching students to resolve conflicts nonviolently and a school for the physically disabled at which they are taught basic life skills like dressing, bathing, and eating).

CDI also argues, without citation to the record, that CDI sells its products for under $20 while MEC sells its clothing products mostly for more than $20 and sometimes in excess of $100.  (Doc. No. 170 at p. 20).  As the Court has reiterated throughout this Order, CDI continually fails to cite the record for support when making factual assertions.  *See* Fed. R. Civ. P. 56(c)(1)(A) ("A party asserting that fact cannot be or is genuinely disputed must support the assertion by (A) citing to particular parts of materials in the record . . . ."); Fed. R. Civ. P. 56(c)(3) ("The Court need consider only the cited materials, but it may consider other materials in the record."); (*see also* (Doc. No. 121 at p. 6 (The Case Management and Scheduling Order clearly states, "Both the movant and the party opposing summary judgment shall provide

pinpoint citations to the pages and lines of the record supporting each material fact.  General references to a deposition are inadequate.")))

As well, CDI, again, takes out of context Sacks' testimony regarding MEC's approach to promoting its brand through clothing sales.  (*See* (Doc. No. 170 at p. 20 (citing (Sacks Dep. at 44:17-45:14)))).  CDI neglects to note that in this part of Sacks' deposition, Sacks is discussing the licensing of the ⫲ mark for clothing and the importance of the brand.  (Sacks Dep. at 42:12-46:7).

Additionally, the Johnson Survey discussed above showed that nearly half (49%) of those shown a 3DL shirt believed the source of the t-shirt was MEC and just 6% of those shown the control cell identified the source as MEC.  (Doc. No. 190-3 at p. 20).  MEC also argues that CDI's claim that its products are distinguishable because they are cheaper is without merit. *See Drexel Enters., Inc. v. Hermitage Cabinet Shop, Inc.*, 266 F. Supp. 532, 538-39 (N.D. Ga. 1967) (citation omitted) (rejecting the cost differential argument).

Based on the foregoing, the Court concludes that a reasonable jury may find that there is a similarity between CDI and MEC's goods offered under their marks.

iv.     Similarity of the Actual Sales Methods

With respect to similarity of actual sales, the likelihood of confusion is "more probable if the products are sold through the same channels to the same purchasers."  *See Ambrit, Inc.*, 812 F.2d at 1541 (citation omitted).

Again, without citing any portion of the record, CDI argues that there is no similarity between the outlets used by CDI and MEC because CDI sells its 3DL shirts at beach shops while MEC sells its goods at "boutique motorcycle and athletic wear retail outlets and via Monster's

43

websites and the websites of athletic goods and retailers." (Doc. No. 170 at p. 21); *see supra* note 26 (discussing the rules regarding citation to the record).

MEC argues that it sells its clothing products through its websites and through retail channels and sporting events, including motorcycle racing events. (Doc. No. 191 at p. 11 (citing (Sacks Dec. at ¶ 5))). Additionally, MEC argues that CDI sold its 3DL t-shirts over the Internet, at beach shops, and at motorcycle events. (*Id.* (citing (Drew Maconachy Dec. (Doc. No. 4 at ¶ 7-9)))). *But see HBP, Inc.*, 290 F. Supp. 2d at 1335 n. 5 ("If the use of the Internet were enough to find commercial outlets to be similar, nearly all goods and services would be considered as being marketed together. The fact that both parties have a presence on the Internet does not suggest that their customers are likely to be similar or overlapping."). Finally, MEC argues that CDI's joint venturer Joe Cool, Inc. conceded that it used similar sales methods as MEC. (Doc. No. 32 at p. 11).[44] As well, the people who shop at "luxury stores" and "beach shops" are not mutually exclusive. *Cf. Frehling Enters., Inc.*, 192 F.3d at 1339 (discussing how affluent people shop at Sears and less affluent shop at Macy's).

Even if the Court did consider CDI's unsupported assertions on this factor, the Court still finds that there is a question of material fact as to whether the parties use similar actual sales methods.

v.   Similarity of Advertising Methods

With respect to similarity of advertising, if both parties use similar advertising media, a finding of likelihood of confusion is more probable. *See Ambrit, Inc.*, 812 F.2d at 1542. CDI argues, without citation, that there is no similarity of advertising because CDI does not advertise. (Doc. No. 170 at p. 21). This time, CDI provides a blank citation. *See supra* note 26.

---

[44] Neither party discusses directly the similarities of their customer bases when addressing this factor in their filings. (*See* (Doc. No. 191 at p. 11); (Doc. No. 170 at p. 21)).

MEC responds that CDI's joint venturer Joe Cool, Inc. conceded that it used methods of advertising similar to MEC.  (Doc. No. 191 at p. 12 (citing (Doc. No. 32 at p. 11))).  It is important to note that Joe Cool, Inc. was the joint venturer making the actual sales.  As well, the record shows that Joe Cool, Inc. maintained an Internet site for its products and a sales catalogue and used sales people to sell its heat transfers to other stores.  (Maconachy Dec. at ¶ 7-9); (Daniel Sadeh Dep. (Doc. No. 185-10 at 21:14-25 (discussing how Joe Cool Inc.'s salesman visited him at his Panama City Beach, Florida shop))).[45]  MEC also argues that, like Joe Cool, Inc. (CDI's joint venturer), MEC promotes its product at motorcycle events.  (Doc. No. 191 at p. 12).

Even if the Court was to consider CDI's bald assertions on this factor, the Court still finds that there is a question of material fact as to whether the parties use similar advertising methods.

vi.    CDI's Intent to Misappropriate MEC's Good Will

With respect to intent, the Eleventh Circuit has held that "[i]f it can be shown that a defendant adopted a plaintiff's mark with the intention of deriving a benefit from the plaintiff's business reputation, this fact alone may be enough to justify the inference that there is confusing similarity."  *Frehling Enters., Inc.*, 192 F.3d at 1340 (citation omitted).

Confusingly, CDI argues that there was no intent to misappropriate because CDI claims it is the senior user as CDI's predecessor Joe Cool, Inc. allegedly began using the ‖ mark in 1993. (Doc. No. 170 at p. 23).  First, CDI, again, does not cite to any part of the record for support.  *See supra* note 26.  Second, as the Court explained above, to reach the likelihood of confusion test, the Court would have to resolve the issue of priority first.  CDI failed to raise such an argument

---

[45] *See* Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record.").

except in one sentence on page 23 of its 25-page motion.  (Doc. No. 170 at p. 23).  Third, the

Court has ruled in connection to MEC's motion for summary judgment that CDI cannot tack the

 design onto to the mark.

As an alternative argument, CDI claims that it uses its mark in conjunction with events

like "Daytona Bike Week;" however, again, CDI fails to cite to the record for support.

MEC argues that CDI's 3DL design is very similar to MEC's mark, including the

use of similar green and yellow color scheme that varies from left to right.  (Doc. No. 191 at p.

10).  As well, MEC notes that evidence shows that CDI's design was not developed until

2010, long after MEC's mark was developed in 2002.  (*Id.* (citations omitted)).

Additionally, MEC argues that CDI used the phrase "let your beast out" on some of its

3DL shirts, which is similar to MEC's federally registered trademark "UNLEASH THE

BEAST."  (Doc. No. 191 (citing (Doc. No. 190-4); (Doc. No. 190-5))).  However, MEC fails to

note that its registration for the phrase "UNLEASH THE BEAST" is limited to fruit juices drinks

and soft drinks, instead of clothing.  (*See* Doc. No. 190-5).

Even if the Court did consider CDI's unsupported assertions on this factor, the Court still

finds that there is a question of material fact as to whether CDI intended to misappropriate

MEC's good will.

    vii.    <u>The Existence and Extent of Actual Confusion in the Consuming Public</u>

Although evidence of actual confusion is not necessary for a finding of a likelihood of

confusion, it is still the best evidence of a likelihood of confusion.  *See John H. Harland Co.*,

711 F.2d at 978 (citations omitted).  The Eleventh Circuit has clarified that there is no absolute scale as to how many instances of actual confusion establish the existence of the factor.  *See Ambrit, Inc.*, 812 F.2d at 1543.  Instead, the Court must evaluate based on the totality of the circumstances involved.  *Id.* (citations omitted).

In fact, more important is the type of person confused than the number of persons confused by the marks.  *See Frehling Enters., Inc.*, 192 F.3d at 1341.  As well, the "quantum of evidence needed to show actual confusion is relatively small."  *Caliber Auto. Liquidators, Inc.*, 605 F.3d at 937 (citation and internal quotations omitted).

CDI argues that the Johnson Survey, which MEC uses to show actual confusion, does not offer a meaningful survey regarding the likelihood of confusion because only one shirt contained the  mark.  (Doc. No. 170 at pp. 21-22).  As the Court noted previously, CDI's reliance on the  mark without any amendment to its Amended Counterclaim is questionable.  Nonetheless, MEC counters that the Johnson Survey included the  mark in the way CDI used the mark on its t-shirts as an ornamental element.  (*See* (Doc. No. 170 at p. 18 (CDI argues that CDI consistently uses the Skinny 3DL design and the Fat 3DL mark side by side on its graphic t-shirts))).  As well, MEC noted that the study also included the  mark alone on the back of some of the t-shirts shown to respondents.  (Doc. No. 191 at pp. 4-5 (citing (Doc. No. 178-25 at pp. 11, 63 &

64))).[46]  MEC also argues that CDI has never offered any proof of any t-shirt marketed with the

 mark alone.

---

[46] Below are some examples of the t-shirts with the  mark alone on the back of the t-shirt.  (*See* (Doc. No. 178-25 at pp. 62- 73)).

**BLACK/GREEN FLORIDA TEST CELL**



**BLACK/GREEN FLORIDA CONTROL CELL**



## YELLOW/PINK FLORIDA TEST CELL



## YELLOW/PINK FLORIDA CONTROL CELL



CDI further rebuts that the Johnson survey is flawed because it was conducted in shopping malls among consumers of t-shirts bearing a logo instead of beachgoers at beach shops and people who attend events like Daytona Bike Week.  (Doc No. 170 at p. 23).   Again, however, CDI fails to cite the record to support the assertion that its customers are limited to beachgoers who shop at inexpensive beach shops and attend events like Daytona Bike Week. (*Id.*); *see supra* note 26.   MEC, moreover, counters that courts have rejected surveys that are too narrow.  (Doc. No. 191 at p. 5 n.2 (citing *Brooks Shoe Mfg., Co. v. Suave Shoe Corp.*, 716 F.2d 854, 860-61 (11th Cir. 1983);  *Scott Fetzer Co. v. House of Vacuums, Inc.*, 381 F.3d 477, 487-88 (5th Cir. 2004))).   Finally, again, people who shop at malls and "beach shops" are not mutually exclusive.  *Cf. Frehling Enters., Inc.*, 192 F.3d at 1339 (discussing how affluent people shop at Sears and less affluent shop at Macy's).

Although the Eleventh Circuit has noted a trend of moving away from giving great weight to survey evidence, such proof can still be probative of actual confusion.  *See Ambrit, Inc.*, 812 F.2d at 1544 n.68 (citation omitted).  For example, according to the Johnson Survey,



**BLACK/GREEN BIKE WEEK TEST CELL**



"When the results to all the survey questions relating to source and relationship are considered together on an unduplicated basis, more than half of the test cell respondents (58%) name Monster as the source of the t-shirt they were shown compared to just 10% in the control cell." (Doc. No. 178-25 at p. 26).

Beyond the survey evidence, the record shows instances of actual confusion.   For example, Daniel Sadeh, a Joe Cool, Inc. buyer in Panama City Beach, Florida, was asked if he ever heard customers call the  design "monster", to which he answered, "Maybe, yeah. . . .  I guess because it looks like the monster design."  (Sadeh Dep. at 28:1-7); (*see also id.* at 32:17-19 (Sadeh may have heard his employees refer to the  design as monster shirts.).  MEC also argues that it has examples of individuals on eBay marketing CDI's 3DL shirts as originating from MEC and being the  mark t-shirts.  (Doc. No. 191 at p. 6).  However, the Court will not rely on these eBay sales for its decision because there is no evidence that either party uses eBay to market their shirts.

Nonetheless, even if the Court did consider CDI's unsupported assertions on this factor, the Court still finds that there is a question of material fact as to whether there is actual confusion in the consuming public.

### viii.    Conclusion Regarding Likelihood of Confusion

Having reviewed the seven factors used to determine the likelihood of confusion, the Court holds that there remains a genuine question of material fact as to whether there is a likelihood of confusion between the parties' respective marks.   Therefore, CDI's motion for summary judgment on Count I, Count III, Count V, Count VI, Count VII, and Count IX of MEC's Second Amended Complaint is denied.

### VI.    **CONCLUSION**

As the Court has noted multiple times in this Order, the parties' briefs were less than ideal in terms of setting forth the applicable and binding law.  As well, the Court reiterates CDI's complete disregard for the Case Management and Scheduling Order and Rule 56 with respect to citing the record.  The Court expects the parties to be more diligent as they prepare for trial. Therefore, based on the foregoing, it is **ORDERED** that the "Dispositive Motion for Partial Summary Judgment by Defendant Consolidate Distributors, Inc. ("CDI")" (Doc. No. 170), filed on September 30, 2012, is **DENIED**.

**DONE** and **ORDERED** in Orlando, Florida on January 3, 2013.

ANNE C. CONWAY
United States District Judge

Copies furnished to:
Counsel of Record
Unrepresented Parties