UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

**MONSTER ENERGY COMPANY,**

**Plaintiff,**

**v.**                                                          **Case No:  6:11-cv-329-Orl-22DAB**

**CONSOLIDATED DISTRIBUTORS,
INC., METTEMP, INC. and DAVID
BAKSHT,**

**Defendants.**
_____/

## ORDER

This cause comes before the Court on the following:

1.   Plaintiff Monster Energy Company's ("MEC") Motion for Summary
     Judgment on Priority and Defendant's Counterclaims (Doc. No. 173), filed on
     October 1, 2012;

2.   Response of Defendant Consolidated Distributors, Inc. ("CDI") to Plaintiff's
     Motion for Summary Judgment (Doc. No. 185), filed on October 19, 2012;
     and

3.   MEC's Reply Brief in Support of Its Motion for Summary Judgment on
     Priority and Defendant's Counterclaims (Doc. No. 192), filed on November 1,
     2012.

## I.       PROCEDURAL BACKGROUND

On March 3, 2011, MEC filed under seal an action, *inter alia*,  for trademark infringement

and copyright infringement, claiming that Defendants were infringing its famed M Claw ( 〣 )

trademark by selling and advertising goods containing the mark. (Doc. Nos. 1 & 2). At that time, MEC requested that the Court enter an *ex parte* seizure order to obtain the alleged "counterfeit products" Defendants[1] intended to sell during Daytona Bike Week 2011.

After the Court entered a temporary restraining order and *ex parte* seizure order arising out of the alleged use of MEC's famed ⚞ trademark (the logo without text) on clothing by CDI and others, deputy United States Marshals arrived at the Florida warehouse and office of Joe Cool, Inc., CDI's joint venturer, and seized merchandise and business records.[2] Soon after this seizure, it was clarified that at the time of seizure, MEC's registered trademark for its famed ⚞ trademark (the logo without text) was limited to beverage cans while the ⚞ (the logo with text) was the mark trademarked for shirts, stickers, and other apparel. MEC's representations to the Court suggested that at the time of the seizure, the ⚞ mark also applied to stickers and clothing. Based on this clarification, the Court denied MEC's request for a preliminary injunction and ordered it to return the seized items to the Defendants.[3] (Doc. No. 40). As well, the Court denied MEC's motion for reconsideration of the denial of a preliminary injunction (Doc. No. 52) and MEC's request to vacate the order pursuant to a settlement agreement (Doc. No. 101).

---

[1] When MEC initially filed this action, it sued Consolidated Distributors, Inc. ("CDI"); David Baksht; Mettemp, Inc.; Joe Cool, Inc.; Joe Cool Bike Week, Inc.; Michelle Amar; and Yosef Amar ("Defendants"). MEC and Joe Cool, Inc.; Joe Cool Bike Week, Inc.; Michelle Amar; and Yosef Amar later entered into a settlement agreement. (Doc. No. 102).

[2] The word "Defendants" refers to all of the original Defendants to this action. In its filings, CDI claimed that Joe Cool Bike Week, Inc. is a part of a joint venture between CDI and Joe Cool, Inc. However, it appears CDI has since abandoned this theory.

[3] At that time, CDI had not yet appeared in the case.

On January 19, 2012, the Court entered a Consent Final Judgment and Permanent Injunction as to Defendants Joe Cool, Inc.; Joe Cool Bike Week, Inc.;[4] Michelle Amar; and Yosef Amar ("Amar Defendants").[5]  (Doc. No. 102).  The settlement agreement was limited to the Amar Defendants.  Pursuant to the settlement, the Amar Defendants admitted that they sold and distributed items bearing designs that the parties contended might have a likelihood of being found to be confusingly similar to MEC's 〜 mark.  (*Id.* at ¶ 7).  As well, among other representations, the Amar Defendants asserted that they would not claim ownership in any trademarks that the parties contended were confusingly similar to MEC's 〜 mark.  (*Id.* at ¶ 8).  Finally, according to the settlement, the Amar Defendants agreed that all of their claims and defenses asserted by them, including their wrongful seizure claim, were dismissed with prejudice.  (*Id.*  at ¶ 10); (*see* (Doc. No. 85 at ¶¶ 145-161)).

On January 30, 2012, the Magistrate Judge granted MEC's motion for entry of a clerk's default against CDI; Mettemp, Inc.; and David Baksht.  (Doc. No. 104).  However, on April 25, 2012, upon the motion of David Baksht and Consolidated Distributors, Inc. ("Baksht Defendants") (Doc. No. 110), the Court set aside the default only as to the Baksht Defendants and not as to Mettemp, Inc.  (Doc. No. 120).

On March 16, 2012, the Baksht Defendants filed their answer and CDI filed a counterclaim (Doc. No. 109), and on April 27, 2012, the Baksht Defendants filed an amended answer and CDI filed its amended counterclaim (Doc. No. 122).  On June 6, 2012, the Baksht Defendants filed their amended answer and affirmative defenses to MEC's Second Amended Complaint.  (Doc.

---

[4] Yosef Amar signed the settlement as president and authorized signatory of Joe Cool, Inc. and Joe Cool Bike Week, Inc.
[5] The settlement did not apply to David Baksht; Consolidated Distributors, Inc.; and Mettemp, Inc., who at the time had failed to plead or respond to MEC's Amended Complaint.

No. 137).  On June 28, 2012, the Court denied CDI leave to amend its amended counterclaim: (1) to join MEC's Chief Executive Officer ("CEO") Rodney Sacks ("Sacks"), MEC's local counsel Richard E. Mitchell ("Mitchell") and his law firm GrayRobinson, P.A., and MEC's lead counsel Lynda Zadra-Symes ("Zadra-Symes") and her law firm Knobbe Martens Olson & Bear, LLP to the existing abuse of process claim and (2) to seek punitive damages under CDI's wrongful seizure and abuse of process claims.  (Doc. No. 140).

## II.     FACTUAL BACKGROUND

### A.  *MEC's Development of the M Claw*

To understand fully MEC's claims for trademark infringement and unfair competition, the Court must first discuss MEC's business and how MEC utilizes the Ⅲmark in that business, particularly in the apparel arena.

MEC designs, creates, develops, markets, and sells beverages ranging from fruit juices to energy drinks.  (Sacks Dec. (Doc. No. 175 at ¶ 2)).  In March 2002, MEC launched its now popular Monster Energy® drink line.  (*Id.* at ¶ 3); (Sacks Dep. (Doc. No. 177-27 at 17:13-21)).[6] In conjunction with the launch of its energy drink, MEC employee Mark Hall and outside graphics designer Ian McClain developed MEC's Ⅲ mark at issue.  (Sacks Dep. at 18:25-19:16).



---

[6] For simplicity, the Court will only refer to the docket entry number for depositions and declarations the first time they are cited.

   

(Examples of MEC's M Claw Mark)

MEC's CEO Sacks testified that the ⫿ mark was first used on clothing at the same time MEC launched its Monster Energy® drink line in 2002.  (*Id.* at 20:21-21:6); (Kelly Dec. (Doc. No. 176 at p. 5 ("I confirmed that MEC began distributing t-shirts and other apparel items bearing the M Claw logo in 2002, and that MEC has continuously distributed t-shirts and other apparel items bearing the M Claw logo since that time.")))  MEC sold the clothing to distributors and to customers and supplied apparel to professional athletes MEC was sponsoring.  (Sacks Dep. at 21:17-22:5).  Eventually, MEC began selling to third parties through the Internet and licensing agreements.  (*Id.* at 21:17-23:7).

According to Nancy Ridenbaugh, as part of her marketing job,[7] in the spring of 2002, she began working with the vendor The Image Factor to develop t-shirts containing the ⫿ mark.  MEC made its first purchase order for 1,000 t-shirts on April 25, 2002.  (Ridenbaugh Dep. at 10:17-12:13).  Ridenbaugh explained that the t-shirt had many purposes with the main goal being the development of brand recognition by the general public.  She explained that MEC: (1) provided t-shirts to distributors for supply to retailers and sales people, (2) used the t-shirts at

---

[7] From September 1997 until April 2007, Nancy Ridenbaugh worked as a project manager in MEC's sales and marketing division.  (Ridenbaugh Dep. (Doc. No. 177-26 at 5:11-6:15)).  According to Ridenbaugh, as project manager in the marketing division, she worked on trade show coordination and organization, aided in product development, and worked with graphic designers to develop different graphics for point of sales items such as stickers, t-shirts, hats, and refrigeration racks and displays.  (*Id.* at 6:3-15).

tradeshows, (3) provided apparel to athletes sponsored by MEC, (4) sold the t-shirts to customers, and (5) gave the t-shirts away for promotional purposes.  (*Id.* at 18:20-20:13).

According to MEC's Senior Vice President of Finance Thomas J. Kelly, MEC's clothing currently reaches the public through direct sales at its website (www.monsterarmy.com), through its customer loyalty program called Monster Gear, through giveaways via its "ambassador teams", through provisions to its distributors so they can promote the brand, and through licenses to third parties.  (Kelly Dec. at p. 2).[8]   According to Kelly, excluding apparel distributions through MEC's licensees, MEC has distributed apparel bearing the $\mathcal{W}$ mark on a yearly basis as follows:[9]

| YEAR | UNITS |
|------|-------|
| 2002 | 5,542 |
| 2003 | 10,116 |
| 2004 | 20,227 |

---

[8] To account for its apparel, MEC's Senior Vice President of Finance Thomas J. Kelly explains that MEC includes the revenue and expenses for its clothing transactions in its financial statements.  Specifically, Kelly notes that MEC includes the Monster Gear program and giveaways to promote its brand as an operating expense line item; it includes the revenue from direct sales to consumers through the Monster Army program as a reduction in the operating expenses line item; it includes the sales of the clothing to MEC's distributors as a reduction in the operating expenses line item; and it includes the revenues received by MEC from licensing as "other income."  (Kelly Dec. (Doc. No. 176 at p. 3)); (*see also* (Ridenbaugh Dep. at 21:21-23:9 (explaining how the accounting system worked for shirts delivered to distributors))).

Kelly further attests that the reason clothing-related activity does not appear separately on MEC's 10-K filings is that "although the activity is substantial, it is not required to be separately disclosed under GAAP in relation to the substantial size of MEC's beverage business. . . . Though substantial in absolute numbers, MEC's sales of M Claw branded apparel are not separately reported because the sales do not meet the GAAP qualitative and quantitative reporting thresholds to require such disclosures."  (Kelly Dec. at p. 6).

[9] This amount includes apparel distributed to MEC's distributors and apparel distributed through MEC's Monster Army and Monster Gear programs.  (Kelly Dec. at ¶ 7).

| 2005 | 47,871 |
|------|--------|
| 2006 | 75,148 |
| 2007 | 120,105 |
| 2008 | 102,881 |
| 2009 | 159,666 |
| 2010 | 259,235 |
| 2011 | 382,676 |
| **TOTAL** | **1,183,467** |

(*Id.* at pp. 4-5).  As well, MEC has received, excluding non-clothing licensees, "over $4 million in royalties from licenses directed to apparel and related items from licensees whose territories included the United States."  (*Id.* at p. 6).

Although much of the present motion will turn on common law trademark rights, MEC does hold the following trademark and copyright registrations:

| **MARK** | **REG. No.** | **GOODS/ SERVICES** | **DATE OF FIRST USE** | **REG. DATE** |
|----------|--------------|---------------------|-----------------------|---------------|
|  | 2903214 | Drinks, namely, carbonated soft drinks, carbonated drinks enhanced with vitamins, minerals, nutrients, amino acids and/or herbs, carbonated and non-carbonated energy or sports drinks, fruit juice drinks having a juice content of 50% or less by volume that are shelf stable, and water, in class 32 (U.S. CLS 45, 46 AND 48). | 03/27/2002 | 11/16/2004 |

7

| | | | | |
|---|---|---|---|---|
| M MONSTER ENERGY | 3044314 | Nutritional supplements in liquid and non-liquid form, but excluding perishable beverage products that contain fruit juice or soy, whether such products are pasteurized or not, in Class 5 (U.S. CLS. 6, 18, 44, 46, 51 AND 52) | 03/27/2002 | 01/17/2006 |
| MONSTER ENERGY | 3044315 | Nutritional supplements in liquid and non-liquid form, but excluding perishable beverage products that contain fruit juice or soy, whether such products are pasteurized or not, in Class 5 (U.S. CLS. 6, 18, 44, 46, 51 AND 52) | 03/27/2002 | 01/17/2006 |
| MONSTER ENERGY | 3057061 | Fruit juice drinks having a juice content of 50% or less by volume that are shelf stable, carbonated soft drinks, carbonated drinks enhanced with vitamins, minerals, nutrients, amino acids and/or herbs, aerated water, soda water, but excluding perishable beverage products that contain fruit juice or soy, whether such products are pasteurized or not, in Class 32 (U.S. CLS 45, 46 AND 48) | 03/27/2002 | 02/07/2006 |
| M MONSTER ENERGY | 3134842 | Beverages, namely, carbonated soft drinks, carbonated drinks enhanced with vitamins, minerals, nutrients, amino acids and/or herbs, carbonated and noncarbonated energy or sports drinks, fruit juice | 03/27/2002 | 08/29/2006 |

| | | | | |
|---|---|---|---|---|
| | | drinks having a juice content of 50% or less by volume that are shelf stable, and water, but excluding perishable beverage products that contain fruit juice or soy, whether such products are pasteurized or not, in Class 32 (U.S. CLS. 45, 46 AND 48) | | |
|  | 3134841 | Beverages, namely, carbonated soft drinks, carbonated soft drinks enhanced with vitamins, minerals, nutrients, amino acids and/or herbs, carbonated and non-carbonated energy and sports drinks, fruit juice drinks having a juice content of 50% or less by volume that are shelf stable, and aerated water, soda water and seltzer water, but excluding perishable beverage products that contain fruit juice or soy, whether such products are pasteurized or not, in Class 32 (U.S. CLS. 45, 46 AND 48) | 03/27/2002 | 08/29/2006 |
|  | 3434822 | Non-alcoholic beverages, namely, energy drinks, excluding perishable beverage products that contain fruit juice or soy, in Class 32 (U.S. CLS. 45, 46 AND 48) | 03/27/2002 | 05/27/2008 |

| | | | | |
|---|---|---|---|---|
|  | 3434821 | Nutritional supplements, in Class 5 (U.S. CLS. 6,18, 44,46, 51 AND 52) | 03/27/2002 | 05/27/2008 |
|  | 3908600 | Stickers; sticker kits comprising stickers and decals; decals, in Class 16 (U.S. CLS. 2, 5, 22, 23, 29, 37, 38 AND 50) | 01/00/2004 | 01/18/2011 |
|  | 3908601 | Clothing, namely, t-shirts, hooded shirts and hooded sweatshirts, sweat shirts, jackets, pants, bandanas, sweat bands and gloves; headgear, namely, hats and beanies, in Class 25 (U.S. CLS. 22 AND 39) | 05/24/2002 | 01/18/2011 |
|  | 3963668 | Stickers; sticker kits comprising stickers and decals; decals; posters in Class 16 (U.S. CLS. 2, 5, 22, 23, 29, 37, 38 AND 50) | 01/00/2004 | 05/17/2011 |
|  | 4011301 | Sports helmets; video recordings featuring sports, extreme sports, and motor sports, in Class 9 (U.S. CLS. 21, 23, 26, 36 AND 38) | 05/24/2002 | 08/16/2011 |
|  | 4051650 | Clothing, namely, t-shirts, hooded shirts and hooded sweatshirts, sweat shirts, jackets, pants, bandanas, sweat bands and gloves; headgear, namely hats and beanies, in Class 25 (U.S. CLS. 22 and 39) | 05/24/2002 | 11/08/2011 |

10

| Copyright | REG. No. | Description | DATE Of First Publication | REG. DATE |
|---|---|---|---|---|
| For an image of the claw, See (Doc. No. 130-14). | VA 1-789-900 | Stylized claw with jagged edges (original version) | 03/27/2002 | 10/11/2011 |
| For an image of the can art work, See (Doc. No. 130-15). | VA-1-727-577 | Monster Energy Can Art | 03/27/2002 | 08/02/2010 |

(Doc. Nos. 130-1 to 130-15).

According to MEC, since 2002, it has spent over $1.68 billion promoting its Monster Energy®

drinks and the ||| mark; in 2011 alone, it spent more than $380 million on these promotional

efforts.  (Sacks Dec. at ¶ 8).

B.  *The Development of the 3DL Design*[10]

To understand fully CDI's claims for trademark infringement and unfair competition, the

Court must first discuss how CDI was formed and how it obtained the 3DL mark.  As well, the

Court must discuss the use of the 3DL mark by Joe Cool, Inc. prior to CDI's alleged ownership

in 2010.

According CDI's corporate representative Menachem Schneorson ("Schneorson"),[11] CDI

is composed of Schneorson and David Baksht ("Baksht"), each owning fifty percent of the

corporation.  (Schneorson Dep. (Doc. No. 177-9 at 17:7-14)).  CDI's business entails owning

trademarks and then licensing those trademarks.  Presently, its alleged trademark ownership is

limited to the 3DL (  ) mark, the one at issue, and the purported "Daytona Bike Week" mark.

---

[10] Throughout this Order, the Court may refer to the actions of Yosef Amar ("Amar") or Joe Cool, Inc. when describing CDI's claims as to priority of the 3DL mark and use of the mark prior to 2010 because CDI allegedly did not own the 3DL mark until 2010.

[11] CDI designated Menachem Schneorson as its corporate representative for its *Federal Rule of Civil Procedure* 30(b)(6) deposition.  (Schneorson Dep. (Doc. No. 177-9 at 4:9-13, 9:24-10:3)).

(*Id.* at 22:16-24).  Before CDI began working with Yosef Amar ("Amar") and Joe Cool, Inc. in 2010, CDI had no specific business purpose.  (*Id.* at 24:18-25:12).

According to CDI, in 2010, Joe Cool, Inc.'s president, Yosef Amar,[12] came to CDI's office in Brooklyn, New York to discuss a mark Amar called the 3DL mark that Joe Cool, Inc. was producing on heat transfers to be applied to t-shirts.  (*Id.* at 10:18-12:7).  Amar told CDI that Joe Cool, Inc.'s mark was popular and that Joe Cool, Inc. wanted to expand its business and needed help registering and protecting the mark.  (*Id.*).[13]  Amar was afraid Joe Cool, Inc. would not be able to control the mark because MEC had a similar mark.  (*Id.* at 65:16-66:7).  According to CDI, Amar told CDI that Joe Cool, Inc. had been using the mark since 1993.  (*Id.* at 12:4-7).[14]



(Example of 3DL mark in 2010 at time of the meeting between CDI and Joe Cool, Inc.)

---

[12] Throughout the depositions, Yosef Amar is also referred to as Joe Cool.

[13] Interestingly, during this time frame, MEC was distributing over 259,235 pieces of apparel with the ⫙ mark and was ascending towards its status as one of the ten most "Liked" brands worldwide on the social media website Facebook, according to business news channel CNBC. (Sacks Dec. at ¶ 10).

[14] CDI could not explain why the 3DL mark it registered in 2010 shows a 2003 copyright. (Schneorson Dep. at 40:13-23).  CDI repeatedly testified that Yosef Amar was the source for any information regarding the first use of the 3DL mark in 1993 and its general use and popularity. (*See, e.g.*, *id.* at 58:9-12; 60:16-19).  As well, Schneorson, CDI's corporate representative, repeatedly testified that Baksht, his partner, was more knowledgeable regarding the details surrounding the 3DL mark and the joint venture with Joe Cool, Inc.  During Baksht's deposition, Baksht repeatedly testified that Schneorson was more knowledgeable about the details surrounding the 3DL mark and the joint venture with Joe Cool, Inc..

After their initial meeting, according to CDI, Joe Cool, Inc., through its president Yosef

Amar, orally assigned the common law  mark to CDI.  As well, Joe Cool, Inc. and CDI

entered into an oral joint venture to exploit the  mark.[15]  According to CDI, Joe Cool, Inc. did

not assign any physical assets or customer lists to CDI with the  mark.  (*Id.* at 77:24-79:11;

85:8-88:14 (describing the details of the joint venture)).  However, CDI now disclaims its

allegation in its Amended Counterclaim that it formed with Joe Cool, Inc. the entity "Joe Cool

Bike Week, Inc. as an (sic) legal entity through which to conduct some of the Joint Venture's

business through [sic]."  *Compare* (Doc. No. 122 at ¶ 150(e))*, with* (Schneorson Dep. at 90:2-

91:1 (claiming that Joe Cool Bike Week, Inc. was simply a bank account Amar opened up to

separate the receipts for sales of the  mark from purchases of other heat transfers and

clothing)).[16]

Once CDI and Joe Cool, Inc. formed their joint venture, Amar became a vice president of

CDI for a temporary period.  (Shneorson Dep. at 111:6-11).  CDI then filed the following

registrations:

| MARK | STATE OF REG. | REG. No. | REG. DATE |
|---|---|---|---|
|  | New Jersey | TM23557 | 09/29/2010 |

---

[15] There is no documentary proof of the assignment and joint venture as all agreements between Joe Cool, Inc. and CDI were oral.

[16] (*See also* (Baksht Dep. (Doc. No. 177-10 at 183:15-24 (testifying that CDI and Joe Cool, Inc. did not actually conduct business through Joe Cool Bike Week, Inc.))).

| | Florida | T10000001063 | 10/07/2010 |
|---|---|---|---|
| | Florida | T100000001102 | 10/21/2010 |
| | Florida | T10000000884 | 08/09/2010 |

C. *MEC's Second Amended Complaint and CDI's Answer and Counterclaim*

In MEC's Second Amended Complaint, it alleges, *inter alia*, that CDI's mark infringes upon MEC's trademarked marks.





(MEC's M Claw Mark)                    (CDI's 3DL Mark in 2010)

In response, CDI raises as its sixth affirmative defense that MEC is not the senior user of the mark (Doc. No. 137 at ¶ 116) and raises the following counterclaims:

---

[17] For this mark, it appears Joe Cool (aka Yosef Amar) registered this mark under Joe Cool, Inc. with CDI's business address in Brooklyn, New York. (Doc. No. 185-7 at p. 2). No party has discussed this discrepancy.

1. Cancellation of MEC's registration of the M Claw mark on clothing (Count I);

2. Trademark infringement based on reverse confusion pursuant to 15 U.S.C. § 1125(a) (Count II);

3. Violation of Florida's common law unfair competition (Count III);

4. Wrongful seizure pursuant to 15 U.S.C. § 1116(d)(11) (Count IV);

5. Florida's common law tort of abuse of process (Count V)

6. Declaratory Judgment that MEC has no right, title, or interest in the 3DL mark (Count VI); and

7. Florida common law tort of interference with contractual relations (Count VII).

(Doc. No. 122).

In the present motion for summary judgment, MEC requests the Court to grant it summary judgment on Count I through Count V of CDI's counterclaim and CDI's sixth affirmative defense.

## III.   LEGAL STANDARD FOR SUMMARY JUDGMENT

A court should grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  It is the movant who bears the initial burden of "identifying for the district court those portions of the record 'which it believes demonstrates the absence of a genuine issue of material fact.'" *Cohen v. United Am. Bank of Cent. Fla.*, 83 F.3d 1347, 1349 (11th Cir. 1996) (quoting *Cox v. Adm'r U.S. Steel & Carnegie*, 17 F.3d 1386, 1396, *modified on other grounds*, 30 F.3d 1347 (11th Cir. 1994)).  In the case in which the non-movant bears the burden of proof at trial, the movant may carry its initial burden by either negating an essential

element of the non-movant's case or by demonstrating the absence of evidence to prove a fact necessary to the non-movant's case. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115-16 (11th Cir. 1993) (citation omitted).

Once the movant carries its initial burden, the non-movant may avoid summary judgment by demonstrating an issue of material fact. *Id.* at 1116. If the movant demonstrates the absence of evidence on a material fact for which the non-movant bears the burden of proof, then the non-movant must either show that the record contains evidence that the movant "overlooked or ignored" or "come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency." *Id.* at 1116-17 (citation omitted). The non-movant must provide more than a "mere scintilla of evidence" supporting its position, and "there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citation omitted).

Further, when analyzing a motion for summary judgment, a court draws all inferences from the evidence in the light most favorable to the non-movant and resolves all reasonable doubt in the non-movant's favor. *Porter v. Ray*, 461 F.3d 1315, 1320 (11th Cir. 2006). Notwithstanding this inference, "[t]here is [still] no genuine issue for trial unless the non-moving party establishes, through the record presented to the court, that it is able to prove evidence sufficient for a jury to return a verdict in its favor." *Cohen*, 83 F.3d at 1349.

### IV. PRIORITY ARGUMENT[18]

---

[18] At the outset, the Court is disappointed that the parties neglected to cite applicable and relevant Eleventh Circuit case law that is binding on this Court. Through the Court's own research, it found the applicable standards. Even with the Court using the applicable standards it researched, the Court notes that the record of evidence provided by the parties was, at times, insufficient to enable the Court to evaluate the appropriate standards fully. *See Planetary Motion, Inc. v. Techplosion, Inc.*, 261 F.3d 1188, 1193-95 (11th Cir. 2001) (discussing the

MEC argues that the Court should grant it summary judgment on CDI's sixth affirmative defense of senior user and the counts in CDI's Counterclaim relating to trademark infringement; specifically, CDI's claim for cancellation of MEC's M Claw marks for clothing (Count I), its claim for reverse confusion (Count II), and its claim for unfair competition under Florida common law (Count III).  (Doc. No. 173).  The thrust of MEC's argument is that CDI cannot establish it has priority over the mark for each of these three claims and CDI's sixth affirmative defense.[19]  CDI counters that because Joe Cool, Inc. (which is often referred to by the name of its president Yosef Amar) created the 3DL mark in 1993, CDI has priority.

## A. *Priority in CDI's Claim for Cancellation*

Before discussing the law governing priority determination, the Court must first set out the standard for cancellation of a trademark.  To cancel a registration under Lanham Act § 2(d), CDI must prove: (1) that the registered mark resembles CDI's 3DL mark, (2) that CDI acquired trade identity rights in the mark before MEC used the mark; and (3) that the M Claw mark is likely to cause confusion when used in connection with the products of MEC.  *See Coach House Rest., Inc. v. Coach and Six Rests., Inc.*, 934 F.2d 1551, 1559 (11th Cir. 1991) (citations omitted).

---

applicable standards for determining priority); *Tally-Ho, Inc. v. Coast Cmty. Coll. Dist.*, 889 F.2d 1018, 1022-25 (11th Cir. 1989) (per curiam) (same).

[19] It appears to the Court that no party is contesting that the M Claw mark and the 3DL mark are similar enough for purposes of summary judgment that the priority issue can be reached.  By similarity, the Court does not mean likelihood of confusion, which is not being addressed in this Order.  The Court further notes that the parties failed to develop fully many of their legal arguments and CDI, at times, failed to cite to the record for factual support.  *See supra* note 18; (*see also* (Doc. No. 121 at p. 6 (The Case Management and Scheduling Order clearly states, "Both the movant and the party opposing summary judgment shall provide pinpoint citations to the pages and lines of the record supporting each material fact.  General references to a deposition are inadequate.")))  The Court expects a higher level of diligence at trial.

In the present case, the issue turns on common law rights in the mark as CDI did not register the  mark for any purpose until 2010 (*See, e.g.*, (Doc. No. 185-3 at p. 1)) and MEC did not register the  mark on clothing and the  mark on clothing until January 18, 2011 and November 8, 2011, respectively (Doc. Nos. 130-10 & 130-13).  *See Tana v. Dantanna's*, 611 F.3d 767, 773 (11th Cir. 2010) ("We have recognized that 'the use of another's unregistered, *i.e.*, common law, trademark can constitute a violation of § 43(a) where the alleged unregistered trademarks used by the plaintiff are so associated with its goods that the use of the same or similar marks by another company constitutes a false representation that its goods came from the same source.'" (citation omitted)).

### i.   Distinctiveness of the  Mark

Although the parties fail to focus on this analysis, "the issue of distinctiveness is relevant to both the likelihood of confusion and the priority of trade identification rights issues."  *See Coach House Rest., Inc.*, 934 F.2d at 1561 (citations omitted).  Therefore, the Court must discuss distinctiveness before addressing priority directly.  Again, the parties failed to apply Eleventh Circuit case law; thus, the Court had to engage in independent research and attempt to use the alleged facts provided by the parties to evaluate their arguments.

MEC bases some of its claims on marks that they registered over five years ago for other products.  In its response to CDI's motion for partial summary judgment, MEC contends that

certain of its marks are incontestable. *See* 15 U.S.C. § 1065(3); (Doc. No. 191 at p. 3).[20] Incontestable status means that a mark is presumed to be at least descriptive with secondary meaning and thus is a relatively strong mark. *Dieter v. B& H Indus. of Sw. Fla., Inc.*, 880 F.2d 322, 329 (11th Cir. 1989). Although a mark is incontestable, an opposing party may still challenge its strength. *See HBP, Inc. v. Am. Marine Holdings, Inc.*, 290 F. Supp. 2d 1320, 1329 (M.D. Fla. 2003). However, to achieve incontestable status, MEC must file an affidavit with the U.S. Patent and Trademark Office five years after registering the trademark and have the trademark declared "incontestable." MEC has not provided the Court any proof of filing the required affidavit; however, CDI appears to concede incontestable status for certain marks for non-clothing products. (*See* Doc. No. 170 at p. 15).

As stated previously, the strength or distinctiveness of a mark is relevant to determining its priority. *See Coach House Rest., Inc.*, 934 F.2d at 1561. The Eleventh Circuit has explained that "only those marks that are capable of distinguishing the owner's goods from those of others, i.e., that are sufficiently 'distinctive,' are eligible for federal registration or protection as common law marks under the Lanham Act." *Tana*, 611 F.3d at 773-74 (citations omitted). There are four types of marks:

> (1) generic—marks that suggest the basic nature of the product or service; (2) descriptive—marks that identify the characteristic or quality of a product or service; (3) suggestive—marks that suggest characteristics of the product or service and require an effort of the imagination by the consumer in order to be understood as descriptive; and (4) arbitrary or fanciful—marks that bear no relationship to the product or service, and the strongest category of trademarks.

*Id.* at 774 (citation omitted).

---

[20] *See* Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record.").

In CDI's related motion for partial summary judgment, CDI fails to address this analysis while MEC argues that its marks are "arbitrary and fanciful" because "their intrinsic nature serves to identify a particular source of a product."  (Doc No. 191 at pp. 6-7); *see Tana*, 611 F.3d at 774 (citations omitted); *see, e.g.*, (Doc. No. 177-1 (showing various media clips in which the ||| mark is displayed or worn by athletes)).  As well, MEC notes that since 2002 it has expended over $1.68 billion in promotional campaigns using the ||| mark and the Monster Energy® drinks. (Sacks Dec. at ¶ 8).  Such promotional expenses may be used to strengthen an initially weak mark.  *See John H. Harland Co. v. Clarke Checks, Inc.*, 711 F.2d 966, 974 n.13 (11th Cir. 1983); *see also Coach House Rest., Inc.*, 934 F.2d at 1560 ("In the absence of consumer survey evidence, four factors can be considered in determining whether a particular mark has acquired a secondary meaning: (1) [T]he length and manner of its use; (2) the nature and extent of advertising and promotion; (3) the efforts made by the plaintiff to promote a conscious connection to the public's mind between the name and the plaintiff's  . . . business; and (4) the extent to which the public actually identifies the name with the plaintiff's [product]." (citation omitted)).

However, the ||| mark may be construed as a variation of the letter "M."  As such, it may be considered a common term and, though arbitrary, may not be "accorded the same degree of protection given such coined and fanciful terms such as 'Kodak' or 'Xerox.'"  *Michael Caruso & Co.  v. Estefan Enters., Inc.*, 994 F. Supp. 1454, 1459 (S.D. Fla. 1998).  The Eleventh Circuit, when addressing the use of the letter "V" on a shoe, explained that the court should consider whether the mark is "a 'common' basic shape or design, whether it [is] unique or unusual in a particular field, [and] whether it [is] a mere refinement of a commonly-adopted and well-known form of ornamentation for a particular class of goods viewed by the public as a dress or

ornamentation for the goods . . . ."  *See Brooks Shoe Mfg., Co. v. Suave Shoe Corp.*, 716 F.2d 854, 857-58 (11th Cir. 1983) (citation omitted).

In the present case, the ||| mark is not in a common design of an "M" and does not appear to be a mere refinement of a commonly adopted ornamentation.  Moreover, the |||mark is still an arbitrary mark even if weakened slightly by its roots in the letter "M."  Its well-established secondary meaning more than compensates for such diminished strength.

Dr. Gerald L. Ford designed and conducted a survey to determine the secondary meaning or acquired distinctiveness of the ||| mark on t-shirts.  (Ford Dec. (Doc. No. 177-2 at p. 3)).[21] Using a standard shopping center intercept methodology, Ford caused to be conducted interviews at "shopping centers in metropolitan markets in eight (8) states, two (2) shopping centers located in each of the four (4) U.S. Census regions."  (*Id.*).  After adjusting for survey data mismeasurement error based upon the control cell, Ford found that sixty-seven percent (66.66%) of the relevant universe associates the ||| mark on t-shirts with MEC,[22] or with a sole, yet anonymous source.[23]  (*Id.* at pp. 3-4); *see also* 6 J. Thomas McCarthy, <u>McCarthy on Trademarks</u>

---

[21] Below are the samples used in the survey.



(Test Cell Symbol)



(Control Cell Symbol)

[22] Ford reports shows that 65.28% of the respondents shown the ||| mark on t-shirts associated the shirt with MEC.  (Ford Dec.  (Doc. No.  177-2 at p. 13)).
[23] "Sole, yet anonymous source" means that the respondent associates the t-shirt with a single company but is unable to identify the company spontaneously by name.

& Unfair Competition § 32:190 (4th ed. 2012) (noting that courts generally regard figures over 50% as clearly sufficient to prove secondary meaning in a designation).   Additionally, Ford conducted a survey at shopping centers in four Florida metropolitan markets (Daytona Beach, Fort Lauderdale, Orlando, and Tampa) and found similar results.  (Ford Dec. at p. 16).   After adjusting for survey data mismeasurement error based upon the control cell, Ford found that approximately seventy-three percent (73.21%) of the relevant universe of Florida respondents associates the 〣 mark on t-shirts with MEC,[24] or a sole, yet anonymous source.  (*Id.* at pp. 18-19).[25]  Therefore, based on the analysis thus far, the Court finds that the 〣 mark is an arbitrary or fanciful mark.

However, "important in gauging the strength of a mark is the degree to which third parties make use of the mark."  *Frehling Enters., Inc. v. Int'l Select Grp., Inc.*, 192 F.3d 1330, 1336 (11th Cir. 1999) (citation omitted); *see also John H. Harland Co.*, 711 F.2d at 975 ("The words of a mark are not, however, the sole factors determining its strength.  Also important is the extent of third party use of the mark." (citations omitted)).

When there is a lack of a third party use, a mark's strength and distinctiveness are enhanced and thus more easily recognized by consumers.  *Frehling Enters., Inc.*, 192 F.3d at 1336 (citations omitted).   Conversely, a mark is weakened, the greater the use by third parties. *See id.*  In CDI's related motion for partial summary judgment, CDI argues: (1) there are thirty-three active and inactive federal trademarks using a claw mark similar to the 〣 mark for a

---

[24] Ford reports shows that 75.00% of the respondents shown the 〣 mark on t-shirts associated the shirt with MEC.  (Ford Dec. at p. 19).
[25] Ford's survey targeted respondents who in the past three months purchased a t-shirt with a logo on it or who in the next three months were likely to purchase a t-shirt with a logo on it. (Ford Dec. at pp. 10-11).

variety of goods and services; (2) there are type fonts with a letter "M" that are currently available on the Internet that resemble the ⩗ mark; and (3) there are designs on book covers, movie posters, and athletic uniforms that are similar to the ⩗ mark.  (Doc. No. 170 at pp. 16-17 (citing (Doc. No. 170-1); (Doc. No. 170-2); (Doc. No. 170-3))).

MEC counters that most of the thirty-three marks cited by CDI "bear no resemblance" to the ⩗ mark and that many are for unrelated products and industries or are, otherwise, abandoned.  (Doc. No. 191 at pp. 7-8);  *see also Ambrit, Inc. v. Kraft, Inc.*, 812 F.2d 1531, 1539 (11th Cir. 1986) ("Use of isolated elements of [the plaintiffs'] trade dress that do not convey the same total image does not, however, lead to the [plaintiff's trade dress] being stripped of protection." (citation omitted)).[26]

*See* examples below



Second, not all of the six type fonts with a letter "M" appear to be similar to the ⩗ mark but a reasonable jury may see some similarities between the ⩗ mark and the letter "M" displayed on page 2 of Document No. 170-2.  Third, the designs on the book covers, movie posters, and

---

[26] MEC also notes that CDI failed to produce these marks during discovery.  (Doc. No. 191 at p. 7).

uniforms, again, do not appear to resemble the Ⱳ mark and thus a reasonable jury may not find them to be examples of third party use.

   *See* examples below



   Finally, the Eleventh Circuit has clarified that with third party uses, it believes "a further consideration relevant in determining the significance of third-party use is the entire name a third party uses, as well as the kind of business in which the user is engaged.  Third party users that incorporate the [mark] along with distinctive additional words, or engage in a business different from that of [the plaintiff], may not diminish the strength of the [plaintiff's] mark."  *See Safeway Stores, Inc. v. Safeway Discount Drugs, Inc.*, 675 F.2d 1160, 1165 (11th Cir. 1982); *see also Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 260 (5th Cir. 1980) ("The third-party uses and registrations discussed above merely limit the protection to be accorded plaintiff's mark outside the uses to which plaintiff has already put its mark." (citations omitted)).[27]  *But see Sun Banks of Fla., Inc. v. Sun Fed. Sav. & Loan Ass'n*, 651 F.2d 311, 316-17 (5th Cir. Jul. 1981) (noting the weakening effect of use of the "Sun" mark in related and unrelated business).[28]  As MEC notes in its argument, the evidence produced by CDI shows that these marks, even if construed as similar to the Ⱳ mark, were used in businesses different from MEC.  Therefore, the

---

[27]*See Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc) (adopting as binding precedent all decisions of the former Fifth Circuit prior to the close of business on September 20, 1981).
[28]Based on the language of *Amstar*, it appears *Sun Banks of Florida, Inc.* overstates the impact of the third-party users in this circuit.

Court concludes that a reasonable jury may find that MEC's ⚡ mark is at least a relatively strong mark.

ii.   <u>Establishment of MEC's First Use of the ⚡ Mark on Clothing</u>

There is no question of material fact that in 2002 MEC first used the ⚡ mark on clothing. As well, it has continued to do so through the current date.   As set forth previously, Sacks testified that in March 2002, MEC launched its Monster Energy® drink line.   (Sacks Dec. at ¶ 3); (Sacks Dep. at 17:13-21).   In conjunction with the launch of its energy drink, MEC employee Mark Hall and outside graphics designer Ian McClain developed MEC's ⚡ mark.   (Sacks Dep. at 18:25-19:16).   During the same year, MEC applied the ⚡ mark to clothing apparel.   (*Id.* at 20:21-21:6); (Kelly Dec. (Doc. No. 176 at p. 5 ("I confirmed that MEC began distributing t-shirts and other apparel items bearing the M Claw logo in 2002, and that MEC has continuously distributed t-shirts and other apparel items bearing the M Claw logo since that time."))).   MEC sold the clothing to distributors and to customers and supplied apparel to professional athletes MEC was sponsoring.   (Sacks Dep. at 21:17-22:5); (*see also* (Ridenbaugh Dep. at 10:17-12:13)).   Eventually, MEC started to sell to third parties through the Internet and licensing agreements. (Sacks Dep. at 21:17-23:7).

According to MEC's Senior Vice President of Finance Thomas J. Kelly, MEC's clothing currently reaches the public through direct sales at its website (www.monsterarmy.com), through its customer loyalty program called Monster Gear, through giveaways via its "ambassador teams", through provisions to its distributors so they can promote the brand, and through licenses to third parties.   (Kelly Dec. at p. 2)); (*see also id.* at 4-5 (showing the units of apparel distributed by MEC from 2002 until 2011)).   Kelly explains that MEC includes the revenue and expenses for its clothing transactions in its financial statements.   (*See id.* at p. 3 (describing how clothing

25

revenue and expenses are shown on financial statements)); (*see also* (Ridenbaugh Dep. at 21:21-23:9 (explaining how accounting system worked for shirts delivered to distributors))); (Kelly Dec. at p. 6 (explaining 10-K rules)).

The fact that MEC used clothing for promotional purposes does not preclude it from claiming rights in the ⫿⫿ trademark.  *See Bridgestone Tire Co. v. Bridgestone Trading Co.*, 221 U.S.P.Q. (BNA) 1012, 1013-1014 (T.T.A.B. 1984) (finding that the date of opposer's first use of the mark on clothing distributed to dealers for promotional purposes may be used to establish priority); *Hurst Performance, Inc. v. Torsten Hallman Racing, Inc.*, 207 U.S.P.Q. (BNA) 671, 673-74 (T.T.A.B. 1980) (finding the date for the use of a mark on promotional apparel may be used to establish priority).  Thus, the Court finds there is no question of material fact that MEC began using the ⫿⫿ mark on clothing beginning in 2002 and continued to do so up through the current date.  Since both parties engage in the sale of clothing, there is clearly competition between them.  *See Tally-Ho, Inc. v. Coast Cmty. Coll. Dist.*, 889 F.2d 1018, 1024-25 (11th Cir. 1989) (per curiam) (noting that a defendant's prior use defense also requires a showing of competition).

iii.     Why the 2010 3DL Mark (  ) is A Junior User in Comparison to MEC's ⫿⫿ mark[29]

Having established that it began using ⫿⫿ mark in 2002, MEC contends that CDI cannot prove that CDI's use is senior to MEC's use of the ⫿⫿ mark.  Because ownership of a distinctive mark is limited by priority of use, CDI must show there is a question of material fact that its use of the  mark predates MEC's use of the ⫿⫿ mark and that CDI maintained "actual and

---

[29] For purposes of the Court's analysis, it is assuming, without ruling, that there was an assignment of the  mark from Joe Cool, Inc. to CDI.  *See Porter*, 461 F.3d at 1320 (A court draws all inferences from the evidence in the light most favorable to the non-movant and resolves all reasonable doubt in the non-movant's favor.).

continuous use" of the ⬛ mark. *See id.* at 1022-23 (stating that "actual and continuous use is required to acquire and retain a protectable interest in a mark").

To show that a party has established prior use of a mark sufficient to establish ownership without evidence of actual sales, a party may produce "evidence showing, first, adoption, and second, use in a way sufficiently public to identify or distinguish the marked goods in an appropriate segment of the public mind as those of the adopter of the mark." *Planetary Motion, Inc. v. Techplosion, Inc.*, 261 F.3d 1188, 1195 (11th Cir. 2001) (citations omitted); *see also id.* ("Courts generally must inquire into the activities surrounding the prior use of the mark to determine whether such an association or notice is present" (citation omitted)); *id.* at 1195 n.9 ("In addition, the continuity of a user's commercial activities in connection with the mark is also relevant to determining whether use is sufficient to establish common law ownership." (citation omitted)).

With respect to the use of a mark, continuous use is essential because "[r]ights in a mark can be lost though abandonment, non-use, or a naked license without control over product quality." *Tally-Ho, Inc.* 889 F.2d at 1022 n.6. Therefore, "[i]nsignficant or sporadic use cannot establish an owner's exclusive right to its mark." *Popular Bank of Fla. v. Banco Popular de P.R.*, 9 F. Supp. 2d 1347, 1354 (S.D. Fla. 1998). Ultimately, the "[r]esolution of the priority issue is governed by common law principles which recognize exclusive trademark rights based on actual use, business presence and reputation, and zone of natural expansion." *Id.* (citation omitted).[30]

MEC argues that Schneorson, CDI's Rule 30(b)(6) representative, testified that Joe Cool, Inc.'s Yosef Amar would be the expert on the use of the ⬛ mark prior to 2010 and its first use. (Schneorson Dep. at 15:2-10). According to Yosef Amar, Joe Cool, Inc. did not start using the

---

[30] Both parties have failed to develop fully the record regarding these factors.

exact design of the  mark until 2010.  (Amar Dep. (Doc. No. 177-30 at 65:4-13)).  However, Schneorson testified that Amar told him that Joe Cool, Inc. had been using the 3DL design since 1993. (Schneorson Dep. at 12:4-7).  Amar's deposition helps to explain this discrepancy.

During his deposition, Amar continually testified that the mark derived from a 1993 design of palm trees and an iguana's hand shown below:





(tree marks below the bird-1993 OSO4,
*see* (Doc. No. 178-7))                    (iguana 1996)

Amar repeatedly testified that with respect to the 3DL design, "[W]e talking about the shape here.  We're not talking about anything else but the shape of the three lines and it's—everywhere."  (Amar Dep. at 62:21-63:13).  Amar explained further that because the 3DL design is a simply three lines, Joe Cool, Inc. continually used it since 1993 as Joe Cool, Inc.'s designs, like the birds and iguanas above, used three lines together.  (*Id.*).  When questioned whether the settlement agreement, which precludes Joe Cool, Inc. from using the mark, applies to these earlier versions since Amar considers them the same, Amar replied, the settlement agreement applies only to the mark but that Joe Cool, Inc. can still sell things that resemble it like the iguana and other animals that have three digits or palm trees with three lines.  (*See id.* at 64:12-

28

65:3).  In other words, it appears that when Amar claims that Joe Cool, Inc. has used the ⟨mark⟩ mark since 1993, Amar means that Joe Cool, Inc. used marks that have three lines that resemble but do not look like the ⟨mark⟩ mark.[31]

Beyond the testimony of Amar and Schneorson, Daniel Sadeh, a Joe Cool, Inc. buyer in Panama City Beach, Florida, was asked when he first sold the ⟨mark⟩ mark to which he responded, "It's hard to remember, because it was a long time ago, but I believe it was the beginning of 2000, 2001." (Sadeh Dep. (Doc. No. 185-10 at 23:21-25)).  Sadeh elaborated that he only sold the ⟨mark⟩ design for a year or two after first purchasing it because it was not a good seller but has no records of when he sold it and for how long.  (*Id.* at 25:15-26:2).  As well, when asked if he ever heard customers call the ⟨mark⟩ design "monster", Sadeh answered, "Maybe, yeah. . . .  I guess because it looks like the monster design."  (*Id.* at 28:1-7); (*see also* (*id.* at 32:17-19 (Sadeh may have heard his employees refer to the ⟨mark⟩ design as monster shirts.))).  Then, when asked when Sadeh first saw the ⟨mark⟩ mark, he replied, "I don't remember.  A long time ago.  . . .  Twelve years

---

[31] In Amar's Answer to Request for the Production of Documents and Things in response to MEC's Subpoena to Produce Documents, he explains,

> The 3DL mark has been used in various shapes of 3 lines as early as the mid 1990's as early as 1993.  The design is a variation of fonts, different typestyles, utilized with dragons, skulls, scratch marks, different claws like eagle claws, iguana claws, and lizard claws, dinosaur claws, dragon claws and bear claws etc.

(Doc. No. 177-39 at p. 2).  As the Court explains further below, the use of three lines in iguanas and trees are not the legal equivalent of the ⟨mark⟩ mark and thus CDI cannot tack such use onto the ⟨mark⟩ mark.  *See Brookfield Commc'n, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1047-48 (9th Cir. 1999) ("The constructive use theory is known as 'tacking,' as the trademark holder essentially seeks to 'tack' his first use date in the earlier mark onto the subsequent mark." (citation omitted)); *see infra* Part IV.A.iv (setting forth the law regarding tacking).

ago, 15, 13 years ago.  I have no idea.  Eleven years ago.  I cannot remember.  I cannot tell exactly a date.  You know, there's stuff on the market, product that maybe can go for a year or two years until you hear about it."  (*Id.* at 29:14-22).  Interestingly, based on Sadeh's calculation, MEC would have begun promoting nationwide its mark as early as 1997 or at the latest 2001.  Moreover, considering that Sadeh claims it takes two years for him to hear about a product, MEC would have begun promoting nationwide the mark as early as 1995 and as late as 1999.  Further, Sadeh claims to have sold the mark in 2000 or 2001 when Amar testified that the mark, in that form, did not even exist until 2010.[32]

However, for purposes of summary judgment, the Court will construe all inferences in favor of the nonmovant.  *See Porter*, 461 F.3d at 1320.  Therefore, based on the testimony before it, the Court may construe that the design was used since 1993.  Although the Court notes that CDI's evidence of continuous and actual use is very weak and questionable at this time, it is still sufficient to create a genuine issue of material fact as to whether the mark was in continuous and actual use since 1993.[33]  *See  Tally-Ho, Inc.*, 889 F.2d 1022 n.6; *Fitzpatrick*, 2 F.3d 1116-17

---

[32] At the time of Daniel Sadeh's deposition, he was still working on a project with Amar and he previously used Baksht to register trademarks.  (Sadeh Dep. (Doc. No. 185-10 at 60:10-13; 18:3-20:11)).  The Court also notes that former Joe Cool, Inc. employee Carie Sadler testified that the earliest the design was sold by Joe Cool, Inc. was in June or July of 2010.  (Sadler Dep. (Doc. No. 177-32 at 22:15-23:5)).

[33] In a related argument regarding the Myrtle Beach t-shirts, MEC argues that Amar's bare assertions of continuous use are insufficient to create a genuine issue of material fact to survive summary judgment.  (Doc. No. 173 at p. 16).  MEC relies solely on an unpublished District of Hawaii opinion that does not cite any source for such principle and the only case near the quotation states that in that case, there was additional evidence proving non-continuing use.  *See World Triathlon Corp. v. Dunbar*, No. 05-00351JMS/KSC, 2006 WL 897586, at *4 (D. Haw. Apr. 6, 2006); *Casual Corner Assocs. v. Casual Stores of Nev., Inc.*, 493 F.2d 709, 712-713 (9th Cir. 1974).  Moreover, the Eleventh Circuit has held, "Oral testimony, even of a single witness, if 'sufficiently probative,' may suffice to prove priority, but such testimony 'should not be characterized by contradictions, inconsistencies, and indefiniteness'; instead, it 'should carry

(citation omitted); *Popular Bank of Fla.*, 9 F. Supp. 2d at 1354 ("Insignificant or sporadic use

cannot establish an owner's exclusive right to its mark."); *see also* 3 J. Thomas McCarthy,

<u>McCarthy on Trademarks & Unfair Competition</u> § 17:9 (4th ed. 2012) ("Where a dearth of

documents and witnesses as to use of a mark in years past makes it difficult to prove either use or

nonuse of a mark, the decision maker is justified in drawing inferences from the evidence that

does exist.").[34]



    iv.    <u>Why CDI Cannot Tack the</u> (skinny 3DL) design to the (fat 3DL) mark[35]

---

with it conviction of its accuracy and applicability.'" *Crystal Entm't Filmworks, Inc. v. Jurado*, 643 F.3d 1313, 1322 (11th Cir. 2011) (citations omitted).   Therefore, the Court does not find MEC's argument persuasive for purposes of granting its motion for summary judgment on this point.
[34] In CDI's response to MEC's motion for summary judgment, CDI raises a spoliation argument. The Court will address the argument *infra* following its analysis of MEC's priority argument.

[35] MEC raises the arguments that CDI did not use the design for trademark purposes and thus a tacking argument is implausible.
       Trademarks are "any word, name, symbol, or device, or any combination thereof [used] to identify and distinguish [one's] goods . . . from those manufactured or sold by others and to indicate the source of the goods."  *World Triathlon Corp. v. Dawn Syndicated Prods.*, No. 8:05-cv-983-T-27EAJ, 2007 WL 2875456, at *1 (M.D. Fla. Sept. 28, 2007) (citation omitted).  In order to prove trademark infringement, CDI "must not only show that it used its mark in commerce, but also that it used its mark as a *trademark*, whether the mark is registered or not. . . .  A trademark's primary function is to signify origin to potential customers and competitors." *Thoroughbred Legends, LLC v. Walt Disney Co.*, No. 1:07-cv-1275-BBM, 2008 WL 616253, at *5 (N.D. Ga. Feb. 12, 2008) (citation omitted); *see also Rock & Roll Hall of Fame and Museum, Inc. v. Gentile Prods.*, 134 F.3d 749, 753 (6th Cir. 1998) ("[I]n order to be protected as a valid trademark, a designation must create 'a separate and distinct commercial impression, which  . . . performs the trademark function of identifying the source of the merchandise to the customers.").

Another avenue by which MEC argues CDI may attempt to establish priority is through tacking.  Because of business decisions and changing advertising schemes, a party's mark may undergo changes over time.  3 McCarthy, supra at §17:25.  Such changes may occur without a party losing its priority in the mark if the change is "done in such a way that the continuing common element of the mark retains its impact and symbolizes a continuing commercial impression." *Id.* § 17:26 ("The test is one of continuity.").  Courts refer to this continuation as "tacking," in which the court finds the two marks to be legal equivalent or indistinguishable.[36] *Brookfield Commc'n, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1047-48 (9th Cir. 1999) ("The constructive use theory is known as 'tacking,' as the trademark holder essentially seeks to 'tack' his first use date in the earlier mark onto the subsequent mark."  (citation omitted)).

---

Amar testified that the  design was never given a style number because "[i]t was just like a sleeve design.  So it's like an add-on-to  -- it's not like a design by itself, you know, the – that represent itself.  It was an add-on back then, you know . . . ." (Amar Dep. at 123:10-124:4).  However, if a design is used merely as an add-on or decoration, it cannot be considered a trademark.  *See Go Pro, Ltd v. River Graphics, Inc.*, No. CIVA01CV600JLK, 2006 WL 898147, at *4 (D. Colo. Apr. 5, 2006) ("The distinction between an ornamental design and a trademark is whether the design is nothing more than ornamental or, if in addition, it is an indicator of source.  Only the latter is a trademark."); *see also* 1 J. Thomas McCarthy, McCarthy on Trademarks & Unfair Competition § 7:24 (4th ed. 2012) ("A symbol or design that is only incidentally ornamental and decorative, can still be a trademark, but if a design is solely or merely ornamental, it cannot be a trademark.").  CDI fails to counter MEC's argument in its response

(Doc. No. 185).  Therefore, the Court, as an alternative ground, may hold that the  design was never used for trademark purposes.  Nonetheless, the Court will still address the tacking argument in the body of the Order.

[36] Before the Court can address whether there is a valid assignment of the  mark to CDI from

Joe Cool, Inc., the Court must determine whether there was valid tacking of the  mark to the  mark.  *Van Dyne-Crotty, Inc. v. Wear-Guard Corp.*, 926 F.2d 1156, 1159 (Fed. Cir. 1991).

The standard of legal equivalence for "tacking" purposes is higher than that used when evaluating competing marks. *Van Dyne-Crotty, Inc. v. Wear-Guard Corp.*, 926 F.2d 1156, 1159 (Fed. Cir. 1991). In other words, "[t]he previously used mark must be the legal equivalent of the mark in question or indistinguishable therefrom, and the consumer should consider both the same." *Id.* (citation omitted). Being confusingly similar may not be enough for the marks to be considered legal equivalents because the marks must create the same, continuing commercial impression. *Id.* (citation omitted). Additionally, a court may determine the legal equivalence of the marks based on "the visual or aural appearance of the marks themselves." *Data Concepts, Inc. v. Digital Consulting, Inc.*, 150 F.3d 620, 623 (6th Cir. 1998) (citation omitted). Finally, tacking should be allowed in only exceptionally rare and narrow instances. *Van Dyne-Crotty, Inc.*, 926 F.2d at 1160; *Brookfield Commc'n, Inc.*, 174 F.3d 1036 at 1047-48.

Amar testified that Joe Cool, Inc. first used the 3DL mark in 1993, explaining that the first use of the 3DL mark was in a skinner form similar to the  and was placed on the sleeve of a sweatshirt. (Amar Dep. at 111:8-115:10).[37] Therefore, CDI argues that it may tack on Amar's use of the  mark to the  mark. (Doc. No. 185 at pp. 10-11).[38] MEC argues that the 

---

[37] Interestingly, Amar also testified that the 2010  design came from his artist who was directed to create a mark that resembled Joe Cool, Inc.'s old stuff like the palm tree shown *supra*. (Amar Dep. at 65:16-25). The parties do not discuss this discrepancy.

[38] CDI also claims that it is now alleging MEC infringed two versions of the 3DL mark (the  mark and the  mark). (Doc. No. 185 at p. 10). However, CDI's amended counterclaim never

mark and the mark are not legal equivalents and therefore cannot be tacked onto each other. (Doc. No. 176 at pp. 16-19).



(Skinny 3DL mark)



(Fat 3DL mark)

The Court agrees with MEC that, based on visual inspection, the ⎪⎪⎪ mark and the mark are not legal equivalents and do not create the same commercial impression. *See Data*

---

raises such a distinction or even the existence of the ⎪⎪⎪ design. In fact, when CDI provides a description of the 3DL, there is no mention of a skinny version. (Doc. No. 122 at ¶ 139 ("CDI is the owner of the following marks: "Wildwood," "Design of 3 Drooping Green Lines On Angle," "Daytona Beach & Design of 3 Drooping Green Lines," and "Florida and Design of 3 Drooping Lines" (collectively the "3DL marks"))). Therefore, CDI, in essence, appears to be attempting to amend its amended counterclaim at the summary judgment stage. Such actions are impermissible and demonstrate a disregard for the *Federal Rules of Civil Procedure* and this Court's case management deadlines.

34

*Concepts, Inc.*, 150 F.3d at 623.   The Court determines that CDI's argument suffers the same fallacies as CDI's argument that the iguanas and trees showed the same use of the 3DL mark.

With respect to tacking the  mark to the  mark, CDI has not presented evidence sufficient for a jury to return a verdict in its favor.  *Cohen*, 83 F.3d at 1349.[39]

    v.    <u>The Relevance of the Myrtle Beach Shirt</u>  <u>as Establishing Priority of Use</u>[40]

One final argument MEC claims that CDI may attempt to employ to prove priority is the first use of the Myrtle Beach shirt below.   In Amar's declaration in support of the Amar Defendants' Response in Opposition to Plaintiff's Motion for Preliminary Injunction (Doc. No. 32-4), Amar swore that Joe Cool, Inc. had been using fonts and marks similar to the  mark since the mid-1990s.  (Doc. No. 32-4 at ¶ 11)

---

[39] The Court notes that for MEC's argument regarding tacking, MEC relies predominantly on *Van Dyne-Crotty, Inc. v. Wear-Guard Corp.*, 926 F.2d 1156 (Fed. Cir. 1991) without discussing the differing views among the appellate courts with respect to tacking.  In *Specht v. Google, Inc.*, the Northern District of Illinois explained that Federal appellate courts are split on whether tacking is a question of law or fact.  *Specht*, 758 F. Supp. 2d 570, 583 (N.D. Ill. 2010) (stating that the Northern District of Illinois and the Ninth Circuit treat tacking as a question of fact while the Federal Circuit and the Sixth Circuit treat it as a question of law).  The *Specht* court further explained that whether the court treats tacking as a question of law or as a question of fact turns on whether the circuit court treats the likelihood of confusion as a question of law or question of fact.  *Id.*  If the circuit court treats the likelihood of confusion as a question of fact, then tacking will be treated as a question of fact.  *Id.*

    MEC's failure to discuss these nuances does not prevent the Court from engaging in tacking analysis because the Eleventh Circuit treats the likelihood of confusion as either a question of law or as a question of fact.  *See Tana v. Dantanna's*, 611 F.3d 767, 775 n.7 (11th Cir. 2010); *see also* 3 J. Thomas McCarthy, <u>McCarthy on Trademarks & Unfair Competition</u> § 17:26 (noting the split among the circuit with respect to tacking and arguing that tacking should be an issue of fact, not an issue of law, because "'[c]ommercial impression,' like most issues in trademark law, should be determined from the perspective of the ordinary purchaser of these kinds of goods or services").  Therefore, the fact that MEC relies on one view of tacking is not dispositive.  The Court further notes that MEC failed to provide such analysis regarding these nuances with respect to tacking.

[40] CDI failed to respond directly to this argument in its response.  (*See* (Doc. No. 185)).

For support, Amar attaches the following to demonstrate use of marks similar to the  mark in 1993:

(1993 Myrtle Beach Mark (Doc. No. 32-10))

In his deposition, Amar concedes that [image] is different from the [image] mark.  (Amar Dep. at 83:22-84:15).  Amar also reaffirmed that Joe Cool, Inc. used [image] in 1993 and confirmed that Joe Cool, Inc. had already stopped selling [image] but was unable to provide a date of last sale.  (*Id.* at 84:20-87:7).  Amar explicated that the image of [image] in (Doc. No. 32-10) is not actually a photograph of a t-shirt but rather is a digital image Joe Cool, Inc. created in 2011 from a scan of some unidentified design or flier in Joe Cool, Inc.'s office.  (*Id.* at 89:1-90:10).

Although CDI's evidence of legal equivalency and continuous and actual use is very weak and questionable at this time, the Court must construe all inferences in favor of the nonmovant, and thus the Court determines only for purposes of summary judgment, based on the record before it, that a reasonable jury could find that            is the legal equivalent of the       mark for tacking purposes and was in continuous use since 1993.  *Van Dyne-Crotty, Inc.*, 926 F.2d at 1159.[41]

> vi.   <u>Cancellation Claim and Other Related Trademarks Claims</u>

Because the Court cannot resolve the issue of priority at this time, MEC's motion for summary judgment on Count I of CDI's counterclaim is denied and MEC's motion for summary judgment on CDI's sixth affirmative defense is denied.

Because the determination of priority is necessary to resolve CDI's trademark infringement claim, the Court cannot grant MEC summary judgment on that count as well.  To prove a claim for reverse confusion trademark infringement, CDI must show "(1) that it had trademark rights in the mark or name at issue and (2) that the other party had adopted a mark or name that was the same, or confusingly similar to its mark, such that that consumers were likely to confuse the two." *Tana*, 611 F.3d at 773 (citation omitted);  *see also Carnival Brand Seafood, Co. v. Carnival Brands, Inc.*, 187 F.3d 1307, 1309 (11th Cir. 1999) ("To prevail on a trademark infringement claim, a plaintiff must show (1) that its mark has priority and (2) that the defendant's mark is likely to cause consumer confusion." (citations omitted)).  Therefore, the

---

[41] Again, the Court rejects MEC's reliance on the *Dunbar* opinion for support.  *See supra* note 33.

Court denies MEC's motion for summary judgment on Count II of CDI's counterclaim, CDI's claim for trademark infringement.

Additionally, the Court cannot resolve CDI's common law claim for unfair competition without first determining priority. The Eleventh Circuit has held that the analysis for Florida common law of unfair competition is the same as under federal trademark infringement claims. *See Gift of Learning Found., Inc. v. TGC, Inc.*, 329 F.3d 792, 802 (11th Cir. 2003) (per curiam) (citation omitted). Therefore, the Court denies MEC's motion for summary judgment on Count III of CDI's counterclaim, CDI's claim for common law unfair competition.[42]

---

[42]After arguing for thirteen pages regarding priority, MEC, in a page and a half, argued in the alternative that Joe Cool, Inc.'s oral assignment of the common law version of the [mark] mark to CDI is impermissible. MEC partially overstates the law. It argues that oral assignments are ineffective, citing 15 U.S.C. § 1060(a)(3) and *Gaia Technologies, Inc. v. Reconversion Technologies, Inc.*, 93 F.3d 774, 780 (Fed. Cir. 1996), *amended by* 104 F.3d 1296 (Fed. Cir. 1996). (Doc. No. 173 at p. 21). Both the statute and the portion of *Gaia* cited address assignments of registered marks rather than assignments of common law marks. *See* 3 McCarthy, *surpra* § 18:4 ("An assignment in writing is not necessary to pass common law rights in a trademark. If there is no documentary evidence of an assignment, it may be proven by the clear and uncontradicted oral testimony of a person in a position to have actual knowledge."). Therefore, because, again, MEC fails to develop the record fully, the Court cannot rule on the validity of the oral assignment.

Similarly, with respect to MEC's argument that because Joe Cool, Inc. allegedly assigned the [mark] mark without the underlying goodwill or business assets, such an assignment is ineffective, the Court finds that MEC failed to develop the record fully for such an argument. Amar testified that Joe Cool, Inc. did not assign any portion of the Joe Cool, Inc. business when Joe Cool, Inc. assigned the [mark] mark to CDI (Amar Dep. at 127:8-128:3). However, when MEC questioned CDI's Rule 30(b)(6) witness Schneorson about goodwill, MEC abandoned the questioning after there was confusion about the meaning of goodwill. (Schneorson Dep. at 77:24-79:9). Therefore, there remains a disputed issue of material fact as to whether the assignment included goodwill. As well, because the goodwill issue remains to be litigated, the Court will not address CDI's claim for reputational damages as they appear to be related.

The Court also finds that CDI overstates the holding and rationale in *International Cosmetics Exchange, Inc. v. Gaspardis Health & Beauty, Inc.*, 303 F.3d 1242 (11th Cir. 2002) as CDI fails to mention that the agreement in that case involved a distribution relationship between a foreign company and an American company. In *International Cosmetics Exchange*, the Eleventh Circuit reiterated, "[I]t is well-settled law that 'the transfer of a trademark or trade

## V.      CDI'S SPOLIATION ARGUMENT

Notwithstanding MEC's priority arguments, CDI, in response to MEC's motion for summary judgment, contends that MEC committed a willful act of spoliation when it destroyed the 3DL apparel the Amar Defendants handed over as part of the settlement agreement between MEC and the Amar Defendants.   (Doc. No. 185 pp. 1-6).   MEC responds that the Amar Defendants required that the agreement include a provision allowing the Amar Defendants to "damage the goods so they [were] not usable" and that in fact the Amar Defendants shredded and thoroughly cut-up the t-shirts and heat transfers before delivering them to MEC.   Moreover, MEC contends that the final destruction of the materials did not occur until after the settlement with the Amar Defendants and a default was entered against CDI.   (Doc. No. 192 at pp. 4-5).

Spoliation is "the intentional destruction of evidence or the significant and meaningful alteration of a document or instrument."   *Se. Mech. Servs., Inc. v. Brody*, 657 F. Supp. 2d 1293, 1299 (M.D. Fla. 2009) (citation omitted).   The Eleventh Circuit clarified that federal law "governs the imposition of spoliation sanctions" because "spoliation sanctions constitute an evidentiary matter."   *Flurry v. Daimler Chrysler Corp.*, 427 F.3d 939, 944 (11th Cir. 2005) (citations omitted).   However, the Eleventh Circuit has not yet developed specific guidelines for spoliation sanctions; thus, courts may consider state law for guidance if that state law is consistent with federal spoliation principles.   *See Se. Mech. Servs., Inc.*, 657 F. Supp. 2d at 1299.

---

name without the attendant good-will of the business which it represents is, in general, an invalid, "in gross" transfer of rights.'" *Id.* at 1246 (citation omitted).  In MEC's reply to CDI's response, it fails to address CDI's arguments regarding the assignment.  Although the Court notes CDI's argument is very weak, the Court still finds that, without a fully developed record and full discussion of the applicable legal standard, summary judgment based on a lack of standing due to an oral assignment without goodwill is not appropriate at this time.

In *Swofford v. Eslinger*, Judge Scriven, citing *Green Leaf Nursery v. E.I. DuPont De Nemours and Co.*, 341 F.3d 1292, 1308 (11th Cir. 2003), stated that the elements of a spoliation claim are:

> (1) the existence of a potential civil action; (2) a legal or contractual duty to preserve evidence which is relevant to the potential civil action; (3) destruction of that evidence; (4) significant impairment in the ability to prove the lawsuit; (5) a causal relationship between the evidence destruction and the inability to prove the lawsuit; and (6) damages.

*Swofford*, 671 F. Supp. 2d 1274, 1280 (M.D. Fla. 2009). Although the court in *Swofford* was addressing spoliation as an evidentiary violation, the case law it cites for the elements of spoliation are cases in which spoliation was raised as an independent cause of action for negligent spoliation of evidence. *See Cont'l Ins. Co. v. Herman*, 576 So. 2d 313, 315 (Fla. 3d DCA 2001); *see also Green Leaf Nursery v. E.I. DuPont De Nemours and Co.*, 341 F.3d 1292, 1308 (11th Cir. 2003) (citing *Continental Insurance Company*). As well, these cases predate the Eleventh Circuit's determination in *Flurry* that the circuit had not yet determined the guidelines for resolving spoliation claims.

Other courts addressing spoliation as an evidentiary violation hold that a party seeking sanctions must show: "(1) the evidence existed at one time, (2) the alleged spoliator had a duty to preserve the evidence, and (3) the evidence was crucial to the movant's prima facie case or defense." *Se. Mech. Servs., Inc.*, 657 F. Supp. 2d at 1299 (citing *Golden Yachts, Inc. v. Hall*, 920 So. 2d 777, 781 (Fla. 4th DCA 2006)). Notwithstanding the presence of these elements, an element of bad faith must exist as "'[m]ere negligence' in losing or destroying the records is not enough for an adverse inference, as 'it does not sustain an inference of consciousness of a weak case.'" *Swofford*, 671 F. Supp. 2d at 1280 (quoting *Bashir v. Amtrak*, 119 F.3d 929, 931 (11th Cir. 1997) (per curiam)); *see also Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1310 (11th Cir. 2009)

("While this circuit does not require a showing of malice in order to find bad faith, mere negligence in losing or destroying records is not sufficient to draw an adverse inference."). The Southern District of Florida has held that bad faith may be based on circumstantial evidence if the following is shown:

> (1) evidence once existed that could fairly be supposed to have been material to the proof or defense of a claim at issue in the case; (2) the spoliating party engaged in an affirmative act causing the evidence to be lost; (3) the spoliating party did so while it knew or should have known of its duty to preserve the evidence; and (4) the affirmative act causing the loss cannot be credibly explained as not involving bad faith by the reason proffered by the spoliator.

*Doe v. Miami-Dade County*, 797 F. Supp. 2d 1296, 1303 (S.D. Fla. 2011) (citation omitted).

Before addressing possible sanctions, the Court must determine whether there was a spoliation violation. On January 19, 2012, the Court entered a Consent Final Judgment and Permanent Injunction (Doc. No. 102) between MEC and the Amar Defendants in which it ordered,

> Within 15 business days of the date of this Consent Final Judgment, Consenting Defendants shall deliver to Counsel for [MEC] for destruction all existing inventory of products and promotional materials, including catalogs, brochures, labels, and hangtags, bearing [MEC's] ⫲ mark or design or any mark that the parties contend is confusingly similar thereof (including the design referenced in Defendants' pleadings as the "3DL" design).

(Doc. No. 102 at pp. 6-7). As well, on October 25, 2011, MEC and the Amar Defendants entered into a Confidential Settlement Agreement (Doc. No. 185-1) in which, the parties agreed that

> [w]ithn 15 business days of execution of this Settlement Agreement, the Amar Defendants will prepare for delivery to Counsel for [MEC] for destruction all existing inventory of products and promotional materials, including catalogs, brochures, labels, and hangtags, bearing [MEC's] ⫲ mark or design or any

mark confusingly similar thereto (including the designs referenced in Defendant's pleadings as the "3DL" design).   The Amar Defendants shall have the right to damage the goods so that they are not useable; however, the goods shall still be identifiable.   The Amar Defendants represent and warrant that their current inventory of products bearing [MEC's] 𝍫 mark or design or any mark confusingly similar thereto (including the design referenced in Defendants' pleadings as the "3DL" design) is as follows:

> T-Shirts Clothing 277[,] hats-6, sweatshirts-1
> Stickers[:] BIG- 38,750[,] small- 19,025.
> Other (specify) hangtags 52,800.
> Decal Sheets-300

> Counsel for [MEC] will coordinate and arrange for receipt of these items.

(Doc. No. 185-1 at p. 7).   Following this settlement agreement and the Court's Consent Final Judgment and Permanent Injunction, the Magistrate Judge granted MEC's motion for entry of default against Baksht; CDI; and Mettemp, Inc. for failing to respond to service.   (Doc. No. 104). On January 31, 2012, the Clerk entered a Clerk's Default, pursuant to *Federal Rule of Civil Procedure* 55(a), against Baksht; CDI; and Mettemp, Inc.   (Doc. No. 105).

Following the entry of default against CDI, Central Moving and Storage picked up additional inventory items turned over by the Amar Defendants.   (Mitchell Dec. (Doc. No. 194 at ¶ 6).   On February 14, 2012, MEC's counsel Richard Mitchell observed the boxes filled with clothing, hang tags, and heat transfers which were already slashed or cut into; he attests that only clothing was referenced on the inventory of the apparel delivered and no business records were observed in the materials delivered.   (*Id.* at ¶¶ 7-9).   Finally, on March 8, 2012, a little over a month after the entry of default, MEC instructed Central Moving and Storage, Inc. to destroy the inventory delivered by the Amar Defendants.   (*Id.* at ¶ 14); (Doc. No. 194-8).

On March 16, 2012, MEC moved for entry of final default judgment against Baksht; CDI; and Mettemp, Inc. (Doc. No. 112).   On March 30, 2012, Baksht and CDI filed opposition to

MEC's motion for entry of final default judgment (Doc. No. 114).  On April 25, 2012, the Court set aside the Clerk's Entry of Default given the strong policy of resolving lawsuits on the merits. (Doc. No. 120).

Based on the foregoing, CDI argues on information and belief that the items turned over to MEC by the Amar Defendants pursuant to the Court's Order were purposely destroyed and contained proof of the Amar Defendants' use of the Fat 3DL mark or Skinny 3DL mark in the 1990s.  (Doc. No. 185 at p. 4).  However, there is no representation that documents were provided to MEC for destruction rather only clothing apparel, hangtags, and heat transfers.  (*See* Mitchell Dec. at ¶¶ 7-9).  CDI cites to Amar's testimony that the heat transfers turned over to

MEC included the  (skinny 3DL) heat transfer, a similar design of which was allegedly first used in 1993.  (Amar Dep. at 122:21-123:6).  However, CDI does not address the fact that the Settlement Agreement specified current inventory.  Further, Joe Cool, Inc.'s employee Carie Sadler testified that Joe Cool, Inc. did not tend to have inventory of old t-shirts but that it is possible that heat transfers from the early years existed.  However, Sadler noted that heat transfers only last six months to a year before they become unusable due to their deterioration. (Sadler Dep. at 28:16-29:9).  As well, the Amar Defendants, at their request, destroyed the heat transfers and apparel before delivering them by slashing them and cutting them.  (*See* (Doc. No. 185-1 at p. 7); (Doc. No. 194-1); (Doc. No. 194-3 at p. 3 (noting the shredding before delivery to MEC)); (Doc. No. 194-4 (photographs showing the damaged items upon delivery))).

Based on CDI's argument, it is not even clear whether any evidence showing the continuous use of the 3DL design in any form was among the items delivered to MEC and whether those items came from the 1990s.  *See  Se. Mech. Servs., Inc.*, 657 F. Supp. 2d at 1299.

Even drawing all inferences in favor of the nonmovant and thus assuming that the evidence did exist, the Court still does not find there was spoliation, which can serve as a basis for denying summary judgment, because there is no proof of bad faith. *See, e.g.*, *Swofford*, 671 F. Supp. 2d at 1280.[43]

The evidence presently before the Court does not merit a finding of bad faith for purposes of spoliation. Pursuant to a settlement agreement and Court order, MEC destroyed the materials the Amar Defendants delivered to MEC. (*See* (Doc. No. 102); (Doc. No. 185-1). Moreover, the Amar Defendants shredded or cut the materials prior to delivering them. (*See* (Doc. No. 185-1 at p. 7); (Doc. No. 194-1); (Doc. No. 194-3 at p. 3 (noting the shredding before delivery to MEC))); (Doc. No. 194-4 (photographs showing the damaged items upon delivery)). Additionally, there is no proof that business records were included in the destruction of materials. (Mitchell Dec. at ¶¶ 7-9). Finally, MEC did not destroy the items until over a month after the Clerk's entry of default against CDI. (*See* (*id.* at ¶ 14); (Doc. No. 194-8)). Therefore, the Court will not deny MEC's motion for summary judgment on the basis of spoliation because it finds there is no proof of bad faith based on the record before the Court.

## VI.   JOINT VENTURE STANDING AND WRONGFUL SEIZURE CLAIM

MEC argues that CDI lacks standing to bring a claim for wrongful seizure based on MEC's seizure of allegedly infringing products and related business records at Joe Cool, Inc.'s place of business. (Doc. No. 173 at p. 22). MEC explicates that because in Florida, the laws of partnership apply equally to joint ventures, property acquired by a partnership is the property of

---

[43] To support the argument that the Court may deny summary judgment because of spoliation, CDI relies on a dissenting opinion in an Eleventh Circuit case and a Second Circuit opinion. Both cases are factually distinguishable. *See Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1321-28 (11th Cir. 2011) (Korman, J., dissenting); *Kronisch v. United States*, 150 F.3d 112 (2d Cir. 1998).

the partnership, not the partners.  (*Id.* at 23 (citing *Kislak v. Kreedian*, 95 So. 2d 510, 514 (Fla. 1957) ("It has been universally held that while 'joint adventure' and partnership are separate legal relationships, both relationships are governed by the same rules of law.  The laws governing partnerships are applicable to joint adventures.")); Fla. Stat. § 620.8203 (2011);[44] Fla. Stat. 620.8501 (2011)[45])).  Therefore, MEC concludes that CDI has no individual ownership interest in the property seized from the joint venture.  Further, MEC concludes that only the joint venture, which is not a party to this case, may bring an action for wrongful seizure, not one of the parties to the joint venture.  (Doc. No. 173 at p. 23).

CDI argues that a joint venture requires a joint proprietary interest in the subject matter and therefore a joint ownership of the joint venture's subject matter.  (Doc. No. 185 at pp. 6-7).  Thus, CDI concludes that it has standing because its proprietary interest in the joint venture.

However, CDI also fails to give a complete picture of Florida law.  For support, CDI relies on *Jackson-Shaw Co. v. Jacksonville Aviation Authority*, 8 So. 3d 1076 (Fla. 2008) (per curiam).  However, the *Jackson-Shaw* court, addressing whether a public entity is a joint owner with a private entity in violation of the Florida Constitution, stated that a joint ownership does not necessarily equate to a joint venture.  *Id.* at 1091.  Additionally, CDI fails to address Florida Supreme Court's jurisprudence that states, "Where real estate is acquired in a partnership business, and for partnership purposes, it will be treated as partnership property, though the legal title be taken in the name of the partners or in the name of a stranger."  *Proctor v. Hearne*, 131 So. 173, 177 (Fla. 1930) (citations omitted); *see also* 8B Fla. Jur. 2d § 783 ("Generally, however,

---

[44] Fla. Stat. § 620.8203 ("Property acquired by a partnership is property of the partnership and not of the partners individually.").

[45] Fla. Stat. § 620.8501 ("Partnership property is owned by the partnership as an entity, not by the partners as co-owners.  A partner has no interest that can be transferred, either voluntarily or involuntarily, in specific partnership property.").

when property is acquired in a joint venture business, and for joint venture purposes, it will be treated as property of the joint venture, even if the legal title is taken in the name of one of the joint venturers or in the name of a stranger.").

In its counterclaim, CDI alleges, "CDI and Joe Cool, Inc. formed Joe Cool Bike Week, Inc. as an (sic) legal entity through which to conduct some of the Joint Venture's business through [sic]." (Doc. No. 122 at ¶ 150(e)). However, during discovery, Schneorson, Baksht and Amar all testified that Joe Cool Bike Week, Inc. was merely a bank account established by Amar to segregate the receipts for sales of the  mark and that CDI and Joe Cool, Inc. did not conduct business through Joe Cool Bike Week, Inc. (Schneorson at 89:16-91:13); (Baksht Dep. at 183:15-184:15); (Amar Dep. at 106:24-109:3). Baksht further argued that the joint venture "was not an entity in its own right. It was a partnership between two people. There was no entity, no separate entity." (Baksht Dep. at 217:2-5).

These new facts raise a novel question. If CDI now contends that the joint venture is a nameless pursuit and is in actuality a partnership, then the question arises whether Joe Cool, Inc., by waiving in the settlement agreement the right to bring a claim for wrongful seizure, did so in his partner capacity and by doing so bound his partner CDI to that decision. (*See* Doc. No. 185-1 at p. 10 ("9. Mutual Releases.")). However, that also raises the issue whether such an action was an extraordinary act by Joe Cool, Inc., requiring a unanimous vote of the partnership. *See* Fla. Stat. § 620.8401(10) ("An act outside the ordinary course of business of a partnership and an amendment to the partnership may be undertaken only with the consent of all of the partners."). Notwithstanding, it is unclear at present whether CDI is pursuing the wrongful seizure claim in

its partner capacity.[46]  Because the parties have failed to address these nuances, the Court denies

MEC's motion for summary judgment on Count IV of CDI's counterclaim.

## VII.   FLORIDA LITIGATION PRIVILEGE BARS ABUSE OF PROCESS CLAIM

As the Court previously explained in denying CDI's motion for leave to amend its

counterclaim, CDI is barred from asserting an abuse of process claim based on the action

surrounding MEC's securing of an *ex parte* seizure order to obtain the alleged "counterfeit

products" Defendants[47] intended to sell during Daytona Bike Week 2011.  (Doc. No. 140).  The

court reiterates that this case is a paradigm for the application of Florida's litigation privilege.

In *Levin, Middlebrooks, Mabie, Thomas, Mayes & Mitchell, P.A. v. United States Fire*

*Insurance Company*, the Florida Supreme Court extended Florida's litigation privilege (an

absolute immunity) to any tortious act occurring during the course of a judicial proceeding so

long as the act has some relation to the proceeding.  *Levin, Middlebrooks, Mabie, Thomas,*

*Mayes & Mitchell, P.A.*, 639 So. 2d 606, 608 (Fla. 1994) (answering a certified question from the

Eleventh Circuit as to whether a lawyer is immune from suit when he certifies to a trial court that

he intends to call opposing counsel as a witness in order to obtain a disqualification and then

fails to subpoena or call the opposing counsel as a witness at trial).  The court extended the

privilege from its prior holdings that limited the absolute immunity to statements made during

---

[46] CDI raises the argument that if it does not have standing then MEC has no valid action for trademark infringement because MEC alleges that CDI "sold and are offering and selling heat transfers, clothing, and/or related products."  (Doc. No. 185 at p. 16 (citing MEC's Second Amended Complaint)).  The Court notes that MEC may still sue for trademark infringement because CDI can infringe in its partner capacity while possibly being precluded from suing for wrongful seizure due to the actions of Joe Cool, Inc. as explained above.  Therefore, CDI's argument is without merit.

[47] As previously noted, when MEC initially filed its suit, it brought actions against CDI; David Baksht; Mettemp, Inc.; Joe Cool, Inc.; Joe Cool Bike Week, Inc.; Michelle Amar; and Yosef Amar ("Defendants").  MEC and Joe Cool, Inc.; Joe Cool Bike Week, Inc.; Michelle Amar; and Yosef Amar later entered into a settlement agreement.  (Doc. No. 102).

the course of a judicial proceeding by parties to the proceeding, judges, witnesses, or counsel. *Id.* (citation omitted).

The court reasoned that "participants in litigation must be free to engage in unhindered communication . . . [and] be free to use their best judgment in prosecuting or defending a lawsuit without the fear of having to defend their actions in a subsequent civil action for misconduct." *Id.* However, these infractions are not without remedy because "just as '[r]emedies for perjury, slander, and the like committed during judicial proceedings are left to the discipline of the courts, the bar association, and the state,' other tortious conduct occurring during litigation is equally susceptible to that same discipline." *Id.* (internal citation omitted).  As well, the trial court may use its contempt power to enforce its orders and "to protect the court from acts obstructing the administration of justice." *Id.* at 608-09.

In *Echevarria, McCalla, Raymer, Barrett & Frappier v. Cole*, the Florida Supreme Court further extended the litigation privilege, stating that it applied to all causes of action, whether they arise out of common law torts or statutory violations.  *Echevarria, McCalla, Raymer, Barrett & Frappier*, 950 So. 2d 380, 384 (Fla. 2007); *see also Jackson v. Bellsouth Telecomms.*, 372 F.3d 1250, 1274 (11th Cir. 2004) ("Florida's litigation privilege affords absolute immunity for acts occurring during the course of judicial proceedings.  The privilege initially developed to protect litigants and attorneys from liability for acts of defamation, but has since been extended to cover all acts related to and occurring within judicial proceedings." (citation omitted)).  For example, in *Latam Investments, LLC v. Holland & Knight, LLP*, Florida's Third District Court of Appeal addressed whether the Florida litigation privilege applied to a claim for abuse of process. *Latam Invs., LLC*, 88 So. 3d 240, 241-42 (Fla. 3d DCA 2011).  During post-judgment efforts to collect on a judgment entered in a client's favor, a law firm issued subpoenas and writs of

48

garnishment; however, it was later determined that the court did not have subject matter jurisdiction over the underlying lawsuit. *Id.* The court determined that the litigation privilege applied because the law firm's acts occurred during and were related to the judicial proceeding. *Id.* at 242-43. As well, the court elaborated that the litigation privilege does not abolish an abuse of process claim because the litigation privilege is limited to "actions taken during a judicial proceeding and which are related to the judicial proceeding." *Id.* at 243. Therefore, an abuse of process claim arises when actions are taken outside of a judicial proceeding or when the actions that are taken during a judicial proceeding are unrelated to a judicial proceeding. *Id.* (citation omitted); *see also Suchite v. Kleppin*, No. 10-21166-CIV, 2011 WL 1814665, at *3 (S.D. Fla. April 29, 2011) ("The litigation privilege can apply to bar claims for abuse of process." (citations omitted)).

As the Court noted in its previous Order (Doc. No. 140), this case squarely falls within the litigation privilege. CDI does not offer any rebuttal to MEC's argument on this point. Therefore, the Court grants MEC summary judgment on Count V of CDI's counterclaim.

## VIII.   CONCLUSION

As the Court has noted multiple times in this Order, the parties' briefs were less than ideal in terms of setting forth the applicable and binding law. As well, the Court reiterates CDI's disregard for the Case Management Scheduling Order and Rule 56 with respect to citing to the record for support of factual assertions. The Court expects the parties to be more diligent as they prepare for trial. Therefore, based on the foregoing, it is **ORDERED** as follows:

1. Plaintiff Monster Energy Company's ("MEC") Motion for Summary Judgment on Priority and Defendant's Counterclaims (Doc. No. 173), filed on October 1, 2012, is **GRANTED in part and DENIED in part**.

2. MEC's motion for summary judgment is **GRANTED** as to Count V of CDI's counterclaim.

3. MEC's motion for summary judgment on CDI's sixth affirmative defense and Counts I through Count IV of CDI's Counterclaim are **DENIED**.

**DONE** and **ORDERED** in Orlando, Florida on January 3, 2013.

ANNE C. CONWAY
United States District Judge

Copies furnished to:

Counsel of Record

Unrepresented Parties