**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

MONSTER ENERGY COMPANY, f/k/a HANSEN BEVERAGE COMPANY, d/b/a MONSTER BEVERAGE COMPANY,

Plaintiff,

Case No. 6:11-CV-329-ORL-22DAB

vs.

CONSOLIDATED DISTRIBUTORS, INC., METTEMP, INC., and DAVID BAKSHT (a/k/a David Lipsker a/k/a David Bakshet a/k/a D Bakht a/k/a DM Schneerson a/k/a Abraham Shneorson),

Defendants.
_______________________________________ /

# AMENDED JOINT FINAL PRETRIAL STATEMENT

Plaintiff Monster Energy Company ("MEC"), represented by lead trial counsel, John B. Sganga, Jr., Esq. of Knobbe Martens Olson & Bear, LLP, along with local counsel Richard E. Mitchell, Esq. of GrayRobinson, P.A., and Defendant David Baksht ("Baksht"), represented by lead trial counsel, Elliot Blumenthal, Esq. of The Law Offices of Elliot Blumenthal, along with local counsel Lawrence Farese, Esq. of Robins, Kaplan, Miller & Ciresi, in accordance with Local Rule 3.06(c), the Court's Case Management and Scheduling Order (Doc. 121), and this Court's Order dated February 4, 2013 (Doc. 266), hereby submit this Amended Joint Final Pretrial Statement.

## I. BASIS FOR FEDERAL JURISDICTION

This Court has jurisdiction over this case pursuant to 28 U.S.C. §§ 1331 & 1338 because this matter arises under the copyright and trademark laws of the Untied States. Jurisdiction over the state law claims is based upon 28 U.S.C. § 1367. This Court also has jurisdiction over all federal and state claims pursuant to 28 U.S.C. § 1332 because this is an action for damages where the amount in controversy is in excess of $75,000 between citizens of different states who enjoy complete diversity.

## II. NATURE OF ACTION

MEC filed this action against Baksht alleging trademark infringement, trademark dilution, copyright infringement, and related claims. MEC alleges that Baksht's logo, shown below to the left, infringes MEC's "M Claw" trademark, shown below to the right.



Baksht's Logo



M Claw

MEC's Complaint originally named several other defendants, including Joe Cool, Inc., and Consolidated Distributors, Inc. ("CDI"). However, MEC has

settled its claims against Joe Cool, and CDI declared bankruptcy on January 22, 2013, resulting in a stay of claims against CDI. Accordingly, trial is scheduled to proceed between MEC and Baksht only.[1]

## III. STATEMENT OF THE CASE

### A. PLAINTIFF MEC'S STATEMENT OF THE CASE

MEC is the designer, developer and seller of the world famous Monster Energy® drinks which it sells under its equally famous M Claw trademark, shown below:

Since 2002, MEC has also distributed and sold t-shirts and other clothing bearing the M Claw trademark. MEC has numerous federal trademark registrations for its M Claw trademark, including Registration No. 4,051,650 for use in connection with clothing. MEC also has a copyright registration for (1) the M Claw itself, and (2) the artwork appearing on its Monster Energy® cans, which includes the M Claw as the central, prominent element.

In early 2011, MEC learned that Baksht, CDI, and Joe Cool were selling clothing, including hats and t-shirts, bearing a design very similar to the M Claw

[1] MEC has filed a motion to lift the stay in the Bankruptcy Court. If that motion is granted, MEC will be seeking to include CDI in the upcoming trial.

trademark. Baksht refers to this design as the "Three Drooping Lines" or "3DL" design. An example of the 3DL design on a t-shirt is shown below:



MEC brought this action in March 2011 to prevent further sales of clothing bearing Baksht's version of MEC's M Claw trademark, and for monetary relief. MEC alleges that the use of the 3DL design infringes MEC's trademark rights, dilutes its trademark rights, infringes its copyright, and constitutes unfair competition.[2]

Baksht was the sole person through which CDI committed its acts of infringement. In fact, Baksht concedes that he is the sole director and officer of CDI, and that he has been at all times the "driving force" and "moving force" behind CDI. He is thus directly liable for all of CDI's purported actions under *Chanel, Inc. v. Italian Activewear of Fla., Inc.*, 931 F.2d 1472, 1477-78 (11th Cir. 1991), and other authorities discussed below and in the jury instructions.

---

[2] To streamline the case for trial, and because the relief sought was duplicative, MEC has dropped its claims for Florida statutory unfair competition (Count VI) and Florida trademark dilution (Count VIII).

Moreover, CDI and Baksht did not observe any corporate formalities whatsoever. For four years, until January 9, 2013, CDI did not even have a Board of Directors, any officers, or any shareholders. Thus, at trial, MEC seeks to establish that Baksht is personally liable for actions he took purportedly in the name of CDI, an empty shell. MEC also seeks to hold Baksht personally liable on theories of contributory infringement, induced infringement, and vicarious infringement.

Baksht now alleges that it is too late for MEC to pierce the corporate veil of CDI. However, MEC's claim that CDI can be disregarded as an entity is based on new admissions by Baksht that CDI never had any officers, directors, or shareholders until January 9, 2013. *See, e.g.,* D.I. 237-1 ¶ 8. Before Baksht made these admissions, he lied to MEC in discovery and lied to this Court in declarations by claiming under oath that CDI had officers, directors, and shareholders. *See, e.g.,* D.I. 179-2 ¶ 1; Baksht Depo. at 17:5-10, 21:5-12. It is only because Baksht lied under oath that the issue of piercing the corporate veil did not arise until recently.

Baksht also seems to contend that MEC cannot properly raise the issues of contributory infringement, induced infringement or vicarious infringement because MEC did not plead these theories in its Complaint. However, MEC is not aware of any authority requiring these legal theories to be pled with specificity. MEC pled infringement by Baksht relating to the M Claw Trademark. In opposing Baksht's Motion to Dismiss, and before close of discovery, MEC explicitly argued that Baksht caused and was liable for the infringement by CDI.

*See* D.I. 142. This gave Baksht more than fair notice of the nature of the allegations against him. Moreover, it is Baksht who has pled the existence of a joint venture between his alter ego CDI and Joe Cool, D.I. 122 ¶ 150, creating liability for Joe Cool's conduct. In addition, Baksht did not object to the presentation of any of these theories of liability when the parties submitted their original Joint Final Pretrial Statement on December 17, 2012. To the contrary, Baksht offered his own proposed interpretation of individual liability under *Chanel. See* D.I. 217 at 71-72 ¶ 3.

As an affirmative defense, Baksht has alleged that he and CDI have the legal right to use their version of the M Claw trademark based upon prior use. According to Baksht, CDI's predecessor-in-interest, Joe Cool, began using Baksht's version of the M Claw trademark on t-shirts in 1993. However, Joe Cool's owner, Yosef Amar, testified that he did not begin using that design until 2010, eight years after MEC began using the M Claw trademark on t-shirts and hats.

After Baksht learned of Mr. Amar's testimony, Baksht shifted ground and argued that he was entitled to priority based upon Joe Cool's alleged use of a different trademark, which the parties have dubbed the three skinny lines. However, this Court adjudicated that issue in favor of MEC on summary judgment. MEC's position in light of that ruling is that Baksht is precluded at trial from arguing priority based on the alleged use of three skinny lines.

At the beginning of the case, former defendant Joe Cool argued that it had been using yet another design, the Myrtle Beach design, since 1993. Baksht never made this argument in any pleadings, in any discovery papers, in his deposition, or anywhere else. However, in light of this Court's summary judgment ruling on the three skinny lines, Baksht has now adopted Joe Cool's old argument.[3]

Baksht's latest shift has no merit for several reasons. First, there is no credible or corroborated evidence that the Myrtle Beach design was ever used at all by Joe Cool. In fact, the design is absent from all of Joe Cool's product catalogs. Second, there is no evidence that the Myrtle Beach design was used continuously from 1993 until the adoption of the 3DL design in 2010. In fact, Yosef Amar testified that the design was abandoned. Third, the Myrtle Beach design is not sufficiently similar to the 3DL design to permit tacking. The two designs must be virtually identical for tacking to be permitted, and they are not. Finally, as was the case with the skinny lines design, there is no evidence that the Myrtle Beach design was used as a trademark to designate a source, rather than being used as a mere decoration or ornamentation.

[3] Baksht has also adopted new terminology, referring to the Myrtle Beach design as the "3DL Myrtle Beach design." This is a transparent attempt to create the false impression that there is some association between the 3DL design and the Myrtle Beach design. Such a false impression is highly prejudicial to MEC, and Baksht should not be allowed to use this newly minted terminology in front of the jury. Indeed, the undisputed testimony of former Joe Cool employee Carie Sadler is that she coined the term "3DL" in 2010 or 2011. Sadler Depo. at 18:4-14.

Baksht also alleges spoliation, contending that evidence of use of the Myrtle Beach design in the 1990s was contained in the materials that Joe Cool turned over to MEC as part of a settlement. However, this Court already resolved the spoliation issue against Baksht on summary judgment. D.I. 228 at 39-44. Thus, spoliation should not be a part of the trial. Even if spoliation were not fully resolved by summary judgment, Baksht's purported evidence of spoliation is so weak, and the prejudicial effect of such allegations is so powerful, that again the Court should not permit spoliation to be a part of the trial.

On the issue of infringement, MEC will present unrebutted expert opinion testimony regarding the similarity that consumers perceive between its M Claw trademark and Baksht's admittedly "strikingly similar" version. This evidence, as well as direct comparison of the accused products with MEC's legitimate products, MEC's trademark registrations, and MEC's copyright registrations, will establish trademark and copyright infringement.

MEC will seek damages in the form of disgorgement of Baksht's profits, and statutory damages.

## B. DEFENDANTS CDI AND BAKSHT'S STATEMENT OF THE CASE

### Creation of CDI's 3DL Marks

Joe Cool, Inc. is in the business of selling pre-printed clothing, primarily t-shirts with a heat transfer iron-on affixed to the t-shirt. Joe Cool, Inc. has been a heat transfer and pre-printed apparel manufacturer, in Daytona Beach, for over 20 years.

Joe Cool, Inc. has used, promoted and advertised the 3DL design, as it evolved from the Myrtle Beach 3DL design (as shown in DTX 2A and as defined in the Court's January 3, 2013 Summary Judgment Order) continuously from 1993 until the products were seized by Plaintiff, and the 3DL design acquired substantial common law rights. All of the uses of the 3DL marks are limited to apparel, including t-shirts and tank-tops.

Baksht will show that the owner of Joe Cool, Inc., Yosef Amar, developed the 3DL Myrtle Beach design in 1993, and continuously produced and sold heat transfers, t-shirts and caps with that design from 1993 until the seizure in this action. Mr. Amar derived the design of the original 3DL design from the claw of iguana designs and from palm leaf designs, which were popular designs that he was producing at and before that time. As such, these designs were independently created, which is a defense to Plaintiff's copyright claims.

There is no evidence that David Baksht, the sole defendant at trial, had any access to or participated in any way in the sale, use or distribution of any merchandise bearing Monster's purported trademarks or copyrighted works.

**Creation of Monster's M Claw Mark**

In July 2001, Steven Spielberg and Universal Pictures released the movie Jurassic Park III. The movie grossed $365,900,000 in box office receipts. In February 2002, six months after the release of Jurassic Park III, the CEO of Monster, Rodney Sacks and a group of associates developed Monster's M Claw mark based on Jurassic Park movie posters.

**Formation of the Joint Venture between Joe Cool, Inc. and CDI**

In June 2010, Mr. Amar asked CDI, to enter into a joint venture with him to sell and market t-shirts and heat transfers using the 3DL marks. Under the terms of their joint venture, CDI and Joe Cool, Inc. would share profits and losses 50-50. No entity was formed to embody the joint venture, rather CDI and Joe Cool, Inc. each owned the property of the joint venture as 50% co-owners. David Baksht did not personally receive any revenue or profits from the joint venture.

The Joint Venture was formed with the following acts:

a) Joe Cool, Inc. assigned all rights, title and interest in the 3DL marks to CDI along with the goodwill of the 3DL trademarks;

b) Yosef Amar, acting on behalf of CDI, registered the 3DL marks as trademarks in the name of CDI with the Florida Department of State, Division of Corporations and in New Jersey;

c) Yosef Amar, acting on behalf of CDI, filed a trademark application for the 3DL mark in the USPTO;

d) CDI granted a license to Joe Cool, Inc. for use of the 3DL marks for the benefit of the Joint Venture;

e) To get the Joint Venture started, CDI arranged an interest-free and collateral-free loan to Yosef Amar, the principal of Joe Cool, Inc., in the amount of $10,000 for the purpose of financing the production of heat transfer stickers utilizing the 3DL marks to be used for the Joint Venture. The loan was to be repaid from the sale of t-shirts;

f) CDI agreed to take responsibility for preparing paperwork for trademark registrations to be used for the Joint Venture and to police the trademarks licensed for the use of the Joint Venture;

g) Using the loan proceeds Joe Cool, Inc. produced

100,000 heat transfer stickers utilizing the 3DL marks and began the process of affixing the heat transfers to t-shirts to create pre-printed t-shirts for the Joint Venture;

h) CDI and Joe Cool, Inc. agreed that CDI and Joe Cool, Inc. would each receive 50% of the profits from the Joint Venture, mainly from the sale of t-shirts and heat transfers utilizing the 3DL mark and related marks;

i) CDI and Joe Cool, Inc. began marketing wholesale sales of the pre-printed t-shirts and the heat transfers.

CDI is the owner of the following marks: "Wildwood," "Design of 3 Drooping Green Lines On Angle," "Daytona Beach & Design of 3 Drooping Green Lines," and "Florida and Design of 3 Drooping Lines" (collectively the "3DL marks").

**Priority of CDI'S 3DL Design Over the M Claw Mark**

CDI has priority of usage of the Myrtle Beach 3DL design (which evolved into the 3DL design that is accused of infringement) over Plaintiff's M Claw mark, as the mark was used by CDI's assignor, Joe Cool, Inc. on clothing prior to any use by Plaintiff.

Plaintiff's use of the M Claw Trademark in the ordinary course of trade on clothing did not start until 2007.

Plaintiff, as the junior user, has saturated the market with its M Claw Trademark that is similar or identical to that of CDI's Myrtle Beach 3DL design. Plaintiff's saturation of the market with its substantially similar or identical mark has overwhelmed Baksht, CDI and CDI's licensees as the senior users.

**Plaintiff Caused a Wrongful Seizure to Be Executed Against CDI's Property, Resulting In Lost Evidence That Would Support Baksht's Defenses.**

On March 3, 2011, Plaintiff filed a Motion for Ex Parte Seizure Order and Temporary Restraining Order and Order to Show Cause regarding Preliminary Injunction. The basis for Plaintiff's Motion was to prevent Defendant's alleged counterfeiting.

Based upon Plaintiff's representations, the Court entered a Temporary Restraining Order, Order to Show Cause, and Order of Seizure on March 4, 2011 ("Seizure Order").

In accordance with the Court's Seizure Order, US Marshals raided Joe Cool, Inc.'s office and warehouse in Daytona Beach and effected a seizure of Defendant's merchandise, goods, and related business records occurred on March 7, 2011.

On March 24, 2011, the Court held a show cause hearing. At the hearing, the Court heard argument of counsel, and based upon the record and argument of counsel, the Court issued its Order on March 30, 2011, denying Plaintiff's Motion preliminary injunction and reversing Seizure Order. On April 13, 2011, the Court entered a further Order denying Plaintiff's Motion for Reconsideration of its motion for preliminary injunction.

Subsequently, the Court issued its Order on March 30, 2011 [DE 40], denying Plaintiff's Motion for Preliminary Injunction and ordered that the seized property be returned to Defendants. The Court held that the TRO and Seizure

Order should never have been entered, as it was based in part, on Plaintiff's "misleading and less than candid statements." [See DE 40].

On April 13, 2011, this Court entered its Order denying Plaintiff's Motion for Reconsideration, again holding that "the temporary restraining order and order of ex parte seizure should never have been entered..." [DE 52, pg. 2].

Plaintiff caused a wrongful seizure because, but for Plaintiff's knowing misrepresentations, material omissions and misleading statements, the Court would not have issued the TRO and Seizure Order, and upon revelation of the true facts at a show cause hearing the Court ordered the seized property returned to Defendants and denied Plaintiff's application for a preliminary injunction. Specifically, Plaintiff misrepresented Defendants as "fly by night" counterfeiters, when in fact, Defendants' business had a permanent and established nature, having operated a retail store in Daytona Beach for seventeen years; and because the goods seized were legitimate merchandise, not counterfeit merchandise.

Prior to the commencement of this action, Plaintiff's registered trademarks for use on clothing consisted only of the M Claw mark together with the words "Monster Energy." Prior to the commencement of this action, Plaintiff's registered use of the M Claw mark alone, i.e., with no other graphics or words, was limited to beverages and stickers. Therefore, the designs on CDI's t-shirts were not identical to Plaintiff's federal trademarks for its clothing, as required to show counterfeiting and to warrant an order of seizure. In addition, the outline

and orientation of the three lines are different, and the "top ends" of the mark point in different directions. More important, Plaintiff's M Claw mark by itself was only trademarked for beverage cans. The trademarks for shirts, stickers, and other apparel include the words "Monster Energy" in a stylized font.

CDI was a victim of the wrongful seizure as the TRO and Seizure Order was directed at Defendant, the seized merchandise was property belonging to CDI and Joe Cool, Inc. as property connected to their Joint Venture, in which Baksht owned an interest as a shareholder in CDI, and the seized business records were property of CDI and Joe Cool, Inc. as property connected to their Joint Venture, including customer and employee lists.

**Plaintiff Acted in Bad Faith in Seeking the Ex Parte Seizure Order.**

The TRO and Seizure Order was obtained by Plaintiff in bad faith. Plaintiff's bad faith is demonstrated by the following findings of the Court regarding Plaintiff's misrepresentations, material omissions and misleading statements in support of its motion for seizure:

1. Plaintiff did not make clear to the Court that the trademark that applied to clothing and other merchandise included the "M Claw" symbol and the words "Monster Energy."

2. Further, in its motion for temporary restraining order, though Plaintiff lists the federal trademark registrations and cites the exhibits, the list suggests that the trademark for stickers and clothing consists only of the M, which Plaintiff calls the "M Claw." (See Doc. No. 3 p. 6.) However, as stated above, Plaintiff's trademark for clothing also includes the words "Monster Energy." The marks are therefore not

identical.

3. Plaintiff makes this misleading suggestion even more strongly in Count One of the complaint. In its allegations of trademark infringement and counterfeiting pursuant to 15 U.S.C. § 1114, the Plaintiff states that its trademark for cans is the M with the words “Monster Energy,” the trademark for nutritional supplements is “M Monster Energy,” and the trademark for clothing is just the M – again, calling it the “M claw.” (Doc. No. 2 ¶ 51.)

4. Another example is that the section of the complaint that contains the allegations relating to the infringement is titled “Defendants’ Infringement of the M Mark.” (Doc. No. 2 p. 11.)

5. Plaintiff also compares an image of the M with a photograph of one of Defendants’ t-shirts and contends that the comparison displays a “patent identify of trademarks.” (Doc. No. 3 p. 15.) Again, Plaintiff does not reveal that the M is not identical to Plaintiff’s actual trademark for clothing.

[Doc 40, pp. 2-3].

In addition, Monster mislead the Court by asserting in its Complaint for purposes of its infringement claim, by stating “Pursuant to 15 U.S.C. § 1065, Registration No. 2,903,214 for the M Claw Trademark is now incontestable.” However, that statement by Monster was misleading because Registration No. 2,903,214 is for the use of the M Claw mark on beverage cans - not on apparel.

Defendant will show as further evidence of Plaintiff’s bad faith that at the time of its motion for an ex parte seizure order, Monster was aware that Joe Cool and CDI’s t-shirts were not identical with, or substantially indistinguishable from

Monster's apparel, and therefore, Monster lacked a good faith belief that Joe Cool and CDI's products were counterfeit.

Further evidence of Plaintiff's bad faith is that Plaintiff received an investigators report on March 4, 2011, one day after Plaintiff filed its motion for ex parte seizure, which Plaintiff did not bring to the Court's attention. The report stated that Joe Cool, Inc. was operating its business from an established business address, a building that it purchased in 2000 for $250,000 and the report showed pictures of the building. Therefore, Plaintiff lacked a good faith belief that Defendants were typical "fly by night" counterfeiters. Prior to the seizure, which took place on March 7, 2011, Plaintiff failed to reveal the information in this report to the Court.

**Plaintiff Caused the Spoliation of Evidence Supporting Defendants' Claim of Priority of the 3DL marks**

Plaintiff willfully, and in bad faith, spoliated material documents and things during the pendency of this matter that supported CDI's claim of priority of its 3DL designs. The documents and things in question consist of art work, heat transfers and t-shirts dating from the 1990's that bore the 3DL designs and would have established the continuous use in commerce of the 3DL designs since that time. These documents and things (the "1990's 3DL Evidence") would support CDI's and Baksht's claim of priority, and were previously in the possession of CDI's assignor of the 3DL marks, Joe Cool, Inc.

The 1990's 3DL Evidence was turned over "to Counsel for Hansen for destruction," during the pendency of this litigation, pursuant to a settlement agreement between Plaintiff and Joe Cool, Inc., dated October 25, 2011. (See Doc 185-1.)

The shredding was done pursuant to orders given by Plaintiff to its counsel, who directed and authorized the shredding of 2,250 pounds of evidentiary material, including clothing items, heat transfers and hang tags that were provided to Plaintiff by Joe Cool, Inc. pursuant to the settlement agreement between Plaintiff and the Joe Cool, Inc.

Among the evidentiary materials which Plaintiff shredded were the original heat transfers that Mr. Amar used to create the 1993 original 3DL mark, evidence that is crucial to Defendant's claim of priority.

**Lack of Confusion between the Marks**

Baksht will show that no likelihood of confusion is created between the M Claw mark and the 3DL marks because the marks themselves are not confusingly similar.

Baksht will show that Monster's M Claw mark is weak because there is evidence of widespread third-party use.

Baksht will show that its 3DL mark does not resemble Monster's M-Claw mark because Monster's mark is clearly the letter M, whereas the 3DL mark is simply a claw mark or a graphic of three drooping lines.

The materials that Monster points to in its pleading as examples of Baksht's infringing use of the 3DL mark on clothing, bear the mark with other content such as wording, motorcycles, skulls and eagles. Such use of the 3DL mark with these additional design elements is contrary to the use employed by Monster for its M-Claw mark, in which the mark is displayed by itself. Similarly, the Court in its prior Order noted “Defendants’ t-shirts were not even close to exactly duplicating – or even closely duplicating – the entire pattern of any of Plaintiff’s t-shirts.” [DE 52].

Furthermore, Baksht will show that Joe Cool and CDI consistently used two versions of CDI’s 3DL mark side by side on their graphic shirt designs – these are the “skinny” 1993 3DL mark and the “fat” 3DL mark. Use of the two 3DL marks on clothing together does not look like Monster's solitary use of its M-Claw mark, featured in the center of the mark's field.

**Further Affirmative Defenses against Plaintiff’s Claims**

Plaintiff’s mark does not qualify for dilution protection because it is not “famous” within the meaning of the Lanham Act for purposes of dilution fame.

Plaintiff’s claims are barred by the doctrine of unclean hands. Specifically, based upon Plaintiff’s actions which resulted in a wrongful seizure, Plaintiff is not entitled to further equitable relief after having misrepresented its case.

Plaintiff’s claims are also barred by the doctrine of unclean hands as a result of Plaintiff’s spoliation of evidence during the pendency of this action. Therefore, Plaintiff is not entitled to equitable relief.

Plaintiff's purported claims for contributory infringement, vicarious liability, induced infringement, liability based on an alter ego theory, and any other theory of recovery involving the liability or actions of a third party other than David Baksht personally are barred because they were not plead in any of Plaintiff's complaints. In addition, such theories may implicate the bankruptcy stay currently in place with respect to defendant CDI. Furthermore, certain terms in Plaintiff's settlement agreement with Joe Cool may further interfere unlawfully with Baksht's ability to defend himself on any such late-added claims, and his opportunity to object to such terms may have been prejudiced by the late addition of these theories of recovery. In the event that the Court permits such late use of these theories, Baksht reserves the right to respond with additional case statements, proposed jury instructions, exhibits and witnesses.

## IV. EXHIBITS

### A. PLAINTIFF'S EXHIBIT LIST

In accordance with Local Rules 3.06 and 3.07, MEC's exhibits are listed in the Clerk's approved form attached hereto as Appendix A.

### B. DEFENDANTS CDI AND BAKSHT'S EXHIBIT LIST

In accordance with Local Rules 3.06 and 3.07, CDI and Baksht's exhibits are listed in the Clerk's approved form attached hereto as Appendix B.

## V. LIST OF WITNESSES

### A. PLAINTIFF'S WITNESS LIST

**Likely to Be Called**

1. Rodney C. Sacks

   c/o John B. Sganga, Jr., Esq.
   Knobbe, Martens, Olson & Bear, LLP
   2040 Main Street, Fourteenth Floor
   Irvine, California 92614
   Phone: (949) 760-0404

2. Mark Hall

   c/o John B. Sganga, Jr., Esq.
   Knobbe, Martens, Olson & Bear, LLP
   2040 Main Street, Fourteenth Floor
   Irvine, California 92614
   Phone: (949) 760-0404

3. Tom Kelly

   c/o John B. Sganga, Jr., Esq.
   Knobbe, Martens, Olson & Bear, LLP
   2040 Main Street, Fourteenth Floor
   Irvine, California 92614
   Phone: (949) 760-0404

4. Drew Maconachy

   c/o John B. Sganga, Jr., Esq.
   Knobbe, Martens, Olson & Bear, LLP
   2040 Main Street, Fourteenth Floor
   Irvine, California 92614
   Phone: (949) 760-0404

5. Robert Chiaradio

   c/o John B. Sganga, Jr., Esq.
   Knobbe, Martens, Olson & Bear, LLP
   2040 Main Street, Fourteenth Floor
   Irvine, California 92614
   Phone: (949) 760-0404

6. Gerald Ford

c/o John B. Sganga, Jr., Esq.
Knobbe, Martens, Olson & Bear, LLP
2040 Main Street, Fourteenth Floor
Irvine, California 92614
Phone: (949) 760-0404

7. Philip Johnson

c/o John B. Sganga, Jr., Esq.
Knobbe, Martens, Olson & Bear, LLP
2040 Main Street, Fourteenth Floor
Irvine, California 92614
Phone: (949) 760-0404

8. Leslie Lott

c/o John B. Sganga, Jr., Esq.
Knobbe, Martens, Olson & Bear, LLP
2040 Main Street, Fourteenth Floor
Irvine, California 92614
Phone: (949) 760-0404

9. David Hanson

c/o John B. Sganga, Jr., Esq.
Knobbe, Martens, Olson & Bear, LLP
2040 Main Street, Fourteenth Floor
Irvine, California 92614
Phone: (949) 760-0404

10. Nancy Ridenbaugh

c/o John B. Sganga, Jr., Esq.
Knobbe, Martens, Olson & Bear, LLP
2040 Main Street, Fourteenth Floor
Irvine, California 92614
Phone: (949) 760-0404

11. Trevor Solomon

c/o John B. Sganga, Jr., Esq.
Knobbe, Martens, Olson & Bear, LLP
2040 Main Street, Fourteenth Floor

Irvine, California 92614
Phone: (949) 760-0404

12. Yosef Amar

    1052 N. Beach St.
    Holly Hill, FL 32117

13. Carie Sadler

    87 Kenilworth Ave.
    Ormond Beach, FL 32174

14. Cezary Pavel Kakol

    14 Fisherman Circle, Apt 2
    Ormond Beach, FL 32174

15. David Baksht

16. Menachem Schneorson

**May Be Called**

17. Ian McLean

    1401 North Broadway #220
    Walnut Creek, CA 94596

18. Terry Sacks

    Knobbe, Martens, Olson & Bear, LLP
    2040 Main Street, Fourteenth Floor
    Irvine, California 92614
    Phone: (949) 760-0404

19. Lynda Zadra Symes

    Knobbe, Martens, Olson & Bear, LLP
    2040 Main Street, Fourteenth Floor
    Irvine, California 92614
    Phone: (949) 760-0404

20. Richard Mitchell

    GRAY – ROBINSON, P.A.
    East Pine Street, Suite 1400

Orlando, FL 32801
(407) 843-8880

21. Jake Brown

c/o John B. Sganga, Jr., Esq.
Knobbe, Martens, Olson & Bear, LLP
2040 Main Street, Fourteenth Floor
Irvine, California 92614
Phone: (949) 760-0404

22. Tucker Hibbert

c/o John B. Sganga, Jr., Esq.
Knobbe, Martens, Olson & Bear, LLP
2040 Main Street, Fourteenth Floor
Irvine, California 92614
Phone: (949) 760-0404

23. Rick Thorne

c/o John B. Sganga, Jr., Esq.
Knobbe, Martens, Olson & Bear, LLP
2040 Main Street, Fourteenth Floor
Irvine, California 92614
Phone: (949) 760-0404

24. Jaime Bestwick

c/o John B. Sganga, Jr., Esq.
Knobbe, Martens, Olson & Bear, LLP
2040 Main Street, Fourteenth Floor
Irvine, California 92614
Phone: (949) 760-0404

25. Shane Bonifay

c/o John B. Sganga, Jr., Esq.
Knobbe, Martens, Olson & Bear, LLP
2040 Main Street, Fourteenth Floor
Irvine, California 92614
Phone: (949) 760-0404

26. Brian Deegan

c/o John B. Sganga, Jr., Esq.

Knobbe, Martens, Olson & Bear, LLP
2040 Main Street, Fourteenth Floor
Irvine, California 92614
Phone: (949) 760-0404

27. Rob Dyrdek

c/o John B. Sganga, Jr., Esq.
Knobbe, Martens, Olson & Bear, LLP
2040 Main Street, Fourteenth Floor
Irvine, California 92614
Phone: (949) 760-0404

28. Ken Block

c/o John B. Sganga, Jr., Esq.
Knobbe, Martens, Olson & Bear, LLP
2040 Main Street, Fourteenth Floor
Irvine, California 92614
Phone: (949) 760-0404

29. Adam Jones

c/o John B. Sganga, Jr., Esq.
Knobbe, Martens, Olson & Bear, LLP
2040 Main Street, Fourteenth Floor
Irvine, California 92614
Phone: (949) 760-0404

30. Mike Metzger

c/o John B. Sganga, Jr., Esq.
Knobbe, Martens, Olson & Bear, LLP
2040 Main Street, Fourteenth Floor
Irvine, California 92614
Phone: (949) 760-0404

31. Dave Mirra

c/o John B. Sganga, Jr., Esq.
Knobbe, Martens, Olson & Bear, LLP
2040 Main Street, Fourteenth Floor
Irvine, California 92614
Phone: (949) 760-0404

32. Paul Thacker

c/o John B. Sganga, Jr., Esq.
Knobbe, Martens, Olson & Bear, LLP
2040 Main Street, Fourteenth Floor
Irvine, California 92614
Phone: (949) 760-0404

33. Thomas “TJ” Lavin

c/o John B. Sganga, Jr., Esq.
Knobbe, Martens, Olson & Bear, LLP
2040 Main Street, Fourteenth Floor
Irvine, California 92614
Phone: (949) 760-0404

34. Robert Scott

c/o John B. Sganga, Jr., Esq.
Knobbe, Martens, Olson & Bear, LLP
2040 Main Street, Fourteenth Floor
Irvine, California 92614
Phone: (949) 760-0404

35. Kim Castelli

c/o John B. Sganga, Jr., Esq.
Knobbe, Martens, Olson & Bear, LLP
2040 Main Street, Fourteenth Floor
Irvine, California 92614
Phone: (949) 760-0404

36. Mitch Payton

c/o John B. Sganga, Jr., Esq.
Knobbe, Martens, Olson & Bear, LLP
2040 Main Street, Fourteenth Floor
Irvine, California 92614
Phone: (949) 760-0404

37. Joe Parsons

c/o John B. Sganga, Jr., Esq.
Knobbe, Martens, Olson & Bear, LLP
2040 Main Street, Fourteenth Floor
Irvine, California 92614

Phone: (949) 760-0404

38. Menachem Ochana

39. Menachem Goldman

40. Amanda Benjamin

    7 Birchtree Way
    Palm Coast, Florida

41. Chris Capers

    600 S. Yonge Street
    Ormond Beach, Florida 32174

42. Joe Hedges

    8601 Beach Boulevard, Apt. 1410
    Jacksonville, Florida 32216

43. Jessica Scholz

    231 Redbud Street
    Rhome, Texas 76078

44. Joseph Little

    9776 Buncome Road
    Jacksonville, Florida 32246

45. Joy Piscatelli

    2131 Evergreen Road
    South Daytona, Florida 32119

46. Roxanne Schaper

    833 Hibiscus Avenue
    Daytona Beach, FL 32117

47. David Stago

    45 High Ridge Road
    Daytona Beach, Florida 32117

48. Chris Hineline
605 Commercial Drive
Holly Hill, FL 32117

Baksht objects to witnesses listed as nos. 24-31 on Plaintiff's exhibit list as they were not timely disclosed pursuant to the Court's prior orders and were only recently added after the pre-trial order was originally submitted. MEC contends that the disputed witnesses will be called only in rebuttal and are therefore proper. Specifically, MEC plans to call the disputed witnesses only to rebut any testimony of Yosef Amar or others that the 3DL design was used before 2010, or that the Myrtle Beach design was used continuously until 2010. Such testimony would be contrary to Mr. Amar's sworn deposition testimony and would be truly unexpected. MEC believes that by disclosing these rebuttal witnesses at all, it has done far more than is required by the Court's Case Management Order.

**B. DEFENDANT BAKSHT'S WITNESS LIST**

**Likely to Be Called**

**1. Danniel Sadeh**
140 Hombre Circle
Panama City, FL 32407

**2. Yosef Amar**
1052. N.Beach St.
Holly Hill FL, 32117

**3. Rodney Sacks**
c/o Knobbe, Martens, Olson & Bear, LLP
Suite 1400
2040 Main St
Irvine, CA 92614

**<u>May Be Called</u>**

1. **<u>David Baksht</u>**
   719 Eastern Parkway
   Brooklyn, New York 11213

## <u>VI. EXPERT WITNESSES</u>

### A. PLAINTIFF'S EXPERT WITNESS LIST

1. **Dr. Gerald L. Ford** – Dr. Ford will testify regarding the secondary meaning and fame of MEC's M Claw trademark.

2. **Philip Johnson** – Mr. Johnson will testify regarding the likelihood of confusion between Baksht's so-called 3DL design and the M Claw trademark.

3. **Leslie Lott** – Ms. Lott will testify regarding the procedures and practices for obtaining trademark registrations in the United States Patent & Trademark Office, in the State of Florida, and in the State of New Jersey. Ms. Lott will also testify regarding CDI's / Baksht's trademark filings before the USPTO, State of Florida, and State of New Jersey in this case, MEC's filings before the USPTO in this case, and the USPTO's conclusion that there is confusing similarity between the so-called 3DL design and MEC's M Claw trademark. Ms. Lott further will testify regarding the use of trademark clearance searches to investigate the availability of a trademark for use. Additionally, Ms. Lott will testify regarding Baksht's pattern,

practice, and history of attempting to obtain trademark registrations for the famous trademarks of third parties, and registering corporate names that incorporate the famous trademarks of third parties.

4. **David Hanson** – Mr. Hanson will testify regarding the profits wrongfully earned by the Defendants as a result of their infringement and other misconduct.

**B. DEFENDANTS CDI AND BAKSHT'S EXPERT WITNESS LIST**

None.

## VII. DAMAGES SOUGHT BY THE PARTIES

**A. PLAINTIFF'S CLAIMS FOR DAMAGES**

1. For copyright infringement, MEC seeks statutory damages under 17 U.S.C. § 504(c) in the amount of $150,000. Pursuant to 17 U.S.C. § 504(b), MEC also seeks disgorgement of Baksht's wrongfully obtained profits in the amount of $61,773. MEC will make an election between statutory damages under Section 504(c) and actual damages and disgorgement of profits under Section 504(b) before entry of judgment, precisely as permitted by the text of Section 504(c)(1). Baksht objects to this proposed timing of Plaintiff's election and requests that the election be made before the jury is empaneled so that Baksht may defend himself properly.

2. For trademark counterfeiting, MEC seeks statutory damages under 15 U.S.C. § 1117(c) in the amount of $2,000,000 per type of good sold.

3. For trademark infringement, pursuant to 15 U.S.C. § 1117(a), MEC seeks disgorgement of Baksht's wrongfully obtained profits in the amount of $61,773. Pursuant to 15 U.S.C. § 1117(a), MEC will ask the Court to treble these awards.

4. For willful trademark dilution under 15 U.S.C. § 1125(c)(5), MEC seeks disgorgement of Baksht's wrongfully obtained profits in the amount of $61,773. Pursuant to 15 U.S.C. § 1117(a) and 15 U.S.C. § 1125(c)(5), MEC will ask the Court to treble these awards.

5. For false designation of origin under 15 U.S.C. § 1125(a), MEC seeks disgorgement of Baksht's wrongfully obtained profits in the amount of $61,773. Pursuant to 15 U.S.C. § 1117(a), MEC will ask the Court to treble these awards.

6. For unfair competition under Florida common law, MEC seeks disgorgement of Baksht's wrongfully obtained profits in the amount of $61,773. MEC also seeks punitive damages in the amount of $500,000.

7. MEC will also be asking the Court for an award of costs, and an award of attorneys' fees pursuant to 17 U.S.C. § 505, 17 U.S.C. § 1117(a), and Florida state law.

## VIII. DEPOSITIONS

### A. PLAINTIFF'S DEPOSITION DESIGNATIONS

| | Deponent | Taken | Page(s)/Lines(s) |
|---|---|---|---|
| 1. | Sadler, Carie | 08/09/2012 | 5:8-17<br>7:10-23<br>8:17-9:19<br>9:23-10:16<br>10:21-11:4<br>11:14-12:3<br>14:2-4<br>16:10-16<br>17:14-18:21<br>19:10-20:25<br>22:15-23:5<br>26:25-27:8<br>27:14-29:9<br>30:12-31:21<br>32:14-33:12<br>33:23-34:19<br>35:19-38:1<br>39:10-25<br>41:14-24<br>42:14-43:7<br>46:15-24<br>47:10-17<br>48:20-50:6<br>50:13-51:17 |
| 2. | Goldman, Menachem | 08/16/2012 | 4:25-5:10<br>8:23-12:7<br>21:10-22:8<br>22:10-24:7<br>24:8-25:1<br>25:6-26:6<br>26:13-28:4<br>28:8-16<br>28:23-29:22<br>30:1-4<br>33:25-34:7<br>34:12-22<br>36:1-8 |

| | Deponent | Taken | Page(s)/Lines(s) |
|---|---|---|---|
| 3. | Ohana, Menachem | 08/17/2012 | 5:15-22<br>8:6-10:6<br>10:15-16<br>10:19-12:7<br>13:3-17<br>16:8-18:4<br>18:9-21:21<br>22:3-23:11<br>24:17-25:18<br>25:23-26:5<br>26:22-27:4<br>27:16-28:2<br>28:5<br>30:19-32:1<br>36:6-10<br>36:12-25<br>39:8-14<br>41:8-41:9<br>41:13-20<br>43:6-21<br>45:14-45:24<br>46:1-5<br>54:1-9<br>54:10-55:16<br>61:10-14<br>62:3-12<br>62:17-20<br>63:1-9<br>65:7-21<br>65:25-66:14 |
| 4. | Kakol, Cezary Pavel | 08/20/2012 | 5:10-18<br>7:22-8:8<br>9:17-11:16<br>12:10-20<br>13:10-23<br>14:11-15:1<br>15:5-15<br>18:18-19:1<br>19:6-17<br>22:3-24:9<br>26:5-10 |

| | Deponent | Taken | Page(s)/Lines(s) |
|---|---|---|---|
| | | | 28:16-29:6<br>33:14-21<br>36:22-37:11<br>39:6-10 |
| 5. | Amar, Yosef | 08/29/2012 | 8:6-8<br>11:1-12:4<br>12:6-24<br>13:4-6<br>14:14-16:21<br>17:15-18:1<br>18:7-21:7<br>21:8-25<br>22:11-24:6<br>25:11-27:14<br>28:19-29:3<br>29:16-30:6<br>30:7-17<br>30:22-31:13<br>32:20-25<br>34:9-19<br>35:5-37:8<br>37:25-38:3<br>38:16-50:14<br>50:18-51:3<br>51:14-63:13<br>65:4-13<br>65:16-67:11<br>67:24-68:22<br>69:5-22<br>71:9-73:14<br>75:11-78:1<br>83:22-85:20<br>86:15-22<br>88:8-16<br>89:1-90:9<br>90:25-92:14<br>93:15-19<br>93:23-95:4<br>96:9-97:12<br>98:4-98:11<br>98:12-99:17 |

| | Deponent | Taken | Page(s)/Lines(s) |
|---|---|---|---|
| | | | 99:19-20<br>100:7-25<br>101:1-9<br>103:17-104:16<br>104:22-105:18<br>106:4-11<br>106:13-23<br>109:12-111:22<br>115:4-13<br>115:14-17<br>115:19-21<br>116:13-18<br>118:22-120:2<br>120:3-17<br>121:13-17<br>121:21-122:2<br>122:16-20<br>123:10-22<br>123:23-124:4<br>125:11-22<br>126:1-128:3<br>130:2-132:7<br>133:10-135:4<br>135:19-24<br>136:14-137:1<br>137:4-22<br>139:10-12<br>139:18-140:11<br>143:13-144:6<br>144:7-14<br>152:5-153:7 |
| 6. | Schneorson, Menachem | 09/12/2012 | 4:25-5:2<br>7:18-8:5<br>8:18-9:4<br>9:24-10:3<br>11:1-12:3<br>15:2-10<br>17:7-19:7<br>19:15-17<br>22:12-23:12<br>24:22-25:19 |

| | Deponent | Taken | Page(s)/Lines(s) |
|---|---|---|---|
| | | | 26:3-8<br>26:12-14<br>29:16-19<br>32:25-33:7<br>33:23-25<br>36:9-25<br>39:13-40:4<br>41:3-6<br>47:21-48:11<br>48:15-19<br>49:3-15<br>50:4-21<br>51:21-52:14<br>53:10-17<br>53:20-54:3<br>55:24-56:6<br>63:18-23<br>65:4-66:23<br>67:2-68:17<br>71:1-73:23<br>74:7-75:17<br>77:24-78:10<br>79:10-81:21<br>82:1-12<br>82:19-24<br>85:8-87:10<br>88:17-22<br>91:3-25<br>93:8-18<br>93:23-94:21<br>95:11-17<br>96:14-98:3<br>98:10-16<br>100:3-5<br>101:22-102:10<br>104:11-25<br>105:6-106:15<br>119:19-120:14<br>121:25-122:9<br>122:21-123:3<br>123:24-124:2 |

| | Deponent | Taken | Page(s)/Lines(s) |
|---|---|---|---|
| | | | 125:11-25<br>126:23-127:8<br>128:15-129:4<br>130:19-131:4<br>131:17-25<br>133:2-5<br>133:24-135:11<br>136:1-11<br>137:1-15<br>137:19-139-14<br>139:21-24<br>140:15-143:18<br>144:6-13<br>148:1-16<br>149:1-22 |
| 7. | Ridenbaugh, Nancy | 09/19/2012 | Entire Transcript (5:8-44:21) |
| 8. | Baksht, David | 09/24/2012 | 7:8-17<br>17:6-10<br>19:1-12<br>19:25-21:3<br>21:15-24<br>23:25-24:6<br>25:11-15<br>26:22-27:7<br>28:16-29:1<br>29:10-21<br>30:5-31:2<br>33:1-3<br>36:25-38:6<br>39:15-24<br>40:9-20<br>42:5-22<br>43:10-44:23<br>45:12-22<br>46:12-47:20<br>48:10-49:6<br>50:4-52:20<br>53:1-15 |

| | Deponent | Taken | Page(s)/Lines(s) |
|---|---|---|---|
| | | | 55:1-57:14<br>57:21-24<br>59:2-60:6<br>73:20-22<br>95:3-25<br>96:12-24<br>139:6-14<br>142:24-143:5<br>156:14-25<br>157:4-8<br>160:4-7<br>161:4-162:10<br>163:19-164:13<br>164:23-165:1<br>165:8-15<br>167:18-21<br>170:2-171:16<br>174:22-175:16<br>176:13-18<br>177:8-13<br>177:25-179:7<br>184:16-185:7<br>186:25-188:3<br>189:25-191:9<br>191:22-192:19<br>203:13-204:4<br>205:13-22<br>206:4-7<br>206:14-207:5<br>207:15-18<br>207:23-208:6<br>208:23-209:6<br>209:10-15<br>216:8-12<br>220:16-221:8<br>222:24-223:8<br>223:16-21<br>225:6-21<br>226:12-227:12<br>230:25-232:1<br>232:10-233:2 |

| | Deponent | Taken | Page(s)/Lines(s) |
|---|---|---|---|
| | | | 233:8-12<br>234:18-25<br>235:10-20<br>236:24-237:1<br>237:19-21<br>240:13-241:10<br>241:15-22<br>242:24-243:17<br>246:22-25<br>254:17-255:1<br>255:15-25<br>256:14-16<br>257:1-16 |

### B. DEFENDANT BAKSHT'S DEPOSITION DESIGNATIONS

None.

## IX. STATEMENT OF ADMITTED FACTS

1. Plaintiff MEC is a Delaware corporation with its principal place of business in Corona, California.

2. MEC was formerly known as Hansen Beverage Company. Hansen Beverage Company changed its name to Monster Energy Company on January 5, 2012.

3. Defendant David Baksht is an individual residing in Brooklyn, New York.

4. On November 16, 2004, the United States Patent and Trademark Office issued Trademark Registration No. 2,903,214 to MEC for the trademark for use in connection with various drinks.

5. Registration No. 2,903,214 has become incontestable within the meaning of 15 U.S.C. § 1065.

6. On August 29, 2006, the United States Patent and Trademark Office issued Trademark Registration No. 3,134,841 to MEC for the trademark for use in connection with various beverages.

7. On May 27, 2008, the United States Patent and Trademark Office issued Trademark Registration No. 3,434,822 to MEC for the trademark for use in connection with various non-alcoholic beverages.

8. On May 27, 2008, the United States Patent and Trademark Office issued Trademark Registration No. 3,434,821 to MEC for the trademark for use in connection with nutritional supplements.

9. On January 18, 2011, the United States Patent and Trademark Office issued Trademark Registration No. 3,908,600 to MEC for the trademark for use in connection with stickers, sticker kits, and decals.

10. On January 18, 2011, the United States Patent and Trademark Office issued Trademark Registration No. 3,908,601 to MEC for the trademark for use in connection with clothing.

11. On May 17, 2011, the United States Patent and Trademark Office issued Trademark Registration No. 3,963,668 to MEC for the trademark for use in connection with stickers, sticker kits and decals.

12. On August 16, 2011, the United States Patent and Trademark Office issued Trademark Registration No. 4,011,301 to MEC for the trademark for use in connection with sports helmets, video recordings featuring sports, extreme sports, and motor sports.

13. After the commencement of this legal action, on November 8, 2011, the United States Patent and Trademark Office issued Trademark Registration No. 4,051,650 to MEC for the trademark for use in connection with clothing.

14. MEC received Copyright Registration No. VA 1-789-900 for the work entitled “Stylized claw with jagged edges (original version),” shown below:



15. MEC received Copyright Registration No. VA 1-727-577 for the work entitled “MONSTER ENERGY Can Art,” shown below:






16. On August 9, 2010, the Florida Department of State, Division of Corporations, issued Trademark Registration No. T10000000884 for the version of the 3DL logo shown below for use in connection with “clothing – T-shirts, caps”:




17. On October 8, 2010, the Florida Department of State, Division of Corporations, issued Trademark Registration No. T10000001063 for the version of the 3DL logo shown below for use in connection with “clothing-T-shirts-caps-headgear”:



18. On October 21, 2010, the Florida Department of State, Division of Corporations, issued Trademark Registration No. T10000001102 for the version of the 3DL logo shown below for use in connection with “clothing, T-shirts, caps, headgear, sweatshirts, shorts, pants”:

19. On September 29, 2010, the New Jersey Division of Revenue issued Trademark Registration No. TM23557 for the version of the 3DL logo shown below for use in connection with “clothing, including boots and shoes”:

## X. STATEMENT OF AGREED PRINCIPLES OF LAW

1. A federal trademark registration is prima facie evidence of the validity of the trademark, of the registrant's ownership of the trademark, and of the registrant's exclusive right to use the registered trademark in commerce on or in connection with the goods or services specified in the registration, subject to any conditions or limitations stated therein. 15 U.S.C. §§ 1057(b), 1115(a).

2. MEC's federal registrations for its M Claw trademark create a rebuttable presumption that MEC has priority of trademark rights. 15 U.S.C. §§ 1057(b), 1115(a); *Emergency One, Inc. v. American Fire Eagle Engine Co.*, 332 F.3d 264, 268-69 (4th Cir. 2003); *Pollution Denim & Co. v. Pollution Clothing Co.*, 547 F. Supp. 2d 1132, 1140 (C.D. Cal. 2007).

3. When a registered mark has been issued and in use for more than five years, the trademark becomes incontestable. An incontestable mark is conclusive evidence of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark in commerce. 15 U.S.C. §§ 1065, 1115(b).

4. In assessing whether confusion is likely, the jury may consider the following factors: (1) the type of the mark, that is, whether the mark is strong or weak; (2) the similarities between the parties' marks; (3) the similarities of the parties' products sold under the marks; (4) the similarities of the parties' retail outlets and customers; (5) similarities in advertising media; (6) the Defendants'

intent; and (7) actual confusion. *Frehling Enters. v. Int'l Select Group, Inc*., 192 F.3d 1330, 1335 (11th Cir. 1999).

5. To prevail on a claim for unfair competition under Florida common law, a plaintiff must show deceptive or fraudulent conduct by the defendant and a likelihood of consumer confusion. *Monsanto Co. v. Campuzano*, 206 F. Supp. 2d 1252, 1267 (S.D. Fla. 2002).

6. A trademark is famous for purposes of dilution if it is widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner. In assessing whether the M Claw trademark is famous, the jury may consider the following factors: (i) the duration, extent, and geographic reach of advertising and publicity of the mark, whether advertised or publicized by the owner or third parties, (ii) the amount, volume, and geographic extent of sales of goods or services offered under the mark, (iii) the extent of actual recognition of the mark, and (iv) whether the mark was registered on the principal register. 15 U.S.C. § 1125(c)(2)(A).

7. Dilution by blurring is defined as an association arising from the similarity between a mark or trade name and a famous mark that impairs the distinctiveness of the famous mark. 15 U.S.C. § 1125(c)(2)(B).

8. In determining whether dilution by blurring is likely to occur, the jury may consider all relevant factors including: (i) the degree of similarity between the mark or trade name and the famous mark, (ii) the degree of inherent or acquired distinctiveness of the famous mark, (iii) the extent to which the owner of

the famous mark is engaging in substantially exclusive use of the mark, (iv) the degree of recognition of the famous mark, (v) whether the user of the mark or trade name intended to create an association with the famous mark, and (vi) any actual association between the mark or trade name and the famous mark. 15 U.S.C. § 1125(c)(2)(B).

9. Dilution by tarnishment is defined as an association arising from the similarity between a mark or trade name and a famous mark that harms the reputation of the famous mark. 15 U.S.C. § 1125(c)(2)(C).

10. A certificate of copyright registration made before or within five years after first publication of the work shall constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate. *Latimer v. Roaring Toyz, Inc.*, 601 F.3d 1224, 1233 (11th Cir. 2010).; 17 U.S.C. § 410(c). The evidentiary weight to be given to a certificate of copyright registration obtained more than five years after first publication of the work shall be in the discretion of the Court. *Id. See also Lifetime Homes, Inc. v. Residential Development Corp*., 510 F. Supp. 2d 794, 801 (M.D. Fla. 2007).

11. Where a plaintiff has obtained a certificate of copyright registration more than five years after first publication of the work, courts typically extend the presumption of validity under 17 U.S.C. § 410(c) to the certificate of registration when the plaintiff presents some evidence of copyright ownership. 3 Nimmer on Copyright § 12.11[A][1] (2012). *See also Yurman Design, Inc. v. Golden Treasure Imports*, 275 F. Supp. 2d 506, 515-16 (S.D.N.Y. 2003).

12. To prove copying, MEC may present either: (1) direct evidence that Defendant copied the copyrighted works, or (2) evidence that Defendant had access to the copyrighted works, and evidence that the Defendant's works are substantially similar to the copyrighted works, or (3) evidence that the Defendants' works are strikingly similar to the copyrighted work. *Baby Buddies, Inc. v. Toys "R" Us, Inc.*, 611 F.3d 1308, 1315 (11th Cir. 2010); *Peter Letterese & Assocs. v. World Inst. of Scientology Enters.*, 533 F.3d 1287, 1300-01 (11th Cir. 2008).

13. Substantial similarity exists when an average lay observer would recognize the alleged copy as having been appropriated from the copyrighted work. *Baby Buddies*, 611 F.3d at 1315.

14. Striking similarity is similarity in appearance that is so striking that the possibilities of independent creation, coincidence and prior common source are, as a practical matter, precluded. *Corwin v. Walt Disney World*, 475 F.3d 1239, 1253 (11th Cir. 2007).

15. There is no copyright infringement if the Defendant independently created the challenged work. Ninth Circuit Model Jury Instruction 17.0 (2007).

16. To prevail on its claim for false designation of origin, a plaintiff must show that it is the owner of a valid trademark through priority of use in commerce or through acquisition of secondary meaning, and that the defendant's'subsequent use in commerce of a word, term, name, symbol, or device, or any false designation of origin, is likely to cause confusion or mistake

as to the affiliation, connection, or association of the defendant with the plaintiff, or as to the origin, sponsorship, or approval of the defendant's goods. 15 U.S.C. 1125(a).

17. A “counterfeit” is a spurious mark which is identical with, or substantially indistinguishable from, a registered mark. 15 U.S.C. § 1127.

18. In a case involving the use of a counterfeit mark, statutory damages may be awarded in an amount not less than $1,000 or more than $200,000 per type of goods sold, offered, for sale, or distributed. 15 U.S.C. § 1117(c).

19. In a case involving the willful use of a counterfeit mark, statutory damages may be awarded in an amount not less than $1,000 or more than $2,000,000 per type of goods sold, offered, for sale, or distributed. 15 U.S.C. § 1117(c).

20. For trademark infringement, false designation of origin, and willful trademark dilution, a plaintiff may be awarded (1) the defendant’s profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action. 15 U.S.C. § 1117(a); 15 U.S.C. § 1125(c).

21. In determining the amount of a defendant’s profits to be awarded, the Plaintiff has the initial burden of proving, by a preponderance of the evidence, the defendant’s gross sales revenue resulting from the infringement. The defendant then has the burden of proving, by a preponderance of the evidence, the amount of expenses that should be deducted from gross sales revenue to

determine profit, and any portion of his profit he alleges is attributable to factors other than use of the infringing trademark. 15 U.S.C. § 1117(a).

22. For trademark infringement, false designation of origin, and willful trademark dilution, if the Court finds that the amount of the recovery based on profits is either inadequate or excessive, the court may in its discretion enter judgment for such sum as the Court shall find to be just, according to the circumstances of the case. 15 U.S.C. § 1117(a); 15 U.S.C. § 1125(c).

23. For copyright infringement, statutory damages may be awarded in an amount not less than $750 or more than $30,000. 17 U.S.C. § 505.

24. In cases of willful copyright infringement, statutory damages may be awarded in an amount not less than $750 or more than $150,000. 17 U.S.C. § 505.

25. In cases of innocent copyright infringement, statutory damages may be awarded in an amount not less than $200 or more than $30,000. 17 U.S.C. § 505.

26. The prevailing plaintiff in a copyright action is entitled to recover the defendant's profits that are attributable to the infringement. In establishing the amount of the defendant's profits, the plaintiff is required to present proof only of the defendant's gross revenues and that there is some reasonable relationship between those revenues and infringement. The burden then shifts to defendant to prove deductible expenses and other elements of profit attributable to factors other than the infringement. 17 U.S.C. 504(b).

27. To be entitled to punitive damages under Florida common law, MEC must show that Baksht acted with malice, moral turpitude, wantonness, willfulness, or reckless indifference to the rights of others. *Brown v. Ford*, 900 So.2d 646, 648 (Fla. 1st Dist. Ct. App. 2005).

## **XI. CONTESTED ISSUES OF FACT**

### **A. Joint Statement of Contested Issues of Fact**

1. Whether the purported transfer of rights in the 3DL mark from Joe Cool to CDI was effective.

2. Whether the M Claw trademark is strong, and the degree of that strength.

3. Whether Baksht was aware of the M Claw trademark at the time he allegedly decided to use the 3DL design.

4. Whether Baksht intended to benefit from the alleged similarities between the 3DL design and the M Claw trademark.

5. Whether the use of hang tags with the designation "OFFICIAL LICENSED PRODUCT" on 3DL merchandise was intended by Baksht to create or does create the appearance that the 3DL merchandise was sold under license from MEC.

6. Whether the disputed 3DL clothing is similar goods to MEC's M Claw clothing.

7. Whether MEC and Baksht or the other Defendants sold their respective clothing through similar trade channels.

8. Whether Baksht or the other Defendants advertised their 3DL merchandise through similar channels to MEC's advertising channels.

9. Whether the 3DL design is substantially indistinguishable from MEC's M Claw trademark.

10. Whether the 3DL design was independently created by Joe Cool.

**MEC's Remedies for Trademark Infringement**

11. Whether Baksht's infringement of MEC's M Claw trademark was willful.

12. Whether the 3DL design constitutes a counterfeit trademark such that MEC is entitled to statutory damages for trademark counterfeiting.

13. The amount of statutory damages, if any, owed by Baksht to MEC for trademark counterfeiting.

**Trademark Dilution**

14. Whether the M Claw trademark is famous.

15. Whether Baksht's use of the 3DL mark is likely to cause dilution by blurring.

16. Whether Baksht's use of the 3DL design is likely to cause dilution by tarnishment.

17. Whether Baksht intended to trade upon the reputation of the M Claw trademark, or intended to tarnish the reputation of the M Claw trademark.

**Copyright Infringement**

18. Whether MEC owns a valid copyright in the work shown in Reg. No. VA 1-789-900.

19. Whether Baksht copied the work shown in Reg. No. VA 1-789-900.

20. Whether Baksht had access to the work shown in Reg. No. VA 1-789-900.

21. Whether there is substantial similarity between the work shown in Reg. No. VA 1-789-900 and the 3DL design.

22. Whether there is striking similarity between the work shown in Reg. No. VA 1-789-900 and the 3DL design.

23. Whether MEC owns a valid copyright in the work shown in Reg. No. VA 1-727-577.

24. Whether Baksht copied the work shown in Reg. No. VA 1-727-577.

25. Whether Baksht had access to the work shown in Reg. No. VA 1-727-577.

26. Whether there is substantial similarity between the work shown in Reg. No. VA 1-727-577 and the 3DL design.

27. Whether there is striking similarity between the work shown in Reg. No. VA 1-727-577 and the 3DL design.

28. Whether Baksht's copyright infringement was willful.

29. Whether MEC is entitled to statutory damages on account of Baksht's alleged copyright infringement, and if so, how much.

## Additional Contested Issues of Fact Proposed by Plaintiff

**A. Priority of Trademark Rights**

1. Whether MEC has used the M Claw trademark in commerce continuously on clothing since 2002.

2. Whether MEC has distributed a total of over one million articles of clothing bearing the M Claw trademark, from 2002 through December 31, 2011.

3. For the year 2009, MEC received over $460,000 in revenues from licensing the M Claw trademark for use in connection with apparel and related items.

4. For the year 2010, MEC received over $1,000,000 in revenues from licensing the M Claw trademark for use in connection with apparel and related items.

5. For the year 2011, MEC received over $2,400,000 in revenues from licensing the M Claw trademark for use in connection with apparel and related items.

6. For the first three quarters of 2012, MEC received over $820,000 in revenues from licensing the M Claw trademark for use in connection with apparel and related items.

7. Whether the logo shown below was first used in commerce by former Defendant Joe Cool, Inc. earlier than in 2010:




8. Whether the Myrtle Beach design is virtually identical to the 3DL design and creates the same commercial impression as the 3DL design.

9. Whether the Myrtle Beach design was ever used in commerce by Joe Cool.

10. Whether the Myrtle Beach design was used continuously in commerce by Joe Cool from 1993 until the adoption of the 3DL design by Joe Cool.

11. Whether Joe Cool used the Myrtle Beach design as a trademark, rather than a mere decoration or ornamentation.

**B. Trademark Infringement**

12. Whether Defendants' use of the 3DL logo is likely to cause consumer confusion.

13. Whether Defendants' use of the 3DL logo has caused consumer confusion.

14. Whether Joe Cool's customers asked for 3DL merchandise using the "Monster" name.

15. Whether sellers of 3DL t-shirts on eBay referred to their merchandise as "Monster" merchandise.

16. Whether Baksht intentionally induced another to infringe MEC's trademarks, or had direct control and monitoring of the goods used by another to infringe MEC's trademarks, and knew or should have known that the other party would infringe.

17. Whether Defendant Baksht actively and knowingly caused CDI's infringement of MEC's trademarks.

**C. Copyright Infringement**

18. Whether Baksht concedes that the 3DL logo has a "striking resemblance" to MEC's M Claw trademark.

19. Whether the other Defendants copied the work shown in Reg. No. VA 1-789-900.

20. Whether the other Defendants had access to the work shown in Reg. No. VA 1-789-900.

21. Whether the other Defendants copied the work shown in Reg. No. VA 1-727-577.

22. Whether the other defendants had access to the work shown in Reg. No. VA 1-727-577.

23. Whether Baksht contributorily infringed Plaintiff's copyrights through the direct infringement of Joe Cool, Consolidated, and/or the alleged joint venture between them, and whether Baksht knew or should have known of the infringing activities, and induced, caused, or materially contributed to the infringing activities.

24. Whether Baksht vicariously infringed Plaintiff's copyrights through the direct infringement of Joe Cool, Consolidated, and/or the alleged joint venture between them, and whether Baksht had a financial interest in the infringing activities and had the rights and ability to supervise or control the infringing activities.

25. Whether Baksht had an actual or apparent partnership with a party that infringed MEC's copyrights, and had authority to bind one another in transactions with third parties or exercise joint ownership or control over the infringing product.

## D. Dilution

26. Whether the use of the 3DL design by other defendants is likely to cause dilution by blurring.

27. Whether the use of the 3DL design by other defendants is likely to cause dilution by tarnishment.

## E. The Significance of CDI as an Entity

28. Defendant CDI is a New York corporation with its principal place of business in Brooklyn, New York.

29. Until January 9, 2013, CDI had no directors, officers, or shareholders, and had adopted no By-Laws.

30. On January 22, 2013, CDI filed a Petition for Bankruptcy under Chapter 11 of the Bankruptcy Code in United States Bankruptcy Court for the Eastern District of New York.

31. Baksht filed a Certificate of Incorporation for CDI on December 28, 2008, and Baksht was the sole incorporator of CDI.

32. Throughout the history of CDI, CDI has operated out of Baksht's apartment in Brooklyn, New York.

33. Other businesses controlled by Baksht, including Associated Business Consultants, also operate out of Baksht's apartment in Brooklyn, New York.

34. Throughout the history of CDI, Baksht was and still is the moving force behind CDI.

35. CDI has not routinely maintained financial records.

36. Baksht is currently the sole director and sole officer of CDI.

37. CDI presently has no business activity other than litigation..

**F. Other Issues**

38. Former defendant Joe Cool, Inc. is a Florida corporation having its principal place of business at 1052 N. Beach Street, Holly Hill, Florida 32117.

39. In October 2011, MEC entered into a written settlement agreement with Joe Cool, Inc., Joe Cool Bike Week, Inc., Yosef Amar, and Michelle Amar, settling MEC's claims against those defendants in the present case.

40. At the time of its settlement with MEC, Joe Cool, Inc.'s inventory of 3DL merchandise included 277 t-shirts, 6 hats, 1 sweatshirt, 38,750 large heat transfers, 19,025 small heat transfers, 52,800 hang tags, and 300 decal sheets.

41. The revenues earned by Joe Cool and CDI on the sales of 3DL merchandise in the years 2010 and 2011 were $123,546.

**Additional Contested Issues of Fact Proposed by Defendants**

**A. Priority of Trademark Rights**

1. Whether Baksht individually used the 3DL design in commerce.

2. Whether MEC has used the M Claw trademark in commerce on t-shirts continuously since 2002 as a trademark.

3. Whether MEC has used the M Claw trademark in commerce on t-shirts as a trademark before the time when Joe Cool began using the Myrtle Beach design on clothing.

4. Whether the 3DL Myrtle Beach design and its successors in evolution such as the 3DL design that is accused of infringement were used continuously in commerce from before the use by Plaintiff of its MEC mark on commerce until the seizure of Joe Cool's goods.

**B. MEC's Trademark Infringement Claim**

5. Whether Baksht's use of the 3DL design is likely to cause consumer confusion.

6. Whether Baksht's use of the 3DL design has caused consumer confusion.

7. Whether Monster knew or should have known that Joe Cool, Inc. was not a fly-by-night counterfeiter.

8. Whether Monster intentionally mislead the Court to believe that Monster had a registered trademark for use on clothing consisting of just the M Claw, without any words.

9. Whether at the time of its motion for an ex parte seizure order, Monster knew or should have known that Joe Cool's t-shirts were not identical with, or substantially indistinguishable from Monster's apparel.

10. Whether Monster purposely destroyed relevant evidence.

11. Whether Monster knew or should have known of its duty to preserve the evidence.

## XII. CONTESTED ISSUES OF LAW

**Contested Issues of Law Proposed by Plaintiff**

1. To prove trademark infringement, MEC must prove priority of trademark rights and that the 3DL design is likely to cause consumer confusion. *Frehling Enters. v. Int'l Select Group, Inc.*, 192 F.3d 1330, 1335 (11th Cir. 1999).

2. Use in commerce can be satisfied by promotional use that does not involve collecting revenue. *Planetary Motion, Inc. v. Techsplosion, Inc.*, 261 F.3d 1188, 1194 (11th Cir. 2001) (wide distribution of the Coolmail software over the Internet, even absent any sales thereof, was sufficient to establish ownership rights in the "Coolmail" mark); *NASDAQ Stock Market Inc. v. Antartica S.R.L.*, 69 U.S.P.Q.2d (BNA) 1718, 1731-32 (T.T.A.B. 2003); *Bridgestone Tire Co. Ltd. v. Bridgestone Trading Co.*, 221 U.S.P.Q. (BNA) 1012, 1014 (T.T.A.B. 1984); 15 U.S.C. § 1127 ("use in commerce" includes when "goods are sold or transported in commerce").

3. A trademark owner may "claim priority in a mark based on the first use date of a similar, but technically distinct, mark — but only in the exceptionally narrow instance where the previously used mark is the legal equivalent of the mark in question or indistinguishable therefrom such that consumers consider both as the same mark." *Brookfield Communications, Inc. v. West Coast Entm't Corp.*, 174 F.3d 1036, 1047-48 (9th Cir. 1999) (internal quotation marks omitted). This is known as "tacking." *Id*. at 1048.

4. The standard for tacking "*is* considerably higher than the standard for 'likelihood of confusion.'" *Brookfield*, 174 F.3d at 1048; *accord Data Concepts, Inc. v. Digital Consulting, Inc.*, 150 F.3d 620, 623 (6th Cir. 1998); *Van Dyne-Crotty, Inc. v. Wear–Guard Corp*., 926 F.2d 1156, 1159 (Fed. Cir. 1991).

5. "The standard for 'tacking' . . . is exceedingly strict: [t]he marks must create the same, continuing commercial impression, and the later mark

should not materially differ from or alter the character of the mark attempted to be tacked." *Brookfield*, 174 F.3d at 1048 (internal quotation marks omitted). "[T]he consumer should consider both as the same mark." *Id*.

6. For tacking to be permitted, both marks must be "virtually identical." *One Indus., LLC v. Jim O'Neal Distrib.*, 578 F.3d 1154, 1161 (9th Cir. 2009).

7. The mere assertion by a witness, unsupported by any documents or other evidence, that the witness made prior use of a trademark, is insufficient to establish the defense of prior use. *World Triathlon Corp. v. Dunbar*, No. Civ. 05-00351JMS/KSC, 2006 WL 897586, at *4 (D. Haw. 2006).

8. A defendant is liable for trademark infringement by another if the defendant intentionally induces another to infringe the trademark, or if the person had direct control and monitoring of the goods used by another to infringe, and knew or should have known that the other party would infringe. *Inwood Labs, Inc. v. Ives Labs, Inc.*, 456 U.S. 844, 854 (1982). ABA Model Jury Instruction 2.4.5 (2008).

9. A party is liable for the trademark infringement of another where the two have an actual or apparent partnership and have authority to bind one another in transactions with third parties or exercise joint ownership or control over the infringing product. *Slep-Tone Entm't Corp. v. Snappers Bar & Grill, Inc.*, Case No. 8:12-cv-157-T-30EAJ, 2012 U.S. Dist. LEXIS 133719 *3 (M.D. Fla. Sept. 19, 2012).

10. Assignments of Federal Trademarks and Trademark Applications must be in writing, and oral assignments are ineffective. 15 U.S.C. § 1060(a)(3); *Gaia Tech., Inc. v. Reconversion Tech., Inc.*, 93 F.3d 774, 780 (Fed. Cir. 1996) (plaintiff lacks standing to bring registered trademark claim where assignment was not in writing).

11. An assignment in gross of the trademark without an assignment of the underlying goodwill or business assets is ineffective. *Mister Donut of Am., Inc. v. Mr. Donut, Inc.*, 418 F.2d 838, 842 (9th Cir. 1969) (a trademark cannot be sold or assigned apart from the goodwill it symbolizes); 3 J.T. McCarthy, *McCarthy on Trademarks & Unfair Competition* §§ 18:2-18:3 (4th ed. 2012).

12. In assessing the strength of a trademark, courts will consider both the commercial strength of the mark and the conceptual strength of the mark. The commercial strength of the mark is determined by examining evidence of advertising, survey evidence, and other evidence showing how the mark is perceived by consumers. The conceptual strength of a mark is determined by deciding whether the mark is arbitrary, suggestive, or descriptive. *Fortune Dynamic v. Victoria's Secret Stores Brand*, 618 F.3d 1025, 1032-35 (9th Cir. 2010).

13. To prevail on its claim for dilution, MEC must show (1) that its M Claw trademark became famous before the Defendants began using the 3DL design, and (2) that the Defendants' commercial use of the 3DL design is likely to cause dilution by blurring or dilution by tarnishment. 15 U.S.C. § 1125(c)(1).

14. To prevail on its claim for copyright infringement, MEC must prove (1) ownership of a valid copyright, and (2) copying of elements of the work that are original. *Latimer v. Roaring Toyz, Inc.*, 601 F.3d 1224, 1232-33 (11th Cir. 2010).

15. To prove that Baksht has committed contributory copyright infringement, MEC must prove that 1) another party directly infringed plaintiff's copyright; 2) Baksht knew or should have known of the infringing activity of these alleged direct infringers; and (3) Baksht induced, caused, or materially contributed to the infringing activity of these alleged direct infringers. *Metro-Goldwyn Mayer Studios Inc. v. Grokster, Ltd.*, 125 S.Ct. 2764, 2776 (2005).

16. To prove vicarious copyright infringement by Baksht, MEC must prove the that 1) another party directly infringed plaintiff's copyrights; 2) Baksht profited from or had a financial interest in the infringing activities of these alleged direct infringers; and 3) Baksht had the right and ability to supervise or control the infringing activities of these alleged direct infringers. *Metro-Goldwyn Mayer Studios Inc. v. Grokster, Ltd.*, 125 S.Ct. 2764, 2776 (2005).

17. "[A] corporation can act only through individuals. 'Obviously . . . if there was an infringement by the corporation, this infringement was caused by some one or more persons either officers or employees of the corporation who caused the acts to be done.'" *Chanel, Inc. v. Italian Activewear of Fla., Inc.*, 931 F.2d 1472, 1477 (11th Cir. 1991) (quoting *Mead Johnson & Co. v. Baby's Formula Serv., Inc.*, 402 F.2d 19, 23 (5th Cir. 1968)).

18. An individual officer of a company is liable for the trademark infringement of his company if he actively and knowingly caused the infringement. *Chanel, Inc. v. Italian Activewear of Fla., Inc.*, 931 F.2d 1472, 1477-78 (11th Cir. 1991).

19. An individual officer of a company is personally liable for copyright infringement by the company where he has the ability to supervise the infringing activity and has a financial interest in that activity, or personally participates in the infringing activity. *Microsoft Corp. v. Technology Enterprises, LLC*, 805 F. Supp. 2d 1330, 1333 (S.D. Fla. 2011); *see also Southern Bell Tel. & Tel. Co. v. Assoc. Tel. Directory Publishers*, 756 F.2d 801, 811 (11th Cir. 1985).

20. Under New York law, to pierce the corporate veil requires a showing that (1) the individual exercised complete domination of the corporation in respect to the transaction attacked; and (2) that such domination was used to commit a fraud or wrong against the plaintiff which resulted in the plaintiff's injury. Indicia of a situation warranting veil-piercing include: (1) the absence of the formalities, *i.e.*, issuance of stock, election of directors, and keeping of corporate records, (2) inadequate capitalization, (3) whether funds are put in and taken out of the corporation for personal rather than corporate purposes, (4) overlap in ownership, officers, directors, and personnel, with other corporate entity (5) common office space, address, and telephone numbers, (6) the amount of business discretion displayed by the allegedly dominated corporation, (7) whether the related corporations deal with the dominated corporation at arms

length, (8) whether the corporations are treated as independent profit centers, (9) the payment or guarantee of debts of the dominated corporation by other corporations in the group, and (10) whether the corporation in question had property that was used by other of the corporations as if it were its own. *Peery v. United Capital Corp.*, 84 A.D.3d 1201, 1202, 924 N.Y.S.2d 470, 472-73 ((N.Y. App. 2011). "In general, New York courts will pierce the corporate veil whenever necessary to prevent fraud or achieve equity." *JSC Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. & Trade Servs., Inc.*, 306 F. Supp. 2d 482, 485 (S.D.N.Y. 2004).

21. Under Florida law, direct liability of an individual can be established under a corporate alter ego theory (piercing the corporate veil), where (1) the individual dominated and controlled the corporation to such an extent that the individual was the alter ego of the corporation; (2) the corporate form was used for a fraudulent or improper purpose; and (3) the fraudulent or improper use of the corporate form caused injury to the claimant. *Faulkner Press, LLC v. Class Notes, LLC*, 2009 WL 5879033, *2 (N.D. Fla. 2009).

22. Under federal alter ego law, an individual is liable under a corporate alter ego theory when the individual exercises complete control over a corporation and uses that control to commit a fraud. The factors to consider include: 1) the commingling of finances, (2) failure to hold meetings and failure to maintain records, (3) the absence of other functioning officers and directors, and (4) whether piercing the corporate veil would be unjust or unfair to an injured

party. *Faulkner Press, LLC v. Class Notes, LLC*, 2009 WL 5879033, *2 (N.D. Fla. 2009).

**<u>Contested Issues of Law Proposed by Defendants</u>**

1. Neither residual nor token use nor promotional use of goods in a different course of trade constitute proper 'use' under the Lanham Act." *Miyano Mach. USA, Inc. v. MiyanoHitec Mach., Inc.,* 576 F.Supp.2d 868, 881 (N.D. Ill. 2008).

2. Under the "tacking" doctrine, "minor changes in a mark which do not change the overall commercial impression created on buyers" do not lead to abandonment of the prior, similar mark. *Sands, Taylor & Wood Co.,* 978 F.2d at 955;*MB,* 2003 WL 21462501, at *10(7th Cir. 1992). As long as the key elements of the mark remain, it has not been abandoned. *Id.* Similarly, the Trademark and Trial Appeals Board has stated that a change in a mark is permissible so long as it does not involve a "material alteration." *Paris Glove of Canada v. SBC/Sporto Corp.,* 2007 Wl 2422997, 84 U.S.P.Q.2d 1856 (TTAB 2007). A material alteration exists if the two marks do not "create the same general commercial impression." *Id. citing* 3*McCarthy on Trademarks and Unfair Competition* §§ 19:58.50, 19:133 (4th Ed.2007);*see also Brookfield Commc'n, Inc. v. West Coast Entm't Corp.,* 174 F.3d 1036, 1048 (9th Cir.1999) ("tacking should be allowed if two marks are so similar that consumers would regard them as essentially the same").

3. "An assignment in writing is not necessary to transfer common law

rights in a trademark," *McCarthy* § 18.4.

4. An act which a party asserts is an agreement to transfer trademark rights will be construed as an assignment if the "conduct manifest[s] agreement" to transfer the rights. *TMT N. Am., Inc. v. Magic Touch GmbH,* 124 F.3d 876, 884 (7th Cir. 1997).

5. An assignment is not in gross if it continues the association of the 'trademark with the very goods which created its reputation. *International Cosmetics Exchange, Inc. v. Gapardis Health & Beauty, Inc.*, 303 F.3d 1242, 1246 (11th Cir. 2002) "[C]ourts now evaluate each assignment in light of the circumstances of the particular case, including both the terms of the transfer and the nature of the assignee's subsequent use. Recent decisions recognize that the central enquiry is whether the use of the mark by the assignee is likely to confuse prospective purchasers by departing from the expectations created by the presence of the trademark. The traditional requirement of accompanying transfer of goodwill can thus be understood as requiring that the assignment not disrupt the existing significance of the mark to consumers. *Id.* (alteration in original) (quoting RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 34, cmt. b (1995)).

6. Until all claims against all Defendants are resolved, a Plaintiff had an affirmative duty to preserve evidence. The law imposes a duty upon litigants to keep evidence that they know, or reasonably should know, are relevant to the matter. *Wilson v. Wal-Mart Stores, Inc.*, No. 5:07-cv-394-Oc-10GRJ, 2008 WL

4642596, at *2 (M.D.Fla. Oct. 17, 2008) (footnote omitted). See also *Managed Care Solutions, Inc. v. Essent Healthcare, Inc*., 736 F. Supp. 2d 1317 (S.D.Fla. 2010), see also*Southeastern Mechanical Services, Inc. v. Brody,* No. 8:08-CV-1151-T-30EAJ, 2009 WL 2242395, at *2 (M.D.Fla. Jul. 24, 2009) (noting that "[o]nce a party files suit or reasonably anticipates doing so... it has an obligation to make a conscientious effort to preserve electronically stored information that would be relevant to the dispute.").

7. "Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *Graff v. Baja Marine Corp*., 310 F. App'x 298, 301 (11th Cir. 2009) quoting *West v. Goodyear Tire & Rubber Co*., 167 F.3d 776, 779 (2d Cir. 1999).

8. A party's failure to preserve evidence rises to the level of sanctionable spoliation when the absence of that evidence is predicated on bad faith," such as when a party purposely loses or destroys relevant evidence. *Bashir v. Amtrak*, 119 F.3d 929, 931 (11th Cir.1997).

9. This circuit does not require a showing of malice in order to find bad faith. *Mann v. Taser Intern., Inc.*, 588 F. 3d 1291 ( 11th Circuit 2009).

10. If direct evidence of bad faith is unavailable, bad faith may be founded on circumstantial evidence, if the following criteria are met: (1) evidence once existed that could fairly be supposed to have been material to the proof or defense of a claim at issue in the case; (2) the spoliating party engaged in an

affirmative act causing the evidence to be lost; (3) the spoliating party did so while it knew or should have known of its duty to preserve the evidence; and (4) the affirmative act causing the loss cannot be credibly explained as not involving bad faith by the reason proffered by the spoliator. *Doe v. Miami-Dade County*, 797 F. Supp. 2d 1296 (SD Florida 2011).

11. In this circuit, sanctions for spoliation of evidence may include (1) dismissal of the case [or default judgment against defendant];(2) exclusion of expert testimony; or (3) a jury instruction on spoliation which raises a presumption against the spoliator. *Flury v. Daimler Chrysler Corp.,* 427 F.3d 939, 945 (11th Cir. 2005*)* .

## XIII. RULES OF EVIDENCE AND CIVIL PROCEDURE

The parties are not aware of any disputes relating to the application of the Rules of Evidence or Rules of Civil Procedure, other than those set forth in the parties' Motions in Limine.

## XIV. PENDING MOTIONS

1. Plaintiff's Motion in Limine No. 1 to Preclude Defendants from Presenting Evidence or Argument regarding MEC's SEC Filings.

2. Plaintiff's Motion in Limine No. 2 to Preclude the Unsupported Testimony of Yosef Amar regarding Prior Use of a "Three Skinny Lines" Design.

3. Plaintiff's Motion in Limine No. 3 to Exclude Defendants from Presenting Evidence or Argument that MEC Did Not Use Its M Claw Trademark Before Filing Its "Intent-to-Use" Trademark Applications. (Unopposed).

4. Plaintiff's Motion in Limine No. 4 to Exclude the Court's Orders Denying Preliminary Injunction and Denying Reconsideration.

5. Plaintiff's Motion in Limine No. 5 to Exclude Defendants' Evidence of Third-Party "Claw" Trademark Registrations and Non-Trademark Uses.

6. Plaintiff's Motion in Limine No. 6 to Exclude Defendants from Presenting Evidence or Argument that MEC's M Claw Trademark is Generic for Clothing or Descriptive of Clothing. (Unopposed).

7. Defendants' Motion in Limine to Exclude Evidence and Argument about David Baksht's Prior Business Activities.

## XV. JURY INSTRUCTIONS, VERDICT FORM AND VOIR DIRE

The parties' Proposed Jury Instructions, Verdict Form and Proposed Voir Dire Questions are attached hereto as Appendices C-E, respectively.

Respectfully submitted this 10th day of February, 2013.

/s/ *Paul A. Stewart*
JOHN B. SGANGA, JR. ESQ.
(Admitted *Pro Hac Vice*)
john.sganga@kmob.com
PAUL A. STEWART, ESQ.
(Admitted *Pro Hac Vice*)
paul.stewart@kmob.com
LAUREN K. KATZENELLENBOGEN, ESQ.
(Admitted *Pro Hac Vice*)
lauren.katzenellenbogen@kmob.com
KNOBBE, MARTENS, OLSON & BEAR, LLP
2040 Main Street, Fourteenth Floor
Irvine, California 92614
(949) 760-0404 Telephone
(949) 760-9502 Facsimile

Lead Trial Counsel for Plaintiff,
MONSTER ENERGY COMPANY f/k/a
HANSEN BEVERAGE COMPANY d/b/a
MONSTER BEVERAGE COMPANY

– and –

CHARLES T. WELLS, ESQ.
Florida Bar No.: 0086265
charles.wells@gray-robinson.com
RICHARD E. MITCHELL, ESQ.
Florida Bar No.: 0168092
rick.mitchell@gray-robinson.com
GRAYROBINSON, P.A.
301 East Pine Street, Suite 1400
Orlando, Florida 32801
(407) 843-8880 Telephone
(407) 244-5690 Facsimile

Local Counsel for Plaintiff,
MONSTER ENERGY COMPANY f/k/a
HANSEN BEVERAGE COMPANY d/b/a
MONSTER BEVERAGE COMPANY

/s/ *Lawrence A. Farese*
ELLIOT J. BLUMENTHAL, ESQ.
*(Pro Hac Vice Pending)*
*Elliot@eblumenthallaw.com*
LAW OFFICES OF ELLIOT J.
BLUMENTHAL, PLLC
483 Chestnut Street
Cedarhurst, New York 11516
(516) 295-0903 Telephone
(516) 706-3963 Facsimile

Lead Trial Counsel for Defendants,
CONSOLIDATED DISTRIBUTORS,
INC. and DAVID BAKSHT

- and –

LAWRENCE A. FARESE
Florida Bar No. 252808
LAFarese@rkmc.com
ROBINS, KAPLAN, MILLER &
CIRESI L.L.P.
711 Fifth Avenue South, Suite 201
Naples, Florida 34102
(239) 430-7070 Telephone
(239) 213-1970 Facsimile

Local Counsel for Defendants,
CONSOLIDATED DISTRIBUTORS,
INC. and DAVID BAKSHT

**CERTIFICATE OF SERVICE**

I hereby certify that on this 10th day of February 2013, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system.

*/s/ Paul A. Stewart*
PAUL A. STEWART, ESQ.